**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MERIT STREET MEDIA, INC., [1] | Case No. 25-80156 (SWE) |
| Debtor. | (Emergency Hearing Requested) |

**DECLARATION OF LISA K. LANSIO
IN SUPPORT OF DEBTOR'S EMERGENCY MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
(A) POSTPETITION FINANCING, AND (B) THE USE OF CASH COLLATERAL;
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1764, I, Lisa K. Lansio, declare as follows under the penalty of perjury:

1.  I am a Senior Director at Triple P Securities, LLC ("Triple P Securities"), the proposed investment banker to the debtor and debtor-in-possession (the "Debtor" or the "Company") in the above-captioned chapter 11 case (the "Chapter 11 Case"). Triple P Securities has its principal place of business at 640 Fifth Ave, 10th Floor, New York, New York 10019. Triple P Securities and Triple P RTS, LLC, the Debtor's proposed restructuring advisor ("Triple P RTS" and together with Triple P Securities, "Portage Point") are each wholly owned by Portage Point Partners, LLC. I am authorized to submit this declaration ("Declaration") in support of the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superprioriy Administrative Expense Claims; (III) Modifying the Automatic Stay;*

---

[1] The last four digits of the Debtor's federal tax identification number are 8890. The Debtor's mailing address is 5501 Alliance Gateway Fwy Fort Worth, TX 76177.

*(IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "DIP Motion").[2]

2.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtor's operations and finances gleaned during the course of my engagement with the Debtor, my discussions with the Debtor's senior management, other members of the Portage Point team, and the Debtor's other advisors, as well as my review of relevant documents or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or opinion.

## Background and Qualifications

3.      Portage Point is a business advisory, interim management, investment banking and financial services firm whose professionals have a wealth of experience in providing financial advisory, restructuring advisory, and turnaround management services and which enjoys an excellent reputation for services it has rendered on behalf of debtors and creditors throughout the United States, both in chapter 11 cases and out-of-court restructurings. The Portage Point team is comprised of operators and advisors with proven skills necessary to identify, preserve and create value in the most challenging and complex situations.  Portage Point's professionals have extensive experience across a wide range of industries.

4.      Portage Point's professionals have assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous cases, including the following: *In re Omega Therapeutics, Inc.*, Case No. 25-10211 (BLS)

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Motion, the proposed interim order attached as Exhibit A thereto (the "Interim DIP Order"), and the *Declaration of Gary Broadbent, Chief Restructuring Officer of the Debtor, in Support of the Debtor's Chapter 11 Proceeding* (the "First Day Declaration"), filed contemporaneously herewith, as applicable.

2

(Bankr. D. Del. Feb. 10, 2025); *In re Dig. Media Solutions, Inc.*, Case No. 24-90468 (ARP) (Bankr. S.D. Tex. Sept. 11, 2024); *In re Blink Holdings, Inc. et al.*, Case No. 24-11686 (JKS) (Bankr. D. Del. Aug. 12, 2024); *In re DRF Logistics, LLC*, Case No. 24-90447 (CML) (Bankr. S.D. Tex. Aug. 8, 2024); *In re Supply Source Enters., Inc.*, Case No. 24-11054 (BLS) (Bankr. D. Del. May 21, 2024); *In re Appgate, Inc.*, Case No. 24-10956 (CTG) (Bankr. D. Del. May 6, 2024); *In re Ambri, Inc.*, Case No. 24-10952 (LSS) (Bankr. D. Del. May 5, 2024); *In re Nogin, Inc.*, Case No. 23-11945 (CTG) (Bankr. D. Del. Dec. 5, 2023); *In re Benitago Inc.*, Case No. 23-11394 (SHL) (Bankr. S.D.N.Y Aug. 31, 2023); *In re Plastiq*, Case No. 23-10174 (BLS) (Bankr. D. Del. June 19, 2023); *In re Big Village Holding LLC*, Case No. 23 10174 (CTG) (Bankr. D. Del. Mar. 6, 2023); *In re Performance Powersports Grp. Inv., LLC*, Case No. 23-10047 (LSS) (Bankr. D. Del. Jan. 16, 2023); *In re VJGJ, Inc. (f/k/a Teligent, Inc.)*, Case No. 21-11332 (BLS) (Bankr. D. Del. Oct. 14, 2021); *In re Alex and Ani, LLC*, Case No. 21-10918 (CTG) (Bankr. D. Del. July 15, 2021); *In re Alamo Drafthouse Cinemas Holdings, LLC*, Case No. 21-10474 (MFW) (Bankr. D. Del. Mar. 29, 2021); *In re LGA3 Corp.*, Case No. 20-11456 (LSS) (Bankr. D. Del. June 1, 2020).

