**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MERIT STREET MEDIA, INC.[1] | Case No. 25-80156 (SWE) |
| Debtor. | (Emergency Hearing Requested) |

**DECLARATION OF GARY BROADBENT, CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PROCEEDING**

I, Gary Broadbent, hereby declare under penalty of perjury as follows:

1.     I am the Independent Director and Chief Restructuring Officer ("CRO") of the above-captioned debtor (the "Debtor" or "Merit Street").  I have served as the Independent Director and CRO for the Debtor since June 18, 2025.  Since September 2024, I have served as Chief Legal Officer at LifeScan, Inc., a global blood glucose monitoring company.  I serve as Independent Director to Royal Greens, Inc., a greenhouse producer of lettuce and leafy greens.  I served as the Chief Restructuring Officer, Chief Legal Officer and Corporate Secretary of AppHarvest, Inc., a publicly-traded high-tech indoor farming company, in 2023, Executive Vice President, General Counsel, and Corporate Secretary, from 2022 to 2023, and Senior Vice President and Deputy General Counsel from 2021 to 2022.  In 2022, I separately served as Senior Vice President, Deputy General Counsel, and Assistant Corporate Secretary to Rubicon Technologies, Inc., a publicly traded software company focused on waste management and recycling.  I served as Chief Wind Down Officer, General Counsel and Secretary, beginning in 2020, and prior to that, Executive Vice President, General Counsel, and Secretary at GenCanna

---

[1] The last four digits of the Debtor's federal tax identification number are 8890.  The Debtor's mailing address 5501 Alliance Gateway Fwy, Fort Worth, TX 76177.

Global, Inc., a hemp company, beginning in 2019.  In addition, from 2018 to 2019, I served as General Counsel, Vice President of Human Resources, and Secretary of Mission Coal Company. From 2010 to 2018, I served in various legal, financial and corporate roles at Murray Energy Corporation, a large coal mining company.  In total, I have over a decade of experience counseling companies similar to Merit Street and, where necessary, successfully transitioning companies through a restructuring or sale.

2.      In my capacity with Merit Street, I am familiar with the facts and circumstances set forth herein, which are based on my actual knowledge as well as information and advice provided to me by the Debtor's management, professionals, attorneys, and advisors.  In addition, the statements made herein are based, in whole or part, upon my review of public and non-public documents and my discussions with other members of Merit Street's management team and advisors on whom I have relied.  I am generally familiar with Merit Street's businesses, financial condition, day-to-day operations, and the circumstances leading to the commencement of this chapter 11 case (the "Chapter 11 Case").  Except as otherwise noted, I have personal knowledge of the matters set forth in this declaration (this "Declaration") or have gained knowledge of such matters from Merit Street's employees, consultants or retained advisers in the ordinary course of my responsibilities.  I believe, to the best of my knowledge, that the facts and circumstances set forth herein are true and correct.  References to bankruptcy, the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanation provided by, and the advice of, counsel to Merit Street.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor.  If called upon to testify, I would testify competently to the facts set forth herein.

3.      On July 2, 2025 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court"). I am submitting this Declaration for the purpose of apprising the Court and other parties in interest of the history of the Debtor, its capital structure and debt, and the circumstances that led to the commencement of this Chapter 11 Case.

4.      To better assist the Court, this Declaration is organized in four sections. Part I provides background information on Merit Street's corporate history, operations and assets. Part II outlines Merit Street's capital structure and other debt obligations. Part III describes the circumstances leading to the filing of this Chapter 11 Case. Part IV provides information in support of the motions and other applications filed with the Court, including the "first day motions" (the "First Day Motions"). The Debtor intends this declaration to constitute the "First Day Declaration" in this Chapter 11 Case.

## INTRODUCTION

5.      As detailed more fully in Part I below, Merit Street was formed in 2023 and in April 2024 Merit Street launched MeritTV—a Texas-based multicast television network and streaming service to provide a platform to embrace core American values of hard work, talent, and respect. MeritTV is available nationwide 24/7 via FTA Broadcast TV, Basic Cable, Satellite & FAST[2], among other platforms. As detailed more fully in Part III below, Merit Street has faced operating challenges, starting since its launch, largely due to Trinity Broadcasting Network of Texas, Inc. ("TBN")'s failed performance under its contracting obligations under the Joint Venture

---

[2] FAST stands for Free Ad-Supported Streaming Television, a type of digital television service that delivers live and on-demand content to viewers over the internet, without a subscription fee.

Agreement (as defined below).  As a result, beginning in August 2024, Merit Street has explored various litigation and financial options to maximize the value of its existing assets.

6.      As part of this process, Merit Street undertook steps to reduce costs and preserve liquidity and began engaging with major creditor constituencies to determine how best to maximize the value of its intellectual property, television network, and streaming service.

7.      Following several months of strategic planning, which led to the conclusion that no viable value-maximizing alternatives existed, Merit Street has launched this Chapter 11 Case to (a) centralize the resolution of all Merit Street's open disputes in a coordinated fashion, preventing a race to the courthouse and ensuring equitable treatment of creditors under the Court's supervision, and (b) facilitate the sale or orderly disposition of some or all of the Debtor's assets.

## BACKGROUND

### I.      Merit Street History and Corporate Structure

#### A.  History

8.      As of January 10, 2023, Merit Street and TBN, a Christian media outlet, entered into an agreement, pursuant to that certain *Binding Letter of Intent* (the "Joint Venture Agreement") through which Dr. Phil McGraw's production company, Peteski Productions, Inc. ("Peteski"), and TBN would launch a new television network in 2024.[3]  Under the Joint Venture Agreement, ownership of Merit Street would be allocated 70% to TBN, and 30% to Peteski.

9.      Among other things, the Joint Venture Agreement obligated TBN to provide Merit Street—at no cost—with all of the distribution and production services necessary to launch and operate the new television network, which included (a) studio production staff members,

---

[3] In February 2023, TBN formed APG Ventures, Inc. as a Delaware corporation to serve as the "NewCo" referenced in the Formation Agreement.  APG Ventures, Inc. changed its name to Merit Street Media, Inc. in March 2024. In February 2025, Merit Street re-incorporated in Texas.

(b) production facilities and all other infrastructure needed to deliver the network, (c) a license to all of TBN's content, and (d) most importantly, a distribution network of local broadcast TV stations, national networks, cable, satellite, and FAST distribution footprint.  In return, Peteski was responsible for delivering certain of Dr. Phil McGraw's programming to air on the new network. The Joint Venture Agreement provided that Peteski would receive approximately $50 million per year for 10 years for these services.

