Holland N. O'Neil (TX 14864700)
Robert Slovak (TX 24013523)
Steven C. Lockhart (TX 24036981)
Mark C. Moore (TX 24074751)
Stephanie L. McPhail (TX 24104104)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
rslovak@foley.com
slockhart@foley.com
mmoore@foley.com
smcphail@foley.com

Rajiv Dharnidharka
(admitted *pro hac vice*)
**FOLEY & LARDNER LLP**
555 California Steet, Suite 1700
San Francisco, CA 94104
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
rajiv.dharnidharka@foley.com

Nora J. McGuffey (TX 24121000)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-4366
Facsimile: (312) 832-4700
nora.mcguffey@foley.com

*Attorneys for Trinity Broadcasting of Texas, Inc.*
*dba Trinity Broadcasting Network and TCT Ministries, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| MERIT STREET MEDIA, INC.,[1] | § § | Case No.: 25-80156-11 (SWE) |
| Debtor. | § § § | |

## TRINITY BROADCASTING OF TEXAS, INC. AND
## TCT MINISTRIES, INC.'S <u>EMERGENCY</u> MOTION FOR AN ORDER:
## (I) DISMISSING DEBTOR'S CHAPTER 11 CASE, (II) CONVERTING THE CASE
## TO CHAPTER 7, OR (III) APPOINTING A CHAPTER 11 TRUSTEE

> **Emergency relief has been requested. Relief is requested not later than 9:30 a.m. on July 29, 2025. If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Trinity Broadcasting of Texas, Inc. dba Trinity Broadcasting Network ("**TBN**") and TCT

Ministries, Inc. ("**TCT**" and together with "TBN," "**Trinity**"), file this *Emergency Motion for an*

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy., Fort Worth, Texas 76177.

*Order: (I) Dismissing the Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* (the "**Motion**"), and respectfully state as follows:

## I.
## PRELIMINARY STATEMENT[2]

1.      This Chapter 11 Case is a sham proceeding orchestrated by one man—McGraw—to benefit himself at the expense of all others.  Filed in the dead of night preceding a holiday weekend with questionable legal authority, the bankruptcy has no legitimate purpose.  Within hours of the bankruptcy filing, MSM—by its own admission—terminated 90% of its employees.  The six (6) remaining are believed to be friends and associates of McGraw.  MSM lists very few unsecured creditors, and Trinity and Peteski are the only parties asserting or seeking liens.[3]

2.      MSM is a media company that intends to spend $0 during the case on programming or production, has no apparent operations and projects a grand total of $0 in revenue. MSM exists only to borrow money (from McGraw/Peteski) to fund litigation and run a sale process designed to allow McGraw to make off like a thief in the night with assets created through the investment of tens of millions of dollars by Trinity, while leaving nothing behind for creditors or other parties in interest. Given that MSM has abandoned the offices and studio built for it by TBN, it is apparent that McGraw intends to use MSM's remaining employees as well as any "assets" acquired from MSM to launch his new competing media and network company.[4]  This Court need look no further

---

[2]      Defined terms in this section shall have the same meaning as later defined in the Motion, or as defined in the *Declaration of Gary Broadbent, Chief Restructuring Officer of the Debtor, in Support of the Debtor's Chapter 11 Proceeding* [Docket No. 14] (the "**Broadbent Declaration**").  In further support of the DIP Motion, the Debtor filed the *Declaration of Lisa K. Lansio in Support of the Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No.12] (the "**Lansio Declaration**"), as applicable.

[3]      July 3, 2025 Hr'g Tr. 17:1-7 (Debtor's counsel representing that "there's a relatively small number of creditors. . . . We did file a Top 30, so of course there are at least 30 unsecured creditors, we believe. But I don't believe the number extends too far beyond what was disclosed in the Top 30."); Broadbent Decl. at p. 9 (prepetition capital structure chart).

[4]      Contemporaneous with the commencement of this Chapter 11 Case (or perhaps immediately prior thereto), McGraw launched a new media venture, Envoy Media Co. ("**Envoy Media**"). Apparently, Envoy Media will

2

than the Approved Budget filed on the Petition Date to understand McGraw/Peteski's preordained outcome: it contemplates no sale proceeds coming into the estate and no resulting payments to creditors. Line items for these concepts do not exist. At the same time, more than 80% (approximately $10.8 million) of the new money loaned (approximately $13.4 million) will go solely to professionals, including $2.4 million apparently earmarked for payment of Peteski's own legal fees to counsel who likely will be called as a material witness based on his prior representation of the Debtor.

3.     The Debtor maintains that the purpose of this Chapter 11 Case is centralize the resolution of the Debtor's open disputes in a coordinated fashion to "ensure the equitable treatment of creditors under Court supervision" and facilitate the sale of some or all of the Debtor's assets.[5] But this is merely a pretext—the Debtor's own pleadings filed and representations made (described in more detail below) lay McGraw/Peteski's intentions bare for all to see:

- Through the DIP Financing, McGraw/Peteski intends to artificially saddle MSM with senior-secured debt, 80+% of which will be used to fund litigation against Trinity and PBR, while affirming Peteski's credit-bid rights against any challenge, even for cause.  In conditioning subsequent draws of the DIP on the full adjudication of the Preference Claim, McGraw/Peteski also seeks to vitiate Trinity's due-process rights and artificially manipulate procedural safeguards, solely for its own benefit—not that of the estate. McGraw/Peteski would also be completely absolved of any wrongdoing with no independent investigation as into whether any claims against them exist.

- Through the Bid Procedures Motion, McGraw/Peteski intends to effectuate that credit bid, taking all or substantially all of MSM's assets—including, explicitly, litigation claims—while providing nothing for anyone else in the form of real value.

---

include live news and original entertainment, and digital platform, "including library programming and original shows from McGraw and his friend and Merit Street collaborator Steve Harvey." Alex Weprin, Hollywood Reporter, *Dr. Phil Returns: Launches Envoy Media Co. in Comeback Bid* (July 14, 2025, at 6:36 a.m.), https://www.hollywoodreporter.com/business/business-news/dr-phil-returns-launches-envoy-media-co-citizen-journalism-1236313554/ ("**Dr. Phil's Merit Street Media may be effectively dead**, but his Envoy Media Co. is just beginning.") (emphasis added).

[5]     Broadbent Decl. ¶ 7.

- Through the Rejection Motion, McGraw/Peteski intends to jettison all of MSM's executory contracts and unexpired leases *except those with TBN* before the sale process even begins, implying MSM already knows what the outcome of that process will be and creating substantial rejection-damages claims the estate will have no way to satisfy nor any intention to do so.

- Finally, through the Adversary Proceeding, McGraw/Peteski attempts shift the spotlight away from their artifice and distract the Court and the parties with the threadbare allegations against Trinity.

In other words, rather than a legitimate attempt at a reorganization of MSM that will benefit all creditors and parties in interest, the purpose of this Chapter 11 Case is to give value to and benefit McGraw *vis-à-vis* Peteski, leaving nothing for anyone else. Chapter 11 reorganization is not intended to be a vehicle for the personal enrichment of one man.

4.      As will be set forth herein, this Chapter 11 Case was transparently filed in bad faith and without proper corporate authority, which cannot be rectified. As such, Trinity submits there is ample cause under section 1112(b) and respectfully requests that this case be dismissed as there is no benefit to creditors. In the alternative, Trinity requests the Court convert this Chapter 11 Case to a Chapter 7 for cause.  Without any operations to protect, Chapter 11 is unnecessary.  A Chapter 7 trustee is fully capable of administering MSM's assets—including litigation claims—in an efficient and impartial way without the need for DIP financing or an expensive sale process that is only intended to facilitate McGraw's "loan-to-own" strategy. If the Court determines that MSM should remain in Chapter 11, at a minimum it should remove the Debtor from possession through the appointment of a Chapter 11 trustee.

## II.
## JURISDICTION, VENUE, AND PREDICATES FOR RELIEF

5.      The United States Bankruptcy Court for the Northern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4

6.      The bases for the relief requested herein are sections 105(a), 1104(a), and 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), rules 2002 and 9006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Section J.34 of the Procedures for Complex Cases in the Northern District of Texas (the "**Complex Procedures**").

7.      Trinity confirms its consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### III.
### <u>RELEVANT BACKGROUND</u>

**A.      The Joint Venture Between TBN and Peteski and Formation of MSM**

8.      From 2002 until he sold TBN on his fake intentions to lean out production staff and move production to Texas, the Dr. Phil Show was hosted by Phillip C. McGraw ("**McGraw**") in connection with Oprah Winfrey's Harpo Productions (2002-2010), Stage 29 Productions (2010-2023), Peteski Productions, Inc. ("**Peteski**") (2005-2023) and CBS Media Ventures ("**CBS**"). The Dr. Phil Show ceased production with CBS in 2023, with the final episode airing on May 25, 2023.

