Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967

Asher Bublick
for the United States Trustee
asher.bublick@usdoj.gov

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No.    25-80156-swe11** |
| | § | |
| **MERIT STREET MEDIA, INC.,[1]** | § | **Chapter 11** |
| | § | |
| *Debtor*. | § | |
| | § | |

**UNITED STATES TRUSTEE'S OBJECTION TO
THE DEBTOR'S POSTPETITION FINANCING MOTION**

TO THE HONORABLE SCOTT W. EVERETT, U.S. BANKRUPTCY JUDGE:

Lisa L. Lambert, the United States Trustee for Region 6 (the "**United States Trustee**"),

files this Objection to *Debtor's Emergency Motion for Entry of Interim and Final Orders (I)*

*Authorizing the Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens*

*and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay,*

*(IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**") [ECF No.

11]. In support of this Objection, the United States Trustee states:

**OVERVIEW**

The United States Trustee objects to the relief sought in the DIP Motion for the following reasons:

  i.    Debtor proposes to roll-up an insider prepetition bridge loan without proof of meeting the
        "entire fairness" standard;

  ii.   Debtor grants liens on chapter 5 causes of action;

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is
5501 Alliance Gateway Fwy, Fort Worth, TX 76177.

**UNITED STATES TRUSTEE'S OBJECTION TO
THE DEBTOR'S POSTPETITION FINANCING MOTION**                                                    **Page 1**

iii.    Debtor waives surcharge rights under § 506(c);

iv.    Debtor waives the "equities of the case" exception under § 552(b); and

v.    Debtor waives the equitable doctrine of "marshaling" with respect to any collateral securing the DIP Facility Loans or the Prepetition Bridge Obligations.[2]

## BACKGROUND

1.    On July 2, 2025, Merit Street Media, Inc. ("**Merit Street**" or "**Debtor**") filed its chapter 11 petition in this Court.

2.    The Debtor is a Texas-based multicast television network and streaming service.

3.    Peteski Productions, Inc. ("**Peteski**") is Dr. Phil McGraw's ("**Dr. Phil**") production company that owns 66.5% of Merit Street. Broadbent Declaration at ¶¶ 8, 13. Dr. Phil serves as Peteski's President and Chief Executive Officer. *See* Franchise Tax Account Status, Texas Comptroller of Public Accounts, https://comptroller.texas.gov/taxes/franchise/account-status/search/32003988881 (last visited August 8, 2025) (showing that for FY 2024, Dr. Phil served as Peteski's CEO/President and sole director); *see also* Broadbent Declaration at ¶ 14 (noting that Dr. Phil was the only other member of the board of Merit Street until June 18, 2025, when Gary Broadbent was appointed by Merit Street as an independent director and sole member of a special committee that oversaw negotiations of the DIP Financing).

4.    According to the *Declaration of Gary Broadbent, Chief Restructuring Officer of the Debtor, in Support of the Debtor's Chapter 11 Proceeding* (the "**Broadbent Declaration**") filed on July 2, 2025, from February 2025 through May 2025, Merit Street pursued investors for potential equity funding but was unable to obtain additional third-party equity financing. [ECF No. 14] at ¶ 49.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Motion.

5.      "In turn, following extensive, arms-length negotiations with Peteski, Merit Street executed the Bridge Loan which provided $7,966,636 in funding for Merit Street to prepare for this Chapter 11 Case and commence good faith negotiations with key parties." Broadbent Declaration at ¶ 49.

6.      On June 30, 2025, Merit Street entered into the Bridge Agreement with Peteski, as lender, in the principal amount of $6,966,636. DIP Motion at ¶ 17. The Bridge Loan is secured by a lien on substantially all of the Debtor's assets. *Id.* On June 10, 2025, Peteski advanced a portion of the Bridge Loan to the Debtor in an amount equal to $1,666,636.00. On June 24, 2025, and June 30, 2025, Peteski subsequently advanced $1,300,000 and $5 million, respectively, to the Debtor. Broadbent Declaration at ¶ 27 n.4.

7.      According to the *Declaration of Lisa K. Lansio in Support of Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Lansio Declaration**") filed on July 2, 2025, the Debtor incurred substantial losses through the Petition Date, which were exacerbated by its ongoing litigation disputes with TBN and PBR. [ECF No. 12] at ¶ 8.

8.      In June of 2025, the Debtor retained Portage Point to provide financial advisory and investment banking services in connection with this case. Lansio Declaration at ¶ 7.

