Holland N. O'Neil (TX 14864700)
Robert Slovak (TX 24013523)
Steven C. Lockhart (TX 24036981)
Mark C. Moore (TX 24074751)
Stephanie L. McPhail (TX 24104104)
Davis G. Mosmeyer III (TX 24106346)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
rslovak@foley.com
slockhart@foley.com
mmoore@foley.com
smcphail@foley.com
dmosmeyer@foley.com

Rajiv Dharnidharka
(admitted *pro hac vice*)
**FOLEY & LARDNER LLP**
555 California Steet, Suite 1700
San Francisco, CA 94104
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
rajiv.dharnidharka@foley.com

Nora J. McGuffey (TX 24121000)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-4366
Facsimile: (312) 832-4700
nora.mcguffey@foley.com

*Attorneys for Trinity Broadcasting of Texas, Inc.*
*dba Trinity Broadcasting Network and TCT Ministries, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| MERIT STREET MEDIA, INC.,[1] | § § | Case No.: 25-80156-11 (SWE) |
| Debtor. | § § | |

## TRINITY BROADCASTING OF TEXAS, INC. AND TCT MINISTRIES, INC.'S REPLY IN SUPPORT OF THE EMERGENCY MOTION FOR AN ORDER: (I) DISMISSING DEBTOR'S CHAPTER 11 CASE, (II) CONVERTING THE CASE TO CHAPTER 7, OR (III) APPOINTING A CHAPTER 11 TRUSTEE

Trinity Broadcasting of Texas, Inc. dba Trinity Broadcasting Network ("**TBN**") and TCT

Ministries, Inc. ("**TCT**" and together with "TBN," "**Trinity**"), file this reply ("**Reply**") in support

of the *Emergency Motion for an Order: (I) Dismissing the Debtor's Chapter 11 Case, (II)*

*Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* [Docket No. 100] (the

---

[1]     The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy., Fort Worth, Texas 76177.

"**Motion to Dismiss**"),[2] and respectfully state as follows:

# I.
## INTRODUCTION

1.      The hearings scheduled for September 16–18 on the Motion to Dismiss will require the Court to answer two legally simple but factually complex questions: (1) did MSM lack the requisite corporate authority to file this Chapter 11 Case on July 2, 2025, and (2) was that filing motivated by bad faith, either in terms of an improper (or non-existent) bankruptcy purpose or an intent to achieve a litigation advantage. The answer to both questions is "yes."

2.      Regarding corporate authority, the evidence will show that the alleged transfer of 40% of the outstanding equity interests in MSM from TBN to Peteski on or about August 8, 2024, which McGraw/Peteski claim gave him the right to declare himself the sole director of MSM, never happened. It was always intended to be part of a multi-stage negotiation by and between TBN and Peteski that McGraw admits (and must admit) was never finalized. No definitive documentation was ever signed. To this day, deal points that TBN repeatedly stated were critical *at the time*, remain unresolved. In the absence of resolution, the "deal," of which the Stock Confirmation was only the first step, never came to fruition. And even if it had, the Stock Confirmation transferred only 40% of the equity interests in MSM and did not constitute a termination event under the Voting Agreement. As such, the Voting Agreement remains in full force and effect, and any actions that McGraw/Peteski took in reliance of McGraw's purported position as the "sole director" on MSM's three-person Board of Directors are null and void. That includes the appointment of McGraw's handpicked Chief Restructuring Officer, the establishment of the Special Committee comprised of that individual, and any subsequent actions predicated on

---

[2]      Capitalized terms shall have the same meaning ascribed as defined in the Motion unless otherwise defined herein.

the powers McGraw/Peteski purportedly conveyed to him, in particular the filing of this Chapter 11 Case.

3.      Regarding bad faith, the evidence will demonstrate beyond a shadow of a doubt that this Chapter 11 Case was not filed to rehabilitate or reorganize the debtor for the benefit of creditors. Instead, it was filed as part of a premeditated strategy to outfit a competing venture that was formed the day prior to the bankruptcy filing but envisioned, at a minimum, weeks before that. The documents produced in discovery demonstrate a pattern of conduct whereby McGraw and his disciples consciously decided to abandon MSM, create what would eventually become Envoy, and put into place a process whereby he could initiate litigation against TBN, fund an exorbitant DIP facility as a litigation war chest, and then credit bid that debt on MSM's assets to or for the benefit of Envoy—leaving creditors with little or nothing on account of hundreds of millions of dollars in claims. Rather than a legitimate attempt to invoke the powers of the Bankruptcy Code, this Chapter 11 Case was filed as an artifice to effectuate McGraw's intention to benefit himself.

4.      Trinity anticipates that MSM and/or Peteski will attempt to introduce evidence of financial distress so they can argue that the bankruptcy filing was not only proper but necessary, and that any responsible fiduciary would have done the same. That argument falls flat considering the explicit, repeated statements by McGraw and/or his disciples that MSM would shut down, liquidate, or cease to exist post-filing. In other words, even assuming financial distress existed, the Chapter 11 Case was never intended to address that distress. The Bankruptcy Code already provides a pathway for entities beyond saving; it is Chapter 7. And the only reason that McGraw/Peteski did not go that route is that it would place someone *truly* independent in control such that his scheme could not be pursued.

5.      Trinity further anticipates that MSM, McGraw/Peteski, and/or the Committee (or all three) will argue that a proposed "Plan Settlement" they negotiated behind closed doors that

3

purports to settle estate claims and causes of action without any semblance of a real investigation into those same claims, justifies keeping this bankruptcy in Chapter 11. It does not and cannot; later actions do not cure or absolve the original sin of bad faith.

6.　　　If the Court agrees that the Chapter 11 Case was filed without proper authority, the outcome is mandatory: dismissal. If, on the other hand, the Court agrees it was filed in bad faith, the Court has discretion on conversion or dismissal. In that instance, given what has been uncovered in discovery to date, particularly *vis-à-vis* Envoy pre- and postpetition, Trinity supports conversion. In any event, the ruse that is this Chapter 11 Case cannot continue.

## II.
## PROCEDURAL HISTORY

7.　　　On July 2, 2025 (the "**Petition Date**"), Phillip C. McGraw ("**McGraw**") through Peteski Productions, Inc. ("**Peteski**") and his handpicked CRO, Gary Broadbent, caused Merit Street Media, Inc. (the "**Debtor**" or "**MSM**") to improperly file a voluntary petition for relief under chapter 11 of the Bankruptcy Code thereby initiating the instant chapter 11 case (the "**Chapter 11 Case**"). Attached to MSM's voluntary petition was an unsigned copy of the *Resolutions of the Special Committee of the Board of Directors of Merit Street Media, Inc.* (the "**Bankruptcy Resolutions**"), which purported to establish MSM's corporate authority to file the Chapter 11 Case.[3] The Bankruptcy Resolutions state that on June 30, 2025, MSM's board (purportedly composed solely of McGraw) established a special committee and delegated to it the duties, rights, and authority set forth in a document called the Special Committee Charter.[4]

---

[3]　　　Docket No. 1. To date an executed copy of this document has never been produced.

[4]　　　At the first-day hearings on July 3, 2025, MSM's counsel stated that Broadbent is the sole member of the Special Committee. July 3, 2025, Hr'g Tr. 7:20–23. And, Lansio, on behalf of MSM, testified that McGraw and Broadbent were the only members of MSM's Board of Directors.

8.      On July 17, 2025, the United States Trustee formed the official committee of

unsecured creditors (the "**Committee**").[5] The Committee was initially comprised of the Darcy

Lynn Ribman 1997 Trust (the "**Ribman Trust**"), Borden Media Consulting, LLC ("**Borden**"),

and Professional Bull Riders, LLC ("**PBR**"). On August 6, 2025, the United States Trustee

reconstituted the Committee, removing PBR.[6] The remaining members of the Committee—the

Ribman Trust and Borden—are closely tied to both the events leading up to this bankruptcy filing,

the principal(s) of MSM, Peteski, and Envoy Media Co. ("**Envoy**"), and, most importantly,

McGraw, who orchestrated this entire thing.[7]

9.      On and after the Petition Date, McGraw/Peteski/MSM undertook four significant

actions that laid bare their intentions in this case, which are entirely to benefit McGraw and/or his

new venture, Envoy:

- *First*, on the Petition Date, the Debtor filed the Complaint and commenced the Adversary Proceeding against Trinity, asserting various claims against Trinity, including, among other things, breach of contract, breach of fiduciary duty, equitable subordination, and the Preference Claim. McGraw/Peteski/MSM immediately sought to truncate TCT's due process rights with respect to the Preference Claim by conditioning any and all future borrowings under the DIP Facility to a final judgment on the Preference Claim.

- *Second*, on the Petition Date, the Debtor filed its Rejection Motion,[8] appearing to seek rejection of all or substantially all of MSM's executory contracts or unexpired leases with parties other than TBN "with respect to

---

[5]      Docket No. 95.

[6]      Docket No. 170.

[7]      Discovery in this matter revealed that Jamie Ribman, husband to Darcy Ribman, was involved in the inception of what would become the Alleged Transfer. On June 29, 2024, McGraw texted Ribman about his "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 1, at PETESKI0007916, following which Ribman texted back about "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 2, at PETESKI0007918. Ribman then texted talking points to McGraw prior to the meeting on July 28, 2024, between McGraw and Matt Crouch discussed below. Ribman is one of the very few creditors that received an explicit guaranty of payment from McGraw in connection with the bankruptcy proceeding *and* an offer to invest in Envoy. Ex. 3, at PETESKI0005841. Ribman was reportedly present at Envoy's new facility on the Petition Date when MSM's Chief Restructuring Officer, Gary Broadbent, visited the facility. Simply put, the idea that a Committee containing Ribman and/or an entity closely related to him represents a completely independent, unemotional voice in the room, lacks credibility.

[8]      *See* Docket No. 26 (the "**Rejection Motion**").

5

its media and general operations."[9] The Rejection Motion has been joined by similar filings to reject specific contracts filed at Docket Nos. 106 and 181.

- _Third_, the Debtor filed its first DIP Motion,[10] seeking authority for MSM to borrow from Peteski up to $21.4 million of DIP Financing on a secured basis in the form of a delayed-draw term loan facility comprised of (a) $13.4 million of new money loans and (b) upon entry of the final DIP order, a $7.9 million roll up of the Bridge Loans (as defined in the DIP Motion). There are at least two important, and concerning, aspects of the proposed DIP Financing: (a) any subsequent DIP Funding was conditioned on the Court fully adjudicating the Preference Claim in the Adversary Proceeding;[11] and (b) upon entry of a final DIP order, McGraw/Peteski would have an unfettered right to credit bid that would be unchallengeable, even for cause.[12] The total proposed borrowing has since increased to a total of approximately $31 million, including the $10 million Unsecured DIP Facility.[13] More than 86% of the proposed DIP has been slated for estate professional fees.

- _Fourth_, regarding that sale process, on July 5, 2025, the Debtor filed its Bid Procedures Motion.[14] Through the Bid Procedures Motion, the Debtor seeks the approval of a prompt sale schedule and bid procedures for the sale of substantially all the Debtor's assets, which include: (a) litigation claims, (b) contract rights, (c) intellectual property, and (d) various personal property assets.[15]

10. When read together, these four pleadings evidenced that the Chapter 11 Case was intended at the outset to take advantage of the Bankruptcy Code all for the benefit McGraw/Peteski—MSM's stakeholder and DIP Lender—to the detriment of other creditors and parties in interest. However, it was not until on or around July 14, 2025, with the announcement

---

[9]     _See_ Rejection Motion ¶ 7. Notably absent from the list of executory contracts and unexpired leases to be rejected is the Lease Agreement with TBN for the studio and office space in the Plex. With no contemplated lease payments in the Approved Budget, it appears MSM does not intend (and never intended) to satisfy all of its administrative expenses.

[10]    _See_ Docket No. 11 (the "**DIP Motion**").

[11]    _See_ DIP Term Sheet, Conditions Precedent to All Subsequent Credit Extensions.

[12]    _See_ Docket No. 35 (the "**Interim DIP Order**"), at ¶ 34. The proposed Final DIP Order has very same language, providing Peteski with an unfettered right to credit bid. _See_ Docket No. 395, at ¶ 34.

[13]    The court entered a second interim order, authorizing MSM to incur $10 million of unsecured financing (the "**Unsecured DIP Facility**"). _See_ Docket No. 357 (the "**Second Interim Order**").

[14]    _See_ Docket No. 44 (the "**Bid Procedures Motion**").

[15]    _Id._ at ¶ 2.

of the McGraw's new venture, Envoy, where McGraw's master scheme became obvious[16]—facilitating a bankruptcy process that allows McGraw, who is an insider and fiduciary, to obtain all assets of MSM, including the litigation claims against Trinity and PBR, and transfer those assets for no consideration to kickstart his new, **competing media venture**, Envoy, while saddling the estate with professional fees and leaving nothing for MSM's creditors.[17]

11.    As a result, on July 18, Trinity filed its Motion to Dismiss, arguing, among other things, that this Chapter 11 Case was filed in bad faith and should be dismissed or converted to a Chapter 7 case pursuant to section 1112(b) of the Bankruptcy Code, or alternatively, a Chapter 11 trustee should be appointed under section 1104(a) of the Bankruptcy Code. Trinity also argued that this Chapter 11 Case was filed without corporate authority because neither Matthew Crouch nor Samuel Smadja (TBN's designees on MSM's board) approved or appointed the Special Committee or Broadbent as the "Independent" Director. For that reason, this Chapter 11 Case must be dismissed for lack of subject matter jurisdiction.[18]

12.    On August 1, PBR filed a partial joinder to the Motion to Dismiss, joining Trinity's argument that this Chapter 11 Case was filed in bad faith and should be converted to a Chapter 7 case.[19] PBR also argued that the case should be converted due to a "substantial or continuing loss

---

[16]    Alex Weprin, Hollywood Reporter, *Dr. Phil Returns: Launches Envoy Media Co. in Comeback Bid* (July 14, 2025, at 6:36 a.m.), https://www.hollywoodreporter.com/business/business-news/dr-phil-returns-launches-envoy-media-co-citizen-journalism-1236313554/ ("**Dr. Phil's Merit Street Media may be effectively dead**, but his Envoy Media Co. is just beginning.") (emphasis added). *See also* Ex. 4, at PETESKI0005505 (text message from P. McGraw to S. Harvey on July 14, 2025, discussing a press release announcing Envoy and deal with S. Harvey).

[17]    The focus on the media content and litigation claims is further evidenced by the sworn testimony of Peteski's hired corporate representative, Professor Anthony Bruster, that the primary collateral for the DIP Financing, from Peteski's perspective, was media content and litigation claims against TBN and PBR. *See* A. Bruster Deposition Tr. 92:1-3 ("███████████████████████████████████████████ " against TBN and PBR).

[18]    Trinity also filed various objections to the DIP Motion, the Bid Procedures, and Rejection Motion. *See* Docket Nos. 202, 203, 204, & 213.

[19]    *See* Docket No. 151 (the "**PBR Joinder**").

to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" pursuant to section 1112(b)(4)(A) of the Bankruptcy Code.

13.    On August 12, MSM and McGraw/Peteski filed objections to the Motion to Dismiss, arguing, among other things, that Broadbent had corporate authority to sign the bankruptcy petition and that this Chapter 11 Case was commenced in good faith.[20] McGraw/Peteski also requested that this Court issue a *Dondi* instruction related to certain *facts* stated in Trinity's Motion to Dismiss.[21]

14.    The parties (Trinity, PBR, MSM, and McGraw/Peteski) then commenced extensive discovery in connection with the Motion to Dismiss.[22] Certain decisions made by McGraw/Peteski, in particular, during the discovery process delayed the ultimate hearing on the Motion to Dismiss, considerably. However, as a result of that discovery as detailed below and as will be presented at trial, there is overwhelming evidence that proves, among other things, (a) this Chapter 11 Case was filed without corporate authority because the Alleged Transfer (defined below) never occurred, so the Voting Agreement never terminated; and (b) the Chapter 11 Case was filed with the sole intent to benefit McGraw and to facilitate the transfer of MSM's assets to a competing media company he formed **the day before the Chapter 11 Case was filed**, Envoy, which is unquestionably bad faith.

15.    On September 12, 2025, four days prior to the start of the ultimate hearing on the Motion to Dismiss, the Committee filed a *Reservation of Rights and Statement* that describes

---

[20]    *See* Docket No. 197 (the "**Peteski Objection**"); Docket No. 200 (the "**MSM Objection**," together with the Peteski Objection, the "**Objections**").

[21]    Specifically, McGraw/Peteski complains about Trinity's statement that this Chapter 11 Case was a "sham proceeding orchestrated by one man—McGraw" and that his plan was "designed to allow McGraw to make off like a thief[.]" Peteski Objection, at ¶ 1 (quoting Motion to Dismiss, at ¶ 2). McGraw/Peteski's *Dondi* request will be addressed *infra*. McGraw/Peteski apparently take issue with Trinity's allusion to 1 Thessalonians 5:2 in likening McGraw's actions to a "thief in the night." The comments of Queen Gertrude in Shakespeare's *Hamlet* spring to mind.

[22]    The parties had also already commenced discovery in the context of the DIP Motion. However, after filing the Motion to Dismiss, the scope of topics later expanded.

generally a "Plan Settlement" that the Committee has negotiated with the Debtor and McGraw/Peteski.[23] In sum, the Committee appears to be arguing that prior, obvious bad faith at the inception of the case and/or the lack of corporate authority to even file the case, should be overlooked in light of what it characterizes as a "remarkable about face." In other words, pay no attention to how we got here or why.[24]

### III.
### FACTUAL BACKGROUND

16.    As detailed in the Motion to Dismiss, there are several significant events leading to the rise and fall of MSM, and eventually the creation of Envoy by McGraw.[25] In summary:

- McGraw initially sought out TBN to be a new partner in the production and distribution of a new version of the *Dr. Phil Show*, making numerous false representations to induce TBN into a partnership. On January 10, 2023, TBN and Peteski entered into a "*Binding Letter of Intent*" (the "**BLI**"),[26] which, among other things, led to the eventual formation of MSM.[27] MSM was owned 70% by TBN and 30% by Peteski. Generally, the BLI contemplated that TBN would contribute services, space, and support to the new venture, while McGraw/Peteski would produce 160 90-minute episodes per year of a new Dr. Phil show to be aired exclusively on the network that became MeritTV. TBN understood that McGraw/Peteski would also contribute his prior library of Dr. Phil episodes from his time at CBS.

- TBN subsequently funded tens of millions in building out production space and offices for MSM at its Plex facility, onboarding employees for MSM hired by McGraw and his agents, such as Ken Solomon and Joel Cheatwood, and providing back-office and technical support. McGraw/Peteski, however, failed to perform under the BLI. Among other things, McGraw/Peteski refused to contribute the prior library of the *Dr.*

---

[23]    *See* Docket No. 376. Any consideration of this "Plan Settlement," which contemplates an as-yet-unfiled Plan of (presumably) Liquidation, will involve considerable discovery and be subject to Court approval.

