Carl C. Butzer (TX Bar No. 03545900)
Christopher Bankler (TX Bar No. 24066754)
Vienna F. Anaya (TX Bar No. 24091225)
Minoo S. Blaesche (TX Bar No. 24075102)
William T. Farmer (TX Bar No. 24127156)
**Jackson Walker LLP**
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbutzer@jw.com
Email: cbankler@jw.com
Email: vanaya@jw.com
Email: mblaesche@jw.com
Email: wfarmer@jw.com

Charles L. Babcock (TX Bar No. 01479500)
Bruce J. Ruzinsky (TX Bar No. 17439425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Emily Meraia (TX Bar No. 24129307)
**Jackson Walker LLP**
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: cbabcock@jw.com
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com
Email: emeraia@jw.com

*Counsel for Peteski Productions, Inc.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>MERIT STREET MEDIA, INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-80156 (SWE)<br><br>**Re: Docket Nos. 100, 151** |

### PETESKI PRODUCTIONS, INC.'S BRIEF IN SUPPORT OF ITS EMERGENCY MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 52(C)

Pursuant to FED. R. CIV. P. 52(c), Peteski Productions, Inc. ("Peteski") moves for Judgment on Partial Findings because Trinity Broadcasting of Texas, Inc. ("TBN") and TCT Ministries, Inc. (collectively, "Trinity") have been fully heard on the issue of corporate authority at the hearing regarding: (A) the Motion to Dismiss[2] filed by Trinity, (B) the PBR Joinder filed by PBR[3]; (C) the

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy, Fort Worth, TX 76177.

[2] Capitalized Terms used but not otherwise defined herein shall have the respective meanings ascribed in the Peteski Objection [Docket No. 197].

[3] PBR's Joinder does not join the Trinity's arguments regarding corporate authority.

Peteski Objection filed by Peteski; and (D) the Debtor Objection. On the basis of testimony this Court has heard from Trinity's Chief Business Officer, Frank Amedia ("Amedia"), Trinity's General Counsel, John Casoria ("Casoria"), and Trinity's President and Chief Executive Officer, Matthew Croach ("Crouch"), documents admitted into evidence as of this filing, pleadings, and applicable law, the Court should enter judgment on partial findings under FED. R. CIV. P. 52(c), as made applicable to this proceeding through FED. R. BANKR. P. 7052.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

I.    PRELIMINARY STATEMENT ................................................................................1

II.   STATEMENT OF FACTS ON THE RECORD ........................................................2

III.  LEGAL STANDARD.................................................................................................7

IV.   ARGUMENT ..............................................................................................................8

      A.   The Stock Confirmation Agreement and subsequent corporate actions
           effective August 8, 2024, evidence the legitimacy of Dr. McGraw as sole
           director of Debtor. ........................................................................................... 8

           1.   The Stock Confirmation Agreement is unambiguous. ................................ 8

           2.   The Stock Confirmation Agreement was executed for
                consideration. ...................................................................................... 10

           3.   The Stock Confirmation Agreement terminated the Voting
                Agreement and permitted the August Consent and Amended
                Bylaws. ............................................................................................... 11

      B.   The February Joint Written Consent, effective February 20, 2025,
           evidences the legitimacy of Dr. McGraw as sole director of Debtor. .................. 12

           1.   Trinity's execution of the February Joint Written Consent ratified
                the appointment of Dr. McGraw as sole director per the Bylaws. ............. 13

           2.   Trinity's execution of the February Joint Written Consent ratified
                the appointment of Dr. McGraw as sole director per Texas law. ............. 14

      C.   Parole evidence supports the effectiveness of the Stock Confirmation
           Agreement and the February Joint Written Consent. ............................................ 16

           1.   Trinity's conduct and testimony support the enforceability of the
                Stock Confirmation Agreement. ............................................................ 17

           2.   Trinity's conduct and testimony support the enforceability of the
                February Joint Written Consent. ............................................................ 18

V.    CONCLUSION.........................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BPX Operating Co. v. Strickhausen*,
629 S.W.3d 189 (Tex. 2021)................................................................14

*Charles R. Tips Family Tr. v. PB Commercial LLC*, 459 S.W.3d 147, 153 (Tex.
App.—Houston [1st Dist.] 2015, no pet.) ................................................18

*Cox Commc'ns, Inc. v. T-Mobile US, Inc.*,
273 A.3d 752 (Del. 2022) .............................................................10, 11

*In re Dura Medic Holdings, Inc. Consol. Litig.*,
333 A.3d 227 (Del. Ch. 2025)...............................................................9

*Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*,
779 S.W.2d 474 (Tex. App.—El Paso 1989, writ denied)........................15

*EBC, Inc. v. Clark Bldg. Sys., Inc.*,
618 F.3d 253 (3d Cir. 2010)..................................................................8

*Energy Transfer, LP v. Williams Cos., Inc.*,
2023 WL 6561767 (Del. Oct. 10, 2023) ................................................17

*Fairchild v. All Am. Check Cashing, Inc.*,
815 F.3d 959 (5th Cir. 2016) ................................................................8

*In re Gisondi*,
487 B.R. 423 (Bankr. E.D. Pa. 2013), *aff'd*, 2014 WL 683755 (E.D. Pa. Feb.
21, 2014) ...........................................................................................7

*Greene v. Potter*,
557 F.3d 765 (7th Cir. 2009) ................................................................7

*Holzbaur v. Trolley Square Hosp., LLC*,
__ A.3d __, 2025 WL 1576550 (Del. Ch. June 4, 2025).......................9, 17

*Koenig v. Aetna Life Ins. Co.*,
2015 WL 6554347 (S.D. Tex. Oct. 29, 2015)..........................................8

