Charles L. Babcock (TX Bar No. 01479500)
Christopher Bankler (TX Bar No. 24066754)
Minoo S. Blaesche (TX Bar No. 24075102)
**Jackson Walker LLP**
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Bruce J. Ruzinsky (TX Bar No. 17439425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**Jackson Walker LLP**
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

*Counsel for Peteski Productions, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re:<br><br>MERIT STREET MEDIA, INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-80156 (SWE)<br><br>**Re: Docket Nos. 100, 151, 579, 582** |

**PETESKI PRODUCTIONS, INC.'S BRIEF IN SUPPORT OF THE MOTION FOR STAY PENDING APPEAL, OR ALTERNATIVELY FOR A TEMPORARY ADMINISTRATIVE STAY, OF OCTOBER 28, 2025 RULING AND ANY ORDER CONVERTING THIS PROCEEDING AND APPOINTING A CHAPTER 7 TRUSTEE**

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy., Fort Worth, TX 76177.

## <u>TABLE OF CONTENTS</u>

**Page**

I.    PRELIMINARY STATEMENT..........................................................................................1

II.    LEGAL STANDARDS................................................................................................4

III.    ARGUMENT ON STAY PENDING APPEAL .........................................................5

    A.    Peteski is likely to succeed on the merits on appeal. ............................................. 6

    B.    Peteski, as well as all creditors, will suffer immediate and irreparable
injury if no stay is issued. ...................................................................................... 21

    C.    The balance of equities heavily favors a stay......................................................... 24

    D.    The public interest heavily favors a stay................................................................ 24

IV.    ARGUMENT ON ALTERNATIVE REQUEST FOR TEMPORARY STAY..................24

V.    CONCLUSION & PRAYER ............................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 461 7th Ave. Mkt., Inc.*,
 623 B.R. 681 (S.D.N.Y. 2020) ............................................................................15

*In re ACC Commc'ns Corp.*,
 361 B.R. 337 (S.D. N.Y. 2007) ......................................................................23, 24

*In re AIG Fin. Prods. Corp.*,
 651 B.R. 463 (Bankr. D. Del. 2023), *aff'd*, 2024 WL 3967465 (D. Del. 2024) ........................8

*Arnold v. Garlock, Inc.*,
 278 F.3d 426 (5th Cir. 2001) ..............................................................................5

*Bd. of Trs. New Orleans Emps. Int'l Longshoremen's Ass'n v. Gabriel, Roeder,
 Smith & Co.*,
 529 F.3d 506 (5th Cir. 2008) ..............................................................................17

*In re BMI Oldco Inc.*,
 671 B.R. 215 (Bankr. S.D. Tex. 2025) ..............................................................7

*Bose Corp. v. Consumers Union of U.S., Inc.*,
 466 U.S. 485 (1984) .........................................................................................11

*Burgess v. Fed. Deposit Ins. Co.*,
 871 F.3d 297 (5th Cir. 2017) ........................................................................21, 22

*In re Dernick*,
 No. 18-32494, 2019 WL 236999 (Bankr. S.D. Tex. Jan. 16, 2019) ...................................4, 24

*In re Fiesta Inn & Suites, LP*,
 2009 WL 5195961 (Bankr. W.D. Tex. Dec. 21, 2009) .........................................................23

*Freedom From Religion Found., Inc. v. Mack*,
 4 F.4th 306 (5th Cir. 2021) ..............................................................................23

*Garcia v. Posada*,
 2024 WL 4415280 (N.D. Tex. Apr. 9, 2024) ..................................................................5, 25

*Hartman Com. Props. Reit v. Hartman*,
 2007 WL 9751970 (S.D. Tex. Apr. 6, 2007) .......................................................................18

*In re Herrera*,
 2010 WL 148182 (Bankr. W.D. Tex. Jan. 8, 2010) ...............................................................23

*In re Honx, Inc.*,
No. 22-90035, 2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) ............................7, 16

*Kolobotos Props., LLC v. Thomas*,
No. 4:21-CV-120-SDJ, 2021 WL 2953687 (E.D. Tex. Mar. 1, 2021) .....................................4

*In re Legacy Est. Grp. LLC*,
No. 05-14659, 2006 Bankr. LEXIS 2782 (Bankr. N.D. Cal. Oct. 9, 2006)...........................16

*In re Little Creek Dev. Co.*,
779 F.2d 1068 (5th Cir. 1986) ........................................................................................9, 14

*Loop Corp. v. U.S. Tr.*,
379 F.3d 511 (8th Cir. 2004) ...............................................................................................16

*Miller v. Dunn*,
774 F. Supp. 3d 806 (N.D. Tex. 2024) .................................................................................14

*Nken v. Holder*,
556 U.S. 418 (2009).............................................................................................................25

*Parker v. Bill Melton Trucking, Inc.*,
No. 3:15-CV-2528-G, 2017 WL 726909 (N.D. Tex. Feb. 24, 2017) .....................................13

*In re Patriot Place, Ltd.*,
486 B.R. 773 (Bankr. W.D. Tex. 2013).................................................................................20

*Peals v. QuikTrip Corp.*,
No. 4:20-CV-22-KPJ, 2021 WL 2043185 (E.D. Tex. May 21, 2021)....................................13

*In re Permian Producers Drilling, Inc.*,
263 B.R. 510 (W.D. Tex. 2000)..............................................................................................5

*Reading & Bates Petroleum Co. v. Musslewhite*,
14 F.3d 271 (5th Cir. 1994) ...................................................................................................5

*In re Red River Talc LLC*,
670 B.R. 251 (Bankr. S.D. Tex. 2025) ...................................................................................8

*Rossco Holdings Inc. v. McConnell*,
2014 WL 11460917 (N.D. Tex. July 23, 2014), *aff'd*, 613 Fed. App'x. 302
(5th Cir. 2015)......................................................................................................................20

*In re Soundview Elite, Ltd.*,
503 B.R. 571 (Bankr. S.D.N.Y. 2014)....................................................................................8

*In re StatePark Bldg. Grp., Ltd.*,
316 B.R. 466 (Bankr. N.D. Tex. 2004)...................................................................................7

*Sweet v. Cardona*,
  657 F. Supp. 3d 1260 (N.D. Cal. 2023) ..................................................................25

*In re Tex. Equip. Co.*,
  283 B.R. 222 (Bankr. N.D. Tex. 2002)...................................................................23

*In re TMT Procurement Corp.*,
  534 B.R. 912 (Bankr. S.D. Tex. 2015) .............................................................15, 16

*Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*,
  711 F. Supp. 3d 627 (N.D. Tex. 2024) ...................................................................21

*United States v. Texas*,
  144 S.Ct. 797 (2024)....................................................................................5, 25

*In re V Cos.*,
  274 B.R. 721 (Bankr. N.D. Ohio 2002) ..................................................................20

