Charles L. Babcock (TX Bar No. 01479500)
Christopher Bankler (TX Bar No. 24066754)
Minoo S. Blaesche (TX Bar No. 24075102)
**Jackson Walker LLP**
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Bruce J. Ruzinsky (TX Bar No. 17439425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**Jackson Walker LLP**
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

*Counsel for Peteski Productions, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re:<br><br>MERIT STREET MEDIA, INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-80156 (SWE)<br><br>**Re: Docket Nos. 100, 151, 579, 582, 599** |

## NOTICE OF APPEAL BY PETESKI PRODUCTIONS, INC. AND PHILLIP C. MCGRAW, PHD

PLEASE TAKE NOTICE that Appellants Peteski Productions, Inc.—a creditor, majority equity owner, and the DIP Lender of the Debtor in the above-referenced case—and Phillip C. McGraw, PhD, by and through their undersigned counsel, hereby each appeal to the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 158(a) and Rules 8001 *et. seq.* of the Federal Rules of Bankruptcy Procedure, from (1) each and every part of this Court's ruling read into the record on October 28, 2025 [Docket No. 582] (the "Ruling"), attached hereto as **Exhibit A** and incorporated herein by reference; (2) this Court's subsequent orders related to the Ruling, specifically the November 7, 2025 *Order Setting Precautionary Due-Process Hearing*

---

[1] The last four digits of the Debtor's federal tax identification number are 8990.  The Debtor's mailing address is 5501 Alliance Gateway Fwy, Fort Worth, TX 76177.

[Docket No. 599] and the October 29, 2025 *Order Preserving Status Quo* [Docket No. 579], which are attached hereto as **<u>Exhibit B</u>** and **<u>Exhibit C</u>**, respectively, and incorporated herein by reference; and (3) all underlying orders, rulings, and findings of fact and conclusions of law (including, without limitation, all oral findings of fact and conclusions of law stated on the record on October 28, 2025). Appellants submit this Notice of Appeal in substantial conformity with Bankruptcy Form B417A.

**Part 1:**     <u>**Identify the appellants**</u>

    1.     Names of the appellants:

       (a)     Peteski Productions, Inc.

       (b)     Phillip C. McGraw, PhD

    2.     Positions of appellants in the adversary proceeding or bankruptcy case that is the subject of this appeal:

       (a)     Peteski Productions, Inc. is a creditor, majority equity owner, and DIP Lender of the Debtor.

       (b)     Phillip C. McGraw, PhD was a witness in the case and is a party-in-interest based on the Ruling.

**Part 2:**     <u>**Identify the subject of this appeal**</u>

    1.     Describe the judgment—or the appealable order or decree—from which the appeal is taken:

       The Court's Ruling read into the record on October 28, 2025 [transcript entered at Docket No. 582]; the Court's subsequent, related *Order Setting Precautionary Due-Process Hearing* [Docket No. 599] and *Order Preserving Status Quo* [Docket No. 579]; and all the Court's underlying orders, rulings, and findings of fact and conclusions of law (including, without limitation, all oral findings of fact and conclusions of law stated on the record on October 28, 2025).

    2.     State the date on which the judgment—or the appealable order or decree—was entered:

       The Ruling was read into the record on October 28, 2025, and the subsequent related orders were entered on October 29, 2025 (Docket No. 579) and November 7, 2025 (Docket No. 599).

**Part 3:**     **Identify the other parties to the appeal**

List the names of all parties to the judgment—or the appealable order or decree—from which the appeal is taken and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| Party | Attorneys |
|---|---|
| Debtor Merit Street Media, Inc. | **SIDLEY AUSTIN LLP**<br>Thomas R. Califano (24122825)<br>Jeri Leigh Miller (24102176)<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas 75201<br>Telephone:      (214) 981-3300<br>Facsimile:      (214) 981-3400<br>Email:           tom.califano@sidley.com<br>                     jeri.miller@sidley.com<br><br>Stephen E. Hessler (admitted *pro hac vice*)<br>Patrick Venter (admitted *pro hac vice*)<br>787 Seventh Avenue<br>New York, New York 10019<br>Telephone:      (212) 839-5300<br>Facsimile:      (212) 839-5599<br>Email:           shessler@sidley.com<br>                     pventer@sidley.com<br><br><br>James W. Ducayet (admitted *pro hac vice*)<br>Steven E. Sexton (admitted *pro hac vice*)<br>Andrew F. Rodheim (admitted *pro hac vice*)<br>One South Dearborn<br>Chicago, Illinois 60603<br>Telephone:      (312) 853-7000<br>Facsimile:      (312) 853-7036<br>Email:           jducayet@sidley.com |
| Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. | **FOLEY & LARDNERY LLP**<br>Holland N. O'Neil (TX 14864700)<br>Robert Slovak (TX 24013523)<br>Steven C. Lockhart (TX 24036981)<br>Mark C. Moore (TX 24074751)<br>Stephanie L. McPhail (TX 24104104)<br>Davis G. Mosmeyer III (TX 24106346)<br>2021 McKinney Avenue, Suite 1600<br>Dallas, TX 75201<br>Telephone: (214) 999-3000 |

| | |
|---|---|
| | Facsimile: (214) 999-4667<br>honeil@foley.com<br>rslovak@foley.com<br>slockhart@foley.com<br>mmoore@foley.com<br>smcphail@foley.com<br>dmosmeyer@foley.com<br><br>Rajiv Dharnidharka (admitted *pro hac vice*)<br>555 California Steet, Suite 1700<br>San Francisco, CA 94104<br>Telephone: (415) 434-4484<br>Facsimile: (415) 434-4507<br>rajiv.dharnidharka@foley.com<br><br>Nora J. McGuffey (TX 24121000)<br>321 North Clark Street, Suite 3000<br>Chicago, IL 60654<br>Telephone: (312) 832-4366<br>Facsimile: (312) 832-4700<br>nora.mcguffey@foley.com |
| Professional Bull Riders LLC | **WICK PHILLIPS GOULD & MARTIN, LLP**<br>Jason M. Rudd, Tex. Bar No. 24028786<br>Scott D. Lawrence, Tex. Bar No. 24087896<br>Dallas, Texas 75204<br>Telephone: (214) 692-6200<br>Email: jason.rudd@wickphillips.com<br>scott.lawrence@wickphillips.com<br><br>**BENESCH, FRIEDLANDER, COPLAN &**<br>**ARONOFF LLP**<br>Jennifer R. Hoover (pro hac vice admitted)<br>Andrew D. Kinsey (pro hac vice admitted)<br>1313 N. Market Street, Suite 1201<br>Wilmington, DE 19801<br>Telephone: (302) 442-7010<br>Email: jhoover@beneschlaw.com<br>akinsey@beneschlaw.com<br><br>Abbey Walsh (pro hac vice admitted)<br>1155 Avenue of the Americas, 26th Floor<br>New York, New York 10036<br>Telephone: (646) 777-0053<br>Email: abbey.walsh@beneschlaw.com |

| | |
|---|---|
| | Nicholas J. Secco (pro hac vice admitted)<br>71 South Wacker Drive, Suite 1600<br>Chicago, IL 60606<br>Telephone: (312) 212-4949<br>Email: nsecco@beneschlaw.com<br><br>Alyssa A. Moscarino (pro hac vice admitted)<br>127 Public Square, Suite 4900<br>Cleveland, OH 44114<br>Telephone: (216) 363-4500<br>Email: amoscarino@beneschlaw.com |
| Peteski Productions, Inc. | **JACKSON WALKER LLP**<br>Charles L. Babcock (TX Bar No. 01479500)<br>Christopher Bankler (TX Bar No. 24066754)<br>Minoo S. Blaesche (TX Bar No. 24075102)<br>2323 Ross Avenue, Suite 600<br>Dallas, TX 75201<br>Telephone: (214) 953-6047<br>Email: cbabcock@jw.com<br>Email: cbankler@jw.com<br>Email: mblaesche@jw.com<br><br>Bruce J. Ruzinsky (TX Bar No. 17439425)<br>Matthew D. Cavenaugh (TX Bar No. 24062656)<br>1401 McKinney Street, Suite 1900<br>Houston, TX 77010<br>Telephone: (713) 752-4200<br>Email: bruzinsky@jw.com<br>Email: mcavenaugh@jw.com |
| Official Committee of Unsecured Creditors | **O'MELVENY & MYERS LLP**<br>Louis R. Strubeck Jr. (SBT 19425600)<br>Scott P. Drake (SBT 24026812)<br>Gregory M. Wilkes (SBT 24047105)<br>Laura Smith (SBT 24066039)<br>2801 North Harwood Street, Suite 1600<br>Dallas, Texas 75201-2692<br>Telephone:    (972) 360-1900<br>Email:    lstrubeckjr@omm.com<br>            sdrake@omm.com<br>            gwilkes@omm.com<br>            lsmith@omm.com<br><br>Julian Gurule (admitted pro hac vice)<br>400 South Hope Street, 19th Floor |

|  | Los Angeles, CA 90071-2811<br>Telephone: (213) 430-6407<br>Email:            jgurule@omm.com |
|---|---|
| Office of the United States Trustee | Asher Bublick<br>1100 Commerce Street, Room 976<br>Dallas, Texas 75242<br>Telephone: (214) 767-8967<br>Email:            asher.bublick@usdoj.gov |

**Part 4:**     <u>**Optional election to have appeal heard by District Court (applicable only in certain districts)**</u>

N/A.


**Part 5:**     <u>**Sign below**</u>


Dated: November 10, 2025
Dallas, Texas

/s/ *Charles L. Babcock*

**JACKSON WALKER LLP**
Charles L. Babcock (TX Bar No. 01479500)
Christopher Bankler (TX Bar No. 24066754)
Minoo S. Blaesche (TX Bar No. 24075102)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Bruce J. Ruzinsky (TX Bar No. 17439425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

*Counsel for Peteski Productions, Inc.*

## **Certificate of Service**

I certify that on November 10, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ *Charles L. Babcock*
Charles L. Babcock

# EXHIBIT A

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                              )    Case No. 25-80156-swe-11
     In Re:                   )
                              )
     MERIT STREET MEDIA, INC., )    Dallas, Texas
                              )    October 28, 2025
            Debtor.           )    2:00 p.m. Docket
                              )
                              )    ORAL RULING
     _____ )
```

                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SCOTT W. EVERETT,
              UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jim Ducayet<br>SIDLEY AUSTIN, LLP<br>One Dearborn<br>Chicago, IL  60603<br>(312) 853-7621 |
| For TBN/Trinity<br>Broadcasting of Texas, Inc.<br>and TCT Ministries, Inc.: | Mark C. Moore<br>FOLEY & LARDNER, LLP<br>2021 McKinney Avenue, Suite 1600<br>Dallas, TX  75201<br>(214) 999-4150 |
| For Peteski Productions,<br>Inc.: | Charles L. Babcock<br>Matthew Dudley Cavenaugh<br>JACKSON WALKER, LLP<br>1401 McKinney Street, Suite 1900<br>Houston, TX  77010<br>(713) 752-4210 |
| For Peteski Productions,<br>Inc.: | Christopher R. Bankler<br>JACKSON WALKER, LLP<br>2323 Ross Avenue, Suite 600<br>Dallas, TX  75201<br>(214) 953-6053 |
| For the Official Committee<br>of Unsecured Creditors: | Greg Wilkes<br>O'MELVENY & MYERS, LLP<br>2801 North Harwood Street,<br>   Suite 1600<br>Dallas, TX  75201-2692<br>(972) 360-1935 |

```
 1   APPEARANCES, cont'd.:

 2   For Professional Bull        Jason M. Rudd
     Riders, LLC:                 WICK PHILLIPS GOULD & MARTIN, LLP
 3                                3131 McKinney Avenue, Suite 500
                                  Dallas, TX  75204
 4                                (214) 692-6200

 5   For Professional Bull        Alyssa A. Moscarino
     Riders, LLC:                 BENESCH, FRIEDLANDER, COPLAN &
 6                                   ARONOFF
                                  127 Public Square, Suite 4900
 7                                Cleveland, OH  44144
                                  (216) 363-4500
 8
     For the United States        Asher Bublick
 9   Trustee's Office:            OFFICE OF THE UNITED STATES
                                     TRUSTEE
10                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
11                                (214) 767-8967

12   Recorded by:                 Sara Ferrufino
                                  UNITED STATES BANKRUPTCY COURT
13                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
14                                (214) 753-2088

15   Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
16                                Shady Shores, TX  76208
                                  (972) 786-3063
17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

1         <u>DALLAS, TEXAS - OCTOBER 28, 2025 - 2:04 P.M.</u>

2      THE CLERK:  All rise.

3      THE COURT:  Thank you.  Please be seated, even though

4 there's nobody in the courtroom.

5   All right.  Good afternoon.  We're here on the 2:00

6 o'clock docket.  We have one matter set in the Merit Street

7 Media case, Case No. 25-80156.  This is the Court's ruling on

8 the pending requests for conversion, dismissal, or appointment

9 of a trustee.

10   I wanted to let the parties know initially I did set this

11 for a WebEx-only ruling because there was some uncertainty

12 about whether I was going to be here in the courtroom or out

13 of town, and that's why I set it that way.  And with that

14 uncertainty, I thought it was better to just let the parties

15 know they had to appear by WebEx.

16   The second thing I'll note is that this is going to be a

17 lengthy ruling.  I might take a break or two during the ruling

18 to get through it.

19   I did have, I understand, an inquiry to my courtroom

20 deputy about an unofficial court reporter appearing on the

21 WebEx hearing.  I've never had that request before.  I just

22 wanted to let the parties know that, after my ruling, my plan

23 is to give my oral ruling script to the official court

24 reporter, who would then be able to expedite the official

25 transcription.  So if there's a concern about getting a quick

1   copy of the transcript, I do plan to do that.

2       If the parties are using a transcriber for internal

3   purposes only, I'm not going to police that, but just

4   understand that that's not the official court transcript.  It

5   should not be used in this or any other proceeding.  I'm not

6   really monitoring that, but I just wanted to let the parties

7   know that I am going to make my script available to the

8   official court reporter to expedite production of a

9   transcript.  We are also going to put the audio of my ruling

10  on the docket after I get off the bench.

11                      PRELIMINARY REMARKS

12      So, with those preliminary remarks, I'll go ahead and get

13  started.

14      This is the Court's ruling on the requests by Trinity and

15  the Professional Bull Riders to dismiss the case, convert it

16  to Chapter 7, or appoint a Chapter 11 trustee.

17      This Chapter 11 case is an anomaly.  It came to me in

18  complete liquidation mode.  Before bankruptcy, after wrestling

19  control of the company away from TBN, Phil McGraw decided to

20  pull the plug on the financially-distressed Merit Street and

21  move the business to a new company.  The Debtor fired nearly

22  all its employees on the first day of the case and immediately

23  sued Trinity.  All that's left is litigation and the sale of a

24  media library and not much else.

25      There never has been even a pretense of a rehabilitation

1  or reorganization.  But that's not what makes this case an

2  anomaly, as liquidating Chapter 11s are common in this

3  district and elsewhere.  What makes this case unique,

4  unfortunately, is that it has been plagued with the attempted

5  destruction of relevant evidence and less-than-truthful

6  testimony by some of the key players.

7      Before I go further, I want to be crystal clear at the

8  outset that I'm not referring to any counsel involved in this

9  case.

10     Regrettably, although the case was filed with

11  questionable-but-consented-to corporate authority, I find

12  clear cause to either convert the case to Chapter 7, dismiss

13  the case, or appoint a Chapter 11 trustee.  Given that cause,

14  I must determine what course of action is in the best interest

15  of creditors and the estate.

16                          JURISDICTION

17     All right.  As far as my jurisdiction, the Court has

18  jurisdiction under 28 U.S.C. Sections 1334 and 157.  These

19  proceedings are core proceedings and core matters.

20     Now for some background.

21                          BACKGROUND

22  A.  First I will talk about the history of the relationship

23  between the parties.

24     TBN is a not-for-profit corporation that operates the

25  Trinity Broadcasting Network, based in Fort Worth, Texas.  TBN

produces its own original Christian programs and broadcasts

its in-house-produced material and third-party-produced

Christian programming in the United States and

internationally.

TCT, an affiliate of TBN, is a not-for-profit corporation

that operates the TCT Network, based in Marion, Illinois.  TCT

produces and broadcasts Christian programming.  I may refer to

TCT and TBN together as "Trinity."

Phil McGraw is a television personality, podcast host, and

author.  I heard a lot about Mr. McGraw's background at trial.

I carefully observed his demeanor when he was in the

courtroom, and I've reviewed countless emails and text

messages to and from Mr. McGraw as part of this trial.  I feel

confident in saying that he likes to be in control of

situations, as you might expect from a self-made man.

Mr. McGraw formed and is majority owner of Peteski

Productions, Inc., a Texas corporation.  From 2002 to 2023,

Mr. McGraw hosted the *Dr. Phil* show on CBS.  Mr. McGraw and

TBN executives started discussing the formation of a legal

relationship for the production and distribution of the *Dr.
Phil* show, which was coming to an end on CBS.

The parties then signed a document called a Binding Letter

of Intent, dated January 10, 2023, which contemplated that Mr.

McGraw would produce new content and TBN would broadcast that

content on its network.  Peteski Exhibit 4.

1    The document has other details about the parties'

2  contemplated relationship, including a proposed ownership

3  structure of Merit Street where TBN would own 70 percent and

4  Peteski would own 30 percent.  The Binding Letter of Intent

5  also contemplated that TBN would put together a production

6  studio and offices for the Debtor at TBN's "PLEX" campus in

7  Fort Worth.

8    The parties appear to disagree on whether the Binding

9  Letter of Intent was just a preface to definitive long-form

10  documents that were never finalized.

11    On March 5, 2024, several things happened with respect to

12  Merit Street, which was then called APG Ventures, Inc.:

13    a.  Merit Street, TBN, and Peteski executed a Voting

14  Agreement, which is found at TBN Exhibit 7, that, among other

15  things, provides for a three-person Board of Directors, with

16  two members to be designated by TBN and one by Peteski;

17    b.  Merit Street also adopted its Bylaws at TBN Exhibit 9;

18  and

19    c.  Merit Street elected three directors:  Matt Crouch, a

20  TBN designee; Samuel Smadja, a TBN designee; and Mr. McGraw,

21  the Peteski designee.

22    On March 7, 2024, the Charter was amended to change the

23  name of APG to Merit Street Media, Inc., which I will refer to

24  as the Debtor, Merit Street, or MSM.

