Jason M. Rudd, Tex. Bar No. 24028786
Scott D. Lawrence, Tex. Bar No. 24087896
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Email: jason.rudd@wickphillips.com
        scott.lawrence@wickphillips.com

Jennifer R. Hoover (*pro hac vice* admitted)
Andrew D. Kinsey (*pro hac vice* admitted)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
1313 N. Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Email: jhoover@beneschlaw.com
        akinsey@beneschlaw.com

**COUNSEL TO PROFESSIONAL BULL RIDERS, LLC**

Nicholas J. Secco (*pro hac vice* admitted)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949
Email: nsecco@beneschlaw.com

Alyssa A. Moscarino (*pro hac vice* admitted)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: (216) 363-4500
Email: amoscarino@beneschlaw.com

Abbey Walsh (*pro hac vice* admitted)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
1155 Avenue of the Americas, 26th Floor
New York, NY 10036
Telephone: (646) 777-0053
Email: abbey.walsh@beneschlaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MERIT STREET MEDIA, INC.,[1] | Case No. 25-80156 (SWE) |
| Debtor. | |

**PROFESSIONAL BULL RIDERS, LLC'S OMNIBUS BRIEF IN OPPOSITION
TO DEBTOR'S EMERGENCY MOTION TO STAY PENDING APPEAL
AND PETESKI PRODUCTION INC.'S MOTION FOR STAY PENDING APPEAL,
OR ALTERNATIVELY FOR A TEMPORARY ADMINISTRATIVE STAY,
OF OCTOBER 28, 2025 RULING AND ANY ORDER CONVERTING
THIS PROCEEDING AND APPOINTING A CHAPTER 7 TRUSTEE**

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy, Fort Worth, TX 76177.

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT.................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

    I.      RELEVANT PLAYERS.................................................................................. 3

    II.     EARLY BANKRUPTCY EVENTS. ............................................................ 5

    III.    DEBTOR'S AND PETESKI'S DISCOVERY MISCONDUCT &
            DISMISSAL REQUEST. ..................................................................... 7

    IV.    DEBTOR, PETESKI, AND THE UCC'S PROPOSED PLAN. ............................ 9

    V.     THE TRIAL. ........................................................................................ 10

    VI.    THE COURT'S RULING....................................................................... 12

          A.    The Four Causes. ................................................................... 13

          B.    Conversion, Dismissal, or Appointment of a Chapter 11
               Trustee.................................................................................. 14

          C.    Unusual Circumstances Exception. ........................................ 15

LAW AND ARGUMENT ..................................................................................... 17

    I.      LEGAL STANDARD ............................................................................ 17

          A.    Motions to Stay Pending Appeal............................................ 17

          B.    Cause to Dismiss, Convert, or Appoint a Chapter 11
               Trustee.................................................................................. 18

    II.     ARGUMENT ...................................................................................... 20

          A.    Lack of Likelihood of Success on the Merits Weighs in
               Favor of Denying the Stay. .................................................... 20

               1.    Cause 1: Substantial and Continuing Loss and
                     Diminution/Rehabilitation. ........................................... 22

                     a.    Substantial or Continuing Losses or
                         Diminution. ....................................................... 22

                     b.    Rehabilitation.................................................... 25

i

2. Cause 2: The CRO Was Not An Independent Fiduciary to Debtor. ...................................................... 26

3. Cause 3: The CRO Failed In His Duty Of Candor To The Court. ................................................................ 30

4. Cause 4: Dr. Phil Destroyed Relevant Evidence........................... 35

5. The Unusual Circumstances Exception Does Not Apply........................................................................................ 39

B. Lack of Irreparable Harm Weighs in Favor of Denying the Stay........................................................................................... 41

C. Substantial Harm to Others Weighs in Favor of Denying the Stay........................................................................................... 48

D. Public Interest Weighs in Favor of Denying the Stay. ............................. 50

III. A TEMPORARY ADMINISTRATIVE STAY IS UNNECESSARY ................... 51

IV. ALTERNATIVE REQUEST TO SUSPEND THE CHAPTER 11 CASE IN THE EVENT A STAY IS GRANTED.................................................. 53

CONCLUSION.............................................................................................................. 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 473 W. End Realty Corp.*,
507 B.R. 496 (Bankr. S.D.N.Y. 2014) ......................................................................48

*In re A&F Enters., Inc. II*,
742 F.3d 763 (7th Cir. 2014) ....................................................................................43

*In re ABC Learning Centres Ltd.*,
445 B.R. 318 (Bankr. D. Del. 2010) .........................................................................19

*In re Abengoa Bioenergy Biomass of Kansas, LLC*,
2018 WL 1613667 (Bankr. D. Kan. Mar. 29, 2018) .................................................50

*In re Adams*,
2020 WL 4922330 (N.D. Tex. Aug. 20, 2020) ..........................................................30

*In re Addison*,
667 B.R. 94 (Bankr. D.S.C. 2025) .............................................................................51

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) ...............................................................42, 44, 46, 47

*In re Advanced Modular Power Systems*,
413 B.R. 643 (Bankr. S.D. Tex. 2009) .....................................................................38

*Allen v. Fitzgerald for Region Four*,
590 B.R. 352 (W.D. Va. 2018) ..................................................................................46

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ....................................................................................45

*In re Am. Land Acquisition Corp.*,
2013 WL 2481534 (Bankr. E.D.N.Y. June 10, 2013) ..............................................42

*Andover Covered Bridge, LLC*,
553 B.R. 162 (B.A.P. 1st Cir. 2016) .........................................................................39

*In re Baroni*,
36 F.4th 958 (9th Cir. 2022) .........................................................................39, 40, 41

*In re Bear Creek Trail*,
35 F.4th 1277 (10th Cir. 2022) .................................................................................42

*Belcher v. Birmingham Tr. Nat'l Bank*,
   395 F.2d 685 (5th Cir. 1968) ...............................................................17

*In re BMI Oldco Inc.*,
   671 B.R. 215 (Bankr. S.D. Tex. 2025) ...........................................25, 26

*Bradberry v. T-Mobile USA, Inc.*,
   2007 WL 2221076 (N.D. Cal. Aug. 2, 2007) ................................48, 49

*Burgess v. FDIC*,
   871 F.3d 297 (5th Cir. 2017) ............................................................45

*In re Burkett*,
   279 B.R. 816 (Bankr. W.D. Tex. 2002)..........................................21, 22

*In re California Palms Addiction Recovery Campus, Inc.*,
   87 F.4th 734 (6th Cir. 2023) ..........................................................18, 43

*Cantu v. Romero Gonzalez & Benavides LLP*,
   2009 WL 10703740 (S.D. Tex. Oct. 13, 2009), *aff'd sub nom. In re Cantu*, 398
   F. App'x 76 (5th Cir. 2010)..........................................................18, 19

*Colorado River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976)..........................................................................47

*In re Correra*,
   589 B.R. 76 (Bankr. N.D. Tex. 2018)...................................................38

*In re Costa Bonita Beach Resort Inc.*,
   479 B.R. 14 (Bankr. D.P.R. 2012)..................................................39, 40

*In re Creekside Sr. Apartments, L.P.*,
   489 B.R. 51 (B.A.P. 6th Cir. 2013)......................................................21

*In re CTLI, LLC*,
   528 B.R. 359 (Bankr. S.D. Tex. 2015) ................................................38

*In re C.W. Mining Co.*,
   636 F.3d 1257 (10th Cir. 2011) ..........................................................42

*DBD Credit Funding, LLC v. Silicon Lab'ys Inc.*,
   2016 WL 6893882 (N.D. Cal. Nov. 23, 2016) ................................48, 49

*In re Dow Corning Corp.*,
   194 B.R. 147 (Bankr. E.D. Mich. 1996)...............................................48

*Matter of Fiesta Homes of Georgia, Inc.*,
   125 B.R. 321 (Bankr. S.D. Ga. 1990)..................................................29

*In re Fiesta Inn & Suites, LP*,
   2009 WL 5195961 (Bankr. W.D. Tex. Dec. 21, 2009)....................................................18, 47

*In re First S. Sav. Ass'n*,
   820 F.2d 700 (5th Cir. 1987) ............................................................................................18

*In re Fordu*,
   201 F.3d 693 (6th Cir. 1999) ............................................................................................18

*Freedom From Religion Found., Inc. v. Mack*,
   4 F.4th 306 (5th Cir. 2021) ...............................................................................................47

*In re Garcia Grain Trading Corp.*,
   2025 WL 2730614 (Bankr. S.D. Tex. Sept. 24, 2025) ......................................................51

*Garcia v. Posada*,
   2024 WL 4415280 (N.D. Tex. Apr. 9, 2024) .....................................................................52

*In re Gen. Motors Corp.*,
   409 B.R. 24 (Bankr. S.D.N.Y. 2009)............................................................................44, 45

*In re Golden*,
   671 B.R. 638 (Bankr. E.D.N.Y. 2025)...............................................................................18

*In re Graf Bros., Inc.*,
   19 B.R. 269 (Bankr. D. Me. 1982)....................................................................................29

*In re Great Am. Pyramid Joint Venture*,
   144 B.R. 780 (Bankr. W.D. Tenn. 1992).........................................................18, 19, 20, 36

*Hardes Holding, LLC v. Sandton Credit Sols. Master Fund, III, LP*,
   2019 WL 6347775 (D.S.D. Nov. 27, 2019)........................................................................45

*In re Herrera*,
   2010 WL 148182 (Bankr. W.D. Tex. Jan. 8, 2010)..................................................... *passim*

*Hilton v. Braunskill*,
   481 U.S. 770 (1987)...........................................................................................................18

*In re Honx, Inc.*,
   2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) ............................................24, 25, 26

*In re Hosack*,
   2006 WL 2385249 (Bankr. N.D. Tex. Aug. 3, 2006).........................................................50

*In re Jacobsen*,
   609 F.3d 647 (5th Cir. 2010) ............................................................................................19

*In re Kwok*,
    662 B.R. 432 (Bankr. D. Conn. 2023) ...................................................................43

*In re L.S. Good & Co.*,
    8 B.R. 312 (Bankr. N.D. W. Va. 1980)...................................................................29

*In re Latimer*,
    489 B.R. 844 (Bankr. N.D. Ala. 2013) ...................................................................51

*In re Lickman*,
    301 B.R. 739 (Bankr. M.D. Fla. 2003) ...................................................................48

*Long v. Robinson*,
    432 F.2d 977 (4th Cir. 1970) ...................................................................................46

*Loop Corp. v. U.S. Tr.*,
    379 F.3d 511 (8th Cir. 2004) ...................................................................................26

*Marrama v. Citizens Bank of Massachusetts*,
    549 U.S. 365 (2007)...........................................................................................19, 36

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................17, 42, 45, 52

*In re Pac. Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ...................................................................................47

*Patman Drilling Int'l, Inc. v. GE Bus. Fin. Servs., Inc.*,
    2008 WL 11349766 (N.D. Tex. May 28, 2008) .....................................................42

*In re Permian Producers Drilling, Inc.*,
    263 B.R. 510 (W.D. Tex. 2000).............................................................................18

*Quest Ventures, Ltd. v. IPA Mgmt. IV, LLC*,
    2018 WL 922145 (E.D.N.Y. Feb. 15, 2018)..........................................................45

*In re Quinteros*,
    2019 WL 5874609 (Bankr. D.D.C. Nov. 8, 2019)..................................................52

*In re Quinteros*,
    2020 WL 6701321 (Bankr. D.D.C. Nov. 13, 2020)................................................52

*In re Ramos*,
    679 Fed. Appx. 353 (5th Cir. 2017).......................................................................30

*In re Red Mountain Mach. Co.*,
    451 B.R. 897 (Bankr. D. Ariz. 2011)......................................................................52

*In re Red River Talc LLC*,
  670 B.R. 251 (Bankr. S.D. Tex. 2025) ............................................................25, 26

*Rolen v. Hansen Beverage Co.*,
  193 Fed. Appx. 468 (6th Cir. 2006) .......................................................................21

*In re Rosson*,
  545 F.3d 764 (9th Cir. 2008) .................................................................................43

*In re Royal Alice Props., LLC*,
  2020 WL 5552576 (Bankr. E.D. La. Sept. 16, 2020) ............................................17

*Ruiz v. Estelle*,
  650 F.2d 555 (5th Cir. 1981) ...........................................................................18, 21

*Ruiz v. Estelle*,
  666 F.2d 854 (5th Cir. 1982) ...........................................................................20, 21

*Sampson v. Murray*,
  415 U.S. 61 (1974)..................................................................................................46

*In re Sanders*,
  2000 WL 329574 (Bankr. N.D. Ill. Mar. 2, 2000) .................................................34

*In re Sealed Appellant*,
  194 F.3d 666 (5th Cir. 1999) .................................................................................31

*In re: Serta Simmons Bedding, LLC*,
  2023 WL 4275019 (S.D. Tex. June 29, 2023), *appeal dismissed sub nom.*
  *Matter of Serta Simmons Bedding, L.L.C.*, 2023 WL 9056061 (5th Cir. July
  31, 2023) .................................................................................................................21

*In re Sillerman*,
  605 B.R. 631 (Bankr. S.D.N.Y. 2019) ...................................................................35

*In re Sternitzky*,
  638 B.R. 770 (Bankr. W.D. Wis. 2022).................................................................50

*Sweet v. Cardona*,
  657 F. Supp. 3d 1260 (N.D. Cal. 2023) ...........................................................45, 52

*In re Target Graphics, Inc.*,
  372 B.R. 866 (E.D. Tenn. 2007) ............................................................................21

*In re Taub*,
  470 B.R. 273 (E.D.N.Y. 2012) ........................................................................42, 44

*In re Texas Equip. Co., Inc.*,
   283 B.R. 222 (Bankr. N.D. Tex. 2002)............................................................................ *passim*

*In re Texas Health Enters., Inc.*,
   255 B.R. 185 (Bankr. E.D. Tex. 2000) ...................................................................................17

*Texas v. United States Dep't of Homeland Sec.*,
   2024 WL 5454617 (E.D. Tex. Aug. 26, 2024), *modified*, 747 F. Supp. 3d 1005
   (E.D. Tex. 2024) ......................................................................................................................52

*In re TMT Procurement Corp.*,
   534 B.R. 912 (Bankr. S.D. Tex 2015) .......................................................................22, 23, 24

*Torch Liquidating Trust v. Stockstill*,
   561 F.3d 377 (5th Cir. 2009) ..................................................................................................38

*In re Trico Marine Servs., Inc.*,
   374 B.R. 529 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. In re Trico Marine
   Servs.*, 382 B.R. 201 (S.D.N.Y. 2008), *aff'd sub nom. In re Trico Marine
   Servs., Inc.*, 340 F. App'x 55 (2d Cir. 2009)........................................................................31

*In re Turkey Leg Hut & Co. LLC*,
   665 B.R. 129 (Bankr. S.D. Tex. 2024) ...................................................................................35

*In re Turner*,
   207 B.R. 373 (B.A.P. 2d Cir. 1997), *as amended* (Mar. 4, 1997) .........................................50

*United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
   44 F.3d 1082 (2d Cir. 1995).....................................................................................................17

*United States v. Smith*,
   2024 WL 516677 (E.D. Mo. Feb. 9, 2024)..............................................................................34

*United States v. Texas*,
   144 S. Ct. 797 (2024) (Barrett, J., concurring) ...............................................................51, 52

*Valley v. Rapides Parish School Bd.*,
   118 F.3d 1047 .........................................................................................................................45

*In re Vascular Access Centers, L.P.*,
   611 B.R. 742 (Bankr. E.D. Penn. 2020) ............................................................................19, 34

*Virginian Ry. Co. v. United States*,
   272 U.S. 658 (1926).............................................................................................................17, 42

*In re Wahlie*,
   417 B.R. 8 (Bankr. N.D. Ohio 2009) ......................................................................................41

*In re Wylie*,
635 B.R. 291 (Bankr. E.D. Mich. 2021) ..................................................21

*In re Westbank Holdings*,
LLC, 2022 WL 3052135 (Bankr. E.D. La. Aug. 1, 2022) ......................34

*In re Young*,
237 F.3d 1168 (10th Cir. 2001) ............................................................43

**Statutes**

11 U.S.C. § 105(a) ..................................................................... *passim*

11 U.S.C. § 524(g)(1)(A) ....................................................................25

11 U.S.C. § 1104(a)(1)..............................................................6, 19, 35

11 U.S.C. § 1112(b)(1) .......................................................................20

11 U.S.C. § 1112(b)(2) ...........................................................15, 18, 26

11 U.S.C. § 1112(b)(4) ............................................................... *passim*

11 U.S.C. § 8007..........................................................................17, 53

**Other Authorities**

Alex Weprin, *Dr. Phil Returns: Launches Envoy Media Co. In Comeback Bid*,
Hollywood Reporter (July 14, 2025, 6:36 AM),
https://www.hollywoodreporter.com/business/business-news/dr-phil-returns-
launches-envoy-mediaco-citizen-journalism-1236313554/......................................6

*Ohio Attorney Directory*, SUP. CT. STATE OH.,
https://www.supremecourt.ohio.gov/attorneysearch/#/83876/attyinfo (last
visited November 17, 2025)...................................................................4

The Professional Bull Riders, LLC ("PBR") respectfully submits this Omnibus Brief in Opposition to Debtor Merit Street Media, Inc.'s ("Debtor") Emergency Motion To Stay Pending Appeal ("Debtor Mot.") [Docs. 589, 590] and DIP Lender Peteski Production Inc.'s ("Peteski" and together with Debtor, the "Movants") Motion For Stay Pending Appeal, Or Alternatively For A Temporary Administrative Stay, of October 28, 2025 Ruling And Any Order Converting This Proceeding And Appointing A Chapter 7 Trustee ("Peteski Mot." and together with Debtor Mot., the "Motions") [Docs. 585, 586].

