

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 18, 2025**

_____
**United States Bankruptcy Judge**

_____

## United States Bankruptcy Court
## Northern District of Texas
## Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | Case No. 25-80156-swe-11 |
| | § | |
| Debtor. | § | |

### *Memorandum Decision Regarding (i) Request to Alter or Amend Judgment; (ii) Motions for Stay Pending Appeal; and (iii) Conversion of Case to Chapter 7*

## I.  Background

On July 18, 2025, creditors Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. filed an *Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* (the **"Trinity Motion"**) [Docket No. 100]. On August 1, 2025, creditor Professional Bull Riders, LLC filed a *Partial Joinder* in Trinity's Motion (the "**Joinder**") [Docket No. 151]. The Court conducted a multi-day trial on those requests and read its ruling into the record on October 28, 2025. Under the Court's ruling that is now transcribed at Docket No. 582 (the "**Ruling**"), the Court stated

1

its intent to convert this case to Chapter 7 pursuant to a separate order. This Memorandum Decision is not the conversion order.

At the end of the Court's ruling, the Debtor announced its intent to file a motion for stay pending appeal and requested an opportunity to brief the issue before a Chapter 7 trustee is appointed. The Court entered its *Order Preserving Status Quo* [Docket No. 579] on October 29, 2025 (the "**Status-Quo Order**"), indicating that the Court would delay entering the conversion order until the Court hears the motion for stay pending appeal, and ordering that the Debtor should not transfer estate property to any party absent further Court order.

Both the Debtor and Peteski Productions, Inc. have since filed motions for stay pending appeal [Docket Nos. 585, 589] (the "**Stay Motions**") and related briefs [Docket Nos. 586, 590] (the "**Stay Briefs**"). Trinity and PBR have filed reply briefs. [Docket Nos. 608, 609].

In its Stay Brief, Peteski argued or suggested the Court did not satisfy due process when it found as cause for conversion or dismissal (a) Mr. Broadbent's failure in his duty of candor to the Court; (b) Mr. McGraw's destruction of relevant evidence and property of the estate in his capacity as either board member of Merit Street or de facto officer or agent of Merit Street; and (c) Mr. Broadbent's not being a neutral fiduciary but instead being conflicted in favor of Mr. McGraw.

To address any concerns about *alleged* failures in due process for issues (a) and (b),[1] the Court held a precautionary due-process hearing on those issues on November 13, 2025 (the "**Precautionary Due-Process Hearing**"). Peteski and Mr. McGraw filed a brief in response [Docket No. 610] (the "**Peteski Due-Process Brief**"), as did the Debtor [Docket No. 617] (the "**Debtor Due-Process Brief**").

In addition, after the Ruling, the Darcy Lynn Ribman 1997 Trust (the "**Ribman Trust**") filed its *Emergency Motion for Entry of an Order (I) Altering or Amending Judgment, and (II) Granting Related Relief*

---

[1] The Court called it a "precautionary" due-process hearing because the Court firmly believed—and still does—that due process had, in fact, been provided. Out of an abundance of caution, the Court set the hearing to address *alleged* failures in due process.

[Docket No. 597] (the "**Ribman-Trust Motion**") on November 7, 2025, which the Court also heard on November 13, 2025.

The Court is now prepared to rule on these matters. The Court's findings and conclusions in this Memorandum Decision address the Ribman-Trust Motion and the Stay Motions. These same findings and conclusions also supplement and amend the Ruling, which is completely interlocutory and which the Court may freely amend or supplement until entry of the conversion order. Although the Debtor and Peteski have both filed notices of appeal [Docket Nos. 598, 607], those are not yet effective because the Court has not yet entered the conversion order, which will be entered only after the Court fully supplements and amends its Ruling through this Memorandum. Fed. R. Bankr. P. 8002(a)(2).

## II. Ribman-Trust Motion

The Ribman Trust requests that the Court remove from its Ruling the Court's finding that Mr. Ribman was a Ribman Trust representative and agent. According to the Ribman Trust, the Court's agency finding violates the party-presentment principle because "no party alleged, briefed, argued, or attempted to prove that Mr. Ribman acted as an 'agent' of the Trust. The issue was not raised in the Motion to Convert, any response, objection, or in the multi-day evidentiary hearing." Ribman-Trust Motion ¶ 16, at 5. The Ribman Trust also argues that the multi-day evidentiary hearing generated "no facts from which an agency relationship could be inferred." *Id.* ¶ 19, at 6. The record contradicts both arguments. The evidence at trial shows that Darcy knowingly permitted Jamie to hold himself out as having apparent authority to act for the Ribman Trust, or lacked ordinary care so as to clothe Jamie with an indicia of authority that would lead a reasonably prudent person to believe Jamie had apparent authority to act for the Ribman Trust. *Patel v. Mustang Rental Servs. of Tex., Ltd.* 719 S.W.3d 691, 699 (Tex. App.— Houston [14th Dist.] 2025) (citing *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)).

The controversy surrounding Jamie Ribman and the Ribman Trust grew exponentially when Trinity first brought to the Court's attention the deleted McGraw-to-Ribman text on August 28. At that hearing, Mr. McGraw's text containing the I-don't-care-what-the-Court-does guaranty of the Ribman Trust claim was front and center. Transcript of Hearing Held August 28, 2025, Docket No. 373 at 18, 23-27, 47-48, 61-

66, 70-71, and 79. Counsel for the Ribman Trust acknowledged that she observed that hearing, after first being retained on July 24, 2025, filing a *Notice of Appearance and Request for All Documents* on July 28, 2025 [Docket No. 140], and thereafter receiving via ECF all briefs and other filings in the bankruptcy case. At the August 28 hearing, everybody in the room, including the presiding judge, was seeing evidence that Jamie Ribman was the point man for the Trust's communications with the Debtor and Mr. McGraw. That hearing would have been a good time for the Ribman Trust's counsel to speak up and set the record straight if she thought only Darcy Ribman was authorized to speak for the Trust.[2] What's more, it was clear to everybody at that hearing that Jamie Ribman's role for the Ribman Trust was going to be a significant part of the then upcoming trial.

Since August 28, the relationship between Mr. McGraw, the Ribmans, and the Ribman Trust was addressed numerous times both in pretrial briefing, in discovery hearings and conferences, and at trial.

To start, here are just a few instances in pretrial briefing (again, which the Ribman Trust was monitoring) where Trinity and PBR alleged that Jamie Ribman was acting for the Ribman Trust or that Mr. McGraw believed Jamie Ribman was acting for the Ribman Trust and was the correct person to communicate with regarding the Ribman Trust claim. All of these examples were cited as evidence in support of cause for conversion or appointment of a Chapter 11 trustee, *none of which* the Ribman Trust disputed or raised in any sort of responsive briefing or even a comment in the courtroom.

---

[2] It is not uncommon in Chapter 11 cases for parties to appear and be heard in contested matters if their rights may be affected. The Court sees these type of "pop-ins" with some frequency. *See, e.g.,* 11 U.S.C. § 1109(b) (noting that a party-in-interest, including a creditor, may appear and be heard on any issue in a Chapter 11 case); *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 269 (2024) (unanimously interpreting "party in interest" broadly to give standing to an insurance company, and noting that by using the words "party" and "interest," the statute was intended to cover entities that are "potentially concerned with, or affected by, a proceeding.").

- "Indeed, the Committee has walked lock step with the Debtor and Peteski during the entire pendency of this case. That is not surprising because neither Ribman nor Borden has any interest in discharging their fiduciary duties to general unsecured creditors. Around the time the Debtor filed this Chapter 11 Case, Dr. Phil guaranteed his good friends, the Ribmans, a 100% recovery on their claim against the Debtor out of his own pocket. He also invited the Ribmans to invest in Envoy." PBR Reply, Docket No. 413 ¶ 12, at 7.

  o PBR here is alleging that Mr. McGraw guaranteed the claim of his good friends Jamie Ribman and Darcy Ribman ("their claim").