5.      Prior to joining Portage Point, I was a Vice President in the Restructuring Group at Lazard Frères & Co. LLC ("Lazard").  Prior to joining Lazard, I was a corporate restructuring and bankruptcy lawyer, most recently at Latham & Watkins LLP.  I have approximately 10 years of experience in corporate restructuring, and I have advised companies and creditors in a broad range of restructuring, reorganization, merger & acquisition, and capital raising transactions in traditional and distressed situations across a variety of industries.

6.      I have a Juris Doctorate from New York University School of Law and a Bachelor of Arts from Brown University. I hold FINRA Series 79, 63 and 24 licenses.

3

**Portage Point's Retention**

7.      Prior to the Petition Date, in June of 2025, the Debtor retained Portage Point to provide financial advisory and investment banking services in connection with the Chapter 11 Case.  In this role, Portage Point has, among other things (i) assisted the Debtor in assessing its liquidity, (ii) reviewed and analyzed the Debtor's financing needs, (iii) assisted the Debtor with negotiating and documenting the DIP Facility, including assisting management in developing the Approved Budget, (iv) solicited parties for debtor-in-possession financing proposals, and (v) assisted the Debtor and its advisors in the preparation for the commencement of this Chapter 11 Case. Throughout its engagement, Portage Point has worked closely with the Debtor's management and other restructuring professionals and has become knowledgeable and familiar with the Debtor's liquidity needs and business operations.

**Background to the Proposed DIP Financing**

8.      As described in detail in the First Day Declaration, the Debtor has incurred substantial losses through the Petition Date, which have been exacerbated by its ongoing litigation disputes with TBN and PBR. It is my understanding that from February 2025 through May 2025, the Company actively sought potential equity investors to provide sufficient capital to continue meeting its operating expenses and the costs associated with the ongoing TBN dispute and PBR Arbitration, which is discussed in greater detail in the First Day Declaration. Throughout this period, it is my understanding that Peteski provided significant funding to cover the Company's expenses.  Despite these substantial capital infusions from Peteski, it is my understanding that the harm caused by TBN and PBR ultimately rendered it impossible for the Company to close an equity round, and the Company was forced to turn its focus to evaluating other strategic alternatives, including the filing of a chapter 11 case.  It is my understanding that after considering various strategic alternatives, the Company determined that a chapter 11 filing

was the best available option.

9.      In light of the Company's severely strained liquidity position and the lack of available third-party capital, the Company engaged in extensive, arms-length negotiations with Peteski to provide emergency bridge financing (the "Bridge Loan") to provide funding for the Company to prepare for this Chapter 11 Case and commence good faith negotiations with key parties.

### The Debtor's Efforts to Obtain Postpetition Financing

10.      To provide adequate liquidity runway to effectuate the Chapter 11 Case, Peteski has committed to provide the Debtor with up to approximately $21.4 million of debtor-in-possession financing ("DIP Financing") on a secured basis in the form of a delayed draw term loan facility (the "DIP Facility") comprising (A) approximately $13.4 million of new money loans and (B) approximately $7.9 million of rolled-up Bridge Loans (upon entry of a final order approving DIP Financing).