10.    This division of responsibilities was designed to ensure that each party contributed its unique strengths to Merit Street, with Peteski focusing on content creation and TBN providing the infrastructure and operational support required to launch and sustain a successful commercial television network.

11.    Following months of preparation, in November 2023, Peteski and TBN announced Merit Street's launch.

12.    On April 2, 2024, MeritTV debuted to a record 100 million TV homes and connected devices.  MeritTV was widely available for free over-the-air television, and distributed to consumers via their subscriptions to cable and satellite companies as well as for free via FAST platforms.

**B.  Corporate Structure**

13.    Currently, Peteski owns 66.5% of Merit Street, TBN owns 28.5%, and SHG Partnership, LLC owns 5%.

## Entity Structure



1. The CrossSeed, Inc. note was assigned to TCT Ministries, Inc. on March 9, 2025. The note converts into a fixed number of shares at the option of the note holder which may be exercised only at the time of an equity raise.

### C. Board of Directors / Independent Directors

14.     In connection with the Debtor's evaluation of strategic alternatives, Merit Street appointed me as an independent director to lead efforts to evaluate strategic alternatives and appointed me as independent director and the sole member of a special committee of Merit Street board (the "Special Committee"), effective as of June 18, 2025.  Dr. Phil McGraw is the only other member of the board of Merit Street.  As independent director and sole member of the Special Committee, I am responsible for establishing, approving, modifying, monitoring, and directing the process and procedures related to the review and evaluation of a possible restructuring transaction and/or any alternatives thereto, including, among other things, the authority to determine whether or not to proceed with any such process, procedures, review or evaluation.

## II.      Overview of Merit Street's Business and Assets

### A.  Overview of "Carriage"

15.     It is my understanding that in broadcasting, local stations may negotiate for "carriage" between cable, satellite, or other pay-TV providers to grant rights to carry their content or channels.  In other words, for a network, such as MeritTV, to receive air time on television, it must negotiate "shelf space" with distributors such as local television stations or cable providers, national satellite companies, and national streaming services.  This shelf space is lucrative and can be costly.

16.     Here, TBN agreed to ensure that Merit Street received carriage at no cost to Merit Street.  Specifically, pursuant to the Joint Venture Agreement, TBN committed, among other things, to provide Merit Street access to its vast nationwide audience via its own local television station inventory and those stations' must carry rights.  TBN also unilaterally elected to pay for carriage to third-parties—both independently-owned local television stations and cable and satellite companies—where TBN did not have carriage itself, again at no cost to Merit Street.  As described in further detail herein, TBN failed to uphold its responsibilities to provide carriage at no cost to Merit Street, and ultimately caused Merit Street to incur considerable carriage obligations.  TBN caused Merit Street to execute agreements to air Merit Street's programming that have total obligations of approximately $96 million.

### B.  Merit Street's Facilities

17.     As part of the Joint Venture Agreement, TBN was required to provide Merit Street at no cost with unfettered use of a commercial production facility in Dallas-Fort Worth, including five acres of live TV, filmmaking, digital studios, as well as staffing and managing the majority of network operating functions (both infrastructure and personnel).

18.     TBN provided its production facility to film *Dr. Phil Primetime*, *Merit Street TV News,* and other programming.  However, TBN caused Merit Street to sign a five-year, multi-million dollar lease with TBN to use that production facility, contrary to the Joint Venture Agreement.

### C.  Merit Street's Talented Employees

19.     Of critical importance to Merit Street's success is its human capital—*i.e.*, the employees who bring a wealth of knowledge and experience to Merit Street's operations and allow the network to produce content 24/7.  As of the Petition Date, Merit Street employed approximately 66 full-time salaried employees.  Merit Street's employees include show hosts, production staff, maintenance, and many other critical personnel.  In addition, as of the Petition Date, Merit Street supplemented its employee workforce with an additional estimated 30 independent contractors. None of these groups is represented by a labor union.

### D.  PBR Rights Agreement

20.     On May 3, 2024, Merit Street, and Professional Bull Riders, LLC ("PBR") entered into a four-year media rights agreement pursuant to the certain *Media Rights Agreement* (the "PBR Agreement") for the license by Merit Street to broadcast certain PBR programming.  Through the PBR Agreement, Merit Street aimed to (a) expand its viewership and revenue through PBR's sports programming and (b) broaden its advertising potential.  Nonetheless, PBR's production and promotion lagged and PBR failed to perform its obligations under the PBR Agreement.

21.     On October 2, 2024, PBR sent Merit Street a notice of breach of contract alleging that Merit Street failed to timely pay $3.5 million in monthly rights fees installments.  On November 2, 2024, PBR announced that it had terminated the PBR Agreement, citing Merit Street's failure to pay the required installment fees.  On November 2, 2024, PBR filed a claim

against Merit Street for all fees owed, and on November 18, 2024, Merit Street counterclaimed against PBR for Fraud and Fraudulent Inducement, Fraud by Omission (Nondisclosure), Negligent Misrepresentation, Breach of Fiduciary Duty, Declaratory Judgment, and Breach of Contract, citing PBR's failure to meet its obligations under the PBR Agreement (the "PBR Arbitration").

### E.  Other Assets

22.    Merit Street currently holds other assets, including the MeritTV+ phone application, customer data, broadcasting equipment, and TBN's obligation to license all TBN content.

### PREPETITION CAPITAL STRUCTURE

| Debtor Obligations | | | |
|---|---|---|---|
| **Instrument** | **Principal Amount Outstanding** | **Maturity** | **Lender / Counterparty** |
| *I. Secured Obligations* | | | |
| Peteski Bridge Loan | $7,966,636 | Mar 2026 | Peteski Productions, Inc. |
| *II. Unsecured Obligations* | | | |
| $25MM Convertible Promissory Note* | $25,000,000 | Sep 2026 | TCT Ministries, Inc. (an affiliate of TBN) |
| Peteski Convertible Note | $11,407,166 | Jan 2026 | Peteski Productions, Inc. |
| Peteski Convertible Note | $14,000,000 | Jan 2026 | Peteski Productions, Inc. |
| Ribman Trust Note | $5,000,000 | Jan 2026 | Darcy Lynn Ribman 1997 Trust |
| **Total** | **$63,373,802** | | |

*Subject to avoidance action regarding the security interest contained in such note.