9.      In early January 2023, representatives of McGraw and/or Peteski, a company owned by McGraw, sought out TBN to be a new partner in the production and distribution of the Dr. Phil Show.  Proclaiming that he was tired of "snot-nosed lawyers" telling him what to do, McGraw wanted a new home with less censorship and more cultural influence, particularly in advance of the 2024 presidential election. To induce TBN into this partnership, McGraw, on behalf of Peteski, made various representations regarding the advertising revenue, product integrations, and viewership of McGraw's "Dr. Phil Show" on CBS and through syndication with other networks and distributors. For instance, McGraw represented, among other things, that:

    **i.**    the Dr. Phil Show received inflated amounts for every advertising spot sold on CBS and that CBS was selling out its ad inventories;

    **ii.**    the Dr. Phil Show was switching from a 60-minute format to a 90-minute format for the purpose of increasing overall revenue;

    **iii.**    production costs would be dramatically reduced by reducing employee workforce and moving all related production activities from California to Texas. Specifically, McGraw represented that he intended to bring *zero* individuals from his existing staff, which numbered in the dozens, to Texas; and

    **iv.**    he owned and would provide access to the entire library of the Dr. Phil Show from his time with CBS.

10.    Relying on these representations, TBN and Peteski then entered into an agreement, the "*Binding Letter of Intent*," dated January 10, 2023 (the "**Joint Venture Agreement**"), as the preface to definitive long-form documents that were never finalized. The Joint Venture Agreement contemplated the formation of a joint venture that would ultimately become the Debtor, Merit Street Media, Inc. ("**MSM**" or "**Debtor**"). Under the Joint Venture Agreement, Peteski agreed to provide MSM with 160 new 90-minute episodes of the new Dr. Phil show per year and agreed that MSM would serve as the exclusive broadcaster of those Dr. Phil shows. In exchange, TBN agreed to provide means for carriage to distribute the Dr. Phil shows and specials to a nationwide audience. TBN also agreed to provide services necessary to produce the new Dr. Phil show, such as building a production studio in Fort Worth, Texas. The parties also agreed that TBN would have a controlling equity interest in MSM. Within days of the execution of the Joint Venture Agreement, TBN wired $20,000,000 to Peteski.

11.    On February 3, 2023, TBN formed MSM under the laws of the State of Delaware.[6]

---

[6]    MSM was originally formed as APG Ventures, Inc. ("**APG**") On or about March 5, 2024, APG changed its name to MSM, which then converted itself to a Texas corporation on or about February 24, 2025. This Motion refers to MSM as such throughout in order to avoid confusion.

4912-6822-3572.11

**B.      TBN Invests Tens of Millions to Build MSM and Merit TV.**

12.      Thereafter, TBN began the process of putting together a production studio and offices for MSM at TBN's "Plex" campus in Fort Worth based on the exact dimensions of McGraw's prior studio in California.   In outfitting the studio to McGraw's specifications—including expansive dressing rooms for McGraw and his wife and the addition of a helipad at the Plex campus—TBN invested tens of millions of dollars into the future of MSM with production of the new 90-minute Dr. Phil shows expected to start in January 2024. TBN also created a new channel, Merit TV, to air them.  The Dr. Phil studio at TBN's Plex campus is shown in the images below:



4912-6822-3572.11





4912-6822-3572.11

13.     Throughout 2023 TBN made the necessary preparations for the launch of MSM's network and programming, including meetings with McGraw and his proposed team.  By May 2023, McGraw had reneged on his promise of a "from scratch" Texas organization with entirely new employees in favor of moving 30-50 prior employees from California. The first MSM employees were officially onboarded in July 2023, including numerous individuals that McGraw declared essential and demanded be hired.

14.     In June 2023, McGraw informed TBN that MSM would not have access to his prior library of Dr. Phil Show episodes.  Instead, he proposed TBN buy half of that library for $100 million, an offer that TBN declined.  McGraw later agreed to allow MSM to show 160 legacy episodes of the Dr. Phil Show per year.

15.     On or about February 1, 2024, TBN and MSM executed that certain *Lease Agreement* concerning the Fort Worth studio and related offices. MSM has never paid any rent or associated amounts under this agreement, nor does the Approved Budget contemplate any such payments post-petition. TBN also provided MSM access to other world-class studios and technical spaces in the Plex. TBN understood that McGraw would film approximately six (6) shows a week so that production of the first season would be completed by July 2024.

16.     On March 5, 2024, multiple things happened with respect to MSM, then named APG Ventures, Inc.:

    **i.**     MSM, TBN, and Peteski executed that certain *Voting Agreement* of the same date (the "**Voting Agreement**").[7]  Among other things, the Voting Agreement provides for a three-person Board of Directors, with two members to be designated by TBN and one by Peteski.[8] The Voting Agreement further provides that no director may be removed from office

---

[7]     A true and correct copy of the *Voting Agreement* by and between APG Ventures, Inc.; TBN; and Peteski dated March 5, 2024 is attached hereto as **Exhibit A**.

[8]     Exhibit A § 1.2.

other than for cause unless the appointing shareholder (TBN or Peteski) directs or approves such removal;[9]

    **ii.**    MSM adopted its Bylaws;[10]

    **iii.**    MSM elected three directors: Matthew Crouch (a TBN designee), McGraw (the Peteski designee), and Samuel Smadja (a TBN designee);[11] and

    **iv.**    MSM changed its name *to* MSM.[12]

17.    On April 2, 2024, MSM officially launched its network with morning and evening news shows, as well as other programming, including 60-minute episodes of Dr. Phil Primetime.

**C.**    **TBN Ceases Funding McGraw's Largesse.**

18.    Rather than decrease from his days at CBS, production costs related to MSM and the 60-minute Dr. Phil Primetime shows ballooned. Ultimately, from February 2023 through July 2024, TBN funded approximately $130 million in costs related to the studio and offices at the Plex, MSM employees, and building out MSM's operations; McGraw, however, had yet to film a single new 90-minute episode (and, to date, has never produced any such episodes). Unwilling to be the only source of funding for MSM, in July 2024 TBN advised Peteski that it would not continue indefinitely.

19.    On July 29, 2024, McGraw proposed that Peteski would assume financial responsibility for MSM's ongoing operations, rather than TBN.  In exchange the parties' relative ownership percentages would flip; where TBN previously owned 70% of MSM and Peteski, 30%, thereafter Peteski would own 70% and TBN, 30%. On August 8, 2024, the parties amended the

---

[9]    *Id*. § 1.4.

[10]    A true and correct copy of the *Action of Sole Incorporator of APG Ventures, Inc.* dated March 5, 2024 is attached hereto as **Exhibit B**.

[11]    *See* Exhibit B.

[12]    A true and correct copy of the *Action by Written Consent of the Stockholders of APG Ventures, Inc.* dated March 5, 2024 is attached hereto as **Exhibit C**.

prior stock purchase agreements of both TBN and Peteski to reflect a redistribution predicated on certain representations by McGraw.

20.     Shortly after executing the stock swap with TBN, on or about August 9, 2024, Peteski (through MSM) terminated nearly 50 of MSM's existing employees and McGraw/Peteski purported to remove the other two members of MSM's board of directors (both TBN designees), leaving himself as the only member of the board.  He did this despite the express provisions of the Voting Agreement regarding removal of directors.

**D.      The $25 Million Convertible Promissory Note**

21.     Around this time, in May 2024, MSM and Professional Bull Riders, LLC ("**PBR**") entered into a four-year agreement pursuant to the certain *Media Rights Agreement* (the "**PBR Agreement**") for the license by MSM to broadcast certain PBR programming. But similar to its relationship with TBN, MSM (now purportedly controlled by McGraw) failed to uphold its end of the bargain and never paid $3.5 million in monthly fees. MSM was then facing lawsuit for its breach of the PBR Agreement, which was later commenced in November of 2024 (the "**PBR Arbitration**"). At MSM's request, TBN participated in the PBR Arbitration by collecting documents and responsive information in its possession, reviewing such documents and information, and ultimately producing them to PBR.

22.     MSM's cash burn and need for additional capital did not end with the August stock swap and related negotiations and representations.  Accordingly, still hoping to salvage the souring relationship while McGraw sought outside funding from new investors, CrossSeed, a Texas non-profit entity affiliated with TBN and TCT, issued a $25 million convertible promissory note to MSM in September 2024 (the "**CrossSeed Convertible Note**").  The CrossSeed Convertible Note converts to equity at a fixed MSM valuation of $425 million at the option of CrossSeed, exercisable only at the time of an equity raise of qualified financing. The CrossSeed Convertible Note is secured by substantially all assets of MSM, and bears interest a rate of 12% simple interest, payable

on the maturity date of September 7, 2026. The outstanding amount under the CrossSeed Convertible Note is approximately $26.25 million.