9.      At the direction of the Debtor, Portage Point solicited third-party interest in providing debtor-in-possession financing to the Debtor ("**DIP Financing**"). *Id.* at ¶ 11.

10.     Portage Point contacted eight institutions that routinely provide debtor-in-possession financing to solicit offers to provide the Debtor with DIP Financing. *Id.*

11.     The Debtor did not receive any proposals for DIP financing from third parties and ultimately focused on negotiating with Peteski:

> The parties contacted by Portage Point indicated they were unwilling to extend financing to the Debtor for several reasons including (i) concerns around whether the DIP financing would be repaid in full given the Company was not entering chapter 11 with a prepackaged or pre-arranged chapter 11 plan or stalking horse purchase agreement, (ii) the size of the DIP Facility and proposed limited duration of the Chapter 11 Case made it challenging for a third-party to achieve sufficient economic returns, and (iii) the nature of the Company's assets and the fact that the Company had limited to no accounts receivable and receipts meant that the DIP recovery may be compromised in a downside scenario. Furthermore, the adjudication of the Preference Claim Count[3] created uncertainty for potential third-party DIP lenders.
>
> Accordingly, the Debtor's financing process focused primarily on developing an actionable proposal with the DIP Lender. Importantly, the Debtor established safeguards aimed at protecting the integrity of its process as it negotiated with Peteski. Among other things, I understand the Company appointed Gary Broadbent as independent director and the sole member of a special committee of the Company's board of directors (the "Special Committee"). The Debtor provided regular updates to the Special Committee, which oversaw the negotiations regarding the terms of the DIP Financing. The Debtor and Peteski also engaged separate advisors. The parties and their advisors negotiated multiple iterations of a term sheet outlining the terms of the DIP Financing (the "DIP Term Sheet").

*Id.*

12.     Leading up to the commencement of this case, the Debtor and Peteski, with the assistance of their respective advisors, negotiated the terms and provisions of the proposed DIP Financing. *Id.* at ¶ 14.

13.     "The negotiations resulted in concessions made by Peteski, including increasing the size of the DIP Facility, reducing the amount of fees and interest, and other key provisions." *Id.*

---

[3] The Debtor alleges in its Adversary Complaint against TBN and TCT—among other things—that, because TCT did not file a financing statement until May 2025, TCT received an avoidable preference under 11 U.S.C. § 547(b) because the transfer occurred within 90 days prior to the Petition Date. DIP Motion at ¶ 2 n.3.

**UNITED STATES TRUSTEE'S OBJECTION TO**
**THE DEBTOR'S POSTPETITION FINANCING MOTION**

14. In regard to the Roll-Up of Peteski's Bridge Loans, Peteski would not have been willing to provide the DIP Facility or extend credit to Merit Street without the Roll-Up:

> the RollUp of the Prepetition Bridge Loans into the DIP Facility upon entry of the Final Order was negotiated by the parties and is an integral component of the overall terms of the DIP Facility required by the DIP Lender as consideration for the extension of postpetition financing, and I understand that Peteski, in its capacity as Prepetition Bridge Lender, would not otherwise consent to the use of their Cash Collateral, or, in its capacity as DIP Lender, would not be willing to provide the DIP Facility or extend credit to the Debtor thereunder without the conversion of the Roll-Up Loan.

*Id.* at ¶ 15.

15. On July 2, 2025, Debtor filed its DIP Motion seeking approval of a DIP Facility that would provide the Debtor with approximately $21.4 million of debtor-in-possession financing in the form of (A) approximately $13.4 million of new money loans and (B) approximately $7.9 million of rolled-up Bridge Loans (upon entry of a final order approving DIP Financing). [ECF No. 11] at ¶ 2.

16. With respect to the funding of the DIP Facility, the First Declaration noted:

> Importantly, Peteski has agreed to provide an interim advance of $4.1 million upon entry of an interim order approving DIP Financing in order for the Debtor to operate its business during the interim period and commence the Adversary Complaint; however, the balance of the DIP Financing will only be funded if, among other condition precedents, the Debtor receives a favorable adjudication of the Preference Claim Count.

[ECF No. 14] at ¶ 50.