[24]    Considering he appears to be a key player in both the "how" and "why," it makes sense Ribman (through the Committee) would take this position.

[25]    Trinity adopts and restates the background facts and averments set forth in its Motion to Dismiss.

[26]    The Motion to Dismiss referred to the BLI as a "Joint Venture Agreement." For the avoidance of doubt, those are the same document.

[27]    At McGraw's direction, TBN formed APG Ventures, Inc. ("**APG Ventures**"), a Delaware corporation, in February 2023 to serve as the new venture referenced in the BLI. APG Ventures changed its name to "Merit Street Media, Inc." in March 2024. To avoid confusion, this Reply will refer to the company as MSM.

*Phil Show* to MSM, but instead, demanded TBN pay McGraw $100 million to obtain a 50% interest in the media library.

- Despite McGraw/Peteski's refusal to honor the deal memorialized in the BLI, TBN nevertheless remained committed to the mission and continued to advance millions of dollars into MSM and participated in the drafting of MSM's governing documents. On March 5, 2024, the parties executed multiple governing documents, including a Voting Agreement.[28] The Voting Agreement provided for a three-person Board of Directors of MSM, with two members to be designated by TBN and one by Peteski.[29] The three directors appointed to MSM are: Matthew Crouch (a TBN designee), McGraw (a Peteski designee), and Samuel Smadja (a TBN designee).[30] MSM officially launched on April 2, 2024.

- Within months of that launch, the skyrocketing costs of supporting MSM were more than TBN could continue justifying. In July 2024, TBN informed McGraw/Peteski that the approximately $130 million it had funded were enough; something had to change. On or about July 28, 2024, McGraw proposed a flip in the parties' respective ownership percentages whereby Trinity would transfer 40% of its stock to Peteski, resulting in Peteski owning 70% and TBN, 30% (the "**Alleged Transfer**").[31] On August 8, 2024, the parties executed a document to reflect the Alleged Transfer (the "**Stock Confirmation**").[32] As consideration for this exchange, among other things subject to continued negotiation, McGraw/Peteski would assume full financial responsibility for MSM's operations and TBN would be relieved of certain obligations under the BLI. TBN pledged to continue negotiating in good faith to reach definitive terms, *which never occurred*. On the same day the parties executed the Stock Confirmation, McGraw/Peteski purported to remove the TBN designees from MSM's board of directors in violation of the Voting Agreement.

- MSM was still in need of cash. To provide additional support for MSM pending McGraw's procurement of additional equity investors (promised by McGraw to include some of the highest-profile names in North Texas, none of which ever materialized), an entity affiliated with TBN and TCT issued a $25 million convertible promissory note to MSM in September 2024. The note is secured by substantially all assets of MSM and has not

---

[28]   Ex. 5, TBN0010343–10357.

[29]   *Id.* at § 1.2.

[30]   Ex. 6, TBN0010328.

[31]   In reality, TBN owned approximately 67.5% of MSM's stock while Peteski owned 27.5%, and Steve Harvey, a close personal friend of McGraw, owned the remaining 5%. For simplicity, the documents, the parties, and the pleadings generally state that it was a 70/30 ownership between TBN and Peteski.

[32]   Ex. 7, TBN0010358.

been repaid. Now held by TCT, the balance outstanding is approximately $27.5 million.

17.    Based on this evidence discovered, the remainder of this Reply is intended supplement the _factual_ history related to the Alleged Transfer as well as the creation and startup of Envoy.

**A.    Project "Getting Rid of TBN" Commences with the Alleged Transfer.**[33]

18.    As noted in the Motion to Dismiss, TBN and Peteski signed the Stock Confirmation on August 8, 2024. It appears to be MSM's and McGraw/Peteski's position that the Alleged Transfer was fully consummated upon execution of the Stock Confirmation, thereby making Peteski the majority shareholder with a 70% equity interest in MSM while TBN has only 30%. That is not accurate. After it became clear that all salient deal points could not be resolved in the timeframe demanded by McGraw, TBN and McGraw/Peteski pivoted and agreed to a _multi-step process_ for restructuring MSM, with the _first step_ being the signing of the Stock Confirmation. As detailed below, McGraw's sworn deposition testimony reveals that he agrees that the multi-step process was never finalized, no definitive document was ever negotiated or executed, and several major deal points remain outstanding to this day.

*i.    TBN Explicitly Conditions Signing the Stock Confirmation on Future Conditions Subsequent.*

19.    After the launch of MSM and months of funding McGraw's ever-increasing demands, something had to change. Indeed, from February 2023 through July 2024, TBN had poured approximately $130 million in costs relating to outfitting the Plex studio and offices to McGraw's specifications (like adding a helipad), paying MSM employees (far more numerous than McGraw originally represented), and building out MSM's operations. Unwilling to be the

---

[33]    *See* Ex. 1, at PETESKI0007917 (text messages between P. McGraw and J. Ribman on June 29 and June 30, 2024, stating that P. McGraw was "███████████████████████████").

only source of funding for MSM, in July 2024, TBN told McGraw that the blank check funding was coming to an end in August 2024.

20.    Recognizing the need for change, on July 11, 2024, McGraw's inner circle circulated an Excel spreadsheet outlining a "██████████████████████"[34] This spreadsheet, which appears to have been created by Phil Gilligan, ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

21.    From there, TBN and McGraw/Peteski began discussing a possible future

████████████████████████████████████████████████████[35] Specifically, on July 28, 2024, Crouch, the President and Chairman of TBN's board, met with McGraw to discuss in more detail the Alleged Transfer and conditions subsequent related thereto. The next day, McGraw attended a meeting with a majority of the TBN directors, stating that Peteski needed to acquire a majority-in-interest of the outstanding shares of MSM to solicit for outside investments in MSM.[36] According to McGraw, he had "friends and family" ready to invest tens of millions of dollars in MSM at a $425 million valuation of the company as soon as he could show them that he had a controlling interest in MSM. McGraw also stated to TBN that if the stock positions were swapped

---

[34]    Ex. 8, PETESKI0003789–3790 (email from P. Gilligan to P. McGraw, et al. on July 11, 2024 and related attachment).

[35]    Ex. 9, TBN0004959 (email from P. McGraw to P. McIntyre and B. Dawson on July 1, 2024, discussing his conversion with M. Crouch regarding a "realignment" going forward); Ex. 10, PETESKI0004492–4505 (emails between P. McGraw and M. Crouch discussing "████████████████████████ ████████████████████"). Ironically, McGraw following up from a phone with Crouch memorializing their discussion and stated that he "████████████████████████████████████████ ██████." *Id.* at PETESKI0004492.

[36]    *See* Ex. 11, TBN0005362–5364. On July 29, 2024, Brian Lidji, counsel at Jackson Walker for McGraw and Peteski, emailed TBN with a draft *Amendment to Binding Letter of Intent & Stock Purchase Agreement* the day before McGraw met with Crouch and Amedia, requesting that TBN sign it. Ex. 12, TBN0023598–23600 (email from B. Lidji to J. Casoria on July 29, 2024, with draft Amendment attached). The draft Amendment illustrates that the parties contemplated addressing a multitude of issues, including transferring 40% of TBN's stock to Peteski and a change of membership of MSM's board. *Id.*

that he would make TBN's proposed 30% ownership worth more than it was at the current 70% ownership interest, a concept he later reiterated.[37]

22.     It was clear that following this July 29 meeting, there was no "meeting of the minds" between TBN and McGraw related to the proposed Alleged Transfer, and so a proposed Stock Confirmation was not signed at this time.[38] In fact, that same day, Brian Lidji of Jackson Walker, LLP ("**Jackson Walker**"), counsel for McGraw/Petesk,[39] emailed John Casoria, outside general counsel to TBN, requesting a meeting the following day and attaching a draft *Amendment to Binding Letter of Intent & Stock Purchase Agreement* that included multiple deal points that needed resolution.[40] Thereafter, the parties continued discussing the terms of the Alleged Transfer and surrounding transactions.

23.     On August 1, 2024, McGraw and TBN (through Crouch and Frank Amedia) had another meeting at McGraw's house to continue discussions regarding the terms of the Alleged Transfer. Following this meeting, TBN informed McGraw that it would be amenable to increasing Peteski's ownership share in MSM from 30% to 70% (thereby decreasing TBN's ownership share from 70% to 30%) subject to the parties addressing "a multitude of outstanding deal points to be finalized," that "will be memorialized in a formal written agreement[.]"[41] In a follow up email, McGraw confirmed this understanding: "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"[42]

---

[37]     Ex. 13, PETESKI0004338–4344.

[38]     Ex. 11, at TBN5362–63.

[39]     Brian Lidji is a partner with Jackson Walker LLP. That firm's overlapping representation of MSM, Peteski, McGraw, Evoy, and his other affiliate entities renders any analysis of on whose behalf Jackson Walker is acting exceedingly difficult.

[40]     Ex. 12, at TBN0023598, 23599-600.

[41]     Ex. 14, TBN0004508-4509 (email from F. Amedia to P. McGraw on Aug. 1, 2024, at 8:30 p.m.).

[42]     *Id.* at TBN0004508 (email from P. McGraw to F. Amedia on Aug. 1, 2024, at 9:24 p.m.).

24.     Despite ongoing negotiations, McGraw kept pushing TBN to sign the Stock Confirmation before any deal points were finalized. On August 3, McGraw emailed TBN urging the parties to execute a stock confirmation document.[43] In response, TBN unequivocally stated that TBN was not in a position to formalize "any written agreement that does not recognize all of the open deal points that are vital to TBN in the restructuring of MSM."[44] On August 4, McGraw acknowledged that there was no "deal" unless TBN's demands were met in the proposed amendment and representing that any stock confirmation document would be a "c████████

████████████████████████████"[45]

25.     The parties continued their negotiations, and on August 6, 2024, TBN emailed McGraw the 10-item list of "deal points" that were necessary to effectuate the Alleged Transfer:[46]

> 1.  70/30 stack swap - separte agreement you already provided
> 2.  Collateralize the July payment as Matt committed.- forthcoming
> 3.  Collateralize the October payment as we discussed - forthcoming
> 4.  Other future payment by TBN terms and obligations to you or MSM are eliminated - included in short memorandum and long form
> 5.  TBN funds through August - in short form
> 6.  No default - in short form
> 7.  New Board of 5, 3 from Dr P, 2 from TBN - in short form and then long form
> 8.  Reconciliation, recognition of TBN investment capital and secure it in some form TBD with MSM. - in long form
> 9.  Work out details for fair stock value preservaitons (you mentioned that you would use the 70% to get investment). Open to hear how you intend to preserve stock value for both of us. - in long form
> 10. Lease to be prepared for facility - exhibit of long form

---

[43]     Ex. 15, TBN0004503–4504 (email from P. McGraw to F. Amedia on Aug. 3, 2024, at 9:28 p.m.); Ex. 16, TBN0023585–23586 (email from F. Amedia to M. Crouch, S. Bunker, and C. May on Aug. 3, 2024, at 10:24 p.m., stating: "Of course, [McGraw] is attempting to get what he wants without finalizing the rest of what we want first.").

[44]     Ex. 17, TBN0024120–24121 (email from F. Amedia to P. McGraw on Aug. 3, 2024, at 9:55 p.m.).

[45]     *Id.* at TBN0024120 (email from P. McGraw to F. Amedia on Aug. 4, 2024) (emphasis added).

[46]     Ex. 18, TBN0015748 (email from F. Amedia to P. McGraw on Aug. 6, 2024); *see also* Ex. 19, TBN0004496–4499 (email from F. Amedia to P. McGraw on Aug. 4, 2024, regarding the 5 stages of the deal).

26.      Based on McGraw/Peteski's repeated assurances to follow through with the remaining steps, TBN and Peteski executed the Stock Confirmation on August 8, 2024.[47] The Stock Confirmation did as the parties intended—*i.e.*, create a document that McGraw could show investors that the Peteski controlled a majority shares of MSM's stock. Specifically, the Stock Confirmation provided that:

> The number of shares provided in the Stock Purchase Agreements which TBN shall purchase from [MSM] shall be reduced by 285,715 shares and the number of shares Peteski shall purchase from [MSM] shall be increased by 285,715 shares.[48]

27.      In other words, 40% of the outstanding shares were taken from TBN and given to Peteski, for which Peteski provided no value to TBN.[49] The consideration was supposed to come later through the remaining steps of the restructuring process, which never occurred. Indeed, McGraw/Peteski never intended to perform any steps beyond the initial signing of the Stock Confirmation.

28.      Nevertheless, after signing the Stock Confirmation, McGraw emailed TBN on August 8, 2024, recognizing that TBN and Peteski "███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████"[50] On August 11, Amedia responded, interlineating his own comments to McGraw's "to do" list and reiterating:

> We agreed to initiate the stock swap but, I never discounted the items that are essential to TBN. I told you a few times that I cannot, will not promise what cannot be assured. Good faith was, is our common bond in this journey together to restructure MSM from

---

[47]    Ex. 7, TBN0010358. The signing of the Stock Confirmation was memorialized in a videotaped session. *See* Ex. 20, PUBRECORD0000628 (https://vimeo.com/1110105386/b4feb8f5f6?share=copy).

[48]    Ex. 7, TBN0010358 at § 1.

[49]    With Peteski's representation that MSM was valued at $425 million, this 40% stock transfer from TBN to Peteski would transfer $170 million of value from TBN to Peteski.

[50]    Ex. 21, TBN0024037–24040, at 24037–38 (email from P. McGraw to F. Amedia on Aug. 8, 2024).

what was from the onset operationally flawed and overzealous on achieving revenue.[51]

29.    But McGraw never intended "███████████████████████████ ████████████" or raise the promised capital from his "family and friends." Rather, McGraw's intention was to reduce TBN's role in MSM to nothing more than "███████████ ██████" and take over the company in what he previously characterized as a "█████████"[52]



### ii.    Negotiations Continue Post-Stock Confirmation.

30.    Following the execution of the Stock Confirmation, TBN continued to work in good faith with McGraw/Peteski to resolve outstanding (and predicate) items. On August 22, 2024, Amedia emailed McGraw regarding, among other things, "federal IRS rules and regulations regarding non-profits[.]"[53] He also repeated the need for a "short form memorandum that

---

[51]    *Id.* at TBN0024037 (email from F. Amedia to P. McGraw on Aug. 11, 2024).

[52]    Ex. 22, PETESKI0003859.

[53]    Ex. 23, TBN0000658–661 (email from F. Amedia to P. McGraw on Aug. 22, 2024, at 9:10 a.m.).

4908-7548-2465.8

acknowledges the major points of our understanding that defines the major deal points of our revised transaction that was [initiated] with the stock swap. Our Board is requiring that this be completed prior to any more funding, soft or otherwise, going forward. This is reasonable and comports with our good faith commitment to each other."[54]

31.    Later that same week, on August 25, McGraw met with Amedia and Crouch, following which he drafted an email to outline " ██████████████████████████████ ██████████████████████████████████ "[55] He then describes major points of the transaction from his perspective, including that he " ████████████████████████████ ████████████████████████████████ ."[56] If details remained to be worked out, as McGraw recognizes, then there was no deal.

32.    The next day, August 26, McGraw emailed his inner circle as a follow-up to a phone call that apparently occurred earlier that day. He concludes that email with an explicit instruction: " ████████████████████████████████████████ ██████████████████ "[57] This is, apparently, because:

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

33.    Discussions continued over the following weeks and months. On September 20, 2024, McGraw emailed Amedia with discussion of the " ██████████████ " and his prior " █████ "

---

[54]    *Id.*

[55]    Ex. 24, TBN0015718 (email from P. McGraw to F. Amedia and M. Crouch on Aug. 25, 2024).

[56]    *Id.*

[57]    Ex. 25, MSM0004822–4823 (email from P. McGraw to K. Solomon, P. McIntyre, J. Cheatwood, P. Gilligan, and B. Dawson on Aug. 26, 2024).

[58]    *Id.* (emphasis in original email).

list.[59] On October 1, 2024, Lidji (now as TBN understood acting as counsel for MSM) emailed Bunker Sessions, of TCT, attaching an "Outline of Resolution of Outstanding MSM-TBN Issues under Binding Letter of Intent."[60] Included in the attached Outline was a discussion of lease issues, payments allegedly owed to Peteski, secondary studio usage, and the need for "███████████ ████████" that never materialized. Lidji then corresponded with Casoria about those same "████████" on October 7, 2024.[61]

34.    Despite TBN's best efforts, the issues surrounding the Alleged Transfer had not been resolved. On December 3, 2024, McGraw emailed Lidji and Amedia stating that he "████ ██████████████████████████████████████████"[62] Thereafter, Lidji emailed Amedia and Casoria recognizing:



35.    Lidji's proposal to address *only* "███████████████████████████" materialized in the form of the "Outline of Proposed Term" dated December 9, 2024, defined in

---

[59]    Ex. 26, PETESKI0003606–3607 (email from P. McGraw to F. Amedia on Sept. 20, 2024, at 4:27 p.m.).

[60]    Ex. 27, TBN0000485, TBN000487 (email from B. Lidji to B. Sessions on Oct. 1, 2024, with BLI attached).

[61]    Ex. 28, TBN0000468–470 (email from B. Lidja to J. Casoria on Oct. 7, 2024). Even as late as December, McGraw was emailing with his inner circle about the major deal points of the proposed transaction involving the Alleged Transfer. Ex. 29, MSM0004420–4422 (email from P. McGraw to K. Solomon and J. Cheatwood on Dec. 7, 2024).

[62]    Ex. 30, PETESKI0003209 (email from P. McGraw to B. Lidji and F. Amedia on Dec. 3, 2024).

[63]    Ex. 31, TBN0003037–3038 (email from B. Lidji to F. Amedia and J. Casoria on Dec. 3, 2024, at 3:26 p.m.) (emphasis added).

the Motion to Dismiss as the "December Outline."[64] On its face, the non-binding December

Outline states:



Amedia executed this document on behalf of TBN at the request of McGraw based on his stated

"need" for another document to show potential investors but did so with the understanding that

definitive documents, referenced repeatedly through the negotiations, resolving all of the

outstanding issues between the parties, remained to be negotiated and executed. No such definitive

documents exist, to which McGraw agreed during his sworn deposition:[66]



The reason no definitive documents exist is because the parties never reached a deal on all

outstanding issues. In his deposition, and while holding a copy of Amedia's 10-point email in his

hand, McGraw testified:[67]

---

[64]      Ex. 32, MSM0004488–4489.

[65]      *Id.*

[66]      Ex. 33, McGraw Deposition Tr. 206:3-14.

[67]      *Id.* at 215:18–216:25.



36.    As such, the Alleged Transfer did not occur given the failure of the parties to reach

agreement on the comprehensive restructuring of MSM. So, TBN remains the majority stockholder

of MSM, holding a 70% equity interest, while Peteski only has 30%.