*Lifshutz v. Lifshutz*,
199 S.W.3d 9 (Tex. App.—San Antonio 2006, pet. denied) ...................14

*In re Mobilactive Media, LLC*,
2013 WL 297950 (Del. Ch. Jan. 25, 2013).............................................17

*McAfee, Inc. v. Agilysys, Inc.*,
    316 S.W.3d 820 (Tex. App.—Dallas 2010, no pet.) ...............................................................12

*Pinkston v. Madry*,
    440 F.3d 879 (7th Cir. 2006) ............................................................................................8

*RSUI Indem. Co. v. Murdock*,
    248 A.3d 887 (Del. 2021) .................................................................................................9

*In re Tusa-Expo Holdings, Inc.*,
    811 F.3d 786 (5th Cir. 2016) ............................................................................................8

*In re Van Damme*,
    2013 WL 5550368 (B.A.P. 9th Cir. Oct. 8, 2013)..............................................................7

*Van Dyke v. Navigator Group*,
668 S.W.3d 353 (Tex. 2023), *reh'g denied* (June 16, 2023) ...................................18, 19

*Villarreal v. First Presidio Bank*,
    283 F. Supp. 3d 548 (W.D. Tex. Jul. 14, 2017)..................................................................8

*Weber v. Gainey's Concrete Prods., Inc.*,
    1998 WL 699047 (5th Cir. Sept. 21, 1998) .......................................................................8

**Statutes**

8 Del. C. § 109(a)........................................................................................................4, 5

11 U.S.C. § 1101 et seq**.**....................................................................................... *passim*

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2573.1 (3d ed.
    2021) .............................................................................................................................7, 8

FED. R. CIV. P. 50(a) ....................................................................................................7

FED. R. CIV. P. 52(c) ........................................................................................... *passim*

FED. R. BANKR. P. 7052 ..............................................................................................7

## I.   PRELIMINARY STATEMENT

1.      Trinity has been fully heard on the issue of Debtor's corporate authority in filing the Bankruptcy Case. The resulting record is clear: Dr. McGraw was the sole director Debtor when Mr. Gary Broadbent was appointed as CRO of Debtor and the Special Committee was created in June 2025.

2.      The Court need only look at two documents admitted into evidence in order to find that Dr. McGraw was vested with the proper corporate authority as sole director of Debtor to authority to appoint Mr. Broadbent and create the Special Committee: (1) the Stock Confirmation Agreement executed on August 8, 2024, making Peteski the majority shareholder of Debtor, and (2) the subsequent August Consent amending the Bylaws of Debtor as of August 8, 2024, appointing Dr. McGraw as sole director of Debtor. As explained in detail below, the Stock Confirmation Agreement is an unambiguous, enforceable agreement, and the subsequent corporate actions were executed in accordance with both the Bylaws and relevant state law. Additionally, Trinity's own conduct and sworn testimony concede the enforceability of these documents.

3.      But even if those two documents were somehow ineffective in appointing Dr. McGraw as sole director of Debtor as of August 8, 2024, there can be no doubt as such appointment was effective as of February 20, 2025, when Trinity executed the February Joint Written Consent, in which Trinity ratified and affirmed the appointment of Dr. McGraw as sole director of Debtor. The testimony provided at the hearing only further confirms that Trinity executed the February Joint Written Consent with full knowledge that it would confirm and consent to Dr. McGraw as sole director of Debtor.

4.      The Stock Confirmation Agreement and February Joint Written Consent ((collectively the "Agreements") each independently evidence Dr. McGraw's authority as sole director of Debtor. Pursuant to either, the record is clear that in June 2025, Dr. McGraw was

Debtor's sole director. Thus Mr. Broadbent and the Special Committee were vested with the proper

authority to commence this Bankruptcy Case on July 1, 2025.

5.      As a matter of law based on the record clearly established by both documents and

testimonial evidence presented at the hearing on Trinity's Motion and PBR's Joinder, this Court

should enter a enter judgment on partial findings under FED. R. CIV. P. 52(c) that this Bankruptcy

Case was thus filed with appropriate corporate authority.

## II.    STATEMENT OF FACTS ON THE RECORD

6.      On March 5, 2024, Mr. Casoria executed the Action of Sole Incorporator of APG

Ventures, Inc. ("APG") pursuant to Delaware law (the state of APG's incorporation). In doing so,

APG: (1) elected Dr. McGraw, Mr. Crouch, and Samuel Smadja ("Mr. Smadja") as directors of

the Board of Directors of APG (the "Board") "to serve until the first annual meeting of

stockholders or until a successor is duly elected and qualified or upon the earlier resignation or

removal of said director"; and (2) adopted and approved the Bylaws of APG Ventures, Inc.,

adopted as of March 5, 2024, (the "Bylaws") attached thereto.[4]  The execution of the Bylaws and

appointment of the Board were in accordance with applicable law and made effective as of March

5, 2024.

7.      Also on March 5, 2024, APG along with TBN and Peteski, as Investors in APG,

executed a Voting Agreement dated as of March 5, 2024 (the "Voting Agreement"), which is

governed by Delaware law.[5] The Voting Agreement was executed in accordance with applicable

law and effective as of March 5, 2024.

---

[4] *See* PETESKI Exhibit 72. Peteski includes a limited Appendix of key documents from the existing record of the
proceeding, including admitted exhibits and sworn testimony. However, Peteski hereby incorporates the entirety of
the record in the proceeding in support of its Motion. The "Exhibits" referenced herein refer to exhibits admitted into
evidence at the multi-day hearing on Trinity's Motion to Dismiss.
[5] *See* Voting Agreement, TBN Exhibit 7, Appendix Exhibit A.