*Valley v. Rapides Par. Sch. Bd.*,
  118 F.3d 1047 (5th Cir. 1997) ..............................................................................22

*Yang v. Does 1–89*,
  2024 WL 5190362 (E.D. Tex. Dec. 20, 2024)......................................................22

**Statutes**

11 U.S.C. § 1112(b)(1) ..................................................................................5, 8, 10, 21

11 U.S.C. § 1112(b)(4)(A)–(P)...................................................................................5, 9

11 U.S.C. § 1123(b)(4) ................................................................................................7, 8

**Other Authorities**

Fed. R. Bankr. P. 8007(a)(1) ..........................................................................................1

Fed. R. Bankr. P. 8007(a)(1)(A).....................................................................................4

Fed. R. Bankr. P. 8007(a)(2) ......................................................................................1, 4

Federal Rule of Civil Procedure 37(e) .....................................................................12, 13

Peteski Productions, Inc. ("Peteski") files this brief in support of its motion seeking a stay of the Court's ruling read into the record on October 28, 2025 [transcript filed at Dkt. 582] ("Ruling"), and any subsequent order converting this proceeding to a Chapter 7 proceeding ("Conversion Order"), pending the resolution by the district court of Peteski's forthcoming appeals of the Ruling and Conversion Order. *See* FED. R. BANKR. P. 8007(a)(1), (a)(2). Alternatively, Peteski requests that the Court grant a temporary administrative stay of the Ruling and Conversion Order to maintain the status quo until the district court can consider and rule on a motion seeking a stay pending appeal. Peteski respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    The stay factors strongly favor a stay pending appeal. Peteski is likely to succeed on the merits because, among other reasons it will present on appeal, none of the four purportedly independent "causes" announced in the Ruling meet the Bankruptcy Code's standard for "cause" or can otherwise withstand scrutiny. Peteski will be irreparably harmed in the interim absent a stay, both due to the expeditious Chapter 7 liquidation process and the reputational and brand harms that will be suffered under the Ruling and Conversion Order while the appeal is pending. Conversely, a stay pending appeal will protect, rather than substantially injure, the interests of other creditors and MSM. Peteski was not a party with claims being adjudicated but has nevertheless also been harmed by the Court's rulings on issues that were not essential to the Court's decision. And the public interest weighs in favor of granting the stay. Accordingly, the Court should stay the Ruling and Conversion Order pending Peteski's appeal.

2.    This bankruptcy case was initiated when the independent director of Debtor Merit Street Media, Inc. ("MSM" or "Debtor") filed for Chapter 11 relief in an effort to manage Debtor's extensive financial distress. Movant Peteski is the majority equity owner, creditor, and DIP Lender of the Debtor in the case.

3.      In 2022, Trinity Broadcasting of Texas, Inc. ("<u>Trinity</u>"), a non-profit, televangelist network, sought to launch a for-profit television network and offered Peteski—the owner of the market-leading *Dr. Phil*—a 30% ownership interest in the new network and additional cash installments over a ten-year period, in return for Peteski producing 160 episodes of a new prime-time show by Dr. Phil McGraw. Trinity and Peteski entered into a Joint Venture Agreement setting out those and other terms.[2] Trinity was responsible for providing the start-up network with virtually everything except the specific "Dr. Phil" content that Peteski promised. The network was named Merit Street TV, and the joint venture entity came to be known as MSM.

4.      Just before the network launched in April 2024, Trinity negotiated *on behalf of MSM* numerous distribution agreements to provide the carriage that the Joint Venture Agreement contemplated that Trinity would transfer to MSM at no cost.[3] These distribution agreements cost approximately $2.6 million per month, which Trinity funded for only a few months before it stopped in July 2024, contrary to the Joint Venture Agreement's written provisions.[4]

5.      As MSM's financial situation continued to deteriorate, in August 2024, Trinity and Peteski agreed to flip ownership interests from the original arrangement: Peteski became MSM's 70% owner, and Trinity became the 30% owner.[5] Peteski amended the bylaws to permit a single director and Dr. McGraw was selected as the sole member of MSM's board of directors, and MSM began taking action to reduce costs and urgently seek more funding.[6] From August 2024 through May 2025, MSM borrowed more than $55 million on convertible promissory notes, including over

---

[2] Ex. W-1 §§ 1, 4–5.
[3] *Id.* at §1.
[4] Ex. X at 513:17–514:17; Ex. Y at 729:7–11.
[5] Ex. G at APP 611.
[6] Ex. V-5 at APP 1258.

$25 million from Peteski.[7] Despite its financial troubles, MSM successfully produced and broadcast exclusive content, including in total 250 episodes of "Dr. Phil Primetime."[8]

6.      In February 2025, Trinity and Peteski signed a Joint Written Consent to convert MSM from a Delaware corporation to a Texas corporation, and Trinity approved a Certification of Formation filed with the Texas Secretary of State, on which Dr. McGraw was listed as the sole member of MSM's board of directors.[9] Trinity executed the Joint Written Consent with full knowledge of its declaration and confirmation of Dr. McGraw as the sole director of MSM.[10]

7.      In June 2025, MSM's board appointed Gary Broadbent as independent director and sole member of a Special Committee of the Debtor.[11] The Special Committee subsequently authorized the Debtor to commence this bankruptcy case and enter into the DIP Lender financing with Peteski. The bankruptcy was filed on July 2, 2025.[12] The "Chapter 11 Plan of Merit Street Media, Inc." ("Chapter 11 Plan") (Dkt. No. 412) was later approved and supported by the Debtor's Official Committee of Unsecured Creditors ("UCC") and filed with the Court.[13]

8.      Meanwhile, Trinity filed a motion seeking, *inter alia*, conversion to a Chapter 7 proceeding.[14] Professional Bull Riders LLC ("PBR") partially joined in Trinity's motion.[15] Peteski and the Debtor each objected to Trinity's and PBR's motion.[16] The Court held a multi-day hearing and, on October 28, 2025, read into the record its Ruling that indicated the Court will convert this

---

[7] Ex. X at 409:6–10, 567:20–568:9; Ex. Y at 729:23–730:3; Ex. Z at 1137:18–24; Ex. E at APP 215–16.
[8] Ex. Z at 1190:20–1191:2.
[9] Ex. V-6.
[10] *Id.*; Ex. X at 280:17–281:3.
[11] Ex. H at APP 698–705; Ex. T-2.
[12] Ex. A.
[13] Ex. O.
[14] Ex. C.
[15] Ex. D.
[16] Ex. F; Ex. H.

case into a Chapter 7 liquidation to be administered by a Chapter 7 trustee, relying on four asserted "causes."[17] But the Court delayed entry of any Conversion Order, and entered an "Order Preserving Status Quo," while the parties brief requests for a stay pending appeal.[18] Peteski will appeal the Ruling, any Conversion Order, and any other adverse rulings in the case.