25    It appears that the parties' initial relative ownership

1   positions - 70 percent TBN and 30 percent Peteski -- were

2   reflected through ownership of uncertificated shares, which

3   was permitted under the Bylaws.  *See* MSM Bylaws, Section 5.01

4   at TBN Exhibit 9.

5      On April 2, 2024, the Debtor officially launched its

6   network with morning and evening news shows, as well as other

7   programming.

8      The parties' relationship, which was already fraying when

9   the network began, continued to deteriorate in mid-2024.  Mr.

10   McGraw wanted control of the business, so he began to plan

11   what he described as his "project of getting rid of TBN."

12   More on the origin of that phrase in a few minutes.

13      At the end of July 2024, thanks to some persuasive

14   messaging that I'll also discuss in a few minutes, the parties

15   started discussing a restructuring of their relationship,

16   including an equity swap of their relative ownership

17   percentages of the Debtor.

18      On August 2, 2024, Mr. McGraw forwarded to Phil McIntyre,

19   Mr. McGraw's longtime business consultant and advisor, an

20   email he sent to Jerry Sharell, a Merit Street public

21   relations agent, somebody we'll hear about again later.

22   That's TBN Exhibit 33.

23      In that forwarded email, after noting that some

24   unproductive staff may be fired in this "eat what you kill

25   world," Mr. McGraw noted, "SO GLAD to get these changes

1    underway!  These TBN folks are in over their heads and so

2    judgmental I just can't stand it.  Be shaping a loud press

3    release announcing in some way that I have made a gangster

4    move and taken a majority ownership position in MSM,

5    diminishing TBN to a passive minority investor role.  We will

6    release it at the right time."

7         The parties dispute the legal consequences of what

8    happened next.  In a series of email exchanges during the

9    first week of August, the parties negotiated the terms of the

10   equity swap.  *See, for example*, Peteski Exhibits 27 and 106.

11   According to TBN, Mr. McGraw claimed he needed to show family-

12   and-friend funding sources a signed paper showing he owned a

13   controlling interest in Merit Street, even while they

14   continued to negotiate the material terms of any equity swap,

15   so the parties agreed to a multi-step process for Peteski to

16   obtain a controlling ownership interest in Merit Street, with

17   the first step being the stock swap.  Again, that's TBN's

18   perspective.  *See* Transcript of Hearing Held on September 22,

19   2025, Docket No. 529 at Pages 18 and 19.

20        Thereafter, according to TBN, the parties would continue

21   to negotiate the outstanding deal points and memorialize them

22   in formal agreements on issues such as recognition of amounts

23   TBN spent on Merit Street as loans, an amended lease for Merit

24   Street's studio space at the PLEX, and Peteski's and Mr.

25   McGraw's agreement to fund all future Merit Street operational

1   expenses.  *See* Trinity Reply Brief, Docket No. 401 at

2   Paragraph 2.

3        Peteski, on the other hand, claims that the stock swap was

4   a standalone agreement and not part of a multi-step agreement.

5   *See, for example*, Peteski's Reply Brief, Docket No. 414,

6   Paragraph 48.

7        For now, I'll just note that the contemporaneous evidence

8   suggests the Trinity executives -- including Mr. Crouch, TBN's

9   chairman; Mr. Amedia, director of TBN and former president of

10  TCT; and Mr. Casoria, TBN's outside general counsel and former

11  Assistant Secretary -- genuinely thought the parties would

12  work in good faith on the post-stock-swap issues.

13       The evidence also shows, in contrast, that Mr. McGraw was

14  angling to get signatures on the stock swap so that Mr. McGraw

15  could oust the board members of TBN.

16       The parties signed the "Merit Street Stock Confirmation"

17  on August 8, 2024.  That's TBN Exhibit 59.

18       After signing the Stock Confirmation, Mr. McGraw emailed

19  TBN, recognizing that TBN and Peteski "have a pretty good 'to

20  do' list to now turn our attention to" and reassuring TBN that

21  he "did not forget [his] commitment to work diligently and

22  expeditiously to get everything buttoned up post 'stock

23  swap.'"  That's TBN Exhibit 67.

24       But Peteski, now relying on a change-of-control provision

25  in the Voting Agreement, executed the Written Consent of the

1   Stockholders of Merit Street Media, Inc., which I may refer to

2   as the "August Consent", which:

3       a.  amended the Bylaws to fix the number of directors at

4   no less than one director, rather than three;

5       b.  removed Trinity's two directors from the Board; and

6       c.  appointed Mr. McGraw as the sole director of the

7   Debtor.

8       Mr. McGraw and Peteski didn't immediately notify TBN

9   executives of the removal of their board members.  TBN found

10  out the hard way in February 2025, thanks to some email

11  exchanges from Mr. Lidji of Jackson Walker, who told them they

12  needed to sign a consent document to change Merit Street from

13  a Delaware corporation to a Texas corporation to help with

14  certain Merit Street litigation that Jackson Walker was

15  handling.  *See* Peteski Exhibit 70.

16      When Mr. Lidji for the first time notified Mr. Amedia in

17  the email exchanges that Mr. McGraw was now the sole board

18  member, Mr. Amedia and the other TBN executives were truly

19  shocked and disappointed.  Mr. Lidji responded later that day

20  with the simple statement, "Needless to say, you should not be

21  surprised."  *See* Peteski Exhibit 73.

22      TBN protested, but elected to take the high road and sign

23  the consent document because they wanted to help Merit Street

24  in the litigation.  Mr. Casoria testified credibly at trial,

25  "I was left with a Hobson's choice of whether to defend --

1    participate and defend and cooperate with who I thought were

2    co-counsel in this litigation, which was well over $100

3    million in potential damages, or to continue to argue with Mr.

4    Lidji over corporate documents that I hadn't seen and fight

5    over how many board members."  *See* Transcript of Hearing Held

6    on September 17, 2025, Docket No. 572 at Pages 14 and 15.

7        Therefore, on or about February 22, 2025, Peteski and TBN,

8    as Debtor's Stockholders, and Mr. McGraw as Debtor's Director,

9    executed a Joint Written Consent of the Stockholders and Board

10   of Directors, the "February Joint Written Consent".  That's

11   Peteski Exhibit 75.

12       I'm going to pause for just a minute.  I see Mr. Bankler.

13   I'm just going to do a sound check.  I'm four pages in.   I

14   just want to make sure everybody can hear me okay so that I

15   don't have to go back and read this.  So I'm going to do

16   occasional sound checks.  Mr. Bankler?

17           MR. BANKLER:  Yes, Your Honor.  I can hear you just

18   fine.  Thank you.

19           THE COURT:  All right.  Thank you.

20       The February Joint Written Consent approved, among other

21   things:

22       (1) the conversion of the Debtor to a Texas Entity;

23       (2) the Texas Certificate of Formation, which listed Mr.

24   McGraw as the only director of the Debtor; and

25       (3) the Amended Bylaws for the converted Debtor entity,

1  which provided for one sole director.

2      The February Joint Written Consent additionally adopted a

3  resolution that the members of the Board of the Debtor,

4  immediately after conversion to a Texas entity, shall be the

5  same persons as the Board of the Debtor immediately prior to

6  conversion -- that is, Mr. McGraw -- and provided that the

7  stockholders and director agreed that the resolutions

8  "approved, ratified, and confirmed in all respects as the act

9  and deed of the Corporation."

10     On February 24, 2025, the Debtor filed its Texas

11 Certificate of Formation with the Texas Secretary of State,

12 declaring publicly that Mr. McGraw was the sole director of

13 the Board of the Debtor.  That's Peteski Exhibit 77.

14     Also in February 2025, Mr. Cavenaugh, Mr. McGraw's and

15 Peteski's restructuring counsel at Jackson Walker, reached out

16 to his friend and fellow restructuring professional, Gary

17 Broadbent, about his interest in a position as Merit Street's

18 Chief Restructuring Officer.  *See* Transcript of Hearing Held

19 September 17, 2025, Docket No. 469 at Page 53.  They had some

20 discussions, but Mr. Broadbent wasn't officially retained

21 until later.

22     As early as May 15, 2025, Mr. McGraw and his team began

23 planning to move Merit's business to a new company.  His team

24 shopped the new company to MediaCo controlling shareholder,

25 Soo Kim.  That's PBR Exhibit 52.

1        High-level discussions with Soo Kim led to a proposed

2   "crawl, walk, run strategy for a partnership over the next

3   three months."  That's PBR Exhibit 52.

4        On June 21, 2025, a member of Mr. McGraw's team was using

5   ChatGPT to look for a new company name.  *See* PBR Exhibit 153.

6        By June 27, 2025, Mr. McGraw's team had negotiated the

7   main deal points of a letter of intent with MediaCo.  PBR

8   Exhibit 181.

9        Then, on July 1, 2025, the day before the bankruptcy

10  filing, the new company was officially incorporated under the

11  name Envoy Media Company.  TBN Exhibit 325.

12       Pursuant to a Consulting Agreement effective as of June

13  18, 2025, the Debtor appointed Mr. Broadbent as Chief

14  Restructuring Officer.

15       Then, pursuant to Board Minutes dated June 30, 2025, Mr.

16  McGraw, as the sole member of the Board, increased the Board

17  size to two and filled the second position by appointing Gary

18  Broadbent as an Independent Director effective as of June

19  18th.  TBN Exhibit 302.

20       As part of that appointment, the Board created a Special

21  Committee of the Board, and at least on paper delegated to Mr.

22  Broadbent, as Independent Director and sole member of the

23  Special Committee, the exclusive authority to pursue

24  "Strategic Options" such as bankruptcy and to direct the

25  prosecution, settlement, and release of litigation "Claims."

1       On July 1st, the Special Committee authorized the Debtor

2  to file Chapter 11 bankruptcy, which it did at 12:15 a.m. on

3  July 2.

4  B.  Professional Bull Riders

5       Next I'll talk about the Professional Bull Riders, LLC,

6  which I may refer to as either PBR or the Bull Riders.

7       PBR is an international professional bull riding

8  organization. It promotes and organizes the premier

9  professional bull riding tour, a Teams league established in

10  2022, and numerous world-class bull riding events.

11      PBR and the Debtor entered into a series of agreements in

12  May and July 2024 where the Debtor agreed to air PBR's

13  programming, and in return was required to pay PBR a sizable

14  rights fee over four years.  The Debtor began broadcasting

15  PBR's content in mid-July 2024.  The PBR Agreements were

16  signed when TBN was in control of the Merit Street board.

17      Merit Street's relationship with PBR soured soon after Mr.

18  McGraw took control of the company in August 2024.  In fact,

19  on September 3, 2024, Mr. McGraw sent an email out to officers

20  of the Debtor, making clear that he was going to withhold a

21  sizeable $3 million monthly payment to PBR as a leverage tool

22  against TBN:

23          "We must make absolutely sure that no one at TBN is

24      spending MSM money starting tomorrow.  We must have

25      that account set up where nobody signs but us.  They

1    are very apt to go in there first thing in the morning

2    and try and write a $3-plus million check to PBR.  We

3    cannot let that happen.  It is a powerful leverage tool

4    that I have by informing them that that payment is

5    being defaulted on because they failed to meet their

6    deadline to fund $25 million on September 1st and now

7    on September 3rd.  They need to figure out what to do.

8    We aren't paying it because we can't pay it.  We have

9    to get our money out of there.

10        "Randi, please impress upon Jim Mittan and Mindy

11   that, as per their notification at the end of last

12   week, they are not authorized to issue checks on behalf

13   of MSM without sign-off by me or Joel.  We will not

14   approve that PBR payment. Obviously, they have to be

15   paid, but I'm playing some eleventh-hour poker here.

16   TBN needs to pay PBR and prepare to make payroll on the

17   7th unless they get this funding done."

18   That's TBN Exhibit 558.

19       PBR was never paid. In response to the Debtor's nonpayment

20   under the PBR Agreements, PBR terminated the Agreements in

21   November 2024 and commenced an arbitration against the Debtor.

22   *See* PBR's Objection at Page 4, Docket No. 97.

23       In the arbitration, PBR alleges breach of contract and

24   seeks damages in an amount of $181-plus million, plus

25   attorneys' fees.  The Debtor counter-claimed against PBR in

1  the Arbitration proceeding for fraud.  Transcript of Closing

2  Arguments, September 29, 2025, Docket No. 550 [Court

3  correction] at Page 116; Peteski Exhibit 146.

4       Just a moment ago I cited an objection at Docket 97.  I

5  don't have it in front of me.  That may not be PBR's

6  objection, but that is the cite for that note.

7  C.  Now I'm going to talk about the Ribmans and the Committee

8  formation and composition.

9       Back on June 30, 2024, in a text thread describing their

10  planned trip together on a Hawker airplane that was delayed

11  because of a faulty fuel sensor, Mr. Ribman asked Mr. McGraw

12  what his schedule was that week. Mr. McGraw replied, "I'm here

13  working on the project of getting rid of TBN!"  That's TBN

14  Exhibit #16.

15       Less than a month later, on July 28, 2024, when Mr. McGraw

16  was getting ready to execute his self-professed gangster move,

17  Mr. Ribman was giving Mr. McGraw detailed and specific talking

18  points to persuade TBN to do the stock swap.  *See, for*

19  *example*, TBN Exhibit 23.  This July 28, 2024, text thread is

20  fascinating.  Mr. Ribman's text starts with this:

21       "Proposed  messaging  ...  This  has  been  a  good

22       partnership.  Your  summer  hiatus  and  their  ongoing

23       discussions with TCT have caused you to reflect on the

24       partnership.  It's important that the two of you focus

25       on  what  you  are  individually  great  at  doing.   His

1    parents founded TBN 50 years [ago] and he has grown it

2    into the largest religious network in the world. He

3    needs to continue to focus on acquisitions such as TCT.

4    The new proposed structure will allow TBN to focus on

5    what it does well (both from a time and money

6    perspective) and will enable you to focus on what you

7    are great at.  His 30 percent will be far more valuable

8    with you leading the network than his 70 percent under

9    the current arrangement.  You are proud of what you

10   have created with him as a co-founder and look forward

11   to a new structure that best leverages your unique

12   talents."

13   Again, that's TBN Exhibit 23.

14   Mr. Ribman obviously put a lot of thought into this

15   messaging, including its emotional nods to Mr. Crouch's

16   parents' role in his success.  After providing the messaging,

17   Mr. Ribman said, "Good luck and let me know how it goes!  I

18   may be out by the studio, if you want to meet out there

19   afterwards."  Mr. McGraw replied, "Perfect lead-in.  I'll

20   call you.  Stand by!"

21   Again, this is Mr. Ribman giving Mr. McGraw specific

22   messaging points praising TBN and Mr. Crouch's parents and

23   persuading TBN to do the stock swap, all while knowing that

24   Mr. McGraw was working on the project of getting rid of TBN.

25   So the text message may be persuasive, but it's also a little

1  disturbing.

2      This specific messaging about the value of the stock

3  positions if they were swapped was highlighted at trial a

4  number of times, including when I watched an August 8, 2024

5  video of Mr. Crouch saying that he thought the word of the

6  Lord was coming from Mr. McGraw's mouth when Mr. McGraw said

7  he was going to make this 30 percent worth more than if it

8  would have been TBN's 70 percent, to which Mr. McGraw replied,

9  "I believe that from my heart."  That's the video at Peteski

10  Exhibit 109.

11      The stock swap value messaging is also specifically raised

12  in a fraud cross-claim filed by Trinity against Mr. McGraw and

13  Peteski.  *See* Adversary No. 25-8006, Docket No. 55, Paragraph

14  51 at Page 15.

15      Specifically, Trinity alleges that this statement and

16  others were intentionally false and made to induce TBN to take

17  certain actions that it would not have otherwise taken, such

18  as executing the stock swap.  *See* Adversary Proceeding No. 25-

19  8006, Docket No. 55, Paragraphs 52 and 110 to 117.

20      Moreover, in its answer in that adversary proceeding to

21  the Debtor's complaint, Trinity also challenges the validity

22  of the stock swap based on fraud, again implicating Mr.

23  Ribman's persuasive messaging.  *See, for example*, Adversary

24  No. 25-8006, Docket No. 49, Paragraphs 1, 52, 83, and 105.

25      On August 8, 2024, the date of the video, Mr. McGraw

1  executed the stock swap and thus began his move to get rid of

2  TBN, which I've already discussed.

3      Mr. Ribman must have been satisfied with the stock swap,

4  because in December 2024 the Darcy Lynn Ribman 1997 Trust lent

5  the Debtor $5 million.  *See* Transcript of Hearing Held

6  September 25, 2025, Docket No. 523 at Page 25.  Mr. Ribman and

7  Darcy Ribman are husband and wife.  *See* Trinity Reply, Docket

8  No. 401, Paragraph 8, Footnote 7.

9      Now let's fast forward to late in the evening on July 1,

10 2025, the day before the bankruptcy filing.  Mr. McGraw sent a

11 text message to Mr. Ribman that, as I'll discuss a little

12 later, Mr. McGraw purposefully deleted after the bankruptcy

13 because he didn't want me to see it.  TBN Exhibit 330.

14     In that text thread, Mr. McGraw told Mr. Ribman the

15 following things:

16     "Okay.  I have been trying to get with you so you are up

17 to speed.  I am filing suit against TBN at 12:01 a.m., as in

18 three hours from now."

19     "I am also filing Chapter 11 for MSM to wipe out all the

20 s-h-i-t Matt Crouch has burdened us with."

21     "It will wipe out PBR's claim against MSM, but our claim

22 against them will survive.  It will free us from TBN's debt

23 for distribution which Matt saddled us with.  Distributors are

24 cooperating with us.  Two biggest assets are OUR claims

25 against TBN and PBR.  The biggest creditor is me.  Second is

1    distributor group, then you.  (See below as to you.)"

2        As an aside, this reference in the text to the large

3    unsecured claims of the distributor group and the Ribman Trust

4    is interesting.  In Chapter 11 cases generally, it's very

5    common -- in fact, expected -- for a debtor to be aware of and

6    concerned about who the largest unsecured creditors in a case

7    are, because they often end up on the creditors' committee,

8    especially if those creditors are encouraged to do so.

9        Now back to more information from the deleted text:

10        "We are immediately relaunching in a joint venture with

11    MediaCo in the new 65,000 square foot broadcast center at 2410

12    Gateway in Irving just off Beltline.  Soundstages are under

13    construction, as are all other elements we need.  We will not

14    go off the air for even one second except where our

15    distributors take us down when they can replace us.  We are

16    working to replace them as well.  No adversarial blood there."