## **PRELIMINARY STATEMENT**

"This Chapter 11 case is an anomaly."[2] "What makes this case unique, unfortunately, is that it has been plagued with the attempted destruction of relevant evidence and less-than-truthful testimony by some of the key players."[3] "I find, based on all the evidence, that [Dr. Phil] deleted the unflattering text message after the bankruptcy petition date because he didn't want me to see it."[4] "I find that Mr. Broadbent's testimony did not satisfy the duty of candor that he has to the Court. For some reason, when put under the spotlight, Mr. Broadbent thought it was more important to shield from the Court his communications with [Dr. Phil]."[5] "I find that Mr. Broadbent was simply doing [Dr. Phil]'s bidding for Envoy, when he should have pushed back instead and kept his distance."[6] "[Dr. Phil] believed he was calling the shots."[7]

---

[2] *See* the Court's October 28, 2025 ruling, at 4:17 [hereinafter "Ruling"], on the requests by Trinity and PBR to dismiss the case, convert it to Chapter 7, or appoint a Chapter 11 Trustee, Docs. 100, Trinity Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee ["Motion to Dismiss/Convert"]; Doc. 151, PBR Partial Joinder In Support of Trinity's Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee ["Partial Joinder"].
[3] Ruling, at 5:3–6.
[4] *Id.* at 37:4–6.
[5] *Id.* at 56:22–57:1.
[6] *Id.* at 47:4–7.
[7] *Id.* at 59:12–13.

1

This is a mere sample of quotes from this Court's 2 ½-hour Ruling delivered from the bench on October 28, 2025. During it, the Court identified four independent "clear" causes to convert this case to Chapter 7.[8] The Court found that conversion was the winner "by a large margin" after presiding over a bench trial that included five trial days spanning from September 16 to 29. During the trial, the Court heard full opening and closing statements, testimony from nine witnesses, and countless arguments from counsel. The Court stayed on the bench after hours on several occasions and examined witnesses on its own. It admitted nearly 200 trial exhibits into the record.

The Court reached serious findings about the conduct of those managing the estate. It found that Phillip C. McGraw ("Dr. Phil") improperly exerted influence to exploit the bankruptcy process for his own benefit. It found that Gary Broadbent ("Broadbent"), Debtor's Chief Restructuring Officer ("CRO"), was not a neutral fiduciary but was instead loyal to Dr. Phil. It found that Broadbent did not satisfy his duty of candor to the Court when he lied in his trial testimony. It found that Dr. Phil intentionally destroyed estate property in the form of an unflattering text message while acting as an agent of Debtor. It found that the Ribman Trust, represented by Jamie and Darcy Ribman (Dr. Phil's close friends), should not be on the Unsecured Creditors Committee ("UCC") because it enjoys a personal, preferred guarantee from Dr. Phil, as evidenced in the text Dr. Phil deleted. It found that Debtor, whose "business was dead as a doornail when they filed for bankruptcy" was suffering substantial and continuing losses with "no hope of rehabilitation."

Comparing the Chapter 11 case to a "broken three-legged stool" with Dr. Phil, Broadbent, and the UCC (half composed of the Ribmans) as the legs, the Court assured creditors they can have faith that Chapter 7 will deliver them a fair and neutral process.

---

[8] *Id.* at 67:21–219

The Court's Ruling is sound, thorough, and well-supported by the facts and law. Yet Debtor

and Peteski insist they are entitled to a stay because they will succeed on appeal. The bottom line

is that there is no remote likelihood of success for Movants, and their continued attempts to

compromise the integrity of the bankruptcy process will create more harm to the estate than they

have already caused. Indeed, if a stay is granted, Dr. Phil (who destroyed estate property) and

Broadbent (who is conflicted in favor of Dr. Phil) may remain in charge for the foreseeable future.

This is not about maximizing value to creditors. It is about Dr. Phil and his cabal, who are desperate

to stay in control, continuing to advance their interests over those of the estate. The Motions are

just the latest example. This Court should not condone it.

**STATEMENT OF FACTS**

A series of events that unfolded before trial provide important context for what transpired

in this case. A discussion of those events is vital for purposes of framing the Motions.

**I.      RELEVANT PLAYERS.**

**Trinity**. TBN is a non-profit corporation that operates the Trinity Broadcasting Network,

based in Fort Worth, Texas. TCT, an affiliate of TBN, is a non-profit corporation that operates the

TCT Network, based in Marion, Illinois. TCT produces and broadcasts Christian programming.[9]

**Dr. Phil & Peteski**. Dr. Phil is a television personality, podcast host, and author who

founded and is the majority owner of Peteski, the DIP Lender.[10] Dr. Phil (through Peteski) and

Trinity co-founded Debtor. Until he retained Broadbent as Debtor's CRO less than two weeks

before filing for bankruptcy, Dr. Phil was Debtor's sole board member and director.[11]

---

[9] *Id.* at 5:24–6:8.
[10] *Id.* at 6:9–21.
[11] Doc. 14, Declaration of Gary Broadbent, Chief Restructuring Officer of the Debtor, In Support of the Debtor's
Chapter 11 Proceeding, ["CRO Declaration"].

**Broadbent**. Broadbent is the Debtor's CRO. He has a Juris Doctor from Case Western Reserve University and served as both in-house counsel and chief legal officer before his position with Debtor.[12] His license to practice law in Ohio is active.[13] On July 18, 2025, Dr. Phil, as sole board member and director of the Debtor, hand-picked Broadbent to serve as CRO. But Broadbent had been in contact with Dr. Phil and Peteski's legal team as early as February 2025.[14]

**Ribmans and the UCC**. Dr. Phil is close personal friends with Jamie and Darcy Ribman (husband and wife). Indeed, Dr. Phil frequently flies on Mr. Ribman's private plane.[15] The Ribmans are all over this case. In June 2024, Dr. Phil told Mr. Ribman that he wanted to get rid of Trinity, his co-equity owner. In July 2024, Mr. Ribman helped Dr. Phil navigate an equity swap with Trinity that went into effect on August 8, 2024, under which Dr. Phil (through Peteski) took majority control of Debtor.[16] In December 2024, The Darcy Lynn Ribman 1997 Trust (the "Ribman Trust") lent Debtor $5 million.[17] On the eve of the bankruptcy, Dr. Phil texted Mr. Ribman his plans to file for Chapter 11 on behalf of Debtor and personally guaranteed the Ribmans' $5 million investment "no matter what the Court does." As discussed further below, Dr. Phil later intentionally deleted that text because he wanted to shield it from discovery. As his close friend, Mr. Ribman was a cheerleader for Dr. Phil's plans, replying, "[y]our challenges are mine!"[18]

Darcy Ribman, representing the Ribman Trust, was appointed to and became Chair of the UCC. PBR and Borden Media Consulting were also appointed.[19] Thereafter, Debtor's counsel

---

[12] 9/17/2025 P.M. Tr., at 140:9–14; 141:1–4; *see also* Doc. 14, CRO Declaration.

[13] *The Supreme Court of Ohio Attorney Directory*, SUP. CT. STATE OH., https://www.supremecourt.ohio.gov/attorneysearch/#/83876/attyinfo (last visited November 17, 2025).

[14] Ruling, at 13:14–21.

[15] *Id.* at 28:20–24.

[16] *Id.* at 8:13–10:17 (citing TBN Exs. 33, 59; Peteski Exs. 27, 106; Doc. 401, ¶ 2; Doc. 414, ¶ 48; Doc. 529, at 18–19).

[17] *See id.* at 17:7–22:16 (citing TBN Exs. 16, 23, 330; Peteski Ex. 109; Doc. 401, ¶ 8 n.7; Doc. 523, at 25; Adversary Proceeding No. 25-8006).

[18] TBN Ex. 330; PBR Ex. 231.

[19] Doc. 95, Appointment of the Official Unsecured Creditor's Committee.

nudged the U.S. Trustee to remove PBR from the UCC because Debtor was marketing its arbitration counterclaims against PBR. Shortly after, the UST removed PBR from the UCC even though PBR vowed not to bid on any claims against it—thereby leaving the Ribman Trust, managed by close friends of Dr. Phil's, as half of the UCC.[20]

**PBR**. PBR is the premier and largest bull riding organization in the world. It is also the largest creditor in this case, seeking $181 million (plus attorneys' fees) from Debtor for its breach of a May 2024 media rights agreement with PBR in which Debtor agreed to broadcast PBR's content. Specifically, Debtor reneged on the agreement by stopping payments with no justification just five months after signing, leading PBR to terminate the agreement and file arbitration against Debtor in November 2024.[21] PBR learned that on September 3, 2024, Dr. Phil told Debtor officers he planned to withhold payment to PBR as a leverage tool against Trinity. Dr. Phil acknowledged that "[o]bviously, [PBR] ha[s] to be paid, but I'm playing some eleventh-hour poker here." PBR was never paid.[22] When Debtor filed this case, it was embroiled in the PBR arbitration.

## II.    EARLY BANKRUPTCY EVENTS.

Debtor filed this case, a DIP Motion, and an adversary proceeding against Trinity on July 2, 2025.[23] That same day, Debtor fired nearly all of its employees.[24] On July 3, during the first-day hearing, the Court approved an interim DIP loan and set a final DIP hearing for July 29.[25] But the DIP Motion had an "unorthodox" request: Peteski would not fund a second DIP draw unless it

---

[20] Ruling, at 24:15–23 (citing Doc. 550, at 8–10; Doc. 172).

[21] *See id.* at 16:19–22 (citing Doc. 97, at 4).

[22] *Id.* at 15:4–16:18 (citing TBN Ex. 558).

[23] *Id.* at 4:21–23; 31:4–22.

[24] *Id.* at 41:12–13.

[25] Doc. 35, Interim Order (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtor to Use Cash Collateral; (III) Granting Adequate Protection, and (IV) Granting Related Relief; Doc. 48, Omnibus Notice of Hearing for July 29, 2025.

prevailed on Debtor's preference claim against Trinity, contained in a six-count post-petition adversary proceeding filed before any substantive motions in the main case.[26]

Two weeks later, on July 14, Dr. Phil announced he was launching Envoy Media Co. ("Envoy"), a suspiciously similar business that was reported to air nearly identical content to Debtor.[27] Corporate filings revealed Dr. Phil founded Envoy on July 1, the day before Debtor filed its case.[28] Four days later, on July 18, Trinity moved to dismiss the bankruptcy, or alternatively, convert it to Chapter 7 or appoint a Chapter 11 Trustee (the "Motion to Dismiss/Convert").[29]

In the Motion to Dismiss/Convert, Trinity alleged the bankruptcy was a sham orchestrated by Dr. Phil to benefit himself at the expense of all others.[30] Trinity argued there was cause to dismiss or convert the case, or appoint a Chapter 11 Trustee, citing Bankruptcy Code §§ 1112(b) and 1104(a)(1).[31] Among the alleged causes were lack of corporate authority, bad faith, no valid bankruptcy purpose, and conflicts of interest (between Debtor, Peteski, and Broadbent).[32] Trinity argued that in the event the Court found corporate authority, creditors would be best served with an impartial Chapter 7 Trustee in charge rather than Dr. Phil, who would promote his own interests. Trinity also highlighted that Debtor was not an operating business.[33]

PBR filed a partial joinder to Trinity's Motion to Dismiss/Convert (the "Partial Joinder"), seeking only conversion.[34] Like Trinity, PBR argued cause under § 1112(b) for bad faith and no

---

[26] Ruling, at 31:10–18 (citing Adversary Proceeding No. 25-8006).
[27] Alex Weprin, *Dr. Phil Returns: Launches Envoy Media Co. In Comeback Bid*, HOLLYWOOD REPORTER (July 14, 2025, 6:36 AM), https://www.hollywoodreporter.com/business/business-news/dr-phil-returns-launches-envoy-mediaco-citizen-journalism-1236313554/.
[28] TBN Ex. 325.
[29] Doc. 10, Motion to Dismiss/Convert.
[30] *Id.* ¶ 1.
[31] *Id.* ¶ 41.
[32] *Id.* ¶¶ 43–67; 70–72.
[33] *Id.* ¶ 67.
[34] Doc. 151, Partial Joinder.

valid bankruptcy purpose.[35] But PBR also raised substantial or continuing loss and diminution to the estate with no likelihood of rehabilitation as another cause to convert.[36] PBR claimed that Debtor did not file to save it business; it shut down operations, laid off nearly its entire workforce that same day, and proceeded to saddle the estate with exorbitant professional fees.[37] Finally, PBR argued that there was a lack of an independent fiduciary presiding over the estate.[38]

## III.    DEBTOR'S AND PETESKI'S DISCOVERY MISCONDUCT & DISMISSAL REQUEST.

Pursuant to requests from PBR and Trinity, the hearings on the Motion to Dismiss/Convert and final DIP approval were postponed to August 19, September 2, and September 16.[39] Debtor characterizes the delays as the fault of Trinity, PBR, and this Court.[40] Conveniently, Movants omit the months of discovery battles that ensued because they chose to withhold information.

PBR and Trinity served discovery to Debtor, Peteski, Dr. Phil, and Envoy. But they had trouble getting it, forcing PBR to file a motion to compel.[41] The Court held a status hearing, during which it was concerned "at least one attorney for Peteski was purposefully not cooperating" in discovery but asked the parties to confer. Conferrals stalled, forcing the parties to attend an August 14 hearing, at which the Court overruled all of Debtor's and Peteski's objections (including to Dr. Phil's texts and emails). The Court found "very few, if any, of the discovery rulings were particularly close calls," and ordered that production be complete by August 22. At this time, the

---

[35] *Id.* ¶ 7.
[36] *Id.* ¶¶ 23–25.
[37] *Id.*
[38] *Id.* ¶¶ 26–27.
[39] Doc No. 144, Hearing Held 7/22/2025 Regarding Emergency Motion for Continuance; Doc. No. 248, Order Granting Motion to Continue Hearing; Doc. No. 373, Hearing Held 8/28/2025 Regarding Emergency Motion for Contempt & Sanctions ("Emergency Sanctions Hearing"). All parties agreed to hear these motions together. Ruling, at 33:7–13 (citing Doc. 144, at 27–28).
[40] Doc. 590, Debtor's Memorandum of Points and Authorities in Support of Emergency Motion to Stay Pending Appeal ["Debtor Memorandum in Support of Motion to Stay"], at 8–9.
at 8–9.
[41] Doc. 173, PBR Emergency Motion to Compel Production by the Debtor and Peteski.

final hearings were set for five days later, on August 19. Due to ample discovery outstanding, and upon Trinity's and PBR's requests, the Court continued the hearings to September 2.[42]

On August 18, in the wake of the Court's order compelling discovery and with the August 22 production deadline imminent, Debtor abruptly filed requests to consent to dismissal and for its counsel to withdraw, setting both for emergency hearing on August 19.[43] Debtor's stated basis: professional fees were mounting, and dismissal would allow Debtor to allegedly maintain a going concern business (despite that business being "dead as a doornail").[44] Curiously, the UCC also supported dismissal, saying creditors could file an involuntary petition against Debtor (the effect of which would allow friendly creditors to choose a court where the discovery orders were not in effect) or negotiate their claims outside of bankruptcy.[45] The Court denied both requests.[46]

Debtor's curious reasons for the dismissal request and the UCC's perplexing support soon became clear: Dr. Phil's August 28 deposition was approaching. But not all of his texts or emails were produced despite the August 22 deadline having expired, forcing Trinity to file an emergency motion for sanctions on August 26. The next day, Peteski claimed its "production is complete." The Court set an emergency hearing on August 28, when Dr. Phil's deposition was supposed to occur. During the hearing, it was revealed Peteski's production was not, in fact, complete.[47]

The worst example involved a text thread between Dr. Phil and Phil McIntyre, his longtime advisor, dated July 1–2, 2025.[48] In the McIntyre Thread, Dr. Phil cut-and-pasted a message he sent to his friend, Mr. Ribman, on the eve of bankruptcy, sharing the following: he is suing Trinity; he is filing for Chapter 11 for Debtor; it "will wipe out PBR's claim" against Debtor but Debtor's