- "Among the potential investors Dr. Phil approached were Darcy and Jamie Ribman, his close friends with whom he had previously shared his desire to rid the Debtor of TBN in June 2024. In December 2024, through a family trust, the Ribmans invested $5 million in the Debtor via a convertible note." PBR Reply, Docket No. 413 ¶ 22, at 11.

  o Again, PBR is alleging that both Jamie and Darcy Ribman acted for the Ribman Trust.

- "At the same time, Dr. Phil and his team were still seeking outside investors for the Debtor. On May 18, McIntyre shared with Jay that the 'collective opinion' was to close an 'investment round with Jamie [Ribman] and co asap inside Merit' while they simultaneously 'start the first phase with Soo [Kim] to move to his studio.'" PBR Reply, Docket No. 413 ¶ 28, at 13.

  o PBR here alleges that it is Mr. Ribman who was the point of contact for potential investment in Envoy in May 2025.

- "The Ribmans were not the only unsecured creditors who received a guarantee from Dr. Phil that he would personally pay their debts outside of this Court's supervision." PBR Reply, Docket No. 413 ¶ 62, at 27.

  o PBR again refers to the Ribmans together as the beneficiary of Mr. McGraw's guaranty.

- "As discussed above, Dr. Phil fully and personally guaranteed the $5 million investment of the Ribmans, whom he has described numerous times as his close personal friends. Dr. Phil also invited the Ribmans to invest in Envoy. Indeed, on the same day that Dr. Phil put the Debtor into bankruptcy, Dr. Phil (along with Broadbent) gave Mr. Ribman a preview of that potential investment vis-à-vis an exclusive VIP tour of Envoy's new facilities at MediaCo." PBR Reply, Docket No. 413 ¶ 66, at 28.

  o More PBR allegations about both Jamie and Darcy Ribman's involvement with the Ribman Trust.

- "This scheme would allow Peteski to extract the Debtor's assets and leave behind the Debtor's liabilities (other than from preferred creditors that Peteski or Envoy chose to assume or backstop, such as Committee Chair Darcy Ribman's claim for $5 million). Ironically, despite this guarantee, the Committee tries to portray itself as an impartial and independent party in this case by claiming that it 'lacks TBN's and PBR's complicated history and business relationships with the Debtor and Peteski'. Committee Reservation of Rights, ¶ 1. The Court should reject the Committee's false characterization of its member's history and business relationships with the Debtor and Peteski." PBR Reply, Docket No. 413 ¶ 91 & n. 208, at 36.

  o Yet more PBR allegations about Mr. McGraw's guaranty of the Ribman Trust claim through the deleted-text guaranty.

- "Discovery in this matter revealed that Jamie Ribman, husband to Darcy Ribman, was involved in the inception of what would become the Alleged Transfer. On June 29, 2024, McGraw texted Ribman about his 'project of getting rid of TBN!,' Ex. 1, at PETESKI0007916, following which Ribman texted back about 'Matt [Crouch] also thinking about how to extricate himself from this relationship.' Ex. 2, at PETESKI0007918. Ribman then texted talking points to McGraw prior to the meeting on July 28, 2024, between McGraw and Matt Crouch discussed below. Ribman is one of the very few creditors that received an explicit guaranty of payment from McGraw in connection with the bankruptcy proceeding *and* an offer to invest in Envoy. Ex. 3, at PETESKI0005841. Ribman was reportedly present at Envoy's

new facility on the Petition Date when MSM's Chief Restructuring Officer, Gary Broadbent, visited the facility. Simply put, the idea that a Committee containing Ribman and/or an entity closely related to him represents a completely independent, unemotional voice in the room, lacks credibility." Trinity Reply, Docket No. 401 n. 7, at 5.

- o Here Trinity explicitly refers to Jamie Ribman as the lucky recipient of Mr. McGraw's I-don't-care-what-the-Court-does guaranty. Based on that guaranty of the Ribman-Trust Claim, Trinity alleges that the Committee is not neutral.

- "In sum, the Committee appears to be arguing that prior, obvious bad faith at the inception of the case and/or the lack of corporate authority to even file the case, should be overlooked in light of what it characterizes as a 'remarkable about face.' In other words, pay no attention to how we got here or why. [fn. 24:] Considering he appears to be a key player in both the 'how' and 'why,' it makes sense Ribman (through the Committee) would take this position." Trinity Reply, Docket No. 401 ¶ 15 & n. 24, at 9.

- o Here Trinity is referring to Jamie Ribman and how Jamie Ribman, through the Committee, was taking certain positions in this case.

- After Trinity describes Mr. Broadbent as working for Mr. McGraw and Envoy, Trinity alleges this: "Furthermore, for similar reasons, the appointment and formation of the Committee does not fix this conflict-of-interest problem. The Committee is comprised of two members. The evidence is clear that at least one of those members (if not both) is a trusted confidant of McGraw and part of his 'inner' circle. It is also clear that this Committee member has some sort of investment or sweetheart deal either in MSM or Envoy that McGraw has promised will remain. As such, there is ample cause to appoint a Chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code." Trinity Reply, Docket No. 401 ¶¶ 163-64, at 74.

- o Here Trinity expressly alleges that Mr. McGraw's I-don't-care-what-the-Court-does  guaranty—made  to  Jamie

Ribman in the deleted text—resulted in a sweatheart deal for the Committee member, the Ribman Trust, that supports cause to appoint a Chapter 11 trustee.

At trial, Mr. McGraw testified that Jamie Ribman, *speaking for the family-and-friends group*, indicated they would feel much more comfortable investing in Merit Street if TBN were not in control. Transcript of Hearing Held Sept 23, 2025, Docket No. 523 at 22. As detailed in the Ruling, Jamie Ribman then provided very specific, persuasive messaging to help with Mr. McGraw's project to get rid of TBN, thereby satisfying the family-and-friends group's desire to see Mr. McGraw in control. Then, after Mr. McGraw and Peteski gained control of Merit Street, the family-and-friends group Ribman Trust made its loan to Merit Street.

In addition, at trial, Mr. McGraw testified extensively about his text to Jamie Ribman, about his promise to pay the Ribman Trust Claim (which he described as "your investment"), and about how Jamie Ribman purportedly declined payment on behalf of the Ribman Trust. Transcript of Hearing Held Sept 23, 2025, Docket No. 523 at 91.

And right before closing arguments, when I asked counsel in attendance if the guaranteed claim referred to in the deleted text was, in fact, the Ribman Trust claim, Mr. Ducayet responded that it was. Transcript of Hearing Held Sept 29, 2025, Docket No. 550 at 11.

Finally, rewinding a bit to the first-day hearings on July 3, 2025, Mr. Venter for the Debtor represented that there were principal-level discussions taking place with the Ribman Trust and that the Ribman Trust was fully in the loop on the bankruptcy. Transcript of Hearing Held July 3, 2025, Docket No. 47 at 16. Of course, just two days before that, on July 1, in the purposefully deleted text message, Mr. McGraw was discussing Merit Street's bankruptcy strategy with Jamie Ribman and educating Mr. Ribman on the large size of the Ribman Trust claim relative to the size of the other claims in the case, an issue *critical* to appointment on a creditors' committee. *Lo and behold*, not long after those discussions, the Ribman Trust appeared on the Committee.

Is there enough evidence to show that Darcy knowingly permitted Jamie to hold himself out as having apparent authority to act for the Ribman Trust, or lacked ordinary care so as to clothe Jamie with an indicia of

authority that would lead a reasonably prudent person to believe Jamie had apparent authority to act for the Ribman Trust? Absolutely.

Moreover, by actively monitoring the briefing and observing the August 28 hearing—all of which extensively dealt with Jamie Ribman's Trust involvement—and never speaking up to set the record straight, *especially when it was obvious Trinity and PBR were teeing up the factual issue for the Court to decide*, the Ribman Trust itself recognized Jamie Ribman's authority, or at least impliedly consented to the Court's determination of the issue for purposes of the requests to convert the case or appoint a Chapter 11 trustee.