11.      In addition, at the direction of the Debtor, Portage Point solicited third-party interest in providing DIP Financing to the Debtor.  Specifically, Portage Point contacted eight institutions that routinely provide debtor-in-possession financing to solicit offers to provide the Debtor with DIP Financing to support this Chapter 11 Case. The Debtor did not receive any proposals for postpetition financing from third parties.  The parties contacted by Portage Point indicated they were unwilling to extend financing to the Debtor for several reasons including (i) concerns around whether the DIP financing would be repaid in full given the Company was not entering chapter 11 with a prepackaged or pre-arranged chapter 11 plan or stalking horse purchase agreement, (ii) the size of the DIP Facility and proposed limited duration of the Chapter 11 Case made it challenging for a third-party to achieve sufficient economic returns, and (iii) the nature of the Company's assets and the fact that the Company had limited

to no accounts receivable and receipts meant that the DIP recovery may be compromised in a downside scenario. Furthermore, the adjudication of the Preference Claim Count created uncertainty for potential third-party DIP lenders.

12.     Accordingly, the Debtor's financing process focused primarily on developing an actionable proposal with the DIP Lender.  Importantly, the Debtor established safeguards aimed at protecting the integrity of its process as it negotiated with Peteski.  Among other things, I understand the Company appointed Gary Broadbent as independent director and the sole member of a special committee of the Company's board of directors (the "Special Committee").  The Debtor provided regular updates to the Special Committee, which oversaw the negotiations regarding the terms of the DIP Financing.  The Debtor and Peteski also engaged separate advisors.  The parties and their advisors negotiated multiple iterations of a term sheet outlining the terms of the DIP Financing (the "DIP Term Sheet").

13.     In light of the foregoing, I believe the Debtor took the steps necessary to ensure negotiations remained independent, notwithstanding the relationship between the Debtor and Peteski.  I, therefore, believe the process to obtain the DIP Financing was conducted in good faith and at arm's length.

**Terms of DIP Financing**

14.     Upon receipt of the DIP Term Sheet from Peteski, the Debtor and its professionals sought to negotiate the best available terms with Peteski.  Leading up to the commencement of this Chapter 11 Case, the Debtor and Peteski, with the assistance of their respective advisors, negotiated the terms and provisions of the DIP Financing. The negotiations resulted in concessions made by Peteski, including increasing the size of the DIP Facility, reducing the amount of fees and interest, and other key provisions.

15.     Based on my experience in representing debtors and creditors in chapter 11 cases and distressed financial transactions, I believe that the terms of the proposed DIP Facility are reasonable under the circumstances.  I believe the interest payments and fees contemplated by the DIP Facility are comparable to other DIP financings and generally consistent with market terms for companies facing similar circumstances as the Debtor.  The fees are an integral component of the overall terms of the DIP Facility and were required by the DIP Lender as consideration for the extension of postpetition financing.  Additionally, the Roll-Up of the Prepetition Bridge Loans into the DIP Facility upon entry of the Final Order was negotiated by the parties and is an integral component of the overall terms of the DIP Facility required by the DIP Lender as consideration for the extension of postpetition financing, and I understand that Peteski, in its capacity as Prepetition Bridge Lender, would not otherwise consent to the use of their Cash Collateral, or, in its capacity as DIP Lender, would not be willing to provide the DIP Facility or extend credit to the Debtor thereunder without the conversion of the Roll-Up Loan.  The contemplated fees and other terms of the DIP Financing (including the Roll-Up) were the subject of arm's-length and good faith negotiations.

16.     Based on my understanding of the Debtor's liquidity needs, as described further in the First Day Declaration, as well as our recent inquiries to potential third-party DIP financing sources, I do not believe alternative sources of postpetition financing are readily available to the Debtor on terms better than or comparable to the DIP Facility.

## Conclusion

17.     For all the reasons stated above, I believe that the DIP Facility is in the best interests of the Debtor's estate and is a sound exercise of the Debtor's business judgment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 2, 2025                                          Respectfully Submitted,

                                                            */s/ Lisa K. Lansio*
                                                            Lisa K. Lansio
                                                            Senior Director, Triple P Securities, LLC