## I.    Convertible Promissory Notes

### A.  CrossSeed Note

23.    On September 9, 2024, the Debtor entered into that certain *Convertible Promissory Note*, dated September 9, 2024 (as amended, restated, supplemented, or otherwise modified from time to time), by and among the Debtor, as issuer, and CrossSeed, Inc. ("CrossSeed"), as

noteholder thereto, which aggregate principal amount is currently approximately $25 million (the "CrossSeed Convertible Note").    On March 5, 2025, CrossSeed assigned the CrossSeed Convertible Note to TCT Ministries, Inc ("TCT").  The CrossSeed Convertible Note is convertible to equity, at the option of the noteholder, at a fixed conversion price of $425 million, which may be exercised only at the time of an equity raise of qualified financing.  The CrossSeed Convertible Notes bear interest at a rate of 12% simple interest, payable on the maturity date of September 7, 2026.

24.    The Debtor has filed contemporaneously herewith an *Adversary Complaint for Declaratory and Monetary Relief* (the "Adversary Complaint") against TBN and TCT asserting various claims against both parties.  The Debtor alleges in the Adversary Complaint—among other things—that, because TCT did not file a financing statement until May 2025, the effective date of the purported transfer of security interest in the CrossSeed Convertible Note to TCT was the date that TCT perfected the CrossSeed Convertible Note—May 27, 2025 (the "Preference Claim Count").  As a result, because the transfer occurred within 90 days prior to the Petition Date, it constitutes an avoidable preference under 11 U.S.C. § 547(b).

**B. Ribman Trust Note**

25.    On December 27, 2024, the Debtor entered into that certain *Convertible Promissory Note*, dated December 27, 2024 (as amended, restated, supplemented, or otherwise modified from time to time), by and among the Debtor, as issuer, and DARCY LYNN RIBMAN 1997 Trust ("Ribman"), as noteholder thereto, pursuant to which Ribman purchased approximately $5.0 million of aggregate principal amount of convertible notes, which aggregate principal amount is currently approximately $5.0 million (the "Ribman Convertible Note").  The Ribman Convertible Note is unsecured.  The Ribman Convertible Note bears a simple interest at a rate of 8% per annum,

payable by the Debtor at any time on or after January 1, 2026 at the Debtor's election or upon demand by the holder(s) of 75% of the aggregate principal amount of the Ribman Convertible Note.

### C. Peteski Convertible Notes

26.     On February 28, 2025, the Debtor entered into that certain *Convertible Promissory Note*, dated February 28, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among the Debtor, as issuer, and Peteski, as noteholder thereto, pursuant to which Peteski purchased approximately $11,407,166 of aggregate principal amount of convertible notes (the "First Peteski Convertible Note").  The Debtor subsequently entered into that certain *Convertible Promissory Note*, dated June 1, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among the Debtor, as issuer, and Peteski, as noteholder thereto, pursuant to which Peteski purchased approximately $14.0 million of aggregate principal amount of convertible notes (the "Second Peteski Convertible Note" and together with the First Peteski Convertible Note, the "Peteski Convertible Notes").  The Peteski Convertible Notes convert to equity at the valuation of the next equity raise.  The Peteski Convertible Notes are senior and unsecured.  The Peteski Convertible Notes bear interest at a rate of 8% simple interest, payable on the maturity date of January 1, 2026.

### D. Bridge Loan

27.     On June 30, 2025, the Debtor entered into that certain *Loan and Security Agreement*, effective as of June 10, 2025[4] (the "Bridge Agreement") with Peteski, as lender, in the original principal amount of $7,966,636 (the "Bridge Loan").  The Bridge Loan is secured by a

---

[4] As described in the Bridge Agreement, on June 10, 2025, Peteski advanced a portion of the Bridge Loan to the Debtor in an amount equal to $1,666,636.00.  On June 24, 2025 and June 30, 2025, Peteski subsequently advanced $1,300,000 and $5 million, respectively, to the Debtor.

lien on substantially all of the Debtor's assets, has an interest rate of 10% per annum, and a maturity date of the earlier of (a) March 30, 2026 and (b) the acceleration of obligations under the Bridge Agreement (to be described in further detail below).

### E. Trade and Related Debt

28.     As of the Petition Date, the Debtor has trade and other related debt, consisting primarily of accounts payable to various trade creditors and service providers.

**KEY EVENTS LEADING TO CHAPTER 11 FILING**

29.     As set forth in more detail below, Merit Street's operational challenges, along with its ongoing litigation disputes with TBN and PBR, have required it to engage advisors to explore strategic alternatives, negotiate DIP Financing (as defined below), and ultimately, to file this Chapter 11 Case, all in an effort to maximize the value of its assets for the benefit of its creditors and all parties in interest.  Additionally, the Debtor is seeking to use the forum of Bankruptcy Court to resolve its pending litigation through one central forum and to avoid a proverbial "race to the courthouse" given the myriad asserted liabilities asserted against the Debtor.

### I.     Merit Street's Declining Liquidity

30.     From February 2025 through May 2025, Merit Street actively sought out potential equity investors.  Throughout these negotiations, Merit Street was still required to meet its payroll obligations and distribution fees, as well as cover other operating expenses.  On each occasion, Peteski provided the necessary funding, operating under the expectation that additional funding through an equity raise would soon be completed.  During this period, Peteski advanced a total of approximately $25 million to Merit Street.

31.     Despite these significant debt infusions from Peteski, the harm caused by TBN and PBR ultimately rendered it impossible for Merit Street to close an equity round.  Specifically,

Merit Street tried to pursue interested potential investors as well as third-party financing. The ongoing operational struggles, however, forced Merit Street's management to redirect its efforts towards ensuring the continued viability of the company. Given this unfortunate sequence of events, Merit Street soon realized that its liquidity situation was not sustainable on a long-term basis, particularly given the obvious challenges of receiving emergency out-of-court financing from Peteski for an unlimited period of time.

### A.    **TBN Litigation**

32.    Almost immediately after Merit Street's formation in 2023, it is my understanding that TBN began neglecting its contractual obligations.

### i.  **Failure to Provide Carriage at No Cost to Merit Street**

33.     Per the Joint Venture Agreement, TBN was specifically responsible for ensuring broad carriage of Merit Street programming.