23.     Following the execution of the CrossSeed Convertible Note and funding of any amounts pledged thereunder, McGraw requested that CrossSeed hold off on filing a UCC-1 Financing Statement in order to prevent interference with future fundraising and stay below the radar with the SEC. Still wanting to be a good partner with McGraw, CrossSeed acquiesced to this request. Had McGraw disclosed his plan to use this pretext to challenge that security interest as a preference, CrossSeed would never have delayed recording.

24.     On March 5, 2025, CrossSeed assigned the note to TCT, an affiliate of TBN, which then filed a UCC-1 Financing Statement on May 27, 2025 covering all or substantially all of MSM's assets.

**E.     The 2024 December Outline**

25.     Despite Peteski and McGraw's failures under the Joint Venture Agreement through and including late 2024, TBN still wanted to salvage the relationship. To that end, and as an extension of the prior negotiations around the equity swap in August 2024, the parties negotiated a non-binding term sheet, dated December 9, 2024 (the "**2024 December Outline**"). In the 2024 December Outline, TBN, Peteski and MSM "agree[d] to negotiate in good faith to reach definitive agreements addressing the issues outlined here as promptly as practical, and with the common goal of signing such definitive agreements prior to December 31, 2024." As such the 2024 December Outline expressly contemplated *subsequent* "definitive agreements" that "when executed by the Parties [would] supersede and replace in its entirety" the Joint Venture Agreement. Those definitive agreements were never finalized or executed prior to the Petition Date.

**F.     The Chapter 11 Case**

26.     On July 2, 2025 (the "**Petition Date**"), MSM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code thereby initiating the instant chapter 11 case (the

12

"**Chapter 11 Case**").    Attached to MSM's voluntary petition is an unsigned copy of the *Resolutions of the Special Committee of the Board of Directors of Merit Street Media, Inc.* [Docket No. 1] (the "**Bankruptcy Resolutions**") purporting to establish MSM's corporate authority to file the Chapter 11 Case. The Bankruptcy Resolutions state that on June 30, 2025, the board (composed solely of McGraw) established a special committee and delegated to it the duties, rights, and authority set forth in a document called the Special Committee Charter.  At the first-day hearing on July 3, MSM's counsel stated that Gary Broadbent, MSM's chief restructuring officer, is the sole member of the Special Committee.[13]  On cross-examination, Ms. Lansio, on behalf of MSM, confirmed that McGraw and Mr. Broadbent (as sole director of the Special Committee) were the only members of the board.[14]

27.    On and after the Petition Date, MSM undertook four significant actions that lay bare its intentions in this case, which are entirely to benefit McGraw and his affiliated entities.

28.    On July 17, 2025, the United States Trustee formed a committee of unsecured creditors (the "**Committee**").[15]  The Committee is comprised of PBR, the Darcy Lynn Ribman 1997 Trust, and Borden Media Consulting, LLC.

> **i.    *The Adversary Proceeding***

29.    First, MSM filed its *Adversary Complaint for Declaratory and Monetary Relief* against Trinity (the "**Complaint**"),[16] thereby initiating Adversary Case No. 25-08006 (the "**Adversary Proceeding**"). The Complaint asserts various claims against Trinity, including, among other things, breach of contract, breach of fiduciary duty, equitable subordination, and avoidance of the alleged preferential transfer under section 547(b) (the "**Preference Claim**").  As

---

[13]    July 3, 2025 Hr'g Tr. 7:20-23.

[14]    *Id*. 38:24-39:9.

[15]    Docket No. 95.

[16]    Docket No. 3.

discussed below, MSM (and Peteski) then immediately sought to truncate TCT's due process rights with respect to the Preference Claim by conditioning any and all future borrowings under the DIP Facility to a final judgment on the Preference Claim.[17]

30.     While the Court permitted the Preference Claim to be adjudicated on an expedited schedule, it further reserved all rights with respect to any of TCT's defenses under section 547(c) to a later date.[18]

31.     In accordance with the Court's scheduling order, TCT filed its Answer to the Preference Claim on July 10, 2025.[19] Trinity's answers or responses to the remaining counts of the complaint are due in the ordinary course of litigation.

### ii.     *The DIP Motion*

32.     Second, among other first-day motions, MSM filed its DIP Motion[20] seeking authority for MSM to borrow from Peteski up to $21.4 million of debtor-in-possession financing (the "**DIP Financing**") on a secured basis in the form of a delayed-draw term loan facility (the "**DIP Facility**") comprised of (a) $13.4 million of new money loans and (b) upon entry of the final DIP order, a $7.9 million roll up of the Bridge Loans (as defined in the DIP Motion). MSM and its professionals represented that an interim advance of up to $4.1 million DIP Financing was necessary "in order to for the Debtor to operate its business during the interim period and commence the Adversary Complaint[.]"[21]

---

[17]     *See* Adv. Pro. Docket No. 2.

[18]     Adv. Pro. Docket No. 7.

[19]     Adv. Pro. Docket No. 15.

[20]     *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 11] (the "**DIP Motion**").

[21]     Broadbent Decl. ¶ 50.

33.     There are many troubling aspects of MSM's proposed DIP Financing.[22] First and foremost, MSM's purported "need" for the DIP Financing is questionable at best. MSM first proclaims that the DIP Financing is needed in the interim to "operate its business," but nothing about MSM suggests that this is an operating company.[23] For instance, the DIP budget (the "**Approved Budget**"), which was later approved by the Interim DIP Order (defined below), shows that MSM has no projected revenue through October 24, 2025.[24] Moreover, the majority of "operating" expenses relate to "Labor Costs," which MSM's investment banker, Ms. Lisa K. Lansio, confirmed were to cover employee wages and benefits.[25] But MSM's Chief Restructuring Officer ("**CRO**") and "Independent" Director, Gary Broadbent, later testified that MSM terminated nearly 90% of its workforce after filing the Chapter 11 Case:

> Q: Have there been layoffs in the last couple of days of most of the employees of the Debtors [sic]?
>
> A: There was a workforce reduction yesterday that reduced basically by 90 percent the workforce. It went from roughly 60 employees to maybe 6 today.[26]

The Approved Budget's allocation for "Other Expenses" were for various unknown "operating expenses," which could include network costs or storage costs.[27] Notably, the Debtor—a media and television production company—budgets $0 for the entire Chapter 11 Case for "Programming and Production" expenses.

---

[22]     Trinity intends to file an objection to the DIP Financing forthwith, and reserves all rights related thereto.

[23]     DIP Motion ¶ 2.

[24]     *See* Interim DIP Order, Ex. 2; *see also* July 3, 2025 Hr'g Tr. 34:23-35:3 (Ms. Lansio confirming that the Approved Budget shows no revenue for MSM).

[25]     *See* July 3, 2025 Hr'g Tr. 35:4-8.

[26]     *Id.* 46:20-24 (cross-examination of G. Broadbent).

[27]     *Id.* 36:9-18 (Q: Do you know what the other expenses are here that are referenced? A: I do. That was meant to cover, in looking at the company's trial balance, you know, certain other operating expenses. You know, kind of network costs, storage costs, various things that may arise that we weren't exactly sure what the nature of those would be, but that was intended to be a cash-all, given the company's trial balances and kind of prior spending history, so to create, you know, some buffer in operating expense in case those did arise.).

34.     The Debtor also represents that interim DIP Financing is needed to "commence the Adversary Complaint" against Trinity.[28] Indeed, during the interim period (from July 11 through July 25, 2025), over half of the $4.1 million amount is designated to pay professional fees—$1.9 million for the Debtor's professional fees and $650,000 for Peteski's attorneys' fees. [29] In fact, the majority of the entire DIP Facility is budgeted to pay professional fees—not operating expenses. For the entire Chapter 11 Case over 80% of the new-money portion of the DIP Facility is reserved for Debtor's and Peteski's professional fees ($8,438,000 for the Debtor's professional fees and $2,375,000 for Peteski's counsel).[30] It is clear that this DIP Facility is nothing more than a litigation fund set up by McGraw/Peteski to go after Trinity—something that could have been done outside of bankruptcy. However, the obvious ploy here is to give McGraw/Peteski a priming position over all other existing creditors to facilitate the loan-to-own strategy—a strategy made even clearer by McGraw's announcement of a newly-formed entity called Envoy Media, Co.,[31] which on information and belief, has been contacting certain of the Debtor's contract parties (such as broadcasters) to enter into new contracts and may already be in possession of property of the Debtor's estate.

35.     In furtherance of this goal, and perhaps the most puzzling and disconcerting part about the DIP Financing, is the condition that any subsequent DIP funding cannot occur until the

---

[28]     DIP Motion ¶ 2.

[29]     It is also worth noting that Peteski's legal counsel, Jackson Walker LLP, also represented the Debtor prior to the Petition Date.  According to the Mr. Broadbent, Jackson Walker LLP represented MSM in connection with the PBR Arbitration—which was commenced in November 2024 and remains ongoing. *See* July 3, 2025 Hr'g Tr. 43:21-44:6 (Q: Are you aware that Jackson Walker had previously -- has been representing the Debtors up through perhaps today? Or yesterday?  A: So, I think Jackson Walker has been longstanding counsel to Peteski. They did represent Merit Street in a dispute with the Professional Bull Riders Association. You know, Matt Cavenaugh can speak to the scope of that engagement.  Q: Okay. But to your knowledge, they have been -- they have been representing the Debtors as well? A: In that dispute, yes.).