17. On July 3, 2025, the Court entered an interim order granting the DIP Motion (the "**Interim Order**"). [ECF No. 35].

## OBJECTION

### I. *The DIP Motion improperly proposes to roll-up an insider prepetition bridge loan*

18. The Debtor has not satisfied the standards required for the Court to approve the DIP Motion. A debtor seeking court approval of debtor-in-possession financing must demonstrate that (1) the financing arrangement is necessary to preserve assets of the estate and (2) the arrangement is otherwise fair and reasonable.[4]

19. Courts routinely recognize that "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a prepetition lien on cash collateral."[5] As a result, courts are cautious in approving financing terms that are considered harmful to an estate and its creditors.[6] Thus, although certain terms unfavorable to the debtor may be permitted as a reasonable exercise of a debtor's business judgment, bankruptcy courts have declined to approve financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of the lender.[7]

20. A "roll-up" allows the payment of pre-petition debt with a post-petition loan:

> Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money

---

[4] *In re Premier Ent. Biloxi LLC*, No. 06-50975, 2007 Bankr. LEXIS 3939, at *7 (Bankr. S.D. Miss. Feb. 2, 2007) (citation omitted); s*ee also In re N. Bay Gen. Hosp., Inc.*, No. 08-20368, ECF No. 21 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on the basis that the terms of the financing were "fair and reasonable" and "supported by reasonably equivalent value" and "consideration"); *In re Futures Equity L.L.C.*, No. 00-33682, 2001 Bankr. LEXIS 2229, at *14 (Bankr. N.D. Tex. Apr. 11, 2001) (same).

[5] *In re Def. Drug Stores, Inc*., 145 B.R. 312, 317 (BAP 9th Cir. 1992).

[6] *See, e.g.*, *In re Laffite's Harbor Dev. I, LP*, No. 17-36191, 2018 Bankr. LEXIS 2, at *6 (Bankr. S.D. Tex. Jan. 2, 2018) ("[C]ourts look to whether the proposed terms [in financing arrangements] would prejudice the powers and rights that the [Bankruptcy] Code confers for the benefit of all creditors and leverage the [c]hapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest.").

[7] *Id.*; *see also In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor) (citing *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)).

being lent to the debtor. As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order. In both a refinancing and a roll-up, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash. For present purposes, however, there is no difference. The point is that a pre-petition secured claim can be paid outside of a plan of reorganization.

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010) (footnotes omitted).

21. "Although there is little reported decisional law to describe the bases for approval of roll-ups, the factors a court may consider in reviewing a roll-up facility are: the liquidity needs of the debtor; whether alternative financing is available on more favorable terms, if at all; whether the secured lender is oversecured; and the extent of the roll-up." 2 *Collier Bankruptcy Practice Guide* ¶44.06 (2025).

22. As an initial matter, the Debtor misstates the standard applicable for approval of the DIP Motion.[8] Although "business judgment" is the default standard of review, a more exacting standard applies where the DIP Facility is an "insider transaction."[9] A "claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."[10] Where the DIP Facility is an insider transaction, the DIP Facility is subject to a heightened scrutiny review, also referred to as the "entire fairness doctrine."[11]

---

[8] *See* DIP Motion [ECF No. 4] at 32-34.

[9] *See In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020) (holding that the DIP Facility was an insider transaction subject to review under the entire fairness doctrine); *see also In re MSR Hotels & Resorts, Inc.*, 2013 WL 5716897, at *1 (finding that approval of the Debtors' proposed DIP financing was subject to a heightened scrutiny standard given the "interrelationship between the parties" to the DIP financing).

[10] *In re Equip. Eq. Holdings, Inc.*, 491 B.R. 792, 842 (Bankr. N.D. Tex. 2013) (quoting *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 744-45 (3d Cir. 2006)).

[11] *Id.*; *see also In re MSR Hotels & Resorts, Inc.*, 2013 WL 5716897, at *1.

UNITED STATES TRUSTEE'S OBJECTION TO
THE DEBTOR'S POSTPETITION FINANCING MOTION                                    Page 7

23.     That is the case here. The DIP Lender, Peteski is the Debtor's majority shareholder,[12] making the DIP Facility an insider transaction and the entire fairness standard applicable.