B.      **McGraw/Peteski Violate the Voting Agreement**.

37.      It is clear that McGraw never intended "█████████████████████
████████████████████" or raise the promised capital from his "family and
friends." Rather, McGraw/Peteski's intention was to effectuate his "████████████" to reduce
TBN's role in MSM to nothing more than "█████████████████"[68]

38.      In furtherance of this goal, after executing the Stock Confirmation, McGraw
through Peteski purported to remove Crouch and Smadja (the TBN designees) from MSM's board
of directors the same day, seemingly leaving himself as the only board member and ultimate
controller of MSM.[69] TBN was not informed of this "decision" at that time, nor was it aware that
McGraw had attempted to remove two directors in direct violation of the Voting Agreement.

39.      Among other things, the Voting Agreement provides that no director may be
removed from office other than for cause unless the appointing shareholder (*i.e.*, TBN or Peteski)
directs or approves such removal.[70] In other words, a TBN-director may only be removed if TBN
consented to the removal by written consent or affirmative vote. Neither of those happened here.

40.      While MSM and McGraw/Peteski contend that the Voting Agreement terminated
as a result of the Alleged Transfer, that again is incorrect. Specifically, the Voting Agreement
provides that it will terminate only in the event of: (a) a public offering of the company's stock;
(b) "the consummation of a change of control transaction involving the transfer, acquisition or sale
of at least *a majority of the outstanding shares* of capital stock of [MSM];" or (c) termination by
MSM or the holders of a majority of the company's stock, as set forth in Section 6.8 of the Voting

---

[68]      Ex. 22, PETESKI0003859.

[69]      Ex. 34, TBN0002919. Notably, on August 4, 2025, MSM filed its Statement of Financial Affairs,
representing that the two directors were purportedly removed on February 3, 2025. *See* Docket No. 161.
MSM since amended it Statement of Financial Affairs, amending the purported removal date to August 8,
2025. Docket No. 186.

[70]      Ex. 5, at TBN0010344, § 1.4.

21

Agreement.[71] Because the Alleged Transfer was never finalized, there was no "change of control transaction" of a majority of MSM's stock. Additionally, the Stock Confirmation—for which there was no exchange of consideration—only purportedly caused TBN to transfer 40% of MSM's stock to Peteski, which is not a transfer of a majority of the shares.

## C.    MSM's Conversion to a Texas Entity.

41.    In addition to violating the Voting Agreement, TBN was not informed that Peteski purportedly "removed" Crouch and Smadja from MSM's board of directors on August 8, 2024. Rather, the first time TBN was made aware that McGraw believed he was the only MSM director was on February 21, 2025—over 6 months after McGraw claims Crouch and Smadja were "removed"—while the parties were discussing the conversion of MSM from a Delaware to a Texas corporation.

42.    On Thursday, February 20, at 11:51 p.m. (CT), Lidji—acting on behalf of MSM— emailed TBN with a draft *Joint Written Consent of Directors and Stockholders of Merit Street Media, Inc.* (the "**Conversion Consent**"), approving the conversion to a Texas corporation and indicating such approval was by McGraw as MSM's sole director.[72]

43.    Less than 10 hours later, on Friday, February 21, at 9:18 a.m. (CT), Lidji emailed TBN again, representing that signing the Conversion Consent was an "▮▮▮▮▮▮▮" because the conversion was vital to MSM's defense in a lawsuit with WRNN, which had an upcoming answer deadline that Monday, February 24.[73] The Conversion Consent constitutes the first time TBN was put on notice that McGraw believed himself to be MSM's only board director. In a subsequent email, Lidji confirmed that MSM's "current board has 1 member, Phil McGraw."[74] Because this

---

[71]    *Id.* at TBN0010346–10348 §§ 5, 6.8 (emphasis added).

[72]    Ex. 35, TBN0000813 (email from B. Lidji to C. May, J. Casoria, F. Amedia, and B. Flint on Feb. 20, 2025).

[73]    Ex. 36, TBN0003059–3063, at 3063 (email from B. Lidji to F. Amedia and C. May on Feb. 21, 2025, at 9:18 a.m.). This other lawsuit was commenced by WRNN against MSM in the District of Delaware.

[74]    *Id.* at TN0003061 (email from B. Lidji to F. Amedia on Feb. 21, 2025, at 10:32 a.m.).

22

was both a surprise and incorrect, Amedia represented that TBN's counsel needed to review the

Conversion Consent.[75]

44.     Notwithstanding this glaring error in the Conversion Consent, Lidji continued to

hound TBN for its signature, emphasizing that if TBN was not ready to sign, "we all will live with

the consequences" in the WRNN litigation.[76] That same day, Casoria responded:[77]

Brian,

There is clearly some confusion that we need to clear up.
There are, and always have been,  3 directors, to my knowledge:
Phil McGraw
Matthew Crouch
Samuel Samdja

This is evidenced in the drafts of the corporate documents created by Manat (representing Dr. Phil) at the beginning of the relationship.
If there was a change made in the membership of the Board of Directors, board member Matthew Crouch nor I are aware of it.  So we need some clarity on this point.
Given the above, I would also like to review the other corporate documents you are referencing (by-laws, etc.) to make sure they match what I have in our files from Manat.
        It continues to be our desire to work cooperatively for the mutual benefit of Peteski & TBN.  Transparency should resolve these relatively minor issues so that we can move this matter forward in a timely manner.
        Your continuing courtesy and cooperation is appreciated.
        Best Regards,


JOHN B. CASORIA, ESQ.
TRINITY BROADCASTING NETWORK
Special Operations Group
2442 Michelle Drive
Tustin, California 92780
(714) 665-2102 (direct)
(714) 665-2168 (fax)
JBCasoria@TBN.tv

45.     The next day, on February 22, Lidji emailed Casoria the current Bylaws of MSM

and the purported amendment "electing" McGraw as the sole director,[78] to which Casoria

responded: "Needless to say, it is a surprise . . . and a disappointment that this was done without

---

[75]     *Id.* at TBN0003061 (email from B. Lidji to F. Amedia on Feb. 21, 2025, at 9:37 a.m.).

[76]     *Id.* at TBN0003060 (email from B. Lidji to F. Amedia on Feb. 21, 2025, at 11:21 a.m.).

[77]     *Id.* at TBN0003059 (email from J. Casoria to B. Lidji on Feb. 21, 2025, at 11:12 p.m.).

[78]     Ex. 37, TBN0002898 (email from B. Lidji to J. Casoria on Feb. 22, 2025, at 7:51 a.m.), TBN0002905–2918 and TBN0002919 (attachments).

consultation or notice [to TBN]."[79] Lidji responded: "Needless to say, you should not be surprised."[80]

46.    But because TBN was committed to the success of MSM and understood from Lidji that converting to a Texas corporation was in MSM's best interest and essential to MSM's defense against WRRN, TBN had no choice but to sign the Conversion Consent immediately. Thus, despite being wholly inaccurate, TBN agreed to sign the Conversion Consent and did so on Saturday, February 22, 2024.[81]

**D.    McGraw/Peteski Decide to Ditch TBN and Start a New Venture with MediaCo.**

47.    Notwithstanding TBN's good faith efforts to work with McGraw/Peteski, at some point either during or towards the end of negotiations with the Alleged Transfer with TBN, but no later than March 2025, McGraw decided that he was done with the partnership with TBN.[82] His new plan, to wit: find a new investor to replace TBN.

48.    To that end, McGraw and/or his disciples (which include, among others, Kenneth Solomon, Joel Cheatwood, Phil Gilligan, and Phil McIntyre) began working together to raise various funding to proceed without TBN. For instance, Cheatwood emailed a representative at Cunningham Broadcasting, a potential investor and/or distribution partner, that MSM is " ███ ████████████████████████████████████ " because the " ███████████ ██████████████████████████████████████████████████████ ███████ "[83] Cheatwood also represented that all other investor conversations agreed.[84]

---

[79]    Ex. 38, TBN0002851–2857, at 2851 (email from J. Casoria to B. Lidji on February 22, 2025, at 11:18 a.m.).

[80]    *Id.*

[81]    Ex. 39, PETESKI0009308 (email from J. Casoria to B. Lidji on Feb. 22, 2025) & PETESKI0009309–9326 (the signed Conversion Consent).

[82]    Ex. 40, MSM0005392 (email from B. Dawson to J. Cheatwood on Mar. 2, 2025: " ████████████ ████████████████████████ ")

[83]    Ex. 41, MSM0002035–2037 (email from J. Cheatwood to M. Anderson & L. Asher on May 5, 2025).

[84]    *Id.*

49.    At some point in early May 2025, McGraw and/or his disciples began speaking with Soohyung Kim ("**Soo Kim**") as a potential investor and/or a new partner of MSM (likely to replace TBN). Soo Kim is one of the founders of Standard General L.P., the largest shareholder in MediaCo Holding Inc. ("**MediaCo**"). MediaCo, in turn, owns Estrella Broadcasting, Inc. ("**Estrella**"), which purportedly owns a broadcasting facility in Irving, Texas. On or around May 9, Solomon and McIntyre began to schedule meetings with Soo Kim.[85] On May 14, McIntyre initiated conversions between John Perry, who oversees McGraw's production, and Ivan Stoilkovich and Dan Ryan, both of whom work at MediaCo with Soo Kim, to "████████ ████████"[86] That same day McGraw (and likely Solomon and McIntyre) made their first visit to MediaCo's facility in Irving.[87]

50.    Following what was likely several meetings and conversations between McGraw, his team, and Soo Kim, the plan evolved into a potential merger of MediaCo and "McGraw Media" (an entity whose involvement here remains unclear).[88] Specifically, the merger contemplated that McGraw Media would merge into MediaCo, and Estrella would be the new producer and distributor of new Dr. Phil content (just as McGraw promised to TBN and required under the

---

[85]    Ex. 42, MCINTYRE-PETESKI0008643 (text messages on May 9, 2025, between K. Solomon and R. Player (McGraw's head of security) about meetings with Soo Kim); Ex. 43, MCINTYRE-PETESKI0008604 (text messages between K. Solomon and P. McIntyre on May 13, 2025, about a meeting with Soo Kim); Ex. 44, MCINTYRE-PETESKI0008720 (text messages on May 14, 2025, between P. McIntyre and Soo Kim about McGraw visiting Soo Kim's "studio" that afternoon).

[86]    Ex. 45, MCINTYRE-PETESKI0008390–8392 (email from P. McIntyre to I. Stoilkovich on May 14, 2025).

[87]    Ex. 44, at MCINTYRE-PETESKI0008721.

[88]    Ex. 46, JAYMCGRAW_PETESKI0008908–8909 (text messages on May 16, 2025, between J. McGraw, P. McGraw, and P. McIntyre with a potential merger term sheet) & JAYMCGRAW_PETESKI0008910–8911 (the attached merger term sheet); Ex. 47, JAYMCGRAW_PETESKI0008912–8913 (text messages on May 17, 2025, between Jay McGraw, P. McIntyre, and P. McGraw regarding the "structure" of a potential deal)

BLI).[89] This merger also contemplated that production of new Dr. Phil content would be moved from TBN's Plex studio to MediaCo's facility in Irving.[90]

51.    Additional discussions with Soo Kim regarding a merger continued through May 2025,[91] and at one point, it was even contemplated that this merger would make MSM a subsidiary of MediaCo.[92] None of these discussions, including the possibility of making MSM a subsidiary of MediaCo, were ever disclosed to TBN. In fact, if this merger or partnership were to occur, Soo Kim wanted McGraw/Peteski/MSM "███████████████████" (*i.e.*, TBN), which Solomon replied was a "██████"[93]

52.    Exactly when or how the terms of this potential merger and/or partnership with Soo Kim and/or MediaCo materialized is unclear—but the ultimate goal is clear: any deal about the future of MSM and its assets would not include TBN. For instance, on May 21, Solomon texted Terry Crosby, a distributor involved with MSM, that the "████████████████████████ ███████████████████████████████████"[94] It was also clear that McGraw had made up his mind about the relationship with TBN, declaring: "██████████ ███████████████████████████████████"[95]

---

[89]    Ex. 46, at JAYMCGRAW_PETESKI0008910–8911 (draft of merger term sheet with MediaCo).

[90]    Ex. 48, JAYMCGRAW_PETESKI0008916–8917 (text messages on May 18, 2025, between J. McGraw and P. McIntyre contemplating that the first phase with Soo is to "██████████████").

[91]    Ex. 49, JAYMCGRAW-PETESKI0008922–8923 (text messages between Jay McGraw and P. McIntyre on May 20, 2025); Ex. 50, MCINTYRE-PETESKI0008529–8530 (text messages from P. McIntyre to Jay McGraw on May 20, 2025, about Soo meetings, says "████████████████████████████ ████").

[92]    Ex. 51, PETESKI0003156 (email from J. McGraw to P. McGraw on May 20, 2025, subject: "████ ████").

[93]    Ex. 52, JAYMCGRAW_PETESKI0008906–8907 (text messages on May 20, 2025, between J. McGraw and K. Solomon: "████████████████████████████████████████ ██████████").

[94]    Ex. 53, MSM0022708–22711, at MSM0022710 (text messages on May 21, 2025, from K. Solomon to T. Crosby).

[95]    Ex. 54, PETESKI0005423–5424 (text messages on May 31, 2025, from P. McGraw to K. Solomon).

4908-7548-2465.8

53.    On or around May 23, 2025, the idea of a merger with MediaCo and MSM appeared to be off the table. While Soo Kim apparently wanted to work with McGraw, he was not "███████ ████████████████████████████████████████████████████████████"[96] This appears to be the turning point of MSM's future. From that point on, the new plan was to abandon MSM and form a new venture (which later came to be known as Envoy) with MediaCo.[97]

54.    Discussions with Soo Kim regarding a future MediaCo partnership continued well into June of 2025.[98] On June 2, 2025, Gilligan texted with his wife, Carol, regarding a new hire at MSM, saying:

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████[99]

On June 12, McGraw's inner circle emailed regarding a "████████████████████████"[100] Specifically, Deb Gerry outlined certain notes from the call that make clear the decision had already been made to tear down MSM and build up a new entity. For example, she described preparations to "████████████████████," "████████████████████████████ ████████████████████████████" and preparation of systems "████████████████ ██████████████████,"[101] The same day, Solomon and Jerry Sharell texted about the

---

[96]    Ex. 55, JAYMCGRAW-PETESKI0008934–8935 (text messages on May 23, 2025, between Jay McGraw and Jordan McGraw).

[97]    Ex. 56, PETESKI0001989 (email from P. McGraw to J. Cheatwood on May 23, 2025, discussing a "████ ████████████"); Ex. 57, MSM0023033–23034 (text messages between K. Solomon and Jordan McGraw on May 24, 2025, discussing a "pretty major reorg" of MSM).

[98]    Ex. 58, MSM0006520–6523 (email from K. Solomon to P. McIntyre on June 9, 2025, regarding ████████ ████)

[99]    Ex. 59, MSM0023191–23194 (text message from P. Gilligan to C. Gilligan on June 3, 2025, at 1:45 p.m.). ███████████████████████████████████████████████████████ ████████████████████████

[100]    Ex. 60, MCINTYRE-PETESKI0008343–8344 (emails between K. Solomon and D. Jeong, et al.).

[101]    Id.

impending press release announcing Envoy, with Sharell noting that Envoy's existence meant MSM's demise:[102]



[103]

55.    On June 15, Cheatwood emailed other employees at MSM that "████████ ████████████████████████████████████████████████████ ████████████████████"[104] Again, despite Gerry's statement on June 12 that "████ ████████████████████████████████████████████████████ ██████" none of these conversations were disclosed to, or included, TBN.

56.    The transition from MSM to the as-yet-unnamed new company and/or partnership with MediaCo gained steam from there. On June 19, McGraw emailed Solomon, and then McIntyre, regarding 16 hours of meetings with lawyers that week to figure out "████████ ████████████████████████"[105] He also clearly stated his intent to "████████ ████████████████████"[106] The teardown then manifested as significant layoffs of MSM personnel, including one person that Perry characterized as one of the "████████████ ██████"[107] Clearly, the layoffs at MSM were linked to the burgeoning partnership with MediaCo; on June 20, Cheatwood texted with an unnamed recipient (believed to be David Jeong, an independent contractor of MSM):[108]

---

[102]    Ex. 61, MSM0023012 (text messages between K. Solomon and J. Sharell on June 12, 2025).

[103]    *Id.* at MSM0023012 (emphasis in the original).

[104]    Ex. 62, MSM0002041 (email from J. Cheatwood to C. Cataldi and G. Gutierrez on June 15, 2025).

[105]    Ex. 63, PETESKI0003210 (emails from P. McGraw to K. Solomon and P. McIntyre on June 19, 2025).

[106]    *Id.*

[107]    Ex. 64, MSM0004012–4015 (email from J. Perry to J. Cheatwood on June 19, 2025).

[108]    Ex. 65, MSM0010369–10371 (text messages between J. Cheatwood and another (likely D. Jeong) on June 20, 2205).



Later in the same thread, Cheatwood and (presumably) Jeong continued their discussions:



57.       Over the following approximately two weeks, McGraw's ultimate goal—to get rid of and sue TBN, dissolve MSM, and start a new media venture with MediaCo with MSM's assets—crystalized. On June 23, Jordan McGraw (McGraw's son) exchanged proposed logos for "Envoy" with McIntyre.[109] Now the new entity had a name. On June 24 or 25, Cheatwood testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[110] Also on June 25, Cheatwood and Solomon texted about transferring health insurance coverage, payroll services, and 401k (if they chose to offer it), to ▮▮▮▮ now known to be Envoy.[111] At this time, Cheatwood and Solomon were MSM's Chief Operating Officer and Chief Executive Officer, respectively. They continue to hold those offices to this day.[112] On June 26, a number of individuals associated with MSM, including McIntyre, began an email exchange with individuals associated with

---

[109]       Ex. 66, PETESKI0005807–5810 (text messages between Jordan McGraw and P. McIntyre on June 23, 2025).

[110]       Ex. 67, J. Cheatwood Dep. Tr. at 17:9–22.

[111]       Ex. 68, MSM0010095–10096 (text messages between J. Cheatwood and K. Solomon on June 25, 2025).

[112]       *See* Docket No. 186, at Part 13, subpart 28 (listing Cheatwood and Solomon as current officers).

MediaCo regarding MSM's technical requirements in preparation for a facility move to MediaCo's facility.[113] The next day, on June 27, Perry and Cheatwood texted regarding, among other things, the planned shutdown of MeritTV and, notably, a bankruptcy filing.[114]



Clearly, the futures of Envoy and MSM, and the bankruptcy filing, were linked.



58.    While Cheatwood and Perry were texting about the shutdown of MSM, other individuals related thereto were having similar discussions. That afternoon Gilligan, Jonathan McElhannon, and Natalia Gomez (a current MSM employee) met to discuss, among other things, "████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████"[115] They also talked about "████████████████████████████████████████

---

[113]    Ex. 69, MCINTYRE-PETESKI0007531–7540.

[114]    Ex. 70, MSM0010027–10029 (text messages between J. Cheatwood and J. Perry on June 27, 2025).

[115]    Ex. 71, MSM0004702–4703.

██████████████████████████ s presumably professional fees associated with the bankruptcy.