8.     Section 5 of the Voting Agreement provides that it "shall terminate" automatically as set forth below:

> Term.  This Agreement shall be effective as of the date hereof and shall continue in effect until and shall terminate upon the earliest to occur of (a) the consummation of the Company's first underwritten public offering of its Common Stock . . . (b) the consummation of a change of control transaction involving the transfer, acquisition or sale of at least a majority of the outstanding shares of capital stock of the Company; and (c) termination of this Agreement in accordance with Section 6.8 below.[6]

9.     Additionally, Section 6.8 of the Voting Agreement provides that any provision of the Voting Agreement may be waived by a written consent executed by the stockholder parties to the Voting Agreement, regardless of whether the written consent references the Voting Agreement.[7]  Section 6.9 further permits the waiver, consent, or approval of any alleged breach or any provision or condition of the agreement.[8]

10.    On March 7, 2024, the Charter was amended to change the name of APG to Merit Street Media, Inc. ("MSM" or the "Debtor" in this Bankruptcy Case). This amendment was in accordance with applicable law and effective as of March 7, 2024.[9]

11.    Up to this point, Debtor had yet to issue any stock certificates. On August 8, 2024, Debtor, Peteski, and TBN[10] executed the Stock Confirmation Agreement.[11]  The Stock Confirmation Agreement amended each of TBN's and Peteski's respective stock purchase agreements. The "Resulting Amendment" of the Stock Confirmation Agreement was: (a) to provide for the issuance and sale of 500,001 shares of the Debtor's common stock to Peteski for

---

[6] Voting Agreement, TBN Exhibit 7 at § 6.8.

[7] *See id.*

[8] *See id.* at § 6.9.

[9] *See* PETESKI Exhibit 15.

[10] More specifically, the Stock Confirmation Agreement was executed by Dr. McGraw on behalf of Peteski as its President and CEO; Matthew Crouch on behalf of Trinity as its Chairman and President; and Matthew Crouch also on behalf of Debtor as a Director at the time of execution.

[11] *See* Stock Confirmation Agreement, TBN Exhibit 59, Appendix Exhibit B.

$7,000.02; and (b) to provide for the issuance and sale of 214,286 shares of the Debtor's common stock to TBN for $3,000.00.[12]

12.    By its own terms, the Stock Confirmation Agreement was executed "for good faith and valuable consideration, the receipt of which is hereby acknowledged" on August 8, 2024, and that "concurrently with the execution of this agreement, Peteski and TBN have each delivered to [Debtor] their respective issuance price[.]"[13] Specifically, Peteski delivered to Jim Mittan, the Chief Financial Officer of Debtor, a check dated August 8, 2024, for $7,000.02 payable to the Debtor for the 500,001 shares of stock it was purchasing under the Stock Confirmation Agreement.[14] The check was deposited by the Debtor on the same day.[15] A stock certificate was then issued to Peteski for 500,001 shares of Debtor's common stock.[16]

13.    Because the execution and fulfillment of the Stock Confirmation Agreement on August 8, 2024, resulted in Peteski's acquisition of "at least a majority of the outstanding shares of capital stock" (i.e. 500,001 of the 714,287 outstanding shares), the Voting Agreement was automatically terminated.[17]

14.    Subsequently, Peteski—as now majority shareholder of Debtor—executed the Written Consent of the Stockholders of Merit Street Media, Inc. (the "<u>August Consent</u>"),[18] which: (a) amended section 3.02 of the Bylaws (the "<u>Amended Bylaws</u>") to fix the number of directors at no less than one director, rather than three, pursuant to section 8.01 of the Bylaws and 8 Del. C.

---

[12] *See id.*

[13] *See id.*; *see also* PETESKI Exhibit 31.

[14] *See* TBN Exhibit 2. Although unnecessary, the record contains ample evidence of additional consideration from Peteski in exchange for the acquisition of the majority of outstanding shares, including Peteski's forbearance on TBN's default on its payments owed to Peteski under the Joint Venture Agreement.

[15] *See id.*

[16] *See* PETESKI Exhibit 35.

[17] *See* Stock Confirmation Agreement, TBN Exhibit 59 (§ 5).

[18] *See* August Consent, PETESKI Exhibit 72, Appendix Exhibit C.

§ 109(a)[19]; (b) removed two directors from the Board pursuant to section 3.05[20] and section 2.11[21] of the Bylaws; and (c) appointed Dr. McGraw as the sole director of the Debtor in accordance with sections 2.09[22] and 2.11 of the Bylaws. The August Consent and Amended Bylaws were executed in accordance with applicable law and effective as of August 8, 2024.

15.     On or about February 20, 2025, Peteski and Trinity as Debtor's Stockholders and Dr. McGraw as Debtor's Director executed a Joint Written Consent of the Stockholders and Board of Directors (the "February Joint Written Consent") to convert the Debtor to a Texas corporation.[23] The February Joint Written Consent approved, among other things: (1) the conversion of the Debtor to a Texas Entity; (2) the Texas Certificate of Formation (the "TX Certificate of Formation"), which listed Dr. McGraw as the only director of Debtor; and (3) the Amended Bylaws for the converted Debtor entity, which provided for one sole director.[24] The February Joint Written Consent additionally adopted a resolution that the members of the Board of the Debtor immediately after conversion to a Texas entity shall be same persons as the Board of the Debtor immediately prior to conversion (*i.e.*, Dr. McGraw), and provided that the stockholders and director agreed that the resolutions "approved, ratified, and confirmed in all respects as the act and

---

[19] *See* 8 Del. C. § 109(a) ("After a corporation other than a nonstock corporation has received any payment for its stock, the power to adopt, amend or repeal bylaws shall be in the stockholders entitled to vote.").