## II.    LEGAL STANDARDS

9.    The Bankruptcy Rules permit this Court to stay its Ruling and Conversion Order pending appeal. *See* FED. R. BANKR. P. 8007(a)(1)(A), (a)(2). To obtain a stay, Peteski must "(1) make a strong showing that [it] is likely to succeed on the merits; (2) demonstrate that [it] will be irreparably injured absent a stay; (3) show that the stay will not substantially injure the other parties interested in the proceeding; and (4) establish that the public interest weighs in favor of granting the stay." *Kolobotos Props., LLC v. Thomas*, No. 4:21-CV-120-SDJ, 2021 WL 2953687, at *4 (E.D. Tex. Mar. 1, 2021) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)).

10.    To satisfy the likelihood-of-success factor, "the movant need not always show a 'probability' of success on the merits but need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Id.* (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981) (per curiam)) (internal quotations omitted). Irreparable injury requires more than a purely economic loss that would be compensable by monetary damages. *See In re Dernick*, No. 18-32494, 2019 WL 236999, at *4 (Bankr. S.D. Tex. Jan. 16, 2019). On the third factor, a court must "balance the hardships of the parties and find whether the harms outweigh any likely irreparable injury to the movant absent a stay." *Id.* Finally, "[i]n bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate[.]" *Id.* at *5.

---

[17] Ex. CC at 62:12–15, 64:13–21, 65:2–3, 66:16–19.
[18] Ex. DD.

11.     The Fifth Circuit has "refused to apply these factors in a rigid mechanical fashion." *Reading & Bates Petroleum Co. v. Musslewhite*, 14 F.3d 271, 272 (5th Cir. 1994). "[T]he absence of any one factor is not fatal to a successful motion for stay[.]" *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 515 (W.D. Tex. 2000) (citation omitted). For example, a movant who falls short of showing a likelihood of success can still obtain a stay if the appeal presents a "substantial case on the merits when a serious legal question is involved" and "the balance of the equities weighs heavily in favor of the stay." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001).

12.     Regarding Peteski's alternative request, the Court has discretion to issue an administrative stay. An administrative stay is intended to "minimize harm while an appellate court deliberates" whether to enter a stay pending the appeal, and it "should last no longer than necessary to make an intelligent decision on the motion for a stay pending appeal." *United States v. Texas*, 144 S. Ct. 797, 798–99 (2024) (Barrett, J., concurring); *see also Garcia v. Posada*, 2024 WL 4415280, at *1 (N.D. Tex. Apr. 9, 2024) (denying stay pending appeal but granting temporary administrative stay).

### III.    ARGUMENT ON STAY PENDING APPEAL

13.     An order converting a Chapter 11 case to Chapter 7 must be based on "cause" under the Bankruptcy Code. 11 U.S.C. § 1112(b)(1). The statute lists 16 non-exclusive circumstances that could constitute cause. *Id.* § 1112(b)(4)(A)–(P). Yet no valid "cause" ground is present here, and indeed only one of the Ruling's four "causes" purports to rest on Section 1112(b)(4).

14.     Peteski will appeal the Ruling, and a stay pending that appeal is warranted under the traditional factors for such relief. In short, Peteski would face irreparable harm without a stay pending appeal, as it has financed the bankruptcy process that resulted in an agreed Chapter 11 Plan that will unravel absent a stay. Respectfully, Peteski is likely to succeed on appeal because the Ruling cannot be reconciled with the law or the extensive evidence in this case.

**A. Peteski is likely to succeed on the merits on appeal.**

15.     Trinity and PBR sought relief by arguing (1) that the purported bad-faith actions of non-debtors led to a bankruptcy filing in bad faith, and there was no valid purpose for filing bankruptcy; and (2) that there was no corporate authority for the appointment of independent director Broadbent, nor for him to file the bankruptcy case. The Court explicitly rejected the second argument. Ruling Hearing Tr. 61:25–62:5. And the Ruling implicitly rejected the first argument, *nowhere* finding that the bankruptcy proceeding was filed in bad faith or that there was no valid purpose for the bankruptcy filing. *See generally* Ruling Hearing Tr. Instead, the Ruling offers three "cause" grounds that *no* party argued could provide "cause," and relies on one ground advanced only by PBR in a joinder—but still without finding bad faith or the lack of a valid purpose for the bankruptcy. None of these purported "causes" have merit.

16.     Peteski may present additional arguments on appeal in challenging the Ruling, including that the exception in Section 1112(b)(2) applies. But even if one focuses only on the four asserted "cause" grounds, Peteski is likely to succeed on the merits on appeal.

### *1.     Trinity and PBR failed to establish either bad faith or the lack of a valid purpose in the filing of the Chapter 11 case.*

17.     Although the Court did not rest its Ruling on the bad-faith or no-valid-purpose grounds for "cause," there would be no basis for finding those grounds implicated here. As demonstrated in Peteski's Pretrial Brief Regarding Allegations of Bad Faith Filing by Debtor,[19] as well as evidence presented at the hearing, MSM filed the bankruptcy in good faith and for a valid

---

[19] Ex. Q.

bankruptcy purpose as a final resort to address acute financial distress that Trinity caused, exacerbated, and refused to remedy.[20] The Court made no determinations otherwise.

18.    In addition to the debtor's financial condition, "[t]wo inquiries are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *In re BMI Oldco Inc.*, 671 B.R. 215, 220 (Bankr. S.D. Tex. 2025) (citing *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 n.7 (3d Cir. 2009)). The evidence shows, *inter alia*, that (1) MSM was under severe financial distress and insolvency caused by Trinity's breaches, self-dealing, and re-characterized insider claim;[21] (2) a valid bankruptcy purpose existed—seeking an orderly, court-supervised process to stabilize operations, centralize disputes, and conduct sales to maximize ongoing value;[22] and (3) the bankruptcy filing was not "merely" to gain tactical litigation advantage.[23]

19.    Chapter 11 expressly authorizes *liquidation* plans. 11 U.S.C. § 1123(b)(4). Courts routinely recognize that liquidating to prevent a race to the courthouse and to preserve estate value are proper, good-faith justifications for Chapter 11. *See, e.g.*, *In re StatePark Bldg. Grp., Ltd.*, 316 B.R. 466, 476 (Bankr. N.D. Tex. 2004) (Hale, J.). And "[t]o find bad faith, the court must find that the facts surrounding the filing of the petition are particularly egregious." *Id.* (citation omitted); *see In re Honx, Inc.*, No. 22-90035, 2022 WL 17984313, at *3 (Bankr. S.D. Tex. Dec. 28, 2022) ("[S]ometimes, a plan of liquidation is better for all parties than attempting to salvage the business

---

[20] Evidence of Trinity's mismanagement and/or manipulation of MSM financials includes saddling MSM with $133 million in liabilities (Ex. V-2, Ex. V-7) before Trinity abandoned the project after only a few months on the air, Ex. Y at 729:7–11; Ex. X at 512:6–21, 513:10–514:25.