17        "Just want you to know we think we 'Free At Last.'  Very

18    happy.  Wish we didn't have to do it, but it is time.

19    Important to me that you know:  Your investment is one hundred

20    percent safe.  Hope you will choose to go along and move it to

21    new deal (clean balance sheet!).  However, I am happy to

22    reimburse you via wire transfer at a moment's notice, as I

23    have previously indicated.  I don't care about the agreement

24    that protects with the library or what the Court does.  Our

25    deal is between us, and I am very grateful for it.  I made a

choice and will not allow you to be in an uncomfortable

position for even a second."

"I just did NOT want you to be surprised in any fashion or

think some court was going to impact your investment.  Not

happening.  Since this goes public technically at midnight, I

just had to get to you with the scoop.  And yes, we can meet

tomorrow!  Hope this helps.  Sorry to be a nag!"

Mr. Ribman replied a few minutes later, noting that "You

couldn't nag me if you tried.  Your challenges are mine!

Couldn't be more proud of what you are building.  Let me know

when you are free tomorrow."

Stated differently, instead of questioning Mr. McGraw's

stated intent to wipe out PBR's claim in the bankruptcy or Mr.

McGraw's guaranty of payment no matter what the Court does,

Mr. Ribman immediately cheered on Mr. McGraw's plan, since Mr.

McGraw's challenges were also Mr. Ribman's challenges.

At trial, Mr. McGraw testified that Mr. Ribman voluntarily

declined his payment offer on a phone call, but I don't

believe that testimony.  *See* Transcript of Hearing Held

September 23, 2025, Docket No. 523, at Pages 91 and 92, and 95

to 96.

In a text thread between Mr. McGraw and Joel Cheatwood

also late in the evening on July 1st, Mr. Cheatwood asked who

should reach out to certain talent that night in advance of

the all-hands meeting the next day.  Mr. McGraw replied that

1    Mr. Cheatwood should call them because "I still have to write

2    our pleading!  With Chip because the lawyers just can't get it

3    right."  That's TBN Exhibit 320.  That text says "bc" but

4    clearly that is short for "because."

5        It's easy for me to connect the dots and conclude that the

6    pleading that Mr. McGraw was working on late in the evening on

7    July 1st with Chip Babcock, Mr. McGraw's and Peteski's long-

8    time litigation counsel, is the very lawsuit against TBN that

9    Mr. McGraw promised he would file within hours, and that was,

10   in fact, filed within hours, except with Sidley signature

11   blocks rather than Jackson Walker's.

12       After the bankruptcy filing, Mr. Ribman met with Mr.

13   McGraw at Envoy's facility, as the text thread suggested they

14   would.  PBR Exhibit 231.

15       For convenience, during this ruling I may refer to the

16   Ribman Trust and Mr. Ribman interchangeably because I find

17   that Mr. Ribman was a Trust representative and Agent for all

18   relevant purposes after the December 2024 loan, including

19   communications with Mr. McGraw, even if Committee counsel

20   dealt with Mrs. Ribman during the bankruptcy.

21       The Debtor filed bankruptcy on July 2nd at 12:15 a.m.,

22   followed at 1:43 a.m. with the lawsuit against TBN that Mr.

23   McGraw promised "I am also filing" shortly after midnight.

24   That's TBN Exhibit 330.

25       At the first-day hearings on July 3rd, Judge Jernigan

1   asked whether certain creditors, including the Ribman Trust,

2   were given notice of the bankruptcy.  Debtor's counsel Mr.

3   Venter noted that there were principal-level discussions with

4   the Ribman Trust and that the Ribman Trust was fully in the

5   loop on the bankruptcy.  That's Transcript of Hearing Held

6   July 3, 2025, Docket No. 47 at Pages 16 to 20.

7        Not surprisingly, just two weeks later, on July 17, after

8   those principal-level discussions and on the heels of Mr.

9   McGraw's text message where he guaranteed payment of the

10  Ribman claim and noted the large size of the Ribman unsecured

11  claim relative to other claims, the Ribman Trust was appointed

12  to the Creditors' Committee.  *See* Docket No. 95.

13       Who else appeared on the Committee?  Borden Media

14  Consulting and the Professional Bull Riders.

15       Somewhere around that time, as discussed right before

16  closing arguments, Debtor's counsel notified Mr. Bublick with

17  the United States Trustee that the Debtors were marketing

18  their litigation claims against PBR.  Transcript of Closing

19  Arguments, September 29, 2025, Docket No. 550 at Pages 8 to

20  10.

21       Not long thereafter, on August 6, PBR was removed from the

22  Committee, even though PBR told the United States Trustee it

23  would not bid on any claims against it.  Docket No. 170, and

24  Transcript of Closing Arguments, September 29, 2025, Docket

25  No. 550 at Page 172.

1        Thus, in the critical early stage of the case, the

2   creditor that knew of Mr. McGraw's project to get rid of TBN,

3   the creditor that provided the specific messaging for that

4   project and praised that project, the creditor that knew of

5   Mr. McGraw's desire to wipe out the PBR claim and cheered on

6   that plan, the creditor that knew its claim was absolutely

7   guaranteed by Mr. McGraw to get paid no matter what the Court

8   does, THAT creditor made it onto the Committee, while the to-

9   be-wiped-out creditor, PBR, was removed from the Committee.

10       Under the proposed plan that Mr. McGraw and Mr. Broadbent

11  negotiated and filed on the eve of trial, Mr. Broadbent, for

12  the estate, will settle and release claims against Mr. McGraw

13  and Peteski while a Litigation Trust, supervised by the same

14  two members on the Creditors' Committee, will control the

15  litigation against TBN and PBR.  That Plan is found at Docket

16  No. 412.  I'll refer the parties to Pages 47 to 50, Pages 9

17  and 10.  Also Plan Article IV.C, Pages 30 to 33, and Plan at

18  Article IV.A.e., at Page 28, generally permitting the

19  Creditors' Committee to select members of the Litigation

20  Advisory Committee that supervise and vote on terms of any

21  settlements.

22       I will repeat these troubling facts for emphasis:  The

23  creditor that helped Mr. McGraw with his plan to remove TBN

24  board members by providing specific messaging that gave rise

25  to a TBN fraud claim against Mr. McGraw and Peteski, the

1  creditor that cheered on Mr. McGraw's stated intent to wipe

2  out a fellow unsecured creditor's claim through the bankruptcy

3  because Mr. McGraw's challenges and Mr. Ribman's challenges

4  were the same, the creditor whose claim -- in a purposefully-

5  deleted text message -- was guaranteed to be paid by Mr.

6  McGraw no matter what the Court does, THAT creditor not only

7  constitutes half of the Creditors' Committee but will

8  supervise litigation against TBN and PBR after confirmation if

9  the plan is confirmed.

10     It may be easier to detect a conflict when a creditor on

11  the committee, such as PBR once was, has claims against the

12  debtor and the debtor has claims against that creditor.  At

13  least in theory, the adverse creditor will benefit and other

14  unsecured creditors may suffer a detriment if the debtor's

15  claims against it are settled cheaply.  Potentially, that

16  conflict can be managed with a waiver that the adverse

17  committee member will abstain from voting on matters

18  concerning litigation with that creditor.  But the U.S.

19  Trustee felt otherwise in this case when PBR was removed from

20  the Committee.  And while I may not know all the facts that

21  led to that decision, I do know that the Debtor nudged the

22  U.S. Trustee in that direction.

23     On the other hand, when a committee member and the debtor

24  are seemingly aligned against a third party -- here, both TBN

25  and PBR -- you could say at least in theory that there is no

conflict that would lead to a breach of the fiduciary duty the

committee member has to all unsecured creditors.  After all,

the bigger the recovery by the debtor against the third party,

the more unsecured creditors will benefit.

But at some point, if a creditor committee member that is

aligned with the debtor is too close to the debtor or is

involved in conduct that will be reviewed by the committee, a

line may be crossed where the fairness of the bankruptcy

process is implicated.

Judge Felsenthal of this Court once said, "The bankruptcy

process must both be fair and appear fair," and he made this

statement in an opinion removing a committee member whose

conduct the committee was investigating.  That's *In re*

*Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D.

Tex. 2003).

*Venturelink* is somewhat distinguishable because the

removed committee member in that case was a former board

member that the debtor had sued for breach of fiduciary duty.

Here, the Ribmans and the Ribman Trust are not current or

former Merit Street board members or officers, and the

bankruptcy estate has not sued any Ribman party.

But Mr. Ribman, knowing of the project to get rid of TBN,

provided the persuasive messaging that Trinity in this very

trial has alleged is the kick-start of the Debtor's bad-faith

conduct that continues to this day.

1      Did Mrs. Ribman and Mr. Borden, the two Committee member

2  representatives, ever discuss Mr. Ribman's persuasive

3  messaging during Committee meetings before the Committee

4  joined with the Debtor and Peteski to argue that this case was

5  filed in good faith?

6      Did Mrs. Ribman watch the trial video where the words

7  originally penned by her husband regarding the stock swap

8  values were perceived by Mr. Crouch to be the word of the Lord

9  coming from Mr. McGraw's mouth?  If so, did that make her the

10  least bit uncomfortable, knowing that Trinity now alleges that

11  the statement was fraudulent?

12      Did Mrs. Ribman and Mr. Borden ever discuss during a

13  Committee meeting whether Mr. McGraw's secret guaranty of the

14  Ribman claim was evidence of bad faith?  Did Mrs. Ribman

15  recuse herself from any of these discussions, leaving Mr.

16  Borden to chat with himself?

17      I'm asking these questions not because I want somebody to

18  reveal confidential Committee deliberations, but because I'm

19  highlighting a fairness issue.

20      And would Mr. Borden feel free to discuss these issues

21  openly with Mrs. Ribman, knowing that Mr. McGraw flies on a

22  Hawker airplane with Mr. Ribman, specially favors the Ribman

23  Trust claim, and attempts to have secret communications with

24  the Ribmans?

25      In other contexts, courts have removed committee members

1   based on a concern that the committee member will share

2   confidential committee deliberations with somebody close to

3   the debtor.  *See, for example*, *In re Swolsky*, 55 B.R. 144, 146

4   (Bankr. N.D. Ohio 1985); *In re Daig Corporation*, 17 B.R. 41,

5   42 (Bankr. D. Minn. 1981).

6        Although *Swolsky* and *Daig* involved family connections

7   between the debtor and the committee, the same principle

8   arguably applies here, given the very close relationship

9   between Mr. McGraw and the Ribmans and given the unusual facts

10  present here.

11       What's more, Mr. Ribman's persuasive messaging is now also

12  at the core of a fraud claim by TBN against Mr. McGraw and

13  Peteski, and it also appears to be implicated in TBN's answer

14  to the Debtor's claims in the pending adversary proceeding.

15       I am not commenting on the merits of the pending fraud

16  claim and answer, but the fact is the Ribman Trust will now

17  have a role in supervising this litigation under the proposed

18  plan.  Will Mrs. Ribman and Mr. Borden have those same awkward

19  discussions when the litigation trust is pursuing or settling

20  TBN-related litigation?

21       Is this bankruptcy process fair or does it appear to be

22  fair to TBN and PBR, when Mr. McGraw has vowed to get rid of

23  and wipe out their claims, all while Mr. Ribman cheers him on

24  and the Ribman Trust sits on the Committee?

25       This line-crossing into unfairness territory is even more

significant when other facts and circumstances in the case

suggest that Mr. McGraw's influence and control extend not

only to the Committee but to other parties as well.  And I'll

cover those facts and circumstances soon.

I didn't lay out all these facts and concerns on the day

of closing arguments when I asked Ms. Young of the U.S.

Trustee Office her thoughts on the Committee composition.  Ms.

Young was pinch-hitting for Mr. Bublick, and at that time she

relayed the U.S. Trustee position that the Committee

adequately represents the interests of unsecured creditors,

even with the Ribman Trust on the Committee.

With this additional information I've provided for the

first time, I hope the U.S. Trustee understands why I've had

so much heartburn over this issue, why I believe the Ribman

Trust should not be on the Committee, and why, if the plan

were confirmed, it would be equally or even more inappropriate

for the Ribmans to sit in judgment of the estate's litigation

with PBR, and especially TBN, against whom the Ribmans are

adverse and conflicted and by whom they may even be called as

witnesses.

I'll conclude my discussion of the Ribmans by cautioning

that I am not relying on the Committee composition as cause to

either convert the case to Chapter 7 or appoint a Chapter 11

trustee.  But I will consider the role of the Ribmans on the

Committee and under the proposed plan when I weigh many

1   factors in deciding what to do after finding cause.

2   D.   I'm now going to talk about the bankruptcy filing and DIP

3   financing and discovery issues.

4       After the Debtor filed for Chapter 11 relief on July 2nd,

5   it let go most of its employees immediately.  There were some,

6   albeit minimal, operations ongoing, and only a handful of

7   employees left.  The budget presented at the first-day hearing

8   reflected that zero revenues were expected during the case.

9       The Debtor quickly filed its first-day motions, including

10  a DIP financing motion.  Although such a motion is, of course,

11  routine in many Chapter 11 cases, there was at least one

12  unorthodox part of the DIP financing motion:  The DIP Lender,

13  Peteski, indicated that it would not fund a second draw under

14  the DIP loan unless and until it received a favorable ruling

15  on the Debtor's preference claim against TCT, an affiliate of

16  TBN, contained in a six-count postpetition adversary

17  proceeding that was filed against TBN and TCT even before any

18  substantive motions were filed in the main bankruptcy case.

19  *See* Adversary Proceeding No. 25-8006.  This is the lawsuit

20  that Mr. McGraw, late on July 1st, worked on with Mr. Babcock

21  and promised that he would file shortly after midnight.  He

22  delivered on his promise.

23      The Court, Judge Jernigan presiding, granted interim DIP

24  financing relief, and based on Peteski's uncustomary condition

25  for the next DIP financing draw, the Court scheduled the next

1    DIP financing hearing and a summary judgment hearing on the

2    preference claim less than a month later, on July 29th.  The

3    Court has no qualms with Judge Jernigan's scheduling of those

4    combined matters on that time frame, given the landscape and

5    record at the time, including Peteski's unorthodox DIP

6    financing condition.

7        As often happens in bankruptcy, however, facts and

8    circumstances change, and Peteski's uncustomary DIP financing

9    condition soon tripped up the Debtor.  Trinity filed a motion

10   requesting dismissal of the case, conversion of the case to

11   Chapter 7, or appointment of a Chapter 11 trustee.  That's at

12   Docket 100.  That motion alleged several causes for relief,

13   including that the bankruptcy was filed in bad faith, that the

14   estate needed a non-conflicted, independent fiduciary, and

15   that the case was filed without proper corporate authority.

16       PBR partially joined in Trinity's motion, preferring

17   conversion over dismissal, and also listing several causes for

18   relief, including the need for an independent and

19   disinterested trustee, and continuing loss to or diminution of

20   the estate and the absence of a reasonable likelihood of

21   rehabilitation.  That's at Docket No. 151.

22       The Court has since reminded the parties more than once of

23   the urgency of determining the authority-to-file issue, given

24   Fifth Circuit precedent holding that a bankruptcy case must be

25   dismissed if it was filed without proper corporate authority.

1   *See Franchise Services of North America*, 891 F.3d 198, 206–07

2   (5th Cir. 2018).

3       Trinity then requested a continuance of the July 29th

4   preference hearing and DIP financing hearing, arguing that it

5   needed discovery for its motion to dismiss, convert, or

6   appoint a trustee.

7       At a July 22nd continuance hearing, when Peteski's

8   unorthodox DIP financing condition was still in place, all

9   parties agreed that it made sense to try the motion to dismiss

10  and preference count at the same time.  *See* Transcript of

11  Hearing Held July 22, 2025, Docket No. 144 at Pages 27 and 28.

12  After all, if there's no bankruptcy case, there's no

13  preference.

14      After a back-and-forth discussion where the Court probed

15  the positions of the parties, including Trinity's and PBR's

16  persuasive arguments that they needed more time to obtain

17  discovery, the Court selected the already-scheduled Merit

18  Street omnibus hearing date of August 19th.  It should have

19  been clear to the Debtor and Peteski, based on the Court's

20  ruling and based on the tight schedule, that Trinity and PBR

21  were entitled to timely production of discovery, not only for

22  the DIP financing motion but also for the competing motions of

23  Trinity and PBR.

24      Unfortunately, Trinity and PBR had trouble getting the

25  discovery they requested, with PBR first filing a motion to

1  compel and a motion to expedite.  Docket Nos. 173 and 174.

2  Trinity later filed a joinder to PBR's motion to compel at

3  Docket No. 206.

4      At an August 8th status conference on those matters, I

5  became concerned that at least one attorney for Peteski was

6  purposefully not cooperating in the production of discovery

7  for the conversion, trustee, and dismissal motions, but I

8  asked the parties to continue conferring before having to set

9  the motion to compel.  *See* Transcript of Hearing Held August

10  8, 2025, Docket No. 223, at Pages 42 and 43.

11      The conferral process stalled, so at an August 14th

12  hearing on Trinity's and PBR's respective motions to compel,

13  the Court overruled the remaining unresolved objections of the

14  Debtor and Peteski to the discovery requests and ordered

15  production by August 22nd.  Transcript of Hearing Held August

16  14, 2025, Docket No. 231, at Pages 14, 19, 25, and 31.  *See*

17  Docket No. 536.

18      In the Court's view, very few, if any, of the discovery

19  rulings were particularly close calls.  And notably, not until

20  August 11th at 11:05 p.m., in Footnote 8 of one of the

21  Debtor's discovery-related responses, did the Debtor notify

22  the Court that Peteski was no longer sticking to its

23  unorthodox DIP financing condition.  That's at Docket 192.

24      With the August 19th hearing looming, and with much of the

25  ordered discovery still outstanding, Trinity and PBR filed an

1   emergency continuance motion that I granted from the bench on

2   August 15, thus pushing the trial to September 2nd.  I

3   memorialized my ruling in a written order found at Docket No.

4   248.

5       The discovery battles continued.  Peteski filed a motion

6   to compel against PBR, which I partially granted at an August

7   25th hearing.  *See* Transcript of Hearing Held August 25, 2025,

8   Docket No. 333 at Page 22.

9       Then things took a darker turn when Trinity filed on

10  August 26th an emergency motion for contempt and sanctions,

11  alleging, among other things, that not all of Mr. McGraw's

12  text messages and emails had been produced, even though the

13  time for production had passed and Mr. McGraw's deposition was

14  scheduled just two days later, on August 28th.  *See* Docket No.