---

[42] Ruling, at 34:4–35:4 (citing Doc. 223, at 42–43; Doc. 231, at 14, 19, 25, 31; Doc. 536; Doc. 248).
[43] *Id.* at 40:16–23.
[44] *Id.* at 41:4–10; 69:10–11.
[45] *Id.* at 41:22–42:5.
[46] *Id.* at 44:10–45:6.
[47] *Id.* at 35:9–21 (citing Doc. 303; Doc. 310, ¶ 1).
[48] TBN Ex. 330 (the "McIntyre Thread").

claim will survive; the "biggest creditor is me"; he was immediately relaunching Debtor as Envoy and hoped Mr. Ribman would move his investment there; and Mr. Ribman's "investment is one hundred percent safe" regardless of "what the Court does."[49] In sum, the text showed Dr. Phil planned to exploit the bankruptcy to advance his own interests and the UCC Chair enjoyed a guarantee. The problem was neither Peteski nor Debtor had produced the thread with Mr. Ribman (the "Ribman Thread")—just the cut-and-pasted message from the McIntyre Thread.[50]

During the August 28 hearing, the Court continued trial to September 16 so the parties would have all documents before Dr. Phil's deposition and set a status hearing on September 2.[51] Eventually, Peteski produced the Ribman Thread. But "curiously absent" was the text in which Dr. Phil guaranteed the Ribmans' investment and vowed to wipe out PBR's claim.[52] PBR joined Trinity's motion for sanctions, raising serious concerns Dr. Phil had spoliated evidence.[53]

## IV.    DEBTOR, PETESKI, AND THE UCC'S PROPOSED PLAN.

At the September 2 status conference, Debtor, Peteski, and UCC announced a settlement. Debtor claims PBR "refused to engage in negotiations regarding a chapter 11 plan."[54] This is false. PBR spent hours discussing the offered plan with counsel for Debtor, Peteski, and UCC, including a September 2 in-person meeting with UCC counsel. But no version of the settlement was acceptable, largely because it had releases for Dr. Phil and Peteski, the main wrongdoers, with no investigation into claims against them. That "settlement" later morphed into a proposed Chapter 11 Plan (the "Plan"), which Debtors filed at 7:17 P.M. on September 15, the night before trial.[55]

---

[49] Ruling, at 36:5–12 (citing TBN Ex. 330).
[50] *Id.* at 36:10–14.
[51] Doc. 373, Emergency Sanctions Hearing, at 95:3–13.
[52] Ruling, at 36:14–18 (citing PBR Ex. 231).
[53] Doc. 427, PBR Supplemental Joinder in Support of Trinity's Emergency Motion for Contempt and Sanctions Against Peteski.
[54] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 7.
[55] Doc. 416, Disclosure Statement for the Chapter 11 Plan of Debtor.

## V.      THE TRIAL.

The parties participated in a trial on the Motion to Dismiss/Convert from September 16–29, 2025 that included testimony from nine witnesses and almost 200 admitted exhibits. Debtor, Peteski, and UCC tried to turn the trial into a referendum on the Plan. The Court cautioned that the Plan was not relevant to the Motion to Dismiss/Convert. Still, the Court allowed testimony about it, saying it would apply the proper weight but would not entertain a "mini trial on the plan."[56]

PBR and Trinity proved at trial that as early as May 15, 2025, Dr. Phil and his team began planning to move Debtor's business to a new company, which they pitched to MediaCo controlling shareholder, Soo Kim.[57] The partnership which was memorialized into a letter of intent by June 27.[58] Simultaneously, Dr. Phil's team was using ChatGPT to look for a new company name.[59] On July 1, the day before the bankruptcy, Dr. Phil incorporated the new company as Envoy.[60]

PBR and Trinity also established that most of Debtor's remaining officers and employees were working for Envoy, which plotted to acquire Debtor's assets, while collecting paychecks from Debtor. There were countless examples.[61] Even Broadbent was working for Envoy, including by blessing the new company's press release.[62] This was just one example that led the Court to find Broadbent was "doing [Dr. Phil's] bidding for Envoy, when he should have pushed back and kept his distance."[63] In evaluating all of this evidence, the Court summarized: "[t]o put it charitably, it wasn't the greatest business judgment for [Debtor] officers Broadbent, Cheatwood, and Solomon

---

[56] 9/23/25 A.M. Tr., at 88:4–106:8.
[57] Ruling, at 13:22–25 (citing PBR Ex. 52).
[58] Id. at 14:1–8 (citing PBR Exs. 52, 153, 181).
[59] Id. at 14:4–5 (citing PBR Ex. 153).
[60] Id. at 14:9–11 (citing TBN Ex. 325).
[61] Id. at 45:7–23; 47:7–20 (citing Doc. 516, at 66–67, 70–71, 77, 88).
[62] Id. at 45:24–46:22 (citing TBN Ex. 416).
[63] Id. at 47:4–7.

to work for Envoy while simultaneously contesting allegations from [Trinity] and PBR that the

Debtor's CRO and other officers are conflicted and attached at the hip to [Dr. Phil]."[64]

Broadbent testified at length. During examination by the Court, he revealed a preference

for dismissal over conversion.[65] When pressed, he admitted dismissal would give another judge a

bite at the apple.[66] This admission heightened the Court's concerns that Broadbent was yielding to

a dismissal demand from Dr. Phil to prioritize his own interests.[67] So the Court questioned him

about Debtor's abrupt request to dismiss the case less than one month prior and whether he spoke

about it with Dr. Phil. The Court noted Broadbent's sharp change in demeanor and resistance and

defensiveness to the questions, during which he first denied and then feigned ignorance about the

discussions. Trinity promptly impeached Broadbent with board meeting minutes revealing that the

dismissal request was in fact discussed in Dr. Phil's presence.[68] Broadbent's disastrous attempt at

a remedial explanation: he confused the board meeting with a fifteen-minute Special Committee

meeting (of which he is the sole member) that took place immediately thereafter.[69]

The Court observed the following with respect to Broadbent's testimony about the board

meeting, which had transpired exactly one month prior: "In short, the dramatic August 17th board

meeting, the very purpose of which was to discuss dismissal versus conversion, was an event that

an intelligent, experienced, and competent CRO would not forget in one month, or a year, or even

ten years. Yet on September 17th, when I asked Mr. Broadbent directly whether he ever had such

a communication, he first denied it and then said he couldn't remember."[70] This led the Court to

find the following: "When I consider Mr. Broadbent's demeanor while testifying, the subject of

---

[64] *Id.* at 48:7–11.
[65] *Id.* at 48:17–49:1.
[66] *Id.* at 49:1–7 (citing Doc. 469, at 219).
[67] *Id.* at 49:8–11.
[68] *Id.* at 49:12–55:13 (citing TBN Ex. 532; Doc. 469, at 220:19–222:8, 223, 228).
[69] *Id.* at 54:6–55:13 (citing Doc. 469, at 228); 57:3–7.
[70] *Id.* at 56:9–15.

his testimony, and the memorable events leading up to his testimony, I find that Mr. Broadbent's testimony did not satisfy the duty of candor that he has to the Court."[71]

Dr. Phil testified for nearly two days. PBR, Trinity, and even the Court relentlessly pursued an explanation for the missing text in the Ribman Thread with Peteski's counsel and Dr. Phil. Dr. Phil's testimony: he didn't delete the text but doesn't know what happened to it.[72] "Neither Peteski nor the Debtor nor anybody else ever provided a satisfactory explanation of the missing text, and [Dr. Phil]'s testimony at trial professing not to know what happened to the missing text was not credible."[73] This led the Court to "find, based on all the evidence, that [Dr. Phil] deleted the unflattering text message after the bankruptcy petition date because he didn't want me to see it."[74] The Court also found that even after hiring Broadbent, there were various examples of Dr. Phil aiming to call the shots—thus undermining Broadbent's "independence."[75] The Court concluded that Dr. Phil "believed he was calling the shots."[76]

The Court took the matter under advisement after closing arguments on September 29.

## VI.     THE COURT'S RULING.

On October 28, the Court issued its Ruling in which it found four separate "clear cause[s]": (1) "There is substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"; (2) "The CRO is not a neutral fiduciary but instead is conflicted in favor of [Dr. Phil]"; (3) "The CRO failed in his duty of candor to the Court"; and (4) [Dr. Phil]'s destruction of relevant evidence in his capacity as either board member of [Debtor]

---

[71] *Id.* at 56:20–23.
[72] 9/16/25 A.M. Tr., at 8:21–15:11; 9/25/25 A.M. Tr., at 9:15–22:15.
[73] Ruling, at 36:25–37:3.
[74] *Id.* at 37:4–6.
[75] *Id.* at 57:8–59:13 (citing as examples Dr. Phil and Cheatwood testimony; TBN Exs. 320, 330, 373; PBR Ex. 282).
[76] *Id.* at 59:12–13.

or *de facto* officer or agent of [Debtor]." After finding cause, the Court held that conversion to Chapter 7 was the winner "by a large margin" and that no exceptions applied.[77]

A.    **The Four Causes.**

**Cause 1: Substantial or continuing loss or diminution**. The Court found that Debtor's "operating revenues are swamped by administrative claims, primarily either unpaid professional fees or outstanding loans to pay professional fees," creating a negative cash flow situation that alone supported cause. The Court also found "there is no hope of rehabilitation" because Debtor has no ability to restore its business, regardless of whether it intends to liquidate.[78]

**Cause 2: The CRO is not a neutral fiduciary**. The Court held that Broadbent "is not a neutral fiduciary but instead is conflicted in favor of [Dr. Phil]."[79] It cited evidence demonstrating that Broadbent worked for Envoy, blessed the work that Debtor's remaining officers and employees performed for Envoy, and "his disastrous attempt to shield from the Court his communications with [Dr. Phil] regarding dismissal or conversion of this case." The Court carefully weighed the evidence supporting Broadbent's independence against the evidence refuting it and the testimony of Mr. Cheatwood, Dr. Phil, and the other witnesses.[80]

**Cause 3: The CRO failed in his duty of candor**. The Court held Broadbent failed in his duty of candor to the Court. It occurred "in real-time during the trial" while the Court was exploring the "critical issue" of whether Broadbent tried to get the case dismissed in mid-August "because he was either looking out for [Dr. Phil]'s personal interests or taking direction from [Dr. Phil]."[81] The Court relied upon § 105(a) of the Bankruptcy Code.[82] It also explained how Broadbent's

---

[77] *Id.* at 5:12; 62:12–67:22; 73:22–74:1.
[78] *Id.* at 63:19–64:12.
[79] *Id.* at 63:19–64:15.
[80] *Id.* at 64:16–65:1.
[81] *Id.* at 65:2–8.
[82] *Id.* at 65:9–11.

deviation from his duty tainted the proposed Plan, a core aspect of which was Broadbent's release

of claims against Dr. Phil and Peteski.[83] Whether other qualified professionals helped Broadbent

review the Plan was immaterial because, as CRO, "the buck stops with him."[84]

**Cause 4: Dr. Phil's destruction of relevant evidence**. Dr. Phil's "destruction of relevant

evidence in his capacity as either board member of [Debtor] or *de facto* officer or agent of

[Debtor]" was yet another basis for cause.[85] His actions "violated not only a discovery order…,

but also a broader principle, that the Debtor's board members or *de facto* officers or agents should

not destroy property of the estate to help them in pending litigation," so the Court had "no problem

adding the deleted text to the list of causes" because "even a cursory review of the text shows

[Dr. Phil] acting in significant part as someone calling the shots for the Debtor."[86]

**B.      Conversion, Dismissal, or Appointment of a Chapter 11 Trustee.**

After finding cause, the Court turned to whether conversion to Chapter 7, dismissal, or

appointment of a Chapter 11 Trustee was the best outcome. The Court held conversion would best

serve creditor interests and was the winner "by a large margin."[87] A Chapter 7 Trustee can sell

assets while enjoying the benefits and protections of the automatic stay, conduct his or her own

independent investigation into estate causes of action, and review and object to proofs of claims.[88]

In Chapter 7, "[c]reditors can have faith that the process will play out fairly and neutrally."[89]

Conversely, dismissal would allow Dr. Phil to pay favored creditors like the Ribmans over

disfavored creditors like PBR, "as his own deleted text makes clear he wants to do."[90] It would

---

[83] *Id.* at 66:4–8.
[84] *Id.* at 66:9–15.
[85] *Id.* at 66:16–19.
[86] *Id.* at 66:19–67:18.
[87] *Id.* at 67:19–22.
[88] *Id.* at 67:22–68:3.
[89] *Id.* at 68:4–5.
[90] *Id.* at 68:6–8.

also allow Debtor or its friendly creditors to file another case in a different jurisdiction to try and get rulings that would favor Dr. Phil and his interests, including on Trinity's pending motion for sanctions and contempt on which the Court has yet to rule.[91]

Finally, the Court held that conversion outweighs appointing a Chapter 11 Trustee because it would result in greater efficiency, lower costs, and much needed fresh eyes.[92] Moreover, in Chapter 11, the Ribman Trust remains—which the Court believes "shouldn't be on the [UCC]."[93] As the Court explained, this would only give rise to more contested issues (and likewise more expenses) when, should the case remain in Chapter 11, the Court would "consider *sua sponte* removal of the Ribman Trust from the [UCC]" and "decline the Ribmans a role in the Litigation Advisory Committee contemplated under the plan."[94] Having "completely run the issue to ground, . . . conversion to Chapter 7 has the added benefit of not reviving it."[95]

## C.    Unusual Circumstances Exception.

The Court concluded by finding that the "unusual circumstances" exception in § 1112(b)(2) does not apply. Under it, a court may not convert if unusual circumstances show that conversion is not in the best interests of creditors and the estate.[96] The Court explained that although there were unusual circumstances present, "they favor conversion and not the current Chapter 11."[97] The Court likened the case to "a broken three-legged stool":

> The first leg is [Dr. Phil], who deletes unfavorable text messages he doesn't want me to see, who vows to pay favored creditors no matter what the Court does, and who vows to wipe out unfavored creditors. The second leg is Mr. Broadbent, who worked for [Dr. Phil]'s newly-created company after the petition date without pushing back and who didn't give me honest and direct answers to direct, simple questions. And the third leg is a Creditors' Committee, half-composed of the

---

[91] *Id.* at 68:8–13.
[92] *See id.* at 68:14–69:15.
[93] *Id.* at 69:16–20.
[94] *Id.* at 69:20–70:2.
[95] *Id.* at 70:2–4.
[96] *See id.* at 70:19–71:7.
[97] *Id.* at 71:11–13.

Ribmans, who enjoy a favorable payment guaranty from either [Dr. Phil] or the Debtor no matter what the Court does, and who enjoy the right under the proposed plan to supervise litigation Mr. Ribman allegedly helped instigate and is now deeply enmeshed in.[98]

It is these parties—the three legs of the broken stool—who asked the Court to find unusual circumstances based on their Plan "that was filed on the eve of trial, including the liquidation analysis that purports to show that Chapter 11 is a better result than Chapter 7."[99] But the Court noted the liquidation analysis relies in significant part on Broadbent's testimony.[100] For the reasons above, the Court did not have confidence that Broadbent did "a neutral, detached, comprehensive investigation into the estate's claims against [Dr. Phil] and Peteski, or even against Trinity and PBR."[101] Accordingly, the Court gave "little weight" to Broadbent's valuation of the claims and the proposed consideration to settle those claims as proffered in the Plan.[102]

The Court concluded: "I simply cannot find on this record that creditors would fare better under the plan than under Chapter 7. There are no unusual circumstances to prevent mandatory conversion."[103] It continued: Even if such unusual circumstances existed, "conversion would still be mandatory" because the Court found substantial and continuing loss to or diminution of the estate without the likelihood of rehabilitation.[104] The exception does not apply if this cause exists— which the Court found it did.[105] "That ends the inquiry."[106] The exception also does not apply if there is a reasonable justification for an act or omission of Debtor that constitutes cause. Here,

---

[98] *Id.* at 71:14–72:4.
[99] *Id.* at 72:5–7.
[100] *Id.* at 72:10–15 (citing Doc. 550, at 158).
[101] *Id.* at 72:16–19.
[102] *Id.* at 72:19–22.
[103] *Id.* at 72:23–25.
[104] *Id.* at 72:1–15.
[105] *Id.* at 72:6–9; 13–15.
[106] *Id.* at 72:15.

Debtor representatives destroyed estate property and lied under oath.[107] "There is no possible reasonable justification for those acts or omissions. That ends the inquiry yet again."[108]

Immediately after the Court read its Ruling, counsel for Debtor requested that the Court stay its conversion order pending appeal, which they filed on November 3.[109] Movants ask the Court to stay enforcement of its Ruling pending appeal, or alternatively, to issue an administrative stay pending District Court review of their requests for stay.[110] PBR opposes those Motions herein.