The Ribman Trust alternatively requests a new hearing on agency, alleging that this "completely new issue" was raised sua sponte by the Court in the Ruling, that no party briefed this issue, and that the Ribman Trust was deprived of notice and an opportunity to be heard on this issue. The Court's points above adequately dispel this argument. In a nutshell, the Court rejects the suggestion that the Ribman Trust is shocked—shocked—that the Court would make a finding that Jamie Ribman was the Trust's point person for communications with Mr. McGraw and the Debtor.

Even if somehow there were insufficient evidence of an agency relationship between Jamie Ribman and the Ribman Trust, the Court would still conclude—as further explained in the Ruling and as supplemented below in the Stay-Motions section—that conversion to Chapter 7 rather than appointment of a Chapter 11 trustee is in the best interests of the estate and creditors, for reasons both unrelated to fairness and directly related to fairness. Each of those reasons favors a Chapter 7. On the fairness issue, I'll echo the words of Judge Felsenthal that I noted in my Ruling: The bankruptcy process must both be fair and appear fair. Jamie Ribman was actively involved in the conduct that is being litigated and determined not only in this very ruling, but also in the related litigation with Trinity and PBR in Adversary Proceeding No. 25-8006. Absent sua sponte Court intervention and thus more time and expenses incurred in the process, Jamie Ribman's wife Darcy would continue to sit on the Committee and supervise post-bankruptcy litigation against Trinity and PBR. Conversion to Chapter 7 avoids that unseemly and unfair arrangement.

### III.  Separately Identified Supplemental and Amended Findings and Conclusions

In the Ruling, the Court identified four causes for conversion or dismissal. For three of the four causes (lack of a neutral fiduciary, failure in the duty of candor to the Court, and destruction of a text), the Court intended to state that each such cause was also cause to appoint a Chapter 11 trustee. The Court states so now for the first two causes, and for bad-faith conduct—the amended fourth cause—as described in this memorandum. Lack of candor to the Court is dishonesty, an enumerated cause. Bad-faith conduct is either unenumerated cause or enumerated cause of gross mismanagement or dishonesty. *See* 11 U.S.C. § 1104(a)(1).

In addition, even if lack of a neutral fiduciary, lack of candor, and bad-faith conduct were somehow not cause to convert to Chapter 7 but were instead only cause to appoint a Chapter 11 trustee, and if no other Chapter 7 conversion cause existed, the Court alternatively would appoint a Chapter 11 trustee rather than dismiss the case or continue with current management in control. A Chapter 11 trustee would at the very least cure the lack of a neutral fiduciary and would avoid the free-for-all of a dismissal. The Court would simply have to address the Ribman Trust issue in the continued Chapter 11.

In the further alternative, absent cause under section 1112(b) or section 1104(a), the Court would find the appointment of a Chapter 11 trustee in the best interest of creditors, equity security holders, and other interests of the estate, given the skyrocketing level of distrust and vitriol among the parties. *In re Taub*, 472 B.R. 208, 227 (Bankr. E.D.N.Y. 2010); *In re Marvel Entertainment Group, Inc.*, 140 F. 3d 463, 472-73 (3d Cir. 1998).

Finally, in reviewing the Stay Motions (discussed below), which prompted the Court to (again) review the evidence and arguments of all parties, the Court came to an inescapable conclusion. There is a more comprehensive fourth cause for conversion, dismissal, or appointment of a Chapter 11 Trustee from the Ruling: Bad-faith conduct in the prosecution of this bankruptcy case by Mr. McGraw, acting for the Debtor.

Although Trinity and PBR initially alleged bad faith in the *filing* of the bankruptcy case, the focus in this case shifted dramatically on August 28, when the deleted text was revealed to the Court. Since then, an

incredible amount of time and expense was spent addressing bad-faith conduct in the *prosecution* of this case. For example, in its PowerPoint presentation for opening arguments, Trinity highlighted the requirement that there be good faith not only in the filing of a bankruptcy, but in the prosecution and confirmation of bankruptcy proceedings. Docket No. 443 at 37/94. That same PowerPoint noted the deleted text on a timeline of critical events, and the content of the deleted text itself was highlighted on its own slide. *Id.* at 68/94, 71/94.

In its pretrial briefing, PBR alleged that the Committee was not neutral due to Mr. McGraw's guaranty of the Ribman Trust claim, which PBR alleged was part of an overall scheme by Mr. McGraw to steer the case for his benefit. *See, e.g.,* PBR Reply, Docket No. 413 ¶ 12, at 7. PBR further alleged that Mr. McGraw's text guaranteeing the Ribman Trust claim appeared to have been deleted. *Id.* ¶ 51 & n.134, at 23.

Trinity noticed the motion for discovery sanctions for the days of trial [Docket No. 362], and the Debtor put the sanctions motion on the agenda for the first day of trial. Docket No. 403. At the beginning of trial, both parties gave their position on whether there was compliance with the prior order compelling production, and Trinity's counsel noted that they had tried—but failed—to get any explanation for the deleted text. Docket No. 490, at 8-11. Trinity's counsel was not interested in even more delays before starting the trial. Further, PBR's counsel noted that the missing text was "quite germane and relevant" to the issues to be tried, that Mr. McGraw was unable at a deposition to provide any sort of explanation for the deleted text, and that PBR had repeatedly asked Peteski's counsel for a forensic image of his phone or an update on their investigation on why the text was deleted, all to no avail. *Id.* at 11-12. PBR's counsel likewise stated they were not interested in further delaying the trial, noting that there was a shadow looming about the missing text. *Id.*

After Peteski's counsel said their investigation was still ongoing, the Court noted: "With this much fanfare being made about that text message it seems like today would have been a good day to have an update. I mean, there's no answer other than, we're still looking into it?" Counsel's reply: "I understand, your Honor. And that is correct." *Id.* at 15.

It smacks of gamesmanship for the Debtor and Peteski to suggest that the deleted text was relevant *only* to discovery matters when Mr.

McGraw's conduct and the deleted text was alleged to be integral to a scheme that involved—in part—hiding from the Court secret communications with Mr. Ribman that described Mr. McGraw's stated intent to wipe out the PBR and Trinity claims and give preferential treatment to the Ribman Trust claim. It seems the goal was to run out the clock on the discovery matter while the conversion trial started, profess never to have finally determined what happened to the deleted text,[3] and then feign surprise when Mr. McGraw was examined about the deleted text at trial. The deletion of the text was squarely within the bad-faith issues raised prior to trial and litigated during trial. The evidence at trial demonstrates that Mr. McGraw deleted the text because it contained highly relevant and unfavorable evidence about Mr. McGraw's inappropriate goals in this case. That's bad-faith conduct in the prosecution of this bankruptcy case.

Unfortunately, the Court confused matters by concluding in the Ruling that the intentional deletion of the text was a separate cause for conversion. It wasn't a separate cause. The issue had already been raised by PBR and Trinity prior to trial and litigated at trial, as was the issue of Mr. McGraw's control over the Debtor and this case. The Fourth cause is simply Mr. McGraw's bad-faith conduct in the prosecution of this case, which is cause to convert the case, dismiss the case, or appoint a Chapter 11 trustee.

Finally, there was abundant evidence at trial that Mr. McGraw conducted Merit Street business by text and email.[4] While writing this

---

[3] The sanctions motion was carried each day of trial and was noted on the docket for each day of trial. Docket Nos. 484, 509, 516, 517, 518, and 519. The Court never received an update. To this day, the Court has received no further update on what happened to the deleted text. Although that could have been forced by somebody setting the sanctions motion for hearing yet again, PBR and Trinity were absolutely within their rights to prove bad-faith conduct at the conversion trial by asking about the deleted text. The Court did not need to make any finding of a violation of a discovery order, and since the sanction motion was pending against only Peteski at the time, the Court amends its Ruling to eliminate that finding as unnecessary.