34.    Instead, however, it is my understanding that TBN caused Merit Street to enter into agreements with local television stations, cable, and national satellite providers to broadcast Merit Street's content – with total expenses during the life of those agreements of approximately $96 million. I understand that, although TBN initially paid the distribution fees for several months under these agreements, it then ceased making the payments. Merit Street was thus forced to pay for the fees itself. Merit Street was unable to maintain its payment obligations under the distribution agreements negotiated by TBN, and has received numerous breach notices. I understand this resulted in distributors discontinuing or threatening to discontinue Merit Street's broadcast signals, which has already resulted in millions of households losing access to Merit Street's programming, including *Dr. Phil Prime Time.*

### ii. Failure to Provide Commercial Production Facility and Advertising At No Cost to Merit Street

35.     Based on my discussions with Merit Street personnel, it is my understanding that throughout negotiations, TBN represented that it would leverage its substantial financial resources and deep expertise in television production and distribution to launch a major new television network, Merit Street TV, anchored by a new nighttime show, *Dr. Phil Primetime*.  I also understand that TBN stated it was already building a facility in Fort Worth, Texas where Merit Street's programing would be produced in a state of the art facility, at no cost to Merit Street.  Relying on these representations, and on TBN's promise in the Joint Venture Agreement that the production services provided to Merit Street would meet or exceed the "existing quality and standards of the Dr. Phil programming," the parties signed the Joint Venture Agreement.  To Merit Street's surprise, the facility provided by TBN was far from state of the art.  For example, I understand that TBN delivered defective facilities with nonfunctional screens, teleprompters, and control rooms as well as subpar or ineffective software.  Additionally, I understand that TBN also caused Merit Street to sign a five-year, multi-million-dollar studio lease with TBN to produce Dr. Phil McGraw's shows, even though TBN was responsible under the Joint Venture Agreement for paying for those studio production expenses.

36.     I understand that TBN also failed to deliver the promised advertising sales infrastructure, including traffic, planning, and pricing systems, and TBN did not create an actual advertising sales team to monetize the value created by Dr. Phil McGraw and his entertainment colleagues, including Steve Harvey, Bear Grills, and Nancy Grace.  Simply put, TBN could not meet the needs and demands to produce commercial broadcasting.

37.     As a result, Peteski was forced to fund or provide marketing, distribution, and advertising infrastructure to limit disruption of Merit Street's operations.

### iii.  TBN's Failure to Make Payments to Peteski

38.    Pursuant to the Joint Venture Agreement, TBN was required to make certain quarterly payments to Merit Street of $5.0 million during the first full year of the partnership.

39.    It is my understanding that in July 2024, TBN failed to make a $5.0 million payment to Peteski as required under the Joint Venture Agreement and notified Peteski that it would not make the required July payments.  In light of ongoing disputes, in August 2024, TBN and Peteski amended their agreement to provide that Peteski owned approximately 70% of the company and TBN owned approximately 30%.  Although the parties' ownership interest shifted, TBN remained obligated to provide all distribution and production services to Merit Street.[5]

40.    Beginning in July 2024 and continuing through to the petition date, I understand that TBN has repeatedly breached the Joint Venture Agreement by failing to make the required payments, initially on a quarterly basis and subsequently on a bi-monthly basis.

41.    As of the Petition Date, I understand that TBN has not paid several millions in fees it owes to Merit Street's broadcasting partners and distributors that TBN remains contractually responsible for.

42.    It is my understanding that, as a result of TBN's breaches of the Joint Venture Agreement, both financial and otherwise, Peteski has stepped in to provide indispensable financial support to Merit Street.  To date, Peteski has extended loans to Merit Street totaling approximately $32,373,802 in order to address the consequences of TBN's breaches.

---

[5] The September 2024 balance sheet that TBN prepared on behalf of Merit Street reflect a "Notes Payable" liability to Merit Street in favor of TBN of $132,994,750.  I understand that TBN has claimed that this note payable is for personnel and other costs incurred by TBN on behalf of Merit Street.  TBN later claimed that the note payable had grown to $140 million.  I understand that TBN has never provided, despite repeated requests, an accounting or breakdown of the expenses included in this $140 million note payable and TBN later withdrew the request for such a note.

43.     For further information regarding the claims against TBN, please refer to the Adversary Complaint, filed contemporaneously herewith.

**B.     PBR Arbitration**

44.     As noted above, PBR was unable to meet the production and promotion requirements under the PBR Agreement.  As a result of PBR's breaches and statements, Merit Street asserts it has a viable fraud and breach of contract counterclaim against PBR, which could serve as a potential source of recovery and liquidity for the Debtor's stakeholders.

45.     On August 21, 2025, however, Merit Street faces a fact deposition discovery deadline with respect to the PBR Litigation, which will be costly and burdensome to Merit Street and further exacerbate Merit Street's liquidity issues.

**C.     Reduction in Force**

46.     Due to these operational challenges, the Debtor initiated several reductions—in force (the "RIFs") in 2025, impacting approximately 71 Employees (the "Former Employees"). Specifically, the Debtor terminated approximately 71 employees between January to June 2025. In connection with the RIFs, the Debtor offered the Former Employees a severance package at management's discretion.  Currently, seven Former Employees and one Former Employee's spouse are on COBRA.

**D.     Board Hires Advisors**

47.     Without a clear solution for its liquidity issues, in June 2025, Merit Street engaged Sidley Austin LLP ("Sidley Austin") to assist it in capital management, including through a strategic alternative review process.  Shortly thereafter, in June 2025, Merit Street approved the retention of Triple P TRS, LLC and Triple P Securities, LLC (collectively, "Portage Point") to provide restructuring advisory and investment banking services.  Given Merit Street's liquidity

position, the Board also instructed Merit Street's management team and advisors to begin contingency planning efforts.    In addition, the Special Committee tasked Merit Street's management team and advisors to evaluate all strategic alternatives, including bridge financing, so that Merit Street could achieve near-term stability from a liquidity perspective, while evaluating a potential chapter 11 filing pathway to maximize value for creditors and other parties in interests.

## II.    Engagement with Key Stakeholders

48.    Merit Street and its management team and advisors have evaluated various strategic options, including both in-court and out-of-court solutions.    In sum, Merit Street evaluated a number of potential options, including: (a) capital raise solutions from existing lenders and third-party lenders, (b) out-of-court restructuring options, and (c) an in-court chapter 11 process.

## III.    Merit Street Enters into Bridge Financing

49.    From February 2025 through May 2025, Merit Street pursued investors for potential equity funding.    During this three-month period, Peteski continued providing financing to Merit Street in order for Merit Street to meet payroll obligations and pay operating expenses. Ultimately, due to severe challenges by TBN, Merit Street was unable to obtain additional third-party equity financing.    In turn, following extensive, arms-length negotiations with Peteski, Merit Street executed the Bridge Loan which provided $7,966,636 in funding for Merit Street to prepare for this Chapter 11 Case and commence good faith negotiations with key parties.    As previously discussed, Merit Street intends to continue engaging with such parties post-petition with the goal of reaching a consensual go-forward path.