[30]     *Id.* at 37:24-38:4 (Q: Do you see Other Professional Fees of $638,000? Do you know what that is for? A: So, that would be for nondebtor professionals that the Debtor is responsible for paying for, so would include parties like Jackson Walker.).

[31]     *See Dr. Phil Returns: Launches Envoy Media Co. in Comeback Bid, supra* note 4.

16

Court has fully adjudicated the Preference Claim in the Adversary Proceeding.[32] When asked why the remaining DIP Facility was conditioned on adjudication of the Preference Claim, Peteski's counsel provided the following ambiguous response to the Court's direct question:

> From Peteski's point of view, Peteski has been supporting and keeping MSM -- keeping the lights on at MSM for many, many months, when it was TBN's obligation to do so. And as I have heard many times over the past couple weeks, enough is enough and too much is too much. And Peteski is willing to provide the bridge financing that got us here today, plus the incremental amounts that are proposed in the interim relief, but is not prepared at this point, Your Honor, to provide any additional funding until it can -- until it knows that there are protections that are going to be available in terms of collateral and the like.[33]

36.     The proposed roll-up of the prepetition Bridge Loans (approximately $7.9 million) is also problematic in that the Debtor's filings are inconsistent about the actual amount of such loans and contain no information about the use of the loaned funds.  For example, the DIP Motion states that on June 30, 2025, Peteski lent $6,966,636 (defined thereafter as the "**Bridge Loans**").[34] But it also says in a footnote of the same paragraph that Peteski did so in three tranches— $1,666,636 on June 10, $1,300,000 on June 24, and $5 million on June 30.[35] This adds up to ***$7.97*** million, not $6.97 million, and the entered Interim DIP Order (defined below) repeats the $7.97 million.  Which is it, and for what were the funds used—particularly the $5 million allegedly funded two days prior to the Petition Date? The DIP Motion does not say, but it does seek a full roll-up of this alleged funding.

---

[32]     *See* DIP Term Sheet, Conditions Precedent to All Subsequent Credit Extensions

[33]     July 3, 2025 Hr'g Tr. 74:10-20.

[34]     DIP Motion ¶ 17.

[35]     *Id*. n.10.

37.    Notwithstanding Trinity's objection, on July 3, 2025, the Court entered the Interim

DIP Order,[36] approving an interim advance of $4.1 million of the DIP Financing, the majority of

which will be set aside for the Debtor's professionals in order to pursue the Adversary Proceeding

against Trinity. The Interim DIP Order further contemplates that upon entry of the final DIP order,

Peteski will have the absolute and unchallengeable right to credit bid the entire DIP Facility

(including the Roll-Up), and that right "shall not be prohibited from making such credit bid 'for

cause' under section 363(k) of the Bankruptcy Code."[37] A final hearing on the DIP Motion is

scheduled for June 29, 2025. Trinity will object to this proposed financing, which should not be

approved on a final basis until this Motion is adjudicated.

### iii.    *The Rejection Motion*

38.    Third, also on the Petition Date, the Debtor filed its Rejection Motion.[38] The

Rejection Motion was not set for hearing on July 3, 2025, but incorporated the Broadbent

Declaration, which does not describe or reference any MSM contracts except those with PBR,

Trinity, or its insurers.  Regardless, the intent of the Rejection Motion appears to be to seek

rejection of all or substantially all of MSM's executory contracts or unexpired leases with parties

other than TBN "with respect to its media and general operations."[39] This includes, among other

things, license and location agreements, distribution agreements, affiliation agreements, program

orders, and service agreements.[40] Rejection of these agreements could give rise to significant

---

[36]    *Interim Order (I) Authorizing (A) Postpetition Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 35] (the "**Interim DIP Order**").

[37]    Interim DIP Order ¶ 34.

[38]    *Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Docket No. 26] (the "**Rejection Motion**").

[39]    *See* Rejection Motion ¶ 7.  Notably absent from the list of executory contracts and unexpired leases to be rejected is the Lease Agreement with TBN for the studio and office space in the Plex.  With no contemplated lease payments in the Approved Budget, it appears MSM does not intend to satisfy all of its administrative expenses.

[40]    Ex. 1 to the Rejection Motion.

claims against MSM's estate, and the business judgment of potential rejection (currently sought to be approved on July 29, 2025) during a sale process (described below), is unexplained.[41]

### iv. *The Bid Procedures Motion*

39.     Fourth, regarding that sale process, on July 5, 2025, the Debtor filed its Bid Procedures Motion.[42] Through the Bid Procedures Motion, the Debtor seeks the approval of a prompt sale schedule and bid procedures for the sale of substantially all the Debtor's assets, which include: (a) litigation claims, (b) contract rights, (c) intellectual property, and (d) various personal property assets.[43] A hearing on the Bid Procedures Motion is currently scheduled for July 29, 2025. Notably, the creditors have no details about the "Debtor's assets" as its schedules and statements are not due to be filed until August 4, 2025.[44]   Approving the Bidding Procedures for unknown assets is premature.

40.     The proposed Bidding Procedures (attached as Exhibit 1 to the Bid Procedures Motion) expressly contemplate and authorize a credit bid by "[a]ny party that has a valid and perfected lien on any Assets of the Debtor's estate,"[45] and do not require that any party submitting a credit bid provide a Good Faith Deposit (as defined therein).[46] When read together with the other motions, the ruse is obvious—which is to give McGraw, who is an insider and fiduciary, a blocking

---

[41]     McGraw's recent creation of Envoy Media provides even more insight to the McGraw/Peteski's strategy—which is to acquire the Debtor's assets for $0 and then transfer those assets McGraw's new media company.

[42]     *Motion for Entry of an Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of a Stalking Horse Bidder, (C) Establishing Bid Deadlines and Scheduling Auction and Sale Hearing, and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof; (II)(A) Authorizing the Sale of the Assets Free and Clear of All Encumbrances, and (B) Approving the Assumption and Assignment of the Assumed Contracts; and (III) Granting Related Relief* [Docket No. 44] (the "**Bid Procedures Motion**").

[43]     Bid Procedures Motion, ¶ 2.

[44]     Docket No. 38 ¶ 2.

[45]     Docket No. 44-1 § XIII.

[46]     *Id*. § IX(d).

position to take over the Debtor's assets while saddling the estate with professional fees intended to benefit and effectuate his takeover.

### IV.
### LEGAL STANDARD

41.      Pursuant to section 1112(b) of the Bankruptcy Code, a court shall convert or dismiss a bankruptcy case for cause when it is in the best interests of the creditors.[47] Section 1112(b)(4) contains a non-exclusive list of what constitutes "cause" for purposes of dismissal or conversion. For example, cause exists where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" or there is gross mismanagement of the estate.[48] This list is not exclusive; bankruptcy courts have the flexibility and discretion to determine what constitutes cause under section 1112(b).[49]  Upon a finding of cause under section 1112(b) to dismiss or covert a Chapter 11 case, the court must weigh whether the appointment of a trustee under section 1104(a) is in the best interest of the creditors and estate.[50]

42.      The moving party bears the initial burden to establish "cause" by a preponderance of the evidence.[51]  Once the cause has been established, it is the debtor's burden to establish an exception under section 1112(b)(2).[52]

---

[47]       11 U.S.C. § 1112(b).

[48]       11 U.S.C. §§ 1112(b)(4)(A)-(B).

[49]       *See, e.g., In re Nat'l Rifle Assoc. of Am.*, 628 B.R. 262, 270 (Bankr. N.D. Tex. 2021) (noting that "'cause' affords flexibility to the bankruptcy courts and can include a finding that the debtor's filing for relief is not in good faith."); *In re Delta AG Grp., LLC*, 596 B.R. 186, 194 (Banrk. W.D. La. 2019); *In re Guiliani,* 661 B.R. 493, 501 (Bankr. S.D.N.Y. 2024).

[50]       *See, e.g., Nat'l Rifle Assoc.*, 628 B.R. at 284; *In re Royal Alice Props., LLC*, No. 19-12337, 2020 WL 5357795, at *9 (Bankr. E.D. La. Sept. 4, 2020) (citing 11 U.S.C. § 1112(b)(1)); *In re NOA, LLC*, 578 B.R. 534, 541 (Bankr. E.D.N.C. 2017) ("Section 1112 and Section 1104 read together require the court to make a finding as to what remedy is in the best interest of the creditors and the estate.").

[51]       *Delta AG Grp., LLC*, 596 B.R. at 194 (citing *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)).