24.     Under the entire fairness standard, the Debtor must prove "the entire fairness of the transaction" by establishing that the insider DIP Facility "was the product of both fair dealing and fair price."[13] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be *objectively fair*, independent of the board's beliefs."[14]

25.     There are two aspects of the entire fairness inquiry: (i) fair dealing, which "focuses on the actual conduct of the corporate fiduciaries in effecting the transaction," and (ii) fair price, which "relates to the economic and financial considerations of the transaction."[15] The Debtor must prove both fair dealing and fair price to meet its burden.[16]

26.     Here, the Debtor has not established either. Debtor merely alleges that Portage Point contacted eight parties on its behalf that were unwilling to extend financing to the Debtor before focusing on negotiations with Peteski. The Debtor has not provided information as to what type of lenders were approached, what was the timeline for these contacts, and what negotiations (if any) were had with those parties. Further, the Debtor does not state when negotiations were commenced with Peteski.

---

[12] *See* Petition, Corp. Ownership Statement [ECF No. 1] (showing that Peteski Productions, Inc. owns a 66.5% equity interest in Debtor); 11 U.S.C. § 101(31).

[13] *See In re Latam Airlines Grp. S.A.*, 620 B.R. at 769 (the insider bears the "burden of showing the 'entire fairness' of the transaction at issue"); *see also In re Signature Apparel Group LLC*, 577 B.R. 54, 101 (Bankr. S.D.N.Y. 2017) ("Under the entire fairness standard, a defendant must establish that a transaction was a product of both fair dealing and fair price.").

[14] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006) (emphasis added).

[15] *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 407 (S.D. Tex. 2008).

[16] *Id.*

27.    Merit Street's appointment of Gary Broadbent as independent director and sole member of a special committee to oversee the negotiations of the DIP Financing also does not support the conclusion that the DIP Financing negotiated with Peteski was the product of both fair dealing and fair price as, prior to his appointment two weeks before the Petition Date, Dr. Phil—the President and CEO of Peteski—was Merit Street's sole director.

28.    The Debtor has failed to demonstrate that the insider DIP Facility was the result of fair dealing, which "includes how the transaction was initiated, structured and negotiated and the timing of the transaction."[17] For instance, prior to the appointment of Gary Broadbent as an independent director and sole member of the Special Committee, it is unclear if there was an arms-length negotiation if Dr. Phil was representing both Merit Street and Peteski in negotiations.[18]

29.    The Debtor has similarly failed to satisfy the second element of the entire fairness standard: that the insider DIP Facility is at a fair price. Fair price "requires proof that 'the price offered was the highest value reasonably available under all the circumstances,'"[19] and can "be established by demonstrating that no better alternatives were available."[20] Although the Debtor has alleged that Portage Point contacted eight third-party lenders to solicit offers to provide Debtor with DIP Financing to support this case, it did not receive any proposals, and "[a]ccordingly "the Debtor's financing process focused primarily on developing an actionable proposal with the DIP

---

[17] *ASARCO*, 396 B.R. at 407.

[18] Notwithstanding the relationship between Merit Street and Peteski, Portage Point maintains that the process to obtain the DIP Financing was conducted in good faith and at arm's length because the Debtor established safeguards aimed at protecting the integrity of its process as it negotiated with Peteski by (i) appointing Gary Broadbent as independent director and the sole member of a special committee of the Company's board of directors to oversee the negotiations regarding the terms of the DIP Financing and (ii) the Debtor and Peteski engaged separate advisors. Lansio Declaration at ¶¶ 12-13.

[19] *ASARCO*, 396 B.R. at 407 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[20] *In re Latam Airlines Grp. S.A.*, 620 B.R. at 791.

**UNITED STATES TRUSTEE'S OBJECTION TO**
**THE DEBTOR'S POSTPETITION FINANCING MOTION**                                          **Page 9**

Lender . . ..["21] The Debtor has failed to offer any proof that the insider DIP Facility was for a fair price and on reasonable terms.

30.     Given that the proposed DIP Facility is an insider loan from Peteski, the Debtor should be required to put on evidence that rolling-up the pre-petition debt into a post-petition priming lien is in the best interests of the estate, with fair and reasonable terms, and that creditors will benefit.[22]

## II.     *The DIP Motion improperly grants to the DIP Lender a lien against chapter 5 causes of action*

31.     The DIP Motion would improperly provide additional liens on chapter 5 causes of action and their proceeds.[23] These proposed liens are additional liens on previously unencumbered property, above and beyond the superpriority administrative expense status for the loan facility, in the aggregate principal amount of up to $21.4 million in proposed DIP funds from the DIP Lender.