59.    On June 28, Cheatwood and Perry continued their discussions about the future—or lack thereof—of MSM and the "████████████████" In texts that day, Cheatwood summarized the scheme:[116]



60.    That the plan was always to utilize a MSM bankruptcy to facilitate the creation of Envoy cannot be argued; in fact, that intent was announced at a MSM staff meeting two days before the Petition Date, on June 30. As Solomon's staff notes reflect:[117]

---

[116]    Ex. 72, MSM0010030–10033 (text messages between J. Cheatwood and J. Perry on June 28, 2025).

[117]    Ex. 73, MCINTYRE-PETESKI0008621–8623 (text messages between K. Solomon and P. McIntyre on June 30, 2025).



61.    It was equally clear that *McGraw himself* intended to use the bankruptcy process to achieve these goals. In texts he purportedly sent to Ribman in the hours prior to the bankruptcy filing, he states:[118]

| # | | 7/1/2025, 10:55 PM |
|---|---|---|

**What I sent to Jamie:**

Ok. I have been trying to get with you so you are up to speed. I am filing suit against TBN at 12:01am as in 3 hours from now.
I am also filing Ch. 11 for MSM to wipe out all the shit Matt Crouch has burdened us with. It will wipe out PBR's claim against MSM but our claim against them will survive. It will free us from TBN's debt for distribution which Matt saddled us with. Distributors are cooperating with us.
Two biggest assets are OUR claims against TBN and PBR. The biggest creditor is me. Second is distributor group then you. (See below as to you.)
We are immediately relaunching in a joint venture with MediaCo in the new 65,000 sq. Ft broadcast center at 2410 Gateway in Irving just off Beltline. Soundstages are under construction as are all other elements we need.
We will not go off the air for even one second except where our distributors take us down when they can replace us. We are working to replace them as well. No adversarial blood there.
Just want you to know we think we "Free At Last." Very happy. Wish we didn't have to do it—but it is time.
Important to me that you know: Your investment is 100% safe. Hope you will choose to go along and move it to new deal. (Clean balance sheet!) However, I am happy to reimburse you via wire transfer at a moments notice as I have previously indicated. I don't care about the agreement that protects with the library or what the court does. Our deal is between us and I am very grateful for it. I made a choice and will not allow you to be in an uncomfortable position for even a second.
I just did NOT want you to be surprised in any fashion or think some court was going to impact your investment. Not happening. Since this goes public technically at midnight I just had to get to you with the scoop.
And yes we can meet tomorrow! Hope this helps. Sorry to be a nag!🙂

## E.    MSM Prepares for and Files Bankruptcy but Continues to Aid McGraw to Launch His New Venture, Envoy Media Co.

62.    On or around June 18, 2025, McGraw, acting as the self-appointed director, caused MSM to engage Broadbent as its CRO. However, Cheatwood and Solomon continued to prepare for the launch of McGraw's new venture. Indeed, Cheatwood and Solomon discuss plans to shut

---

[118]    Ex. 74, PETESKI0005841–5844 (text messages between P. McGraw and P. McIntyre on July 1-2, 2025).

down MSM and transition to a "newco" while MSM was preparing to file bankruptcy. Specifically, on June 28, Cheatwood emails Jeong and Perry about the ███████████████████████████████ ████████████████████████████████████████████[119] That same day, Cheatwood later texts Perry about something that MSM's ███████████████████████████████ ██████████[120] Cheatwood and Perry then go on to discuss ███████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████[121] This plan was further discussed at MSM's board meeting on July 1 at which MSM's bankruptcy counsel presented the plan to terminate all but 7 employees and rehire them at ██████████████████████[122]

63.      On July 1, 2025, Envoy was officially formed as a Delaware entity.[123] The next day, July 2, MSM commenced this Chapter 11 Case and subsequently fired 90% of its employees.[124] The sworn testimony of Cheatwood, MSM's Chief Operating Officer, confirms that many of these employees have been offered positions at Envoy and are actively working for it now. It also appears that *virtually all* of the remaining MSM employees/independent contractors also work for Envoy. The most concerning overlap is Cheatwood and Solomon—both of whom are officers and fiduciaries of MSM—continuing to work at MSM while also working with McGraw to launch Envoy. Indeed, in the days and weeks following the bankruptcy filing, Solomon and Cheatwood have been actively working to set up Envoy, negotiate contracts for it with MSM's ad distributors and providers, and build its staff. For example:

---

[119]   Ex. 75, MSM0004230 (email from J. Cheatwood to D. Jeong and J. Perry on June 28, 2025).

[120]   Ex. 72, MSM0010030–10033.

[121]   *Id.*

[122]   Ex. 76, MSM0001490–1571 (Minutes of a Meeting of the Board of Directors of Merit Street Media, Inc., dated July 1, 2025).

[123]   Ex. 77, PETESKI0001120–1122.

[124]   July 3, 2025, Hr'g Tr. 46:20–24: (Broadbent: "There was a workforce reduction yesterday [Petition Date] that reduced basically by 90 percent the workforce. It went from roughly 60 employees to maybe 6 today.").

- On July 3, Solomon emailed a Samsung representative they ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[125] Later, on July 5, Solomon ████████████████████████████████████████████████████[126]

- Also on July 3, Cheatwood emailed Jeff Miller, MSM's VP of Human Resources, ████████████████████████████████████████████████████ ████████████████████████[127] Broadbent was copied in this email.

- On July 5, Solomon emailed a representative at CNZ Communications ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[128] Broadbent was also copied on this email.

- On July 8, Cheatwood emailed McGraw, stating that he and Solomon were ████████████████████████████████████████████████████████████████ ████[129] McGraw then approved ████████████████████ for Envoy.[130]

- On July 9, Jeong, another MSM employee, emailed McIntyre, Solomon, Cheatwood, Perry, and McGraw about "████████████████████████ ████████████████████"[131]

- On July 17, Miller sent Cheatwood an ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[132]

---

[125] Ex. 78, MSM0001845 (email from K. Solomon to T. Ho on July 3, 2025).

[126] *Id.* (email from K. Solomon to T. Ho on July 5, 2025).

[127] Ex. 79, MSM0004712–4714.

[128] Ex. 80, MSM0001847 (email from K. Solomon to T. Crosby on July 5, 2025).

[129] Ex. 81, MSM0002175 (email from J. Cheatwood to P. McGraw on July 8, 2025).

[130] Ex. 82, MSM0013964 (email from J. Cheatwood to P. Gilligan, J. Miller, N. Gomez on July 8, 2025).

[131] Ex. 83, PETESKI0003868–3869 (email from P. McIntyre to D. Jeong and others on July 9, 2025).

[132] Ex. 84, MSM0014094 (email from J. Miller to J. Cheatwood and K. Solomon on July 17, subject line: "████████████████████") and MSM0014095 (attachment from email). Cheatwood testified at his deposition ████████████████████████████████████████████████████████████████ Ex. 67 at 136:16–137:20.

4908-7548-2465.8

64.     Eventually, Cheatwood's and Solomon's involvement with Envoy reached a level where they stopped using their MSM email accounts for Envoy business and switched to their personal accounts. On July 21, Cheatwood texted "David" (likely Jeong) that he and Solomon needed to be ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████[133] But their involvement did not stop there; both Solomon and Cheatwood remained committed and loyal to McGraw and to launching Envoy, while their obligation to MSM fell by the wayside.

65.     The interplay of the MSM bankruptcy and the launch of Envoy cannot be denied. Initially, McGraw and his inner circle contemplated a "handoff/launch" for Envoy of July 14, less than two weeks after the bankruptcy filing.[134] As events unfolded in the Chapter 11 Case that delayed or frustrated their goals, that date moved:

- On July 13, McGraw told ███████████████████████████████
███████████████████████████.[135]

- On July 19, Rothman told a friend that he was "███████████████████████
on August 1,[136] a timeline he also communicated to ████████████████
████████[137] and

- On July 24, Patrick Wilson emailed individuals at United Teleports and Samsung that "███████████████████████████████████
████████."[138] Wilson's email regarding the delay is easily understood as a reaction to this Court's ruling on July 22, which continued the hearing on

---

[133] Ex. 85, MSM0010378–10379 (text messages to from J. Cheatwood to someone on July 21, 2025). Solomon was even cautioning other MSM-Envoy employees to "be more careful/discrete with [their] work on Envoy." *See,* Ex. 86, MSM0010237–10238 (text messages from J. Cheatwood to M. Rothman on July 28, 2025).

[134] Ex. 78, at MSM0001845.

[135] Ex. 87, PETESKI0006642 (email from P. McGraw to J. Cheatwood, K. Solomon, S. Jerry, and G. Broadbent on July 13).

[136] Ex. 88, MSM0010639 (text messages between M. Rothman and S. Wood on July 19, 2025).

[137] Ex. 89, MSM0007795 (email from Samsung representative to M. Rothman on July 21, requesting a progress updated due to their "truncated timeline to expedite migration to new feed by 8/1").

[138] Ex. 90, MSM0007897.

the Motion to Dismiss (and other relief requested by MSM and McGraw/Peteski) from July 29 to August 19.

66.     Sworn deposition testimony from both McGraw and Cheatwood indicate that,

███████████████████████████████████████████████████████████████████

███████ [139] Envoy has not launched.

## F.   McGraw Admits: (1) He Filed the Chapter 11 Case, and (2) He Wants MSM's Assets.

67.     At various points in time, MSM, its professionals, Peteski, and even McGraw himself have attempted to distance McGraw from the decision to file bankruptcy. Indeed, the oft-repeated party line is that it was Broadbent who "decided to file" in his role as the sole member of the Special Committee, and McGraw/Peteski played no role. This is MSM's official position on the issue.

68.     The problem is that McGraw's own statements, as well as the circumstances leading up to the filing set forth above, tell a different story:

- In the text to Ribman mere hours prior to the filing, McGraw stated explicitly that "███████████████████████████"[140]

- In an email to Judge Rosemarie Aquilina, McGraw stated: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[141]

- In a nearly identical email to Garry Pearson, McGraw said the same thing;[142] and

- In a text message to Chief John Chell of the NYPD and Kaz Daughtry, McGraw said it again.[143]

---

[139]   *See, e.g.,* Ex. 91, PETESKI0004527 ("███████████████████████████."); Ex. 92, PETESKI0004529 ("███████████████████████████████"); Ex. 93, PETESKI0004532 ("███████████████████████ ."); Ex. 94, PETESKI0005199 ("███████████████████████").

[140]   Ex. 74, PETESKI0005841 (text messages from P. McGraw to P. McIntyre on July 1–2, 2025).

[141]   Ex. 92, PETESKI0004529–4531 (email from P. McGraw to R. Aquilina on July 4, 2025).

[142]   Ex. 93, PETESKI0004532 (email from P. McGraw to G. Pearson on July 4, 2025).

[143]   Ex. 94, PETESKI0005199–5200 (text messages from P. McGraw to Chief Chell NYPD and K. Daughtry on July 3, 2025).

The sworn deposition testimony of Cheatwood also establishes that McGraw was integrally involved in discussions on June 24 and 25, mere days after Broadbent arrived on the scene, about a bankruptcy filing and the planning therefor. Texts with members of his inner circle (Cheatwood and Solomon) also show that McGraw drafted the talking points used at the staff meeting at the Plex on July 2 where 90% of MSM's employees were terminated and then informed they could apply for positions at Envoy.[144] McGraw also texted Cheatwood on the evening of July 1, within hours of the bankruptcy filing, that he "███████████████████" which can be assumed to be the adversary Complaint against TBN and TCT.[145]

69.    McGraw's intent with respect to the Chapter 11 case once-filed cannot reasonably be denied, either; in an email to his son Jay on July 14 regarding the meaning behind the name "Envoy," McGraw stated:[146]



70.    On July 30, in text messages with Perry, McGraw made his intent even more clear:[147]



71.    When viewed in the context of his stated intent to acquire the assets, the combination of an exorbitant DIP facility he provides, the vast majority of which pays legal fees

---

[144]    Ex. 95, PETESKI0005190–5193 (text messages between P. McGraw, J. Cheatwood, and K. Solomon on July 1-2, 2025).

[145]    Ex. 96, MSM0009871–9872 (text messages between P. McGraw and J. Cheatwood on July 1, 2205).

[146]    Ex. 97, PETESKI0004541–4543 (email from P. McGraw to Jay McGraw on July 14, 2025).

[147]    Ex. 98, PETESKI0009450–9452 (text messages between J. Perry and P. McGraw on July 30, 2025).

for a lawsuit he drafted, an unfettered and unchallengeable right to credit bid in that same DIP order, and a sale process that McGraw knows is unlikely to find a buyer interested lays bare the initial reason for and purpose of this Chapter 11 Case: to shift MSM's assets to Envoy, launch Envoy with MSM's assets, leave the liabilities behind, and provide nothing to creditors.

**G.** **The Chapter 11 Case Is a Sham Proceeding.**

72.    Unfortunately, the evident bad faith does not stop with this unfettered credit-bid construct; McGraw/Peteski (through MSM) have also attempted to use the bankruptcy process to enrich Envoy in other ways. In particular, it appears that MSM is using the power of contract rejection pursuant to section 365 to Envoy's advantage.

73.    As noted above, MSM is party to that certain *First Look & Service Agreement* with Wonder Love, Inc., an affiliate of TV host, Steve Harvey (the "**Harvey Agreement**"). Individuals involved with MSM, including McGraw himself, have characterized the Harvey Agreement as providing MSM with an exclusive right to all of Harvey's productions domestically.[148] This exclusivity is potentially valuable; if Harvey were to produce content, it must be offered to MSM first. However, press releases announcing the creation of Envoy on July 14 make clear McGraw's intent to have Harvey produce content for *that* entity, creating a conundrum.[149] How can Harvey do that if he is contractually obligated to MSM?

74.    Enter one of the Rejection Motions filed on August 8, ***after*** the Envoy announcement *vis-à-vis* Harvey.[150] This motion seeks to reject the Harvey Agreement, potentially paving the way for him to provide content to Envoy rather than MSM. As noted in Trinity's

---

[148]    Ex. 99, MCINTYRE-PETESKI0007589–7596, at 7590 (email from P. McIntyre to P. Gilligan on Aug. 23, 2024, at 5:43 p.m., stating: "█████████████████████████████████████████████████████████████████████ ").

[149]    *See* Matthew Keys, *Dr. Phil Relaunches Merit Street as Envoy Media*, TheDesk.Net (July 14, 2025), https://thedesk.net/2025/07/dr-phil-envoy-media-launch/. ("Comedian Steve Harvey will produce original content for the venture, and repeats of his former syndicated talk show "Steve" will air on the national TV channel, the company said.").

[150]    *See* Docket No. 181.

objection,[151] this inherent conflict of interest between MSM and McGraw/Peteski/Envoy and the

"use of tools inherent to the Bankruptcy Code undermine the integrity of the bankruptcy process"

and demand additional review. Simply put, Chapter 11 is not, and never was intended, to be a

vehicle for officers, directors, and/or shareholders (or all three) of a bankruptcy company to

effectuate their personal goals and enrich themselves to the detriment of all others.

75.    Trinity anticipates that MSM will attempt to put on evidence that the real

justification underlying the rejection of the Harvey Agreement is the cost associated therewith, the

argument being that *not* rejecting it would expose the estate to significant administrative expenses.

However, given that MSM has shown no intent to pay *other* administrative expenses of the estate

(except the professional fees), including expenses associated with its lease agreement for space at

the Plex (which it has never paid) this argument falls flat.

## IV.
## LEGAL STANDARD

76.    Pursuant to section 1112(b) of the Bankruptcy Code, a court shall convert or

dismiss a bankruptcy case for cause when it is in the best interests of the creditors.[152] Section

1112(b)(4) contains a non-exclusive list of what constitutes "cause" for purposes of dismissal or

conversion. For example, cause exists where there is a "substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation" or there is

gross mismanagement of the estate.[153] This list is not exclusive; bankruptcy courts have the

flexibility and discretion to determine what constitutes cause under section 1112(b).[154] Upon a

---

[151]    *See* Docket No. 203.

[152]    11 U.S.C. § 1112(b).

[153]    11 U.S.C. §§ 1112(b)(4)(A)-(B).

[154]    *See, e.g., In re Nat'l Rifle Assoc. of Am.*, 628 B.R. 262, 270 (Bankr. N.D. Tex. 2021) (noting that "'cause'
affords flexibility to the bankruptcy courts and can include a finding that the debtor's filing for relief is not
in good faith."); *In re Delta AG Grp., LLC*, 596 B.R. 186, 194 (Bankr. W.D. La. 2019); *In re Guiliani,* 661
B.R. 493, 501 (Bankr. S.D.N.Y. 2024).

4908-7548-2465.8

finding of cause under section 1112(b) to dismiss or covert a Chapter 11 case, the court must weigh

whether the appointment of a trustee under section 1104(a) is in the best interest of the creditors

and estate.[155]

77.    Independent from any finding of "cause," a bankruptcy case must be dismissed if

the debtor did not have valid corporate authority to file a petition because the Court thus lacks

subject matter jurisdiction over the case.[156]    As the Fifth Circuit held, the person who signs the

bankruptcy petition must have had the actual authority to do so at the time the petition is filed.[157]

State law determines who has the authority to file a bankruptcy petition on behalf of the

corporation.[158]

78.    The moving party bears the initial burden to establish "cause" by a preponderance

of the evidence.[159] Once the cause has been established, it is the _debtor's_ burden to establish an

exception under section 1112(b)(2).[160]

---

[155]    _See, e.g., Nat'l Rifle Assoc._, 628 B.R. at 284; _In re Royal Alice Props., LLC_, No. 19-12337, 2020 WL 5357795, at *9 (Bankr. E.D. La. Sept. 4, 2020) (citing 11 U.S.C. § 1112(b)(1)); _In re NOA, LLC_, 578 B.R. 534, 541 (Bankr. E.D.N.C. 2017) ("Section 1112 and Section 1104 read together require the court to make a finding as to what remedy is in the best interest of the creditors and the estate.").

[156]    _See, e.g., Franchise Servs. of Am. Inc. v. United States Trustee (In re Franchise Servs. of N. Am., Inc.)_, 891 F.3d 198, 206–07 (5th Cir. 2018) ("If the petitioners lack authorization under state law, the bankruptcy court 'has no alternative but to dismiss the petition.'") (citing _Price v. Gurney_, 324 U.S. 100, 106 (1945)); _In re Cinch Wireline Servs., LLC_, No. 23-51742-CAG, 2024 WL 848199, at *9 (Bankr. W.D. Tex. Mar. 18, 2025); _In re Mid-South Business Assocs., LLC_, 555 B.R. 565, 570 (Bankr. N.D. Miss. 2016); _In re 301 W N. Avenue, LLC_, 666 B.R. 583, 955 (Bankr. N.D. Ill. 2025) ("There is cause to dismiss a case if corporate authority to file for relief under the Bankruptcy Code does not exist."); _In re Apex Brittany MO, LP_, No. 23-11463 (CTG), 2023 WL 8205669, at *3 (Bankr. D. Del. Nov. 27, 2023) ("It is well established that a court must dismiss a bankruptcy case if the party acting on behalf of a corporate entity in filing the petition lacked the authority to do so.").