[20] Section 3.05 of the Bylaws provides that "the stockholders entitled to vote in an election of directors may remove any director from office at any time, with or without cause, by the affirmative vote of a majority in voting power."

[21] Section 2.11 of the Bylaws provides that "[a]ny action to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered...to the Company...."

[22] Section 2.09 of the Bylaws provides that "except as otherwise required by law or the Certificate of Incorporation, the election of directors shall be decided by a plurality of the votes cast at a meeting of the stockholders by the holders of stock entitled to vote in the election."

[23] *See* February Joint Written Consent, PETESKI Ex. 75, Appendix Exhibit D.

[24] *Id.*

deed of the [Debtor.]"[25]

16.    The February Joint Written Consent was executed by Peteski and TBN as Stockholders, and Dr. McGraw as Director.[26] More specifically, John Casoria executed the February Joint Written Consent on behalf of TBN as its Assistant Secretary. Prior to executing the February Joint Written Consent, Mr. Casoria specifically inquired about the inclusion of Dr. McGraw as sole Director of Debtor in various provisions, and executed the February Joint Written Consent with full knowledge of its representations, approvals, and effects regarding the make up of the Board.[27]

17.    Each party executed the February Joint Written Consent with requisite authority and in accordance with applicable law. The February Joint Written Consent was effective February 20, 2025.

18.    The Debtor filed its TX Certificate of Formation with the Texas Secretary of State, declaring publicly that Dr. McGraw was the sole director of the Board of the Debtor, and as expressly consented to by TBN.

19.    Despite Dr. McGraw's control of Debtor since August 2024 and tens of millions of dollars of capital support poured into Debtor by Peteski, Debtor's financial condition continued to deteriorate throughout 2025. On June 18, 2025, Dr. McGraw, as the sole member of the Board, appointed Gary Broadbent ("Mr. Broadbent") as an independent director and CRO.  As part of that appointment, the Board created a special committee of the Board (the "Special Committee") and delegated to Mr. Broadbent, as independent director and sole member of the Special Committee, the exclusive authority to establish, approve, modify, monitor, and direct the process and

---

[25] *Id.*

[26] *Id.*

[27] *See id.*; *see also* Excerpts from Evidentiary Hearing on Trinity's Motion to Dismiss ("Hearing Tr.") 280:17–25, 281:1–3, Appendix Exhibit E.

procedures related to the review and effectuation of a potential restructuring transaction or any alternative thereto.

20.     After reviewing potential alternatives, and in light of the company's ongoing financial distress and insolvency, the Special Committee authorized the Debtor to commence voluntary proceedings under chapter 11 of the Bankruptcy Code on July 1, 2025.[28]

## III.  LEGAL STANDARD

21.     In a bench trial, once "a party has been fully heard on an issue . . . the court may enter judgment as a matter of law" under Rule 52(c) if, under the controlling law, the claim cannot be maintained without a favorable finding on that issue.[29]  Being fully heard under Rule 52(c) does not entitle a party to "introduce every shred of evidence," regardless of probative value.[30]  That would undermine the purpose of Rule 52(c), which like Rule 50(a) for jury trials, permits the court to terminate a futile case once it is clear that a party cannot prevail based on the evidence already presented or anticipated.[31]  Rule 52(c) thereby allows the court to avoid unnecessary proceedings and conserve judicial resources when additional evidence or argument would not change the court's ruling.[32]

22.     When dismissing a case pursuant to Rule 52(c), "a court is not required to make

---

[28] Consistent with the Debtor's governing documents, the Special Committee approved a resolution authorizing the filing of the chapter 11 case at a duly called meeting of the Special Committee on July 1, 2025.  The Special Committee's approval is reflected in the minutes of such Special Committee meeting. (MSM Exhibit 74). Additionally, Mr. Broadbent signed an officer's certificate that further shows the validity of the chapter 11 approval and the Special Committee meeting minutes. (MSM Exhibit 7).

[29] FED. R. CIV. P. 52(c), made applicable to this proceeding through FED. R. BANKR. P. 7052.

[30] Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2573.1 (3d ed. 2021) [hereinafter *Wright & Miller*].

[31] *See Greene v. Potter*, 557 F.3d 765, 768 (7th Cir. 2009) (citing cases); *see also In re Van Damme*, 2013 WL 5550368 (B.A.P. 9th Cir. Oct. 8, 2013); FED. R. CIV. P. 52(c) Advisory Notes, (explaining that Rule 52(c) parallels Rule 50(a)).

[32] *In re Gisondi*, 487 B.R. 423 (Bankr. E.D. Pa. 2013), *aff'd*, 2014 WL 683755 (E.D. Pa. Feb. 21, 2014) ("The purpose of Rule 52 motions is to conserve the time and resources of the parties and of this Court by obviating the need for moving party to present its rebuttal case where the nonmoving party has failed to present evidence sufficient to carry its ultimate burden of persuasion.").

any special inferences or review the facts in the light most favorable to the plaintiff."[33]   Rather,

the Court's task is to evaluate all the evidence, resolve any conflicts, assess the witnesses'

credibility, and resolve the case on the basis of the preponderance of the evidence.[34]   After

considering the above, the court "make[s] a determination in accordance with its own view of the

evidence" and the law.[35]

### IV. ARGUMENT

23.      Trinity has been fully heard on their allegation of lack of corporate authority. *See*

Fed. R. Civ. P. 52(c). The evidentiary record clearly demonstrates that Dr. McGraw was Debtor's

sole director when he appointed Mr. Broadbent as Debtor's CRO and Special Committee member.