[21] Ex. V-1; Ex. V-2; Ex. V-3; Ex. V-4; Ex. V-7; Ex. Y at 729:7–11; Ex. X at 512:6–21, 513:10–514:25.

[22] Ex. X at 524:3–8, 577:2–14.

[23] Ex. V-1; Ex. V-2; Ex. V-3; Ex. V-4; Ex. V-7; Ex. Y at 729:7–11; Ex. X at 512:6–21, 513:10–514:25.

as an ongoing matter or allowing the provisions of chapter 7 or a race to the courthouse to dictate

the liquidation process."); *In re Soundview Elite, Ltd.*, 503 B.R. 571, 580 (Bankr. S.D.N.Y. 2014)

("[I]t is not bad faith to file a chapter 11 petition for the purpose of a more orderly liquidation.").

20.     MSM was in extreme financial distress—through Trinity's conduct,[24] and despite

Peteski's provision of additional liquidity.[25] And after full consideration of all available avenues,[26]

MSM filed the Chapter 11 case to serve the valid bankruptcy purpose of an orderly liquidation to

maximize the value of the estate to creditors, exactly as Chapter 11 authorizes. *See* 11 U.S.C.

§ 1123(b)(4). Plainly, this shows that MSM acted in good faith. *See, e.g.*, *In re AIG Fin. Prods.*

*Corp.*, 651 B.R. 463, 474 (Bankr. D. Del. 2023), *aff'd*, 2024 WL 3967465 (D. Del. 2024). Any

evidence-based "evaluation of [MSM's] financial condition, motives, and the local financial

realities" would have confirmed the filing was in good faith. *In re Red River Talc LLC*, 670 B.R.

251, 305 (Bankr. S.D. Tex. 2025).

> **2.     None of the Ruling's four asserted grounds provide "cause" under Section 1112(b).**

21.     The Ruling's stated "cause" grounds cannot justify relief under 11 U.S.C.

§ 1112(b)(1) and are otherwise not supportable in this case.

22.     Most of the Ruling's asserted grounds—grounds 2, 3, and 4—fail for the simple

reason that they are *legally* invalid as supposed bases for finding "cause" under 11 U.S.C.

§ 1112(b)(1). The specified examples of "cause" indicate that the paradigm is protection of the

estate for the benefit of the creditors, such as continuing or substantial loss to the estate without a

---

[24] Ex. V-1; Ex. V-2; Ex. V-3; Ex. V-4; Ex. V-7; Ex. Y at 729:7–11; Ex. X at 512:6–21, 513:10–514:25.
[25] Ex. X at 409:6–10, 567:20–568:9; Ex. Y at 729:23–730:3; Ex. Z at 1137:18–24; Ex. E at APP 215–16.
[26] Ex. X at 499:23–501:11, 519:1–4, 527:17–25.

reasonable likelihood of rehabilitation, or gross mismanagement of the estate. *See* 11 U.S.C. § 1112(b)(4)(A)–(P). *None* of the grounds listed in § 1112(b)(4) relate to the production or alleged destruction of information, or to the sort of neutrality or candor assessments, that make up the Ruling's bases for grounds 2–4. Unsurprisingly, the Ruling offers nothing to justify these as valid grounds for "cause" under § 1112(b)—nor has Trinity or PBR ever done so—and indeed the Ruling does not cite at all to § 1112(b)(4) in relation to these three grounds.

23.     Nor does the Ruling rely on the alternative source for cause argued by Trinity and PBR: bad faith. The Fifth Circuit provides that a Chapter 11 case may be subject to conversion for cause under § 1112(b) for lack of good faith in filing for bankruptcy. *See In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). This cause ground was a key focus of the arguments by Trinity and PBR, as the Ruling noted. But tellingly, the Ruling makes *no* finding of bad faith. The Ruling nowhere mentions the *Little Creek* case or analysis, instead announcing four supposedly "independent" grounds to justify "cause" but with only one of them having any anchoring in the law (albeit erroneously invoked here, *see* Part III.A.2.b (ground 1)). There is simply no legal basis under the Bankruptcy Code for finding "cause" from grounds 2, 3, and 4, which were raised *sua sponte* by the Court. For this reason alone, these grounds are unlikely to be sustained on appeal. In addition, each of the grounds fails on the merits:

> *a.      Ground 4: Allegedly missing text message.*

24.     Most obviously, the Ruling's final asserted "cause" ground, relating to an alleged "destruction" of one text by Dr. McGraw that Peteski produced elsewhere, cannot stand.[27] This ground lacks any legal or factual basis for numerous reasons, only some of which are detailed below to demonstrate that Peteski is likely to prevail appealing this ground.

---

[27] Ex. CC at 66:16–67:19.

25.     _First_, the Ruling offers no _authority_ supporting this as a ground for conversion, nor did any Trinity or PBR _pleading_ request conversion as a consequence related to the discovery disputes. That is surely because there is no such basis. The Bankruptcy Code does not recognize the alleged deletion of a personal text to one of his friends by a debtor officer on his personal phone as "cause" for conversion, and the Ruling provides no other legal support for its holding that any alleged deletion was cause for conversion under 11 U.S.C. § 1112(b)(1).

26.     The Ruling states that "the deleted text was raised prominently in the reply briefs of both Trinity and PBR on the issue of conversion, dismissal, or appointment of a Chapter 11 trustee[.]"[28] But while the _substance_ of the allegedly missing text was discussed in those cited briefs, in neither brief (nor elsewhere in the filings) did either Trinity or PBR allege that the supposed _deletion_ of that text was in itself a viable cause ground for conversion. Moreover, the fact that Trinity and PBR's briefing contained "prominent" discussion of the content of the allegedly missing text contradicts the Ruling's finding that the text was "destroy[ed]"[29]—in fact, as is undisputed, it was produced _by Peteski_.

27.     The Ruling also rests on the notion that the alleged deletion of a personal text by Dr. McGraw amounted to a "violation . . . [of] a broader principle, that the Debtor's board members or _de facto_ officers or agents should not destroy property of the estate to help them in pending litigation[.]" Even if any allegedly missing text could provide grounds for conversion—it does not—there is no evidence supporting this allegation about an impact on the estate. As explained further below, there is no evidence that Dr. McGraw intentionally deleted any text; indeed, he testified emphatically that he did not.[30] And it is undisputed that the text was produced by Peteski.

---

[28] _See_ Ex. CC at 67:6–10.
[29] _See id._ at 66:19–23.
[30] Ex. AA at 1544:23–1545:12.

But there is also no evidence that the personal texts on Dr. McGraw's personal cell phone, pre-petition, amounted to "property of the estate." To hold otherwise required the Court to engage in sheer speculation and would mean that the cell phone data of any officer of any debtor—pre-petition or otherwise—is estate property. There is also no evidence that any act alleged was done in the "capacity" of MSM's officer or agent.