15  303.

16      On August 27th, Peteski filed a response to the sanctions

17  motion, alleging, in bold and italicized letters, "As of this

18  filing, Peteski's production is complete."  That's Docket No.

19  310, Paragraph 1.

20      But at the August 28th hearing, I found out that the

21  production was not exactly complete.  Mr. Moore, counsel for

22  Trinity, showed the Court three documents that were produced

23  by Peteski's counsel for the first time on August 26th.

24  Transcript of Hearing Held August 28, 2025, Docket No. 373 at

25  Page 18.

1       One was by far the most troubling.  It was a text thread

2   between Mr. McGraw and Phil McIntyre, Mr. McGraw's longtime

3   business consultant and advisor, spanning July 1st and 2nd,

4   2025.  That's at TBN Exhibit 330.

5       In that text thread, Mr. McGraw said, "What I sent to

6   Jamie:" and he cut-and-pasted the McGraw-Ribman text thread

7   from July 1st that I described earlier, the one where Mr.

8   McGraw promised to wipe out the PBR claim and guaranteed the

9   Ribman claim.

10      The problem is that neither Peteski nor the Debtor ever

11  produced the original unflattering text message from Mr.

12  McGraw to Mr. Ribman.  The only reason I know about it is

13  because it was cut-and-pasted into the McGraw-to-McIntyre

14  text, which was produced.  Later, I learned that a lengthy

15  text thread between Mr. McGraw and Mr. Ribman from July 1st

16  was produced, but curiously absent from that thread was the

17  unflattering message I've talked about at length.  PBR Exhibit

18  231.

19      In other words, you can tell from the chronological order

20  of the July 1st text thread between Mr. McGraw and Mr. Ribman

21  that was produced that the unflattering message Mr. McGraw

22  sent is missing.  It appears that the unflattering portion of

23  the text had been deleted from Mr. McGraw's phone before the

24  rest of the text thread was produced.

25      Neither Peteski nor the Debtor nor anybody else ever

1    provided a satisfactory explanation of the missing text, and

2    Mr. McGraw's testimony at trial professing not to know what

3    happened to the missing text was not credible.

4        I find, based on all the evidence, that Mr. McGraw deleted

5    the unflattering text message after the bankruptcy petition

6    date because he didn't want me to see it.

7        I've spent a significant amount of time reviewing the

8    deleted July 1st text message and all the related evidence to

9    determine in what capacity Mr. McGraw was acting when he

10   deleted it.  He does not appear to have been acting in his

11   capacity of Peteski, the DIP Lender, or even Peteski, the

12   shareholder.  Instead, Mr. McGraw appears to have been acting

13   in significant part in his capacity as a member of the board

14   of Merit Street, or a *de facto* officer or agent of Merit

15   Street, describing his control over the Debtor and his plan to

16   file bankruptcy to wipe out the PBR claim and sue TBN.

17       He also noted that "our" claim against PBR will survive,

18   that the bankruptcy filing will free "us" from TBN debt, and

19   that the two biggest assets are "OUR claims" against TBN and

20   PBR.  These are all references to the Debtor.

21       Mr. McGraw then described the largest claims in the case,

22   including the Ribman claim, previewing the Ribmans' appearance

23   on the Committee.

24       Mr. McGraw, as a board member or *de facto* officer or agent

25   exercising control over the Debtor and strategizing with a

creditor about the bankruptcy filing had a duty to turn over that text message pursuant to my order compelling production, which memorialized my August 14th bench ruling.  *See* Docket No. 536.

My order compelling production is directed to both Peteski and the Debtor, so it should have been produced no matter in what capacity he created and maintained the text message.  But again, at least part of the duty of production was his duty as a board member or *de facto* officer or agent of the Debtor.

Finally, there is ample evidence that Mr. McGraw used cell phone text messages to conduct business for Merit Street.  There are too many in evidence to count.  Those text messages contain in part the Debtor's business records.  One of those business-related text messages was the one he purposefully deleted.

Mr. McGraw also had a duty, separate and apart from any specific order compelling production or general discovery rules, not to destroy property of the estate.  The text message itself, a communication with a creditor describing the Debtor's litigation and bankruptcy strategy, is property of the estate, no matter who owned the physical phone or who paid for the phone data service.  *See Torch Liquidating Trust v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009), which interprets the phrase "all legal or equitable interests" in Bankruptcy Code Section 541 broadly.

1    *See also In re Correra*, 589 B.R. 76, 124 (Bankr. N.D. Tex.

2    2018), where the Chapter 7 debtor and his former personal

3    assistant spoliated evidence in violation of discovery rules

4    by not preserving computer and computer records.  The court

5    noted that "This is not a mere discovery dispute at this

6    point; rather, this dispute involves an act of intentional

7    destruction of property of the estate and an overt effort to

8    make records of the debtor inaccessible."

9    *See also In re CTLI, LLC*, 528 B.R. 359, 368 (Bankr. S.D.

10   Tex. 2015), concluding that a debtor firearms company and not

11   the former majority owner owned a firearms Facebook page when,

12   among other things, many but not all of the former owner's

13   posts were business-related and he spoke for the store with

14   phrases like, "On behalf of myself and the Tactical Firearms

15   family."

16   Finally, *see also In re Advanced Modular Power Systems*,

17   413 B.R. 643, 667 (Bankr. S.D. Tex. 2009), holding that

18   property of the estate includes assets such as goodwill, phone

19   numbers, and other similar intangible property.

20   When I consider the entirety of the evidence in this case,

21   some of which I have yet to describe, I find that Mr. McGraw

22   has exercised influence and control over the Debtor since the

23   bankruptcy filing in his capacity as a board member or *de

24   facto* officer or agent, notwithstanding the appointment of Mr.

25   Broadbent as CRO and Independent Director.

1    Finally, counsel for Peteski noted at trial that the text

2    message at issue was produced, because it was cut-and-pasted

3    into a different text thread between Mr. McGraw and Mr.

4    McIntyre that was produced.

5    I have two responses to that.  First, kudos to Peteski's

6    counsel for producing the unfavorable cut-and-pasted copy.  My

7    comments related to the deleted text are not directed to

8    Peteski's counsel.

9    Second, that Mr. McGraw apparently forgot to delete the

10   cut-and-pasted version from the McGraw-McIntyre text thread

11   does not excuse Mr. McGraw's destruction of the original

12   version in the McGraw-Ribman text thread, which I have found

13   he did on purpose so that I wouldn't see it.

14   E.  Now let me rewind a little bit and talk about the abrupt

15   attempt to dismiss the case in mid-August.

16   On August 14th, I ruled from the bench that Peteski had

17   until August 22nd to produce text messages and emails and

18   other responsive documents.  On August 18th, the Debtor

19   abruptly filed a request to consent to dismissal and Sidley

20   filed a motion to withdraw as counsel, and they set both

21   requests for emergency hearing on August 19th, just three days

22   before my August 22nd deadline to produce documents, including

23   Mr. McGraw's texts and emails.

24   Keep in mind that at this time on August 19th I was not

25   yet aware of the purposefully-deleted text message, which was

1    first produced on August 26th and which Mr. Moore first

2    brought to my attention on August 28th.

3        At the August 19th hearing, I first heard the emergency

4    request by the Debtor to consent to dismissal.  In a nutshell,

5    the Debtor's counsel argued that I should dismiss the case

6    immediately because of continuing unpaid professional fees,

7    and that dismissal was preferable to conversion because it

8    would allow the Debtor to allegedly maintain a going concern

9    business with management and employees who could shepherd the

10   process on an out-of-court basis.

11       That explanation struck me as odd at the time since there

12   wasn't a going concern business.  The Debtor fired nearly all

13   its employees on the first day of the case.  I was concerned

14   that the Debtor simply wanted to file bankruptcy somewhere

15   else to try to get different rulings.

16       During closing arguments at trial, Mr. Strubeck for the

17   Committee expressed surprise that the Committee supported

18   dismissal over conversion at the August 19th hearing.  I was

19   equally surprised when it happened, and some of the reasons

20   the Committee provided at the hearing to support dismissal

21   over conversion gave me pause.

22       Mr. Wilkes said that dismissal would give creditors

23   optionality.  One option he mentioned was for creditors to

24   file, after dismissal, an involuntary petition against the

25   Debtor.  I found that suggested option very concerning,

1   because it would have allowed creditors friendly to Mr. McGraw

2   to file the petition in another jurisdiction, potentially

3   freeing the Debtor and Peteski of my orders compelling them to

4   produce emails and text messages, many of which I now believe

5   Mr. McGraw didn't want me to see.

6       Indeed, as I'll discuss later, Mr. Broadbent admitted when

7   I questioned him at trial that a dismissal in mid-August would

8   have freed him to decide whether to give me or another judge

9   another bite at the apple, which was a diplomatic way of

10  saying he wanted to file bankruptcy somewhere else because he

11  didn't like my DIP loan and discovery rulings.  *See* Transcript

12  of Hearing Held September 17, 2025, Docket No. 469 at Page

13  219.

14      Dismissal on August 19, followed by an involuntary

15  elsewhere, also could have truncated inquiry into whether the

16  case was filed in good faith or whether it was being

17  prosecuted in good faith and for the benefit of all creditors

18  with either Mr. McGraw or Mr. Broadbent or both at the helm.

19      It was also unexpected for the Committee to suggest, after

20  all the time we spent trying to get to a hearing on

21  conversion, dismissal, or appointment of a trustee, despite

22  Peteski's discovery failures, that the parties should now

23  start that process all over again in a new case.  Although Mr.

24  Wilkes suggested that the issue of corporate authority to file

25  the bankruptcy could have been obviated in an involuntary

1    case, that issue, although significant, was but one of many

2    issues that were well on their way to resolution when the

3    Debtor abruptly sought dismissal.

4        According to Mr. Wilkes, dismissal of the case would also

5    give creditors the second option, to simply negotiate

6    settlement and payment of their claims outside of bankruptcy.

7    With 20/20 hindsight, that suggestion seems especially

8    curious.

9        I want to say I have no reason to believe that Mr. Wilkes

10    or the other Committee counsel knew about the deleted text at

11    that point on August 19th, because Mr. Moore first raised it

12    at an August 28th hearing, but the Ribmans and Mr. McGraw

13    certainly were aware of the text that vowed to wipe out the

14    PBR claim and to pay the Ribman claim no matter what the Court

15    does, and there's no question that both the Debtor and Peteski

16    were in the process of reviewing responsive texts and emails,

17    given my August 22nd production deadline.

18        Dismissal on August 19th would have been a free pass to

19    Mr. McGraw to pay his favored creditors like the Ribmans and

20    not pay his disfavored creditors like PBR, and it would have,

21    just in the nick of time, excused the obligation to turn over

22    the text message thread with Mr. Ribman that Mr. McGraw tried

23    to deep-six.

24        Finally, in support of dismissal, Mr. Wilkes also said he

25    believed there likely would be no recovery for unsecured

1   creditors in a Chapter 7 after considering administrative

2   expenses.  It's difficult to see how the Committee could have

3   been confident in that position at that stage of the case,

4   even with mounting administrative expenses.

5       But in any event, I thought it was strange for the

6   Committee to take this position on immediate dismissal when I

7   hadn't heard a shred of evidence yet on a significant

8   unsecured creditor's motion to convert, which had been pending

9   for nearly three weeks.

10      After carefully considering the arguments of all parties,

11  I denied the emergency request, in part because there was

12  still an open issue on corporate authority that needed to be

13  resolved, because there were still documents that hadn't been

14  produced, and because dismissal would deprive PBR of the

15  opportunity to present its request to convert the case, which

16  had been on file since August 1st.

17      I then heard Sidley's emergency motion to withdraw as

18  counsel, which alleged that Sidley couldn't continue to

19  represent the Debtor without incurring unreasonable financial

20  burden and risk.  I denied that request as well, in part

21  because Sidley attorneys were at least partly responsible for

22  depositions that had to be retaken and documents that at least

23  initially were not produced, and because Sidley could not

24  explain how replacement counsel, who was never identified,

25  could possibly handle all the discovery obligations that would

1  be dropped in their lap and still be prepared for the

2  scheduled trial on September 2nd.

3       I concluded the hearing thinking to myself that the

4  proffered explanations for why the Debtor suddenly sought

5  dismissal and why Sidley suddenly sought to withdraw didn't

6  quite make sense.

7  F.   Now I'm going to talk about Debtor employees working for

8  Mr. McGraw and Envoy after the bankruptcy filing.

9       This is not the first bankruptcy case I've seen, either on

10  the bench or in private practice, where an insider proposes to

11  purchase a debtor's assets out of a bankruptcy.  But in the

12  other cases I've been involved with, scrupulous attention was

13  paid to avoiding any appearance that the process was being run

14  by or for the benefit of the insider.

15       But it goes beyond just appearances.  The process should

16  not, in fact, be run by or for the benefit of the insider, who

17  is clearly self-interested.

18       And in all my years of private practice and my three and a

19  half years on the bench, I have never seen a case where a

20  debtor's officers and employees were, in fact, working for the

21  insider's newly-created company that plans to acquire what's

22  left of the debtor's assets in the bankruptcy.  I've never

23  seen it until this case, that is.

24       Take, for example, TBN Exhibit 416, which is a draft Envoy

25  press release dated July 14, 2025, the title for which is "Mr.

1  McGraw Launches Envoy Media Company, A New Interactive News

2  and Entertainment Multimedia Platform."

3       Jerry Sharell, a public relations agent, the same one Mr.

4  McGraw tasked a year earlier with drafting a press release of

5  his anticipated self-professed gangster move against TBN,

6  circulated the draft on July 13th to Mr. McGraw and Mr.

7  McGraw's core team:  Ken Solomon, the Debtor's Chief Executive

8  Officer; Joel Cheatwood, the Debtor's Chief Operating Officer;

9  Phil McIntyre, Mr. McGraw's close personal advisor and

10  business consultant; and Mr. Broadbent.

11      Mr. McGraw did a "reply all" the same day, quarterbacking

12  the proposed launch date and commenting on a national

13  distribution from launch.  Interestingly, Mr. McGraw added,

14  "Gary, of course, will sign off on everything or make edits."

15  Mr. McGraw thus seems to have been under the impression that

16  part of Mr. Broadbent's job as CRO of Merit Street was to

17  simply sign off on Envoy press releases or edit them.

18      An appropriate response from the Debtor's CRO would have

19  been to ask to be taken off the email chain, as the Debtor's

20  CRO had no business signing off on Envoy press releases or

21  acting as Envoy's editor.  Instead, Mr. Broadbent replied all

22  with, "Press release looks great!"  That's TBN Exhibit 416.

23      At trial, Mr. Broadbent attempted to justify his response

24  by saying that he knew the transaction was going to be

25  scrutinized so it was better to have Merit Street informed of

1    what was going on at Envoy rather than be taken by surprise.

2    That's Transcript of Hearing Held September 17, 2025, Docket

3    No. 469 at Page 118.

4        That explanation was not credible.  Unfortunately, I find

5    that Mr. Broadbent was simply doing Mr. McGraw's bidding for

6    Envoy, when he should have pushed back instead and kept his

7    distance.  Mr. Solomon and Mr. Cheatwood likewise should have

8    bowed out of that email discussion, since at the time they

9    were solely employees of Merit Street.

10        There are other examples, such as Mr. Cheatwood creating

11    staffing plans for Envoy while an officer of Merit Street,

12    negotiating salaries for Envoy employees, setting up Envoy

13    bank accounts, setting up Envoy domain names, negotiating a

14    MediaCo lease, and addressing MediaCo facility matters.  *See*

15    Transcript of Hearing Held September 22, 2025, Docket No. 516

16    at Pages 66, 67, 70 and 71, 77, and 88.

17        Mr. Cheatwood's general testimony, including his proffered

18    explanations, including that Merit Street wasn't harmed, was

19    not entirely credible, as I lost count how many times he was

20    impeached with his prior deposition testimony.

21        Finally, near the end of July, somebody must have told Mr.

22    Cheatwood to back off, at least publicly, the work for Envoy,

23    as he noted in a July 28th text message, "My dilemma is this.

24    As a remaining officer of MSM, I've been advised not to do

25    anything public to indicate an attachment to Envoy.  That's

1    about to change, but as yet hasn't."  That's TBN Exhibit 498.

2         The thing that evidently was about to change was that Mr.

3    Cheatwood and Mr. Solomon finally signed consulting agreements

4    with Envoy on August 2nd, making their allegiance to Envoy

5    public and official rather than secretive.  *See* Transcript of

6    Hearing Held September 17, 2025, Docket No. 469 at Page 204.

7         To put it charitably, it wasn't the greatest business

8    judgment for Merit Street officers Broadbent, Cheatwood, and

9    Solomon to work for Envoy while simultaneously contesting

10   allegations from TBN and PBR that the Debtor's CRO and other

11   officers are conflicted and attached at the hip to Mr. McGraw.

12        Could I do a quick sound check?  I'll take anybody.  Mr.

13   Moore?  Mr. Bankler?

14             MR. BANKLER:  We can hear you.

15             MR. RUDD:  Yes, we can hear you, Your Honor.

16             THE COURT:  All right.  Thank you.

17        Unfortunately, Mr. Broadbent's credibility and his

18   professed independence from Mr. McGraw and Peteski took an

19   even more serious and abrupt hit when I asked Mr. Broadbent

20   some simple and direct questions near the end of his testimony

21   at trial on September 17th.

22        After noting the benefits of a Chapter 7 bankruptcy,

23   including an automatic stay, centralized litigation, and 363

24   sales, over the free-for-all of dismissal, I asked Mr.

25   Broadbent why he thought dismissal was preferable to

1    conversion to Chapter 7, as he previously testified.  Mr.

2    Broadbent admitted that a dismissal would free him to give

3    another judge another bite at the apple, which was another way

4    of saying he wanted to file bankruptcy elsewhere to get a

5    judge who might give him different rulings on the DIP loan and

6    discovery matters.  Transcript of Hearing Held September 17,

7    2025, Docket No. 469 at Page 219.

8        That answer heightened my concern that Mr. Broadbent might

9    be yielding to a demand from Mr. McGraw to dismiss the case to

10   protect Mr. McGraw's personal interests, rather than put the

11   bankruptcy estate in the hands of a neutral trustee.