## LAW AND ARGUMENT

### I.    LEGAL STANDARD

#### A.    Motions to Stay Pending Appeal.

Federal Rule of Bankruptcy Procedure Rule 8007 governs a motion to stay a bankruptcy court's order pending appeal.[111] "A stay is not a matter of right, even if irreparable injury might otherwise result,"[112] and is an "extraordinary remedy."[113] Issuance of a stay pending appeal "is discretionary and equitable."[114] The movant carries the "difficult burden"[115] of showing that the particular circumstances of the case justify an exercise of judicial discretion.[116] The Court must consider four factors: (1) likelihood of success on the merits; (2) irreparable injury absent issuance

---

[107] *Id.* at 73:16–19.

[108] *Id.* at 73:19–21.

[109] *Id.* at 76:11–17; Doc. 585, Peteski Mot.; Doc. 586, Peteski Brief in Support of Motion to Stay; Doc. 589, Debtor Mot.; Doc. 590, Debtor Memorandum in Support of Motion to Stay.

[110] *See* Doc. 585, Peteski Mot.; Doc. 586, Peteski Brief in Support of Motion to Stay; Doc. 589, Debtor Mot.; Doc. 590, Debtor Memorandum in Support of Motion to Stay.

[111] *See* FED. R. BANK. P. 8007(a)(1)(A).

[112] *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).

[113] *In re Royal Alice Props., LLC*, 2020 WL 5552576, at *4 (Bankr. E.D. La. Sept. 16, 2020) (applying *Belcher v. Birmingham Tr. Nat'l Bank*, 395 F.2d 685, 686 (5th Cir. 1968)).

[114] *In re Texas Health Enters., Inc.*, 255 B.R. 185, 187 (Bankr. E.D. Tex. 2000) (internal citations omitted).

[115] *United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995).

[116] *Nken*, 556 U.S at 433.

of the stay; (3) substantial harm to other parties interested in the proceeding; and (4) whether the stay will benefit the public interest.[117] The first two factors are the "most critical."[118]

A stay is granted only where "relative harm and the uncertainty of final disposition justify it."[119] While all four factors are relevant, each factor is assessed by its strengths and weaknesses comparative to the others "because the degree to which a factor is dispositive varies with the other factors' strengths."[120] The absence of any one factor "is not fatal" to the motion for stay, but "greater weight is given to the first factor," likelihood of success on the merits, in the Fifth Circuit.[121] Dependent upon the strength of the equitable factors, a court will be acting within its discretion to deny the stay if a party fails to establish any one of the four requirements.[122]

## B.     Cause to Dismiss, Convert, or Appoint a Chapter 11 Trustee.

As noted above, in considering a motion for a stay, the most important factor is the likelihood of success on the merits. Here, that means the likelihood Movants can succeed on their arguments that all four of the Court's findings of cause were reversible error under Bankruptcy Code § 1112(b)(2). Grounds for cause are "subject to judicial discretion under the particular circumstances of each case."[123] A Court's causal "findings are to be liberally construed in support of a judgment, even if the findings are not as explicit or detailed as might be desired,"[124] and it need not give "exhaustive reasons" for its decision to convert.[125] Indeed, "the nature of the case"

---

[117] *Id.* at 426 (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[118] *Id.* at 434.

[119] *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) ("*Ruiz I*").

[120] *In re Golden*, 671 B.R. 638, 651–52 (Bankr. E.D.N.Y. 2025).

[121] *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 515 (W.D. Tex. 2000) (citing *In re First S. Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987)).

[122] *In re Fiesta Inn & Suites, LP*, 2009 WL 5195961, at *4 (Bankr. W.D. Tex. Dec. 21, 2009) ("[Movant] failed to persuade this court that either a balancing of the equities or public policy favor granting a stay pending appeal.").

[123] *In re Great Am. Pyramid Joint Venture*, 144 B.R. at 790.

[124] *In re California Palms Addiction Recovery Campus, Inc.*, 87 F.4th 734, 741 (6th Cir. 2023) (quoting *In re Fordu*, 201 F.3d 693, 710 (6th Cir. 1999) (internal citations omitted)).

[125] *Cantu v. Romero Gonzalez & Benavides LLP*, 2009 WL 10703740, at *6 (S.D. Tex. Oct. 13, 2009), *aff'd sub nom. In re Cantu*, 398 F. App'x 76 (5th Cir. 2010).

dictates the necessary "detail and exactness," and the record must "give an appellate court a clear understanding of the basis" for the bankruptcy court's decision.[126]

"[A] bankruptcy judge may, under section 105(a), as amended, convert or dismiss a case *sua sponte* even though section 1112(b) explicitly requires that the request be made by a party in interest."[127] And § 105(a) of the Bankruptcy Code is clear: The court has authority to issue *any* order it deems necessary to effectuate the Bankruptcy Code. No other provision should "preclude the court from, *sua sponte*, taking *any action or making any determination necessary or appropriate* to enforce or implement court orders or rules, or *to prevent an abuse of process*."[128] This "broad authority granted to bankruptcy judges . . . is surely adequate to authorize" a ruling to prevent an outcome that "may provide a debtor with an opportunity to take action prejudicial to creditors."[129] Courts may use their broad authority under § 105(a) to dismiss or convert a case when there is conduct tantamount to bad faith.[130]

Identifying and applying cause is a very fact-intensive process.[131] Section 1112(b)(4) provides a non-exclusive list of enumerated causes.[132] Furthermore, section 1104(a)(1) of the Bankruptcy Code, which provides for the appointment of a Chapter 11 Trustee or Examiner, provides additional enumerated causes, including "fraud, dishonesty, incompetence, or gross mismanagement" of the debtor by current management.[133] Courts have found cause present under

---

[126] *Id.*
[127] *Id.* at 789.
[128] 11 U.S.C. § 105(a) (emphasis added).
[129] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375 (2007).
[130] *See id.* at 375–76; *In re Jacobsen*, 609 F.3d 647, 661 (5th Cir. 2010) (finding cause to convert Chapter 13 bankruptcy to Chapter 7 for bad faith) ("[B]ad faith justifies a bankruptcy court's exercise of its powers under § 105(a).").
[131] *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 337 (Bankr. D. Del. 2010), *on reconsideration in part* (Jan. 21, 2011), *subsequently aff'd*, 728 F.3d 301 (3d Cir. 2013) (internal citations omitted).
[132] *See* 11 U.S.C. § 1112(b)(4)(a)–(p); *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 790 (Bankr. W.D. Tenn. 1992).
[133] *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Penn. 2020).

§ 1104(a) with facts like those at issue here, including "conflicts of interest," "lack of credibility

and creditor confidence," and "breaches of fiduciary duties."[134]

Upon finding cause, or to "prevent an abuse of process," a court is "statutorily authorized

to convert a Chapter 11 case to a Chapter 7 liquidation case or to dismiss the case, or appoint a

Chapter 11 trustee, whichever is in the best interest of the creditors and the estate."[135]

## II.   ARGUMENT

### A.   Lack of Likelihood of Success on the Merits Weighs in Favor of Denying the Stay.[136]

The Court found four independent, yet equally dispositive "clear" causes to convert the

case to Chapter 7: (1) substantial or continuing loss to or diminution of the estate and absence of

a reasonable likelihood of rehabilitation; (2) the CRO is not a neutral fiduciary but instead is

conflicted in favor of Dr. Phil; (3) the CRO failed in his duty of candor to the Court; and

(4) Dr. Phil's destruction of relevant evidence in his capacity as either a board member or *de facto*

officer or agent of Debtor.[137] To meet the first factor of the stay analysis, Movants must show a

likelihood of success that *each* of the Court's four findings of cause were erroneous and reversible.

Anything less, and the stay must be denied. Movants fall overwhelmingly short of their burden to

make this showing.

The first factor carries considerable weight: it is a "prerequisite in the usual case even if it

is not an invariable requirement," though, it need not provide a "probability" of success.[138] While

Movants argue a stay may be granted upon a showing of only substantial merit if the case presents

---

[134] *Id.* at 765–77 (finding cause where sole member and manager of debtor's partner was conflicted to debtor, provided "unbelievable" and "self-serving" testimony at trial, and "consistently put his own interests ahead of" debtor).

[135] *In re Great Am. Pyramid Joint Venture*, 144 B.R. at 790; *see also* 11 U.S.C. § 105(a); 11 U.S.C. § 1112(b)(1).

[136] This Objection responds solely to the Motions' request for a stay pending appeal and is not a full response to the Movants' allegations of reversible error. PBR's failure to raise any argument in this Objection does not waive PBR's right to make future argument in response to any appeals from the Conversion Order once it is entered.

[137] Ruling, at 62:12–66:19.

[138] *Ruiz v. Estelle*, 666 F.2d 854, 857 (5th Cir. 1982) ("*Ruiz II*").

a serious legal question,[139] and the other three are "heavily tilted" in their favor, Movants have

failed to demonstrate that the appeal will involve a "serious legal question" or that the other factors

are heavily tilted in their favor.[140] The appeal involves the Court's findings of cause—not legal

questions. As such, Movants must show a likelihood of success on the merits of all four causal

findings, not just substantial merit to their claims. Moreover, the substantial merit standard is

usually applied when the appeal involves an uncertain or unresolved question of law.

Reversing factual findings is a difficult burden considering the "reduced probability" of

error in such findings "because the district court had the benefit of a complete record that can be

reviewed" upon a motion to stay.[141] A debtor is not entitled to a stay pending appeal where granting

such relief would effectively reverse "the very order from which appeal is being taken."[142]

To prevail, Movants must establish more than a "mere possibility" of success on *each and*

*every* causal finding. Importantly, the Court's decision to convert is reviewed for an abuse of

discretion.[143] Abuse of discretion is found only where the "reviewing court is firmly convinced

that a mistake has been made."[144] When the issue is factual in nature, the court's broad discretion

is "unlikely to be overturned on appeal" unless clearly erroneous.[145] Thus, Movants fail to satisfy

factor one because the for-cause determinations are derived from the Court's ample findings of

---

[139] *In re: Serta Simmons Bedding, LLC*, 2023 WL 4275019, at *2, *11 (S.D. Tex. June 29, 2023), *appeal dismissed sub nom. Matter of Serta Simmons Bedding, L.L.C.*, 2023 WL 9056061 (5th Cir. July 31, 2023) (declining to apply the substantial merit standard when the issues, "while certainly of great importance to the parties, do not equate to a serious legal issue.").

[140] *Ruiz II*, 66 F.2d at 857 (quoting *Ruiz I*, at 565–66).

[141] *Wylie*, 635 B.R. 291, 295 (Bankr. E.D. Mich. 2021).

[142] *In re Herrera*, 2010 WL 148182, at *2 (Bankr. W.D. Tex. Jan. 8, 2010).

[143] *Id.* at *1; *see generally, e.g.*, *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51 (B.A.P. 6th Cir. 2013); *In re Target Graphics, Inc.*, 372 B.R. 866, 870 (E.D. Tenn. 2007); *In re Burkett*, 279 B.R. 816, 817 (Bankr. W.D. Tex. 2002) (citing *In re Kemp*, 52 F.3d 546, 550 (5th Cir. 1995)).

[144] *In re Target Graphics, Inc.*, 372 B.R. at 870 (citing *Rolen v. Hansen Beverage Co.*, 193 Fed. Appx. 468, 472 (6th Cir. 2006)).

[145] *In re Texas Equip. Co., Inc.*, 283 B.R. 222, 227 (Bankr. N.D. Tex. 2002); *In re Burkett*, 279 B.R. at 817.

fact in its 96-page Ruling, "based primarily on an evaluation of the credibility and demeanor of

witnesses, [which] are highly unlikely to be reversed on appeal as 'clearly erroneous.'"[146]

### 1.   Cause 1: Substantial and Continuing Loss and Diminution/Rehabilitation.

### a.   Substantial or Continuing Losses or Diminution.

Movants argue they are likely to reverse the Court's finding that cause exists under

§ 1112(b)(4)(A) because Debtor did not actually suffer substantial or continuing losses.[147] These

arguments have no likelihood of success, let alone merit in the first instance.[148]

*First*, Debtor says the Court did not actually hold it was suffering operating losses.[149] To

be charitable, Debtor completely misreads the Ruling, not to mention its own budget:

> The Debtor's latest 20-week cash budget for the period from the bankruptcy petition
> date through mid-November was filed at Docket No. 392-1. The budget reflects
> cumulative gross collections of just $1.949 million, **negative** operating cash flows
> of almost $1 million, and total restructuring costs of over $20 million. The operating
> revenues are swamped by administrative claims, primarily either unpaid
> professional fees or outstanding loans to pay professional fees.[150]

This holding was based on testimony by Coley Brown, Debtor's financial advisor.[151] There is no

ambiguity in the record; Debtor did in fact incur operating losses of almost $1 million.

*Second*, Debtor and Peteski argue that merely accruing professional fees does not constitute

continuing loss to the estate, citing *In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D.

---

[146] *In re Burkett*, 279 B.R. at 817; *see also In re Texas Equip. Co., Inc.*, 283 B.R. at 227.

[147] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16 ("[A]s the Court recognized, Merit Street's operating revenues ($1.949 million) exceed the costs of its current operations ($1 million)) (citing Ruling, at 62:17–24).

[148] As noted above, Movants argue they must only prove "substantial merit", not "likelihood of success." The higher threshold of likelihood of success applies, but Movants have failed to even demonstrate substantial merit.

[149] Peteski echoes this by arguing "MSM *increased* revenue during the case." Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 39 (emphasis in original).

[150] Ruling, at 62:17–24 (emphasis added).

[151] 9/23/25 A.M. Tr., at 57:6–8 (Q: And so operating cash flow for the bankruptcy case, the 20 weeks, is negative $1.158 million? A: Correct."); 71:2–5 ("Q: And so this, if you look down below to the Operating Cash Flow or Cumulative Operating Cash Flow line, shows – that shows a loss of almost a million dollars. Is that correct? A: On an operating cash flow basis, yes."); *see also* PBR Ex. 478.

Tex 2015) in support.[152] This is beside the point, as the Court's finding under § 1112(b)(4)(A) did

not rest solely on the accrual of professional fees. Instead, the Court held (i) "**this negative cash**

**flow situation alone is sufficient to establish continuing loss to or diminution of the estate,**"

and (ii) "the operating revenues are swamped by administrative claims, primarily either unpaid

professional fees **or outstanding loans to pay professional fees**."[153] And, under § 1112(b)(4)(A),

either continuing losses or substantial diminution to the estate can establish cause, and the Court

found both: "there is clear, substantial **and** continuing loss to or diminution of the estate."[154] So,

even if accruing professional fees on its own does not constitute a continuing loss (here, it does),

incurring administrative expenses to pay those fees and the associated operating losses have caused

substantial diminution to the estate, thereby meeting § 1112(b)(4)(A)'s requirement.[155] Even if this

argument was correct (it is not), it would not be reversible error.

_Third_, Debtor attempts to rewrite § 1112(b)(4)(A) to say that if Debtor is not an operating

company and holds only intangible assets with stable value, then "[t]here is no substantial or

continuing loss, or risk of loss, to those assets."[156] This argument has no legal or factual merit. The

statute does not say that cause depends on whether Debtor's assets are losing value but whether

---

[152] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16; Doc. 586, Peteski Brief in Support of Motion to Stay Pending Appeal, or Alternatively for a Temporary Administrative Stay ["Peteski Brief in Support of Motion to Stay"], ¶ 39.

[153] Ruling, at 62:22–63:1 (emphasis added).

[154] _Id._ at 63:14–15 (emphasis added).

[155] _See In re TMT Procurement_, 534 B.R. 912, 919 (Bankr. S.D. Tex. 2015) ("The court found [declining cash positions], along with evidence of post-petition borrowings of $233,000.00 accumulating administrative expenses, sufficient to establish continuing loss under § 1112(b)(4)(A)") (internal citation omitted). Movants also argue the Court should have considered that the accrual of professional fees is in pursuit of litigation that could provide recoveries to the estate. Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16; Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 39. Even if true, the Court was not required to consider this, particularly because the only way Debtor can pay professional fees is by incurring additional debt financing, unlike the debtor in _In re TMT Procurement_, that used cash on hand to pursue litigation claims. _In re TMT Procurement_, 534 B.R. at 919. But, in any event, the Court did consider this and determined that the estate causes of action would be best prosecuted by an independent and neutral Chapter 7 Trustee. Ruling, at 68:25–69:4.

[156] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16–17.

Debtor's estate is suffering "substantial or continuing loss to or diminution of the estate."[157] And the Debtor was and is incurring operating losses despite the fact that its assets are primarily intangible ones. The Court appropriately and correctly applied the statute to the facts and concluded that the estate was suffering "substantial and continuing loss to or diminution of the estate."[158]

_Fourth_, Debtor argues "courts have rejected 'continuing loss' arguments where a debtor in possession has sufficient funding to confirm a plan."[159] This argument also has no merit or chance of success. First, although Debtor implies multiple courts have reached this conclusion, it cites only one: _In re Honx, Inc._, 2022 WL 17984313, at *3 (Bankr. S.D. Tex. Dec. 28, 2022). Second, Debtor misstates _Honx_, in which the committee made a continuing loss argument. The _Honx_ court rejected that argument NOT because the debtor demonstrated it had funding to confirm a plan, but because it found the debtor could continue to fund its Chapter 11 case without incurring any losses at all.[160] In _Honx_, a parent funded the debtor under an agreement that did not require repayment, hence why the debtor was not suffering losses.[161] The same is not true here, where Peteski, Debtor's majority shareholder, has not offered such generous terms. Quite the opposite: Peteski has funded the Debtor with DIP financing under which it has received secured and unsecured

---

[157] 11 U.S.C. § 1112(b)(4)(A).