[4] *See, e.g.*, TBN Ex. 554 pp. 4594—4597 (Mr. McGraw texting Frank Amedia about the terms of a contract between TBN and MSM and the need for MSM to secure a bridge loan.); TBN Ex. 143 (Mr. McGraw texting Frank Amedia about "3 MAJOR issues to resolve [with] MSM: Lease, Shared Services, Distribution and just comp with Peteski."); Peteski Ex. 86 (Mr. McGraw texting Matt Crouch "as partners/shareholders

Memorandum and further considering the issue, it became clear to the Court that there is no need (as suggested by Peteski) to halt this proceeding and hear a new adversary proceeding to determine whether the deleted text—which on its face reflects Mr. McGraw conducting and discussing Merit Street business—is a company record and thus necessarily property of the estate, or whether Mr. McGraw acted in his personal capacity when deleting it. *See, e.g.*, 11 U.S.C. § 102(1) (recognizing that notice and a hearing means such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances).

After hearing Peteski's position at the Precautionary Due-Process Hearing, the Court determines anew—without any burden of proof or persuasion on Peteski—that the text Mr. McGraw deleted was a Merit Street record and thus necessarily property of the estate, and that he did it wearing his Merit Street hat.[5]

## IV.  Stay Motions

In determining whether to grant a stay pending appeal, the Court considers (1) whether the movant has made a strong showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether granting the stay would substantially harm other parties; and (4) whether granting

---

in MSM" about needing a cash injection so MSM does not lose its must carry distribution.); TBN Ex. 200 (Mr. McGraw texting Ken Solomon about how MSM can best pursue litigation against TBN.); TBN Ex. 345 (Mr. McGraw texting Ken Solomon and Joel Cheatwood an outline of the points to be told to Merit employees at a mass layoff the day after bankruptcy was filed.). *See also* TBN Ex. 45 (Mr. McGraw emailing Frank Amedia about deal points of a swap of MSM stock between Peteski and TBN.); TBN Ex. 86 (Mr. McGraw emailing MSM officers and managers around two weeks after purporting taking majority control in MSM that the MSM employees are not on the same team as TBN and that "if you really need something done come to ME FIRST and I will decide how to get it."); TBN Ex. 558 (Mr. McGraw emailing Brian Lidji and MSM officers about the need to be "sure that no one at TBN is spending MSM money... [because] [t]hey are very apt to go in there first thing in the morning and write a $3+ million check to PBR.").

[5] Even without a determination on property of the estate, the Court's ruling on the bad-faith conduct remains the same. Mr. McGraw deleted the text because he didn't want the Court to see it and his stated intent to wipe out the claims of unfavored creditors and guaranty the claims of a favored creditor.

the stay would serve the public interest. *In re First South Savings Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987).

None of the four factors favors a stay pending appeal.

### A.     The movants have not made a strong showing of likelihood of success on the merits

The Court's findings of cause to convert to Chapter 7 are all fact-based, and three of the four (lack of candor, lack of a neutral fiduciary, and bad-faith conduct in the prosecution of this case) heavily depend on the Court's boots-on-the-ground credibility determinations.[6] *See, e.g., First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 814 (5th Cir. 1992) ("The bankruptcy judge had occasion to observe Martin and to listen to his testimony, which necessarily includes the opportunity to study any changes in both his demeanor and tone of voice. This opportunity places the bankruptcy judge in a far superior position to gauge Martin's credibility than this Court is in by merely reading the transcripts. If the bankruptcy judge finds one version of events more credible than other versions, this Court is in no position to dispute the finding. Consequently, we hold that the bankruptcy court's findings of fact are not clearly erroneous.").

The Court will respond point-by-point to the arguments in the Peteski Stay Brief and the Debtor Stay Brief regarding likelihood of success on the merits.

- **Trinity and PBR failed to establish either bad faith or the lack of a valid purpose in the filing of the Chapter 11 case.**

Although PBR and Trinity alleged a bad-faith filing, the Court's Ruling and this Memorandum do not rely on any party establishing a bad-faith

---

[6] The Court realizes that the Debtor and Peteski didn't have an opportunity to address in their Stay Motions this description of, and finding of, the amended Fourth Cause, but the Debtor and Peteski will have a full opportunity to address it on appeal and any stay request addressed to the District Court. Because there are multiple independent causes for conversion and given the administrative losses that this estate is incurring each day (causing harm to other parties, as explained below), the Court will not order another round of briefing on the Stay Motions.

or valid purpose in the *filing* of the Chapter 11 case, so this point is moot.[7]

PBR and Trinity raised and litigated the issue of whether there was bad-faith conduct in the *prosecution* of the Chapter 11 case, which the Court addresses elsewhere.

- **Destruction of information, neutrality assessments, and candor assessments are *legally* invalid grounds for cause because they don't fall within the "paradigm" of protection of the estate for the benefit of creditors, such as continuing loss to the estate and gross mismanagement. And the Court didn't even cite § 1112(b)(4) in its analysis.**

This argument is a head-scratcher. The determination of cause is inherently a factual determination, depending of course on the unique facts of each case, which is why section 1112(b)(4) is a nonexhaustive, nonexclusive list of *examples* of cause. For instance, in the Chapter 11 case of a fully operating and viable business with dozens, hundreds, or thousands of employees, it very likely would be a clearly erroneous *factual* determination that a dishonest CRO would be cause to convert to Chapter 7, resulting in the liquidation of the business and loss of jobs. It would be much more appropriate in that case to appoint a Chapter 11 trustee under the "dishonesty" cause listed in the nonexclusive, nonexhaustive list of examples of cause in section 1104(a)(1) for appointment of a Chapter 11 trustee. That way, the business wouldn't have to liquidate, and employees would keep their jobs.

But in this case, Merit Street is already a zombie of a company with virtually no employees, virtually no operations, and virtually nothing left to do other than sell a media library under section 363 and pursue litigation. Under the unique facts of this case, dishonesty is cause to remove the CRO, and Chapter 7 fits the bill much better than a continuing Chapter 11 liquidation for the factual reasons the Court has detailed at length in the Ruling and in this Memorandum.

---

[7] The Court's not so sure it would be smooth sailing for the Debtor if the Court were to undertake this analysis, as Peteski seems to suggest in its Brief. But because it's a more complicated analysis and unnecessary given the other cause findings, the Court won't do it.

For the same reasons, destruction of information and neutrality assessments might more appropriately lead to appointment of a Chapter 11 trustee rather than a Chapter 7 conversion, depending on the facts. After carefully weighing all the evidence and facts in this case, I find that conversion to Chapter 7 is more appropriate.

Finally, it is simply odd to suggest an iron-clad legal rule that "gross mismanagement of the estate" is some type of paradigm example of cause that suitably results only in Chapter 7 conversion. After all, "gross mismanagement" is also listed as an *example* of cause for appointment of a Chapter 11 trustee under section 1104(a)(1). And Peteski trivializes the need for neutral estate fiduciaries—which are critical for the integrity of the bankruptcy process—by suggesting it's merely "trial-management concerns." Peteski Stay Brief ¶ 48, at 20.

In a nutshell, facts matter. And the Court has carefully considered them before determining the appropriate remedy.