## IV.    Merit Street Enters into DIP Financing

50.    In addition to the Bridge Loan, to provide adequate liquidity runway to effectuate the Chapter 11 Case, Peteski has further committed to provide Merit Street with up to

17

$21.4 million of debtor-in-possession financing ("DIP Financing") on a secured basis in the form

of a delayed draw term loan facility (the "DIP Facility") comprising of (A) $13.4 million of new

money loans and (B) $7.9 million of rolled-up Bridge Loans (upon entry of a final order approving

DIP Financing).  Importantly, Peteski has agreed to provide an interim advance of $4.1 million

upon entry of an interim order approving DIP Financing in order for the Debtor to operate its

business during the interim period and commence the Adversary Complaint; however, the balance

of the DIP Financing will only be funded if, among other condition precedents, the Debtor receives

a favorable adjudication of the Preference Claim Count.

**V.      Chapter 11 Filing and Next Steps**

51.      On July 1, 2025, the Special Committee authorized the Debtor to commence the

voluntary proceeding under chapter 11 of the Bankruptcy Code.  Merit Street intends to maximize

the value of its assets for stakeholders in this case by expeditiously transferring its assets, including

the owned facilities and its intellectual property portfolio.  The Debtor anticipates that in the

coming days, more information will be shared regarding a potential pathway with respect to the

process for monetizing such assets.

52.      Merit Street has determined that an expeditious transition and marketing process

and resolution of this Chapter 11 Case is necessary to preserve its limited liquidity and ensure the

greatest possible recovery for its stakeholders.  In addition, Merit Street believes that the relief

requested in the various First Day Motions appropriately balances the need for the Debtor to

swiftly proceed towards an orderly wind-down while also allowing for a centralized resolution of

all Merit Street's open disputes in a coordinated fashion.

53.      Merit Street currently intends to maintain ongoing operations throughout the

duration of this Chapter 11 Case, with certain employees remaining in their respective roles to

support both the sale process and the effective administration of the bankruptcy proceeding. Peteski will also explore alternative platforms for the distribution of go-forward content, as such efforts are likely to further optimize the relevance, and thus value, of Merit Street's assets.

## FIRST DAY MOTIONS

54. Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, facilitate the efficient administration of this Chapter 11 Case, and execute a swift and smooth restructuring. I am generally familiar with the contents of each of the First Day Motions and believe that the relief sought therein is necessary to enable the Debtor to operate during this Chapter 11 Case with minimal disruption or loss of productivity and value and best serves the Debtor's estate and creditors' interests. The First Day Motions include the following:

- "Claims Retention Application": *Application of the Debtor's for Entry of and Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date;*

- "PII Redaction Motion": *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Redact Certain Personal Identifying Information; (II) Establishing a Complex Service List; (III) Approving the Form and Manner of Notice of Commencement and (IV) Granting Related Relief;* and

- "SOAL/SOFA Motion": *Debtor's Emergency Motion for Entry of an Order Extending Time for the Debtor to File Schedules and Statements of Financial Affairs.*

***Operational Motions.***

- "Cash Management Motion": *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Continue to Operate its Cash Management System and Maintain Existing Bank Accounts; and (II) Granting Related Relief;*

- "Insurance Motion": *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Continue Insurance Policies and (B) Pay All Obligations With Respect Thereto; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief;*

- "Taxes Motion": *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay Prepetition Taxes and Fees and (II) Granting Related Relief*;

- "Utilities Motion": *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Open Utility Accounts, (II) Approving Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies, (III) Establishing Procedures for Resolving Objections by Utility Companies; (IV) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (V) Granting Related Relief*; and

- "Wages Motion": *Debtor's Emergency Motion for Entry of an Order (A) Authorizing the Debtor to (A) Satisfy Prepetition Employee Compensation and Benefit Obligations and (B) Continue Its Employee Programs, Policies, and Procedures; and (C) Granting Related Relief.*

55.     I have consulted with my colleagues at Merit Street and the Debtor's Advisors regarding the relief requested in the First Day Motions, and I understand each of the First Day Motions and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate.  Where applicable, a brief summary of the facts supporting the First Day Motions is set forth below.  To the extent any contain additional facts, those facts are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to such terms in the relevant First Day Motions.

56.     The operational First Day Motions seek authority to, among other things, honor employee-related wages and benefit obligations, ensure the continuation of the Debtor's cash management system, and maintain other operations in the ordinary course of business.  The operational First Day Motions request authority to pay certain prepetition claims.  I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, I understand that the Debtor has narrowly tailored its requests

20

for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. Accordingly, I believe and am advised that emergency consideration of such motions is warranted.

57.     I further believe that the relief requested in the First Day Motions is necessary, is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will allow the Debtor to operate with minimal disruption and maximize value preservation during the pendency of this Chapter 11 Case.  Additionally, I believe that (1) the relief requested in each operational First Day Motion is critical; (2) unless the relief is granted, the Debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate which is disproportionate to the amount of the prepetition claim sought to be satisfied; and (3) there is no practical or legal alternative by which the Debtor can deal with the claimants sought to be paid other than by payment of the claim.

58.     Accordingly, for the reasons set forth herein and in each respective First Day Motion, I believe that the Court should grant the relief requested in the First Day Motions.

***Administrative Motions.***

      A.     **Claims Retention Application**

59.     Pursuant to the *Debtor's Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date* (the "Claims Agent Retention Application"), the Debtor seeks entry of an order authorizing the Debtor to employ and retain Epiq Corporate Restructuring, LLC ("Epiq") as the claims, noticing, and solicitation agent (the "Claims, Noticing, and Solicitation Agent") in the Debtor's chapter 11 case, effective as of the Petition Date (as defined therein), consistent with the terms of the Standard Services Agreement between Epiq and the Debtor, dated as of June 26, 2025 (the "Services Agreement").

60.     Although the Debtor has not yet filed its schedules of assets and liabilities and statements of financial affairs, the Debtor anticipates that there will be hundreds of parties to be noticed and that many of these parties will file claims.  In view of the number of anticipated parties and the complexity of the Debtor's business, the Debtor submits that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtor and/or the Office of the Clerk of the Bankruptcy Court, of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of the Debtor's estate and its creditors.  Accordingly, I believe the Claims Agent Retention Application should be granted.