[52]       *Id.*

<strong>V.</strong><br><strong><u>ARGUMENT AND AUTHORITIES</u></strong>

**A.     <u>Cause Exists Under Section 1112(b) to Dismiss or Convert the Chapter 11 Case.</u>**

  **i.     *The Debtor Lacked the Authority to File the Chapter 11 Case, the Actions Were Ultra Vires, and Thus, the Chapter 11 Case Must be Dismissed.***

43.     Mr. Broadbend did not have the corporate authority to authorize the Debtor's bankruptcy. This fact alone requires the Court to dismiss the Chapter 11 Case under section 1112(b).  Independent from any finding of "cause," a bankruptcy case must be dismissed if the debtor did not have valid corporate authority to file a petition because the Court thus lacks subject matter jurisdiction over the case.[53]  As the Fifth Circuit held, the person who signs the bankruptcy petition must have had the actual authority to do so at the time the petition is filed.[54]  State law determines who has the authority to file a bankruptcy petition on behalf of the corporation.[55]

44.     The Debtor is a Texas corporation, and thus, Texas law should govern. Under Texas law, the default rule is that the business and affairs of a corporation is managed through the board of directors.[56] Any action by the board requires either (a) a vote of a majority of the directors present at a meeting at which quorum is present, or (b) a written consent stating the action to be

---

[53] *See, e.g., Franchise Servs. of Am. Inc. v. United States Trustee (In re Franchise Servs. of N. Am., Inc.)*, 891 F.3d 198, 206-07 (5th Cir. 2018) ("If the petitioners lack authorization under state law, the bankruptcy court 'has no alternative but to dismiss the petition.'") (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)); *In re Cinch Wireline Servs., LLC*, No. 23-51742-CAG, 2024 WL 848199, at \*9 (Bankr. W.D. Tex. Mar. 18, 2025); *In re Mid-South Business Assocs., LLC*, 555 B.R. 565, 570 (Bankr. N.D. Miss. 2016); *In re 301 W N. Avenue, LLC,* 666 B.R. 583, 955 (Bankr. N.D. Ill. 2025) ("There is cause to dismiss a case if corporate authority to file for relief under the Bankruptcy Code does not exist."); *In re Apex Brittany MO, LP*, No. 23-11463 (CTG), 2023 WL 8205669, at \*3 (Bankr. D. Del. Nov. 27, 2023) ("It is well established that a court must dismiss a bankruptcy case if the party acting on behalf of a corporate entity in filing the petition lacked the authority to do so.").

[54] *Franchise Servs. of N. Am.*, 891 F.3d at 207 ("It is not enough that those who seek to speak for the corporation may have the right to obtain that authority. Rather, they must have it at the time of filing.").

[55] *Id.* at 206; *Mid-South Business Assocs.*, 555 B.R. at 570-71.

[56] Tex. Bus. Orgs. Code § 21.401(a); *see also In re Estate of Poe*, 648 S.W.3d 277, 286 (Tex. 2022).

21

taken that is signed by all members of the board.[57]   One of these requirements was necessary to
authorize MSM to file for relief under the Bankruptcy Code; yet neither were validly obtained.

45.     Instead, the Bankruptcy Resolutions reflect that MSM's board appointed a "Special
Committee" (of one person, Mr. Broadbent), who then authorized the filing of this Chapter 11
Case and the appointment of Mr. Broadbent as the CRO and "Independent" Director.  All of these
actions were done without the proper and valid board approval.

46.     <u>First</u>, MSM's board did not have the authority to designate the Special Committee
because such action was approved by a single board member—McGraw. And while MSM's
certificate of formation lists only one director—McGraw—this is incorrect. MSM's Texas
certificate of conversion ***should have*** listed two other board members (the TBN designees).  Its
apparent failure to do so is likely because McGraw/Peteski believed that they terminated the TBN
directors prior to its conversion to a Texas entity.

47.     However, McGraw/Peteski's removal of the TBN-appointed directors was not done
in accordance with the Voting Agreement, and therefore, such termination was invalid.[58] The
Voting Agreement allows a TBN-director to be removed only if TBN consented to the removal by
written consent or affirmative vote to such removal.[59] That did not happen here. At no point did
TBN provide a written agreement or an affirmative vote to remove its own directors.[60] As a result,

---

[57]     Tex. Bus. Orgs. Code § 21.415.

[58]     The purported termination of the TBN directors occurred while MSM was incorporated under Delaware law.
As such, the Voting Agreement and Delaware law governs removal of directors.

[59]     Voting Agreement § 1.4(b).

[60]     *Salamone v. Gorman*, 106 A.3d 354, 379-80 (Del. 2014) (finding removal provisions in a voting agreement
permissible where it allowed only those persons eligible to designate a director could remove said director);
*New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 573 (Del. Ch. 2023) (noting that stockholders can contract
"about how to exercise their voting power to elect directors" without violating the DGCL, charter, and
bylaws); *c.f. Bouchard v. Braidy Indus., Inc*., 2020 WL 2036601, at *15 (Del. Ch. Apr. 28, 2020) ("Although
Bouchard seeks the immediate removal of the Director Defendants from the Board without regard to the
mechanism by which they were designated the Voting Agreement limits Plaintiff's removal rights to the
removal of directors that he is entitled to designate.") (cleaned up).  Even under Texas law, this would have
been improper.  *See* Tex. Bus. Orgs. Code § 21.409(b) ("If the certificate of formation entitles the holders of
a class or series of shares or a group of classes or series of shares to elect one or more directors, only the

any action taken or approved by MSM's board, including the designation of the Special Committee, was *ultra vires* and should be null and void.[61]

48.     Second, because the "Governing Body" (*i.e.*, the board of one) was acting without proper corporate authority, the appointment of Mr. Broadbent as the CRO and "Independent" Director of MSM was similarly *ultra vires and should be null and void*. The Special Committee had no authority to authorize the filing of this Chapter 11 Case, nor did Mr. Broadbent have the authority to sign the bankruptcy petition.[62]

49.     As such, section 1112(b) requires dismissal of this Chapter 11 Case.[63]

        **ii.     *The* Little Creek *Factors Demonstrate Bad Faith.***

50.     Assuming, arguendo, that the Debtor had the corporate authority to file bankruptcy (which it did not), Trinity submits that cause exists to dismiss or convert the case for lack of good faith filing. The majority of courts, including the Fifth Circuit, have determined that filing a bankruptcy petition not in good faith is sufficient cause under section 1112(b).[64] The standard for

---

holders of shares of that class, series, or group may vote on the removal of a director elected by the holders of shares of that class, series, or group.").

[61]     MSM also did not have the authority to convert to a Texas corporation. In Delaware, the board of directors must adopt a resolution approving the conversion and then such resolution must be submitted to the stockholders of the corporation at an annual or special meeting; only after a majority vote approving the resolution may the entity convert. 8 D.G.C.L. § 266(b). MSM did not properly adopt any board resolution (if one exists) as the TBN directors were never notified of the conversion. Nor did TBN vote on such resolution at a stockholder meeting.

[62]     Similarly, MSM also did not have the authority to commence the Adversary Proceeding against Trinity.

[63]     *See Price*, 324 U.S. at 107 (noting that there was no "indication that Congress bestowed on the bankruptcy court jurisdiction to determine that those who in fact do not have the authority to speak for the corporation as a matter of local law are entitled to be given such authority and therefore should be empowered to file a petition on behalf of the corporation.").

[64]     *See, e.g., Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071-73 (5th Cir. 1986) ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."); *In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991); *In re Antelope Techs., Inc.*, 431 F.App'x 272, 275 (5th Cir. 2011); *In re LTL Mgmt., LLC*, 64 F.4th 84, 101 (3d Cir. 2023) ("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith."); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988) ("A case under Chapter 11 may be dismissed for cause pursuant to section 1112 of the Bankruptcy Code if the petition was not filed in good faith."); *see also Nat'l Rifle Assoc.*, 628 B.R. at 270 (noting that "'cause' affords flexibility to the bankruptcy courts and can include a finding that the debtor's filing for relief is not in good faith.").

23

dismissal or conversion for bad faith "depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."[65] Overall, the analysis of "cause" under section 1112(b) is "'case-specific, focusing on the circumstances of each debtor' and requires consideration of the totality of the debtor's circumstances."[66] The moving party has the initial burden to make a prima facie showing of lack of good faith; upon such showing the burden shifts to the debtor to show good faith.[67]

51.     The Fifth Circuit in *Little Creek* observed that findings of lack of good faith are generally predicated on certain "reoccurring but non-exclusive patterns," such as:

(1)     The debtor employees few or zero employees, except for the principal(s);

(2)     The debtor has engaged in improper pre-petition conduct;

(3)     The debtor has little or no cash flow;

(4)     The debtor has little to no cash to sustain a plan of reorganization or make adequate protection payments;

(5)     There are only a few unsecured creditors with relatively small claims;

(6)     The case is a two-party dispute between the debtor and a single creditor (or consolidated group of creditors);

(7)     The debtor's primary asset is about to be sold or transferred, and the debtor has failed to prevent the sale or transfer in state court.[68]

Not all factors must be present for a finding of bad faith.[69] Here, the majority of the *Little Creek* factors are present, evidencing that the Chapter 11 Case was filed in bad faith.