32. The Court should not approve or authorize liens on chapter 5 causes of action.  Typically, these avoidance actions are a source of recovery for general unsecured creditors in chapter 11 cases. *Cf. Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors …."); Chapter 5 avoidance actions are not the Debtor's property, but instead are rights created by statute that may be used for the benefit of creditors.  *See In re Cybergenics Corp.*, 226 F.3d 237, 243-45 (3d Cir. 2000) (state law fraudulent transfer claim is not an asset of the debtor).

33.     As of this filing, the Debtor has failed to produce evidence valuing these potential

---

[21] DIP Motion at ¶¶ 21-22.
[22] *See In re FCX, Inc*., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").
[23] Interim Order at ¶¶ 5, 11

**UNITED STATES TRUSTEE'S OBJECTION TO**
**THE DEBTOR'S POSTPETITION FINANCING MOTION** **Page 10**

avoidance actions. In addition, the Debtor is actively litigating whether TCT's liens can be avoided as a preference, which may potentially give rise to additional collateral for the DIP Lender's security. At a minimum, the Debtor should be required to prove its analysis of potential avoidance actions and why they should not be carved out for the benefit of general unsecured creditors.

### III.     *The DIP Motion improperly waives parties' right to surcharge collateral*

34.     The United States Trustee objects to any provisions waiving Debtor's or a successor trustee's right to surcharge collateral under 11 U.S.C. § 506(c). Under the proposed Final Order, Debtor agrees to waive its right to surcharge the collateral under 11 U.S.C. § 506(c). *See* Interim Order [ECF No. 35] at ¶ 25. Here, the DIP Lender is not unreasonably exposed to the surcharge of its collateral. Secured lenders are typically the primary beneficiaries of a chapter 11 case. Waiving section 506(c) rights deprives the estate of a tool to recover administrative expenses, harming unsecured creditors who rely on estate funds. Furthermore, the party seeking recovery under section 506(c) bears the burden of demonstrating a direct benefit to the lender's collateral. *New Orleans Public Service, Inc. v. First Federal Savings and Loan Association of Warner Robins, Georgia (In re Delta Towers),* 924 F.2d 74, 76 (5th Cir. 1991). Retaining section 506(c) rights preserves the estate's ability to recover legitimate costs (e.g., sale-related expenses) while ensuring judicial oversight, benefiting unsecured creditors without unduly burdening the DIP Lender. The parties should be required to demonstrate to the Court why the section 506(c) waiver is necessary given that the DIP Lender would not be prejudiced if this right were not waived.

### IV.     *The DIP Motion's waiver of 552(b) equities of the case exception is prejudicial to the estate and unsecured creditors*

35.     The United States Trustee objects to the waiver of 11 U.S.C. § 552(b)'s equities of the case exception in the Debtor's DIP Motion as it unduly prejudices the estate and unsecured creditors by eliminating the Court's ability to equitably adjust the DIP Lender's post-petition liens

---

on proceeds generated through estate efforts. *See* Interim Order [ECF No. 35] at ¶ 27.  In this sale-driven chapter 11 case, the Debtor's asset sales are likely to produce significant proceeds from pre-petition collateral, and estate expenditures may enhance that value. Waiving section 552(b) deprives the Court of discretion to allocate these proceeds fairly, as contemplated by the statute, potentially allowing the DIP Lender to capture value created by the unsecured creditors' contributions. Such waiver undermines creditor protections and requires justification.

## V.      *The DIP Motion improperly constrains creditors from enforcing any marshaling provisions against DIP Lenders*

36.      The proposed Final Order prevents any party from asserting the equitable doctrine of marshaling against the lenders.  *See* Interim Order [ECF No. 35] at ¶ 26.  The United States Trustee objects to this provision to the extent it prevents other creditors from invoking the doctrine of marshaling, should cause arise. In this sale-driven chapter 11 case, marshaling is essential to ensure junior lienholders and unsecured creditors benefit from equitable allocation of sale proceeds from diverse collateral pools.

## CONCLUSION

The United States Trustee respectfully requests that the Court enter an order denying the DIP Motion. The United States Trustee also requests any other relief to which the United States Trustee may be entitled.

Dated: August 11, 2025

Respectfully submitted,

LISA L. LAMBERT
UNITED STATES TRUSTEE

*/s/ Asher M. Bublick*
Asher M. Bublick
Texas State Bar No. 24113629
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967
asher.bublick@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on August 11, 2025, that I sent a copy of the forgoing document via ECF.

*/s/ Asher M. Bublick*
Asher M. Bublick