[157]    _Franchise Servs. of N. Am._, 891 F.3d at 207 ("It is not enough that those who seek to speak for the corporation may have the right to obtain that authority. Rather, they must have it at the time of filing.").

[158]    _Id._ at 206; _Mid-South Business Assocs._, 555 B.R. at 570-71.

[159]    _Delta AG Grp., LLC_, 596 B.R. at 194 (citing _In re Woodbrook Assocs._, 19 F.3d 312, 317 (7th Cir. 1994)).

[160]    _Id._

# V.
# REPLY

## A.      The Debtor Lacked Corporate Authority to File the Chapter 11 Case.

79.      MSM's and Peteski's assertion that this bankruptcy case was filed with proper corporate authorization hinges on McGraw being the *sole* director of MSM. McGraw, and only McGraw, purported to create the Special Committee, appointed Broadbent, and, ultimately, caused MSM to file this bankruptcy. There is no allegation that the directors TBN's designated directors (Crouch and Smadja), who constituted a majority on MSM's three-person board, approved or even knew about this scheme. But MSM and Peteski insist that McGraw had every right to orchestrate the removal of TBN's designated directors—without notice. But the Voting Agreement, which is still in effect, says otherwise.

### i.      *The Voting Agreement Is in Effect and Barred the Removal of TBN's Designated Directors.*

80.      On March 5, 2024, TBN, Peteski, and MSM (still named APG Ventures at that time) executed the Voting Agreement along with a host of other agreements addressing corporate governance issues.[161] This agreement provided that APG Ventures' board would be comprised of two TBN designees (Crouch and Smadja) and one Peteski designee (McGraw).[162] The Voting Agreement also provided that only the designating party (TBN or Peteski) could remove their designated directors.[163]

81.      TBN did not remove its own directors, leaving McGraw in sole control of MSM. So, instead, MSM and Peteski argue that the Voting Agreement terminated after the Alleged Transfer was allegedly consummated.[164] This argument is problematic for several reasons.

---

[161]     Ex. 5, TBN0010343.

[162]     *Id.* at § 1.2.

[163]     *Id.* at § 1.4.

[164]     MSM Objection ¶ 41; Peteski Objection ¶ 33.

41

There was no termination event.

82.     The termination "event" MSM and Peteski rely upon never occurred. The termination provision of the Voting Agreement states that it will "continue in effect until and shall terminate upon . . . the consummation of a change of control transaction involving the transfer, acquisition or sale of at least a majority of the outstanding shares of capital stock of the Company."[165] In other words, a termination event only occurs if there is a change of control and the transaction that results in the change of control includes a majority of the shares in MSM.

83.     There is no doubt that the Alleged Transfer (assuming, *arguendo*, that it was effective, which, as discussed below, it was not) involved a change of control. Allegedly, Peteski's ownership share in MSM increased from 30% to 70%; TBN's share was decreased from 70% to 40%.[166] So, Peteski purportedly assumed majority shareholder position. But there is also no doubt that the Alleged Transfer did not involve the transfer of 50% or more of the outstanding shares of MSM. On its face, the Stock Confirmation envisions 285,715 of the total outstanding 714,287 shares (*i.e.*, 40%) being transferred from TBN to Peteski.[167] The transfer of 40% of the outstanding shares is simply not a transaction "involving the majority of the outstanding shares." So, it does not qualify as a termination event.

84.     In their Objections, MSM and Peteski myopically focus on the term "change of control" to the exclusion of the rest of the language in the termination provision. Peteski asserts that "the Voting Agreement terminated by its own terms pursuant to section 5 thereof on August

---

[165]    Ex. 5, TBN0010343 at § 5.

[166]    Ex. 7, TBN0010358 at ¶ 1.

[167]    *Id.* at ¶ 1 (stating "[t]he number of shares… which TBN shall purchase from MSM shall be reduced by 285,715 shares and the number of shares Peteski shall purchase from MSM shall be increased by 285,715 shares").

42

2024 when Peteski became the majority shareholder."[168] But becoming a majority shareholder—standing alone—is not the trigger for termination of the Voting Agreement.

85.     MSM, on the other hand, resorts to a misleading partial quotation of the termination provision to argue that "a 'change of control' happens upon the 'transfer, acquisition or sale of at least a majority of the outstanding shares of capital stock of the Company.'"[169] Conspicuously absent in this quotation is the all-important qualifier that "*a* change of control transaction" must "involv[e] the transfer, acquisition or sale of at least a majority of the outstanding shares." As detailed below, that never occurred.

86.     In short, neither MSM nor Peteski are able to square the plain language of the Voting Agreement with their argument that the parties' agreement presented no obstacle to McGraw's takeover of MSM.

<u>The Alleged Transfer did not occur.</u>

87.     The Alleged Transfer/Stock Confirmation that MSM and Peteski claim terminated the Voting Agreement was just one part of a multi-part restructuring of MSM. Because the parties never agreed on the other deal points necessary to effectuate the comprehensive restructuring, the Alleged Transfer was ineffective and, thus, could not constitute a termination event.

88.     Under Delaware law,[170] a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration.[171] None of these elements are met here.

---

[168]    MSM Objection ¶ 4.

[169]    Peteski Objection ¶ 33.

[170]    MSM *née* APG Ventures was, indisputably a Delaware corporation at the time of the execution of the Stock Confirmation.

[171]    *Patterson Woods & Assoc., LLC v. Realty Enterp., LLC*, CIV.A05C-01224JOH, 2008 WL 2231511 at *4 (Del. Super. Ct. May 21, 2008).

89.    *First*, TBN made clear—prior to and after the Stock Confirmation—that any agreement to transfer 40% of MSM stock to Peteski was conditioned on agreement on the entire, comprehensive deal to restructure TBN and Peteski's relationship *vis-à-vis* MSM. That did not occur, so there was no intent to consummate the Alleged Transfer or be bound by the Stock Confirmation.

90.    TBN and Peteski began discussing a comprehensive restructuring of their business relationship concerning MSM in early July 2024.[172] Based on representations by McGraw, this restructuring needed to include *inter alia* a swap in majority-in-interest positions to allow McGraw to solicit tens of millions of dollars in new investments from "friends and family." But that was only one part of the multi-step restructuring envisioned by the parties. In meetings in late July, Crouch, Amedia, and McGraw discussed the Alleged Transfer and other aspects of restructuring.[173] Following a July 30, 2024, in-person meeting, Amedia (on behalf of TBN) emailed McGraw and informed him that:

> Dr. Phil, pursuant to our conversations this week, we are in agreement to restructure our present arrangement as pertains to MSM such that we flip the 70% TBN and 30% Dr Phil, to 30% TBN and 70% Dr. Phil. We are taking this step in good faith subject to your acknowledgement that we have a multitude of outstanding deal points to be finalized and that we will continue to proceed in good faith together to complete the entire understanding which will be memorialized in a formal written agreement within an expedient and reasonable time period.[174]

91.    McGraw responded that he would "continue our focus on finalizing the outstanding deal points to memorialize in formal written agreement as expeditiously as possible."[175] However, he maintained that the TBN and Peteski urgently needed to effectuate the Alleged Transfer portion

---

[172]    Ex. 8, PETESKI0003789–3790 (email from P. Gilligan to P. McGraw, et al. on July 11, 2024, and related attachment).

[173]    Ex. 11, TBN0005362–5364, at 5362–63.

[174]    Ex. 14, TBN0004508-4509.

[175]    *Id*.

of the restructuring plan. In follow-up communications, TBN reiterated that it would not formalize "any written agreement that does not recognize all of the open deal points that are vital to TBN in the restructuring of MSM."[176] McGraw acknowledged as much, stating that: "we don't have deal [on the Alleged Transfer] unless your demands, whatever they may be, are met on other points in the proposed amendment. Therefore, what we have, is a **<u>contingency agreement</u>**, not an actual agreement."[177]

92.     On August 4, 2025, Frank Amedia provided McGraw the first of two outlines of the comprehensive restructuring plan, consisting of a five-stage vision for the deal.[178] McGraw responded the following day with interlineated comments, agreeing that "If you don't ultimately get what you want on other deal points, we have no deal on the stock swap. I get it and respect your position."[179]

93.     On August 6, 2025, Amedia provided another outline of the restructuring plan with ten specific deal points that were necessary to effectuate the comprehensive realignment between TBN and Peteski with respect to MSM: [180]

---

[176]     Ex. 16, TBN0023585–23586.

[177]     Ex. 17, TBN0024120–24121 (emphasis added).

[178]     Ex. 100, TBN0015749.

[179]     *Id.*

[180]     Ex. 18, TBN0015748.

> 1.  70/30 stack swap - separte agreement you already provided
> 2.  Collateralize the July payment as Matt committed.- forthcoming
> 3.  Collateralize the October payment as we discussed - forthcoming
> 4.  Other future payment by TBN terms and obligations to you or MSM are eliminated - included in short memorandum and long form
> 5.  TBN funds through August - in short form
> 6.  No default - in short form
> 7.  New Board of 5, 3 from Dr P, 2 from TBN - in short form and then long form
> 8.  Reconciliation, recognition of TBN investment capital and secure it in some form TBD with MSM. - in long form
> 9.  Work out details for fair stock value preservaitons (you mentioned that you would use the 70% to get investsment). Open to hear how you intend to preserve stock value for both of us. - in long form
> 10. Lease to be prepared for facility - exhibit of long form

94.     Based on McGraw/Peteski's repeated assurances that the Alleged Transfer was part and parcel of a comprehensive restructuring—and that there was no deal on the Alleged Transfer if the other deal points were not agreed to—TBN and Peteski executed the Stock Confirmation on August 8, 2024.[181] The Stock Confirmation did as the parties intended—*i.e.*, create a document that McGraw could show investors that Peteski held a majority of MSM's stock. Specifically, the Stock Confirmation provided that:

> The number of shares provided in the Stock Purchase Agreements which TBN shall purchase from [MSM] shall be reduced by 285,715 shares and the number of shares Peteski shall purchase from [MSM] shall be increased by 285,715 shares.[182]

95.     On the day following the execution of the Stock Confirmation, McGraw emailed TBN, recognizing that TBN and Peteski "have a pretty good 'to do' list to now turn our attention to" and reassuring TBN that he "did not forget [his] commitment to work diligently and expeditiously to get everything buttoned up post 'stock swap.'"[183] On August 11, 2024, Amedia responded, interlineating his own comments to McGraw's "to do" list and reiterating:

---

[181]    Ex. 7, TBN0010358. The signing of the Stock Confirmation was memorialized in a videotaped session. *See* PubRecord0000628 (https://vimeo.com/1110105386/b4feb8f5f6?share=copy).

[182]    Ex. 7, TBN0010358 at § 1.

[183]    Ex. 21, TBN0024037–24040, at 24037-38 (email from P. McGraw to F. Amedia on Aug. 8, 2024).

> We agreed to **initiate** the stock swap but, I never discounted the
> items that are essential to TBN. I told you a few times that I cannot,
> will not promise what cannot be assured. Good faith was, is our
> common bond in this journey together to restructure MSM from
> what was from the onset operationally flawed and overzealous on
> achieving revenue.[184]

96.     Yet, signing the Stock Confirmation—step 1 of the multi-process "deal"—was the
farthest the parties ever got in negotiating and agreeing to the comprehensive restructuring of
MSM. As McGraw admitted in his deposition, the deal points from Amedia's August 6 email were
never addressed. Instead, as was later revealed, McGraw's intent was to secure a majority
shareholder position, reduce TBN's role in MSM to nothing more than "▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮" and take over the company in what he previously characterized as a "▮▮▮▮▮▮▮▮▮"[185]

97.     While McGraw apparently believed that he could obtain 40% of TBN's MSM stock
without agreeing to the rest of the restructuring deal outlined by the parties, that is not the case.
The communications preceding execution of the Stock Confirmation make clear that the
restructuring deal was an all-or-nothing proposition: "If you don't ultimately get what you want on
other deal points, we have no deal on the stock swap. I get it and respect your position."[186] And
because the parties did not agree to the comprehensive deal to restructure MSM, there was no
intent by TBN to be bound to the Alleged Transfer.

98.     MSM and Peteski are likely to argue that the execution of the Stock Confirmation
is dispositive of TBN's intent to be bound by the terms of that document. But Delaware law is
clear that a court must consider what "the parties communicated to each other up until the time
that the contract was signed—*i.e.*, their words and actions—including the putative contract itself"
in adjudicating whether the first element of a valid contract is satisfied.[187] Here, the circumstances

---

[184]     *Id.* at TBN0024037 (email from F. Amedia to P. McGraw on Aug. 11, 2024) (emphasis added).

[185]     Ex. 22, PETESKI0003859.

[186]     Ex. 100, TBN0015749.

[187]     *See Eagle Force Holdings, LLC v. Campbell*, 235 A.3d 727, 734–35 (Del. 2020).

preceding and following the signing of the Stock Confirmation document make clear the parties'
intent: a conditional acceptance of the terms of the Alleged Transfer "subject to" agreement on a
comprehensive deal to restructure their relationship with respect to MSM[188] or there is "no deal on
the stock swap."[189]

99.      _Second_, the terms of the agreement to restructure MSM were not "sufficiently
definite." Under Delaware law, "a contract must contain all material terms in order to be
enforceable."[190] But the closest the parties came to a "contract" was a thumbnail sketch of basic
concepts for what that deal might look like. For example, the August 6 deal points memorandum
email was only able to encapsulate vague aspirations like "[w]ork out details for fair stock value
preservations" and "[r]econciliation, recognition of TBN investment capital and secure it in some
form TBD with MSM."[191] Undoubtedly, preserving fair stock value and recognizing TBN's
funding for MSM was material to the parties' arrangement. But, because negotiations for a
comprehensive restructuring never amounted to anything, there are no "sufficiently definite" terms
to enforce.[192]

100.    _Third_, there is no consideration supporting the Alleged Transfer of stock from TBN
to Peteski.

101.    Under Delaware law, as with every other jurisdiction, a valid contract requires the
exchange of consideration.[193] Prior to the Alleged Transfer, TBN owned approximately 70% of

[188]     Ex. 14, TBN0004508–4509.

[189]     Ex. 100, TBN0015749–15753, at 15750 (email from P. McGraw to F. Amedia on Aug. 5, 2024, at 3:33 p.m.)

[190]     _Osborn ex rel. Osborn v. Kemp_, 991 A.2d 1153, 1159 (Del. 2010).

[191]     Ex. 18, TBN0015748.

[192]     _Shilling v. Shilling_, 332 A.3d 453, 462 (Del. 2024) ("[A] valid contract requires an offer, acceptance, and
consideration, and the parties must have intended that the contract would bind them." quoting _Trexler v.
Billingsley_, 166 A.3d 101 (Del. 2017) (Table)); _Nickerson v. E.I.L. Instruments, Inc_., 874 S.W.2d 936, 939
(Tex. App.—Houston [1st Dist.] 1994) (same).

[193]     _N. Am. Fire Ultimate Holdings, LP v. Doorly_, 2025 WL 736624, at *3 (Del. Ch. Mar. 7, 2025); _Benson v.
Forgie_, 2023 WL 5623568, at *4 (Tex. App.—Houston [14th Dist.] Aug. 31, 2023) ("Consideration is
essential to a contract." citing _Unthank v. Rippstein_, 386 S.W.2d 134, 137 (Tex. 1964)); _Chan v. Montebello_

48

the stock of MSM, and Peteski owned 30%.[194] According to MSM and Peteski, through the Stock Confirmation, TBN transferred 40% of the stock to Peteski. So, Peteski certainly received something—40% of MSM's stock that was valued (according to Peteski) at $170 million (i.e., 40% of a total enterprise valuation of $425 million).[195] But this begs the question: what did TBN receive in return? The answer is clear: nothing.

102.    On its face, the Stock Confirmation provides for no consideration to be given in exchange for the Alleged Transfer. There is nothing in the Stock Confirmation referencing any promise made by Peteski or payment from Peteski to TBN in exchange for 40% of TBN's outstanding shares. So, a literal reading of the Stock Confirmation contemplates that TBN would have transferred over $170 million of value to Peteski for $0.[196]

103.    The *intended* consideration, however, would have been found in the comprehensive restructuring deal that TBN and Peteski agreed subsumed the Alleged Transfer. Had the parties consummated that multi-part agreement, the deal points that benefitted TBN (i.e., eliminating TBN's financial support of MSM moving forward, recognizing TBN's investment capital, etc.) would have supplied more than enough good and valuable consideration to support the transfer of 40% of MSM's stock from TBN to Peteski.[197] But without agreement on any other part of the restructuring deal, this purported standalone stock transfer lacked any consideration whatsoever. The absence of any consideration given by Peteski renders the Stock Confirmation unenforceable, and thus, the Alleged Transfer never occurred.

---

*Development Co.*, 2008 WL 2986379, at *7 (Tex. App.—Houston [14th Dist.] July 31, 2008) ("Contracts are valid if there is consideration on each side.").

[194]    Ex. 101, MSM0001815; Ex. 102, TBN0010337.

[195]    Ex. 103, TBN0004397 (email from McGraw discussing locking in a $425 million valuation of MSM).

[196]    *Young v. Ershick*, 617 F. Supp. 3d 563, 585 (E.D. Tex. 2022) ("[L]ack of consideration occurs when the contract, at its inception, does not impose obligations on both parties.").

[197]    Ex. 18, TBN15748.

49

104.     In sum, none of the necessary elements of a valid, enforceable contract exist with respect to the Stock Confirmation. The other aspects of the comprehensive MSM restructuring deal were indispensable to TBN's acceptance of the terms of the Alleged Transfer, providing definite terms for the restructuring arrangement, and supplying consideration for any purported stock transfer. But without those other deal points, the Stock Confirmation is no contract at all— and certainly not capable of constituting a termination event under the Voting Agreement.

### ii.      *TBN Did Not Consent to the Removal of Its Designated Directors.*

105.     MSM and Peteski next argue that, even if the Voting Agreement was never terminated (which it was not), TBN consented to the removal of its directors (or waived any objection to their removal) by executing the Conversion Consent.[198] But TBN never acceded to the removal of its directors.

106.     MSM and Peteski ignore the context of the Conversion Consent and the irreconcilably inconsistent positions taken by Peteski in securing TBN's signature. Specifically, on February 22, 2025, Brian Lidji, presumably acting as counsel for MSM, emailed TBN representatives Amedia and Colby May that:

> The most urgent issue this morning is the move of MSM corporate home from Delaware to Texas. If TBN is not going to agree to that, please let me know. If it is going to agree to that, please send back the signed consent. It take time to make the Delaware and Texas filings and we want it effective today, before our answer is due on Monday in the WRNN suit. Dragging out the decisions will eliminate the possible of making the filing in time.[199]

107.     In response, Amedia stated that he had been "inquiring as to what the Board constitution is now. I had suggested that TBN have two members, and Petesk[i] or other three?"[200]

---

[198]    Ex. 39, PETESKI0009309.