There is no doubt that Mr. Broadbent's subsequent decision to file this Bankruptcy Case was done

with requisite corporate authority. Accordingly, this Court has jurisdiction to adjudicate this

Bankruptcy Case. Trinity's Motion to Dismiss and PBR's Joinder on this issue should be denied

as a matter of law pursuant to Federal Rule of Civil Procedure 52(c).[36]

**A.      The Stock Confirmation Agreement and subsequent corporate actions effective
August 8, 2024, evidence the legitimacy of Dr. McGraw as sole director of Debtor.**

### *1.   The Stock Confirmation Agreement is unambiguous.*

24.      The Stock Confirmation Agreement unambiguously provides for Peteski's

acquisition of the majority of the Debtor's outstanding shares of stock. Trinity's and (inexplicably)

PBR's attempts to flood the record with extraneous evidence is improper and irrelevant under

applicable law.

---

[33] *See Koenig v. Aetna Life Ins. Co.*, 2015 WL 6554347, at *4 (S.D. Tex. Oct. 29, 2015) (citing *Weber v. Gainey's Concrete Prods., Inc.*, 1998 WL 699047, at *1 n.1 (5th Cir. Sept. 21, 1998)); *Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548, 550 (W.D. Tex. Jul. 14, 2017).
[34] Wright & Miller, § 2573.1; *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010); *Pinkston v. Madry*, 440 F.3d 879, 890 (7th Cir. 2006).
[35] *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 963 n.1 (5th Cir. 2016).
[36] *See In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786, 788 n.1 (5th Cir. 2016).

25.     The Stock Confirmation Agreement is subject to Delaware law.[37] Delaware law requires that, if the contractual language is clear, priority be given to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all of its provisions.[38] Importantly, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to **create** an ambiguity if a contract is unambiguous.[39] Similarly, contract terms are not ambiguous merely because the parties to the contract disagree.[40] Instead, "a contract is ambiguous **only when** the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[41] And **only if** a contract is first found to be ambiguous should the court look outside of the four-corners of the document.[42]

26.     Here, the Stock Confirmation Agreement is unambiguous. Trinity identifies no term or provision within the four corners of the Stock Confirmation Agreement that is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[43] The opening clause— "[Debtor], TBN and Peteski hereby agree that their respective Stock Purchase Agreements are amended as follows, **and not otherwise**"—confirms integration. The "Resulting Amendment" is stated expressly:

---

[37] *See* Stock Confirmation Agreement, TBN Exhibit 59.

[38] *In re Dura Medic Holdings, Inc. Consol. Litig.*, 333 A.3d 227, 245 (Del. Ch. 2025).

[39] *See Holzbaur v. Trolley Square Hosp., LLC*, __ A.3d __, 2025 WL 1576550, at *5 (Del. Ch. June 4, 2025) ("It is well-settled that a court should not venture beyond the four corners of an agreement when its express terms are unambiguous.").

[40] *Dura Medic*, 333 A.3d at 246.

[41] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 906 (Del. 2021) (emphasis added).

[42] *Id.*

[43] *Id.*

| | MSM Shares Issued | % | Issuance Price | |
|---|---|---|---|---|
| TBN | 214,286 | 30.00% | $ | 3,000.00 |
| Peteski | 500,001 | 70.00% | $ | 7,000.02 |
| Total | 714,287 | 100.00% | $ | 10,000.02 |

[44]

27.    No ambiguity exists (nor has any been pled). Pursuant to Delaware law, the Court should not look beyond the four corners of the document to determine the intent of the parties and construe its terms.[45]

## 2. The Stock Confirmation Agreement was executed for consideration.

28.    In addition to being unambiguous, the Stock Confirmation Agreement is valid and enforceable. The evidence in the record reflects that the Stock Confirmation Agreement was executed with consideration.

29.    Under Delaware law, "[c]onsideration requires that each party to a contract convey a benefit or incur a legal detriment, such that the exchange is 'bargained for.'"[46] "If this requirement is met, there is no additional requirement of equivalence in the values exchanged because we limit our inquiry into consideration to its existence and not whether it is fair or adequate."[47]

30.    To start, the Stock Confirmation Agreement states on its face that it is "for good and valuable consideration, the receipt of which is hereby acknowledged" by TBN, Peteski, and the Debtor. Indeed, this consideration is articulated in the Stock Confirmation Agreement: specific payments for acquisition of a specific number of shares for each party. For Peteski, the "detriment"

---

[44] *See* Stock Confirmation Agreement, TBN Exhibit 59.
[45] *See id.*
[46] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 764 (Del. 2022)
[47] *Id.* (quotations omitted) (cleaned up).

to Peteski was a $7,000.02 payment to Debtor[48] in exchange for the received "benefit" of 500,001 shares of Debtor's common stock. The record contains uncontroverted evidence that Petreski timely tendered payment to Debtor in the exact amount required in the Stock Confirmation Agreement.[49] Peteski thus received 500,001 shares of Debtor's stock, becoming the majority owner of the outstanding shares.[50] The evidence clearly shows the "existence" of consideration for the Stock Confirmation Agreement. Any inquiry into "whether [$7,000.02] is fair or adequate" is improper under Delaware law.[51]

### 3.  *The Stock Confirmation Agreement terminated the Voting Agreement and permitted the August Consent and Amended Bylaws.*

31.    The Stock Confirmation Agreement resulted in Peteski's acquisition of 500,001 shares of Debtor, which is unquestionably the majority of Debtor's outstanding shares. Its execution thereby constituted a "consummation of a change of control transaction involving the transfer, acquisition or sale of at least a majority of the outstanding shares of capital stock of the Company."[52] This is one of the events explicitly included in the Voting Agreement on which the Voting Agreement "*shall* terminate upon[.]"[53] Thus, as of the execution and effectiveness of the Stock Confirmation Agreement on August 8, 2024, the Voting Agreement terminated.