28.    _Second_, as a substantive matter, there is _no evidence_ to support this asserted ground and it is conclusively rebutted by the undisputed fact that the supposedly missing text was _produced by Peteski_. Dr. McGraw could not have been clearer in testifying, emphatically and consistently, that he did not delete any text.[31] There is no contrary evidence. In fact, the only evidence at the hearing regarding the alleged missing text by Dr. McGraw consists of (1) the text between Dr. McGraw and Mr. Ribman that does not contain the at-issue text;[32] (2) the text (produced by Peteski) between Dr. McGraw and Mr. McIntyre wherein Dr. McGraw states "What I sent to [Mr. Ribman]" followed by what the Court states is a copy/paste of the allegedly missing text;[33] and (3) Dr. McGraw's consistent testimony that he did not delete the text.[34] Additionally, the allegedly missing text was unquestionably produced: the implied copy/paste of the text into the thread between Dr. McGraw and Mr. McIntrye.[35]

29.    On this record, no evidence supports this asserted ground in the Ruling.  And as a matter of law, where the allegedly missing information was produced—by Peteski no less—there can be no prejudice or harm from the claimed lack of production, defeating this ground as matter

---

[31] _Id_.
[32] Ex. U-1.
[33] Ex. T-1; Ex. CC at 40:9–13.
[34] Although the Court is free to perceive the credibility of a witness, lack of credibility does not amount to affirmative evidence to the contrary of the testimony. _See Bose Corp. v. Consumers Union of U.S., Inc._, 466 U.S. 485, 512 (1984).
[35] _See_ Ex. CC at 40:9–13; _see also_ Ex. T-1

of law.  In this circumstance, it is clearly erroneous, legal error, and a clear abuse of discretion for the Ruling to find that Dr. McGraw intentionally destroyed the text, much less property of the bankruptcy estate, and to rest conversion on this basis.

30.     *Third*, the Court-ordered conversion operates as a *sanction* against Peteski.  While the Court did not acknowledge this relief is a sanction, it functionally is and yet it is procedurally improper, substantively improper, and lacks evidence. On this record and under binding rules and authorities, reversal on this ground is likely.

31.     For one thing, no party requested conversion (or dismissal) as a sanction for the alleged deletion of the text message at issue—not even in the still-pending motions for contempt and sanctions. Trinity sought supplemental discovery opportunities and attorneys' fees, or alternatively that "Peteski be prohibited from opposing Trinity's claim that the Debtor lacked corporate authority to institute the bankruptcy and issue a negative inference on the issue of corporate authority[.]"[36] And PBR requested either additional discovery or a brief adjournment and allowance to depose Dr. McGraw on certain documents.[37] But no one requested what the Ruling did, as a sanction or otherwise. That alone makes the Ruling's reliance on this ground improper, as a matter of due process and otherwise procedurally. This is especially true because the Court purported to leave the sanctions motions pending, while imposing stark consequences against Peteski—*i.e.*, a sanction—in the Ruling for the same asserted issue.[38]

32.     Further, to the extent the Ruling constitutes a sanction on this ground, it is also substantively improper, including because the supposedly missing text was produced. Federal Rule

---

[36] Ex. I at ¶ 2; Ex. L; *see* Ex. M.

[37] *See* Ex. J at ¶17; Ex. S.

[38] *See* Ex. CC at 67:1–5, 68:12–13 (discussing "the pending sanctions motion that I've yet to rule on").

of Civil Procedure 37(e) limits sanctions to situations where lost information "cannot be restored or replaced through additional discovery." *See* Fed. R. Civ. P. 37(e); *see also Peals v. QuikTrip Corp.*, No. 4:20-CV-22-KPJ, 2021 WL 2043185, at *5 (E.D. Tex. May 21, 2021). As explained above, the allegedly missing text was undisputedly produced elsewhere,[39] and argued about by Trinity and PBR. As a matter of course, no sanction could issue under Rule 37.[40]

33.    Additionally, "the party invoking the doctrine of spoliation has the burden of proving that the party who committed the alleged spoliation—in any form—acted in bad faith." *Parker v. Bill Melton Trucking, Inc.*, No. 3:15-CV-2528-G, 2017 WL 726909, at *3 n.3 (N.D. Tex. Feb. 24, 2017). But neither Trinity nor PBR met that burden, and in fact neither party solicited testimony from Dr. McGraw on this issue at the hearing. Only the Court asked Dr. McGraw about the allegedly deleted text message, to which Dr. McGraw emphatically testified, "I can tell you unequivocally I did not delete that text message for any reason whatsoever."[41] The evidence is far from sufficient to carry Trinity's and PBR's burden to establish bad faith spoliation of evidence under Federal Rule of Civil Procedure 37(e).

34.    *Fourth*, to the extent the Ruling silently calls upon an inherent-power basis for sanctioning, that would be entirely unsupported here. The Ruling certainly did not state that it invoked an inherent authority to issue sanctions, thus making any such basis reversable at the outset. But even indulging that this authority could support "cause" ground 4, this ground would still constitute error, both substantively and procedurally.

---

[39] *See* Ex. CC at 40:9–13; *see also* Ex. T-1.
[40] *See further* Ex. K; Ex. R.
[41] Ex. AA at 1544:23–1545:12.

35. Substantively, for all the reasons explained above, there is no evidence supporting any sanction based on the allegedly missing text message. The only *evidence* is Dr. McGraw's denial of having deleted any text and Peteski's production of the language at issue.

36. Procedurally, an (entirely silent) inherent-power sanction would be flawed on a number of levels. For example, "before imposing sanctions under its inherent power, a [district] court must make a specific finding that the sanctioned party acted in 'bad faith.'" *Miller v. Dunn*, 774 F. Supp. 3d 806, 818 (N.D. Tex. 2024) (quoting *Maguire Oil Co.*, 143 F.3d 205, 209 (5th Cir. 998) (citation omitted)). Here, the Ruling failed to make any finding of bad faith—in relation to *Little Creek*, alleged spoliation of evidence, or otherwise. Additionally, to sanction *sua sponte* with inherent power, the evidentiary burden is elevated to clear-and-convincing evidence, as the Northern District recently recognized. *See Miller*, 774 F. Supp. 3d at 819.

37. As discussed *supra*, the only record evidence related to the allegedly missing text message is (1) the McGraw-Ribman text that does not contain the at-issue message; (2) the McGraw-McIntyre text where Dr. McGraw states, "What I sent to [Mr. Ribman]" followed by what the Court believes is a copy/paste of the allegedly missing message; and (3) Dr. McGraw's consistent testimony that he did not delete the text. Given that this *de minimus*, circumstantial (at best) evidence would fail to meet Trinity or PBR's burden of proof if their request for sanctions were properly before the Court in the Ruling—which they were not—certainly this evidence falls far short of the clear-and-convincing evidence necessary to support invoking a court's inherent power to issue sanctions or the requirements of due process.