12       I then asked him some questions about the abrupt attempt

13   to dismiss the case in mid-August and whether he communicated

14   with Mr. McGraw about whether to dismiss or convert the case

15   at that time.  As I was asking Mr. Broadbent these questions,

16   I was laser-focused on his demeanor.  He became increasingly

17   uncomfortable answering the questions, and there were pregnant

18   pauses during his answers.  One of those pauses is even noted

19   in the transcript.  I could tell that he did not want to

20   answer the questions.  I'm going to quote the exchange now:

21       "Q   I know they're -- I understand, but you rank

22       dismissal above conversion to Chapter 7?

23       "A   Yeah, I would.

24       "Q   Okay.  And so earlier in the case, there was a

25       request to consent to the dismissal.  Do you remember

1    that?

2    "A   Yeah.

3    "Q   And that's kind of where I'm headed with this.  I

4    was a little perplexed why the Debtor was consenting to

5    a dismissal at that point as opposed to converting to

6    Chapter 7.  Did Mr. McGraw consult with you or did you

7    talk with him about that consent to dismissal?

8    "A  I don't think so.  I'd have to look at the board

9    meetings, but I know I talked a lot with our

10    restructuring advisors on that.  I --

11    "Q   Was there communication between Mr. McGraw on his

12    side and you on the other side regarding dismissal

13    versus conversion?"

14    (Pause).  And the transcript reflects the word "pause."

15    "THE WITNESS: I don't remember one.  I remember talking

16    to our restructuring advisors, but I don't remember

17    them channeling any message from Mr. McGraw."

18    "BY THE COURT:

19    "Q   Are you aware of any communications between Mr.

20    McGraw, Peteski on the one hand, and either you or your

21    professionals about whether it would be better to

22    consent to a dismissal versus convert to a 7?

23    "A   I think the advice that we -- that I received from

24    our advisors --

25    "Q   So I don't want -- I'm not trying to get into

1    privileged communication, so I don't want to know what

2    your lawyers --

3    "A    Sure.

4    "Q    I'm   asking,   do   you   know   if   there   were

5    communications between you and your counsel on the one

6    hand   and   Mr.   McGraw   and   his   counsel   or   other

7    restructuring  advisors  on  whether  it  was  better  to

8    dismiss the case or convert it to a 7?

9    "A    I don't know.   I don't know if they -- I'm sure

10   they talked about it, but I don't know the content of

11   those conversations.

12   "Q    You are sure that they talked?

13   "A    I guess I should be more careful with my words.   I

14   presume  that  they  talked,  but  I  don't  know  what  was

15   said between them."

16   That's Transcript of Hearing Held September 17, 2025,

17   Docket No. 469, Page 220, Line 19, through Page 222, Line 8.

18   Mr. Moore for TBN then jumped out of his chair at

19   lightning speed and proceeded to impeach Mr. Broadbent, whose

20   demeanor changed instantly and suggested he knew he had just

21   been busted.  Mr. Moore first started with these questions:

22   "BY MR. MOORE:

23   "Q    All right, Mr. Broadbent.   Did the Debtor's Board

24   of Directors have a meeting on August 17, 2025, where

25   voluntary dismissal was discussed?

1       "A    We may have. I'm not sure. I can't remember.

2       "Q    Okay.    And   was   Mr.   McGraw   present   for   that

3       meeting?

4       "A    I'm not sure.

5       "Q    Was Jackson Walker present for that meeting?

6       "A    I don't know."

7       Transcript of Hearing Held September 17, 2025, Docket No.

8  469 at Page 223.

9       Mr. Broadbent's answers were abrupt and defensive, and his

10  sudden memory lapses that started with some of my questions

11  and continued with Mr. Moore's questions were completely at

12  odds with his earlier trial testimony, where Mr. Broadbent

13  exhibited a vast and impressive knowledge and memory of

14  detailed events, both prior to and during the bankruptcy.

15      Mr. Moore then showed Mr. Broadbent TBN Exhibit 532, which

16  are minutes of a meeting of the Board of Directors of Merit

17  Street dated August 17, 2025, just one month before Mr.

18  Broadbent's trial testimony.  The minutes reflect that it was

19  a large and robust meeting.  The board members present were

20  Mr. Broadbent and Mr. McGraw.  The minutes reflect many others

21  participating as well:  four attorneys from Sidley attended;

22  four attorneys from Jackson Walker attended; four

23  representatives of Portage, the Debtor's financial advisor,

24  attended, including Coley Brown, who testified at trial about

25  the Debtor's liquidation analysis; and Ken Solomon, the

1   Debtor's CEO, and Joel Cheatwood, COO, also attended.

2        According to the minutes, the video-teleconference meeting

3   started at 3:00 o'clock p.m. and lasted a full hour.  I'm

4   going to quote the minutes at length:

5        "Upon the presence of a quorum of the Board, Mr. Venter

6   began by providing an overview of certain materials attached

7   hereto as Exhibit A (the "Discussion Materials").  Mr. Venter

8   recounted the rulings of the bankruptcy court since the last

9   board meeting and described their potential impact on the

10  Company's pursuit of a value-maximizing Chapter 11 process.

11  Questions were asked and answered, and a discussion ensued.

12  The Board concluded that a path forward under Chapter 11 had

13  become increasingly infeasible in light of recent court

14  rulings.

15       "Mr. Venter then provided an overview of the mechanics and

16  merits of a hypothetical (i) dismissal of the Company's

17  Chapter 11 case, and (ii) conversion of the Company's Chapter

18  11 case to a case under Chapter 7.  Questions were asked and

19  answered, and a discussion ensued regarding the relative

20  merits of each option, with the Board weighing the (i) the

21  flexibility each option afforded the Company to react to

22  unforeseen developments, and (ii) the estimated return to

23  creditors under each option.  The Board expressed support for

24  dismissal of the case.

25       "II.  Adjournment.  There being no further business to

1  come before the Board, the meeting was adjourned at 4:00

2  o'clock p.m. Eastern Time."

3       One of the slides attached to the Discussion Materials

4  that were attached to the minutes is called "Voluntary

5  Dismissal," which is followed by redactions for a claim of

6  privilege.  Although Mr. Broadbent testified that he didn't

7  think they went through the Discussion Materials attached to

8  the minutes with Mr. McGraw in the room and that they went

9  through those Discussion Materials only in a Special Committee

10  meeting after the full board meeting, his testimony was not

11  credible and is contradicted by the board minutes themselves.

12       Mr. Ducayet tried to salvage the situation by asking Mr.

13  Broadbent whether, having now read the minutes, he remembered

14  Mr. McGraw or Jackson Walker making any sort of direction to

15  him about whether to seek dismissal or seek conversion.  Mr.

16  Broadbent, who just minutes before when I questioned him

17  denied having any discussion with Mr. McGraw and his

18  professionals about conversion or dismissal, and then

19  alternatively not remembering one, suddenly answered with a

20  definite and firm conviction:

21       "A   Absolutely not, no.

22       "Q   Who made that decision?

23       "A   I did."

24       *See* Transcript of Hearing Held September 17, 2025, Docket

25  No. 469 at Page 228.

1        Mr. Ducayet then went on to show Mr. Broadbent Debtor's

2   Exhibit 80, which are the minutes of the meeting of the

3   Special Committee of the Merit Board, which met immediately

4   after the full board meeting.  The minutes reflect that Mr.

5   McGraw and the Jackson Walker attorneys were not in that

6   meeting, but the minutes also explicitly state that Mr.

7   Broadbent considered the input of the full board -- that is,

8   Mr. McGraw.

9        Now, with Mr. Ducayet's prompting, Mr. Broadbent recalled

10  very specifically and without hesitation that, after the

11  discussion at that Special Committee meeting, he wanted to

12  seek dismissal because of the lack of funding to pay

13  increasing administrative expenses.

14       The whole episode was very disappointing to me, and I'll

15  repeat what I said at closing arguments:  I lost sleep over

16  Mr. Broadbent's testimony, and I've lost sleep writing this

17  part of my ruling, which I didn't enjoy or appreciate having

18  to write.

19       The full board meeting on August 17th, exactly one month

20  before Mr. Broadbent's September 17th trial testimony, would

21  have been one of the most memorable events of the case, if not

22  the most memorable.  It was a stressful time not only for me,

23  but for the parties and the attorneys as well, as both the

24  Sidley law firm and the Jackson Walker law firm made it clear

25  they were exasperated that I would only consider further

interim DIP financing to pay necessary operating expenses and

not to prefund attorney fee accounts before we reached

resolution on the motions to dismiss, convert, or appoint a

trustee.

The August 17th board meeting was such a drastic event

that it prompted not only an emergency request to dismiss the

case, but also an emergency backup request by Sidley to

withdraw as counsel, both of which were heard on August 19th.

In short, the dramatic August 17th board meeting, the very

purpose of which was to discuss dismissal versus conversion,

was an event that an intelligent, experienced, and competent

CRO would not forget in one month, or a year, or even ten

years.  Yet on September 17th, when I asked Mr. Broadbent

directly whether he ever had such a communication, he first

denied it and then said he couldn't remember.

I've always considered myself a straight shooter.  I don't

always ask questions on the bench, but when I do, I don't

think it's expecting too much to expect straight answers, and

I didn't get them from Mr. Broadbent.

When I consider Mr. Broadbent's demeanor while testifying,

the subject of his testimony, and the memorable events leading

up to his testimony, I find that Mr. Broadbent's testimony did

not satisfy the duty of candor that he has to the Court.  For

some reason, when put under the spotlight, Mr. Broadbent

thought it was more important to shield from the Court his

1   communications with Mr. McGraw regarding the emergency request

2   to dismiss the case.

3       Further, his testimony regarding the full board meeting

4   and the Special Committee meeting throws a shadow of doubt

5   over all his trial testimony, including that involving his

6   independence from Mr. McGraw and his apparent work for Envoy

7   after the bankruptcy filing.

8       Before I turn to my legal conclusions, I'll finish this

9   background discussion by noting that, even after retaining Mr.

10  Broadbent as CRO, Mr. McGraw continued to make Alexander Haig-

11  like statements, asserting control over the bankruptcy and the

12  litigation against TBN.  At trial, Mr. McGraw testified, "My

13  attitude is you don't — you don't hire a brain surgeon and

14  then hold a mirror to see if you can coach him through doing

15  it."  Transcript of Hearing Held September 25, 2025, at Page

16  44, Docket No. 524.

17      That testimony was not credible.  There are numerous

18  examples after Mr. Broadbent was retained as CRO of Mr. McGraw

19  purporting to call the shots rather than the other way around.

20  Here are a few:

21      Mr. Cheatwood stated that "Dr. Phil led the [June 24th or

22  25th] discussion [about whether to file bankruptcy], along

23  with the attorneys from Jackson Walker."  Transcript of

24  Hearing Held September 22, 2025, Docket No. 516 at Page 17.

25      When asked if Mr. Cheatwood's testimony about the June

1   24th or 25th discussion was accurate, Mr. McGraw said, "You

2   can take it as gospel."  Transcript of Hearing Held, September

3   25, 2025 [Court correction], Docket No. 523 at Page 154.

4        When Mr. Cheatwood asked Mr. McGraw if he still wanted to

5   "talk to the talent tonight in advance of tomorrow's all

6   hands," -- the meeting where Merit Street fired almost all of

7   the remaining Merit Street employees -- Mr. McGraw said, "I

8   still have to write our pleading.  You talk to the talent,

9   please."  TBN Exhibit 320.

10       "I am filing suit against TBN at 12:01 a.m., as in three

11  hours from now."  TBN Exhibit 330.

12       "I am also filing Chapter 11," which will "wipe out PBR's

13  claim against MSM, but our claim against them will survive."

14  TBN Exhibit 330.

15       Mr. McGraw told Judge Aquilina on July 4th that "I filed

16  suit," "I also then filed Chapter 11," and more.  TBN Exhibit

17  373.

18       Mr. McGraw made those same statements to Former NYPD Chief

19  John Chell on July 4th, and that's found at PBR Exhibit 282.

20       During his direct examination by Mr. Secco, Mr. McGraw

21  attempted to explain away his usage of the pronoun "I" in the

22  context of filing suit against TBN and filing bankruptcy on

23  behalf of the Debtor.  Mr. McGraw stated, "When I'm writing to

24  my friends like this, who are not sophisticated in these

25  matters or interested in a lot of the legalese, they're just

1  interested in my experience in this, I'm explaining to them

2  where I am and how I feel about this.  I was speaking about

3  this from a personal experience rather than breaking it down

4  into this entity to that entity to this entity."  Transcript

5  of Hearing held September 25, 2025, Docket No. 530 at Page 26

6  and 27.

7      But one of these friends Mr. McGraw was communicating with

8  was a sitting judge who would certainly understand the

9  legalese.

10     Mr. McGraw's explanation for his usage of the pronoun "I"

11 in the context of these statements is not credible, especially

12 when I consider the rest of the evidence from trial.  Mr.

13 McGraw believed he was calling the shots.

14                          ANALYSIS

15     All right.  Now to the analysis part of my ruling.  Before

16 I turn to my ruling, let me first address a timing issue.

17 Bankruptcy Code Section 1112(b)(3) requires that I decide the

18 motion to convert or dismiss not later than 15 days after the

19 commencement of the hearing unless the movants expressly

20 consent to a continuance for a specific period of time or

21 compelling circumstances prevent the Court from meeting the

22 time limits established in Section 1112(b)(3).

23     Compelling circumstances prevented me from meeting this

24 time limit.  Those compelling circumstances include the length

25 and complexity of the multiday trial itself, an unusually busy

1    court schedule in my other cases recently, and an out-of-town

2    family medical emergency that put me behind several days.

3    Some of the matters I prepared for, or ruled on, or both,

4    while I was either preparing for the Merit Street trial,

5    conducting the Merit Street trial, or working on a ruling on

6    the Merit Street trial, include the following:

7         I gave a 29-page, 157-paragraph oral ruling in mid-

8    September on Phase I of the Hooters confirmation hearing,

9    dealing with a complicated royalty dispute with a significant

10   creditor.

11        I conducted an eight-day confirmation trial in the Stoli

12   Vodka/Kentucky Owl cases, including a 12-page, 69-paragraph

13   oral ruling from the bench on October 3.

14        I prepared for and took under advisement two significant

15   and complicated Rule 12(b)(6) hearings in the McClain cattle

16   case.

17        I issued rulings in two unrelated but tricky Chapter 13

18   under-advisements earlier in October.

19        Finally, I handled my every-day, every-week hearings and

20   orders in countless cases in my increasingly-busy docket.

21        Now I'll turn to the ruling.  Under Section 1112(b)(1) of

22   the Bankruptcy Code, upon request of a party in interest, a

23   bankruptcy court "shall" convert a case to Chapter 7 or

24   dismiss the case, whichever is in the best interests of

25   creditors and the estate, for cause, unless the court

1   determines that appointment of a Chapter 11 trustee or

2   examiner is in the best interests of creditors and the estate,

3   or unless the exception in Section 1112(b)(2) applies.

4        I'll first address cause before discussing any exceptions

5   to conversion or dismissal, and among the alleged causes, I'll

6   start with the alleged lack of corporate authority to file the

7   bankruptcy.

8        Again, the Court has reminded the parties more than once

9   of the urgency of determining the authority-to-file issue,

10  given Fifth Circuit precedent holding that a bankruptcy case

11  must be dismissed if it was filed without proper corporate

12  authority.  *See Franchise Services* case, 891 F.3d 198, 206-07

13  (5th Cir. 2018).

14       My ruling on this issue is extremely narrow.  I have

15  serious concerns about whether the August 8, 2024 Stock

16  Confirmation resulted in a change of control within the

17  meaning of Section 5 of the Voting Agreement, and whether the

18  Stock Confirmation was a standalone agreement as opposed to

19  the first step in a multistep process involving a change in

20  control of Merit Street.

21       I don't need to decide those issues today because I find

22  that Trinity ratified Mr. McGraw as sole board member while

23  the parties sorted out their disagreements on ownership and

24  control of Merit Street.

25       In other words, for the limited purpose of this ruling, I

1   find that Trinity did not consent to a stock swap with its

2   ratification; it simply ratified Mr. McGraw's role as sole

3   board member for the limited purpose of exercising

4   questionable-but-consented-to authority to put in place the

5   steps for Merit Street to file the bankruptcy.  The parties'

6   rights and defenses concerning the stock swap generally are

7   fully preserved and will be decided another day.

8        Now I'll move on to the nonjurisdictional causes for

9   conversion or dismissal.  I find at least four causes to

10  convert or dismiss the case, each of which independently is

11  sufficient cause to warrant relief.

12       The first cause for conversion or dismissal:  There is

13  substantial or continuing loss to or diminution of the estate

14  and the absence of a reasonable likelihood of rehabilitation,

15  as alleged in PBR's joinder filed on August 1st.  That's

16  Docket 151.  Things have only gotten worse since then.

17       The Debtor's latest 20-week cash budget for the period

18  from the bankruptcy petition date through mid-November was

19  filed at Docket No. 392-1.  The budget reflects cumulative

20  gross collections of just $1.949 million, negative operating

21  cash flows of almost $1 million, and total restructuring costs

22  of over $20 million.  The operating revenues are swamped by

23  administrative claims, primarily either unpaid professional

24  fees or outstanding loans to pay professional fees.  This

25  negative cash flow situation alone is sufficient to establish

1  continuing loss to or diminution of the estate.  *See Loop*

2  *Corp. v. United States Trustee*, 379 F.3d 511 at Pages 515 to

3  516 (8th Cir. 2004).  *See also In re TMT Procurement Corp.*,

4  534 B.R. 912, 920-21 (Bankr. S.D. Tex. 2015).

5      Mr. McGraw and Peteski have been willing to fund the case

6  so far, and have indicated that they may release or waive

7  certain claims, in the hopes that Mr. Broadbent will be the

8  one they negotiate with for a release and in the hopes that

9  the Ribmans will be there to supervise the litigation with TBN

10 and PBR.

11     But Mr. Broadbent and the Ribmans will soon be excused

12 from any supervision in this case, likely drying up the

13 bankruptcy funding.

14     There is clear, substantial, and continuing loss to or

15 diminution of the estate.  The case has basically been an

16 expensive exercise in trying to keep control over who

17 negotiates releases for Mr. McGraw and Peteski and who

18 controls and supervises the litigation against TBN and PBR.

19     In addition, there is no hope of rehabilitation.

20 Persuasive authority demonstrates that "rehabilitation" under

21 this Code section does not mean a liquidating Chapter 11.