[158] Ruling, at 63:14–15. While Debtor's decision to incur operating losses that did not create or preserve the estate's or assets' value was a questionable exercise of business judgment, that does not change the fact that Debtor chose to operate at a loss through the Chapter 11 case for no ascertainable benefit. And the budget presented at trial showed Debtor intended to continue to operate at a loss through the end of the budget period. _See_ 9/23/25 A.M. Tr., at 69:17–72:12; PBR Ex. 478; (contrast with _In re TMT Procurement_ where the Court rejected a motion to convert under Section 1112(b)(4)(A) in part because when the motion was heard, "[d]ebtors ha[d] wound down operations" and "the remaining assets are relatively stable in value and are no longer being diminished through operational losses." _In re TMT Procurement_, 534 B.R., at 920).

[159] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16; Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 39.

[160] _In re Honx_, Case No. 22-90035, 2022 WL 17984313, at *3 ("Because HONX has this ready source of funding from its parent, it is not experiencing a substantial or continuing loss").

[161] _See In re Honx, Inc._, 2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022), Declaration of Todd R. Synder, Chief Administrative Officer of Honx, Inc., in Support of Chapter 11 Petition and First Day Motions, Exhibit A (Funding Agreement) [Doc. 8].

administrative claims against Debtor, which, as the Court appropriately ruled, are causing substantial and continuing diminution of the estate. As such, neither *Honx* nor the contention that Debtor has sufficient funding to confirm a plan constitutes a meritorious argument for reversal.

### b. Rehabilitation.

To make a finding of cause under § 1112(b)(4)(A), the movant must also show an absence of a reasonable likelihood of rehabilitation. The Court easily found this requirement, as "there is no hope of rehabilitation."[162] Indeed, "[t]here never has been even a pretense of rehabilitation."[163] Relying on *Collier on Bankruptcy*, the Court held that rehabilitation does not mean "whether the debtor can confirm a plan, but rather, whether the debtor's business prospects justify continuance of the reorganization effort" and "rehabilitation does not include liquidation."[164]

Debtor cites three cases to argue that the Ruling was wrong as a matter of law. But each is an outlier, and unlikely to precipitate a finding of error here. Each case involved a debtor with significant exposure to personal injury claims seeking to confirm a plan to obtain a § 524(g) channeling injunction, relief that would not be available in a Chapter 7 liquidation.[165] The same is not true here. Debtor did not file bankruptcy to obtain the benefit of a § 524(g) injunction. These inapposite cases do not create any likelihood that the Ruling will be reversed.

---

[162] Ruling, at 63:19.

[163] *Id.* at 4:25.

[164] *Id.* at 64:5–7, 10–11.

[165] *See* 11 U.S.C. § 524(g)(1)(A) ("After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11…"); *In re Honx, Inc.*, 2022 WL 17984313, at *2 ("*Honx* indicated that its purpose in filing for bankruptcy was to fairly and efficiently deal with its asbestos liability in exactly the manner Congress intended when it enacted § 524(g)."); *In re BMI Oldco Inc.*, 671 B.R. 215, 224 (Bankr. S.D. Tex. 2025) ("Rehabilitation is measured by a 'debtor's intention to use the bankruptcy process to prevent a complete and total loss of value.' This includes the ability to obtain funding from its parent with which it may be able to pay the asbestos claimants.") (internal citation omitted); *In re Red River Talc LLC*, 670 B.R. 251, 305 (Bankr. S.D. Tex. 2025) (analyzing whether debtor filed bankruptcy for a proper bankruptcy purpose, not whether it has a reasonable likelihood of rehabilitation, and the court held "seeking to enjoin future asbestos-related claims is authorized by Congress under §524(g).").

And, despite Peteski's argument, the Court's reliance on *Loop*, which has far more analogous facts, was proper.[166] *Loop* involved an appellate challenge to the bankruptcy court's decision converting a non-operating, liquidating debtor from Chapter 11 to Chapter 7.[167] In so doing, it overruled an objection from the debtor's 50% equity owner (which was also a creditor).[168] The *Loop* facts are remarkably on point with those here, where Peteski (Debtor's majority owner, also a creditor) has objected to the Ruling converting the non-operating, liquidating Debtor's Chapter 11 case to Chapter 7. And the appellate court in *Loop* considered and rejected the exact arguments Debtor and Peteski are attempting to advance.

Moreover, *Honx* and *BMI Oldco* dispel Peteski's concern that every liquidating Chapter 11 debtor would be subject to conversion under § 1112(b)(4)(A) (*Red River Talc* did not involve a request for conversion or dismissal under this section). In both cases, the courts denied conversion or dismissal of liquidating debtors under § 1112(b)(2)(A) based on the particular facts, namely the potential for claimants to be paid through a § 524(g) injunction if the cases remained in Chapter 11. As such, Peteski's argument that a liquidating Chapter 11 debtor could never withstand a conversion motion is not likely to succeed. Movants cannot establish any likelihood of success on the merits in reversing the Court's finding of cause under § 1112(b)(4)(A). Movants' request for a stay must therefore be denied without further inquiry because the unusual circumstances exception in § 1112(b)(2) does not apply to a finding of cause under § 1112(b)(4)(A).

### 2. Cause 2: The CRO Was Not An Independent Fiduciary to Debtor.

The Debtor and Peteski are not likely to succeed in reversing the Court's second finding of cause: CRO Broadbent was not a neutral fiduciary to the Debtor but conflicted to Dr. Phil.

---

[166] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16; Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 39.
[167] *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 513 (8th Cir. 2004).
[168] *Id.*

Movants allege "there is no evidence [in the record] that the CRO worked for Envoy," or alternatively, the Court "misinterpreted it."[169] They insist the Court solely and wrongly relied on a July 14, 2025 email exchange between Jerry Sharell (a public relations agent for Debtor), Solomon (Debtor's CEO), Cheatwood (Debtor's COO), Dr. Phil, and Broadbent regarding an Envoy press release, which Dr. Phil told Debtor officers Broadbent would sign off on or edit.[170] The Court concluded Broadbent, as Debtor's CRO, "had no business signing off on Envoy press releases or acting as Envoy's editor."[171] The Court held an "appropriate response from the Debtor's CRO would have been to ask to be taken off the email chain," rather than reply, "looks great!"[172]

This email is not the sole basis for the Court's findings; it was just an "example."[173] Indeed, the Court considered all the evidence, which included Debtor's few remaining employees working for Envoy while collecting paychecks from Debtor, all with Broadbent's approval.[174] The Court also found Dr. Phil's testimony that Broadbent managed the bankruptcy "not credible," outlining "numerous examples after Broadbent was retained as CRO of [Dr. Phil] purporting to call the shots rather than the other way around."[175] These included Dr. Phil leading a meeting with his attorneys about whether to file for bankruptcy and countless emails and texts Dr. Phil sent to his friends he boasted "*I* am filing suit against [Trinity]," "*I* am also filing Chapter 11," among others.[176]

---

[169] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 19; Doc 586, Peteski Brief in Support of Motion to Stay, ¶ 43.

[170] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 19; Doc 586, Peteski Brief in Support of Motion to Stay, ¶ 44; Ruling, at 45:24–46:22 (citing TBN Ex. 416).

[171] Ruling, at 46:20–21.

[172] *Id.* at 46:20–22 (citing TBN Ex. 416).

[173] *Id.* at 45:24.

[174] *See id.* at 47:7–48:11.

[175] *Id.* at 57:17–20.

[176] *Id.* at 57:21–59:13 (emphasis added) (citing examples of evidence supporting Dr. Phil's control after retaining Broadbent).

Broadbent's testimony continued to undermine his "professed independence."[177] While the Court questioned some of Broadbent's early testimony, it "took an even more serious and abrupt hit" in response to direct questions from the Court,[178] which are discussed with the third cause. But it is important to note here as well, as the Court recalled several testimonial and physical behaviors from Broadbent, which informed the Court's finding that he was not neutral.

*First*, the Court recalled Broadbent's "admi[ssion] that a dismissal would free him to…file bankruptcy elsewhere to get a judge who might give him different rulings…."[179] Second, the Court noted Broadbent's "increasing[] uncomfortab[ility]"[180] while answering direct questions from the Court, which included what the Court observed to be "abrupt and defensive" answers and "pregnant pauses."[181] Third, the Court detected that Broadbent's "vast and impressive knowledge and memory of detailed events" exhibited during his counsel's examination seemed to immediately fade when the Court asked him to recall details of an August 17 board meeting that occurred one month prior.[182] The contrast is important: Broadbent's sharp recall of events more remote in time involved themes that supported Debtor's narrative. But the details of the more recent August 17 board meeting (of which he feigned ignorance) did not.

The Court ultimately found:

> [Broadbent's] testimony regarding the full board meeting and the Special Committee meeting throws a shadow of doubt over all his trial testimony, including that involving his independence from [Dr. Phil] and his apparent work for Envoy after the bankruptcy filing.[183]

---

[177] *See id.* at 48:17–21.
[178] *Id.* at 48:17–20.
[179] *Id.* at 49:2–6.
[180] *Id.* at 49:16–17.
[181] *Id.* at 49:17–19; 52:9.
[182] *Id.* at 52:13–14.
[183] *Id.* at 57: 3–7.

Movants can only prevail on their request to reverse the second causal finding if they overcome the staggering burden of convincing an appellate court that this Court's keen findings about Broadbent's demeanor and credibility, considered with all other record evidence, were clearly erroneous. But an appellate court did not observe Broadbent's testimony at length or question him directly from the bench like this Court did. Movants instead suggest Broadbent's own profession that he was neutral is enough for the reviewing court to reverse. Notwithstanding that Broadbent has enjoyed a handsome salary of more than $150,000 per month to serve as CRO[184] that will evaporate upon conversion, the Court had every other reason to find otherwise.

The ample evidence supports the finding that Broadbent is not a neutral fiduciary.[185] So does the case law. In *In re Graf Bros., Inc.*, the Court converted a liquidation case from Chapter 11 to Chapter 7 after finding cause under § 1112(b) due to a conflict of interest between the debtor and those with whom debtor would have been dealing during liquidation.[186] In *Matter of Fiesta Homes of Georgia, Inc.*, a court converted a case from Chapter 11 to Chapter 7 after finding cause under § 1112(b) due to conflicts of interest between the debtor's officers and certain insiders, mandating removal of those conflicted officers from control of the estate.[187] In *In re L.S. Good & Co.*, a court appointed a Chapter 11 Trustee after finding cause under § 1104(a) because current management, who was conflicted, could not be trusted to investigate and pursue claims on behalf of the estate, which included claims adverse to the parent company's interests.[188]

Likewise, here, the Court found Broadbent is conflicted in favor of Dr. Phil and thus unable to independently manage the Debtor's estate, which will require him to investigate and pursue

---

[184] MSM Ex. 47.
[185] Ruling, at 64:13–15.
[186] *See In re Graf Bros., Inc.*, 19 B.R. 269, 270 (Bankr. D. Me. 1982).
[187] *See Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 325–26 (Bankr. S.D. Ga. 1990).
[188] *See In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. N.D. W. Va. 1980). These cases are instructive regardless of whether courts dismissed, converted, or appointed a Chapter 11 Trustee because they demonstrate bases for the first step of the analysis: finding cause.

claims against Dr. Phil, Peteski, Envoy, MediaCo, and others, negotiate settlements of those claims, and liquidate assets, among other things. Movants' arguments barely suggest the "mere possibility" the Court abused its discretion in finding Cause 2. They are not warranted to a stay, and because the Court need only find one cause to convert, the inquiry ends yet again.

### 3.    Cause 3: The CRO Failed In His Duty Of Candor To The Court.

The Court gravely conveyed the following: "I'll repeat what I said at closing arguments: I lost sleep over Mr. Broadbent's testimony, and I've lost sleep writing this part of my ruling."[189] Broadbent failed in his duty of candor, giving the Court yet another cause to convert.[190]

Specifically, the Court found that Broadbent provided "less-than-truthful testimony" when the Court asked him direct questions about whether Broadbent discussed with Dr. Phil the Debtor's sudden request to dismiss the case one month prior.[191] Broadbent first denied it, then professed ignorance, before being promptly impeached with a document conclusively demonstrating that such discussions did, in fact, happen.[192] The Court's finding on this matter, which is supported by its direct observations, will undoubtedly withstand appellate scrutiny.[193]

Peteski's arguments are unfounded and misguided. *First*, it says the duty of candor does not extend to Broadbent because he is a "lay fiduciary or restructuring professional."[194] This is a misguided attempt at obfuscation. As an attorney and officer of the court, Broadbent must know, understand, and respect the duty of candor, to which he is bound.[195] The duty extends to witnesses

---

[189] Ruling, at 55:14–18.

[190] *Id.* at 65:2–20.

[191] *Id.* at 49:12–51:15 (quoting 9/17/25 P.M. Tr., at 220:19–222:8).

[192] *Id.* at 51:18–52:6 (quoting 9/17/25 P.M. Tr., at 223).

[193] Peteski argues that such a finding cannot constitute cause under 11 U.S.C. §1112(b)(4). As set forth above, the Court is not bound by the list of causes statute and can, and did, invoke § 105(a). The Court is also free to reach its own findings on cause, including under § 1104(a) or otherwise.

[194] Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 48.

[195] *In re Adams*, 2020 WL 4922330, at *17 (N.D. Tex. Aug. 20, 2020) ("It goes without saying that an attorney's duty of candor is paramount") (citing *In re Ramos*, 679 Fed. Appx. 353, 358 n.5 (5th Cir. 2017)).

who happen to be attorneys, and violating it is "tantamount to bad faith."[196] But the duty does not

just apply to attorneys; it applies to corporate officers who testify.[197] At a minimum, Broadbent

testified in his capacity as a director, board member, officer, and estate professional of the Debtor.

But he also did so in his capacity as a lawyer, experience he touted as qualifications that rendered

him a competent CRO.[198] Peteski cannot use this experience to amplify why Broadbent should

remain in control but shy away from it when he perjured himself to protect Dr. Phil.

There is no question the duty of candor extends here. Broadbent, a lawyer who maintains

an active license and has a long tenure serving in the legal profession, raised his right hand, took

the oath, and swore to tell the truth.[199] In its attempt to claim that Broadbent is a naïve layperson

to whom the duty should not apply, Peteski tacitly admits Broadbent was not forthcoming in his

testimony. This presents even more concerns with Broadbent remaining in control—if he is

incapable of understanding the duty of candor, the estate faces bigger problems.

*Second*, Peteski alleges Broadbent's "shortcomings" in testimony did not cause "supposed

diminution of the estate."[200] Regardless of whether this is true (which Peteski does not establish

one way or the other), this first finding of cause did not rest on Broadbent's testimony. It is unclear

why Peteski thinks this is worth nothing, but it appears Peteski confuses the Court's basis for

Cause 3 with that for Cause 1. As set forth above, the Court's finding on Cause 1 is ironclad.

*Third*, Peteski complains that the Court "announced its 'duty of candor' theory late in the

proceedings," which deprived Peteski of "a fair chance to contest whether the testimony amounted

---

[196] *In re Sealed Appellant*, 194 F.3d 666, 672 (5th Cir. 1999) (attorney who "testified falsely or was deliberately misleading while under oath is a finding 'tantamount to bad faith'").

[197] *In re Trico Marine Servs., Inc.*, 374 B.R. 529, 540 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. In re Trico Marine Servs.*, 382 B.R. 201 (S.D.N.Y. 2008), *aff'd sub nom. In re Trico Marine Servs., Inc.*, 340 F. App'x 55 (2d Cir. 2009) (finding a corporate officer "had a duty of candor" while testifying to the court).

[198] 9/17/2025 P.M. Tr., at 140:9–14; 141:1–4; *see also* Doc. 14, CRO Declaration.

[199] 9/17/25 P.M. Tr., at 37:12–14.