- **The Court raised ground 2, a conflicted fiduciary, sua sponte, raising due-process concerns**

This argument is just flat wrong. Trinity, in its Motion and *while Mr. Broadbent was CRO*, alleged that the estate needed an independent fiduciary, a Chapter 7 trustee. Trinity Motion ¶ 67. Likewise, PBR, *while Mr. Broadbent was CRO*, alleged in its Joinder that the estate needed an independent and disinterested Chapter 7 trustee without conflicts. PBR Joinder ¶ 26. The issue of a conflicted fiduciary and the need for an independent trustee was raised numerous other times before trial. Here are just a few samples: *See* Trinity Motion ¶ 69 ("Creditors would be best served by an independent trustee—not one that is currently under the control of McGraw/Peteski. An independent trustee (whether it be one appointed in a Chapter 11 or Chapter 7 case) will best serve the interests of all creditors and stakeholders."); Trinity Motion ¶ 72 ("[I]t is McGraw vis-à-vis Peteski that is running this Chapter 11 Case—not the Debtor."); Trinity Motion ¶ 80 ("But overall, and perhaps the most important justification here, is that the appointment [of a] Chapter 11 trustee cleanses the Debtor of all material conflicts of interest—i.e., removes McGraw/Peteski from control."); Trinity Reply [Docket No. 401] ¶ 140 (alleging as bad-faith conduct: "Worst of all, Broadbent—the Debtor's

16

CRO and 'Independent' Director[8]—was aware of their employment and activities for Envoy and did nothing to stop them."); Trinity Reply [Docket No. 401] ¶ 143 (alleging that bad-faith conduct—which would include the prior description of Mr. Broadbent's approval of Merit officer work for Envoy—was cause to either convert or dismiss); PBR Reply Brief [Docket No. 413] ¶ 78 (alleging as cause to convert the case Peteski's and McGraw's control over Mr. Broadbent, whose technical appointment was done merely to "cloak transactions between the Debtor and Peteski with a façade of being arm's length negotiations.").

The Court finds that the Debtor and Peteski had due-process notice that the Court might either convert the case, dismiss the case, or appoint a Chapter 11 trustee based on the issue of Mr. Broadbent's independence or neutrality, which Trinity and PBR raised before trial and numerous times since.

- **The Court raised ground 3, lack of candor, sua sponte, raising procedural due-process concerns**

The Court observed Mr. Broadbent's lack of candor in real time, during trial, when the Court was exploring whether he was conflicted. His lack of candor is now part-and-parcel of the Court's conflicted-fiduciary determination. The Court didn't need to raise whether his lack of candor was an independent cause for conversion or dismissal, and the fact that the Court did so has no effect whatsoever on the conflicted-fiduciary—ground 2—determination of cause.

But did the Court somehow violate the Debtor's (or Peteski's) due-process rights by raising whether potential dishonesty was an independent cause? The Debtor hasn't made that argument, although it's possible it may on appeal. Peteski is claiming procedural due-process concerns. Although the Court is sensitive to allegations of due-process violations, the Court finds—after carefully considering the issue—no such violations here.

This is what the Court said at closing arguments, *after* the close of evidence:

---

[8] Notice the air quotes.

THE COURT: Something I will ask you to address and I'm going to have all the parties address it. So you did, in the alternative, request appointment of a trustee. And you have alleged — you cite the statute and what potential causes could be. And you mentioned conflict of interest. You also cite trustworthiness is a factor. Something I'm going to ask all the parties to address, and I will tell you I lost sleep after Mr. Broadbent's testimony. That's generally not a good thing when the Judge loses sleep. So I have some concern that Mr. Broadbent's testimony in response to my questions may not have satisfied the duty of candor that he had to the Court.

So I'm going to ask all parties to address whether *if, and it's an if at this point, if* I find that there is not a neutral fiduciary who is willing to honor an obligation of candor to the Court, is that solely cause for appointment of a [Chapter 11] trustee or is it either an independent or an overlapping cause for appointment of a Chapter 7 trustee?

Transcript of Closing Arguments Sept 29, 2025, Docket No. 55 at 42 (emphasis added by the Court in this quote because that language was emphasized on the record).

A court asking what the appropriate remedy might be *if* the court makes a certain finding of dishonesty is hardly a due-process violation, and the Court knows of no other way to raise sua sponte a potential Chapter 7 conversion, Chapter 11 trustee appointment, or dismissal for cause, which the Court is entitled to do under sections 105(a), 1104(a), and 1112(b) of the Bankruptcy Code. *In re Lynch*, 795 Fed. App'x. 57, 59 (2d Cir. 2020) (holding a bankruptcy court may sua sponte convert a Chapter 11 proceeding to one under Chapter 7 for cause); *In re A-1 Specialty Gasolines*, 238 B.R. 876, 878-79 (holding the 1986 amendment to the Bankruptcy Code that changed the language in 11 U.S.C. § 105(a) permitted sua sponte conversion of a Chapter 11 case to one under Chapter 7).

At closing arguments, the Debtor's counsel didn't ask for more time to consider the question. Nor did Peteski's counsel. If they wanted more notice and a separate hearing, they could have asked for it. Peteski finally did, in its Stay Brief, allege that "[r]ecasting a credibility critique

as "cause" deprived Peteski of a fair chance to contest *whether the testimony amounted to 'cause'* under § 1112(b)." Peteski Stay Brief, Docket No. 586 ¶ 50, at 21 (emphasis added). In response to that allegation, the Court set the Precautionary Due-Process Hearing and gave Peteski *exactly* what it asked for: a fair chance (to the extent it didn't already get it) to contest *whether the testimony amounted to cause* under § 1112(b). At the very beginning of the Precautionary Due-Process Hearing, in response to apparent confusion about the scope of the hearing, the Court made crystal clear that it was *not* reopening the determination of whether Mr. Broadbent's testimony lacked candor;[9] instead, it was inviting the Debtor and Peteski to address any *other* arguments or evidence of *whether the testimony amounted to cause*. *See* Fed. R. Bankr. P. 9023 (generally making Federal Civil Rule 59 applicable in a bankruptcy case); Fed. R. Civ. P. 59 (allowing retrial "on all or some of the issues"). In other words, the Court effectively gave the Debtor and Peteski more time to answer the question from closing arguments.

To the extent Peteski is suggesting that the Court—prior to the Precautionary Due-Process hearing—needed to vacate its determination that Mr. Broadbent's credibility was cause for conversion, the Court doesn't believe that's required. The Court is serious about allegations of due-

---

[9] No party offered, and the Court did not consider, any evidence on this issue at the Precautionary Due-Process Hearing, notwithstanding a new Broadbent declaration attached to the Debtor's Due-Process Brief. Had it been offered, the Court would not have considered it because—as the Court made clear at the beginning of the hearing—the Court was not reopening that issue. In its Due-Process Brief, the Debtor says the new Broadbent declaration is also submitted for the Stay Motions. Although Bankruptcy Rule 8007(b)(3)(B) permits the filing of declarations "supporting facts subject to dispute," those facts should relate to the stay request (such as irreparable harm, an issue relevant to the stay pending appeal). Mr. Broadbent's new declaration inappropriately attempts to get into the record additional testimony that was never offered at trial on the merits. That's not the purpose of a Rule 8007(b)(3)(B) declaration. Likelihood of success on the merits should be determined on the facts presented at trial. Movants should not be permitted to buttress trial evidence—to support likelihood of success on appeal—with evidence submitted to the trial court or an appellate court for the first time in a motion for stay pending appeal. A motion for stay pending appeal is not a motion to reopen the evidence or for a new trial. The Debtor is inappropriately attempting to expand the record on appeal, which (with rare exceptions not applicable here) largely consists of evidence presented at trial or in pretrial matters. *Cf.* Fed. R. App. P. 10(a); *Craig v. Bisignano*, __ F. 4th __, 2025 WL 3077897 at *1-*2 (5th Cir. 2025) ("Consistent with Rule 10(a), we have excluded filings attached to briefs that were not available to the district court and offered by a party for the first time on appeal."). *See also* Fed. R. Bankr. P. 8009.

process violations. It was fully the Court's intent, in setting the Precautionary Due-Process Hearing, to put Peteski in the same position it was in at closing arguments, except giving it more time to consider the issue. The Court was not expecting—and does not expect—Peteski to rebut or disprove the Court's determination, which the Court is considering *anew* after considering the positions set forth by Peteski at the Precautionary Due-Process Hearing and in its Due-Process Brief. The Court is giving Peteski a new slate.[10] After considering Peteski's position, the Court determines that Mr. Broadbent's testimony was independent cause for conversion to Chapter 7. The integrity of the bankruptcy process depends in turn on having estate fiduciaries that will fulfill the duty of candor to the Court. While lack of candor might more appropriately lead to appointment of a Chapter 11 trustee under certain facts, here Chapter 7 with a Chapter 7 trustee is the best path forward.