**B.      PII Redaction Motion**

61.     Pursuant to the *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Redact Certain Personally Identifiable Information; (II) Establishing a Complex Service List; (III) Approving the Form and Manner of Notice of Commencement; and (IV) Granting Related Relief* (the "Personally Identifiable Information (PII) Redaction Motion"), the Debtor seek entry of an order (a) authorizing the Debtor to redact certain personally identifiable information, (b) establishing an official complex service list; (c) approving the form and manner of notice of commencement of these chapter 11 cases, and (d) granting related relief.

62.     I believe cause exists to authorize the Debtor to redact the names, home addresses, email addresses, and any other personally identifiable information of individuals or any other natural person, to the extent applicable or required by law, from any paper filed or to be filed with the Court in these chapter 11 cases, including the schedules and statements, because such information could be used to perpetrate identity theft or create other risks to the individuals' safety and welfare.

63.     Further, the Debtor anticipates there will be approximately 763 notice parties in this Chapter 11 Case.  The costs associated with photocopying and mailing routine pleadings to all potential creditors going forward would be substantial and exceedingly burdensome, especially because it is not necessary to apprise all creditors and parties-in-interest of routine matters that do not affect their rights.  Accordingly, I believe it is appropriate for the Court to limit notice in this Chapter 11 Case such that the Debtor and all other parties-in-interest do not incur needlessly large, recurring expenses in serving routine pleadings.  Thus, the Debtor requests that the Court establish certain notice procedures (the "Notice Procedures").  These Notice Procedures include the Debtor proposing to establish an official complex service list (the "Complex Service List"), and the Debtor further proposing that notice of any pleading, motion, application, notice, brief, objection, response, affidavits, declaration, or other writings filed in this Chapter 11 Case (each a "Filing", collectively, the "Filings"), other than an event or deadline that must be served on all creditors pursuant to Bankruptcy Rule 2002, be served only on (a) the parties on the Complex Service List, (b) any party who has filed a notice of appearance and request for service of pleadings but has not yet been added to the Complex Service List, and (c) any party whose interests the specific Filing affects.  I believe the Notice Procedures are appropriate to reduce the cost and expense of these cases to the Debtor's estate, while preserving parties-in-interests' rights to notice.

64.     Finally, I am advised that, in compliance with the requirements of Bankruptcy Rule 2002(a), the Debtor, through Epiq, proposes to serve the Notice of Commencement on all parties entitled to such notice, and to advise them of the meeting of creditors pursuant to Bankruptcy Code section 341.  I believe service of a single Notice of Commencement will not only avoid confusion among creditors but will prevent the Debtor's estate from incurring unnecessary costs associated

23

with serving multiple notices to the parties entitled to receive such notice under Bankruptcy Rule 2002. Further, the Debtor intends to file the Notice of Commencement in a form fit for publication.

65.     Accordingly, based on the foregoing, I believe that the relief requested in the PII Redaction Motion is in the best interests of the Debtor, its estate, and all other parties in interest and should be approved.

### C.     SOAL/SOFA Motion

66.     Pursuant to the *Debtor's Emergency Motion for Entry of an Order Extending Time for the Debtor to File Schedules and Statements of Financial Affairs* (the "SOFA Motion"), the Debtor seeks entry of an order extending the deadline by which the Debtor must file its schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") to the date that is 33 days following the Petition Date (as defined below), *i.e.*, through and including August 4, 2025.

67.     Given the ongoing operational demand on the Debtor's personnel on a day-to-day basis, it will take substantial time for the Debtor to analyze and compile the information needed to complete its Schedules and Statements. Completing the Schedules and Statements requires the Debtor to spend considerable time and effort to collect, review, and assemble copious amounts of information in addition to attending to the day-to-day demands of the chapter 11 process. After postpetition, the substantial amount of work entailed in completing the Schedules and Statements will be directly competing with the demands upon the Debtor's personnel to address critical operational matters during the initial postpetition period.

68.     Accordingly, the Debtor requests that the Court extend the Schedules Deadline to the date that is 33 days following the Petition Date, *i.e.*, through and including August 4, 2025.

69.     I believe that the relief requested in the SOFA Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability

to operate its business in chapter 11 without disruption.  Accordingly, I believe that the SOFA Motion should be granted.

***Operational Motions.***

### D.    Cash Management Motion

70.    Pursuant to the *Debtor's Emergency Motion for Entry of An Order (I) Authorizing the Debtor to Continue to Operate its Cash Management System and Maintain Existing Bank Accounts and (II) Granting Related Relief* (the "Cash Management Motion"), the Debtor seeks entry of an order (i) authorizing the Debtor to continue to operate its Cash Management System and maintain its existing bank accounts, including honoring certain prepetition obligations related thereto and (ii) granting related relief.  The Debtor uses a cash management system to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's business (the "Cash Management System").  The Debtor uses the Cash Management System to collect and disburse cash generated by its businesses, pay its financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of its financing agreements, obtain accurate account balances and other financial data, forecast financial performance, and ensure cash availability and liquidity.  The Debtor's Cash Management System includes nine bank accounts (collectively, the "Bank Accounts").  The bulk of the Debtor's cash on-hand is comprised of proceeds from the Debtor's ongoing business operations.  As of the Petition Date, the Debtor has an aggregate amount of approximately $558,000 in the Bank Accounts.

71.    In addition, the Debtor incurs periodic service charges and other fees in connection with the maintenance of the Cash Management System (collectively, the "Bank Fees").  The Bank Fees primarily consist of service charges from the Cash Management Banks.  The Debtor incur approximately $200 per month, in the aggregate, in Bank Fees. As of the Petition Date, the Debtor

owes the Cash Management Banks approximately $200 in unpaid Bank Fees.  The Debtor seeks authority to continue paying Bank Fees, including the prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practices.

72.    The Debtor maintains one corporate credit card program issued by Wells Fargo (the "Wells Fargo Credit Card").[6]  As of the Petition Date, approximately twenty (20) Wells Fargo Credit Cards have been issued to the Debtor; none of the cards have been provided to employees as of yet.  As further described above, the Debtor is in the process transitioning certain functions to itself from TBN.  The Debtor opened the Wells Fargo Corporate Credit Cards to aid in this transition.  Accordingly, the continued functionality of the Wells Fargo Credit Cards is critical to avoid a costly disruption of the Debtor's ordinary business operations.