---

[65]     *Little Creek Dev. Co.*, 779 F.2d at 1072.

[66]     *In re Traxcell Techs., LLC*, 657 B.R. 453, 459 (Bankr. W.D. Tex. 2024) (quoting *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 371-72 (5th Cir.1987)).

[67]     *Nat'l Rifle Assoc. of Am.*, 628 B.R. at 270.

[68]     *See, e.g., In re 1701 Commerce, LLC*, 744 B.R. 652, 657-58 (Bankr. N.D. Tex. 2012) (citing *Little Creek Dev. Co.*, 779 F.2d at 1072-73); *Traxcell Techs., LLC*, 657 B.R. at 459; *see also In re McMahan*, 481 B.R. 901, 916 (Bankr. S.D. Tex. 2012) (adding the existence of a two-party dispute as a *Little Creek* factor).

[69]     *1701 Commerce, LLC*, 744 B.R. at 658, n.18.

4912-6822-3572.11

52.     Factor 1—Little to No Employees. As the Debtor's CRO testified, the Debtor

terminated over 90% of its employees on the Petition, leaving the Debtor with only six (6)

employees, the majority of which are believed to be only executives or friends of McGraw.[70] "A

lack of any employees suggests that there is no business to reorganize and thus no good faith reason

for being in chapter 11."[71] As such, factor 1 weighs in favor of bad faith.

53.     Factor 2—Improper Prepetition Conduct. The Debtor unquestionably engaged in

improper pre-petition conduct, denuding MSM of resources that could and should otherwise have

gone to satisfy obligations to PBR, produce the agreed-upon 90-minute shows (none of which were

made to date), and avoid the financial distress of which MSM now complains.  McGraw pocketed

millions in compensation for himself and his cronies through MSM, which was funded entirely by

TBN before September 2024.

54.     Factors 3 & 4—No Cash Flow and No Cash to Sustain a Reorganization. The

Debtor has absolutely no revenue or cash flow, and the only projected cash flow is funding from

the DIP Facility (if approved), a majority of which is to pay professionals. To that end, there is

essentially nothing to sustain a plan of reorganization or liquidation. Furthermore, the Debtor

contemplates a sale of substantially all of its assets to Peteski via a credit bid. Assuming that sale

occurs, and Peteski is the winning bidder, there would be no proceeds for other creditors, nor

would there be anything for the Debtor to reorganize or liquidate. As such, factors 3 and 4 weigh

in favor of finding bad faith.

55.     Factor 5—Few Unsecured Creditors. The Debtor has very few unsecured creditors

and the amounts are relatively small. "A relatively low proportion of unsecured debts tends to

indicate bad faith because it suggests the debtor filed in contemplation of a single, large, secured

---

[70]     *See* July 3, 2025 Hr'g Tr. 46:19-24.

[71]     *Traxcell Techs.,* 657 B.R. at 460.

debt."[72] The Debtor reports to have a little over thirty (30) unsecured creditors, totaling to a little over $12 million of unsecured debt.[73] By way of comparison, the Debtor has two secured creditors—Trinity and Peteski. Trinity is the Debtor's largest secured creditor, and is the primary target of this Chapter 11 Case. As such, factor 5 weighs in favor of finding bad faith.

56.    <u>Factor 6—Two-Party Dispute</u>. This Chapter 11 Case is nothing more than a two-party dispute between Trinity and the Debtor. The existence of a two-party dispute in a chapter 11 case is enough by itself to find bad faith and support dismissal.[74]

57.    This Chapter 11 Case is nothing more than a way to fund litigation against Trinity. This entire bankruptcy was manufactured to allow McGraw *vis-à-vis* Peteski to finance a litigation against Trinity—something that could have been done outside of bankruptcy. Indeed, the Adversary Proceeding and DIP Term Sheet clearly show that the entire purpose of this Chapter 11 Case was to strip Trinity of its security interest—a claim manufactured by McGraw prepetition in asking Trinity to delay its filing of UCC-1 Financing Statement—and litigate with Trinity regarding their pre-petition contractual relationship on a truncated timeline required by the terms of the DIP Financing—a lending relationship where McGraw/Peteski are on both sides of the proposed transaction. Factor 6 thus weighs in favor of finding bad faith.

---

[72]    *Id.* at 460-61.

[73]    *See* Top 30 Largest Unsecured Creditors, Docket No. 1. The Debtor represented that the number of unsecured creditors does not extend too far beyond the Top 30 List. *See* July 3, 2025 Hr'g Tr. 17:1-7.

[74]    *See, e.g., Traxcell Techs.*, 657 B.R. at 461-2; *In re Triumph Christian Center, Inc.*, 493 B.R. 479, 495 (Bankr. S.D. Tex. 2013) (noting the most important fact was that this was a two-party dispute); *In re Starmark Clinics, LP*, 388 B.R. 729, 736 (Bankr. S.D. Tex. 2008) (dismissal for cause is appropriate where it appears that the "debtor was attempting to use the Bankruptcy Code to gain an unfair advantage in a two party dispute."); *see also In re Liptak*, 304 B.R. 820, 836 (Bankr. N.D. Ill. 2004) ("If the debtor's only purpose for filing the case is to delay (or defeat) a single judgment creditor, and the case has little or no ability to benefit the creditor body as a whole, then the debtor has not filed the Chapter 11 in good faith.").

4912-6822-3572.11

ii.     ***The Chapter 11 Case Serves No Valid Bankruptcy Purpose And was Filed To Obtain a Tactical Litigation Advantage, which also Demonstrates Bad Faith.***

58.     In determining good faith or lack thereof, courts also look to (a) whether the chapter 11 case serves a "valid bankruptcy purpose" and (b) whether the case was filed "merely to obtain a tactical litigation advantage."[75] Valid purposes of bankruptcy include, among other things, preserving the debtor's going concerns or liquidating its assets ***for the benefit of creditors***.[76]

59.     It is the Debtor's position that its purpose in filing this Chapter 11 Case is to (a) centralize all open disputes, to prevent a race to the courthouse and ensure the equitable treatment of creditors, and (b) to facilitate a sale or disposition of some or all of its assets.[77] But this is nothing more than stage dressing or lip service to the Court.[78] The Debtor has no intention to ensure "equitable treatment of creditors" through use of a sale—and it is hard to imagine that the Debtor is even intending to make any distribution to its creditors. Instead, the end goal of this bankruptcy is for McGraw, through Peteski—the Debtor's purported majority shareholder—to takeover the company. Put simply, the sole purpose of this Chapter 11 Case is to benefit McGraw/Peteski.

60.     Commencing a bankruptcy to facilitate the takeover of debtor by a shareholder is not a valid purpose of bankruptcy.[79] Ultimately, a chapter 11 case is filed in good faith when it

---

[75]     *See, e.g., Nat'l Rifle Assoc.,* 628 B.R. at 280 (citing *In re 15375 Mem'l Corp.,* 589 F.3d 605, 618 (3d Cir. 2009)); *In re Ozcelebi,* 639 B.R. 365, 396 (Bankr. S.D. Tex. 2022); *In re Red River Talc. LLC,* No. 24-90505 (CML), 2025 WL 1029302, at *42 (Bankr. S.D. Tex. Mar. 31, 2025); *see also In re Trust,* 526 B.R. 668, 680 (Bankr. N.D. Tex. 2015).

[76]     *See, e.g., Ozcelebi,* 639 B.R. 396-97 (noting a valid purpose is to preserve the debtor's going concern and maximize property available to satisfy creditors); *Red River Talc. LLC,* 2025 WL 1029302, at *42 (finding that a valid purpose is to liquidate assets and create a liquidation trust to benefit creditors).

[77]     Broadbent Decl. ¶ 7.

[78]     *In re Rent-A-Wreck of Am., Inc.,* 580 B.R. 364, 374 (Bankr. D. Del. 2018) (noting that the desire to use the Bankruptcy Code to one's advantage does not automatically constitute a good faith filing).

[79]     *See id.* at 383 (finding bad faith where the debtors' purpose in filing was "nothing more than a straightforward attempt to take value that belongs Mr. Schwartz [a creditor/adversary of the debtors] and give it to the debtors" which would in turn only benefit the debtors' owner).