[199]    Ex. 38, TBN0002851.

[200]    *Id.* The proposal of a five-member board comprised of two TBN designees and three Peteski designees is in reference to one of deal points comprising the comprehensive restructuring of MSM, as reflected in an email sent by Amedia prior to the Alleged Transfer. *See* Ex. 18, TBN15748.

Lidji replied that "the current board has 1 member, Phil McGraw. That will not change as a result of the move from Delaware to Texas."[201] Lidji doubled down in a later email, stating: "John [Casoria] is incorrect. The only current director of MSM is Phil McGraw."[202]

108.    John Casoria then intervened on behalf of TBN to address Lidji directly, vehemently emphasizing that there "*always* have been" three directors of MSM: "Phil McGraw, Matthew Crouch, [and] Samuel Samdja," and directing Lidji's attention to the corporate documents created by McGraw's prior counsel.[203]

109.    Lidji subsequently provided Casoria with a copy of the *Written Consent of the Stockholders of Merit Street Media, Inc.*, dated August 8, 2024, that purported to amend the Bylaws to change the board composition from three to one and appointed McGraw as sole director.[204] As discussed above, that consent was invalid as Peteski was a minority shareholder due to the failure of the Alleged Transfer. Furthermore, Peteski had not informed TBN of the supposed removal of TBN's directors allegedly occurring six months prior.

110.    Upon receiving notice of a dramatic corporate change for the first time, Casoria expressed that he was surprised and disappointed that Peteski had attempted to change the composition of MSM's board without any consultation or notice.[205] However, based on Lidji's heightened sense of urgency and representations that this was necessary for MSM's defense in the WRNN litigation, Casoria executed the Conversion consent even though he confirmed that Crouch and Smadja remain on MSM's board.[206]

---

[201]    Ex. 38, TBN0002851.

[202]    *Id.*

[203]    *Id.*

[204]    Ex. 39, TBN0002898, attaching TBN0002919.

[205]    Ex. 38, TBN0002851. In response, Lidji stated: "Needless to say, you should not be surprised." *Id.*

[206]    Ex. 39, PETESKI0009308

111.    MSM and Peteski latch on to this document as evidence of TBN's waiver (pursuant to section 6.8 of the Voting Agreement) of any objection to the removal of its designated directors. But it reflects no such thing.

112.    "Waiver is the voluntary and intentional relinquishment of a known right."[207] It may be express or implied, but in either circumstance waiver "must be unequivocal."[208] But, here, TBN lodged its objection to the purported removal of its directors and explicitly disagreed with Peteski's suggestion that its directors had already been removed.[209] And there is certainly nothing the parties' correspondence that indicates TBN unequivocally accepted Peteski's late-noticed supposed takeover of MSM's board.

113.    Further, waiver requires that the waiving party have "knowledge of all material facts."[210] Peteski's lack of transparency and communication deprived TBN of this knowledge. In fact, MSM itself seems to lack knowledge of the material facts of this supposed waiver of the Voting Agreement's protections. It initially averred to this Court that TBN's directors were removed on February 3, 2025[211]—not on August 8, 2025—as it now argues.

114.    Additionally, MSM's and Peteski's argument also begs the question: if, as Peteski apparently believed, the August 8, 2024, Alleged Transfer made Peteski was the majority shareholder _and_ controlled the sole director position, why was TBN's consent necessary? Nothing in the Bylaws mandated that TBN consent to a conversion into a Texas entity as a minority shareholder without a director's seat. Jackson Walker's insistence that TBN agree to the

---

[207]    _Realty Growth Inv'rs v. Council of Unit Owners_, 453 A.2d 450, 456 (Del. 1982) (citing 28 Am. Jur. 2d, Estoppel and Waiver, § 158 (1966)).

[208]    _Javice v. JPMorgan Chase Bank, N.A._, No. 2022-1179-KSJM, 2023 WL 4561017, at *4 (Del. Ch. July 13, 2023).

[209]    Ex. 38, TBN0002851.

[210]    _Realty Growth Inv'rs_, 453 A.2d at 456.

[211]    Docket No. 161, at 47.

conversion on an expedited basis further evidences that confusion both behind the scenes at MSM/Peteski and with TBN.

115.    Even setting all that aside, the fact is that the Conversion Consent—and the communications that preceded its execution—took place in the context of the ongoing negotiations for a comprehensive restructuring of MSM. As reflected in the August 6, 2024, restructuring "deal points outline" email from Amedia and Casoria's pre-conversion correspondence with Lidji, the board composition of MSM was one of the items that TBN and Peteski identified as being part and parcel of the restructure.[212] Given the urgency for conversion conveyed by Lidji, MSM's counsel, and the fact that the size and composition of MSM's board would likely change if the parties' reached a final agreement on the restructuring, TBN took a practical approach to the supposedly time-sensitive conversion matter and signed the Consent Conversion. But it simultaneously made clear that it was "reviewing" the board of directors issue.[213] So, even if TBN executed the Conversion Consent, its communications prior to doing so make clear that there was no agreement between the parties that McGraw was the sole director of MSM.[214]

116.    MSM and Peteski cannot, given TBN's clear disagreement with their proffered view of MSM's board composition, claim that TBN intentionally and knowingly waived its objection to the removal of its directors or its rights under the Voting Agreement.

117.    As a final point, because the Alleged Transfer never came to be an enforceable, effective contract, Peteski's purported removal of TBN's directors was void *ab initio*, as it violated Delaware corporate law.[215] The Delaware General Corporation Law does not permit a director to

---

[212]    *See* Ex. 18, TBN0015748; Ex. 38, TBN0002851.

[213]    Ex. 38, TBN0002851.

[214]    *See Eagle Force Holdings*, 235 A.3d at 735–36 (finding that a court can take into account the circumstances and communications surrounding the execution of document to determine whether a party agreed to be bound by its terms).

[215]    *Wagner v. BRP Grp., Inc.*, 316 A.3d 826, 845, 850 (Del. Ch. 2024) ("If the Challenged Provisions violate the DGCL, then they are void, not voidable, and equitable defenses cannot validate void acts.).

be removed by the action of a minority of shareholders (*i.e.*, Peteski) and equitable arguments, such as waiver or estoppel, cannot validate them after the fact.[216]

> ### iii. *Peteski Was Not Permitted to Amend MSM's Bylaws to Remove TBN's Designated Directors.*

118.    As a final matter, Peteski is incorrect in implying that it could simply amend MSM's Bylaws to effectuate the removal of TBN's designated directors. In its objection, Peteski states: "Following the execution and delivery of the Stock Confirmation, Peteski, as the 70% majority shareholder of the Debtor, amended the Debtor's bylaws to permit a single director and elected Dr. McGraw as the sole member of its board of directors."[217] But the Voting Agreement allowed no such thing.

119.    Both the Bylaws and the Voting Agreement address the constitution of MSM's board of directors and procedures for removal.[218] For its part, the Bylaws state:

> **Section 3.02   Number; Term of Office**. The Board of Directors shall consist of three (3) or more members, each of whom shall be a natural person. Unless the Certificate of Incorporation fixes the number of directors, the number of directors shall be determined by resolution of the Board of Directors. Each director shall hold office until a successor is duly elected and qualified or until the director's earlier death, resignation, disqualification, or removal.

> **Section 3.05   Removal**. Except as prohibited by applicable law or as otherwise provided in the Certificate of Incorporation, the stockholders entitled to vote in an election of directors may remove any director from office at any time, with or without cause, by the affirmative vote of a majority in voting power thereof.[219]

120.    On the other hand, the Voting Agreement specifies:

> **1.1    Size of Board**. Each Stockholder agrees to vote, or cause to be voted, all Shares (as defined below) owned by such Stockholder,

---

[216]    8 D.G.C.L. § 141(k); *Wagner*, 316 A.3d at 845, 850 (finding the equitable defense of waiver does cannot validate void acts); *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 994 (Del. Ch. 2024) ("Equitable defenses, including laches, cannot validate void acts.").

[217]    Peteski's Objection at ¶ 25.

[218]    Ex. 104, TBN0026710 at § 3.02; Ex. 5, TBN0010343 at §§ 1.1, 1.2.

[219]    Ex. 104, TBN0026710 at §§ 3.02, 3.05.

or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set and remain at three (3) directors and may be increased only with the written consent of the TBN Stockholder (defined below) and the Peteski Stockholder. For purposes of this Agreement, the term "Shares" shall mean and include any securities of the Company that the holders of which are entitled to vote for members of the Board, including, without limitation, all shares of Common Stock, now owned or subsequently acquired by a Stockholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise.

1.2     **Board Composition**. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, the following persons shall be elected to the Board:

(a) Two (2) individuals to be designated by Trinity Broadcasting of Texas, Inc. or its affiliates (the "TBN Stockholder"), which individual designees as of the date of this Agreement are Matthew Crouch and Samuel Smadja; and

(b) One (1) individual to be designated by Peteski Productions, Inc., or its affiliates (the "Peteski Stockholder"), which individual designee as of the date of this Agreement is Phillip McGraw.

1.4     **Removal of Board Members**. Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

(a) no director elected pursuant to Section 1.2 of this Agreement may be removed from office other than for cause unless such removal is directed or approved by the written consent or affirmative vote of the Person(s) entitled under Section 1.2 to designate that director; and

(b) no director elected pursuant to Section 1.2 of this Agreement may be removed from office other than for cause unless such removal is directed or approved by the affirmative vote of the Person(s), or of the holders of at least

55

a majority of the shares of stock, entitled under Section 1.2
to designate that director.[220]

121.    Peteski seems argue that once it purportedly became the majority shareholder of

MSM, it was entitled pursuant to section 8.01 of the Bylaws to remove the board of director

provisions in the Bylaws and create a board consisting of one man—McGraw.[221] But the Voting

Agreement specifically addressed the constitution of the board (two TBN designees and one

Peteski designee) and the removal procedure (only accomplished by the vote of the party entitled

to designate the director). And McGraw could not orchestrate an end-run around the Voting

Procedure by amending the Bylaws.

122.    "In the absence of anything to indicate a contrary intention, writings executed at

the same time and relating to the same transaction are construed together as a single contract, as

though they were as much one in form as they are in substance, in order to determine the intent,

rights, and interests of the parties."[222] MSM's Bylaws and the Voting Agreement (as well as

several other documents) were executed the same day—March 5, 2024—and relate to corporate

organization and governance issues of MSM.[223] As a result, the Bylaws and the Voting Agreement

should be construed together.

---

[220]     Ex. 5, TBN0010343 at §§ 1.1, 1.2, 1.4.

[221]     Ex. 104, TBN0026710 at § 8.01 ("Amendments. These Bylaws may be amended, altered, terminated,
repealed, or waived by (i) the Board of Directors or (ii) the holders of at least a majority of the voting power
of all of the shares of capital stock issued and outstanding, voting together as a single class on an as converted
basis.").

[222]     *Simon v. Navellier Series Fund*, No. 17734, 2000 WL 1597890, at *7 n.33 (Del. Ch. Oct. 19, 2000) (citing
17A C.J.S. Contracts § 315, at 337 (1999); 11 WILLISTON ON CONTRACTS § 30:26, at 239–42 (4th ed. 1999)).

[223]     Ex. 104, TBN0026710; Ex. 5, TBN0010343.

123.     Under Delaware law, "general terms of the contract must yield to more specific terms."[224] And courts will not interpret a contract in a manner that would render some provisions superfluous.[225]

124.     But what Peteski proposes here runs afoul of both rules. Peteski's purported amendment of the Bylaws is nothing more than attempt to override the far more specific terms of the Voting Agreement (crafted specifically to address the election and removal of directors) with the general terms regarding that subject matter supplied by the Bylaws. Even more clearly, Peteski's argument renders the Voting Agreement a nullity. If the provisions of the Voting Agreement can be "amended" away by the majority shareholders via the Bylaws, what effect does it have?

125.     In sum, MSM's and Peteski's explanations for how McGraw supposedly came to be the sole director do not survive scrutiny. The Voting Agreement was not terminated by the Alleged Transfer (if it even occurred) because it did not constitute a termination event. The Voting Agreement procedures for removal were not followed. And TBN never consented to the removal of its directors nor did it waive any objection to the purported removal.

126.     As a result, McGraw/Peteski has been controlling MSM without the authority to do so, including creating the Special Committee, appointing Broadbent, and causing MSM to file this bankruptcy. All such actions are *ultra vires*, and null and void. Accordingly, this Chapter 11 Case must be dismissed for lack of subject matter jurisdiction.[226]

---

[224]     *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 n.96 (Del. 2019).

[225]     *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1057 (Del. 2023) (citing RESTATEMENT (SECOND) OF CONTRACTS § 203 cmt. B).

[226]     *See, e.g., Franchise Servs. of Am. Inc.*, 891 F.3d at 206-07 ("If the petitioners lack authorization under state law, the bankruptcy court 'has no alternative but to dismiss the petition.'") (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)).

**B.**    **This Chapter 11 Case Was Filed in Bad Faith.**

127.    Assuming, *arguendo*, that this Court has subject matter jurisdiction, and McGraw/Peteski had the authority to put MSM into bankruptcy (which they did not), this Chapter 11 Case was nevertheless filed in bad faith.[227] The Court does not need to look any further than MSM's initial filings and the record from the First Day hearing to conclude that this Chapter 11 Case was filed as a litigation tactic to take advantage of the debtor-in-possession avoidance powers and saddle the estate with senior-secured debt without providing a benefit to any of the creditors or stakeholders. It is now the Debtor's burden to demonstrate its good faith.[228] MSM has not, nor can it, satisfy this burden. In addition to the ***facts*** stated the Motion to Dismiss—which are based on its very own pleadings—the evidence undeniably proves that this Chapter 11 Case was filed to: (a) fund litigation against Trinity, and (2) facilitate the acquisition of MSM's assets solely to benefit McGraw ***and*** his new, competing media venture, Envoy.

       ***i.***     ***MSM Cannot Demonstrate that this Chapter 11 Case Was Filed in Good Faith.***

128.    Unsurprisingly, it is MSM's (and McGraw/Peteski's) position that this Chapter 11 Case was filed to "maximize" value for the benefit of all creditors.[229] Specifically, MSM argue that this Chapter 11 Case was to "avoid a race to the courthouse" and "centralize the resolution" of MSM's open disputes, in order to facilitate a sale or an orderly liquidation of the Debtor.[230]

---

[227]    However, even if this Court finds that there was a lack of corporate authority (*ergo* no subject matter jurisdiction), the Court is still permitted to find that the Chapter 11 Case was filed in bad faith. *See, e.g., Chitex Commc'ns, Inc. v. Kramer*, 168 B.R. 587, 590–91 (S.D. Tex. 1994) (finding that the chapter 11 case was filed without corporate authority and the filing constituted bad faith since it was filed on the eve of a foreclosure in an effort to evade a state court judgment); *In re Delaware Valley Lift Truck, Inc.*, 640 B.R. 342, 353-54 (Bankr. E.D. Pa. 2022) (noting it prior ruling determined the petition was filed in bad faith as a litigation tactic *and* without corporate authority).

[228]    *Nat'l Rifle Ass'n of Am.*, 628 B.R. at 270.

[229]    MSM Objection ¶ 1; Peteski Objection ¶ 37.

[230]    *See, e.g.,* MSM Objection ¶¶ 47, 56.

These hollow statements are just window dressing as they do nothing more than to recite basic bankruptcy principles. They cannot carry the day to prove good faith.

129.    A Chapter 11 case "must add or preserve value that would otherwise be unavailable to creditors outside of bankruptcy."[231] To that end, "[t]o be filed in good faith, a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code."[232] Indeed, a debtor's desire to invoke the powers conferred by the Bankruptcy Code does not *per se* establish good faith, nor does it automatically constitute a valid bankruptcy purpose.[233] "If it did, an entity willing to bear the costs of a bankruptcy filing could use the Bankruptcy Code's redistributive mechanisms to its advantage, a concept antithetical to the structure and purposes of the Bankruptcy Code."[234]

130.    This Chapter 11 Case does nothing more than to seek the benefits of the Bankruptcy Code. Inherent in the "purposes" articulated by MSM, it is using the powers of the automatic stay for the benefit of MSM (but really McGraw/Peteski). "The protection of the automatic stay is not a *per se* a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing."[235] This is not a good faith filing.

131.    Again, as emphasized by TBN and PBR (***and*** McGraw), this Chapter 11 Case is a transparent effort by McGraw to get rid of TBN (with the added benefit of stalling the PBR arbitration). This scheme was plainly evident by the fact that any future draws on the DIP Facility (at least the first one) was conditioned on wiping out TCT's security interest, the claim of which

---

[231]    *Santa Fe Corp. Servs. v. BEPCO, L.P. (In re 15375 Memorial Corp.)*, 589 F.3d 605, 620 (3d Cir. 2009).

[232]    *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 129 (3d Cir. 2004).

[233]    *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 374 (Bankr. D. Del. 2018) (citing *Integrated Telecom Express*, 384 F.3d at 129).

[234]    *Id.* at 374–75.

[235]    *15375 Memorial Corp.)*, 589 F.3d at 620 (quoting *Integrated Telecom Express*, 589 F.3d at 128) (cleaned up).

59

was filed prior to any substantive pleadings in the bankruptcy itself. Commencing a bankruptcy for the purpose of getting rid of a stakeholder is an improper use of the bankruptcy court and the provisions of the Bankruptcy Code.[236]

132.    Moreover, the notion that this Chapter 11 Case was intended to prevent a race to the courthouse is without merit as there is no evidence to support such an assertion.[237] To state the obvious, there was no pending litigation against or otherwise involving Trinity, nor had Trinity suggested or otherwise indicated it intended to exercise any remedial rights against MSM or its assets. Rather, the only litigation involving Trinity and MSM is the Adversary Proceeding, which was commenced by McGraw using MSM as an instrumentality. The only pre-petition litigation involved PBR, which, as MSM acknowledged, had significant upcoming deadlines right before this Chapter 11 Case was filed (e.g., evidencing a litigation tactic).[238] Nevertheless, the theory of "preventing a race to the courthouse" is typically relevant where there are competing demands to a debtor's limited assets that would result in unequal treatment amongst creditors.[239] As one bankruptcy court observed:

> [A] costly "race to the courthouse" would develop, with each creditor rushing to enforce its collection rights at the first sign of trouble, lest other creditors get there first and levy on all of the debtor's available assets. In their zeal to ensure satisfaction of their

---

[236]    *See, e.g., In re mpX Technology, Inc.,* 310 B.R. 453, 349 (Bankr. M.D. Fla. 2004) ("Filing a Chapter 11 petition for the purpose of resolving an inter-company dispute is not one of the goals which is to be achieved in a Chapter 11 case and it is totally improper to use the bankruptcy court and the provisions of the Code for this purpose."); *In re Sirius Systems, Inc.,* 112 B.R. 50, 55 (Bankr. D.N.H. 1990) (noting that shareholders filing a bankruptcy case to resolve a shareholder dispute was part of their "overall litigation tactic against each other"); *In re Antelope Techs., Inc.,* 431 F. App'x 272, 275 (5th Cir. 2011) (affirming dismissal where the district court found that the purpose of the petition was not primarily to reorganize or respond to a financial crisis but to gain an unfair advantage in a shareholder derivative action).