32.    With the Voting Agreement terminated, the Bylaws simply provided that directors may be removed by an affirmative vote of a majority in voting power.[54] Thus Dr. McGraw's execution of the August Consent on behalf of Peteski—the majority shareholder—and related

---

[48] Although unnecessary, the record contains ample evidence of additional consideration from Peteski in exchange for the acquisition of the majority of outstanding shares, including Peteski's forbearance on TBN's default on its payments owed to Peteski under the Joint Venture Agreement.
[49] *See* PETESKI Exhibit 31.
[50] *See* Stock Confirmation Agreement, TBN Exhibit 59.
[51] *See Cox Commc'ns*, 273 A.3d at 764.
[52] *See* Stock Confirmation Agreement, TBN Exhibit 59.
[53] *Id.*
[54] *See* PETESKI Exhibit 72.

Amended Bylaws was permissible and valid.

33.     In sum, the Stock Confirmation Agreement resulted in Peteski being the majority shareholder of Debtor; and the August Consent and Amended Bylaws resulted in Dr. McGraw being the sole director of the Debtor effective August 8, 2024. Each of these effective documents are in the record, with no contravening evidence.

**B.     The February Joint Written Consent, effective February 20, 2025, evidences the legitimacy of Dr. McGraw as sole director of Debtor.**

34.     Even if the Stock Confirmation Agreement and subsequent corporate actions effective August 8, 2024 were not valid—which they were—Trinity ratified the appointment of Dr. McGraw as sole director of Debtor per the Bylaws, as well as Texas law. Thus even if the Court disregards the Stock Confirmation Agreement and August Consent, the February Joint Written Consent confirms Dr. McGraw as sole director of Debtor as of February 20, 2025.

35.     No argument has been made and no evidence has been presented by Trinity that there is any ambiguity in the February Joint Written Consent is ambiguous and subject to extrinsic evident—nor could it. There is no term in the February Joint Written Consent that is "uncertain and doubtful or it is reasonably susceptible to more than one meaning."[55] Instead, the language is clear that the February Joint Written Consent, among other things, (a) approved of the Amended Bylaws for the converted Debtor entity, which provided for one sole director, (b) approved the TX Certificate of Formation that what included as an attachment and which listed Dr. McGraw as the only director, and (c) adopted the resolution that the members of the Board of the Converted Debtor immediately after conversion shall be same persons as the Board of the Debtor immediately prior

---

[55] *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 826 (Tex. App.—Dallas 2010, no pet.) (collecting authority) ("Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law. A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." (citations omitted)).

to conversion (*i.e.*, Dr. McGraw).[56] Moreover, the February Joint Written Consent stated that the stockholders and director agreed that the resolutions "approved, ratified, and confirmed in all respects as the act and deed of the [Debtor.]"[57]

36.    The record is also clear that on February 22, 2025, John Casoria—director of Trinity—signed the unambiguous February Joint Written Consent on behalf of Trinity, with full knowledge of its inclusion and consent to Dr. McGraw continuing as sole director of Debtor.[58] The Court need look no further than this fully executed, unambiguous written consent to hold that Dr. McGraw was the sole director of Debtor.

37.    Trinity's corporate authority challenge to Dr. McGraw's appointment as sole director of Debtor is a post hoc invention belied by its own admissions. For example, Trinity's Motion concedes the Debtor is a Texas corporation governed by Texas law,[59] And at the Hearing, Mr. Casoria testified at length that he viewed Debtor as a Texas—not Delaware—corporation.[60] Paradoxically, however, Trinity now attempts to reject the February Joint Written Consent to which it consented. This effort fails under the plain terms of the February Joint Written Consent and under Texas law.

*1.*    ***Trinity's execution of the February Joint Written Consent ratified the appointment of Dr. McGraw as sole director per the Bylaws.***

38.    The Bylaws executed on March 5, 2024—which no one disputes—provide that the Bylaws "may be amended, altered, terminated, repealed, or waived by (i) the Board of Directors or (ii) the holders of at least a majority of the voting power of all of the shares of capital stock issued and outstanding, voting together as a singled class on an as converted basis."[61] Additionally

---

[56] *See id.*
[57] *Id.*
[58] *See* February Joint Written Consent, PETESKI Exhibit 75.
[59] Dkt. 100, Trinity's Motion to Dismiss ¶ 44.
[60] Hearing Tr. at 284:11–285:4; 301:11–14.
[61] *See* TBN Exhibit 9.

or alternatively, Section 6.8 of the Voting Agreement also provides that it may be amended, modified or terminated, and the observance of any term may be waived through a written instrument, that can be satisfied by a written consent of the stockholders, "whether or not such action by written consent makes explicit reference to the terms of this Agreement."[62]

39.     Thus, regardless of whether the actions taken on August 8, 2024 were enforceable at the time (i.e. the August Consent and Amended Bylaws), Trinity's agreement to and execution of the Joint February Written Consent amounted to an amendment or waiver of the Bylaws, as well as an amendment to the Voting Agreement.[63] Trinity thereby ratified the removal of Mr. Crouch and Mr. Smadja from the Broad, and the appointment of Dr. McGraw as the sole Director of the Board.