### b.    Ground 1: Substantial or continuing loss to the estate.

38. The Ruling's first "cause" ground is the only one that references a statutorily recognized ground for cause, Section 1112(b)(4)(A), stating that the "operating revenues are

swamped by administrative claims, primarily either unpaid professional fees or outstanding loans to pay professional fees," and suggesting that the subsequent negative cash-flow situation was alone sufficient to establish continuing loss to or diminution of the estate.[42] But that finding and conclusion is clearly erroneous and legally unsupportable.

39.     Specifically, the record conclusively reflects that MSM *increased* revenue during the case through renegotiated distribution agreements, which, along with the post-petition financing, supported the business and preserved estate value for an orderly liquidation.[43] It is also undisputed that the estate possesses claims against Trinity and PBR that could generate recovery for the estate.[44] To that end, the determination that administrative claims generated in furtherance and pursuit of those recoveries, specifically the mere accrual of professional fees, constitutes a continuing loss or diminution of the estate is legally flawed and clearly erroneous. *See In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015) ("[T]he mere accrual of professional fees does not constitute a continuing loss to the estate."); *see also In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 691 (S.D.N.Y. 2020) ("A bankruptcy court abuses its discretion if it bases its decision on an erroneous view of the law or clearly erroneous factual findings.").

40.     From the outset of the Chapter 11 case, MSM was confident—backed by its professionals' competent analysis—that a quick, orderly wind-down would maximize the value of the estate and the return to creditors.[45] This contemplated process was derailed by Trinity and PBR,

---

[42] Ex. CC at 62:19–63:1.

[43] Ex. X at 568:17–22 ("having reduced head count enough, that the small amount of revenue that we received was enough to float at least more sustainably than it was before."), 568:23-569:5 ("what [this process] created is a settlement and a plan that's going to be very beneficial to unsecured creditors."); Ex. O; Ex. N.

[44] *See* Ex. E at APP 155.

[45] *See* Ex. B ¶ 52.

a pair of claimants and litigants that are subject to valuable claims held by the estate.[46] Nonetheless, MSM and its professionals right-sized its operations, preserving key revenue streams and the estate's most-valuable assets.   Had the Chapter 11 Plan been presented to, and given full consideration by, the Court, along with the liquidation analysis and Settlement Term Sheet,[47] it would be clear that MSM's Chapter 11 Plan process did not lead to continuing loss to or diminution of value of the estate, but rather preserved the valuable assets of the estate, presented a meaningful return to creditors via the Settlement Term Sheet, and platformed a value-maximizing process to the benefit of all creditors.   *See In re Legacy Est. Grp. LLC*, No. 05-14659, 2006 Bankr. LEXIS 2782, at *4–5 (Bankr. N.D. Cal. Oct. 9, 2006) (even with extraordinary expenses and operating reports displaying a loss, the estate may be enhanced by the chapter 11 process).

41.     Finally, the Court's reliance on *Loop Corporation* is misplaced. That case and others recognize that Section 1112(b) should be applied consistent with the principle that "liquidation is permitted under Chapter 11." *See Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 517 (8th Cir. 2004); *see also In re TMT Procurement Corp.*, 534 B.R. at 921; *In re Honx, Inc.*, 2022 WL 17984313, at *3. Moreover, if the Ruling's reliance on MSM's Chapter 11 Plan to liquidate as independent support for its finding of cause under Section 1112(b)(4)(A)[48] were to become the norm, that would subject *every* liquidating debtor under Chapter 11 to conversion or dismissal.

### c.     Grounds 2 and 3: CRO's neutrality or candor.

42.     Whatever the Court may have thought of the testimony of Chief Restructuring Officer Broadbent ("CRO"), these are simply not "cause" grounds under Section 1112(b). As explained above, the Ruling offers no authority supporting either of these bases as grounds for

---

[46] *See* Ex. E at APP 155.
[47] *See* Ex. X at 572:19–573:10; Ex. N.
[48] *See* Ex. CC at 63:19–24.

conversion, nor did any Trinity or PBR pleading request conversion on these grounds. This alone disposes of both grounds. In addition:

Neutrality (Ground 2)

43.    The Ruling determined that the CRO "is not a neutral fiduciary but instead is conflicted in favor of Mr. McGraw . . ."[49] This asserted ground fails because the Ruling never explains how it could support "cause" under the Bankruptcy Code or the pleadings—and it cannot. Further, the evidence cited to support this cause ground includes the CRO's "work for Envoy after the petition date, his blessing of the other Merit Street officers' work for Envoy after the petition date, and his disastrous attempt to shield from the Court his communications with Mr. McGraw regarding dismissal or conversion of this case."[50] This purported "evidence," however, is either not a part of the record or the Court misinterpreted it, and in either case the finding is clearly erroneous. *See Bd. of Trs. New Orleans Emps. Int'l Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008).

44.    Specifically, the evidentiary record confirms the CRO has *not* worked for Envoy, and has only acted to advance MSM's interests.[51]  The Court's Envoy finding is apparently based on the CRO having sent an email about an Envoy press release.[52] The Ruling claimed that the CRO's statement that "he knew the transaction was going to be scrutinized so it was better to have Merit Street informed of what was going on at Envoy rather than be taken by surprise" was not

---

[49] *Id.* at 64:13–15.
[50] *Id.* at 64:16–21.
[51] *See* Ex. X at 538:4–12 ("Q. Okay. So, first of all, whether it is Envoy or whatever the entity is, have you ever done any work for an entity affiliated with Dr. Phil prior to this case? A. I have not. Q. Do you have any expectation of ever doing any work for any entities affiliated with Dr. Phil in the future? A. I do not."), 550:22–551:1 ("Q. Going all the way back to June 18th, Mr. Broadbent, have you ever done anything to benefit Envoy or Peteski or any entity affiliated with Dr. McGraw to the detriment of Merit? A. No.")
[52] *See* Ex. X at 462:6–15.

credible.[53] But this plainly ignores the beginning of the CRO's testimony where he stated "from a Merit standpoint, I approved that press release."[54] The CRO's testimony directly contradicts any finding he was acting on behalf of or working for Envoy when he approved the press release. Further, there is no testimony or evidence that the CRO drafted the release, was directed by Envoy, or was compensated by Envoy in connection with it. Any finding that the CRO works for Envoy lacks evidence and is clearly erroneous.