22 Courts have consistently understood "rehabilitation" to refer

23 to a debtor's ability to restore the viability of its

24 business.  *See Loop Corp.*, 379 F.3d at 515-516.

25     As noted by *Collier's* and the cases it cites:

1     "Significantly, the second part of the test under Section

2     1112(b)(4)(A) requires a reasonable likelihood of

3     'rehabilitation,' not 'reorganization.'  Thus, the standard

4     under Section 1112(b)(4)(A) is not the technical one of

5     whether the debtor can confirm a plan, but, rather, whether

6     the debtor's business prospects justify continuance of the

7     reorganization effort.  'Rehabilitation' is not another word

8     for 'reorganization.'  Rehabilitation means to reestablish a

9     business.  Whereas confirmation of a plan could include a

10    liquidation plan, rehabilitation does not include

11    liquidation."  That's 7 *Collier on Bankruptcy*, Paragraph

12    1112.04.

13    The second cause for conversion or dismissal:  The CRO is

14    not a neutral fiduciary but instead is conflicted in favor of

15    Mr. McGraw, as alleged in PBR's joinder filed on August 1st.

16    The evidence in support of that conflict includes Mr.

17    Broadbent's work for Envoy after the petition date, his

18    blessing of the other Merit Street officers' work for Envoy

19    after the petition date, and his disastrous attempt to shield

20    from the Court his communications with Mr. McGraw regarding

21    dismissal or conversion of this case.

22    In making this finding, I have carefully weighed the

23    evidence supporting Mr. Broadbent's independence against the

24    evidence tilting the other way.  I have also carefully

25    considered and weighed the testimony of Mr. Cheatwood, Mr.

1   McGraw, and other witnesses.

2       The third cause for conversion or dismissal:  The CRO

3   failed in his duty of candor to the Court.  This happened in

4   real-time during the trial, and it happened while I was

5   exploring a critical issue in this case -- that is, whether

6   Mr. Broadbent tried to get the case dismissed abruptly in mid-

7   August because he was either looking out for Mr. McGraw's

8   personal interests or taking direction from Mr. McGraw.

9       Pursuant to Section 105(a) of the Bankruptcy Code, the

10  Court may act *sua sponte* in dismissing or converting a case

11  under Section 1112(b).  *See In re Starmark Clinics, L.P.*, 388

12  B.R. 729 (Bankr. S.D. Tex. 2008) and *In re Munteanu*, 2007 U.S.

13  Dist. LEXIS 48233 (E.D.N.Y. Jun. 28, 2007).  *See also* 7

14  *Collier on Bankruptcy*, Paragraph 1112.04.  *Finally, see* 11

15  U.S.C. Section 105(a), which reads in part, "No provision of

16  this title providing for the raising of an issue by any party

17  in interest shall be construed to preclude the court from, *sua*

18  *sponte*, taking any action or making any determination

19  necessary or appropriate to enforce or implement court orders

20  or rules, or to prevent an abuse of process."

21      I specifically asked the parties at closing arguments to

22  address whether Mr. Broadbent's trial testimony, either

23  considered on its own or in connection with other evidence,

24  was cause to either convert the case or appoint a Chapter 11

25  trustee.  The Debtor's counsel addressed the issue in closing

1  arguments and did not ask for more time to consider or address

2  the issue.  I consider the issue fully joined after sufficient

3  due process.

4      Candor to the Court is critical, even at this later stage

5  of the case.  I reviewed the proposed plan as soon as it was

6  filed on the eve of trial, and I quickly determined that a

7  core aspect of the plan was Mr. Broadbent's release for the

8  estate of claims, if any, against Mr. McGraw and Peteski.

9  Although, of course, Mr. Broadbent has qualified professionals

10 to assist him, the buck stops with him, and it's his judgment,

11 at least initially, whether to pursue claims or negotiate a

12 settlement and release of claims.  Somebody else is going to

13 have to come to court to persuade me of any settlement of

14 estate causes of action against not only Mr. McGraw and

15 Peteski, but other parties as well.

16     The fourth cause for conversion or dismissal:  Mr.

17 McGraw's destruction of relevant evidence in his capacity as

18 either board member of Merit Street or *de facto* officer or

19 agent of Merit Street.  Mr. McGraw's actions violated not only

20 a discovery order aimed at Peteski and the Debtor, but also a

21 broader principle, that the Debtor's board members or *de facto*

22 officers or agents should not destroy property of the estate

23 to help them in pending litigation.

24     The deleted text message was not expressly raised in

25 Trinity's and PBR's initial moving papers because it did not

1    come to light until August 26th to 28.  Even before then,

2    however, Trinity and PBR moved to compel the production of

3    emails and text messages from both the Debtor and Peteski, and

4    the issue is now one of the subjects of a pending request for

5    sanctions.

6        In addition, the deleted text was raised prominently in

7    the reply briefs of both Trinity and PBR on the issue of

8    conversion, dismissal, or appointment of a Chapter 11 trustee.

9    *See, for example*, Docket No. 413, Paragraph 51, and Docket No.

10   401, Paragraph 68.

11       All parties have been fully heard on whether Mr. McGraw

12   intentionally deleted the text message.

13       Given all the due process on the issue of whether Mr.

14   McGraw deleted the text, and given that even a cursory review

15   of the text shows Mr. McGraw acting in significant part as

16   someone calling the shots for the Debtor, I have no problem

17   adding the deleted text to the list of causes to either

18   convert or dismiss the case.

19       Now that I've determined there is cause to convert or

20   dismiss the case, I'll next determine which of those two

21   options is in the best interests of creditors and the estate.

22   The winner there by a large margin is conversion.  A Chapter 7

23   trustee can sell the media library and any remaining assets

24   under Section 363 of the Bankruptcy Code, while enjoying the

25   benefits and protections of the automatic stay.  The Chapter 7

1   trustee can then do his or her own independent investigation

2   into estate causes of action, and the trustee can also review

3   filed proofs of claim to determine which ones to object to.

4   Creditors can have faith that the process will play out fairly

5   and neutrally.

6       Dismissal, on the other hand, would allow Mr. McGraw to

7   pay his favored creditors and not pay his unfavored creditors,

8   as his own deleted text makes clear he wants to do.  Dismissal

9   would also allow the Debtor or friendly creditors to file

10  another bankruptcy case in a different jurisdiction to try to

11  get different rulings that favor Mr. McGraw and his interests,

12  including on the pending sanctions motion that I've yet to

13  rule on.

14      Next, I'll address whether conversion to Chapter 7, or

15  instead appointment of a Chapter 11 trustee or an examiner, is

16  in the best interests of creditors and the estate.  This one

17  is a closer call, but the nod goes to Chapter 7 for a few

18  reasons.

19      First, what's left in this case is the sale of a media

20  library, and litigation, and not much else.  A Chapter 7

21  trustee can handle those matters more efficiently and at lower

22  cost compared to a continued Chapter 11 with the attendant

23  expenses of estate professionals for both a debtor and a

24  committee.

25      In making this determination, I have carefully weighed the

1   potential benefits and detriments of having new counsel with

2   limited knowledge of the case, yet with fresh eyes, come in

3   for the Chapter 7 trustee.  Overall, I think fresh eyes are

4   needed.

5       I have also carefully considered that there is normally a

6   dramatic difference between appointment of a Chapter 11

7   trustee and conversion to Chapter 7 when the debtor is an

8   operating company with a viable business and employees' jobs

9   are on the line.  There simply is not that type of dramatic

10  difference here, where the Debtor's business was as dead as a

11  doornail when they filed bankruptcy and nearly all the

12  Debtor's employees were fired on day one.  There's a media

13  library to sell, and litigation, and like I said, not much

14  else.  We're now talking about a Chapter 11 liquidator versus

15  a Chapter 7 liquidator.

16      Second, I've talked until I'm blue in the face about the

17  Ribmans, why they shouldn't be on the Committee and why they

18  shouldn't supervise litigation against PBR and especially TBN

19  going forward under the proposed plan, even if a Chapter 11

20  trustee were to adopt that plan.  I do not intend to reopen

21  the discussion in a continued Chapter 11 where I would then

22  face more contested issues and the estate would thus incur

23  even more administrative expenses when I consider *sua sponte*

24  removal of the Ribman Trust from the Committee under

25  Bankruptcy Code Sections 1102(a)(4) and 105(a) and when I

1   decline the Ribmans a role in the Litigation Advisory

2   Committee contemplated under the plan.  I've completely run

3   this issue to ground, and conversion to Chapter 7 has the

4   added benefit of not reviving it.

5       Third, although the Committee supports a Chapter 11

6   trustee over a Chapter 7 trustee, I give at least as much

7   weight on this issue to the voice of PBR, which has a

8   significant asserted unsecured claim.  In weighing these

9   competing voices, I have specifically considered the fact that

10  PBR is in litigation with the estate.  All the evidence to

11  date leads me to believe that PBR is still considering the

12  best interests of unsecured creditors in this trial, even

13  though it also has its own litigation interests to consider.

14      Finally, appointment of an examiner would not be helpful

15  at this point.  We've had a full trial on the relevant issues.

16  There is nothing left to examine that a Chapter 7 trustee

17  can't do.  Also, appointment of an examiner would not address

18  the corporate governance issues I'm concerned about.

19      Next, I'll address whether the exception in Bankruptcy

20  Code Section 1112(b)(2) applies and thus prevents conversion

21  to Chapter 7.  Under this subsection, the court may not

22  dismiss or convert the case to Chapter 7 if it specifically

23  finds that unusual circumstances establish that dismissal or

24  conversion is not in the best interests of creditors and the

25  estate and an objecting party establishes that (1) there is a

1   reasonable likelihood that a plan will be confirmed within a

2   reasonable time; (2) the cause for dismissal or conversion is

3   other than continuing loss to or diminution of the estate

4   without reasonable likelihood of rehabilitation; and (3) there

5   is a reasonable justification for the act or omission of the

6   debtor constituting cause, and the act or omission will be

7   cured within a reasonable time.

8        The first condition that must be satisfied to stop

9   mandatory conversion is that I must specifically find unusual

10  circumstances establishing that conversion is not in the best

11  interests of creditors and the estate.  Although there are

12  unusual circumstances in the case, they favor conversion and

13  not the current Chapter 11.

14       At this point, and notwithstanding able counsel for the

15  parties, the Chapter 11 case is a broken three-legged stool.

16  The first leg is Mr. McGraw, who deletes unfavorable text

17  messages he doesn't want me to see, who vows to pay favored

18  creditors no matter what the Court does, and who vows to wipe

19  out unfavored creditors.

20       The second leg is Mr. Broadbent, who worked for Mr.

21  McGraw's newly-created company after the petition date without

22  pushing back and who didn't give me honest and direct answers

23  to direct, simple questions.

24       And the third leg is a Creditors' Committee, half-composed

25  of the Ribmans, who enjoy a favorable payment guaranty from

1  either Mr. McGraw or the Debtor no matter what the Court does,

2  and who enjoy the right under the proposed plan to supervise

3  litigation Mr. Ribman allegedly helped instigate and is now

4  deeply enmeshed in.

5      These parties presumably want me to find the required

6  unusual circumstances based on the Chapter 11 plan that was

7  filed on the eve of trial, including the liquidation analysis

8  that purports to show that Chapter 11 is a better result than

9  Chapter 7.

10      While I very appreciate Committee counsel's role in

11  negotiating this plan, Mr. Strubeck himself acknowledged in

12  closing arguments that the liquidation analysis relies in

13  significant part on the testimony of Mr. Broadbent.  *See*

14  Transcript of Closing Arguments, September 29, 2025, Docket

15  No. 550 at Page 158.

16      For the reasons I've already discussed, I don't have

17  confidence that Mr. Broadbent has done a neutral, detached,

18  comprehensive investigation into the estate's claims against

19  Mr. McGraw and Peteski, or even against Trinity and PBR.  I

20  therefore give little weight to his valuation of the claims

21  and the proposed consideration to be received to settle those

22  claims.

23      I simply cannot find on this record that creditors would

24  fare better under the plan than under Chapter 7.  There are no

25  unusual circumstances to prevent mandatory conversion.

1      Even if the required unusual circumstances existed,

2   conversion would still be mandatory because the objecting

3   parties cannot possibly satisfy the second condition of

4   Section 1112(b)(2) to stop mandatory conversion.  They must

5   also establish that (1) there is a reasonable likelihood that

6   a plan will be confirmed within a reasonable time; (2) the

7   cause for dismissal or conversion is other than continuing

8   loss to or diminution of the estate without reasonable

9   likelihood of rehabilitation; and (3) there is a reasonable

10  justification for the act or omission of the debtor

11  constituting cause, and the act or omission will be cured

12  within a reasonable time.

13      One cause I have found is continuing loss to or diminution

14  of the estate without reasonable likelihood of rehabilitation.

15  That ends the inquiry.

16      What's more, two causes I have found involve purposeful

17  destruction of estate property, in violation of a discovery

18  order, and less-than-truthful testimony by Debtor

19  representatives.  There is no possible reasonable

20  justification for those acts or omissions.  That ends the

21  inquiry yet again.

22      To summarize, cause exists to convert this case to Chapter

23  7.  That alternative is better than dismissal, appointment of

24  a Chapter 11 trustee, or appointment of an examiner.  And the

25  two required conditions in Section 1112(b)(2) to stop the

1   mandatory conversion do not exist.

2                              CONCLUSION

3       I'll wrap up this ruling with a few comments.  Mr. Ducayet

4   suggested at closing arguments that to find cause for

5   conversion, I would necessarily have to find a conspiracy that

6   includes not only the respective clients but also the

7   professionals as well as the U.S. Trustee.  I have too much

8   respect for the professionals and the U.S. Trustee to agree

9   with that hyperbole.  If there were a conspiracy that included

10  all the professionals, Peteski's counsel wouldn't have done

11  the right thing and produced the unfavorable and unflattering

12  text message that Mr. McGraw tried to keep hidden.

13      If there were a conspiracy that included all the

14  professionals, I wouldn't have received an honest and direct

15  answer from Ms. Miller when I asked if anybody talked to the

16  U.S. Trustee about PBR's role on the Committee.  I am familiar

17  with the jockeying that goes on in Chapter 11s concerning

18  Committee composition, and Ms. Miller's response didn't

19  surprise me.  Ms. Miller did nothing wrong, and I appreciate

20  her candor.  I'm much more bothered by the Ribmans' inclusion

21  than PBR's exclusion.

22      If there were a conspiracy that included all the

23  professionals, Mr. Ducayet wouldn't have acknowledged in

24  response to my question before closing arguments that the

25  claim Mr. McGraw guaranteed to pay in the deleted text message

1  was, in fact, the Ribman Trust claim.  I specifically recalled

2  and appreciated that acknowledgment as I was writing my ruling

3  and reviewing the transcripts, and that's one reason I asked

4  the attorneys to work with the court reporter to fix the

5  transcript that didn't correctly record that exchange.

6      If there were a conspiracy that included the U.S. Trustee,

7  Ms. Young would not have parachuted into the closing arguments

8  on relatively short notice to address questions I had for Mr.

9  Bublick, who has been the main U.S. Trustee attorney at this

10 trial.  Ms. Young relayed the U.S. Trustee position regarding

11 the Committee composition with the information available to

12 her at the time.

13     As I said earlier, my ruling is the first time I have laid

14 out in detail all the reasons I think it's inappropriate for

15 the Ribmans to sit on the Committee and to supervise post-

16 confirmation litigation against Trinity and PBR.  I will never

17 find out if the U.S. Trustee would have been persuaded by my

18 reasoning because the Committee will cease to exist upon

19 conversion.  I think I might have persuaded them, but even if

20 they disagreed with my analysis, I have no doubt that the U.S.

21 Trustee Office would act with impeccable integrity and hard

22 work, which is par for the course for them.

23     I could name other examples, but I've given enough to

24 demonstrate that my ruling absolutely is not a finding of a

25 conspiracy.  In short, there can be cause for conversion

1   without a conspiracy.  That's the case here.

2       I will end where I began.  This case is an anomaly.  And

3   for the unique reasons I've discussed at length, this case

4   will be converted to Chapter 7.  That concludes the Court's

5   ruling.  The Court will prepare its own order.

6           MR. DUCAYET:  Your Honor?

7           THE COURT:  I'm sorry?

8           MR. DUCAYET:  Your Honor, it's Jim Ducayet from

9   Sidley on behalf of the Debtors.  May I be heard briefly?

10          THE COURT:  Sure.

11          MR. DUCAYET:  Your Honor, in light of the Court's

12  ruling, we would respectfully request that you stay

13  enforcement of your pending order to permit us to take an

14  appeal.

15          THE COURT:  This is a request for a stay pending

16  appeal?

17          MR. DUCAYET:  Yes, it is.

18          THE COURT:  So, first, --

19          MR. DUCAYET:  Pursuant to Rule 8007(a).

20          THE COURT:  So, first, I'll ask -- I'm going to take

21  a short break in a minute because my throat is really killing

22  me.  But before I do, --

23          MR. DUCAYET:  Of course, Your Honor.

24          THE COURT:  -- let me hear from other counsel on that

25  request, on whether I should entertain that request now.

1              MR. BABCOCK:  Your Honor, this is Charles Babcock for

2     Peteski.  And I'm not sure whether we would appeal or not.  I

3     suspect we would.  But we certainly would want to have an

4     opportunity to talk to our client in order to make that

5     decision expeditiously.  So we would join Mr. Ducayet's

6     request for a stay for some short period of time.

7              MS. MOSCARINO:  Your Honor, this is Alyssa Moscarino

8     for PBR.  May I be heard?

9              THE COURT:  Sure.

10             MS. MOSCARINO:  Thank you.  We would request an

11    opportunity to be heard on this issue, and also to brief the

12    issue, but we will note our objection for the record to the

13    requested stay.

14             THE COURT:  All right.

15             MR. MOORE:  Your Honor, Mark Moore on behalf of

16    Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc.

17        We agree with PBR's counsel that we'd like to be heard on

18    this.  I believe that the rule referenced requires notice and

19    a hearing.  Under the Federal Rules of Bankruptcy Procedure,

20    the parties get 14 days to file their notice of appeal.  It's

21    extremely unlikely, especially given the Government shutdown,

22    that a 7 trustee would even be in place, much less would take

23    any kind of precipitous action before that 14-date period

24    runs.