[200] Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 49.

to 'cause' under § 1112(b)."[201] This argument falls flat, as Peteski had every opportunity to address

this theory during trial.[202] Indeed, as the Court reminded the parties in its Ruling:

> [The Court] specifically asked the parties at closing arguments to address whether
> Mr. Broadbent's trial testimony, either considered on its own or in connection with
> other evidence, was cause to either convert the case or appoint a Chapter 11 trustee.
> The Debtor's counsel addressed the issue in closing arguments and did not ask for
> more time to consider or address the issue. [The Court] consider[s] the issue fully
> joined after sufficient due process.[203]

Peteski participated in closing arguments and had the opportunity to contest the Court's finding

that Broadbent's testimony was uncredible. Indeed, it was during closings that the Court expressed

its serious concerns with the testimony, over which it had "lost sleep."[204] Counsel for the Debtor

spent time addressing these comments.[205] Peteski could have done the same. It is unable to show

any likelihood of success. Nevertheless, in response to Peteski's due process argument, the Court

has scheduled an emergency hearing to be held on November 13 to provide Peteski the opportunity

to make further arguments on this issue.[206]

Debtor also attempts to attack the Court's finding. All attempts fail when evaluating

Debtor's likelihood of success. Debtor asks the Court to rely on the very testimony it questions to

prove its validity.[207] Debtor claims there is "no evidence" that "[Dr. Phil] demanded that the CRO

dismiss the case" and that Broadbent's testimony suggests "he did not remember talking directly

to [Dr. Phil] about dismissal," which the board minutes refute.[208] First, the Court's finding does

not depend upon whether Dr. Phil did or did not demand that Broadbent dismiss the case. The

---

[201] *Id.* ¶ 50.
[202] *See generally* Ruling, at 65:21–66:3.
[203] *See id.* at 65:21–66:3.
[204] *Id.* at 55:14–18.
[205] *See id.* at 65:21–66:3.
[206] *See* Doc. 599, Order Setting Precautionary Due-Process Hearing.
[207] *See* Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 21.
[208] *See id.*

inquiry was whether discussions about dismissal happened at all—they did[209]—and Broadbent lied about them under oath. Second, the Court did not focus solely on direct communications between Broadbent and Dr. Phil. It clarified that the discussions about dismissal could have been between lawyers or representatives of Debtor and Peteski (*i.e.*, Dr. Phil).[210]

It is incredible to ask the Court to rely on testimony over which it lost sleep to acknowledge its decision should be reversed. But the Court considered more than just Broadbent's words or the exhibits. The Court also considered his demeanor, upon which it was "laser-focused," noting he "became increasingly uncomfortable answering the [Court's] questions and there were pregnant pauses during his answers. One of those pauses is even noted in the transcript."[211]

Those present in the courtroom felt the palpable tension during this exchange, which the Court quoted in entirety in its Ruling.[212] It was late in the evening on September 17, as the Court stayed on the bench after hours so Broadbent could complete his testimony.[213] When counsel for all parties concluded their examinations, the Court began to directly examine Broadbent from the bench about the benefits of dismissal versus conversion, and ultimately the events leading up to and during the August 17 board meeting when dismissal versus conversion was discussed in the presence of Dr. Phil and Broadbent, as well as the fifteen-minute Special Committee meeting that took place immediately thereafter during which Broadbent, as the sole member, apparently made the decision to request dismissal.[214]

To call into question the Court's observations in this moment is quite incredible. To contend that an appellate court will find them to be abuses of discretion is astounding.

---

[209] TBN Ex. 532.
[210] 9/17/25 P.M. Tr., at 221:23–222:8.
[211] Ruling, at 49:16–19.
[212] *Id.* at 49:20–52:6.
[213] 9/17/25 P.M. Tr., at 234:22.
[214] *Id.* at 215:24–222:8.

Debtor seeks to undermine the Court's attention to Broadbent's demeanor by citing a case which says, "taking a beat to consider one's response" "is not inherently suspicious, especially for someone who is familiar with the process of providing testimony in court."[215] The Court's findings are based on more than just Broadbent's pauses (which were more than "a beat"). It also evaluated his defensive and uncomfortable nature, resistance to the questions, inability to recall unfavorable facts compared with masterful ability to recall favorable ones (and ability to recall events when Broadbent's counsel questioned him compared to adverse counsel or the Court), the length of time (or lack thereof) that had elapsed between events and Broadbent's testimony, and, of course, the exhibits with which Broadbent was presented that directly refuted his statements.[216]

Other courts have found cause to dismiss, convert, or appoint a Chapter 11 Trustee where those managing debtors' estates exhibited dishonesty. For example, in *In re Westbank Holdings, LLC*, the court found cause under § 1104(a) to remove the sole managing member of the debtor where he was "evasive, unclear, and devoid of candor" during his trial testimony.[217] *In re Vascular Access Centers* found cause under § 1104(a) where the sole member and manager of a debtor's partner was "dishonest, not credible, incompetent, and completely untrustworthy."[218] And in *In re Sanders*, the court found cause under § 1104(a) because debtors' representatives demonstrated a "lack of truthfulness" in making representations to the Court.[219]

The Court enjoys great discretion in making credibility calls, which will not be disturbed absent an abuse of discretion.[220] The Court properly exercised its discretion to find Cause 3.

---

[215] *See United States v. Smith*, 2024 WL 516677, at *1 (E.D. Mo. Feb. 9, 2024); *see also* Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 21.

[216] Ruling, at 52:9–54:23.

[217] *In re Westbank Holdings*, LLC, 2022 WL 3052135, at *15–16 (Bankr. E.D. La. Aug. 1, 2022) (appointing Chapter 11 Trustee because the *Westbank* debtor, unlike Debtor here, was a going concern).

[218] 611 B.R. at 769 (appointing Chapter 11 Trustee because the *VAC* debtor, unlike Debtor here, was reorganizing).

[219] *In re Sanders*, 2000 WL 329574, at *5 (Bankr. N.D. Ill. Mar. 2, 2000) (appointing Chapter 11 Trustee because the *Sanders* debtor, unlike Debtor here, was reorganizing).

[220] *In re Texas Equip. Co., Inc.*, 283 B.R. 222, 227 (Bankr. N.D. Tex. 2002) (internal citation omitted).

**4.      Cause 4: Dr. Phil Destroyed Relevant Evidence.**

The Court unequivocally ruled that Dr. Phil deleted an "unflattering text message,"[221] which was estate property, in his capacity as an agent or *de facto* agent of the Debtor. That text outlined Dr. Phil's plans to file Chapter 11 for the Debtor and exploit it for his own benefit, guaranteed the Ribmans' investment no matter what the Court does, vowed to wipe out PBR's claim, announced his intent to sue Trinity and launch Envoy, and more.[222] Dr. Phil's explanation (or lack thereof) about what happened to the text was not credible. This prompted the Court to issue its fourth and final finding of cause. Movants will not succeed in disturbing this finding.

Peteski offers four misguided reasons for why the fourth cause cannot stand.

_First_, Peteski says the Court offered no authority to support this cause, nor did Trinity or PBR plead such a request. The Court has broad authority under § 1112(b) to find cause to convert, but Peteski need not look further than § 1112(b)(4)(e)—under which cause includes "failure to comply with an order of the court."[223] The Court explicitly found Dr. Phil "violated . . . a *discovery order*," thus providing evidence and authority for cause.[224] In finding such cause, a court is not required to find "a debtor's non-compliance to be willful, in bad faith, or fraudulent."[225] Here, however, there exists both: failure to comply with a Court order; and purposeful intent to do so.

There also exists Dr. Phil's dishonesty, another ground for cause. *See, e.g.,* 11 U.S.C. § 1104(a)(1).[226] And of course, the Court can (and did) also find cause *sua sponte* under § 105(a)

---

[221] Ruling, at 36:11.

[222] TBN Ex. 330.

[223] 11 U.S.C. § 1112(b)(4)(e); *In re Turkey Leg Hut & Co. LLC*, 665 B.R. 129, 140 (Bankr. S.D. Tex. 2024) ("Under § 1112(b)(4)(E), 'failure to comply with an order of the court' is cause for dismissal or conversion."); *see also In re Sillerman*, 605 B.R. 631 (Bankr. S.D.N.Y. 2019) (finding cause under § 1104(a)(1) where debtor failed to comply with court order).

[224] Ruling, at 66:19–23 (emphasis added).

[225] 11 U.S.C. § 1112(b)(4)(e); *In re Turkey Leg Hut & Co. LLC*, 665 B.R. at 140.

[226] *See Phoenix Heliparts Inc*., 2015 WL 14080554, at *2 (Bankr. D. Ariz. Oct. 19, 2015) (finding cause under § 1104(a) where debtor's "destruction and fabrication of evidence" established "debtor's material dishonesty").

"to prevent an abuse of process,"[227] even if a party did not explicitly request such a cause.[228] The Court's use of § 105(a) is appropriate to prevent Debtor from capitalizing on "an opportunity to take action prejudicial to creditors" as it has already done.[229]

Of course, Trinity and PBR did not plead such a request because they did not find out about the deleted text until just before trial due to Dr. Phil's attempts to hide it. The Court recognized as much.[230] Once it came to light, however, "Trinity and PBR moved to compel the production of emails and text messages" and raised it in their sanctions request and reply briefs.[231] Then, PBR, Trinity, and even this Court explored an explanation for the missing text with counsel for Peteski and with Dr. Phil in his deposition and at trial.[232] Dr. Phil's counsel had an opportunity to examine him on the text.[233] Counsel for all parties (and the Court) addressed it during closing arguments.[234] Accordingly, the request has been plead in detail and exhausted by all parties.

_Second_, Peteski's says the text was "conclusively rebutted" because Peteski produced a copy of it (from the McIntyre Thread). This does not resolve the primary issue: "[t]he problem is that neither Peteski nor the Debtor ever produced the _original_ unflattering text message."[235] "[T]hat [Dr. Phil] apparently forgot to delete the cut-and-pasted version . . . does not excuse [Dr. Phil]'s destruction of the original version."[236] An allegedly unedited duplicate of the deleted

---

[227] 11 U.S.C. § 105(a).
[228] _See In re Great Am. Pyramid Joint Venture_, 144 B.R. 780, 789 (Bankr. W.D. Tenn. 1992).
[229] _Marrama v. Citizens Bank of Massachusetts_, 549 U.S. 365, 375 (2007); Ruling, at 43:18–20 ("Dismissal on August 19th would have been a free pass to [Dr. Phil] to pay his favored creditors like the Ribmans and not pay his disfavored creditors like PBR.").
[230] Ruling, at 66:24–67:1.
[231] _Id._ at 67:1–10.
[232] 9/25/25 A.M. Tr., at 9:15–22:15; 9/25/25 P.M. Tr., at 110:11–24.
[233] _See_ Ruling, at 67:11–12.
[234] 9/29/25 Tr., at 11:9–12:25 (Debtor); 34:13–18 (Trinity); 54:6–11 (PBR); 123:24–124:18 (Peteski); 147:19–148:4 (UCC); _see also_ Ruling, at 74:22–75:5.
[235] Ruling, at 36:10–24 (emphasis added).
[236] _Id._ at 40:9–13.

text does not change Dr. Phil's nefarious intent when he deleted the original, and it is insufficient to satisfy the Court's order compelling production.

_Third and Fourth_, Peteski says conversion operates as a discovery or inherent power sanction against Peteski, claiming (1) no party requested such relief, (2) a lack of due process, (3) the missing text was allegedly produced, and (4) that Trinity and PBR failed to prove spoliation of the text. These are conclusory assertions, and (1)–(3) have been rebutted above. Moreover, on November 7, this Court entered an Order setting a precautionary due process hearing in which it admonished Peteski that its characterization of the Ruling as a sanction was wrong:

> Peteski misconstrues the [Ruling], so the Court now makes it clear that the Court's ruling is not, and was not intended to be, a discovery sanction or inherent-power sanction against Peteski. The Court's ruling regarding the text message, and its precautionary due-process hearing on that subject, is limited to whether the conduct is enumerated or unenumerated cause under §§ 1104(a) and 1112(b). Although that issue concerns, at least in part, whether the Debtor violated an order (a discovery order) for purposes of § 1112(b)(4)(E), the issue is whether there is cause under §§ 1104(a) and 1112(b) to dismiss, convert, or appoint a trustee because of that conduct.[237]

With respect to (4), Peteski's only basis for claiming Trinity and PBR failed to prove spoliation is Dr. Phil's self-serving testimony that he didn't delete the text, which the Court found was not credible.[238] But Peteski ignores the myriad circumstances that attend the missing text: the text is "unflattering," and Dr. Phil did not want the Court to see it;[239] Dr. Phil admitted he sent the text to Ribman and that it's no longer on his phone;[240] Movants resisted discovery from PBR and Trinity for months, requiring motions to compel and for sanctions;[241] the Movants tried to dismiss the case three days before the Court's production deadline;[242] Peteski failed to complete production

---

[237] Doc. 599, Order Setting Precautionary Due-Process Hearing.
[238] Ruling, at 36:25–37:6 ("[Dr. Phil]'s testimony at trial professing not to know what happened to the missing text was not credible. I find, based on all the evidence, that [Dr. Phil] deleted the unflattering text message.").
[239] _Id._ at 37:4–6.
[240] 9/25/25 A.M. Tr., at 12:12–15.
[241] Ruling, at 33:3–36:18.
[242] _Id._ at 40:18–23.

by the deadline and did not produce the Ribman Thread until it was subject to an emergency motion for sanctions;[243] the chronology and timing of texts in the Ribman Thread do not make sense unless the missing text is present, which would fit perfectly in the Ribman Thread;[244] Dr. Phil and his counsel insist a forensic investigation of his phone was "inconclusive" but have never produced the forensic report despite multiple requests;[245] before openings, the Court asked Peteski's counsel for an update and she was unable to provide one.[246]

Movants also argue there is no evidence the text was estate property. But the Court "spent a significant amount of time reviewing" the text "and all related evidence to determine in what capacity [Dr. Phil] was acting when he deleted it."[247] The Court found Dr. Phil acted "in significant part" as a Debtor board member, or a *de facto* Debtor officer or agent, because he testified about the amount of control he had over Debtor and the bankruptcy decision.[248] The Court noted (1) each time Dr. Phil referred to himself and Debtor as "our," (2) how he alluded to Ribman joining the UCC, (3) his duty to turn over the text in response to the Court's order compelling production, and (4) his use of his personal phone for business purposes, thus creating Debtor's business records.[249] The Court also provided ample case law to support the notions that the text message constituted estate property and Dr. Phil's duty to not delete it.[250]

Movants appear to chalk up the missing text to some apocalyptic affair. But the Court turned to logical reasoning supported by the evidence and the lack of credibility in Dr. Phil's

---

[243] *Id.* at 35:9–25.
[244] *Id.* at 36:19–24.
[245] 9/16/25 A.M. Tr., at 7:18–10:22; 9/25/25 A.M. Tr., at 14:6–22.
[246] 9/16/25 A.M. Tr., at 14:10–15:11.
[247] Ruling, at 37:7–10.
[248] *Id.* at 37:12–16.
[249] *Id.* at 37:17–38:15.
[250] *Id.* at 38:16–39:19. *See also Torch Liquidating Trust v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009); *In re Correra*, 589 B.R. 76, 124 (Bankr. N.D. Tex. 2018); *In re CTLI, LLC*, 528 B.R. 359, 368 (Bankr. S.D. Tex. 2015); *In re Advanced Modular Power Systems*, 413 B.R. 643, 667 (Bankr. S.D. Tex. 2009).

testimony to sum up what the record clearly shows: "[Dr. Phil] apparently forgot to delete the cut-and-pasted version from the [McIntyre Thread]."[251] The Court should retain Cause 4 as legally and factually sound. Debtor and Peteski will not succeed in upending it.

### 5. The Unusual Circumstances Exception Does Not Apply.

Movants insist that even if Causes 2, 3 and 4 stand, they still should not have resulted in conversion because of "unusual circumstances" due to Debtor's filing the Plan, with support of the UCC, on the eve of trial. The Court did not agree: "I simply cannot find on this record that creditors would fare better under the plan than under chapter 7. There are no unusual circumstances to prevent mandatory conversion."[252]

This determination is only reversible upon a showing of clear error.[253] Debtor may take issue with the Court's conclusions regarding the Plan's liquidation analysis and the UCC's impartiality but that does not rise to a showing of clear error.[254] Furthermore, Debtor's legal support for this argument does not support such a finding on the present facts. In *In re Costa Bonita Beach Resort Inc.*, the court found unusual circumstances because "Debtor's plan of reorganization contemplates to pay the secured and unsecured creditors (excluding the unsecured insider creditors) **in full**."[255] In *In re Baroni*, the Ninth Circuit affirmed a finding that unusual circumstances did not exist and explained "that unusual circumstances counseling against granting relief exist where continuing the case in Chapter 11 will likely yield a higher recovery for creditors **without the usual risks of failure associated with a Chapter 11 plan.**"[256] In support, the Ninth

---

[251] Ruling, at 40:9–10.

[252] *Id.* at 72:23–25.

[253] *Andover Covered Bridge, LLC*, 553 B.R. 162, 170–71 (B.A.P. 1st Cir. 2016).

[254] Furthermore, Debtor does not even allege that it has a likelihood of success on the merits on this point. It says only that they have substantial merit. *See* Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 21.

[255] *In re Costa Bonita Beach Resort Inc.*, 479 B.R. 14, 43 (Bankr. D.P.R. 2012) (emphasis added).

[256] *In re Baroni*, 36 F.4th 958, 968–69 (9th Cir. 2022).