Nor did the Court need to vacate its Ruling in its entirety, as Peteski also argues in its Due-Process Brief. Did the Court already make up its mind on conversion, as Peteski suggests? Yes. But there were multiple independent grounds to find cause to convert the case to Chapter 7, and depending on how the Court rules on the credibility-as-cause-to-convert issue, Peteski might have had one less ground to argue on appeal.

- **There is no evidence that Mr. McGraw intentionally deleted any text; he actually produced it. And what's the harm anyway?**

As the Court explained in detail in the Ruling, Mr. McGraw deleted the unflattering text in the lengthy McGraw-to-Ribman text thread, and he apparently forgot to delete the copy in the McGraw-to-McIntyre thread. Mr. McGraw's "I didn't do it" protestations in the courtroom (which the Court observed, paying particular attention to his demeanor) were not credible.

And to say there was no harm because the McGraw-to-McIntyre shadow copy was produced is to whistle past the graveyard. Mr. McGraw *tried*

---

[10] Because the Court's Ruling was completely interlocutory, and there is not yet a conversion order, the Court is free to change its findings and conclusions for any reason. There's no need to vacate anything. The Court's consideration of the issue anew—without any burden of persuasion or proof placed on Peteski or the Debtor—provides Peteski the clean slate it requested.

*but failed* to hide his true intent to wipe out the PBR and Trinity claims and favor the Ribman Trust claim. That is bad-faith conduct in the prosecution of this case.

- **The conversion to Chapter 7 is a sanction against Peteski**

It is not. As already noted, the Court did not need to make any finding of a violation of a discovery order, and since the sanction motion was pending against only Peteski at the time, the Court amends its Ruling to eliminate that finding as unnecessary. The Court is not making any discovery-based negative inferences. The Court is not ruling on any discovery ground whatsoever. The Court is not relying on a nebulous inherent power to sanction. The Court is not relying on a violation of any order. The bad-faith conduct was—together with other independent grounds—cause for conversion under section 1112(b).

- **"Only the Court asked Dr. McGraw about the allegedly deleted text message," so the Court must have acted sua sponte.**

Mr. Slovak, Trinity's counsel, did first, followed soon after by Mr. Secco, PBR's counsel. Transcript of Hearing Held September 23, 2025, Docket No. 523 at 48, 88.

- **The substantial-or-continuing-loss-to-the-estate ground is clearly erroneous and legally unsupportable.**

The Court is very comfortable with this factual determination. The Court found that the Debtor had negative monthly cash flows (expenses exceeded its revenue) of approximately $1 million—not that the Debtor had monthly operating expenses of $1 million as suggested by the movants. There is substantial and continuing loss and diminution even before considering administrative expenses.

As for the planned payment for those administrative expenses, Peteski cites hoped-for recoveries from claims against Trinity and PBR under the proposed plan. But for the many reasons outlined elsewhere in the Memorandum, it would be nearly impossible for the Court to make the required finding for confirmation that the plan was proposed in good faith. 11 U.S.C. § 1129(a)(3). The Court rejects Peteski's hyperbole that—under the Court's analysis—*every* Chapter 11 liquidating plan will result in Chapter 7 conversion. Again, facts matter.

Even if there is a split in the case law on whether "rehabilitation" includes liquidating Chapter 11s, it doesn't change the result here. That is, even if a liquidating Chapter 11 plan could be "rehabilitation" under section 1112(b)(4)(A), those Chapter 11 cases could be saved from Chapter 7 conversion only if the debtor shows (a) the unusual circumstances required under section 1112(b)(2); and (b) a reasonable likelihood the plan will be confirmed within a reasonable time as required by section 1112(b)(2)(A). The Debtor and Peteski have not established either of these conditions given everything described in the Ruling and this Memorandum about the Plan, the Debtor, and this whole Chapter 11 case.

- **The "unusual circumstances" exception to Chapter 7 conversion applies because the undisputed evidence in Mr. Brown's liquidation analysis shows creditors will be better off under the proposed plan than they would under a Chapter 7 liquidation.**

As the Court found in the Ruling and as supplemented in this Memorandum, the Court gives little or no weight to Mr. Brown's liquidation analysis that purports to show creditors would do better in this Chapter 11 under the proposed plan than they would in a Chapter 7. Mr. Brown, the financial advisor, can't possibly know the value of the estate's claims against Peteski and Mr. McGraw, or against Trinity and PBR, which are critical to the liquidation analysis. In other words, Mr. Brown's analysis *assumes* in part that the value given by Peteski and Mr. McGraw for releases exceed the value a truly neutral, detached trustee could recover through litigation and settlement. Mr. Brown's analysis necessarily relies on Mr. Broadbent's determination of the value of those claims and the reasonableness of the plan settlement. Although Mr. Broadbent has attorneys to help him with that analysis, at the end of the day, the attorneys take direction from the client. It's *Mr. Broadbent* who again will have to look the Court in the eyes and testify that he's made a neutral, detached investigation and that he thinks the value the estate is getting for the releases is reasonable. The Court would have no confidence in that determination.

- **The Court clearly erred in its findings regarding Mr. Broadbent's lack of candor.**

Some of the more important arguments on this issue are addressed below.

- **The Court gave too much weight to the pauses in Mr. Broadbent's testimony.**

  - The Court sees and hears pauses in testimony nearly every week in all manner of cases, including when the Court asks questions. That is just one factor the Court considered, as explained in the Ruling.

- **Mr. Broadbent needed to see the Board Minutes to refresh his recollection of what happened on August 17.**

  - The Court explained in detail in its Ruling why this suggestion is not credible for a seasoned chief restructuring officer. But it may be difficult for somebody who is not a restructuring professional to appreciate how dramatic, unusual, and stressful the August 17 board meeting would have been in this Chapter 11 case—again, just *one month* prior to Mr. Broadbent's trial testimony. So the Court will attempt to put it in terms that a reviewing court might appreciate. Would a district court need to review its proceedings minutes to remember whether it was reversed by the Fifth Circuit in the last month? Would a district court need to review its proceedings minutes to remember whether it imposed the death penalty in the last month?

- **The Debtor had the Board of Director minutes and Special Committee minutes marked as exhibits at trial, so Mr. Broadbent could not possibly have intended to hide that there were meetings where conversion or dismissal was discussed.**

  - The Court has no idea which of the hundreds of trial documents Mr. Broadbent knew were marked as exhibits. Nor does the Court know whether Mr. Broadbent realized— even though the attorneys for PBR and Trinity had wrapped up their examination of him—the Court would ask all attorneys if they had any follow-up questions for Mr. Broadbent based on my questions (which is the Court's practice after examining a witness).

  - After considering Mr. Broadbent's testimony as a whole— including his demeanor, his pauses, the subject of his

testimony, and the memorable events leading up to his tes-
timony—the Court reluctantly stands by its findings.

- **The Court clearly erred in finding that Mr. Broadbent was
  conflicted and is not a neutral fiduciary.**

First, the Court has already covered Mr. Broadbent's dashed credibility
and the Court's finding that he did not want me to know about his Au-
gust 17 board meeting with Mr. McGraw. The meeting was unusual, and
the requests that flowed from it (immediate dismissal of the case shortly
before texts were due to be turned over, and withdrawal of counsel) were
highly unusual. Mr. Broadbent's reluctance to tell the truth about this
meeting with Mr. McGraw when put under the spotlight puts a severe
dent in his professed neutrality.