73.    I believe that the continuation of the Debtor's Cash Management System is essential to the Debtor's businesses.  Maintaining the current Cash Management System will facilitate the Debtor's transition into chapter 11 by minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Requiring the Debtor to adopt a new, segmented cash management system during this Chapter 11 Case would be expensive, burdensome, and unnecessarily disruptive to the Debtor's operations.  Importantly, the Cash Management System provides the Debtor with the ability to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  The Debtor has implemented internal control procedures that prohibit payments on account of prepetition debts.  I believe that any disruption of the Cash Management System could have a negative adverse effect on the Debtor's restructuring efforts.  Indeed, requiring the Debtor to adopt a new, segmented cash management

---

[6] Historically, the Debtor has been an authorized user on credit cards for which TBN is ultimately responsible for issued by BoA (the "BoA Credit Cards").  The Debtor does not intend to use these credit cards, nor does it believe it has any obligations to pay outstanding balances arising thereunder.  For the avoidance of doubt, the Debtor is not seeking authority to pay any balances under the BoA Credit Cards to the extend there are amounts owed.

system would have an immediate adverse effect on the Debtor's operations to the detriment of its estate and stakeholders.  Accordingly, I believe the Cash Management Motion should be granted.

### E.   **Insurance Motion**

74.    Pursuant to the *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Continue Insurance Policies and (B) Pay All Obligations with Respect Thereto; (II) Authorizing Financial Institution to Honor and Process Related Checks and Transfers; and (III) Granting Related Relie*f (the "Insurance Motion"), the Debtor seeks entry of an order (i) authorizing the Debtor to (a) continue all the Insurance Policies in accordance with the applicable insurance policies and indemnity agreements and to perform with respect thereto in the ordinary course of business, (b) pay any prepetition obligations arising under the Insurance Policies, and (c) modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor's employees to proceed with any claims they may have under the Workers' Compensation Program; and (ii) granting related relief.

75.    The Debtor maintains approximately sixteen (16) Insurance Policies that are administered by various third-party Insurance Carriers.  In connection with the operations of its business and management of its properties, the Insurance Policies provide the Debtor with coverage for, among other things, production liability, cyber liability, automobile liability, transportation liability, workers' compensation and employer liability, crime and general liability. In addition, the Insurance Policies include several layers of excess liability coverage.  A detailed list of the Insurance Policies currently maintained by the Debtor is attached to the Insurance Motion as Exhibit B.

76.    The Debtor incurs various obligations in connection with its Insurance Policies, including obligations in respect of Insurance Premiums, Deductibles, and the Workers' Compensation Program.

77.     Continuation and renewal of the Insurance Policies and entry into new Insurance Policies is essential to preserving the value of the Debtor's businesses, properties, and assets.  In many cases, coverage provided by the Insurance Policies is also required by the applicable regulations, laws, customer contracts, and other arrangements that govern the Debtor's operations, as well as the Bankruptcy Code.

78.     The failure to pay the Insurance Premiums and other related insurance expenses, including payment of satisfaction of the Deductibles, when due will harm the Debtor's estate in several ways.  The Insurance Carriers may refuse to honor the Insurance Policies, which will require the Debtor to obtain replacement policies and possibly reconfigure its risk management program.  Obtaining replacement policies would require the Debtor to commit significant resources and could result in less favorable coverage or terms from the Debtor's insurers.  The Insurance Carriers could also attempt to terminate the Debtor's existing Insurance Policies or deny coverage.  Any disruption in insurance coverage could threaten the Debtor's ability to continue operating its business as the Debtor is subject to myriad regulatory and contractual obligations to maintain specific amounts and types of insurance coverage.

79.     Additionally, applicable state law mandates that certain debtors maintain workers' compensation coverage for its employees.  Staying any proceedings relating to the Workers' Compensation Claims could cause employee departures or otherwise harm employee morale, which would severely disrupt the Debtor's business and prevent a successful reorganization.  This risk is exacerbated by the potential negative impact on the financial well-being of eligible workers' compensation claimants who do not receive timely payments for prepetition employment related injuries.  Accordingly, maintaining the Workers' Compensation Program and satisfying all

workers' compensation claims in connection therewith are crucial to the Debtor's continued operations and the success of the Debtor's ongoing chapter 11 process.

80.    Accordingly, based on the foregoing, the relief requested in the Insurance Motion is in the best interests of the Debtor, its estate, and all parties in interest and should be approved.

### F.    <u>Taxes Motion</u>

81.    Pursuant to the *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay Prepetition Taxes and Fees; and (II) Granting Related Relief* (the "<u>Taxes Motion</u>"), the Debtor seeks entry an order (a) authorizing the Debtor to pay prepetition Taxes and Fees to various federal, state, local, regulatory, and governmental authorities (collectively, the "<u>Taxing Authorities</u>" as further defined in the Taxes Motion) and (b) granting related relief.

82.    In the ordinary course of its business, the Debtor is subject to a variety of income, franchise, business-related taxes and charges, regulatory fees, assessments and related obligations (collectively, the "<u>Taxes and Fees</u>").  The Debtor pays the Taxes and Fees to the Taxing Authorities through checks and electronic funds transfers that are processed through its banks.  The Debtor pays the Taxes and Fees to the Taxing Authorities on a periodic basis—monthly, quarterly, or annually, as applicable, depending on their nature and incurrence.

83.     The Debtor anticipates that certain tax obligations may be outstanding as of the Petition Date; however, the Debtor currently lacks full visibility into the status and amounts of such obligations because TBN, pursuant to the Joint Venture Agreement, is responsible for filing and remitting payments for certain taxes on the Debtor's behalf, excluding those certain obligations as listed on <u>Exhibit B</u> on the Taxes Motion.

84.    I believe the continued payment of the prepetition Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtor's estate.  If such obligations are not timely paid, the Debtor's directors and officers may be subject to lawsuits or prosecution, the

Debtor would face additional tax liability through subsequent interest charges, fees, and penalties, the Debtor's business operations may be suspended, and the Debtor will be required to expend time and money to resolve these issues.   Accordingly, I believe the Taxes Motion should be granted.

   **G.**     **Utilities Motion**

   85.     Pursuant to the Motion *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Open Utility Accounts, (II) Approving the Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies, (III) Establishing Procedures for Resolving Objections by Utility Companies; (IV) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (V) Granting Related Relief* (the "Utilities Motion"), the Debtor seeks entry of an order (i) authorizing the Debtor to open new accounts postpetition to transact with Utility Companies (as defined below), (ii) establishing procedures for resolving objections by the Utility Companies, (iii) establishing procedures for new Utility Companies seeking to hold a deposit; (iv) prohibiting the Utility Companies from altering, refusing, or discontinuing service; and (v) granting related relief.