"seeks to preserve or create some value that would otherwise be lost outside of bankruptcy"

whether that be done via a plan of reorganization or liquidation.[80] As the Third Circuit observed:

> To be filed in good faith, a petition must do more than merely invoke
> some distributional mechanism in the Bankruptcy Code. It must
> seek to create or preserve some value that would otherwise be lost—
> not merely distributed to a different stakeholder—outside of
> bankruptcy. ***This threshold inquiry is particularly sensitive where,
> as here, the petition seeks to distribute value directly from a
> creditor to a company's shareholders***.[81]

61.     Here, it is clear that the Chapter 11 Case seeks to avoid Trinity's security interest

in order to allow McGraw/Peteski—the Debtor's purported majority stakeholder—to credit bid for

substantially all of the Debtor's assets, including for all litigation claims against Trinity. This

scheme is made abundantly clear through the Debtor's proposed sale process. Indeed, the Interim

DIP Order expressly contemplates that Peteski has the right to credit bid the entire DIP Facility

(including the Roll-Up) and that right shall not be prohibited "for cause."[82] This language, if

approved, gives McGraw/Peteski the unchecked right to acquire assets at no cost and zero benefit

to the creditors. Such a sale would not require the Debtor to satisfy the best-interest test, nor would

it result in any distributions to creditors. Rather, because Peteski is financing this entire process, it

is artificially inflating its own secured claim in order to credit bid against the Debtor's assets and

then transfer those assets for no consideration to Envoy Media (McGraw's new media company).

The Debtor cannot use the bankruptcy process for the sole benefit of McGraw.

62.     Furthermore, as detailed above, the Chapter 11 Case was filed to obtain a tactical

litigation advantage (which is also an improper bankruptcy purpose).[83] Indeed, the Chapter 11

---

[80]    *See, e.g., Ozcelebi*, 639 B.R. 396-97; *In re Rent-A-Wreck of Am., Inc*., 580 B.R. at 383 ("One of the purposes
of chapter 11 is to maximize property available to satisfy creditors.").

[81]    *In re Integrated Telecom Express, Inc*., 384 F.3d 108, 129 (3d Cir. 2004) (emphasis added).

[82]    *See* Interim DIP Order ¶ 34.

[83]    *See In re Antelope Techs., Inc.,* 431 F.App'x 272, 275 (5th Cir. 2011) (affirming dismissal where the district
court found that the purpose of the petition was not primarily to reorganize or respond to a financial crisis
but to gain an unfair advantage in a shareholder derivative action).

4912-6822-3572.11

Case was filed to jam Trinity in a truncated litigation timeline—particularly as it relates to the alleged Preference Claim. The litigation purpose inherent in the bankruptcy filing is evident from the fact that the Complaint was filed prior to any substantive pleadings in the bankruptcy itself.

63.     Accordingly, there is ample cause to find the Chapter 11 Case was commenced in bad faith. The primary purpose of this Chapter 11 Case is to take advantage of the debtor-in-possession's avoidance powers all to benefit one of the Debtor's stakeholders. That is not a valid bankruptcy purpose. One of the primary purposes of a Chapter 11 is to "maximize property *available to satisfy creditors*."[84]

**B.     Because there is Ample Cause to Find Bad Faith, the Court Should Dismiss the Chapter 11 Case, or in the Alternative Convert to a Chapter 7 Case under Section 1112(b) of the Bankruptcy Code.**

64.     Upon finding cause, the Court must determine whether conversion or dismissal is in the best interest of the creditors and the estate.[85] There is no brightline test to determine whether conversion or dismissal is the best interest of the estate.[86] The decision is left to the discretion of the Court.[87]

65.     Trinity submits that the creditors would be served best by dismissal of this case. As detailed above, the Debtor is essentially not operating, has very few remaining employees, no cash flow or cash to facilitate a plan of reorganization or liquidation, and commenced this Chapter 11 Case with the only goals being to fund a litigation against Trinity and allow McGraw/Peteski to acquire the assets. "Resort to the protection of the bankruptcy laws is not proper under these

---

[84]     *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 383 (emphasis in the original).

[85]     11 U.S.C. § 1112(b).

[86]     *Ozcelebi*, 639 B.R. at 365; *In re Fleestar LLC*, 614 B.R. 767, 781 (Bankr. E.D. La. 2020).

[87]     *In re M.A.R. Designs & Construction, Inc.*, 653 B.R. 843, 872 (Bankr. S.D. Tex. 2023).

circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's terminal euphoria.'"[88]

66.     Moreover, everything that the Debtor seeks to do through this Chapter 11 process can be, and should be, done outside bankruptcy. There was no reason to commence bankruptcy but-for allowing McGraw/Peteski to credit bid at almost no cost and provide zero benefit to creditors while also enjoying the benefit of exceptionally broad releases proposed to be approved on a final basis in the Interim DIP Order. Neither this Court nor the Debtor's creditors should be subjected to the costs and delays of a bankruptcy proceeding under these conditions. As such, dismissal of this Chapter 11 Case is in the best interest of the estate.

67.     In the alternative, Trinity submits that conversion could also provide a meaningful chance of recovery and would be more appropriate than MSM remaining in chapter 11. Because the Debtor is essentially not operating and has little to no assets, a chapter 7 trustee would be fully equipped to conduct a sale (if it so chose) in a manner that maximizes value for creditors, without the artificial encumbrance of the superpriority DIP Facility and saddling the estate with millions of dollars of unnecessary professional fees. In other words, because there is nothing to legitimately reorganize, and no ongoing operations to protect, conversion to chapter 7 with an independent fiduciary (the chapter 7 trustee) in place would minimize administrative costs, allow for an independent review of the needs of the estate and the best way to maximize the value of assets, and ultimately pave the way for a more meaningful distribution to the Debtor's creditors and other stakeholders. Any assets of the estate would remain to be liquidated, and McGraw/Peteski would be allowed to bid real dollars.  What he would not be allowed to do is orchestrate the entire bankruptcy filing to direct the assets to himself in exchange for funding litigation where no one benefits but him.

---

[88]     *Little Creek*, 779 F.2d at 1073.

4912-6822-3572.11

**C.     In Alternative, the Court Should Appoint a Chapter 11 Trustee Under Sections 1112(b) and/or 1104(a) of the Bankruptcy Code.**

68.     Even if the Court were to determine that dismissal or conversion is not appropriate, Trinity submits that a Chapter 11 trustee under section 1104(a) should be appointed at this time. Section 1112(b) of the Bankruptcy Code provides that if there is cause to convert or dismiss a case, the Court may instead appoint a Chapter 11 trustee under section 1104(a) if it is in the best interest of creditors and the estate.[89] In making this determination, one court observed that:

> the distinguishing factor is the expanded possibility in Chapter 11 for a trustee using independent judgment and good management to direct the affairs of the estate including on-going operations (if any) in order to optimize recovery for the creditors and the estate.[90]

69.     As detailed above, ample cause exists under section 1112(b) to find that the Debtor filed its Chapter 11 Case in bad faith.  Creditors would be best served by an independent trustee— not one that is currently under the control of McGraw/Peteski. An independent trustee (whether it be one appointed in a Chapter 11 or Chapter 7 case) will best serve the interests of *all* creditors and stakeholders.  Thus, if the Court determines it is in the best interest of creditors and the estate to keep the Debtor in a Chapter 11 case, then Trinity respectfully requests that a Chapter 11 trustee be appointed.

> **i.     *The Court Should Appoint a Chapter 11 Trustee for Cause under Section 1104(a)(1) Because there is an Irresolvable Conflict of Interest Between the Debtor and Peteski.***

70.     In addition to cause under section 1112(b), cause also exists under section 1104(a)(1) to appoint a Chapter 11 trustee.  Section 1104(a)(1) requires the Court to appoint a Chapter 11 trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement

---

[89]     *See, e.g., In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *6 (Bankr. N.D. Tex. Mar. 14, 2008); *In re NOA, LLC*, 578 B.R. 534, 541 (Bankr. E.D.N.C. 2017) ("Section 1112 and Section 1104 read together require the court to make a finding as to what remedy is in the best interest of the creditors and the estate.").

[90]     *NOA, LLC*, 578 B.R. at 541 (quoting *In re Sydnor*, 431 B.R. 584, 600 (Bankr. D. Md. 2010)) (cleaned up).

of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause."[91]

71.     Although section 1104(a)(1) provides four types of misconduct that constitute cause to appoint a trustee (e.g., fraud, dishonesty, incompetence, and gross mismanagement), these examples are not exclusive.[92] For instance, courts have determined that cause exists when there is a conflict of interest or when the debtor fails to discharge its fiduciary duties.[93] The legal principles underlying this are straightforward: as a "debtor-in-possession," the debtor owes fiduciary duties, such as the duty of care, duty of loyalty, and duty of impartiality.[94] If the debtor is clearly incapable of performing such fiduciary duties, a chapter 11 trustee may be appointed pursuant to section 1104(a) of the Bankruptcy Code.[95]

72.     Here, it is questionable at best as to whether the Debtor is able to perform its fiduciary duties during this Chapter 11 Case. As the DIP Financing and Bid Procedures make clear: it is McGraw *vis-à-vis* Peteski that is running this Chapter 11 Case—not the Debtor.  Peteski is using the Debtor and this Chapter 11 Case to wipe out Trinity's security interest and inflate its own security interest to acquire the Debtor for little to no meaningful value to the estate.  Put simply, the Debtor is being controlled by McGraw to effectuate a sale of substantially all its assets to an insider (McGraw/Peteski) that will provide absolutely no benefit to the Debtor's other

---

[91]     11 U.S.C. § 1104(a)(1).