[237]    *In re Bedmar, LLC,* No. 25-11027 (JKS), 2025 WL 2496260, at *17 (Bankr. D. Del. Aug. 29, 2025) (rejecting the argument that the bankruptcy minimizes the estate by preventing a race to the courthouse that may have resulted if each landlord commenced litigation across various jurisdictions).

[238]    MSM Objection ¶ 58.

[239]    *In re Murray,* 543 B.R. 484, 494-95 (Bankr. S.D.N.Y. 2016), *aff'd,* 900 F.3d 53 (2d Cir. 2018); *In re 15375 Memorial Corp.,* 589 F.3d at 620 ("It is true that, at its most basic level, bankruptcy is designed to handle the distribution problems arising when the system of individual creditor remedies harms the creditors as a group and there are not enough assets to go around.").

particular debts, the creditors might dismember a debtor that, on reflection, all would agree is worth more to the creditors collectively as a going concern.[240]

None of those concerns are present here—particularly, when MSM's only secured creditors are TCT (an affiliate of TBN) and Peteski.[241]

133.    To that end, the Debtor's bare recitation that this Chapter 11 Case is to "maximize assets" is nothing more than a pretext for its actual purpose—which is to get rid of Trinity so that McGraw can launch his new venture, Envoy.

> ii.    **The Chapter 11 Case Was Filed to Benefit McGraw and Envoy, Which Is an Abuse of the Bankruptcy Code, Not a Valid Bankruptcy Purpose, and Thus, Proves Bad Faith.**

134.    "Bankruptcy is a collective remedy, with its original purpose—which continues to this day—to address the needs and concerns of creditors with competing demands to debtors' limited assets[.]"[242] This purpose has expanded to accomplish other important "social goals:" to provide a discharge, to rehabilitate, and to capture going concern value for the benefits of the creditor and to save jobs.[243] In other words, a valid bankruptcy should seek to preserve the debtor's going concern value or liquidate its assets *for the benefit of all creditors*.[244] It follows that unless

---

[240]    *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 924 (Bankr. N.D. Cal. 1994) (quoting David A. Skeel, *Markets, Courts, and the Brave New World of Bankruptcy Theory*, 1993 Wis. L.R. 465 (1993)).

[241]    Schedule D, Docket No. 162.

[242]    *Murray*, 543 B.R. at 494-95 (Bankr. S.D.N.Y. 2016).

[243]    *Id.* (finding that an involuntary was commenced in bad faith where a single creditor attempted to invoke the bankruptcy process as its personal "judgment enforcement devise."); *In re Lots by Murphy, Inc.*, 430 B.R. 431, 435–36 (Bankr. S.D. Tex. 2010) ("When the purposes of the bankruptcy system (i.e., the twin pillars) will not be achieved, a bankruptcy proceeding 'has lost its *raison d'etre*'" (quoting *Little Creek*, 7798 F.2d at 1073)).

[244]    *See, e.g., In re Ozcelebi*, 639 B.R. 365, 396–97 (Bankr. S.D. Tex. 2022) (noting a valid purpose is to preserve the debtor's going concern and maximize property available to satisfy creditors); *In re Red River Talc. LLC*, 670 B.R. 251, 305 (Bankr. S.D. Tex. 2025) (finding that a valid purpose is to liquidate assets and create a liquidation trust to benefit creditors); *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 383 ("One of the purposes of chapter 11 is to maximize property available to satisfy creditors.").

4908-7548-2465.8

a Chapter 11 petition was filed in furtherance of one of these goals, the bankruptcy serves no valid

purpose and thus was not filed in good faith.[245] As the Third Circuit observed:

> It is easy to see why courts have required Chapter 11 petitioners to
> act within the scope of the bankruptcy laws to further a valid
> reorganizational purpose. Chapter 11 vests petitioners with
> considerable powers—the automatic stay, the exclusive right to
> propose a reorganization plan, the discharge of debts, etc.—that can
> impose significant hardship on particular creditors. When
> financially troubled petitioners seek a chance to remain in business,
> the exercise of those powers is justified. But this is not so when a
> petitioner's aims lie outside those of the Bankruptcy Code.[246]

To that end, nothing in the Bankruptcy Code permits a stakeholder to be preferred ahead of other

creditors; in fact, the opposite is true. It is black letter law that in bankruptcy equity does not benefit

until after creditors are paid in full.[247] As such, bankruptcy cannot be used to merely "distribute

value directly from creditors to the debtor's stakeholder."[248] A petition filed with that intent is not

done in good faith.[249]

---

[245] *Nat'l Rifle Ass'n of Am.*, 628 B.R. at 270-71; *In re JWB Overland LLC*, 656 B.R. 518, 524 (Bankr. M.D. Fla. 2024) (finding that if a debtor is pursuing a goal other than obtaining relief provided through the methods available in the Bankruptcy Code, that constitutes bad faith); *Murray*, 543 B.R. at 496 ("And the bankruptcy court cannot properly be employed as a rented battlefield, to achieve ends for which it never was intended, and as a collection mechanism to achieve none of the goals the Court has just noted."); *see also In re Boca Village Ass'n, Inc.*, 422 B.R. 318, 325 (Bankr. S.D. Fla. 2009) ("When it appears under the totality of circumstances that a debtor has taken advantage of the court's jurisdiction in a manner abhorrent to the purposes of Chapter 7, a court can dismiss a Chapter 7 case for bad faith constituting cause under § 707(a)." (internal citations omitted)); *In re Levinsky*, 23 B.R. 210 (Bankr. E.D.N.Y. 1982) (noting that dismissal of petitions for lack of good faith warranted when an entity has been organized for the express purpose of taking advantage of reorganization provisions).

[246] *In re SGL Carbon Corp.*, 200 F.3d 154, 165–66 (3d Cir. 1999) (citing *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 373 (5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)).

[247] *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017) ("The Code places equity holders at the bottom of the priority list. They receive nothing until all previously listed creditors have been paid in full."); *Wells Fargo Bank, N.A. v. The Hertz Corp. (In re The Hertz Corp.)*, 120 F.4th 1181, 1198 (3d Cir. 2024) ("[I]n bankruptcy equity comes after debt").

[248] *Integrated Telecom Express*, 384 F.3d at 129 ("[Bankruptcy] must seek to create or preserve some value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy.") (emphasis added).

[249] *See, e.g.*, *Rent-A-Wreck of Am.*, 580 B.R at 374 (finding bad faith where the debtors' purpose in filing was "nothing more than a straightforward attempt to take value that belongs to Mr. Schwartz [a creditor/adversary of the debtors] and give it to the debtors" which would in turn only benefit the debtors' owner); *Bedmar, LLC*, 2025 WL 2496260, at *18 ("Here, the purpose of the Debtor's case is to benefit shareholders of the Enterprise—which is outside the purpose of the Bankruptcy Code and not done in good faith.").

135.    Here, it is abundantly clear that this Chapter 11 Case was filed for the sole benefit of McGraw/Peteski—a stakeholder of the Debtor—at the expense other legitimate creditors, including Trinity. In filing this Chapter 11 Case, McGraw sought to abuse the powers of a debtor-in-possession to transfer estate assets directly into McGraw's new, competing media venture, Envoy, thereby leaving nothing for the estate or creditors. From the outset of this bankruptcy, this scheme was apparent. The only mistake Trinity made in filing the Motion to Dismiss was not knowing how right it was.

136.    *First*, on the Petition Date, MSM fired nearly 90% of its employees, most of whom have been rehired by Envoy. Among the employees who moved to Envoy are those that were essential to the creation and production of MSM content. Conveniently, because MSM ceased such creation days before the filing, MSM could justify their termination as they were no longer "necessary" for operations. It was critical to move MSM employees over to begin working on the launch of Envoy as soon as possible,[250] and MSM had been contemplating this for weeks leading up to the Petition Date.

137.    *Second*, MSM commenced the Adversary Proceeding against Trinity, which included the Preference Claim. This step was important because any future borrowing under the secured DIP Facility was conditioned on the Court adjudicating the Preference Claim. By wiping out TCT's security interest, Peteski would be the only remaining secured creditor, thereby securing its lien over substantially all of the Debtor's assets (including litigation claims) and ultimately, control over this Chapter 11 Case. This conclusion is further reinforced by McGraw's self-serving statements to others that he was the only—or primary—creditor of MSM.[251]

---

[250]    Ex. 105, MSM0002138 (email from J. Miller to J. Cheatwood on July 1, 2025, stating ███████ ██████).

[251]    Ex. 94, PETESKI0005199 (text message from P. McGraw to Chief Chell NYPD and K. Daughtry, stating: "███████████████████████████████████████████ ████").

4908-7548-2465.8

138.    _Third_, the final DIP Order (if approved) would then give McGraw/Peteski the unfettered right to credit bid on substantially all MSM assets. Indeed, the interim DIP Order contemplated that Peteski would have an unfettered right to credit bid right that would be unchallengeable, even for cause.[252] Under these circumstances—particularly when the DIP Facility is almost entirely to fund professional fees—a credit bid by Peteski would yield nothing in return to the estate or any distributions to creditors. Moreover, a credit bid ensured that McGraw would not have to pay any consideration for MSM's assets in pursuit of his launch of Envoy.

139.    _Fourth_, after Peteski credit bids and obtains MSM's assets, including the litigation claims against Trinity, McGraw could then freely control and transfer those assets as he so desires. After the creation of Envoy (which occurred the day before filing) it became apparent that McGraw intended to transfer MSM's assets to Envoy. Any subsequent retreat by McGraw/Peteski from the concept of a credit bid or the sale of litigation claims (to him) cannot contravene the obvious original intent.

140.    The creation of Envoy only confirms the true purpose of this Chapter 11 Case— _i.e._, to gut MSM of its employees and assets to kickstart McGraw's competing new media company. And while MSM and McGraw/Peteski will attempt to disprove these intentions and distant themselves from Envoy, MSM's post-petition actions and involvement with Envoy prove otherwise. On day 1 of this bankruptcy, MSM ceased creating new content and fired nearly all of its employees so that _Envoy_ could hire them. From there, MSM's remaining employees/officers— mainly Solomon and Cheatwood—continued to work diligently and faithfully with McGraw and his followers to launch Envoy. They had open and repeated discussions about the launch date, its

---

[252]    Interestingly, MSM correctly notes that the law provides for credit bids to be challenged for "cause." MSM Objection ¶ 51 (citing 11 U.S.C. § 363(k) and _In re Phila. Newspapers, LLC_, 599 F.3d 298 (3d Cir. 2010)). Yet, for some reason, MSM does not recognize that its own Interim DIP Order (and now proposed Final DIP Order) explicitly provide that Peteski's "shall not be prohibited for making such credit bid 'for cause' under section 363(k) of the Bankruptcy Code." Interim DIP Order, ¶ 34; proposed Final DIP Order, Docket No. 395, at ¶ 34.

4908-7548-2465.8

content, and MSM distributers to move over to Envoy. Worst of all, Broadbent—the Debtor's CRO and "Independent" Director—was aware of their employment *and activities for* Envoy and did nothing to stop them.

141.    There is nothing legitimate about this Chapter 11 Case. To McGraw, it was simply a means to an end. The end here being to effectively leave TBN with a shell of MSM, saddled with debt and unsatisfied creditors, while starting anew with MSM's assets at Envoy. This is an entirely improper use of the Bankruptcy Code, as this Chapter 11 Case does not create (or preserve) value that would otherwise be lost outside of bankruptcy.[253] In fact, the opposite is true; launching Envoy and selling MSM's assets could have occurred outside of the bankruptcy, or at least, in a Chapter 7 with an independent fiduciary conducting the liquidation and at minimal expense to the estate. Instead, McGraw/Peteski decided to commence this Chapter 11 Case in order to obtain releases of valuable claims against themselves and abuse other debtor-in-possession powers all to benefit themselves.

142.    Ultimately, the primary purpose of this Chapter 11 Case was to benefit McGraw and his new venture. This is not a valid purpose and undeniably proves that this Chapter 11 Case was commenced in bad faith.

**C.    Because Ample Cause Exists to Find Bad Faith, the Court Should Convert this Chapter 11 Case to Chapter 7.**

> ***i.    The Unusual Circumstances Exception Under Section 1112(b)(2) is Inapplicable to a Finding of Bad Faith.***

143.    Because there is ample cause to find bad faith, the Court should either convert or dismiss this Chapter 11 Case. MSM nonetheless invokes the exception under section 1112(b)(2), which provides, in pertinent part:

---

[253]    *See, e.g., mpX Technology, Inc.,* 310 B.R. at 459 ("Filing a Chapter 11 petition for the purpose of resolving an inter-company dispute is not one of the goals which is to be achieved in a Chapter 11 case and it is totally improper to use the bankruptcy court and the provisions of the Code for this purpose.").

The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

> (A) there is a reasonable likelihood that a plan will be confirmed within . . . a reasonable period of time; and

> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

> > (i) for which there exists a reasonable justification for the act or omission; and

> > (ii) that will be cured within a reasonable period of time fixed by the court.[254]

144.    MSM argues that because the Motion to Dismiss was filed 16 days from the Petition Date, conversion or dismissal would have been premature.[255] In particular, MSM pointed to the fact that there are ongoing discussions with Peteski and the Committee regarding a "global" settlement for a plan that _could_ result in distributions to unsecured. Peteski echoes these statements, maintaining that it has been working in good faith (with an emphasis on doing so through separate counsel) to make this bankruptcy a "success."[256] The Committee has now come forward to report that the parties (MSM, McGraw/Peteski, and the two irreparably conflicted Committee members) have reached a "settlement in principle" that will be baked into a Chapter 11 plan.[257] Thus, according to MSM (and now the Committee), this should be enough to overcome a finding of bad faith and avoid dismissal or conversion.

---

[254]    11 U.S.C. § 1112(b)(2)(A)–(B).

[255]    MSM Objection ¶ 72.

[256]    Peteski Objection ¶ 37.

[257]    Committee Reservation of Rights ¶ 2. Specifically, the Committee represented that McGraw/Peteski will give the estate $17 million (which, upon information and belief, would be from the proceeds of selling McGraw's airplane) as a "baseline" recovery for unsecured creditors. _Id._ According to the Committee, Peteski also agreed to waive any recoveries under the plan, including the entire DIP Facility (both secured and unsecured), the prepetition Bridge Loans, and its unsecured notes. _Id._ In exchange, "Peteski and its related parties will receive estate releases."

145.    As a preliminary matter, the potential for, or a concept of, a plan settlement is not enough to establish an "unusual circumstance," particularly when it is almost certain that MSM will face substantial challenges in confirming a plan.[258] For example, this "plan settlement" is contingent on Peteski *and its affiliates* receiving estate releases, and those releases are subject to an "investigation" by the Debtor and Committee (which the Committee characterized as a "fiduciary out"). Not only is it highly unlikely that MSM and the Committee have started their "investigation," it is also almost impossible to imagine that they would be able to conduct an *impartial* and fulsome investigation into McGraw and Envoy (both "affiliates" of Peteski).[259]

146.    Moreover, in addition to challenges of good faith under section 1129(a)(3), Trinity expects that any proposed plan will inappropriately classify and/or subordinate Trinity's and PBR's claims to ensure there is a consenting impaired voting class.[260] Specifically with respect to PBR, it is almost certain that a plan will not recognize the legitimacy of its contingent and unliquidated claim. While the estimation of PBR's claim is not related per se to Trinity, this issue is nevertheless indicative of the uphill battle McGraw/Peteski/MSM must fight for confirmation.

147.    Furthermore, where, like here, the bankruptcy has been filed in bad faith, a debtor cannot point to a Chapter 11 plan as an "unusual circumstance" to absolve itself from its own bad faith.[261] As the Eleventh Circuit determined:

---

[258]    *C.f. Nat'l Rifle Ass'n of Am.*, 628 B.R. at 285 (noting that while the court was aware during trial the debtor intended to file a plan that would pay creditors in full but also finding that the evidence of bad faith demonstrated that the debtor would face "substantial challenges" in confirming a plan).

[259]    *See* 11 U.S.C. § 101(2) (defining "affiliate" to include an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor" or a "corporation 20 percent or more whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote"). And while it is unlikely that the plan will explicitly provide for a release of Envoy, common sense and familiarity with the Chapter 11 process suggests that any defined term relating to a release will be broadly drafted to encompass Envoy.

[260]    McGraw testified that he does not think "███████████████████████████████." Ex. 33, McGraw Depo Tr. 122:17–18.

[261]    *In re Phoenix Piccadilly, Ltd.*, 489 F.2d 1393, 1395 (11th Cir. 1988) ("We reject the debtor's argument that the bankruptcy court cannot ever dismiss a case for bad faith if there is equity in the property because the presence of equity indicates the potential for a successful reorganization."); *see also In re Ozcelebi*, 639 B.R.

> [T]he taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement. ***The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith.***[262]

"[B]ad faith cannot be cured or justified such that the exception to dismissal [or conversion] under [section] 1112(b)(2) applies."[263] To allow otherwise would eviscerate the requirement that every bankruptcy petition must be filed in good faith.[264] The Fifth Circuit has recognized the very importance of the good faith requirement, stating:

> Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors and creditors with "clean hands."[265]

For that reason, no amount of "unusual circumstances" can undue or justify a debtor's bad faith; to hold otherwise, would allow a debtor to continually abuse the Bankruptcy Code and process,

---

at 425 ("[G]iven those [bad faith] findings, there is no reasonable likelihood that Debtor could confirm a plan pursuant to § 1191(b), which incorporates § 1129(a)(2), requiring that '[t]he proponent of the plan complies with the applicable provisions of this title.'").

[262] *Phoenix Piccadilly*, 489 F.2d at 1395 (quoting *In re Natural Land Corp. v. Baker Farm, Inc. (In re Natural land Corp.)*, 825 F.2d 296, 298 (11th Cir. 1987)) ("We reject the debtor's argument that the bankruptcy court cannot ever dismiss a case for bad faith if there is equity in the property because the presence of equity indicates the potential for a successful reorganization.").

[263] *In re LTL Mgmt., LLC*, 652 B.R. 433, 454 (Bankr. D.N.J. 2023), *aff'd*, 2024 WL 3540467 (3d Cir. July 25, 2024) (finding that debtor's case was filed in bad faith for lack of financial distress but determining that "whatever the basis for bad faith" is for cause cannot be cured or justified under section 1112(b)(2)).

[264] *Little Creek*, 779 F.2d at 1071 ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.").