> **2.     *Trinity's execution of the February Joint Written Consent ratified the appointment of Dr. McGraw as sole director per Texas law.***

40.     TBN also ratified the composition of the Board under Texas law.

41.     Under Texas law, "[t]ransactions between corporate fiduciaries and their corporation are capable of ratification by the shareholders or, as occurs more commonly, by the board of directors' specific approval or acquiescence, laches, or acceptance of benefit."[64] Ratification may only be obtained if all material facts are disclosed to the board or shareholders. "Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate."[65]   Express ratification—in writing, for example—typically makes the parties' intentions clear.[66]   Courts have found that "even if the transaction is detrimental to the corporation, no cause of action will lie if

---

[62] *See* TBN Exhibit 7.
[63] *See id.*
[64] *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 21 (Tex. App.—San Antonio 2006, pet. denied).
[65] *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021).
[66] *Id.*

all of the shareholders have ratified the transaction."[67]

42.     Here, the evidence on the record forecloses any doubt about Trinity's understanding of the February Joint Written Consent and its execution of the same. First, the evidentiary record demonstrates that, after receiving a draft of the February Joint Written Consent, Trinity's officers inquired about the inclusion of Dr. McGraw as the sole director of Debtor.[68] Indeed, Mr. Amedia specifically asked for "clarity on this point" on February 21, 2025.[69] In response, Mr. Casoria, Mr. Amedia, Colby May (outside counsel to TBN), and Mr. Crouch received a copy of the August Consent and Amended Bylaws on February 22, 2025.  Mr. Casoria confirmed receipt, stating "[w]e are reviewing."[70] Hours later, Mr. Casoria signed the February Joint Written Consent on behalf of TBN.[71]

43.     Additionally, at the Hearing, Mr. Casoria testified that he sent an email expressing "disappointment" in the adjustments to the Board to simply "plant [his] flag in the sand."[72]  But by his own admission, he reviewed the Amended Bylaws and August Consent, did not challenge them as invalid, and ***knowingly signed the Joint Written Consent confirming the adoption of the same***.[73]  Mr. Casoria additionally testified that—even if it believed that it was somehow still majority shareholder of Debtor—Trinity never challenged the February Joint Written Consent, never informed the Texas Secretary of State that the filing of the TX Certificate of Formation was inaccurate or unauthorized, never sent a demand letter or otherwise denied the effects of the

---

[67] *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 478 (Tex. App.—El Paso 1989, writ denied).
[68] PETESKI Ex. 75.
[69] *Id.*
[70] *Id. See also* Hearing Tr. at 280:17–281:3.
[71] *See* February Joint Written Consent, PETESKI Exhibit 75; *see also* PETESKI Exhibit 74.
[72] Hearing Tr. at 284:6–7.
[73] Hearing Tr. at 280:17–25, 281:1–3.

February Joint Written Consent (including the conversion of Debtor into a Texas entity), etc.[74] Mr. Casoria never communicated to *anyone* that he considered the Joint Written Consent void as an action taken by Dr. McGraw as Debtor's sole director.[75]

44.     All of this evidences that Trinity was aware of the "material facts" pertaining to the appointment of Dr. McGraw as the sole director prior to Trinity's execution of the February Joint Written Consent. While Mr. Casoria may have been "surprised" or "disappointed" in the appointment, he nonetheless signed the February Joint Written Consent on behalf of stockholder Trinity, acknowledging Dr. McGraw as the sole director.[76] Mr. Casoria explicitly testified that he understood that "TBN would be bound by the [February Joint Written Consent]" by signing on its behalf[77] and that he was authorized to do so.[78] By law, Trinity ratified Dr. McGraw's appointment as sole director of Debtor effective February 20, 2025. As such, Dr. McGraw's months-later appointment of Mr. Broadbent as Independent Director of the Special Committee was proper under Texas law.

**C.     Parole evidence supports the effectiveness of the Stock Confirmation Agreement and the February Joint Written Consent.**

45.     Trinity has not identified any ambiguity in either the Stock Confirmation Agreement of the February Joint Written Consent. Either of these unambiguous agreements independently evidence Dr. McGraw's authority as sole director of the Debtor. Parol evidence is improper and irrelevant to interpretation and application of either.

46.     Regardless, Trinity's efforts to flood the record with extrinsic evidence about the Agreements fails. Instead, the parties' conduct confirms (1) the Stock Confirmation Agreement

---

[74] *Id.* at 284:1-285:4; 325:10-15.
[75] *Id.* at 320:18–24.
[76] *Id.* at 282:9–20.
[77] *Id.* at 309:10–14.
[78] *Id.* at 325:6–8.

was effective and enforceable upon its August 8, 2025 execution, thus authorizing the subsequent

August Consent and Amended Bylaws, **and** (2) the February Joint Written Consent was effective

and enforceable as of February 20, 2025.

> **1.     Trinity's conduct and testimony support the enforceability of the Stock Confirmation Agreement.**

47.     Under Delaware law, "[i]t is well-settled that a court should not venture beyond the

four corners of an agreement when its express terms are unambiguous."[79] If an agreement is found

to be ambiguous, then courts may:

> apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation.[80]

48.     With respect to the Stock Confirmation Agreement, the "overt statements and acts

of the parties, the business context, prior dealings between the parties" lead to only one

"objectively reasonable" interpretation of the Stock Confirmation Agreement: it was effective

upon its execution on August 8, 2024.[81]

49.     Mr. Crouch repeatedly testified that Trinity is a "30 percent shareholder" of Debtor

and that Peteski and Dr. McGraw have had control over Debtor since the Stock Confirmation

Agreement in August 2024.  Mr. Crouch specifically testified as follows:

Q: Who was in control of production [of Debtor] after the Stock Confirmation Agreement?