45.    The Ruling also misinterprets the effect of the CRO's blessing of other Merit Street officers' work for Envoy after the petition date. "[A] 'hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose." *Hartman Com. Props. Reit v. Hartman*, 2007 WL 9751970, at *4 (S.D. Tex. Apr. 6, 2007) (quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985)). Yet the Ruling stated: "To put it charitably, it wasn't the greatest business judgment for Merit Street officers Broadbent, Cheatwood, and Solomon to work for Envoy while simultaneously contesting allegations from TBN and PBR that the Debtor's CRO and other officers are conflicted and attached at the hip to Mr. McGraw."[55] Again, there is no evidence that the CRO was working for Envoy. And permitting Cheatwood and Solomon to work for Envoy was certainly a rational business decision. Given the winding down of MSM, the CRO determined in his business judgment to cap the other officers to 15 hours a week and reduce their wages and benefits.[56] The CRO could not risk losing the CEO and COO given their knowledge and expertise but also recognized that the other officers would need to supplement their reduced salary.[57] Further, the

---

[53] Ex. CC at 46:23–47:4.
[54] Ex. X at 462:13–15.
[55] Ex. CC at 48:7–11.
[56] Ex. X at 539:13–23.
[57] *See id.* at 562:15–563:1.

CRO testified that Envoy was not a competitor and therefore he did not see any conflict.[58] The CRO thus made a rational business judgment, and the Ruling improperly inserted its own business judgment instead.

46. Nor is there evidence to support the finding that the CRO attempted to "shield" his communications with Dr. McGraw regarding dismissal or conversion of this case. The Ruling noted the CRO's hesitancy and memory lapses when questioned about whether there were communications regarding dismissal versus conversion.[59] But the testimony itself reflects that the CRO consulted MSM's restructuring advisors on those issues.[60] These are the same restructuring advisors that the CRO hired to be separate from Peteski.[61] Before the CRO had an opportunity to look at the board minutes from the meeting, he testified he did not remember communications with Dr. McGraw regarding dismissal versus conversion and did not recall any messages being channeled from Dr. McGraw.[62] After being shown the board minutes, he firmly clarified that Dr. McGraw did not direct him to seek dismissal or conversion, and that he made the decision.[63] He also explained that substantive deliberations occurred in a later special-committee session that did not include Dr. McGraw.[64] The Ruling's finding relies on the CRO's demeanor and pauses rather than any testimony, and the evidentiary record shows no hidden communications directing dismissal or conversion and contains the CRO's unequivocal testimony that he alone made the decision, with advice from MSM professionals, and without direction from Dr. McGraw.

---

[58] *See id.* at 557:9–17, 559:2–6.
[59] *See* Ex. CC at 49:15–20, 52:9–14, 56:23–57:2.
[60] Ex. X at 582:24–583:10, 591:15–22.
[61] *Id.* at 391:13–24.
[62] *Id.* at 583:7–10.
[63] *Id.* at 590:14–23.
[64] *Id.* at 588:7–17, 591:3–14.

47.     Accordingly, the Ruling's second "cause" ground is clearly erroneous and lacks any evidentiary support, and it is legally flawed because the Court's view of the CRO's neutrality is not tied to, and indeed is not relevant to, cause under Section 1112(b).

Candor (Ground 3)

48.     As the third "cause" ground, the Ruling determined that the CRO violated a duty of candor to the Court.[65] Once again, this fails because the Ruling never explains how it could possibly support "cause" under the Bankruptcy Code or the pleadings—and it cannot. A freestanding "duty of candor" for a lay fiduciary or restructuring professional is certainly not among the cause grounds in Section 1112(b)(4), in either kind or character. *See In re V Cos.*, 274 B.R. 721, 725-26 (Bankr. N.D. Ohio 2002) (defining cause grounds). Converting (or dismissing) a case because a fiduciary's testimony was deemed insufficiently "candid" exceeds Section 1112(b)'s framework and collapses trial-management concerns into liquidation authority.

49.     Moreover, the perceived shortcomings in the CRO's testimony did not cause any supposed diminution of the estate. It would elide the line between judicial supervision and business judgment to turn trial testimony itself into a ground for cause.[66] And decisions whether to investigate, pursue, or settle estate claims are quintessential exercises of the *fiduciary's* judgment. *Rossco Holdings Inc. v. McConnell*, 2014 WL 11460917, at *2 (N.D. Tex. July 23, 2014), *aff'd*, 613 Fed. App'x. 302 (5th Cir. 2015). While the Court may police controversies and approve settlement amounts, it may not substitute its own view about whether to bring claims or negotiate settlements. *See In re Patriot Place, Ltd.*, 486 B.R. 773, 826 (Bankr. W.D. Tex. 2013).

---

[65] Ex. CC at 65:2–3.
[66] *Id.* at 66:4–15.

50.     Finally, the procedural posture underscores the problem. The Code provides for conversion only "after notice and a hearing" on the "cause" asserted. 11 U.S.C. § 1112(b)(1). Here, the Court announced its "duty of candor" theory late in the proceedings.[67] Recasting a credibility critique as "cause" deprived Peteski of a fair chance to contest whether the testimony amounted to "cause" under § 1112(b). Conversion was legally unsound and procedurally improper.

**B.   Peteski, as well as all creditors, will suffer immediate and irreparable injury if no stay is issued.**

51.     An irreparable injury is one that cannot be fully remedied through a later award of monetary damages. *See Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*, 711 F. Supp. 3d 627, 641 (N.D. Tex. 2024); *see also Burgess v. Fed. Deposit Ins. Co.*, 871 F.3d 297, 304 (5th Cir. 2017). Absent a stay here, several irreparable injuries will occur.

52.     First, under the Court's Ruling and any Conversion Order, there will immediately be appointed a Chapter 7 trustee with authority to dispose of MSM assets—and without consideration of the Chapter 11 Plan approved by the UCC and funded by Peteski. Such a result would deprive unsecured creditors of the significant recovery the Chapter 11 Plan provides. The liquidation analysis attached to the Plan puts this contrast in stark terms: a Chapter 7 liquidation would provide unsecured creditors with an estimated recovery of between 3.4% and 11.5%, whereas the proposed Chapter 11 Plan's monetization projects unsecured recoveries of between 29.5% and 37.7%.[68] Trinty and PBR offered no contrary analysis. A successful appeal of the Court's Ruling and Conversion Order cannot unwind a Chapter 7 trustee's liquidation transactions or effectuate the creditor-approved Chapter 11 Plan. Absent a stay, the Chapter 7 liquidation process will happen, will not be reversible, and will mean the Chapter 11 Plan never has a chance

---

[67] Ex. BB at 42:9–19, 94:3–4.
[68] Ex. P at APP 1085.

to be implemented. The loss of any chance for Chapter 11, and the specific loss of the projected Chapter 11 recoveries, would be irreparable. This alone warrants a stay pending appeal.

53.     Second, irreparable injury warranting a stay may also include reputational harm, including harm caused directly by the order being appealed. *See, e.g.*, *Burgess*, 871 F.3d at 299, 304 (harm to professional reputation caused by order requiring movant to withdraw from his professional industry deemed irreparable); *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1055–56 (5th Cir. 1997); *see also Yang v. Does 1–89*, 2024 WL 5190362, *4–5 (E.D. Tex. Dec. 20, 2024) (recognizing that damage to brand and reputation are irreparable because they are not quantifiable or adequately compensable with subsequent money damages) (citing *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1378 (Fed. Cir. 2024); *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013)).