25        We believe this issue needs to be fully briefed in light

1  of the Court's ruling.  We need a copy of the Court's ruling

2  to be able to determine what the position would be.  But at

3  that outset, obviously, we would oppose any stay being entered

4  today and ask to be heard on regular notice.

5        MR. WILKES:  Your Honor, this is Greg Wilkes.  We're

6  in the same boat as Jackson Walker is, in the need to be able

7  to speak with our client.

8        MR. DUCAYET:  Your Honor, if I could just briefly

9  make a comment.

10     We're happy to brief this.  I simply wanted to put

11 something on the record in view of the potential timing here.

12 You know, provided that we all have an opportunity to brief

13 this before a trustee is appointed, I think that's perfectly

14 fine.  It'll give all of us an opportunity to speak with our

15 respective clients and brief this issue fully so that Your

16 Honor can consider it.  And we're willing to do that quickly,

17 Your Honor.

18        THE COURT:  All right.  Do we have --

19        MR. BUBLICK:  Your Honor?

20        THE COURT:  Yes, there's Mr. Bublick.  I was going to

21 ask if Mr. Bublick was on.

22        MR. BUBLICK:  The U.S. Trustee stands ready to

23 appoint a Chapter 7 trustee, should the Court enter that order

24 directing the U.S. Trustee to appoint a Chapter 7 trustee,

25 Your Honor.

1                THE COURT:  All right.

2                MR. BUBLICK:  Without delay.

3                THE COURT:  All right.  Thank you, Mr. Bublick.

4        Anybody else want to weigh in?  I am going to take a short

5    break because I need -- well, I have a big bottle of water,

6    but I need to get something for my throat.  So why don't we

7    take a five-minute recess.

8        Mr. Ducayet, could you tell me, are you planning to file a

9    motion?

10                MR. DUCAYET:  Your Honor, --

11                THE COURT:  You're not suggesting that you argue that

12    now?

13                MR. DUCAYET:  No, Your Honor.  We're fine filing a

14    motion.  I simply wanted to put it on the record so that there

15    wasn't any issue with respect to the immediate appointment of

16    a trustee.  We're -- we have a motion ready to go.  We can get

17    that on file very promptly.  And as I said, we're happy to

18    brief that.

19                THE COURT:  All right.  Let me take a short recess,

20    and I'll come back out.

21                MR. DUCAYET:  Thank you, Your Honor.

22                THE CLERK:  All rise.

23        (A recess ensued from 4:26 p.m. until 4:40 p.m.)

24                THE CLERK:  All rise.

25                THE COURT:  Thank you.  Please be seated.

1     All right.  Thank you for that break.  I had a chance to

2  get a lozenge for my throat.

3     Mr. Ducayet, can you tell me timing-wise when you expect

4  to be able to file your motion?

5        MR. DUCAYET:  Your Honor, I think we could file it

6  first thing tomorrow morning.

7        THE COURT:  Say it again?

8        MR. DUCAYET:  I'm sorry, Your Honor.  We could file

9  it first thing in the morning, first thing tomorrow.

10        THE COURT:  All right.  And then, Responding Parties,

11  how much time do you think you would need to respond?

12        MR. MOORE:  Your Honor, Mark Moore on behalf of TBN

13  and TCT Ministries.

14     So, there's a couple of issues.  First, I think we need

15  the Court to enter its order.  We also need to get a firm

16  grasp of what the Court's findings and conclusions were

17  through either your written transcript or the official

18  transcript of the hearing.  That seems to be a gating issue to

19  staying your ruling if we don't have a copy of what your

20  ruling is, but I understand that the Debtor wants to move

21  quickly.

22     But then, third, the Court has now found, at least we can

23  all understand, cause for conversion of the case to Chapter 7.

24  The United States Trustee's Office has indicated that it is

25  ready, willing, and able to appoint a Chapter 7 trustee upon

1   entry of your order converting the case.

2        In the absence of a stay, that order will not be stayed,

3   so we'd like the United States Trustee to move forward with

4   that, understanding that there's very little risk, or

5   believing that there's very little risk, if any, that any

6   precipitous action is going to be taken before the Court --

7   or, before the Court could hear, potentially grant or

8   potentially overrule the motion for stay pending appeal.

9        As far as if a motion is filed tomorrow, our staff at

10  Foley obviously will work as quickly so we can with our

11  clients to get a response on file.  I suspect, without having

12  spoken to the client, we could probably do that by Monday.

13  But, again, we don't actually know yet what the basis for that

14  motion for stay pending appeal is going to be because we don't

15  even have your order.

16       So those are some of the concerns that we have, both with

17  the process that is underlied by a motion, or what seems to be

18  an oral motion, but then also the circumstances of the case,

19  where you've now ordered that conversion is appropriate, the

20  United States Trustee says that they can appoint a 7 trustee.

21            THE COURT:  So help me with that.  If I were to enter

22  the order immediately and the U.S. Trustee appoints a Chapter

23  7 trustee, and then we have a hearing on a motion for stay

24  pending appeal, going down the decision tree, if I deny it,

25  then the Chapter 7 trustee stays there.  If I grant it, then

1   what?  Who's in control of the Debtor at that point?

2          MR. MOORE:  Your Honor, I believe that the procedural

3   impact would be that you stay your own order, which means

4   that, functionally, the Debtor-in-Possession remains in

5   possession, assuming that you order a stay, and the 7 trustee

6   is not in place and is not in authority.

7       But your order is your order until it is stayed or

8   overturned on appeal.  So it's kind of taking chicken or egg,

9   whether you should -- I think what the Debtor is asking you to

10  do is to not enter your order, or to enter your order but then

11  kind of order the United States Trustee not to act on it.  And

12  that doesn't seem procedurally proper, either.

13         THE COURT:  So, Mr. Bublick, can you tell me, just

14  logistically, if I were to enter the order today and have the

15  normal language about the U.S. Trustee is ordered to appoint a

16  Chapter 7 trustee, how long does that process take?  I know it

17  doesn't take long, but can you help me understand maybe a

18  little more granular-like how long that takes?

19         MR. BUBLICK:  Your Honor, if I could just have a

20  moment with my client?

21         THE COURT:  Sure.

22      (Pause.)

23         MR. BUBLICK:  Your Honor, it does depend on the

24  Clerk's staff as well, given that they are understaffed at the

25  moment as well.  So we believe it probably would be tomorrow

1    morning, at the earliest.

2            THE COURT:  So if I enter the order today, then at

3    some point tomorrow morning you would select a trustee and

4    then -- I just don't know, I should know this because I did a

5    smaller amount of Chapter 7 trustee work, but how long does it

6    take to select someone, notify them?  And then obviously

7    they're going to have to start doing stuff if I don't stay the

8    order.

9        So I guess I'm struggling a little bit with how that would

10   play out logistically.  If I enter the order and the U.S.

11   Trustee does their thing and appoints a Chapter 7 trustee, and

12   then I stay the order, again, this goes back to Mr. Moore,

13   then what happens?  Does the Chapter 7 trustee not do

14   anything?  Because then there's an order in place, and then

15   the Chapter 7 trustee will have duties.  Do I then say, But

16   don't do anything, just let the current management stay there?

17            MR. MOORE:  I think that's a question for the Court,

18   frankly, about what you would want your stay order to look

19   like.

20       If there are let's call them ministerial actions that a

21   Chapter 7 trustee could take pending a denial, hypothetical

22   denial of the motion to stay, such as get their hands wrapped

23   around what the assets of the estate are, or to understand who

24   the parties are, things of that nature, then those actions

25   seem like they're still appropriate to be taken.

1      But what you're faced with now is you have found cause.

2   The Debtor wants you to do basically a *de facto* stay of your

3   finding of cause so that they could file a motion they've not

4   yet filed and then have it ruled on expeditiously, which I

5   understand at one point, but then also puts us in a box of

6   having to respond expeditiously.

7      And it seems like this could be dual-tracked, where you

8   get a Chapter 7 trustee.  Assuming the Chapter 7 trustee

9   doesn't sell anything, settle anything, or give anything away,

10  it doesn't seem like it would be prejudicial to anyone for

11  that person to be there.  And then the Court can ultimately

12  rule on whether you want to stay your own order that appointed

13  that person in the first place.

14          THE COURT:  Let me ask Mr. Bublick to weigh in on

15  that.  Because once they appoint a Trustee, I know they have

16  duties, they have to start doing stuff, protecting the estate.

17  Mr. Bublick, how would that play out?  I guess I can craft a

18  bespoke order, but I'm trying to figure out how that would

19  work.  If I enter an order requiring you to appoint a trustee,

20  you then appoint a Chapter 7 trustee, can the order then say,

21  But don't do anything?  I think that seems potentially

22  problematic.

23          MR. BANKLER:  Your Honor, may I make an offer?  I'm

24  not trying to interrupt Mr. Bublick, but I think I can propose

25  a solution to the question that you're asking, if you'll allow

1  me.  Or I'll wait if Your Honor would prefer for me to wait.

2       THE COURT:  No, go ahead.

3       MR. BANKLER:  I think one of two solutions might be

4  in order, Your Honor, neither of which would impact the bigger

5  issues that Mr. Moore is talking about, which is getting the

6  order entered and having time to properly brief and understand

7  a full stay pending appeal.  That's a bigger issue.  As Mr.

8  Moore said, it probably needs to be briefed and heard on an

9  expeditious but slower timeline than figuring out here this

10  afternoon.

11      So what I would propose, Your Honor, would be one of two

12  things.  One, your order becomes effective on a date later

13  than today; or two, you enter a temporary administrative stay

14  of your order.  Not a stay pending appeal, a temporary

15  administrative stay, so that a Chapter 7 trustee is not

16  appointed, for example, tomorrow morning and then we end up in

17  the weird scenario that Your Honor seems to be struggling

18  with.  Or we would all be struggling with.  I'm not trying to

19  point out Your Honor.

20      But, that way, we don't have a Chapter 7 trustee then

21  appointed with duties but we all know that we're trying to

22  brief and have Your Honor hear a motion for stay pending

23  appeal.

24      So if Your Honor were to just enter a temporary

25  administrative stay of your own order, that seems to be a

 1  solution that could buy us the time to properly brief and hear

 2  the issues before Your Honor.

 3         THE COURT:  What would the administrative stay --

 4         MR. MOORE:  Your Honor, if I may briefly respond?

 5         THE COURT:  Yes.  What would the administrative stay

 6  of my order, what would that say?

 7         MR. BANKLER:  It would just say that your order is

 8  not effective until the motion for stay pending appeal can be

 9  properly briefed and heard before the Court.  Something along

10  those lines, Your Honor.

11         THE COURT:  All right.

12         MR. MOORE:  Your Honor, I think --

13         THE COURT:  Well, first, --

14         MR. MOORE:  I apologize, Your Honor.

15         THE COURT:  No, that's okay.  Let me hear from --

16  well, go ahead, Mr. Moore, and then I'll go to Mr. Bublick.

17         MR. MOORE:  Again, Your Honor, this seems like it's a

18  very chicken-and-egg sort of situation.  What MSM and Peteski,

19  and I understand they're not necessarily aligned right now

20  because this just came up, but what they're effectively saying

21  is you found cause, you are going to enter an order, but that

22  order shouldn't have meaning until something else happens.

23     This issue has been fully briefed about whether to

24  convert, dismiss, appoint a Chapter 11 trustee.  You have

25  heard all of the evidence related to that issue.  What they're

1    trying to do is short-circuit that order by basically jumping

2    an appeal to the front of the line and assuming the validity

3    of that appeal.

4        Your order is your order until it is disturbed on appeal

5    or stayed by you or someone else.  So your order needs to be

6    entered.  Your order needs to be effective.  And the United

7    States Trustee's Office should be acting upon that order, just

8    like it would any other conversion order, until you decide

9    otherwise at a future time.

10       And I hear the Court's concern, and I understand it,

11   because we share the concern of, if you don't act on the

12   order, then you effectively have a debtor that's in purgatory,

13   with management that the Court has now repeatedly questioned

14   their candor and the reasons why they're taking certain

15   actions.

16       So we are very concerned that if the Court has found this

17   cause and the Court has determined that it's necessary to take

18   this step, which you have, that there be any delay in that

19   step, unless you subsequently find cause or a reason to stay

20   your own ruling that you just read to the court over the last

21   two hours and forty-five minutes.

22            THE COURT:  All right.  Mr. Bublick, what are your

23   thoughts?

24            MR. BUBLICK:  Your Honor, as to your earlier

25   question, the U.S. Trustee would, if she were directed to

1   appoint a trustee, would choose a trustee off the next

2   rotation, and we would immediately be in contact with that

3   person so they can move forward expeditiously.  And,

4   obviously, that once they were -- once they did receive that

5   appointment, they would immediately have -- they would take

6   over the bank accounts, change the locks, and proceed with all

7   those duties and powers.

8          THE COURT:  And so that's what I'm struggling with a

9   little bit.  An administrative stay.

10         MR. DUCAYET:  If I could, Your Honor, I think what

11  Mr. Bankler suggests makes eminent sense, which is you issue

12  your order, you issue an administrative stay to permit the

13  parties to brief the motion for a stay, and then decide that

14  motion.  I think that protects everybody.

15       The concern, obviously, that we have is, like you said,

16  we're in purgatory.  But, frankly, a concern that we're going

17  to lose standing and thereby sort of lose the ability to

18  appeal this order at all.

19       And so that's why we made this request.  We want to make

20  sure that we have the ability to preserve our appeal, should

21  we -- should we present it to the District Court.  This allows

22  you to effectuate your order.  It allows for the parties to

23  brief the motion to stay in a little bit, you know, a better

24  time.  And then Your Honor can decide one way or the other one

25  whether you're going to grant the stay or not.

1     But all of this I think can be done without the need for a

2    trustee to step in and take over the bank accounts and change

3    the locks on the doors and the like.  Your Honor will still

4    have the order out there.  It will just be temporarily stayed

5    while the parties brief this issue.

6          THE COURT:  And I'm struggling --

7          MR. MOORE:  Your Honor, the threat of locking the

8    doors or keeping people out of a certain place would be

9    highlighted in a normal Chapter 11 case where you had an

10   operating debtor.  The only operational location of the Debtor

11   that I'm aware of is TBN's PLEX studio that has not been

12   occupied by the Debtor for almost four months.  The Court has

13   made multiple findings about how there is not an operational

14   debtor in this situation.  The Debtor entered bankruptcy on a

15   liquidation posture with no legitimate prospect of

16   reorganization.

17     So the fear that you might ordinarily have as a debtor of

18   losing the value of an ongoing operation is not present in

19   this case.  Full stop.  In fact, if you stop their operations,

20   the testimony at trial was they would actually not lose money.

21   They would not gain money, but they would lose less, I guess

22   is the better way to put it.

23     And while I understand the concern that the Debtor has,

24   once again, the order is the order.  The Court has issued its

25   ruling.  The order needs to be entered and followed upon,

1   unless the Court orders otherwise subsequently.

2        And this idea of an administrative or prudential stay, I

3   don't know the justification for that under the circumstances

4   or under the Bankruptcy Code.

5             MR. WILKES:  Well, Judge, may I be heard on this?

6             THE COURT:  Sure.

7             MR. WILKES:  This is Greg Wilkes.  I think Your Honor

8   has the ability under 9014(c)(1) to extend the 14-day

9   automatic stay under 7062 that normally applies in adversary

10  proceedings.  Your Honor has the discretion to be able to

11  extend that to contested matters, including this one.  And

12  perhaps that's the simplest way, and that may be sort of, in a

13  roundabout way, the way that Mr. Bankler was trying to get to

14  this in terms of the administrative stay.

15       But I think in terms of a procedural way, the way that you

16  would do it, Judge, is to look at 9014(c)(1), which allows

17  Your Honor to extend the other rules to the extent that Your

18  Honor determines in a contested matter.  That would include

19  7062.

20            MR. MOORE:  So, as we stand here today, we're not in

21  an adversary proceeding or a contested matter where that rule

22  applies.

23            MR. WILKES:  That's not --

24            MR. MOORE:  If they were trying to change the rules

25  of the game  --

1              MR. WILKES:  That's not --

2              MR. MOORE:  -- after the game has been played, we

3    don't believe that's appropriate.

4              MR. WILKES:  Sorry, Judge.  That's not how the rule

5    works.  9014 applies to contested matters, which we clearly

6    are in.

7              MR. MOORE:  And -- and --

8              MR. WILKES:  And Your Honor has the discretion in the

9    context of a contested matter to extend the rules that

10   otherwise apply in other proceedings.

11             MR. MOORE:  Your Honor, we're extremely uncomfortable

12   with the idea that we would get through this entire process,

13   the Court would issue its ruling and make its determination,

14   the Debtor would decide that it's going to stay or attempt to

15   stay the proceeding, and then get relief in advance of that

16   stay, which is effectively to tell the United States Trustee,

17   notwithstanding that I am ordering you to appoint a Chapter 7

18   trustee, don't do it.

19             MR. DUCAYET:  And Your Honor, the point I think we're

20   simply trying to make is we could lose our right to appeal

21   entirely unless the motion is stayed, unless the order is

22   stayed.  That's the point.

23             MR. WILKES:  That's the concern.  The other concern,

24   Judge, is that the Committee, for example, might not have the

25   ability to continue any efforts that it determines it wants to

1    take in response to the order if a trustee is appointed,

2    because obviously that has dramatic ramifications for the

3    Committee.

4            THE COURT:  All right.  I think what I'm going to do

5    is sleep on it.  I'm going to sleep on it.  I will give you

6    some comfort that I'm not going to sign any order today.  I

7    have another TRO I have to address after I get off the bench.

8    I'm going to go address that TRO, get an order out on that

9    TRO, and then give it a little bit more thought on whether the

10    administrative stay or some other remedy would be appropriate

11    or not.  I understand the positions of the parties, but --

12            MR. BUBLICK:  Your Honor?

13            THE COURT:  Yes?

14            MR. BUBLICK:  I understand you will be delaying your

15    ruling.  Will you be preparing that order, or will you be

16    assigning a party to prepare that order?

17            THE COURT:  The order converting the case?

18            MR. BUBLICK:  Yes, Your Honor.

19            THE COURT:  No, we will prepare that.  We will

20    prepare that.  I'm not going to sign it today.  We already

21    have an order.  I'm not going to sign it.  It's not going to

22    be entered today.  I'm going to turn to my other TRO.  I'm

23    going to think about it overnight.