Circuit cited to several cases, including *In re Costa Bonita*, which, as noted above, provided for payment in full of non-insider creditors, which would minimize the risk of failure of the plan.[257]

Debtor's Plan, on the other hand, does not propose to pay creditors in full, as evidenced by the fact that the class of general unsecured creditors is marked as impaired and entitled to vote. And, if allowed to proceed, the Debtor's Plan would be acutely exposed to failure. While the Plan was filed with the support of the UCC (whose impartiality has been called into serious question by the Court),[258] it is unknown whether the UCC would continue to exist if the case remained in Chapter 11 (the Court noted it would likely *sua sponte* remove the Ribman Trust from the UCC, which would cause it to dissolve), or, if it did, whether the UCC would continue to support the Plan.[259] And, the Plan has no pre-established impaired consenting class and therefore, it is not known if this requirement for confirmation can even be met.

Furthermore, the settlement with Peteski included in the Plan, and on which the Plan depends, is contingent on the outcome of a yet-to-be-done investigation of the estate's claims against Peteski, Dr. Phil, and potentially others (like Envoy or MediaCo, for example). If the investigation results in Debtor or the UCC demanding more than $17 million from Peteski in exchange for the release, Peteski is not obligated to continue to support the Plan. And the Court is unlikely to approve the Ribman Trust's position on the advisory board of the proposed litigation trust—in that event, it is unclear if Peteski would continue to support the Plan. For these and many other reasons, the viability of the existing support for the Plan is anything but certain. Even if

---

[257] Although no attribution is provided, Debtor's parenthetical for *In re Baroni* is actually the Ninth Circuit's parenthetical in its cite to *In re Costa Bonita*. As such, Debtor's parenthetical is misleading in that it suggests that it is from the Ninth Circuit's ruling itself, not a parenthetical summarizing another case.

[258] Ruling, at 25:22–26:9; 26:23–27:9; 29:21–30.

[259] *Id.* at 69:16–70:4.

Peteski and the UCC continued to support the Plan, it would be subject to objections and a successful solicitation of creditors.

The trial on the Motion to Dismiss/Convert was not the appropriate time to raise objections to the Plan filed on the eve of trial or the facially flawed liquidation analysis that supports it. As such, PBR's silence on the Plan's terms does not mean consent. And, in fact, were Debtor to proceed with confirmation of the Plan, PBR would vote against confirmation and would object to confirmation on the ground that the Plan is not confirmable under the Bankruptcy Code, including, without limitation, because the Plan is not in the best interests of creditors. While Debtor trumpets its liquidation analysis as gospel, it is anything but and its assumptions raise many questions that have yet to be answered.[260] So Debtor or Peteski's argument that the unusual circumstances exception applies in this case based on the Plan's "guaranteed" partial payments to creditors provided for under the Plan should be heavily discounted due to the risk that the Plan cannot be confirmed at all.[261] And case law supports the fact that merely filing a plan, the confirmation of which is uncertain, does not constitute unusual circumstances.[262]

### B. Lack of Irreparable Harm Weighs in Favor of Denying the Stay.

Movants have not demonstrated irreparable harm absent a stay. A party seeking a stay pending appeal must show "a probable irreparable harm" that is "neither remote nor speculative,

---

[260] Many of the assumptions underlying the liquidation analysis are questionable, including that Peteski would pay more for Debtor's intellectual property in a Chapter 11 case than it would in Chapter 7. Why would a Chapter 7 Trustee sell the IP to Peteski for $4 million if Peteski was willing to pay $13 million for those assets in a Chapter 11? And why does the analysis assume that a litigation trustee would be able to recover between $26 million and $40 million on claims against Trinity, but a Chapter 7 Trustee would only recover $13 million? Similarly, the analysis assumes that a litigation trustee could recover between $1.4 million and $4.2 million from PBR, but a Chapter 7 Trustee could recover only $1.4 million. These assumptions, and many others, have yet to be scrutinized by creditors or the Court.

[261] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 7.

[262] *See In re Baroni*, 36 F.4th 958, 968–69 (9th Cir. 2022); *In re Wahlie*, 417 B.R. 8, at *13 (Bankr. N.D. Ohio 2009) ("The fact that a plan has been filed does not, as suggested by the Debtors, rise to the level of an 'unusual circumstance' as this event is commonly encountered in a Chapter 11 case.").

but actual and imminent."[263] Notably, "a stay is not a matter of right, even if irreparable injury might otherwise result."[264] Further, mere possibility that an appeal may be rendered moot by denying a stay "does not, in and of itself, constitute irreparable harm."[265]

Debtor argues it will suffer irreparable harm without a stay because it will lose the opportunity to seek confirmation of the Plan and it may lose its standing to pursue an appeal.[266] Debtor's second argument regarding irreparable harm, that Debtor may lose its ability to pursue an appeal without a stay, fails as a matter of law. First, Debtor does not cite a single case that finds that the dismissal by a Chapter 7 Trustee of an appeal filed by the pre-conversion debtor constituted irreparable harm to the debtor. In fact, although Debtor cites to *In re Bear Creek Trail, LLC*[267] to support its claim of irreparable harm, the Tenth Circuit denied the Debtor's request to stay a conversion order pending appeal. Second, conversion divests the debtor's pre-conversion management of the ability to decide whether the debtor should appeal, but it does not divest the debtor of the ability to appeal.[268] The other cases cited by Debtor stand for this same proposition, as the Debtor acknowledges.[269] Third, the Debtor states its intention to attempt to circumvent the ample precedent it cited and maintain an appeal after the case is converted based on the ruling in *Patman Drilling Int'l, Inc. v. GE Bus. Fin. Servs., Inc*.[270] Either way, Debtor will not lose its right to appeal by conversion, and if Debtor's management loses the right to appeal on its behalf, that does not cause Debtor irreparable harm. As such, this argument has no legal merit.

---

[263] *In re Taub*, 470 B.R. 273, 278 (E.D.N.Y. 2012) (quoting *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007)).
[264] *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).
[265] *In re Am. Land Acquisition Corp.*, 2013 WL 2481534, at *7 (Bankr. E.D.N.Y. June 10, 2013) (internal citation omitted); *Herrera*, 2010 WL 148182, at *3.
[266] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 6–8.
[267] *In re Bear Creek Trail, LLC*, 35 F.4th 1277, 1280–81 (10th Cir. 2022).
[268] *Id.* at 1281 (citing *In re C.W. Mining Co.*, 636 F.3d 1257 (10th Cir. 2011) ("[O]nce a Chapter 7 trustee was appointed, the debtor's former management could no longer appeal on the debtor's behalf.").
[269] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 8.
[270] 2008 WL 11349766, at *1 (N.D. Tex. May 28, 2008).

Debtor also argues that depriving it of the ability to seek confirmation of the Plan constitutes irreparable harm but cites no authority to support this argument. Debtor cites a litany of cases purporting to stand for the proposition that a debtor *may be* irreparably harmed absent a stay of the conversion of a case from Chapter 11 to Chapter 7.[271] But none of the cited cases support that *this Debtor* will be irreparably harmed absent a stay. *In re Rosson*,[272] *In re Cal. Palms Addiction Recovery Campus, Inc.*,[273] and *In re Young*[274] simply stand for the proposition that a conversion order is final and immediately appealable, which no one contests. They do not, however, hold that a conversion order must be stayed on request. And *In re A&F Enters., Inc. II*[275] and *In re Kwok*[276] are easily distinguished: they stand for the proposition that a debtor seeking to reorganize as a going concern can be irreparably harmed by conversion to Chapter 7. Neither case speaks to whether a non-operating debtor, such as Debtor here, would be harmed by a conversion to Chapter 7, given that it would be liquidated in either case.

Furthermore, Debtor premises the irreparable harm argument entirely on its belief that creditors will be harmed; it articulates no harm to itself, probably because it has no basis to do so because it never contemplated reorganization as a going concern, like the debtors in *Young* and *A&R Enters*.[277] Despite Debtor's concern for creditors, no creditor has sought a stay of the conversion order.[278] PBR, the largest unsecured creditor of Debtor, actually requested conversion.

---

[271] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 6.
[272] 545 F.3d 764, 770 (9th Cir. 2008).
[273] 87 F.4th 734, 740 (6th Cir. 2023).
[274] 237 F.3d 1168, 1173 (10th Cir. 2001).
[275] 742 F.3d 763, 769 (7th Cir. 2014).
[276] 662 B.R. 432, 439 (Bankr. D. Conn. 2023).
[277] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 7 ("[T]he Plan would provide tens of millions of dollars of guaranteed recovery to creditors…the status quo should be maintained so that creditors have the opportunity to vote on the Plan.").
[278] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 7.

What's more, the Ribman Trust, which is Chair of the UCC and co-sponsored the Plan, recently filed a motion stating the following:

> The Court converted the case because the evidentiary record demonstrated continuing losses, an absence of any realistic prospect of rehabilitation, and governance concerns that undermined confidence in the Debtor's ability to operate in chapter 11. Those findings alone satisfy section 1112(b) of the Bankruptcy Code…."[279]

There is no indication the Ribman Trust seeks to block the conversion or preserve the viability of a plan of it co-sponsored; indeed, its motion suggests the opposite. As such, Debtor has failed to state a claim of irreparable harm to itself, and its claim of harm to creditors is not echoed by any actual creditors (nor does it have standing to claim irreparable harm for the benefit of other parties).

Moreover, the Plan is nothing more than a proposal, and the ability of the Plan to be confirmed is remote and speculative at best (*see* Section II(A)(5), Unusual Circumstances, *supra*). As such, there is no irreparable harm to Debtor (or creditors) due to the loss of the ability to seek confirmation of the Plan upon a conversion to Chapter 7.[280]

Peteski raises three irreparable injuries that it claims will occur without a stay.

*First*, Peteski echoes Debtor's argument that loss of the ability to seek confirmation of the appeal "would deprive unsecured creditors of the significant recovery the Chapter 11 Plan provides."[281] PBR refers to its arguments immediately above regarding why this does not constitute irreparable harm, to Peteski, Debtor or anyone else. Peteski also argues that the liquidation of Debtor cannot be unwound if the appeal is successful, but that also does not amount to irreparable harm meriting a stay because Debtor will be liquidated no matter which chapter it is in.[282] In

---

[279] Doc. 597, Darcy Lynn Ribman 1997 Trust's Emergency Motion for Entry of an Order (I) Altering or Amending Judgment, and (II) Granting Relief, ¶ 20.

[280] *In re Taub*, 470 B.R. at 278 (quoting *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007)).

[281] Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 52.

[282] *In re Gen. Motors Corp.*, 409 B.R. 24, 31, 34 (Bankr. S.D.N.Y. 2009) (holding where the ultimate outcome remains the same regardless of the appeal's success, no substantial irreparable harm exists).

*General Motors*, the court held that because the matter concerned "the death of a company," and a stay would not simply delay payment to creditors, the company would be forced to liquidate regardless of whether the stay was granted.[283] Similarly, here, Debtor is "dead as a doornail," and came to the Court in "complete liquidation mode."[284] Regardless of whether Debtor would be successful on appeal, the company will ultimately liquidate, rendering the requested stay futile.[285] Thus, there is no irreparable harm.

_Second_, Peteski argues that a stay is warranted due to reputational harm already caused to Peteski and Dr. Phil (who has not sought a stay pending appeal) by Trinity and PBR and that the "Ruling has added fuel to that fire."[286] This undermines Peteski's request for a stay. A movant seeking a stay pending appeal "must show that a stay is necessary to avoid likely irreparable injury to the applicant *while the appeal is pending*."[287] A stay of entry of the conversion order could not prevent any reputational harm that Peteski alleges has already occurred by the Ruling. The actual conversion order will just convert the case to Chapter 7 and will have no bearing on either Peteski's or Dr. Phil's reputations. Furthermore, the cases cited by Peteski do not support the request for a stay on reputational grounds.[288]

---

[283] *Id.* at 31, 34.

[284] Ruling, 69:9–15; 4:17–18.

[285] *See Quest Ventures, Ltd. v. IPA Mgmt. IV, LLC*, 2018 WL 922145, at *2 (E.D.N.Y. Feb. 15, 2018) (finding that debtor's former management did not suffer harm where the appointment of a Chapter 7 Trustee would merely "yield the same result," despite debtor's loss of control over the appeal in conversion); *Hardes Holding, LLC v. Sandton Credit Sols. Master Fund, III, LP*, 2019 WL 6347775, at *3 (D.S.D. Nov. 27, 2019).

[286] Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 54.

[287] *Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1272 (N.D. Cal. 2023) (emphasis added) (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) and *Nken*, 556 U.S. at 434).

[288] *See, e.g.*, *Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017) (finding "reputational injury [does] not necessarily constitute irreparable harm" and granting stay based on irreparable injury because order would leave movant unable to find employment); *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1056 (finding that an employment termination order should be stayed because of the severe injury it could inflict on movant's professional reputation).

Finally, Peteski and Dr. Phil cannot establish that the alleged reputational harm is truly irreparable because:

> One the one hand, if the court ultimately affirms the bankruptcy court, any reputational harm is an injury of Petitioner's own making and cannot justify a finding of irreparable harm…On the other hand, if the court ultimately reverses the bankruptcy court, any reputational harm will be cured.[289]

Finally, Peteski alleges that denying the stay risks its ability to assert its appellate rights under the doctrine of equitable mootness. This argument fails to establish irreparable harm meriting the issuance of a stay for largely the same reasons discussed above. Namely, the conversion of the case and liquidation of Debtor's assets will not cause any harm or prejudice to Peteski in the first place. While PBR does not take any position on whether Peteski's appeal will be equitably moot at this time, the cases cited by Peteski holding that equitable mootness can constitute irreparable harm deal with appeals from a confirmation order and a sale order, both of which are easily distinguishable from the facts present here and therefore do not support a finding of irreparable harm in this case.[290] Moreover, if the liquidation of Debtor's assets in Chapter 7 renders the appeal equitably moot to the extent that the assets cannot be retrieved, that does not constitute irreparable harm because that is exactly what Debtor proposed to do in Chapter 11. "A risk of mootness, standing alone, does not constitute irreparable harm."[291] The cases cited by Peteski in support of this argument are, once again, inapplicable here based on substantially different underlying facts and do not support a finding that equitable mootness in this case would

---

[289] *Allen v. Fitzgerald for Region Four*, 590 B.R. 352, 361 (W.D. Va. 2018) (citing *Long v. Robinson*, 432 F.2d 977, 981 (4th Cir. 1970) and *Sampson v. Murray*, 415 U.S. 61, 91 (1974)).

[290] *See generally In re Tex. Equip. Co.*, 283 B.R. 222 (Bankr. N.D. Tex. 2002) (holding that an appeal of a sale order would be moot once sale is consummated); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 349 (S.D.N.Y. 2007) (holding that there was a "strong possibility of mootness [of an appeal of a confirmation order] based on substantial consummation of a bankruptcy [reorganization] plan").

[291] *In re Herrera*, 2010 WL 148182, at *3 (Bankr. W.D. Tex Jan. 8, 2010) (citing *In re Adelphia Commc'ns Corp.*, 361 B.R. at 347 and n. 39).

constitute irreparable harm to Peteski.[292] Additionally, equitable mootness is a "judicial anomaly" because a federal court has a "virtually unflagging obligation" to exercise its jurisdiction.[293]

Notwithstanding the foregoing, even if the Court found *some* irreparable injury "on the scoreboard," that injury would need to be weighed against the harm to other parties (discussed below) that could be caused by leaving Debtor under the control of existing management for the duration of the appeal,[294] and that "the equities certainly do not favor the wrongdoer."[295] The Court has already determined that Debtor's agents and officers are conflicted, not credible, and have destroyed estate property.[296] So long as Debtor holds the reigns, estate property remains at risk of further dissipation or compromise.[297] As the Bankruptcy Court for the Western District of Texas has found, it is not equitable to allow a debtor to remain in "*de facto* if not *de jure*" control of the property at issue "so that the debtor can continue the very pattern of abuse that the court found justified (in part) the decision to convert this case."[298] Based on these considerations, even if Movants are at risk of suffering some irreparable harm without a stay (which they are not), that

---

[292] *In re Herrera*, 2010 WL 148182, at *3 (finding irreparable harm because conversion would potentially deprive debtor of assets that would sold in a Chapter 7 liquidation); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 349 (holding that there was a "strong possibility of mootness [of an appeal of a confirmation order] based on substantial consummation of a bankruptcy [reorganization] plan"); *In re Fiesta Inn & Suites, LP*, 2009 WL 5195961, at *3 (Bankr. W.D. Tex. Dec. 21, 2009) (finding irreparably harm if appellant was forced to pay a money judgment while appealing that judgment, which would render appeal moot).

[293] *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

[294] *See In re Herrera*, 2010 WL 148182, at *2 ("[T]he equities do not favor allowing the debtor to stay in continued possession of the rental properties that are at the heart of this bankruptcy, allowing the debtor to have *de facto* if not *de jure* exclusive control over those properties so that the debtor can continue the very pattern of abuse that the court found justified (in part) the decision to convert this case."); *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 317 (5th Cir. 2021) (finding the stay "plainly balances the equities," unlike the present case).