Second, Peteski misconstrues the Court's finding when the Court said,
"To put it charitably, it wasn't the greatest business judgment for Merit
Street officers Broadbent, Cheatwood, and Solomon to work for Envoy
while simultaneously contesting allegations from TBN and PBR that the
Debtor's CRO and other officers are conflicted and attached at the hip
to Mr. McGraw." Transcript of Ruling, Docket 582 at 48. The Court
amends its findings to state it more bluntly: It was inappropriate for
them to do so as the Court's overall findings suggested and as Mr. Cheat-
wood tacitly recognized when he said he was told to stop revealing any
public attachment to Envoy. TBN Ex. 498. Mr. Broadbent knew of and
approved paying a liquidating debtor's employees to do work not only for
Merit Street, but also—free of charge—for the company that is planning
to buy the Merit Street media library and that is owned and controlled
by Mr. McGraw. *See, e.g.,* TBN Ex. 403 (Envoy Media Staffing Plan that
noted Mr. Cheatwood (Merit COO), Mr. Solomon (Merit CEO), Jeff Mil-
ler (Merit HR), Natalia Gomez (Merit finance), and Marc Rothman
(Merit programming/scheduling/traffic) were consultants who were
"[e]mployed by MSM and contracted to Envoy at no additional costs.");
Transcript of Hearing Held Sept. 22, 2025, Docket No. 516 at 80-81 (Mr.
Cheatwood acknowledging Merit employees were performing "volun-
tary" services for Envoy).

That was all highly unusual and not in the ordinary course of business under any reasonable construction of that term.[11] Mr. Broadbent and the Debtor should have disclosed this to the Court and other creditors and asked for Court permission. *See* 11 U.S.C. § 363(b) (requiring court permission to use, sell, or lease property of the estate outside the ordinary course of business); 11 U.S.C. § 363(c) (allowing trustee/debtor to enter into transactions without court approval only if done in the ordinary course of business). *See also In re ASARCO LLC*, 441 B.R. 813, 829 (Bankr. S.D. Tex. 2010) (citing *In re Bethlehem Steel Corp.*, No. 02 Civ. 2854(MBM), 2003 WL 21738964 at *10 (Bankr. S.D.N.Y. 2003) ("[U]nder § 363(b), if the debtor in possession wants to use funds from the estate for a transaction outside the ordinary course of business, the debtor must obtain advance approval from the bankruptcy court.")). Instead, as Mr. Cheatwood recognized, they were trying to work for Envoy in secrecy.

It simply doesn't help Peteski's or the Debtor's case to say that Mr. Broadbent and his top lieutenants—or the rank-and-file employees—weren't actually getting paid by Envoy initially, and that the whole process didn't harm Merit Street. They were being paid by Merit Street yet working for Envoy for free behind the scenes and helping Mr. McGraw launch the business. This all should have been disclosed to the Court and other creditors as one or more transactions outside the ordinary course of business.[12] Then the Court could have determined whether Mr. Broadbent's now after-the-fact business-judgment justification was sound. Instead, he chose to keep his and the Debtor's nonordinary-course dealings with Envoy and Mr. McGraw secret, which has become a theme during this case. For just *one* example of the type of problems this causes, see the discussion below on harm to other parties and what happened at a recent administrative-claim hearing that involved Merit Street employees who worked for both the Debtor and Envoy, unbeknownst to the Court.

---

[11] As mentioned in the Ruling, the Court has never seen anything like this in a long private-practice career or in three and a half years on the bench.

[12] Indeed, Mr. Broadbent admitted at trial that "Merit is not going to operate as it once did. I think it's very clear that the most likely scenario is a wind down of Merit as it once was." Docket No. 469 at 183.

Finally, in a last-ditch effort to satisfy the likelihood-of-success factor, the Debtor and Peteski argue that they need not show a 'probability' of success on the merits but need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay. *See Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981) (per curiam).

After carefully considering the parties' positions, the Court concludes that there are no serious legal questions involved. And as noted elsewhere, the balance of the equities does *not* weigh heavily in favor of a stay; the balance favors immediate conversion instead.

**B.    Most of the alleged harms would not result in irreparable injury if the stay is not granted, and any reputational harm is outweighed by other factors, including serious countervailing harms**

Mr. McGraw was already moving the business to Envoy before this case was filed. The Debtor fired nearly all its employees on the petition date. As mentioned in the Ruling, Merit Street was dead as a doornail when it arrived in bankruptcy (or perhaps more accurately, it was on life support, and Mr. McGraw and Peteski were harvesting the organs for Envoy). All the Debtor had left to do—all that it planned to do—was sell the Debtor's media library and handle claims by and against the estate. What will happen if the Court does not order a stay? A neutral fiduciary will sell the media library and handle claims by and against the estate. That's not irreparable injury. That's satisfaction of the Debtor's goal, except a conflicted fiduciary won't be in charge.

Moreover, all parties, including the Debtor and Peteski, will enjoy a double layer of protection when a Chapter 7 trustee proposes to sell the media library or pursue or settle claims. The first layer of protection is the Chapter 7 trustee—selected from a panel of qualified trustees by the United States Trustee—who must exercise sound business judgment and obtain fair and reasonable results when selling assets or handling claims. The second layer of protection is this Court, which won't approve any asset sales or any proposed settlement of litigation unless all appropriate standards are met. Rather than irreparable injury, that's indubitable protection.

The Debtor and Peteski cite several cases involving irreparable injury when the Chapter 11 case of a fully operational business is converted to

Chapter 7, or when the Chapter 13 case of an individual debtor is converted to Chapter 7. Debtor Brief at 6, Peteski Brief at 21-23. In such cases, courts have found that the Chapter 11 debtors may suffer irreparable injury because fully operational businesses in Chapter 11 would be shut down and liquidated in a Chapter 7 (with the attendant loss of employee jobs), and the Chapter 13 individual debtors would suffer irreparable injury because they would lose their possessions that they're entitled to keep in a Chapter 13 (such as certain nonexempt property) but not in a Chapter 7. In such cases, it's not surprising when courts find threat of irreparable injury because—as quoted in the Debtor's Brief at 6—"'[U]nder Chapter 7, once the debtor's assets have been liquidated, it is virtually impossible to reassemble them.'" *In re Young*, 237 F.3d 1168, 1173 (10th Cir. 2001) (threat of irreparable injury in conversion from Chapter 13 to 7).

This case is nothing like those cases. Merit Street is on life support. The Debtor fired nearly all its employees on the first day of the case, and the Court learned for the first time at a November 13 hearing on an emergency application to pay administrative expenses that two more officers (Mr. Cheatwood and Mr. Solomon) recently left the company and that the Debtor is perilously low on cash. The Debtor's plan all along was to liquidate what's left of the company. That's exactly what's going to happen in Chapter 7, fully protected by a neutral estate fiduciary and under Court supervision. Even the Debtor and Peteski have no desire to "reassemble" the company or its assets. Indeed, Mr. McGraw (through either Peteski or its designee Envoy) has been chomping at the bit to bid for the media library. Nothing will stop that now.

Next, the Debtor argues that it might lose standing to appeal if a stay is not granted. But the Debtor cites cases it says supports the standing of Debtor's management to appeal even if the case is converted. Debtor Brief at 8. The Court does not opine on that issue, which is exclusively within the province of the courts on appeal. The mere possibility of irreparable harm is not enough, however. *In re Taub*, 470 B.R. 273, 278 (E.D.N.Y. 2012) (quoting *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007)). That is especially true here under these unique facts when the Debtor's stated goal to liquidate under a neutral fiduciary will be fully accomplished absent a stay. And as noted below, there are serious countervailing harms to consider if a stay is granted.