   86.     Pursuant to the Joint Venture Agreement, TBN historically paid for the utilities services necessary to operate the Debtor's business (the "Utility Services"), including, but not limited to, water, electricity, telecommunications, internet, and technology systems.  TBN would pay these Utility Services directly to the utility company providing service (the "Utility Companies").  TBN has never invoiced the Debtor for the Utility Services.  As a result, the Debtor has had a lack of visibility into the Utility Service payments made on its behalf.  The Debtor anticipates that over the course of this chapter 11 case, the Debtor may be required to open new accounts with the Utility Companies on an as needed basis (the "Utility Accounts").

30

87.     Utility Services are essential to the Debtor's ongoing operations and, therefore, the success of the Debtor's continuing operations.  The Debtor's operations require electricity for lighting, sound, heating, and air conditioning, among others.  Should for any reason, utilities become unavailable, the Debtor's business operations could be severely disrupted, which would negatively impact the Debtor's reorganization efforts to the detriment of all parties in interest. Accordingly, it is essential that the Debtor has the authority to open new utility accounts, if necessary, during this chapter 11 case.

88.     In the event the Debtor is required to open a Utility Account, the Debtor intends to pay all postpetition obligations owed to the Utility Providers in a timely manner.  Nonetheless, to provide the Utility Providers with adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtor proposes depositing into a segregated escrow account held by Epiq for the benefit of the Utility Providers (the "Adequate Assurance Account").  The Debtor proposes to provide the Utility Providers with adequate assurance pursuant to section 366 of the Bankruptcy Code by depositing into the Adequate Assurance Account cash in an amount equal to the estimated cost of two (2) weeks' of Utility Services, based on the reasonable calculation of the Debtor and its advisors (the "Adequate Assurance Deposit").  The Adequate Assurance Account will only be funded in the event of the Debtor opens a Utility Account.

89.     The Debtor further requests authority to cause the funds held in the Adequate Assurance Account to be returned to the Debtor upon the effective date of a chapter 11 plan if there are no outstanding disputes related to postpetition payment or such other time as the Court may order.

90.     I believe that the Adequate Assurance Account, in conjunction with cash on hand, cash flow from operations, and the Debtor's proposed use of cash collateral and debtor-in-

possession financing, demonstrate the Debtor's ability to pay for future Utility Services in the ordinary course of business (collectively the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies in satisfaction of section 366 of the Bankruptcy Code.  Accordingly, I believe the Utilities Motion should be granted.

### H.    Wages Motion

91.    Pursuant to the *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Satisfy Prepetition Employee Compensation and Benefit Obligations and (B) Continue their Employee Programs, Policies, and Procedures in the Ordinary Course, and (II) Granting Related Relief* (the "Wages Motion"), the Debtor is seeking authority to (a) pay and remit any prepetition claims on a postpetition basis, as applicable, relating to certain Workforce Obligations including related expenses, fees, and costs incident to the Workforce Obligations, and including amounts owed to third-party service providers, administrators, and tax authorities, and (b) maintain, continue to honor, and pay amounts related to or on account of the Workforce Obligations on a postpetition basis in the ordinary course of business, as such business practices, programs, policies, and procedures giving rise to the Workforce Obligations may be modified, supplemented, or discontinued from time to time in the ordinary course of business.  The monetary relief sought in the Wages Motion with respect to prepetition obligations is summarized in the following chart:

| Workforce Obligations | Estimated Prepetition Amount Outstanding |
| --- | --- |
| **Compensation Obligations** | |
| Unpaid Wages | $500,000 |
| Reimbursement Obligations | $25,000 |
| Withholding Taxes and Obligations | $150,000 |

| Workforce Obligations | Estimated Prepetition Amount Outstanding |
|---|---|
| Employer Payroll Taxes | $50,000 |
| Deductions | $45,000 |
| Payroll Maintenance Fees | $5,000 |
| Contractor Obligations | $215,000 |
| **Subtotal:** | **$990,000** |
| **Employee Benefit Obligations** | |
| Medical Plans | $175,000 |
| Dental Plans | $6,000 |
| Vision Plans | $0 |
| Life, AD&D, and Disability Insurance Plans | $600 |
| Flexible Spending Program | $1,750 |
| Retirement Benefits | $20,000 |
| **Subtotal:** | **$203,350** |
| **Total:** | **$1,193,350** |

92.    As described more fully in the Wages Motion, as of the Petition Date, the Debtor's workforce is comprised of approximately 66 employees and 30 independent contractors.  The Debtor's workforce brings a wealth of knowledge and experience to the Debtor's operations and allow the network to produce content 24/7.  The Debtor's employees include show hosts,

production staff, maintenance, and many other critical personnel.  The Debtor's operations could not be continued without its employees and contract staff.

93.    The Debtor seeks authority to pay or remit, as applicable, prepetition amounts with respect to: Employee Compensation Obligations, Contractor Obligations, and Employee Benefit Obligations, and to maintain, continue to honor, and pay amounts related to or on account of the Workforce Obligations on a postpetition basis in the ordinary course of business.  The Debtor's workforce relies on the compensation and benefits they receive through the programs described in the Wages Motion to pay their daily living expenses and support their families.  Granting the relief requested will enable the Debtor to maintain morale, enhance the Debtor's ability to retain necessary employees, and otherwise eliminate any personal hardship as a result of this chapter 11 case which, in turn, will maximize value for the benefit of all stakeholders, including the Debtor's workforce.

94.    The relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm to the Debtor's estate.  Failure to satisfy obligations related to Workforce Obligations will jeopardize morale and likely result in the loss of valuable Employees, who are the lifeblood of the Debtor's operations, thereby hindering the Debtor's ability to meet its obligations and threatening the successful consummate of this Chapter 11 Case for the benefit of the Debtor's stakeholders.

95.    I believe that: (1) it is critical that the Debtor maintain its workforce, which is the lifeblood of their operations and instrumental to the Debtor's ability to operate in the ordinary course and maximize value; (2) if the Debtor is not able to satisfy the prepetition Workforce Obligations, it is likely that the Debtor's workforce would suffer reduced productivity or seek alternative employment, imperiling the Debtor's ability to continue as a going concern; and (3) the

Debtor would not be able to replace its Employees or doing so would be more costly than satisfying such claims.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 2nd day of July, 2025

*/s/ Gary Broadbent*
By: Gary Broadbent
Chief Restructuring Officer