[92]     11 U.S.C. § 1104(a)(1); *see, e.g., In re Sillerman,* 605 B.R. 631, 641 (Bankr. S.D.N.Y. 2019) ("The words 'including' and 'or similar cause' allow the court to consider other conduct in analyzing whether there is cause to appoint a trustee."); *In re Futterman*, 584 B.R. 609, 616 (Bankr. S.D.N.Y. 2018) (noting other types of conduct that constitute cause include "inappropriate relations between corporate parents and subsidiaries, misuse of assets and funds, inadequate record-keeping and reporting, and various instances of conduct found to establish fraud or dishonesty, lack of credibility, and lack of creditor confidence.").

[93]     *See*, *e.g., Patman Drilling Int'l, Inc.,* 2008 WL 724086, at *6; *Sillerman,* 605 B.R. at 647-48.

[94]     *In re Ford Steel, LLC,* 629 B.R. 871, 890 (Bankr. S.D. Tex. 2021); *In re Bowman*, 181 B.R. 836, 842-43 (Bankr. D. Md. 1995).

[95]     *See Sillerman*, 605 B.R. at 648 (citing *In re Ionosphere Clubs, Inc*., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990)).

creditors. A debtor-in-possession owes fiduciary duties *to all of its creditors*; its job "is to make sure the creditors are paid."[96] It appears Debtor has abdicated this duty by facilitating a sale intended to benefit one insider—McGraw/Peteski. This alone is sufficient cause to appoint a trustee.[97]

73.    Moreover, the Debtor's prepetition conduct with McGraw/Peteski further demonstrates the Debtor's inability to carry out its debtor-in-possession duties. For instance, prior to June 18, 2025 (after the first alleged funding of the Bridge Loans was made on June 10), McGraw was allegedly the sole board member of the Debtor.[98] McGraw then handpicked and appointed Mr. Broadbent to the Debtor's board—McGraw was the only vote needed for Mr. Broadbent's appointment.[99] It is also unclear as to whether McGraw, in control of Peteski, was involved in DIP Financing negotiations with Peteski prior to Mr. Broadbent's appointment as CRO and "Independent" Director of the Debtor.[100] It seems impossible for him not to have been on both sides of that transaction.

74.    These facts do not instill confidence that the Debtor is capable of carrying out its fiduciary duties. As such, cause exists to appoint a Chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code.

---

[96]    *Bowman*, 181 B.R. at 843.

[97]    *See, e.g., Royal Alice Props.,* 2020 WL 5357795, at *10 (finding cause to appoint a Chapter 11 trustee because the managers of debtor were operating the debtor for their own benefit and not creditors).

[98]    July 3, 2025 Hr'g Tr. 45:23-46:3.

[99]    *Id.* 45:16-22.

[100]    It is also worth noting that Peteski's legal counsel, Jackson Walker LLP, also represented the Debtor prior to the Petition Date. According to the Mr. Broadbent, Jackson Walker LLP represented MSM in connection with the PBR Arbitration—which was commenced in November 2024 and remains ongoing. *See id.* 43:21-44:6 (Q: Are you aware that Jackson Walker had previously -- has been representing the Debtors up through perhaps today? Or yesterday? A: So, I think Jackson Walker has been longstanding counsel to Peteski. They did represent Merit Street in a dispute with the Professional Bull Riders Association. You know, Matt Cavenaugh can speak to the scope of that engagement. Q: Okay. But to your knowledge, they have been -- they have been representing the Debtors as well? A: In that dispute, yes.).

ii. ***The Court Should Appoint a Chapter 11 Trustee Under Section 1104(a)(2) Because Appointment is in the Interests of the Creditors, Equity Security Holders, and Other Interests.***

75.     Trinity further submits that in the absence of dismissal or conversion, the appointment of a Chapter 11 trustee is in the "interests of the creditors, any equity security holders, and other interests of the estate[.]"[101]  In making such a determination, "the court should consider the practical realities, necessities of the case, and the totality of the circumstances in determining whether to appoint a trustee."[102] In addition, courts consider the following factors which should be balanced against the cost of appointment:

> (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee; balanced against the cost of the appointment.[103]

76.     *First*, while under the control of McGraw/Peteski the trustworthiness of the Debtor to protect the interests of the estate is questionable at best. As noted above, the Debtor is intending to facilitate a sale that provides zero benefit or recoveries to other creditors and steers MSM's assets to McGraw/Peteski or an entity they designate.

77.     *Second*, the Debtor's prospects of rehabilitation are slim to none. After a sale that would yield no proceeds, there is nothing left to reorganize (let alone liquidate).

78.     *Third*, the fact that the Debtor's only "Independent" Director was appointed and approved at the sole discretion of McGraw, Trinity is not confident in the Debtor's present management.

---

[101]     11 U.S.C. § 1104(a)(2).

[102]     *Ford Steel, LLC,* 629 B.R. at 890 (citing *Ionosphere Clubs,* 113 B.R at 168).

[103]     *Royal Alice Props.*, 2020 WL 5357795, at *11 (quoting *Ionosphere Clubs*, 113 B.R. at 168); *Ford Steel,* 629 B.R. at 890; *In re Esco Elevators, Inc.*, No. 494-44339-MT, 1995 WL 605982, at *3 (Bankr. N.D. Tex. Jan. 31, 1995).

4912-6822-3572.11

79.     _Fourth_, there would be no additional cost to the estate with the appointment of a Chapter 11 trustee.  Rather, additional benefit could be brought into the estate with the appointment of an independent trustee because such trustee could pursue a real value maximizing sale process.  It could also reevaluate the Approved Budget to maximize recoveries for all creditors.

80.     But overall, and perhaps the most important justification here, is that the appointment Chapter 11 trustee cleanses the Debtor of all material conflicts of interest—_i.e._, removes McGraw/Peteski from control.  As detailed above, the entire objective of this Chapter 11 Case is to inflate McGraw/Peteski's security interest and sell substantially all of the Debtor's assets free of charge.  This is not only an invalid bankruptcy purpose, it also demonstrates that the Debtor is not acting as a fiduciary for all creditors.  To that end, the only way to give the creditors any real chance of recoveries here would be to appoint a Chapter 11 trustee.

## VI.
## <u>CONCLUSION</u>

81.     The Debtor did not have the proper corporate authority to file this Chapter 11 Case, and thus, the Court lacks jurisdiction and the case must be dismissed. This Chapter 11 Case also serves no legitimate or valid bankruptcy purpose. The Debtor is hardly operational; has no cash flow; a handful of employees; and there is nothing to reorganize or liquidate for the benefit of creditors. Rather, the Debtor commenced this Chapter 11 Case at the behest of McGraw/Peteski to commence litigation with Trinity and wipe out its security interest secured creditor in order to transfer value to McGraw/Peteski. This Chapter 11 Case should be dismissed, or at least, converted to a Chapter 7 case.  In the alternative, Trinity submits that under these facts and circumstances the appointment of a Chapter 11 trustee is also warranted.

4912-6822-3572.11

WHEREFORE, Trinity respectfully requests that this Court enter an order (a) dismissing this Chapter 11 Case, (b) converting this Chapter 11 Case to a case under chapter 7; or (c) appointing a chapter 11 trustee; and (d) grant such other and further relief as may be just and proper.

DATED: July 18, 2025

Respectfully submitted by:

*/s/ Mark C. Moore*
Holland N. O'Neil (TX 14864700)
Robert Slovak (TX 24013523)
Steven C. Lockhart (TX 24036981)
Mark C. Moore (TX 24074751)
Stephanie L. McPhail (TX 24104104)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
rslovak@foley.com
slockhart@foley.com
mmoore@foley.com
smcphail@foley.com

-and-

Rajiv Dharnidharka
(admitted *pro hac vice*)
**FOLEY & LARDNER LLP**
555 California Steet, Suite 1700
San Francisco, CA 94104
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
rajiv.dharnidharka@foley.com

-and-

Nora J. McGuffey (TX 24121000)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-4366
Facsimile: (312) 832-4700
nora.mcguffey@foley.com

***Attorneys for Trinity Broadcasting of Texas, Inc.
dba Trinity Broadcasting Network and TCT
Ministries, Inc.***

36

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2025, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.

*/s/ Nora J. McGuffey*

Nora J. McGuffey

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 9007-1(f) and Section J.34 of the Complex Procedures, on July 18, 2025, I conferred with Debtor's counsel at Sidley Austin LLP regarding the filing of the Motion and relief sought herein. I understand counsel does not consent to the relief requested herein, and the Motion is considered contested.

*/s/ Mark C. Moore*

Mark C. Moore

4912-6822-3572.11