[265] *Little Creek*, 779 F.2d at 1072; *see also In re Aearo Technologies, LLC*, No. 22-02890-JJG-11, 2023 WL 3938436, at *14 (Bankr. S.D. Ind. June 9, 2023) ("In the Court's view, framing good faith in terms of Chapter 11's underlying goals serves to protect the bankruptcy court's jurisdictional integrity. This protection of the bankruptcy court's jurisdiction is imperative."); *Furness v. Lilienfield,* 35 B.R. 1006 (D. Md. 1983) ("[T]he 'good-faith' requirement has long been the policing mechanism of bankruptcy courts to make certain that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy philosophy and policy and for no other purpose.").

and ultimately, undermine the integrity of this Court.[266]

148.    Here, based on the insurmountable evidence of bad faith, MSM cannot now tout a Chapter 11 plan as evidence of "unusual circumstances" (or its possibility of confirmation) to wipe away or cleanse itself from its bad faith. Nor can a plan "settlement" with McGraw/Peteski and the Committee rectify this issue. Moreover, at least one bankruptcy court has determined that the exception under section 1112(b)(2) should be used where "cause" is based on "technical mistakes or other procedural and ministerial failings."[267] Trinity urges this Court to adopt the same.

149.    Simply put, McGraw/Peteski/MSM's bad faith cannot be undone; the exception under section 1112(b)(2) is not available to MSM. Trinity has demonstrated that this Chapter 11 Case was filed in bad faith and for the sole purpose of benefitting McGraw/Peteski. McGraw/MSM/Peteski cannot retroactively fix its bad faith intentions for filing this Chapter 11 Case, nor should the Court permit it to do so. Bad faith actions must have consequences.

### ii.    *Converting this Chapter 11 Case to a Chapter 7 is in the Best Interest of Creditors and Estate.*

150.    MSM further argues that converting this case to a Chapter 7 would be inefficient, timely, and diminish estate value.[268] Specifically, MSM contends that a Chapter 7 trustee would need time to educate him or herself about the Debtor's assets, restart the Debtor's sale process, which would cause the estate incur additional administrative expenses, depleting creditor recoveries.[269] According to MSM, these circumstances do not suggest conversion is in the best interest of the creditors and estate.

---

[266]    *See, e.g., Furness v. Lilienfield,* 35 B.R. 1006, 1011 (D. Md. 1983) ("[A] good-faith requirement guards against jurisdictional abuse as well as the misuse and manipulation of bankruptcy remedies.").

[267]    *LTL Mgmt., LLC*, 652 B.R. at 454.

[268]    MSM Objection ¶¶ 77–78.

[269]    MSM Objection ¶ 77.

151.     While this Chapter 11 Case does not preserve or add value to MSM's assets, Trinity

nevertheless submits that conversion is in the best interest of creditors. First, and foremost, based

on the apparent bad faith of this bankruptcy (as well as serious abdications of fiduciary duties by

MSM officers, discussed infra), a Chapter 7 trustee would be better positioned to investigate and

effectively liquidate MSM's limited assets.[270] This point is only emphasized by the clear conflicts

of interest among MSM officers, McGraw, and Evoy, as well as the Committee members.

152.     Moreover, MSM also has limited assets, consisting primarily of intellectual

property, leases, and causes of action. There is nothing particularly complicated that would require

a Chapter 7 trustee an unreasonable amount of time to catch-up to speed about this debtor, its

assets, and limited operations.[271]

153.     To that end, under these facts and circumstances, conversion to a Chapter 7 and the

appointment of an independent fiduciary (*i.e.*, a Chapter 7 trustee) would be in the best interest of

the creditors. It would minimize administrative costs, save the estate from over $9 million of

secured debt (which MSM has represented it intends to borrower from Peteski if this Chapter 11

Case continues), and, most importantly, allow for an independent review of the needs of this case

and the best way to maximize value of assets *for all creditors and stakeholders*. If estate assets

are to be sold, McGraw/Peteski (or even Envoy) would be allowed to bid, but for real cash dollars

that would yield a more meaningful distribution to creditors. Most importantly, a Chapter 7 trustee

---

[270]    *In re M.A.R. Designs & Construction, Inc.*, 653 B.R. 843, 872–73 (Bankr. S. D. Tex. 2023) (finding that "based on the numerous findings of bad faith and gross mismanagement of the estate by the Debtor, that a Chapter 7 trustee would be better positioned to investigate and effectively liquidate the numerous pieces of real estate owned by Debtor.")

[271]    For instance, MSM's current professionals were engaged one week before filing this Chapter 11 Case. *See* Docket Nos. 104 (engaging Sidley on or around June 25, 2025) & 105 (engaging Portage Point on or around June 25, 2205). It is hard to imagine that a Chapter 7 trustee would need more time than the Debtor's own professionals to "educate" him or herself about MSM—particularly in light of MSM's limited operations and assets.

would not allow McGraw/Peteski to use this bankruptcy process to funnel assets to Peteski all for the benefit of McGraw and Envoy.

154.     A conversion to a Chapter 7 would maintain the integrity of the bankruptcy process *and* benefit all creditors and stakeholders. As such, Trinity requests that upon a finding of bad faith, this Court convert this Chapter 11 Case to a Chapter 7.

> ### iii.     *If the Court were to Keep MSM in Chapter 11, then a Chapter 11 Trustee Should be Appointed Under Section 1112(b).*

155.     Assuming, *arguendo*, that this Court determines dismissal or conversion is not appropriate due to some "unusual circumstance," Trinity asserts that a Chapter 11 trustee must be appointed. Section 1112(b) of the Bankruptcy Code provides that if there is cause to convert or dismiss a case, the Court may instead appoint a Chapter 11 trustee under section 1104(a) if it is in the best interest of creditors and the estate.[272]

156.     As detailed above, ample cause exists under section 1112(b) to find that the MSM filed its Chapter 11 Case in bad faith. Creditors would be best served by an independent trustee— not one that is currently beholden to McGraw/Peteski. An independent trustee (whether it be one appointed in a Chapter 11 or Chapter 7 case) will best serve the interests of *all* creditors and stakeholders.

157.     Thus, if the Court determines it is in the best interest of creditors and the estate to keep the MSM in a Chapter 11 case, then Trinity respectfully requests that a Chapter 11 trustee be appointed under section 1112(b)(1) of the Bankruptcy Code.

---

[272]     *See, e.g., In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *6 (Bankr. N.D. Tex. Mar. 14, 2008); *In re NOA, LLC*, 578 B.R. 534, 541 (Bankr. E.D.N.C. 2017) ("Section 1112 and Section 1104 read together require the court to make a finding as to what remedy is in the best interest of the creditors and the estate.").

**D.      If MSM Remains in Chapter 11, the Court Should Appoint a Chapter 11 Trustee
Under Section 1104(a) of the Bankruptcy Code.**

158.    Absent conversion or dismissal, Trinity further maintains that a Chapter 11 trustee

may be appointed under section 1104(a) because of the Debtor's inherent conflicts of interest with

McGraw/Peteski and/or it is in the best interest of creditors, equity security holders, and others.

Section 1104(a) of the Bankruptcy Code provides:

> (a) At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or the United
> States trustee, and after notice and a hearing, the court shall order
> the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or
> gross mismanagement of the affairs of the debtor by current
> management, either before or after the commencement of the case,
> or similar cause, but not including the number of holders of
> securities of the debtor or the amount of assets or liabilities of the
> debtor; or
>
> (2) if such appointment is in the interests of creditors, any
> equity security holders, and other interests of the estate, without
> regard to the number of holders of securities of the debtor or the
> amount of assets or liabilities of the debtor.[273]

159.    MSM makes essentially two arguments in opposition. _First_, MSM argues that by

forming the Special Committee and appointing Broadbent as the CRO and "Independent" Director,

it has sufficiently addressed any governance or conflict issues.[274] _Second_, MSM argues that

appointing a Chapter 11 trustee is not in the best interest because it would be duplicative at this

juncture—particularly with an "active" Committee and "Independent" Director—and impose

substantial administrative costs.[275] Neither of those arguments can save the day.

---

[273]    11 U.S.C. § 1104(a).

[274]    MSM Objection ¶ 87.

[275]    _See, e.g., id._ at ¶ 94.

72

i.    **The Court Must Appoint a Chapter 11 Trustee Under Section 1104(a)(1) for Cause Because of the Apparent Conflicts of Interest and Breaches of Fiduciary Duties by MSM Officers**.

160.    As a "debtor-in-possession," the debtor **and its managers** acts as a fiduciary of the estate and its creditors.[276] Among these responsibilities, the debtor-in-possession has the fiduciary duty to protect and conserve estate property for the benefit of creditors, **including a duty to avoid self-dealing and conflicts of interest**, avoid damaging the estate, and refrain from acting in a manner that could hinder a successful reorganization or liquidation.[277] If the debtor is incapable of performing such fiduciary duties, a Chapter 11 trustee must be appointed pursuant to section 1104(a) of the Bankruptcy Code.[278]

161.    It is clear that Solomon and Cheatwood—officers and fiduciaries of MSM—are working at the Debtor while simultaneously working at Envoy, a direct competitor of MSM. Indeed, the very purpose and formation of Envoy was to create and produce the same content as was intended for MSM (but failed). Moreover, they have continued to operate MSM during this for the benefit of Envoy (*e.g.*, firing and hiring MSM employees, attempting to transfer estate assets, employing MSM officers at Envoy), rather than legitimate creditors of the estate. Even McGraw/Peteski's creation of Envoy presents a conflict of interest as one of the controlling entities

---

[276]    *In re Royal Alice Props., LLC*, 2020 WL 5357795, at *10 ("A chapter 11 debtor and its managers owed fiduciary duties to the estate."); *In re Ford Steel, LLC*, 629 B.R. 871, 890 (Bankr. S.D. Tex. 2021) (noting the debtor-in-possession owes the duty of care, duty of loyalty, and duty of impartiality); *In re Bowman*, 181 B.R. 836, 842-43 (Bankr. D. Md. 1995).

[277]    *See In re Sillerman,* 605 B.R. 631, 648 (Bankr. S.D.N.Y. 2019); *Ford Steel*, 629 B.R. at 889 (noting that a debtor-in-possession must avoid self-dealing, conflicts of interest, and the appearance of impropriety); *Bowman*, 181 B.R. at 843 ("A debtor-in-possession does not act in its own interest but must act in the best interest of the creditors of the estate.").

[278]    *See Sillerman*, 605 B.R. at 648 (Bankr. S.D.N.Y. 2019) (citing *In re Ionosphere Clubs, Inc*., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990)).

of MSM.[279] This also clearly demonstrates a breach of fiduciary duty and conflict of interest warranting the appointment of a Chapter 11 trustee.[280]

162.    Moreover, despite MSM's contentions, the fact that there is an "Independent" Director and CRO does not absolve MSM from these inherent and abundant conflicts of interest. Indeed, Broadbent knew about the creation of Envoy, knew that it sought to use same content and vendors as MSM, and know that MSM officers were working for both MSM and Envoy. Yet he did nothing to stop them. Whether it be woeful ignorance or an abdication of his fiduciary duty to MSM, the result is the same—MSM's current management cannot remain the same. If the Debtor is to remain in Chapter 11, there must be an independent fiduciary who is looking out for all creditors and stakeholders—not those who are working for, or beholden to, McGraw and his new venture.

163.    Furthermore, for similar reasons, the appointment and formation of the Committee does not fix this conflict-of-interest problem. The Committee is comprised of two members. The evidence is clear that at least one of those members (if not both) is a trusted confidant of McGraw and part of his "inner" circle. It is also clear that this Committee member has some sort of investment or sweetheart deal either in MSM or Envoy that McGraw has promised will remain.[281]

164.    As such, there is ample cause to appoint a Chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code.

---

[279]    *In re Esco Elevators, Inc.*, No. 494-44339-MT, 1995 WL 605982, at *4 (Bankr. N.D. Tex. Jan. 31, 1995) (viewing the "current management" under § 1104(a)(1) of the debtors who owe fiduciary duties to include not only officers but also those who are the debtors' controlling persons).

[280]    *Royal Alice Props., LLC*, 2020 WL 5357795, at *10 (finding that the debtor's principals continued operations of the debtor for their own personal benefit, rather than creditors, breached their fiduciary obligations, and warranted appointment of a chapter 11 trustee); *Sillerman*, 605 B.R. at 646 ("Courts may find a conflict of interest, which can constitute cause for appointment of a trustee, where the debtor has inappropriate dealings with an entity in which the debtor has an interest.").

[281]    Ex. 3, at PETESKI0005841.

74

ii. **The Court Should Appoint a Chapter 11 Trustee Under Section 1104(a)(2) Because Appointment is in the Interests of the Creditors, Equity Security Holders, and Other Interests**.

165.    Furthermore, even if these actions do not amount to definitive breach of fiduciary duties, these do not instill confidence that MSM can or will carry out this Chapter 11 Case for the benefit of all creditors and stakeholders under section 1104(a)(2). Indeed, for all the same reasons cited in its Motion to Dismiss (e.g., lack of trustworthiness of the McGraw/Peteski, Debtor, and management, zero prospects of rehabilitation, and zero additional cost to the estate), Trinity maintains that appointment of a Chapter 11 trustee would be in the best interest of all parties involved in this Chapter 11 Case, assuming the Court decides against dismissal or conversion.

166.    But overall, and perhaps the most important justification here, is that the appointment of a Chapter 11 trustee cleanses the Debtor of all material conflicts of interest—*i.e.*, removes McGraw/Peteski from control. As detailed above, the entire objective of this Chapter 11 Case is to benefit McGraw/Peteski. This is not only an invalid bankruptcy purpose but also evidences that the Debtor is not acting as a fiduciary for all creditors. To that end, the only way to give the creditors any real chance of recoveries here would be to appoint a Chapter 11 trustee.

## VI.
## OBJECTION AND RESPONSE TO PETESKI'S *DONDI* INSTRUCTION

167.    In its opening brief, Trinity made the following statement: "MSM exists only to borrow money (from McGraw/Peteski) to fund litigation and run a sale process designed to allow McGraw to make off like a thief in the night with assets created through the investment of tens of millions of dollars by Trinity, while leaving nothing behind for creditors or other parties in interest."[282] According to counsel for McGraw/Peteski, this sentence—specifically, the reference to McGraw "mak[ing] off like a thief in the night"—warrants a *Dondi* instruction because Trinity's

---

[282]    Motion to Dismiss ¶ 2.

4908-7548-2465.8

counsel and client are not treating Jackson Walker or its client (presumably, McGraw and not Peteski or Envoy) with civility and is engaging in "offensive" or "antagonistic" behavior.[283]

168.    The crux of Jackson Walker/McGraw's grievances is the fact that Trinity used a simile—a figure of speech that uses the words "like" or "as" to compare two *unlike* things[284]—to illustrate the obvious ploy of this Chapter 11 Case: that is, McGraw via Peteski could obtain and transfer MSM's assets to Envoy for $0. Nowhere in the Motion to Dismiss (or any subsequent pleading) did counsel or Trinity actually accuse McGraw of being a criminal and "stealing" MSM assets. In fact, even after discovering that certain MSM content had been transferred (or attempted to be transferred) to Envoy,[285] Trinity and its counsel have maintained their civility towards Jackson Walker and its client(s) and have not accused anyone of being a "thief" on the record or to the press.

169.    Trinity and its counsel take their obligations under *Dondi* seriously. Counsel would not make, nor have they made, an allegation of "thievery" without a fulsome investigation and conclusive evidence. Counsel has not made any improper or reckless accusations, nor have they engaged in any antagonistic or obnoxious behavior during this Chapter 11 Case.

170.    As such, Trinity requests that the Court deny the *Dondi* request.

**VII.
JURISDICTION REQUEST**

171.    In the event that this Court dismisses the Chapter 11 Case for either lack of corporate authority or bad faith (or both), Trinity respectfully requests this Court keep the Chapter

---

[283]    Peteski Objection ¶ 7 (citing Standard E, F, and K of *Dondi Props. Corp. v. Commerce Savings & Loan*, 121 F.R.D. 284, 288-89 (N.D. Tex. 1988)).

[284]    *Simile*, Merriam Webster, https://www.merriam-webster.com/dictionary/simile (last visited Sept. 13, 2025) (defining "simile" as "a figure of speech comparing two unlike things that is often introduced by *like* or *as*").

[285]    *See, e.g.,* Ex. 106, MSM0007485–7487 (email correspondences between A. Calderon, an MSM employee, regarding the FTP transfer of MSM content to Envoy); Ex. 107, MSM0017731–17739 (email correspondence between J. Perry and M. Rothman on July 24 and July 25, 2025, discussing the "███████████████████████ ████████████").

11 Case open for a brief period of time so that it may consider a request for sanctions related to the orchestration of this bad-faith filing.[286]

# VIII.
## CONCLUSION

172.    This Chapter 11 Case was filed without proper corporate authority, and thus, the Court lacks jurisdiction and the case must be dismissed. This Chapter 11 Case also serves no legitimate or valid bankruptcy purpose. The entire goal of this bankruptcy was so McGraw could get rid of TBN and launch his new, competing media venture, Envoy with MSM's assets. As such, MSM commenced this Chapter 11 Case at the behest of McGraw/Peteski to commence litigation with Trinity and wipe out its security interest secured creditor in order to transfer value to McGraw/Peteski and then ultimately, Envoy. This Chapter 11 Case should be converted to a Chapter 7. In the alternative, Trinity submits that under these facts and circumstances the appointment of a Chapter 11 trustee is also warranted.

**WHEREFORE**, Trinity respectfully requests that this Court enter an order (a) dismissing this Chapter 11 Case, (b) converting this Chapter 11 Case to a case under chapter 7; or (c) appointing a chapter 11 trustee; and (d) grant such other and further relief as may be just and proper.

DATED: September 15, 2025                Respectfully submitted by:

*/s/ Mark C. Moore*
Holland N. O'Neil (TX 14864700)
Robert Slovak (TX 24013523)
Steven C. Lockhart (TX 24036981)
Mark C. Moore (TX 24074751)
Stephanie L. McPhail (TX 24104104)
Davis G. Mosmeyer III (TX 24106346)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

---

[286]    *See, e.g., In re Tbyrd Enters. LLC,* 354 F. App'x 837 (5th Cir. 2009) (affirming bankruptcy court's sanctions order for filing a bankruptcy case in bad faith); *In re Del. Valley Lift Truck Inc.,* 640 B.R. 342 (Bankr. E.D. Pa. 2022) (issuing sanctions against the entity that orchestrated and promoted a bad faith bankruptcy filing).

4908-7548-2465.8

Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
rslovak@foley.com
slockhart@foley.com
mmoore@foley.com
smcphail@foley.com
dmosmeyer@foley.com

-and-

Rajiv Dharnidharka
(admitted *pro hac vice*)
**FOLEY & LARDNER LLP**
555 California Steet, Suite 1700
San Francisco, CA 94104
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
rajiv.dharnidharka@foley.com

-and-

Nora J. McGuffey (TX 24121000)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-4366
Facsimile: (312) 832-4700
nora.mcguffey@foley.com

*Attorneys for Trinity Broadcasting of Texas, Inc.*
*dba Trinity Broadcasting Network and TCT*
*Ministries, Inc.*

4908-7548-2465.8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2025, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.

_/s/ Nora J. McGuffey_ _____
Nora J. McGuffey

4908-7548-2465.8