A: Dr. Phil.[82]

---

[79] *Holzbaur*, __ A.3d __, 2025 WL 1576550, at *5.
[80] *Energy Transfer, LP v. Williams Cos., Inc.*, 2023 WL 6561767, at *19 (Del. Oct. 10, 2023) (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013).
[81] *See id.*
[82] Hearing Tr. at 942:8–10.

Mr. Crouch further testified that Trinity controls Debtor only "[a]s much as a 30 percent shareholder controls a company" and is aware of the rights Trinity has with respect to Debtor as a "30 percent shareholder."[83] Mr. Amedia of Trinity also testified as to communications he had in the weeks and months following the execution of the Stock Confirmation Agreement wherein he references a "70/30" ownership split between Peteski and TBN that was "agreed to," and that "[Dr. McGraw] has now control of the operations when we signed the [Stock Confirmation Agreement][.]"[84]

50.    The Stock Confirmation Agreement is the only document regarding a change in ownership of the Debtor or documenting a 30% ownership interest in Debtor by Trinity. Therefore this testimony by Mr. Crouch and Mr. Amedia is a plain acknowledgement that the Stock Confirmation Agreement is valid, effective, and enforceable.

**2.    *Trinity's conduct and testimony support the enforceability of the February Joint Written Consent.***

51.    Similar to Delaware law, Texas law also bars examination of extrinsic evidence to interpret an unambiguous contract.[85] Only if the contract is found to be ambiguous may the court consider evidence beyond the four corners of the document to determine its one meaning.[86]

52.    As discussed *supra*, the February Joint Written Consent is unambiguous, and its

---

[83] *Id.* at 927:21–25; 928:10–14.

[84] *Id.* at 151:9–15; 148:22-25; 189:15-19.

[85] *See Van Dyke v. Navigator Group*, 668 S.W.3d 353, 361 (Tex. 2023), reh'g denied (June 16, 2023) ("[W]e emphasize that the initial analysis remains confined to the four corners[.]"); *Charles R. Tips Family Tr. v. PB Commercial LLC*, 459 S.W.3d 147, 153 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("If the contract is ambiguous as a matter of law, only then is parol evidence of the parties' interpretation of the contract admissible.")

[86] *See Van Dyke*, 668 S.W.3d at 365 ("[I]f our ordinary rules of construction [four corners] are incapable of generating a single answer, then our case law involving inescapable ambiguity—including the authorized but reluctant recourse to extrinsic evidence—provides the next step. When that happens, a factfinder may be needed to finally resolve the text's meaning.").

meaning can clearly be ascertained within the four corners of the document.[87] Any examination of extrinsic evidence to interpret its meaning is unnecessary and improper under Texas law.[88] Nonetheless, Trinity's conduct surrounding its execution of the February Joint Written Consent and subsequent thereto lead to only one reasonable interpretation of the February Joint Written Consent: it was effective and enforceable since February 20, 2025. First, the record is clear that Trinity was aware that the TX Certificate of Formation, including Dr. McGraw as the sole director, would be filed with the Texas Secretary of State.[89] Additionally, the conduct of Trinity and repeated testimony from its executives evidence that Trinity acknowledges Debtor as a Texas entity—which only could have resulted from effectiveness of the February Joint Written Consent.[90]

53.     Trinity cannot cherry-pick which parts of an integrated contract are valid and which are not. Its conduct and sworn testimony confirm Trinity's understanding that the Stock Confirmation Agreement transferred majority ownership and control of the Debtor to Peteski on August 8, 2024. Its conduct and sworn testimony confirm Trinity's understanding that the February Joint Written Consent converted Debtor into a Texas entity. Trinity cannot simultaneously claim that these same Agreement causing are ineffective. Extrinsic evidence provided by testimony of Trinity's executives at the Hearing—while improper to interpret either unambiguous Agreement—supports that both the Stock Confirmation Agreement and the February Joint Written Consent are valid and enforceable upon their respective executions in August 2024 and February 2025.

## V.  CONCLUSION

54.     Trinity has been fully heard on its argument that Dr. McGraw lacked the corporate

---

[87] *See id.* at 361.

[88] *See id.*

[89] *See* February Joint Written Consent, PETESKI Exhibit 75; *see also* PETESKI Exhibit 74.

[90] Hearing Tr. at 284:11–285:4; 301:11–14.

authority to appoint MSM CRO Broadbent, who subsequently authorized Debtor to file this chapter 11 proceeding. The evidence of the record dictates a clear result: that Dr. McGraw was lawfully appointed as sole director of Debtor, and thus was authorized to appoint Mr. Broadbent and establish the Special Committee. Accordingly, Peteski is entitled to judgment on partial findings under Rule 52(c), as provided in the Proposed Findings of Fact and Conclusions of Law Pursuant filed herewith.

Dated: September 25, 2025
Dallas, Texas

/s/ *Christopher Bankler*

**JACKSON WALKER LLP**
Charles L. Babcock (TX Bar No. 01479500)
Bruce J. Ruzinsky (TX Bar No. 17439425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Emily Meraia (TX Bar No. 24129307)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: cbabcock@jw.com
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com
Email: emeraia@jw.com


Carl C. Butzer (TX Bar No. 03545900)
Christopher Bankler (TX Bar No. 24066754)
Minoo S. Blaesche (TX Bar No. 24075102)
Vienna F. Anaya (TX Bar No. 24091225)
William T. Farmer (TX Bar No. 24127156)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbutzer@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com
Email: vanaya@jw.com
Email: wfarmer@jw.com

*Counsel for Peteski Productions, Inc.*

21

## **<u>Certificate of Service</u>**

I certify that on September 25, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

<u>/s/ *Christopher Bankler*</u>
Christopher Bankler