54.     Here, the reputational attacks on Peteski and Dr. McGraw, not to mention MSM and the CRO, are well-documented. Indeed, the damage to their reputations has been the intent of Trinity and PBR since even before they entered this bankruptcy proceeding.[69] The Court's Ruling has added fuel to that fire with the comments about Dr. McGraw, in particular, that as demonstrated above do not even remotely relate to any valid basis for Section 1112(b) cause. Even if these appeals are successful, and even if there could be a complete unwinding of the Chapter 7 trustee's liquidation of assets that will have occurred during the appellate process—and, of course, there cannot be—there *still* would be no avenue for Peteski and Dr. McGraw to recover monetary damages to remedy the reputational harm caused by the Ruling. *See Valley*, 118 F.3d at 1056 (recognizing that even if there could be a monetary award following a successful appeal, that

---

[69] Ex. AA at 1393:1–1394:14, 1538:11–1539:5.

"monetary award would likely be inadequate and almost certainly speculative"). That harm is thus irreparable, independently justifying a stay pending appeal.

55.     Third, irreparable injury also includes the possible loss of a meaningful opportunity to vindicate appellate rights. *See, e.g.*, *In re Tex. Equip. Co.*, 283 B.R. 222, 228 (Bankr. N.D. Tex. 2002); *see also In re ACC Commc'ns Corp.*, 361 B.R. 337, 347–48 (S.D. N.Y. 2007) (denial of a chance at full appellate relief is "quintessential form of prejudice," and "where the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied"). Equitable mootness can be a form of irreparable harm; if the assets are irretrievably liquidated during the pendency of the appeal, then an appeal cannot adequately vindicate the appellant's rights. *See In re Herrera*, 2010 WL 148182, at *3 (Bankr. W.D. Tex. Jan. 8, 2010) (citing *In re Gen. Motors Corp.*, 409 B.R. 24, 31 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 347 & n.39; *In re Fiesta Inn & Suites, LP*, 2009 WL 5195961, at *3 (Bankr. W.D. Tex. Dec. 21, 2009). Here, absent a stay, a Chapter 7 liquidation will likely occur rapidly, and Trinity and PBR will surely argue on appeal that Peteski's appeal has become equitably moot as a result. Peteski will oppose any such arguments, but the mere possibility of the issue if no stay is granted separately justifies granting a stay pending appeal to avoid any irreparable harm in the loss of appellate rights.

56.     For these reasons, and for the core purpose of stays to preserve the status quo, a stay pending appeal is compelling here. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). Before the Ruling, the Chapter 11 proceeding was moving on a path to maximize the value of the estate for the benefit of all creditors, including the general unsecured creditors, with Peteski providing DIP financing that Debtor had requested and with the Chapter 11 Plan offering an orderly path for conducting the bankruptcy proceedings. Yet the Ruling would

irreparably and immediately upend that status quo, injecting an accelerated process that will undoubtedly yield results that are both less likely to maximize the recovery of value for the creditors and virtually impossible to unwind.[70] This is the very definition of irreparable harm.

### C.  The balance of equities heavily favors a stay.

57.      As shown above, the harm to Peteski and others interested in the bankruptcy proceedings will be irreparable in the absence of a stay pending appeal. By contrast, Trinity will not be injured by a stay. When balancing the hardships, the harms to Peteski and others in the absence of a stay significantly outweigh any potential harm that Trinity or PBR might try to claim they suffer under a stay. *See In re Dernick*, 2019 WL 236999, at *4.

### D.  The public interest heavily favors a stay.

58.      The public interest in bankruptcy proceedings "is to have an orderly administration of the debtor's assets via their bankruptcy estate." *In re Dernick*, 2019 WL 236999, at *5. The Chapter 11 proceedings that were ongoing and would have continued under the MSM Chapter 11 Plan would have served that public interest. Absent a stay of the Ruling and Conversion Order, however, that Plan will never be given an opportunity to work. There is also significant public interest in the preservation of the integrity and efficacy of the appellate process, allowing a meaningful appeal to vindicate appellate rights. *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 377.

## IV.   ARGUMENT ON ALTERNATIVE REQUEST FOR TEMPORARY STAY

59.      If this Court were to decline a stay pending appeal, Peteski will request that relief from the district court on an expedited basis. A temporary administrative stay by this Court would be important for the district court to have sufficient time to consider that stay request.

---

[70] Ex. P at APP 1085.

60.    Federal courts have the authority to issue brief administrative stays of their rulings—even if they deny a motion for a stay pending appeal, *see, e.g.*, *Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1279–80 (N.D. Cal. 2023)—to enable a reviewing court to consider whether to stay the ruling while that court hears an appeal of the ruling. *See, e.g.*, *Garcia*, 2024 WL 4415280, at *1. As Justice Barrett has recognized, "[d]eciding whether to grant a stay pending appeal requires consideration of the four *Nken* factors, which includes an assessment of the appellant's likelihood of success on the merits. That is not always easy to evaluate in haste, and an administrative stay buys the court time to deliberate." *United States v. Texas*, 144 S.Ct. at 798 (Barrett, J., concurring).

61.    As this Court recognized in entering its Order Preserving the Status Quo, a brief period in which no liquidation activities can occur, while the Court considers whether to grant a stay pending appeal, enables a prompt yet orderly consideration of this important issue. Likewise, Peteski requests that the Court afford the district court the same opportunity to consider the important question of whether to issue a stay pending appeal. That is especially warranted because the district court will not have the familiarity with this case that this Court does. An administrative stay that lasts "no longer than necessary" for the district court to have an opportunity "to make an intelligent decision on the motion for a stay pending appeal," *id.* at 798, would preserve the district court's opportunity to make a considered decision on that critical motion.

## V.    CONCLUSION & PRAYER

The Court should grant Peteski's motion and stay the Ruling and Conversion Order pending Peteski's appeals of those rulings. Alternatively, the Court should at least grant a temporary administrative stay of the Ruling and Conversion Order until the district court resolves Peteski's forthcoming request that the district court issue a stay pending appeal.

Dated: November 3, 2025
Dallas, Texas

/s/ *Charles L. Babcock*

**JACKSON WALKER LLP**
Charles L. Babcock (TX Bar No. 01479500)
Christopher Bankler (TX Bar No. 24066754)
Minoo S. Blaesche (TX Bar No. 24075102)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Bruce J. Ruzinsky (TX Bar No. 17439425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

*Counsel for Peteski Productions, Inc.*

## Certificate of Service

I certify that on November 3, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ *Charles L. Babcock*

Charles L. Babcock