24        And then let me look at the calendar.  (Pause.)  I don't

25    know that I'm going to need to reconvene this hearing, but if

1    I do, I have some time tomorrow afternoon.  Again, I'm not

2    telling you I'm going to set something, but if I were to set a

3    status conference or something, if I have additional

4    questions, what are y'all's schedules tomorrow afternoon?

5            MR. DUCAYET:  Your Honor, from the Debtors, we can

6    have someone available at any time.

7            MS. MOSCARINO:  PBR will --

8            MR. BANKLER:  We'll be available from Peteski.

9            MS. MOSCARINO:  Sorry, Chris.  PBR will make it work.

10           A VOICE:  (overspoken), Your Honor.

11           A VOICE:  (overspoken) is available, Your Honor.

12           MR. BANKLER:  I apologize.  We're --

13           THE COURT:  No, that's all right.  I invited this.

14    So let me go to Mr. Wilkes.  I'm just going to go on the

15    *Hollywood Squares* here.  Well, to Mr. Bankler.  Mr. Bankler,

16    tomorrow afternoon?

17           MR. BANKLER:  Either myself or someone from our team

18    will make it work for sure, Your Honor.

19           THE COURT:  Okay.  Mr. Moore?

20           MR. MOORE:  Your Honor, I have a conflict with a case

21    on the West Coast beginning at 3:30 p.m. Central.  But before

22    that, completely available through the morning.

23           THE COURT:  Well, my morning doesn't look great.

24    What about 2:00 o'clock?

25           MR. MOORE:  Perfectly available, Your Honor.

1           THE COURT:  So that depends on whether my 1:30 lift

2     stay docket cooperates.

3        Mr. Cavenaugh, Mr. Babcock?

4           MR. CAVENAUGH:  Someone from Jackson Walker will be

5     available, Your Honor.

6           THE COURT:  All right.

7           MR. BABCOCK:  And Your Honor, we'll get it covered

8     one way or the other, Your Honor.

9           THE COURT:  All right.

10       (WebEx interruption.)

11          THE COURT:  Mr. Ducayet?

12          MR. DUCAYET:  Yes, Your Honor.  Someone from Sidley

13    will be there.  I can make it work.

14          THE COURT:  Okay.  Who have I missed?  Mr. Bublick?

15          MR. BUBLICK:  Your Honor, the U.S. Trustee will --

16    there will always be someone available from the U.S. Trustee's

17    Office.

18          THE COURT:  All right.  Have I missed anybody?

19          MR. WILKES:  Judge, I think you missed me, but that's

20    okay, we'll make somebody available as well.

21          THE COURT:  All right.  Thank you, Mr. Wilkes.

22       So, just keep it open.  I don't know if we're going to

23    need it or not.  I'm going to turn to my other emergency

24    matter, and then I'll give it some thought tonight.  In the

25    meantime, --

1          MR. DUCAYET:  Thank you, Your Honor.

2          THE COURT:  In the meantime, between now and

3  tomorrow, is there -- well, forget that.  All right.  I'm

4  going to give it some thought, and then we will notify the

5  parties if I decide we need to reconvene tomorrow afternoon.

6          MR. DUCAYET:  Thank you, Your Honor.

7          MR. BANKLER:  Thank you, Your Honor.

8          THE COURT:  All right.  Anything else for this

9  afternoon?

10          MR. DUCAYET:  No, sir.

11          THE COURT:  All right.  Thank you all.  The Court

12  will be in recess.

13          THE CLERK:  All rise.

14          MR. RUDD:  Thank you, Your Honor.

15      (Conclusion of proceedings at 5:02 p.m.)

16                          --oOo--

17

18

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **10/30/2025**

24  _____      _____
   Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                                        3

    Emergency Motion for an Order: (I) Dismissing the
    Debtor's Chapter 11 Case, (II) Converting the Case to
    Chapter 7, or (III) Appointing a Chapter 11 Trustee
    filed by TCT Ministries, Inc., Trinity Broadcasting
    of Texas dba Trinity Broadcasting Network (100)

    Partial Joinder of Emergency Motion for an Order (I)
    Dismissing Debtor's Chapter 11 Case, (II) Converting
    the Case to Chapter 7, or (III) Appointing a Chapter
    11 Trustee filed by Creditor Professional Bull Riders,
    LLC (151)

END OF PROCEEDINGS                                                             95

INDEX                                                                         96

# EXHIBIT B



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 7, 2025**

_____
**United States Bankruptcy Judge**

_____

United States Bankruptcy Court
Northern District of Texas
Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | Case No. 25-80156-swe-11 |
| | § | |
| Debtor. | § | |

### Order Setting Precautionary Due-Process Hearing

On July 18, 2025, creditors Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. filed an *Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* [the **"Motion"**] [Docket No. 100]. On August 1, 2025, creditor Professional Bull Riders, LLC filed a *Partial Joinder* in Trinity's Motion [the "**Joinder**"] [Docket No. 151]. The Court conducted a multi-day trial on those requests and read its ruling into the record on October 28, 2025, starting at 2:00 p.m. Under the Court's ruling, the Court intends to convert this case to Chapter 7 pursuant to a separate order. This order is not the conversion order.

At the end of the Court's ruling, the Debtor announced its intent to file a motion for stay pending appeal and requested an opportunity to brief the issue before a Chapter 7 trustee is appointed. The Court entered its

1

*Order Preserving Status Quo* [Docket No. 579] on October 29, 2025, indicating the Court would delay entering the conversion order until the Court hears the motion for stay pending appeal.

Both the Debtor and Peteski Productions, Inc. have since filed motions for stay pending appeal [Docket Nos. 585, 589] and related briefs [Docket Nos. 586, 590]. In its brief, Peteski argues or suggests the Court did not satisfy due process when it found as cause for conversion or dismissal (a) Mr. Broadbent's failure in his duty of candor to the Court; (b) Mr. McGraw's destruction of relevant evidence in his capacity as either board member of Merit Street or de facto officer or agent of Merit Street; and (c) Mr. Broadbent's not being a neutral fiduciary but instead being conflicted in favor of Mr. McGraw.[1]

To address any concerns about alleged failures in due process for issues (a) and (b), the Court **ORDERS** as follows pursuant to 11 U.S.C. §§ 105(a), 1104(a), and 1112(b), Federal Rules of Civil Procedure 52 and 59, and Federal Rules of Bankruptcy Procedure 7052 and 9023:

---

[1] Trinity, in its Motion and while Mr. Broadbent was CRO, alleged that the estate needed an independent fiduciary, a Chapter 7 trustee. Motion ¶ 67. Likewise, PBR, while Mr. Broadbent was CRO, alleged in its Joinder that the estate needed an independent and disinterested Chapter 7 trustee without conflicts. Joinder ¶ 26. *See also* Motion ¶ 69 ("Creditors would be best served by an independent trustee—not one that is currently under the control of McGraw/Peteski. An independent trustee (whether it be one appointed in a Chapter 11 or Chapter 7 case) will best serve the interests of all creditors and stakeholders."); Motion ¶ 72 ("[I]t is McGraw vis-à-vis Peteski that is running this Chapter 11 Case—not the Debtor."); Motion ¶ 80 ("But overall, and perhaps the most important justification here, is that the appointment [of a] Chapter 11 trustee cleanses the Debtor of all material conflicts of interest—i.e., removes McGraw/Peteski from control."); Trinity Reply [Docket No. 401] ¶ 140 (alleging as bad-faith conduct: "Worst of all, Broadbent—the Debtor's CRO and 'Independent' Director—was aware of their employment and activities for Envoy and did nothing to stop them."); Trinity Reply [Docket No. 401] ¶ 143 (alleging that bad-faith conduct—which would include Mr. Broadbent's approval of Merit officer work for Envoy—was cause to either convert or dismiss); PBR Reply Brief [Docket No. 413] ¶ 78 (alleging as cause to convert the case Peteski's and McGraw's control over Mr. Broadbent, whose technical appointment was done merely to "cloak transactions between the Debtor and Peteski with a façade of being arm's length negotiations."). The Court finds that the Debtor and Peteski had due-process notice that the Court might either convert the case, dismiss the case, or appoint a Chapter 11 trustee based on the issue of Mr. Broadbent's independence or neutrality.

1. The Court will hold a hearing on November 13, 2025, at 9:30 a.m. to address any additional evidence and arguments related solely to the following:

   a. Whether Mr. Broadbent's testimony that the Court addressed in its ruling is cause to either dismiss the case, appoint a Chapter 11 trustee, or convert the case to Chapter 7.

      i. The potential cause may be unenumerated cause under 11 U.S.C. §§ 1104(a)(1) and 1112(b)(4), and enumerated cause under § 1104(a)(1) (dishonesty).

   b. Whether Mr. McGraw's purposeful deletion of his text message to Mr. Ribman is cause to either dismiss the case, appoint a Chapter 11 trustee, or convert the case to Chapter 7.[2]

      i. The potential cause may be unenumerated cause under 11 U.S.C. §§ 1104(a)(1) and 1112(b)(4), enumerated cause under § 1104(a)(1) (fraud, dishonesty, gross mismanagement of the affairs of the debtor by current management), and enumerated cause under § 1112(b)(4) (gross mismanagement of the estate and failure to comply with an order of the Court, including the order at Docket No. 536).

2. The precautionary due-process hearing shall be set as a hybrid hearing, with parties being permitted to appear both in person or by Webex. The address where the hearing shall be held is:

---

[2] Peteski misconstrues the Court's October 28 ruling, so the Court now makes it clear that the Court's ruling is not, and was not intended to be, a discovery sanction or inherent-power sanction against Peteski. The Court's ruling regarding the text message, and its precautionary due-process hearing on that subject, is limited to whether the conduct is enumerated or unenumerated cause under §§ 1104(a) and 1112(b). Although that issue concerns, at least in part, whether the Debtor violated an order (a discovery order) for purposes of § 1112(b)(4)(E), the issue is whether there is cause under §§ 1104(a) and 1112(b) to dismiss, convert, or appoint a trustee because of that conduct.

United States Bankruptcy Court
1100 Commerce Street
14th Floor, Courtroom 3
Dallas, Texas 75242

3.  The Webex link is: https://us-courts.webex.com/meet/everett.
    The Webex instructions are attached to this order.

4.  The parties shall confer on whether to suspend their agreed
    briefing schedule for the motions for stay pending appeal pend-
    ing the outcome of the precautionary due-process hearing. After
    the precautionary due-process hearing, the Court will determine
    whether to set a further hearing on the motions for stay pending
    appeal, or whether the Court will rule on the papers.

### End of Order ###

# WebEx Hearing Instructions
## Judge Scott W. Everett

Pursuant to General Order 2023-05 issued by the Court on September 19, 2023, hearings before Judge Scott W. Everett will be conducted pursuant to the guidelines set forth in the General Order unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:   https://us-courts.webex.com/meet/everett

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In:   1-650-479-3207;   Access code:   2304 017 9738

**Participation/Attendance Requirements**:

- Counsel and other parties-in-interest who plan to actively participate in the hearing are encouraged to attend the hearing in the WebEx video mode using the WebEx video link above. Counsel and other parties-in-interest who will <u>not</u> be seeking to introduce any evidence at the hearing and who wish to attend the hearing in a telephonic-only mode may attend the hearing in the WebEx telephonic-only mode using the WebEx dial-in and access code above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time.  Please be advised that a hearing may already be in progress. <u>During hearings participants are required to keep their lines on mute when they are not addressing the Court or otherwise actively participating in the hearing</u>. **The Court reserves the right to disconnect or place on permanent mute any attendee that causes any disruption to the proceedings**.  For general information and tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode, and live testimony will only be accepted from witnesses who have the WebEx video function activated**. Telephonic testimony without accompanying video will <u>not</u> be accepted by the Court.  The Court may consider special requests for other appearance options on a case-by-case basis.

- All WebEx hearing attendees are required to comply with Judge Everett's Telephonic and Videoconference Hearing Policy (included within Judge Everett's Judge-Specific Guidelines): https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-everetts-hearing-dates .

**Exhibit Requirements**:

- Any party intending to introduce documentary evidence at the hearing <u>must</u> file an exhibit list in the case with a true and correct copy of each designated exhibit filed as a <u>separate, individual</u> attachment <u>thereto</u> so that the Court and all participants have ready access to all designated exhibits.

- In addition, for evidentiary hearings, when more than ten exhibits have been filed in ECF or when the total page count of all exhibits exceeds 500 pages, Judge Everett requests a thumb/USB drive be delivered to him prior to the hearing at: U.S. Bankruptcy Court, Attn: Stephen Manz, 1100 Commerce Street, Room 1254, Dallas, TX 75242.

- Paper copies of exhibits are not encouraged; however, paper copies may be provided <u>to the witness(s)</u> at an in-person hearing if preferred.

**Notice of Hearing Content and Filing Requirements:**

<u>IMPORTANT: For all hearings that will be conducted by WebEx only</u>:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing Instructions or provide notice that they may be obtained from Judge Everett's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-everetts-hearing-dates .

- When electronically filing the Notice of Hearing via CM/ECF <u>select "at https://us-courts.webex.com/meet/everett" as the location of the hearing</u> (note: this option appears immediately after the first set of Wichita Falls locations).  Do <u>not</u> select Judge Everett's Dallas courtroom as the location for the hearing.

## <u>CONNECTION INSTRUCTIONS FOR PARTICIPATING IN A WEBEX VIRTUAL HEARING</u>

The Court will allow participation in a virtual hearing using either of the following two methods. Please connect at least 10 minutes prior to the hearing time. It is recommended that attorneys discuss the logistics of the WebEx appearance with their clients/witnesses at least 48 hours before the hearing.

### <u>Option 1: Using the WebEx app on your smartphone, tablet, laptop, or desktop.</u>

Please connect using only one device. Using two or more devices may cause audio feedback issues.

If using a phone or tablet for video, it should be set in a stationary position. Holding a phone or tablet in your hand while speaking does not yield a good video for the court.

**NOTE: If you are experiencing audio issues when using the WebEx application,** you may use the "Call Me At" selection under "Audio Connection" to move just the audio portion of the WebEx conference to your telephone.

### <u>Option 2: Call in via phone (audio only).</u>

Webex dial-in number: 1-650-479-3207 (access code: 2304 017 9738).

## <u>HELPFUL HINTS AND ETIQUETTE</u>

- Please use the mute function when you are not speaking. Please be aware that sometimes the court mutes everyone when there is background noise.  When you want to speak, make sure you are not on mute.  Call-in users should <u>dial *6 to unmute your line</u>.

- Remember to state your name for the record each time before speaking and speak slowly and clearly so the Court can get a good record.

- Use headphones whenever possible, especially if using a desktop PC with external speakers. We have found that newer iPhones provide the best visual and audio feed – better than most desktop computers. <u>If you are on a personal computer, headphones or earbuds are required for those who need to speak during the hearing.</u>

- During examination, attorneys and witnesses should use a separate camera and microphone  when possible. To avoid feedback, parties using separate devices must not be in the same room. The Court may consider special requests on a case-by-case basis.
- WebEx participants may use the "share" button to easily share their screen or document with the Court or other WebEx participants.  Press "stop sharing" to remove the presentation from the meeting.

- When making an appearance from a vehicle, please park in a safe location with windows rolled up (to minimize background distraction and noise) and use a headset that is ear-to-phone (not the vehicle's hands-free speaker-phone option).

- Suggestions for participating in a WebEx hearing from home: If you are having connectivity problems, turn off devices that may be using bandwidth on your home network. Devices or applications such as Facetime, Roku, streaming media players, video games, or large downloads can negatively impact the audio and video quality of the WebEx meeting.

- Participants are reminded that they should wear attire suitable for court.

- Participants who wish to test their WebEx connection or the share screen functionality in advance of the hearing may arrange a "practice run" by contacting the courtroom deputy.

Exhibits should be filed ahead of time by the date that they would normally be exchanged pursuant to our local rules using the "list (witness/exhibit/generic)" OR "notice (generic)" OR "Support/Supplemental document" event in ECF.

Demonstrative aids and Power Points should also be filed prior to the hearing, if possible. If not, WebEx has the ability to allow you to share your screen, or a particular document, with everyone in the hearing. If these documents are admitted as exhibits, they would then have to be filed after the hearing.

- During the hearing, lawyers can refer to (and offer) their exhibits by referencing the exhibit's docket number for the court and all to access. After the hearing, the court will create a Minute Entry reflecting which exhibits were admitted. You should consider emailing exhibits to witnesses ahead of time since they may not have access to PACER.

- In addition for evidentiary hearings, when more than ten exhibits have been filed in ECF or when the total page count of all exhibits exceeds 500 pages, Judge Everett requests a thumb/USB drive be delivered to him prior to the hearing at: U.S. Bankruptcy Court, Attn: Stephen Manz, 1100 Commerce Street, Room 1254, Dallas, TX 75242.

- Paper copies of exhibits are not encouraged; however, paper copies may be provided to the witness(s) at an in-person hearing if preferred.

# EXHIBIT C



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 29, 2025**

_____
**United States Bankruptcy Judge**

_____

United States Bankruptcy Court
Northern District of Texas
Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | Case No. 25-80156-swe-11 |
| | § | |
| Debtor. | § | |

### _Order Preserving Status Quo_

On July 18, 2025, creditors Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. filed an *Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* [the **"Motion"**] [Docket No. 100]. On August 1, 2025, creditor Professional Bull Riders, LLC filed a *Partial Joinder* in Trinity's Motion [the **"Joinder"**] [Docket No. 151]. The Court conducted a multi-day trial on those requests and read its ruling into the record on October 28, 2025, starting at 2:00 p.m. Under the Court's ruling, the Court intends to convert this case to Chapter 7 pursuant to a separate order. This order is not the conversion order.

At the end of the Court's ruling, the Debtor announced its intent to file a motion for stay pending appeal and requested an opportunity to brief the issue before a Chapter 7 trustee is appointed. The Court has not yet entered its order converting the case to Chapter 7. The Court is willing

1

to preserve the status quo, but the status quo must apply to all parties. Therefore, pursuant to 11 U.S.C. § 105(a) and—to the extent it applies prior to entry of a conversion order—Bankruptcy Rule 8007(e), the Court will delay entering the conversion order until the Court hears the motion for stay pending appeal.

In addition, pending further Court order, it is **ORDERED** that—notwithstanding any prior orders entered in this case—the Debtor shall not transfer any estate property to any person for any reason pending further Court order, and any transfers made after 2:00 p.m. on October 28, 2025, shall be returned to the Debtor immediately.

It is further **ORDERED** that the parties shall confer on the logistics of the hearing date and briefing deadlines.

### End of Order ###