[295] *In re Fiesta Inn & Suites, LP*, 2009 WL 5195961, at *3.

[296] Ruling, at 22:17–21 ("I don't believe that testimony."); 36:25–37:3 ("[Dr. Phil]'s testimony at trial . . . was not credible."); 57:17–19 ("That testimony was not credible."); 59:10–13 ("[Dr. Phil]'s explanation . . . is not credible."); 36:25–37:6 ("[Dr. Phil]'s testimony at trial professing not to know what happened to the missing text was not credible. I find, based on all the evidence, that [Dr. Phil] deleted the unflattering text message.").

[297] *Id.* at 45:15–23 ("The [bankruptcy] process should not, in fact, be run by for the benefit of the insider, who is clearly self-interested.").

[298] *In re Herrera*, 2010 WL 148182, at *2.

harm is outweighed by the harm that will be caused to other parties by leaving existing
management in charge of Debtor during the appeal.

### C.    Substantial Harm to Others Weighs in Favor of Denying the Stay.

Substantial harm to others, namely PBR, Trinity, and the entire creditor body, significantly
outweighs Movants' nonexistent harm absent a stay. This factor is the "other side of the coin to
[Movant's] irreparable harm."[299] Under it, the moving party bears the burden of persuasion and
"must show that the balance of harms tips in favor of granting the stay."[300] Courts have denied
motions to stay when substantial harm to others occurred in the following settings: a questionable
fiduciary remaining in control of the estate,[301] risks of losing evidence,[302] and delay of
administering the bankruptcy estate.[303] Here, the facts give rise to similar scenarios, suggesting the
balancing test tips in favor of the other harmed parties in this proceeding—not Movants.

Movants attempt to avoid this conclusion by suggesting the Court could enter another order
requiring the "maintenance of the status quo pending appeal" to "avoid potential harm to
parties."[304] This is at least a tacit acknowledgment that parties would be harmed without continuing
the status quo order due to leaving Broadbent and Dr. Phil in control—both of whose ability to act
in the best interests of the estate has been questioned by the Court.[305] While a complete suspension
of the Chapter 11 case during the pendency of the stay would reduce the harm that could be

---

[299] *In re Lickman*, 301 B.R. 739, 748 (Bankr. M.D. Fla. 2003).

[300] *See id.*; *In re 473 W. End Realty Corp.*, 507 B.R. 496, 508 (Bankr. S.D.N.Y. 2014).

[301] *In re Dow Corning Corp.*, 194 B.R. 147, 153 (Bankr. E.D. Mich. 1996).

[302] *DBD Credit Funding, LLC v. Silicon Lab'ys Inc.*, 2016 WL 6893882, at *13 (N.D. Cal. Nov. 23, 2016) (quoting
*Bradberry v. T-Mobile USA, Inc.*, 2007 WL 2221076 (N.D. Cal. Aug. 2, 2007) (overruled on other grounds)).

[303] *In re Lickman*, 301 B.R. at 748.

[304] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 9; Doc. 586, Peteski Brief in Support of Motion
to Stay, ¶ 55.

[305] As discussed below, PBR submits that if this is how the court chooses to proceed, the court should entirely suspend
the Chapter 11 proceeding, not just continue the status quo order.

perpetrated against creditors, there would still be the risk of leaving Broadbent and Dr. Phil in control of the Debtor and its books and records, its media library, and any other assets it has.

In its Ruling, the Court determined that Dr. Phil's intentional spoliation of evidence by destroying estate property and Broadbent's lack of neutrality and failure to maintain his duty of candor to the Court were bases for finding three of the four grounds for cause.[306] Although Movants allege the Court's finding is "erroneous,"[307] and "not supported by the record,"[308] the Court stated it "spent a significant amount of time reviewing" "all the evidence" when making its decision, and that it "lost sleep" because of Dr. Phil's and Broadbent's "troubling" actions.[309] To grant the requested stay means these uncredible individuals remain in charge of Debtor, leaving no comfort to creditors that estate property and assets will be preserved.

"Courts have recognized that 'risk of lost evidence weighs against granting a stay.'"[310] A Chapter 7 Trustee must investigate Debtor's claims immediately to mitigate this risk and prevent substantial harm to others. Here, the risk of losing evidence arises from witnesses' memory loss over time and delay in allowing a Chapter 7 Trustee to take possession and control of all of Debtor's business records. Currently, the parties have not been through discovery, and no witnesses are on the record yet. Should the Court grant the Motions, by the time the case does convert to Chapter 7, the issues will be increasingly remote in time from when they occurred. This could lead to inaccurate witness recollections, which ultimately could reduce the likelihood that meritorious claims can be successfully pursued.

---

[306] *See* Ruling, at 62:8–12; 64:13–15; 65:2–8; 66:16–19.
[307] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16; Doc. 586, Peteski Brief in Support of Motion to Stay, ¶ 29.
[308] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 16.
[309] *See* Ruling, at 37:7–17; 37:4; 55:14–18.
[310] *DBD Credit Funding, LLC v. Silicon Lab'ys Inc.*, 2016 WL 6893882, at *13 (N.D. Cal. Nov. 23, 2016) (quoting *Bradberry v. T-Mobile USA, Inc.*, 2007 WL 2221076, at *4 (N.D. Cal. Aug. 2, 2007) (overruled on other grounds)).

There is also the issue of professional fees that will be incurred by Debtor in order to prosecute the appeal if the stay is granted. These fees could be significant and will further diminish whatever recoveries may be available for prepetition creditors. Debtor has not disclosed how it intends to pay for the fees necessary to pursue this appeal – or whether incurring those fees would be in the best interests of its creditors, none of whom have requested a stay. Debtor's choice to request a stay and pursue an appeal will only lead to more debt and greater financing issues, which is not in the best interest of creditors. Thus, the Court should prevent further financial harm to creditors and deny Debtor's and Peteski's motions to stay.

### D.    Public Interest Weighs in Favor of Denying the Stay.

The public interest weighs in favor of denying a stay to immediately divest control of Debtor and its assets from current management. *In re Herrera* is instructive here:

> If a stay were granted here, then the court would be in effect giving continued shelter to a debtor whom the court has already found has been abusing the bankruptcy process in furtherance of a larger pattern of frustrating his secured creditors. . . . It strikes the court that public policy counsels against affording a debtor continued special protections when the court already has probable cause to believe that a bankruptcy crime has been committed.[311]

Bankruptcy "[p]ublic policy favors finality in litigation,"[312] and "preventing unreasonably prolonged proceedings."[313] There is no telling how long an appeal will take. The Debtor filed a *Notice of Appeal* stating that Debtor appeals "from each and every part of the [Ruling]."[314] This appeal is overbroad, all-encompassing, and will require extensive briefing and time for the District Court to review and decide. That delay does not serve the public interest. *Debtor's Emergency*

---

[311] *In re Herrera*, 2010 WL 148182, at *3 (Bankr. W.D. Tex. Jan. 8, 2010).

[312] *In re Turner*, 207 B.R. 373, 379 (B.A.P. 2d Cir. 1997), *as amended* (Mar. 4, 1997).

[313] *In re Sternitzky*, 638 B.R. 770, 781 (Bankr. W.D. Wis. 2022). *See also In re Hosack*, 2006 WL 2385249, at *5 (Bankr. N.D. Tex. Aug. 3, 2006) (finding a stay was a delay tactic that would disserve the public interest); *In re Abengoa Bioenergy Biomass of Kansas, LLC*, 2018 WL 1613667, at *9 (Bankr. D. Kan. Mar. 29, 2018) ("The just, speedy, and efficient resolution of…disputes is the primary goal of bankruptcy courts as it should be of all participants.").

[314] Doc. 598, Debtor Notice of Appeal.

*Motion For Entry of an Order Authorizing Payment of Key Estate Expenses*,[315] which seeks relief from the Status Quo Order to pay claims only past due by a matter of days, further underscores this. Leaving Debtor (and its creditors) in limbo while Movants appeal over who should be allowed to liquidate the Debtor does not serve the public interest. Finally, public policy is meant to encompass the public generally, not just parties-in-interest in the case at hand and to protect the integrity of the judicial process, which would not be accomplished by a stay here.[316]

Movants do nothing more than pay lip service to this fourth factor and fall back on their belief that trying to confirm their Plan is in the public interest. Moreover, Debtor actually says denying a stay would "wipe out guaranteed recoveries for unsecured creditors," a statement which is demonstrably false and completely disregards the conditionality of the settlement and the uncertainty regarding whether the Plan is even confirmable. Movants failed to satisfy this factor.[317]

## III.   <u>A TEMPORARY ADMINISTRATIVE STAY IS UNNECESSARY</u>

A temporary administrative stay is used when temporal concerns arise in a proceeding, usually when serious matters are at issue or the court needs to manage its own docket.[318] This case presents neither situation.

Courts grant administrative stays "in an exercise of *its* docket-management authority," not an exercise for a lower court to manage a potential docket-overload for a higher court.[319] Justice Barrett, in her concurrence to a shadow-docket case, said as much, stating that the Supreme Court

---

[315] Doc. 592, Debtor's Emergency Motion for Entry of an Order Authorizing Payment of Key Estate Expenses ["Key Estate Expenses Motion"].
[316] *In re Texas Equip. Co., Inc.*, 283 B.R. 222, 228 (Bankr. N.D. Tex. 2002) (finding difficulty envisioning public interests served in dispute of two private parties' property rights); *In re Addison*, 667 B.R. 94, 101 (Bankr. D.S.C. 2025) ("…the only interest a stay would serve is Debtor's because it would allow him to further delay creditors…").
[317] *In re Garcia Grain Trading Corp.*, 2025 WL 2730614, at *6 (Bankr. S.D. Tex. Sept. 24, 2025) ("Defendants provided absolutely no evidence or witnesses whatsoever in support of this factor. Accordingly, the Court finds that Defendants have failed to demonstrate that the granting of a stay pending appeal would be in the public's interest.").
[318] *In re Latimer*, 489 B.R. 844, 867 (Bankr. N.D. Ala. 2013).
[319] *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring) (emphasis added).

and "courts of appeals use the procedure to the same end."[320] Justice Barrett infers that such stays

should be granted by courts of appeals because it "reflects . . . the relative consequences of staying

the *lower court* judgment versus allowing it go to[sic] into effect."[321] Justice Barrett continued by

saying that "the *Nken* factors are obviously on the court's radar, and unsurprisingly, they can

influence the stopgap decision."[322] But she cautioned that "[t]he real problem . . . is the risk that a

court will avoid *Nken* for too long."[323]

Other non-bankruptcy courts rarely impose an administrative stay and do so for a very

limited time period (seven days) and for high-profile, temporally important issues—Congressional

instructions regarding Hague Convention cases and children being removed from their home

country,[324] nationally imposed rules regarding illegal immigrants,[325] and payment or discharge of

millions of dollars in student-loan debt impacting thousands of people and schools.[326] When

bankruptcy courts consider whether to grant a motion for a stay and temporary administrative stay,

their decision often reflects an analysis of the four stay factors[327] or the decision of the motion for

a stay.[328] The Bankruptcy Court for the District of Arizona countered such a request by stating it

was provided with "no authority for a Bankruptcy Court to grant 'a brief administrative stay.'" It

concluded that "the 'brief administrative stay' must be denied," because the movant had not

satisfied the "threshold requirement for any stay."[329]

---

[320] *Id.*

[321] *Id.* (emphasis added).

[322] *Id.* at 799.

[323] *Id.*

[324] *See Garcia v. Posada*, 2024 WL 4415280, at *1 (N.D. Tex. Apr. 9, 2024).

[325] *See Texas v. United States Dep't of Homeland Sec.*, 2024 WL 5454617, at *1–3 (E.D. Tex. Aug. 26, 2024), *modified*, 747 F. Supp. 3d 1005 (E.D. Tex. 2024).

[326] *See Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1279–80 (N.D. Cal. 2023).

[327] *In re Quinteros*, 2019 WL 5874609, at *15 (Bankr. D.D.C. Nov. 8, 2019).

[328] *In re Red Mountain Mach. Co.*, 451 B.R. 897, 909 (Bankr. D. Ariz. 2011); *In re Quinteros*, 2020 WL 6701321, at *3 (Bankr. D.D.C. Nov. 13, 2020).

[329] *In re Red Mountain Mach. Co.*, 451 B.R. at 909.

For all of the above-stated reasons in this brief, the Court should also deny the request for a temporary administrative stay. Issuing an administrative stay risks the possibility of prolonging this case longer than necessary, as there is no telling how long the District Court will take to rule given the current government shutdown. Further, this case presents no high-profile, temporally important issues like the ones in the cases cited by Debtor and Peteski. Rather, Peteski raised concerns about liquidation activities, but there is no immediate concern of such liquidation as appointing a Chapter 7 Trustee and completing investigations of claims will take considerable time. Finally, Debtor and Peteski have failed to satisfy the four stay factors, as explained throughout this brief, which other bankruptcy courts use as guidance in deciding whether to issue an administrative stay. Why grant one stay when simultaneously denying another? Thus, the Court should follow other bankruptcy courts and deny the request for a temporary administrative stay.

## IV.   ALTERNATIVE REQUEST TO SUSPEND THE CHAPTER 11 CASE IN THE EVENT A STAY IS GRANTED

To the extent that the Court grants a stay, which it should not, PBR requests the Court also suspend the Chapter 11 case in its entirety under Bankruptcy Rule 8007(e)(1) in order to protect and maintain the status quo and to avoid irreparable harm to PBR and other creditors during the pendency of the appeal.[330] The Debtor does not oppose extending the Status Quo Order: "The Court can avoid potential harm to other parties by ordering a similar maintenance of the status quo [as is currently in effect under the Order Preserving Status Quo [Doc. 579]] pending appeal."[331]

But to fully protect the status quo, more than an extension of the existing Status Quo Order is needed. This need is demonstrated by (1) Debtor's refusal to extend fee application objection deadlines, (2) Peteski's refusal to respond to PBR and Trinity's request to extend the challenge

---

[330] FED. R. BANK. P. 8007(e)(1).
[331] Doc. 590, Debtor Memorandum in Support of Motion to Stay, at 9.

deadline under the Interim DIP Order, and (3) Debtor's Emergency Motion that seeks relief from the Status Quo Order to allow the Debtor to distribute cash out of the estate. All aspects of the Chapter 11 case must come to a halt if the stay is granted (which it should not be).

The Court has found that the Debtor's two board members, Broadbent and Dr. Phil, are acting for the benefit of Dr. Phil, and not in the best interests of the estate. To allow the Chapter 11 case to proceed under their control to any extent during the pendency of the appeal would give Broadbent and Dr. Phil the opportunity to attempt to subvert the Court's Ruling and continue to pursue ends that are likely to benefit no one other than Dr. Phil and favored creditors.

Furthermore, the Debtor's Emergency Motion makes clear that the Debtor actually intends to continue to airing reruns of its media library—causing further operating losses to the estate— during the pendency of the appeal (if a stay is granted).[332] This too supports a complete suspension of the Chapter 11 case if a stay is issued to prevent further diminishing the estate by incurring the expenses related to airing those reruns.

The public interest is also served by a suspension of all Chapter 11 proceedings to ensure that the relief granted by the Court in the conversion order can be implemented as ordered if the stay is granted but the Movants' appeals are ultimately unsuccessful. The Movants should not be given the opportunity to dissipate the Debtor's assets or alter its rights in any way during the pendency of any stay that might be granted.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Peteski's and Debtor's motions to stay the pending appeal and deny the alternative request to grant a temporary administrative stay.

---

[332] Doc 592, Key Estate Expenses Motion.

Dated: November 10, 2025                    Respectfully submitted,

/s/ Jason M. Rudd
Jason M. Rudd, Tex. Bar No. 24028786
Scott D. Lawrence, Tex. Bar No. 24087896
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Email: jason.rudd@wickphillips.com
        scott.lawrence@wickphillips.com

Nicholas J. Secco (*pro hac vice* admitted)
BENESCH FRIEDLANDER COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949
Email: nsecco@beneschlaw.com

Alyssa A. Moscarino (*pro hac vice* admitted)
BENESCH FRIEDLANDER COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: (216) 363-4500
Email: amoscarino@beneschlaw.com

Abbey Walsh (*pro hac vice* admitted)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
1155 Avenue of the Americas, 26th Floor
New York, New York 10036
Telephone: (646) 777-0053
Email: abbey.walsh@beneschlaw.com

Jennifer R. Hoover (*pro hac vice* admitted)
Andrew D. Kinsey (*pro hac vice* admitted)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
1313 N. Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Email: jhoover@beneschlaw.com
        akinsey@beneschlaw.com

**COUNSEL TO PROFESSIONAL BULL RIDERS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 10, 2025, a true and correct copy of the foregoing document was served by the Court's ECF noticing system on all parties that consent to such service via electronic filing.

<u>*/s/ Jason M. Rudd*                              </u>
Jason M. Rudd

56