Next, the Debtor and Peteski argue that creditors will be irreparably harmed if a stay is not granted because they'll lose out on the creditor recoveries guaranteed to them under the plan negotiated by Mr. McGraw and Mr. Broadbent. Even if the Debtor and Peteski had standing to raise this argument for other parties, there is nearly zero chance the Court would confirm the plan and make the finding required for confirmation that the plan was proposed in good faith by the Debtor, given the Court's findings related to two of the principals behind the negotiated settlement (Mr. McGraw and Mr. Broadbent), and given the Ribman Trust's role on the Committee and in supervising postpetition litigation against PBR and Trinity. *See* 11 U.S.C. § 1129(a)(3).

Just as important, as the Court found in the Ruling and as supplemented in this Memorandum, the Court gives little or no weight to Mr. Brown's liquidation analysis that purports to show creditors would do better in this Chapter 11 than they would in a Chapter 7, as already explained above.

Moreover, there is no reason Peteski and Mr. McGraw couldn't reach a functionally equivalent settlement with a Chapter 7 trustee if the trustee believes the benefits under the plan settlement are worth giving a release to Mr. McGraw and Peteski.

Finally, Peteski—not the Debtor—argues that Peteski and Mr. McGraw, as well as the Debtor and Mr. Broadbent, will suffer irreparable reputational harm if a stay is not granted, relying on cases involving damages to a brand from shutting down the business or movants being removed from their professional industry. Peteski Brief ¶ 53, at 22. There is zero chance of damages to the Merit Street brand, as the company is being liquidated no matter the chapter of this case.

The Court recognizes the seriousness of the Court's findings about Mr. McGraw's and Mr. Broadbent's conduct, so much so that (as already noted), the Court lost sleep over the Ruling. But as noted in the following section, actual and threatened harm to creditors and administrative claimants outweighs any harm to the movants.

To summarize, most of the alleged harms would not result in irreparable injury if the stay is not granted, and any reputational harm is outweighed by other factors, including serious countervailing harms to other parties-in-interest.

28

## C. Granting the stay would substantially harm other parties

Peteski argues in its Stay Brief that "Trinity will not be injured by a stay. When balancing the hardships, the harms to Peteski and others in the absence of a stay significantly outweigh any potential harm that Trinity or PBR might try to claim." Peteski Brief ¶ 57, at 24. Similarly, the Debtor argues that "any potential harm to other parties caused by a stay pending appeal would be minimal, if it exists at all. . . . The Court can avoid potential harm to other parties by ordering a similar maintenance of the status quo pending appeal." Debtor Brief at 9. Both Stay Briefs neglect to fully address the potential harm that would occur should the Court stay its order converting the case.

A very recent event in this case highlights the type of harm that may continue if the Court stays conversion of this case. On November 6, 2025, the Debtor filed an emergency motion to pay certain administrative claims [Docket No. 592], which the Debtor could not do absent further Court order under the terms of the Status-Quo Order. Those unpaid administrative claimants included the four remaining rank-and-file Merit Street employees who were owed postpetition wages and benefits of roughly $179,000, as well as a group of content distributors who were unpaid to the tune of $265,964 for providing postpetition services to the Debtor. Transcript of Hearing Held Nov. 13, 2025, Docket No. 628 at 86, 92.

But the problem is that Peteski decided to stop funding this case on October 19 even before the Court issued its Ruling on October 28. *See* Withdrawal, Docket 558. And at the November 13 emergency hearing, Coley Brown, the Debtor's financial advisor, testified that the Debtor currently has only roughly $200,000, not nearly enough to pay both groups of administrative claimants. Mr. Brown further testified that there are continuing operating losses and that the estate continues to diminish. *See* Transcript of Hearing Held Nov. 13, 2025, Docket No. 628 at 115.

Trinity and PBR objected to the request, partly because those employees had done work for Envoy during the bankruptcy at no cost, *id.* at 89-90, and partly because the funds on hand would have (and according to Trinity and PBR, should have) gone to the Chapter 7 estate had the Debtor and Peteski not asked for a stay pending appeal.

Peteski's counsel, who also represents Mr. McGraw and Envoy, was at the hearing. The Court never heard any offer by Envoy to pay its share of those employees' unpaid wages or unpaid benefits.[13] Yes, this is the same Envoy that Mr. McGraw set up to buy the Debtor's business and acquire its assets and many of its employees. The same Envoy described as the new venture in the infamous deleted text. TBN Ex. 330. The same Envoy that Mr. Broadbent and his core team of officers were working for free of charge—after the bankruptcy filing—to help get the Envoy business kickstarted, with press releases and all. No help from this same Envoy.

The Debtor's counsel pleaded for the Court to avoid the precedent of failing to pay rank-and-file employees who needed money to get by during the holidays. *Id.* at 132. Counsel for an ad hoc group of distributors, on the other hand, demanded that the Court pay all administrative claimants ratably, even if that meant the rank-and-file employees would lose out. *Id.* at 137.

With not enough cash on hand to go around, the Court was faced with a Hobson's choice of sorts. Should the Court deny payment to all the Chapter 11 administrative claimants and let the funds go to the Chapter 7 trustee so that the Chapter 7 estate doesn't become administratively insolvent? Should the Court require ratable payment of administrative claimants, which would likewise leave rank-and-file employees at least partially unpaid during the holidays? Or should the Court favor certain administrative claimants (the rank and file) over others (the distributors)?

The Court exercised its discretion and allowed certain payroll to be paid and denied without prejudice payment of the balance of the administrative claims.

---

[13] During the conversion trial, after the fact, since Court approval was never requested, Mr. Broadbent attempted to justify a potential financial benefit of Merit employees working for Envoy: "There could be [a financial benefit] if the vacation PTO, the other administrative liabilities of the company were absorbed by Envoy or absorbed by a new employer so that we no longer have that burden on us." Transcript of Hearing Held Sept. 17, 2025, Docket No. 469 at 184. Not all employees were absorbed by Envoy, nor apparently was their share of administrative liabilities, including the unpaid benefits of $149,000 that were part of the emergency motion to pay administrative claims. Certainly, Envoy didn't offer to absorb them during the November 13 hearing.

This harm to administrative claimants will only be exacerbated should the order converting the case be stayed given the Debtor's continuing losses and the lack of a DIP loan. The same risk of substantial harm to administrative claimants extends to general creditors in the case as well. An overarching goal of bankruptcy is an equitable, fair distribution of assets to a debtor's creditors. That distribution has already been delayed for months, and it will continue to be delayed even further if the order converting the case is stayed.

The Court finds granting a stay of its conversion order would result in substantial harm to other parties.

### D. Granting the stay would not serve the public interest

It would serve the public interest to have a neutral, nonconflicted Chapter 7 trustee in place immediately who can begin an orderly administration of estate assets. Peteski itself states that "public interest in bankruptcy proceedings is to have an orderly administration of the debtor's assets via their bankruptcy estate." Peteski Brief ¶ 58, at 24 (internal quotations omitted). Delaying the conversion order would only stall the orderly administration, which would not serve the public interest.

Staying the conversion order would also create confusion among creditors of the estate. This case would enter an uncertain state of limbo. The case would enter Chapter 7, but depending on when the stay took effect, there would be either no Chapter 7 trustee, or a Chapter 7 trustee who is stayed from doing anything. General creditors and administrative claimants need certainty on who has authority to exercise control over and take actions on behalf of the estate. Staying the conversion order would muddy the waters and amplify uncertainty.

The Bankruptcy Code provides "[p]romptly after the order for relief under this chapter, the United States trustee shall appoint" a Chapter 7 trustee. 11 U.S.C. § 701. Staying the conversion order frustrates the prompt appointment of a Chapter 7 trustee, and were the Court to stay its conversion order, the resulting delay in promptly appointing a Chapter 7 trustee would harm and parties-in-interest and would not serve the public interest.

## V.  Conclusion

The Court will enter separate orders (a) denying the Ribman-Trust Motion; (b) denying the Stay Motions; and (c) converting this case to Chapter 7 immediately and without further delay or stays, administrative or otherwise.

### End of Memorandum ###