Charles L. Babcock (TX Bar No. 01479500)
Christopher Bankler (TX Bar No. 24066754)
Minoo S. Blaesche (TX Bar No. 24075102)
**Jackson Walker LLP**
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Bruce J. Ruzinsky (TX Bar No. 17469425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**Jackson Walker LLP**
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

*Counsel for Peteski Productions, Inc. and Phillip C.
McGraw, PhD.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re:<br><br>MERIT STREET MEDIA, INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-80156 (SWE)<br><br>**Re: Docket Nos. 100, 151, 579, 582, 599, 630, 631, 632, 633** |

## <u>AMENDED NOTICE OF APPEAL BY PETESKI PRODUCTIONS, INC. AND PHILLIP C. MCGRAW, PHD</u>

PLEASE TAKE NOTICE that Appellants Peteski Productions, Inc.—a creditor, majority equity owner, and the DIP Lender of the Debtor in the above-referenced case—and Phillip C. McGraw, PhD, by and through their undersigned counsel, hereby each appeal to the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 158(a) and Rules 8001 *et. seq.* of the Federal Rules of Bankruptcy Procedure, from:

(1) the order converting this Chapter 11 proceeding to a Chapter 7 proceeding entered on November 18, 2025 [Docket No. 632] (the "<u>Conversion Order</u>"), attached hereto as **Exhibit A** and incorporated herein by reference, and all underlying orders, rulings, and findings of fact and

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy, Fort Worth, TX 76177.

conclusions of law, including (without limitation) (a) each and every part of this Court's ruling read into the record on October 28, 2025 [Docket No. 582] (the "Ruling"), attached hereto as **Exhibit B** and incorporated herein by reference, (b) each and every part of this Court's November 18, 2025 *Memorandum Decision Regarding (i) Request to Alter or Amend Judgment; (ii) Motions for Stay Pending Appeal; and (iii) Conversion of Case to Chapter 7* [Docket No. 630] (the "Memorandum Decision"), attached hereto as **Exhibit C** and incorporated herein by reference; (c) each and every part of this Court's other orders subsequent to and related to the Ruling, specifically the November 7, 2025 *Order Setting Precautionary Due-Process Hearing* [Docket No. 599] and the October 29, 2025 *Order Preserving Status Quo* [Docket No. 579], which are attached hereto as **Exhibit D** and **Exhibit E**, respectively, and incorporated herein by reference, and (d) all findings of fact and conclusions of law made by this Court, including in the Ruling read orally on October 28, 2025, in the November 18, 2025 Memorandum Decision, in the November 7, 2025 *Order Setting Precautionary Due-Process Hearing*, and in the Conversion Order;

(2) the order denying motions for stay pending appeal entered on November 18, 2025 [Docket No. 633] (the "Stay Order"), attached hereto as **Exhibit F** and incorporated herein by reference, and all underlying orders, rulings, and findings of fact and conclusions of law, including (without limitation) each and every part of the November 18, 2025 Memorandum Decision; and

(3) the order denying the Darcy Lynn Ribman 1997 Trust's emergency motion entered on November 18, 2025 [Docket No. 631] (the "Ribman Order"), attached hereto as **Exhibit G** and incorporated herein by reference, and all underlying orders, rulings, and findings of fact and conclusions of law, including (without limitation) each and every part of the November 18, 2025 Memorandum Decision.

47599784v.3 151741/00007

Appellants submit this Amended Notice of Appeal in substantial conformity with Bankruptcy Form B417A.

**Part 1:**      **Identify the appellants**

    1.    Names of the appellants:

        (a)    Peteski Productions, Inc.

        (b)    Phillip C. McGraw, PhD

    2.    Positions of appellants in the adversary proceeding or bankruptcy case that is the subject of this appeal:

        (a)    Peteski Productions, Inc. is a creditor, majority equity owner, and DIP Lender of the Debtor.

        (b)    Phillip C. McGraw, PhD was a witness in the case and is a party-in-interest based on, inter alia, the Ruling and Memorandum Decision.

**Part 2:**      **Identify the subject of this appeal**

    1.    Describe the judgment—or the appealable order or decree—from which the appeal is taken:

    The Court's Conversion Order [Docket No. 632]; the Court's Ruling read orally on October 28, 2025 [transcript entered at Docket No. 582]; the Court's November 18, 2025 Memorandum Decision [Docket No. 630]; the Court's related *Order Setting Precautionary Due-Process Hearing* [Docket No. 599] and *Order Preserving Status Quo* [Docket No. 579]; all the Court's other underlying orders, rulings, and findings of fact and conclusions of law (including, without limitation, all rulings, findings of fact, and conclusions of law in the Ruling read orally on October 28, 2025, in the November 18, 2025 Memorandum Decision, in the November 7, 2025 *Order Setting Precautionary Due-Process Hearing*, and in the Conversion Order); the Court's Stay Order [Docket No. 633]; and the Court's Ribman Order [Docket No. 631].

    2.    State the date on which the judgment—or the appealable order or decree—was entered:

    The Conversion Order was entered on November 18, 2025 (Docket No. 632). The Ruling was read into the record on October 28, 2025 (Docket No. 582), the Memorandum Decision was entered on November 18, 2025 (Docket No. 630), and the other related orders were entered on October 29, 2025 (Docket No. 579) and November 7, 2025 (Docket No. 599). The Stay Order was entered on November 18, 2025 (Docket No. 633). The Ribman Order was entered on November 18, 2025 (Docket No. 631).

**Part 3:** **Identify the other parties to the appeal**

List the names of all parties to the judgment—or the appealable order or decree—from which the appeal is taken and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| Party | Attorneys |
|---|---|
| Debtor Merit Street Media, Inc. | **SIDLEY AUSTIN LLP**<br>Thomas R. Califano (24122825)<br>Jeri Leigh Miller (24102176)<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas 75201<br>Telephone: (214) 981-3300<br>Facsimile: (214) 981-3400<br>Email: tom.califano@sidley.com<br> jeri.miller@sidley.com<br><br>Stephen E. Hessler (admitted *pro hac vice*)<br>Patrick Venter (admitted *pro hac vice*)<br>787 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 839-5300<br>Facsimile: (212) 839-5599<br>Email: shessler@sidley.com<br> pventer@sidley.com<br><br>James W. Ducayet (admitted *pro hac vice*)<br>Steven E. Sexton (admitted *pro hac vice*)<br>Andrew F. Rodheim (admitted *pro hac vice*)<br>One South Dearborn<br>Chicago, Illinois 60603<br>Telephone: (312) 853-7000<br>Facsimile: (312) 853-7036<br>Email: jducayet@sidley.com |
| Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. (Appellee) | **FOLEY & LARDNER LLP**<br>Holland N. O'Neil (TX 14864700)<br>Robert Slovak (TX 24013523)<br>Steven C. Lockhart (TX 24036981)<br>Mark C. Moore (TX 24074751)<br>Stephanie L. McPhail (TX 24104104)<br>Davis G. Mosmeyer III (TX 24106346)<br>2021 McKinney Avenue, Suite 1600<br>Dallas, TX 75201<br>Telephone: (214) 999-3000 |

4

| | |
|---|---|
| | Facsimile: (214) 999-4667<br>honeil@foley.com<br>rslovak@foley.com<br>slockhart@foley.com<br>mmoore@foley.com<br>smcphail@foley.com<br>dmosmeyer@foley.com<br><br>Rajiv Dharnidharka (admitted *pro hac vice*)<br>555 California Steet, Suite 1700<br>San Francisco, CA 94104<br>Telephone: (415) 434-4484<br>Facsimile: (415) 434-4507<br>rajiv.dharnidharka@foley.com<br><br>Nora J. McGuffey (TX 24121000)<br>321 North Clark Street, Suite 3000<br>Chicago, IL 60654<br>Telephone: (312) 832-4366<br>Facsimile: (312) 832-4700<br>nora.mcguffey@foley.com |
| Professional Bull Riders LLC (Appellee) | **WICK PHILLIPS GOULD & MARTIN, LLP**<br>Jason M. Rudd, Tex. Bar No. 24028786<br>Scott D. Lawrence, Tex. Bar No. 24087896<br>Dallas, Texas 75204<br>Telephone: (214) 692-6200<br>Email: jason.rudd@wickphillips.com<br>scott.lawrence@wickphillips.com<br><br>**BENESCH, FRIEDLANDER, COPLAN &**<br>**ARONOFF LLP**<br>Jennifer R. Hoover (pro hac vice admitted)<br>Andrew D. Kinsey (pro hac vice admitted)<br>1313 N. Market Street, Suite 1201<br>Wilmington, DE 19801<br>Telephone: (302) 442-7010<br>Email: jhoover@beneschlaw.com<br>akinsey@beneschlaw.com<br><br>Abbey Walsh (pro hac vice admitted)<br>1155 Avenue of the Americas, 26th Floor<br>New York, New York 10036<br>Telephone: (646) 777-0053<br>Email: abbey.walsh@beneschlaw.com |

47599784v.3 151741/00007

| | |
|---|---|
| | Nicholas J. Secco (pro hac vice admitted)<br>71 South Wacker Drive, Suite 1600<br>Chicago, IL 60606<br>Telephone: (312) 212-4949<br>Email: nsecco@beneschlaw.com<br><br>Alyssa A. Moscarino (pro hac vice admitted)<br>127 Public Square, Suite 4900<br>Cleveland, OH 44114<br>Telephone: (216) 363-4500<br>Email: amoscarino@beneschlaw.com |
| Peteski Productions, Inc. | **JACKSON WALKER LLP**<br>Charles L. Babcock (TX Bar No. 01479500)<br>Christopher Bankler (TX Bar No. 24066754)<br>Minoo S. Blaesche (TX Bar No. 24075102)<br>2323 Ross Avenue, Suite 600<br>Dallas, TX 75201<br>Telephone: (214) 953-6047<br>Email: cbabcock@jw.com<br>Email: cbankler@jw.com<br>Email: mblaesche@jw.com<br><br>Bruce J. Ruzinsky (TX Bar No. 17469425)<br>Matthew D. Cavenaugh (TX Bar No. 24062656)<br>1401 McKinney Street, Suite 1900<br>Houston, TX 77010<br>Telephone: (713) 752-4200<br>Email: bruzinsky@jw.com<br>Email: mcavenaugh@jw.com |
| Official Committee of Unsecured Creditors | **O'MELVENY & MYERS LLP**<br>Louis R. Strubeck Jr. (SBT 19425600)<br>Scott P. Drake (SBT 24026812)<br>Gregory M. Wilkes (SBT 24047105)<br>Laura Smith (SBT 24066039)<br>2801 North Harwood Street, Suite 1600<br>Dallas, Texas 75201-2692<br>Telephone:      (972) 360-1900<br>Email:          lstrubeckjr@omm.com<br>                sdrake@omm.com<br>                gwilkes@omm.com<br>                lsmith@omm.com<br><br>Julian Gurule (admitted pro hac vice)<br>400 South Hope Street, 19th Floor |

47599784v.3 151741/00007

| | |
|---|---|
| | Los Angeles, CA 90071-2811<br>Telephone: (213) 430-6407<br>Email:        jgurule@omm.com |
| Office of the United States Trustee | Asher Bublick<br>1100 Commerce Street, Room 976<br>Dallas, Texas 75242<br>Telephone: (214) 767-8967<br>Email:        asher.bublick@usdoj.gov |

**Part 4:**      __Optional election to have appeal heard by District Court (applicable only in certain districts)__

N/A.

**Part 5:**      __Sign below__

Dated: November 18, 2025
Dallas, Texas

/s/ *Charles L. Babcock*

**JACKSON WALKER LLP**
Charles L. Babcock (TX Bar No. 01479500)
Christopher Bankler (TX Bar No. 24066754)
Minoo S. Blaesche (TX Bar No. 24075102)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6047
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Bruce J. Ruzinsky (TX Bar No. 17469425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

*Counsel for Appellants Peteski Productions, Inc. and Phillip C. McGraw, PhD*

47599784v.3 151741/00007

## <u>Certificate of Service</u>

I certify that on November 18, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ *Charles L. Babcock*
Charles L. Babcock

# EXHIBIT A



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 18, 2025**

United States Bankruptcy Judge

_____

## United States Bankruptcy Court
## Northern District of Texas
## Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | **Case No. 25-80156-swe-11** |
| | § | |
| Debtor. | § | |

---

### *Order Converting Case to Chapter 7*

On July 18, 2025, creditors Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. filed an *Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* (the **"Motion"**) [Docket No. 100]. On August 1, 2025, creditor Professional Bull Riders, LLC filed a *Partial Joinder* in Trinity's Motion (the **"Joinder"**) [Docket No. 151]. The Court conducted a multi-day trial on those requests and read its ruling into the record on October 28, 2025, announcing its intent to convert this case to Chapter 7 pursuant to a separate order. For the reasons stated in the Court's oral ruling that is now transcribed at Docket 582, and for the additional reasons stated in the Memorandum Decision entered on this date (which amends and supplements the Court's oral ruling), the Motion and the Joinder are granted in part and denied in part.

**IT IS THEREFORE ORDERED** that:

1. The request in the Motion to dismiss this case is **DENIED**.

2. The request in the Motion to appoint a Chapter 11 trustee is **DE-NIED**.

3. The request in both the Motion and Joinder to convert this case to one under Chapter 7 is **GRANTED**.

4. This case is converted to one under Chapter 7 of the Bankruptcy Code.

5. The United States Trustee, Lisa L. Lambert, shall immediately appoint a Chapter 7 trustee in the case.

### End of Order ###

# EXHIBIT B

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                  )   Case No. 25-80156-swe-11
In Re:                            )
                                  )
MERIT STREET MEDIA, INC.,         )   Dallas, Texas
                                  )   October 28, 2025
          Debtor.                 )   2:00 p.m. Docket
                                  )
                                  )   ORAL RULING
_____)

                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE SCOTT W. EVERETT,
                    UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:             Jim Ducayet
                            SIDLEY AUSTIN, LLP
                            One Dearborn
                            Chicago, IL  60603
                            (312) 853-7621

For TBN/Trinity             Mark C. Moore
Broadcasting of Texas, Inc. FOLEY & LARDNER, LLP
and TCT Ministries, Inc.:   2021 McKinney Avenue, Suite 1600
                            Dallas, TX  75201
                            (214) 999-4150

For Peteski Productions,    Charles L. Babcock
Inc.:                       Matthew Dudley Cavenaugh
                            JACKSON WALKER, LLP
                            1401 McKinney Street, Suite 1900
                            Houston, TX  77010
                            (713) 752-4210

For Peteski Productions,    Christopher R. Bankler
Inc.:                       JACKSON WALKER, LLP
                            2323 Ross Avenue, Suite 600
                            Dallas, TX  75201
                            (214) 953-6053

For the Official Committee  Greg Wilkes
of Unsecured Creditors:     O'MELVENY & MYERS, LLP
                            2801 North Harwood Street,
                              Suite 1600
                            Dallas, TX  75201-2692
                            (972) 360-1935
```

APPEARANCES, cont'd.:

| For Professional Bull Riders, LLC: | Jason M. Rudd<br>WICK PHILLIPS GOULD & MARTIN, LLP<br>3131 McKinney Avenue, Suite 500<br>Dallas, TX  75204<br>(214) 692-6200 |
|---|---|
| For Professional Bull Riders, LLC: | Alyssa A. Moscarino<br>BENESCH, FRIEDLANDER, COPLAN &<br>   ARONOFF<br>127 Public Square, Suite 4900<br>Cleveland, OH  44144<br>(216) 363-4500 |
| For the United States Trustee's Office: | Asher Bublick<br>OFFICE OF THE UNITED STATES<br>   TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX  75242<br>(214) 767-8967 |
| Recorded by: | Sara Ferrufino<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX  75242<br>(214) 753-2088 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX  76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1            <u>DALLAS, TEXAS - OCTOBER 28, 2025 - 2:04 P.M.</u>

2            THE CLERK:  All rise.

3            THE COURT:  Thank you.  Please be seated, even though

4    there's nobody in the courtroom.

5        All right.  Good afternoon.  We're here on the 2:00

6    o'clock docket.  We have one matter set in the Merit Street

7    Media case, Case No. 25-80156.  This is the Court's ruling on

8    the pending requests for conversion, dismissal, or appointment

9    of a trustee.

10       I wanted to let the parties know initially I did set this

11   for a WebEx-only ruling because there was some uncertainty

12   about whether I was going to be here in the courtroom or out

13   of town, and that's why I set it that way.  And with that

14   uncertainty, I thought it was better to just let the parties

15   know they had to appear by WebEx.

16       The second thing I'll note is that this is going to be a

17   lengthy ruling.  I might take a break or two during the ruling

18   to get through it.

19       I did have, I understand, an inquiry to my courtroom

20   deputy about an unofficial court reporter appearing on the

21   WebEx hearing.  I've never had that request before.  I just

22   wanted to let the parties know that, after my ruling, my plan

23   is to give my oral ruling script to the official court

24   reporter, who would then be able to expedite the official

25   transcription.  So if there's a concern about getting a quick

1  copy of the transcript, I do plan to do that.

2       If the parties are using a transcriber for internal

3  purposes only, I'm not going to police that, but just

4  understand that that's not the official court transcript.  It

5  should not be used in this or any other proceeding.  I'm not

6  really monitoring that, but I just wanted to let the parties

7  know that I am going to make my script available to the

8  official court reporter to expedite production of a

9  transcript.  We are also going to put the audio of my ruling

10  on the docket after I get off the bench.

11                      PRELIMINARY REMARKS

12       So, with those preliminary remarks, I'll go ahead and get

13  started.

14       This is the Court's ruling on the requests by Trinity and

15  the Professional Bull Riders to dismiss the case, convert it

16  to Chapter 7, or appoint a Chapter 11 trustee.

17       This Chapter 11 case is an anomaly.  It came to me in

18  complete liquidation mode.  Before bankruptcy, after wrestling

19  control of the company away from TBN, Phil McGraw decided to

20  pull the plug on the financially-distressed Merit Street and

21  move the business to a new company.  The Debtor fired nearly

22  all its employees on the first day of the case and immediately

23  sued Trinity.  All that's left is litigation and the sale of a

24  media library and not much else.

25       There never has been even a pretense of a rehabilitation

1    or reorganization.  But that's not what makes this case an

2    anomaly, as liquidating Chapter 11s are common in this

3    district and elsewhere.  What makes this case unique,

4    unfortunately, is that it has been plagued with the attempted

5    destruction of relevant evidence and less-than-truthful

6    testimony by some of the key players.

7        Before I go further, I want to be crystal clear at the

8    outset that I'm not referring to any counsel involved in this

9    case.

10       Regrettably, although the case was filed with

11   questionable-but-consented-to corporate authority, I find

12   clear cause to either convert the case to Chapter 7, dismiss

13   the case, or appoint a Chapter 11 trustee.  Given that cause,

14   I must determine what course of action is in the best interest

15   of creditors and the estate.

16                           JURISDICTION

17       All right.  As far as my jurisdiction, the Court has

18   jurisdiction under 28 U.S.C. Sections 1334 and 157.  These

19   proceedings are core proceedings and core matters.

20       Now for some background.

21                           BACKGROUND

22   A.  First I will talk about the history of the relationship

23   between the parties.

24       TBN is a not-for-profit corporation that operates the

25   Trinity Broadcasting Network, based in Fort Worth, Texas.  TBN

produces its own original Christian programs and broadcasts
its in-house-produced material and third-party-produced
Christian programming in the United States and
internationally.

TCT, an affiliate of TBN, is a not-for-profit corporation
that operates the TCT Network, based in Marion, Illinois.  TCT
produces and broadcasts Christian programming.  I may refer to
TCT and TBN together as "Trinity."

Phil McGraw is a television personality, podcast host, and
author.  I heard a lot about Mr. McGraw's background at trial.
I carefully observed his demeanor when he was in the
courtroom, and I've reviewed countless emails and text
messages to and from Mr. McGraw as part of this trial.  I feel
confident in saying that he likes to be in control of
situations, as you might expect from a self-made man.

Mr. McGraw formed and is majority owner of Peteski
Productions, Inc., a Texas corporation.  From 2002 to 2023,
Mr. McGraw hosted the *Dr. Phil* show on CBS.  Mr. McGraw and
TBN executives started discussing the formation of a legal
relationship for the production and distribution of the *Dr.
Phil* show, which was coming to an end on CBS.

The parties then signed a document called a Binding Letter
of Intent, dated January 10, 2023, which contemplated that Mr.
McGraw would produce new content and TBN would broadcast that
content on its network.  Peteski Exhibit 4.

1    The document has other details about the parties'

2   contemplated relationship, including a proposed ownership

3   structure of Merit Street where TBN would own 70 percent and

4   Peteski would own 30 percent.  The Binding Letter of Intent

5   also contemplated that TBN would put together a production

6   studio and offices for the Debtor at TBN's "PLEX" campus in

7   Fort Worth.

8    The parties appear to disagree on whether the Binding

9   Letter of Intent was just a preface to definitive long-form

10  documents that were never finalized.

11   On March 5, 2024, several things happened with respect to

12  Merit Street, which was then called APG Ventures, Inc.:

13   a.  Merit Street, TBN, and Peteski executed a Voting

14  Agreement, which is found at TBN Exhibit 7, that, among other

15  things, provides for a three-person Board of Directors, with

16  two members to be designated by TBN and one by Peteski;

17   b.  Merit Street also adopted its Bylaws at TBN Exhibit 9;

18  and

19   c.  Merit Street elected three directors:  Matt Crouch, a

20  TBN designee; Samuel Smadja, a TBN designee; and Mr. McGraw,

21  the Peteski designee.

22   On March 7, 2024, the Charter was amended to change the

23  name of APG to Merit Street Media, Inc., which I will refer to

24  as the Debtor, Merit Street, or MSM.

25   It appears that the parties' initial relative ownership

1    positions - 70 percent TBN and 30 percent Peteski -- were

2    reflected through ownership of uncertificated shares, which

3    was permitted under the Bylaws.  *See* MSM Bylaws, Section 5.01

4    at TBN Exhibit 9.

5        On April 2, 2024, the Debtor officially launched its

6    network with morning and evening news shows, as well as other

7    programming.

8        The parties' relationship, which was already fraying when

9    the network began, continued to deteriorate in mid-2024.  Mr.

10   McGraw wanted control of the business, so he began to plan

11   what he described as his "project of getting rid of TBN."

12   More on the origin of that phrase in a few minutes.

13       At the end of July 2024, thanks to some persuasive

14   messaging that I'll also discuss in a few minutes, the parties

15   started discussing a restructuring of their relationship,

16   including an equity swap of their relative ownership

17   percentages of the Debtor.

18       On August 2, 2024, Mr. McGraw forwarded to Phil McIntyre,

19   Mr. McGraw's longtime business consultant and advisor, an

20   email he sent to Jerry Sharell, a Merit Street public

21   relations agent, somebody we'll hear about again later.

22   That's TBN Exhibit 33.

23       In that forwarded email, after noting that some

24   unproductive staff may be fired in this "eat what you kill

25   world," Mr. McGraw noted, "SO GLAD to get these changes

underway!  These TBN folks are in over their heads and so

judgmental I just can't stand it.  Be shaping a loud press

release announcing in some way that I have made a gangster

move and taken a majority ownership position in MSM,

diminishing TBN to a passive minority investor role.  We will

release it at the right time."

The parties dispute the legal consequences of what

happened next.  In a series of email exchanges during the

first week of August, the parties negotiated the terms of the

equity swap.  *See, for example*, Peteski Exhibits 27 and 106.

According to TBN, Mr. McGraw claimed he needed to show family-

and-friend funding sources a signed paper showing he owned a

controlling interest in Merit Street, even while they

continued to negotiate the material terms of any equity swap,

so the parties agreed to a multi-step process for Peteski to

obtain a controlling ownership interest in Merit Street, with

the first step being the stock swap.  Again, that's TBN's

perspective.  *See* Transcript of Hearing Held on September 22,

2025, Docket No. 529 at Pages 18 and 19.

Thereafter, according to TBN, the parties would continue

to negotiate the outstanding deal points and memorialize them

in formal agreements on issues such as recognition of amounts

TBN spent on Merit Street as loans, an amended lease for Merit

Street's studio space at the PLEX, and Peteski's and Mr.

McGraw's agreement to fund all future Merit Street operational

expenses.  *See* Trinity Reply Brief, Docket No. 401 at

Paragraph 2.

Peteski, on the other hand, claims that the stock swap was

a standalone agreement and not part of a multi-step agreement.

*See, for example*, Peteski's Reply Brief, Docket No. 414,

Paragraph 48.

For now, I'll just note that the contemporaneous evidence

suggests the Trinity executives -- including Mr. Crouch, TBN's

chairman; Mr. Amedia, director of TBN and former president of

TCT; and Mr. Casoria, TBN's outside general counsel and former

Assistant Secretary -- genuinely thought the parties would

work in good faith on the post-stock-swap issues.

The evidence also shows, in contrast, that Mr. McGraw was

angling to get signatures on the stock swap so that Mr. McGraw

could oust the board members of TBN.

The parties signed the "Merit Street Stock Confirmation"

on August 8, 2024.  That's TBN Exhibit 59.

After signing the Stock Confirmation, Mr. McGraw emailed

TBN, recognizing that TBN and Peteski "have a pretty good 'to

do' list to now turn our attention to" and reassuring TBN that

he "did not forget [his] commitment to work diligently and

expeditiously to get everything buttoned up post 'stock

swap.'"  That's TBN Exhibit 67.

But Peteski, now relying on a change-of-control provision

in the Voting Agreement, executed the Written Consent of the

Stockholders of Merit Street Media, Inc., which I may refer to
as the "August Consent", which:

    a.  amended the Bylaws to fix the number of directors at
no less than one director, rather than three;

    b.  removed Trinity's two directors from the Board; and

    c.  appointed Mr. McGraw as the sole director of the
Debtor.

    Mr. McGraw and Peteski didn't immediately notify TBN
executives of the removal of their board members.  TBN found
out the hard way in February 2025, thanks to some email
exchanges from Mr. Lidji of Jackson Walker, who told them they
needed to sign a consent document to change Merit Street from
a Delaware corporation to a Texas corporation to help with
certain Merit Street litigation that Jackson Walker was
handling.  *See* Peteski Exhibit 70.

    When Mr. Lidji for the first time notified Mr. Amedia in
the email exchanges that Mr. McGraw was now the sole board
member, Mr. Amedia and the other TBN executives were truly
shocked and disappointed.  Mr. Lidji responded later that day
with the simple statement, "Needless to say, you should not be
surprised."  *See* Peteski Exhibit 73.

    TBN protested, but elected to take the high road and sign
the consent document because they wanted to help Merit Street
in the litigation.  Mr. Casoria testified credibly at trial,
"I was left with a Hobson's choice of whether to defend --

1    participate and defend and cooperate with who I thought were

2    co-counsel in this litigation, which was well over $100

3    million in potential damages, or to continue to argue with Mr.

4    Lidji over corporate documents that I hadn't seen and fight

5    over how many board members." *See* Transcript of Hearing Held

6    on September 17, 2025, Docket No. 572 at Pages 14 and 15.

7         Therefore, on or about February 22, 2025, Peteski and TBN,

8    as Debtor's Stockholders, and Mr. McGraw as Debtor's Director,

9    executed a Joint Written Consent of the Stockholders and Board

10   of Directors, the "February Joint Written Consent".  That's

11   Peteski Exhibit 75.

12        I'm going to pause for just a minute.  I see Mr. Bankler.

13   I'm just going to do a sound check.  I'm four pages in.   I

14   just want to make sure everybody can hear me okay so that I

15   don't have to go back and read this.  So I'm going to do

16   occasional sound checks.  Mr. Bankler?

17             MR. BANKLER:  Yes, Your Honor.  I can hear you just

18   fine.  Thank you.

19             THE COURT:  All right.  Thank you.

20        The February Joint Written Consent approved, among other

21   things:

22        (1) the conversion of the Debtor to a Texas Entity;

23        (2) the Texas Certificate of Formation, which listed Mr.

24   McGraw as the only director of the Debtor; and

25        (3) the Amended Bylaws for the converted Debtor entity,

1  which provided for one sole director.

2      The February Joint Written Consent additionally adopted a

3  resolution that the members of the Board of the Debtor,

4  immediately after conversion to a Texas entity, shall be the

5  same persons as the Board of the Debtor immediately prior to

6  conversion -- that is, Mr. McGraw -- and provided that the

7  stockholders and director agreed that the resolutions

8  "approved, ratified, and confirmed in all respects as the act

9  and deed of the Corporation."

10     On February 24, 2025, the Debtor filed its Texas

11  Certificate of Formation with the Texas Secretary of State,

12  declaring publicly that Mr. McGraw was the sole director of

13  the Board of the Debtor.  That's Peteski Exhibit 77.

14     Also in February 2025, Mr. Cavenaugh, Mr. McGraw's and

15  Peteski's restructuring counsel at Jackson Walker, reached out

16  to his friend and fellow restructuring professional, Gary

17  Broadbent, about his interest in a position as Merit Street's

18  Chief Restructuring Officer.  *See* Transcript of Hearing Held

19  September 17, 2025, Docket No. 469 at Page 53.  They had some

20  discussions, but Mr. Broadbent wasn't officially retained

21  until later.

22     As early as May 15, 2025, Mr. McGraw and his team began

23  planning to move Merit's business to a new company.  His team

24  shopped the new company to MediaCo controlling shareholder,

25  Soo Kim.  That's PBR Exhibit 52.

1        High-level discussions with Soo Kim led to a proposed

2   "crawl, walk, run strategy for a partnership over the next

3   three months."  That's PBR Exhibit 52.

4        On June 21, 2025, a member of Mr. McGraw's team was using

5   ChatGPT to look for a new company name.  *See* PBR Exhibit 153.

6        By June 27, 2025, Mr. McGraw's team had negotiated the

7   main deal points of a letter of intent with MediaCo.  PBR

8   Exhibit 181.

9        Then, on July 1, 2025, the day before the bankruptcy

10  filing, the new company was officially incorporated under the

11  name Envoy Media Company.  TBN Exhibit 325.

12       Pursuant to a Consulting Agreement effective as of June

13  18, 2025, the Debtor appointed Mr. Broadbent as Chief

14  Restructuring Officer.

15       Then, pursuant to Board Minutes dated June 30, 2025, Mr.

16  McGraw, as the sole member of the Board, increased the Board

17  size to two and filled the second position by appointing Gary

18  Broadbent as an Independent Director effective as of June

19  18th.  TBN Exhibit 302.

20       As part of that appointment, the Board created a Special

21  Committee of the Board, and at least on paper delegated to Mr.

22  Broadbent, as Independent Director and sole member of the

23  Special Committee, the exclusive authority to pursue

24  "Strategic Options" such as bankruptcy and to direct the

25  prosecution, settlement, and release of litigation "Claims."

1       On July 1st, the Special Committee authorized the Debtor

2  to file Chapter 11 bankruptcy, which it did at 12:15 a.m. on

3  July 2.

4  B.  Professional Bull Riders

5       Next I'll talk about the Professional Bull Riders, LLC,

6  which I may refer to as either PBR or the Bull Riders.

7       PBR is an international professional bull riding

8  organization. It promotes and organizes the premier

9  professional bull riding tour, a Teams league established in

10  2022, and numerous world-class bull riding events.

11      PBR and the Debtor entered into a series of agreements in

12  May and July 2024 where the Debtor agreed to air PBR's

13  programming, and in return was required to pay PBR a sizable

14  rights fee over four years.  The Debtor began broadcasting

15  PBR's content in mid-July 2024.  The PBR Agreements were

16  signed when TBN was in control of the Merit Street board.

17      Merit Street's relationship with PBR soured soon after Mr.

18  McGraw took control of the company in August 2024.  In fact,

19  on September 3, 2024, Mr. McGraw sent an email out to officers

20  of the Debtor, making clear that he was going to withhold a

21  sizeable $3 million monthly payment to PBR as a leverage tool

22  against TBN:

23          "We must make absolutely sure that no one at TBN is

24      spending MSM money starting tomorrow.  We must have

25      that account set up where nobody signs but us.  They

1    are very apt to go in there first thing in the morning

2    and try and write a $3-plus million check to PBR.  We

3    cannot let that happen.  It is a powerful leverage tool

4    that I have by informing them that that payment is

5    being defaulted on because they failed to meet their

6    deadline to fund $25 million on September 1st and now

7    on September 3rd.  They need to figure out what to do.

8    We aren't paying it because we can't pay it.  We have

9    to get our money out of there.

10        "Randi, please impress upon Jim Mittan and Mindy

11    that, as per their notification at the end of last

12    week, they are not authorized to issue checks on behalf

13    of MSM without sign-off by me or Joel.  We will not

14    approve that PBR payment.  Obviously, they have to be

15    paid, but I'm playing some eleventh-hour poker here.

16    TBN needs to pay PBR and prepare to make payroll on the

17    7th unless they get this funding done."

18    That's TBN Exhibit 558.

19        PBR was never paid. In response to the Debtor's nonpayment

20    under the PBR Agreements, PBR terminated the Agreements in

21    November 2024 and commenced an arbitration against the Debtor.

22    *See* PBR's Objection at Page 4, Docket No. 97.

23        In the arbitration, PBR alleges breach of contract and

24    seeks damages in an amount of $181-plus million, plus

25    attorneys' fees.  The Debtor counter-claimed against PBR in

1   the Arbitration proceeding for fraud.  Transcript of Closing

2   Arguments, September 29, 2025, Docket No. 550 [Court

3   correction] at Page 116; Peteski Exhibit 146.

4       Just a moment ago I cited an objection at Docket 97.  I

5   don't have it in front of me.  That may not be PBR's

6   objection, but that is the cite for that note.

7   C.  Now I'm going to talk about the Ribmans and the Committee

8   formation and composition.

9       Back on June 30, 2024, in a text thread describing their

10  planned trip together on a Hawker airplane that was delayed

11  because of a faulty fuel sensor, Mr. Ribman asked Mr. McGraw

12  what his schedule was that week. Mr. McGraw replied, "I'm here

13  working on the project of getting rid of TBN!"  That's TBN

14  Exhibit #16.

15      Less than a month later, on July 28, 2024, when Mr. McGraw

16  was getting ready to execute his self-professed gangster move,

17  Mr. Ribman was giving Mr. McGraw detailed and specific talking

18  points to persuade TBN to do the stock swap.  *See, for*

19  *example*, TBN Exhibit 23.  This July 28, 2024, text thread is

20  fascinating.  Mr. Ribman's text starts with this:

21          "Proposed  messaging  ...  This  has  been  a  good

22      partnership.  Your  summer  hiatus  and  their  ongoing

23      discussions with TCT have caused you to reflect on the

24      partnership.  It's important that the two of you focus

25      on  what  you  are  individually  great  at  doing.   His

1      parents founded TBN 50 years [ago] and he has grown it

2      into the largest religious network in the world. He

3      needs to continue to focus on acquisitions such as TCT.

4      The new proposed structure will allow TBN to focus on

5      what it does well (both from a time and money

6      perspective) and will enable you to focus on what you

7      are great at.  His 30 percent will be far more valuable

8      with you leading the network than his 70 percent under

9      the current arrangement.  You are proud of what you

10      have created with him as a co-founder and look forward

11      to a new structure that best leverages your unique

12      talents."

13      Again, that's TBN Exhibit 23.

14      Mr. Ribman obviously put a lot of thought into this

15 messaging, including its emotional nods to Mr. Crouch's

16 parents' role in his success.  After providing the messaging,

17 Mr. Ribman said, "Good luck and let me know how it goes!  I

18 may be out by the studio, if you want to meet out there

19 afterwards."  Mr. McGraw replied, "Perfect lead-in.  I'll

20 call you.  Stand by!"

21      Again, this is Mr. Ribman giving Mr. McGraw specific

22 messaging points praising TBN and Mr. Crouch's parents and

23 persuading TBN to do the stock swap, all while knowing that

24 Mr. McGraw was working on the project of getting rid of TBN.

25 So the text message may be persuasive, but it's also a little

1   disturbing.

2       This specific messaging about the value of the stock

3   positions if they were swapped was highlighted at trial a

4   number of times, including when I watched an August 8, 2024

5   video of Mr. Crouch saying that he thought the word of the

6   Lord was coming from Mr. McGraw's mouth when Mr. McGraw said

7   he was going to make this 30 percent worth more than if it

8   would have been TBN's 70 percent, to which Mr. McGraw replied,

9   "I believe that from my heart."  That's the video at Peteski

10  Exhibit 109.

11      The stock swap value messaging is also specifically raised

12  in a fraud cross-claim filed by Trinity against Mr. McGraw and

13  Peteski.  *See* Adversary No. 25-8006, Docket No. 55, Paragraph

14  51 at Page 15.

15      Specifically, Trinity alleges that this statement and

16  others were intentionally false and made to induce TBN to take

17  certain actions that it would not have otherwise taken, such

18  as executing the stock swap.  *See* Adversary Proceeding No. 25-

19  8006, Docket No. 55, Paragraphs 52 and 110 to 117.

20      Moreover, in its answer in that adversary proceeding to

21  the Debtor's complaint, Trinity also challenges the validity

22  of the stock swap based on fraud, again implicating Mr.

23  Ribman's persuasive messaging.  *See, for example*, Adversary

24  No. 25-8006, Docket No. 49, Paragraphs 1, 52, 83, and 105.

25      On August 8, 2024, the date of the video, Mr. McGraw

executed the stock swap and thus began his move to get rid of

TBN, which I've already discussed.

Mr. Ribman must have been satisfied with the stock swap,

because in December 2024 the Darcy Lynn Ribman 1997 Trust lent

the Debtor $5 million.  *See* Transcript of Hearing Held

September 25, 2025, Docket No. 523 at Page 25.  Mr. Ribman and

Darcy Ribman are husband and wife.  *See* Trinity Reply, Docket

No. 401, Paragraph 8, Footnote 7.

Now let's fast forward to late in the evening on July 1,

2025, the day before the bankruptcy filing.  Mr. McGraw sent a

text message to Mr. Ribman that, as I'll discuss a little

later, Mr. McGraw purposefully deleted after the bankruptcy

because he didn't want me to see it.  TBN Exhibit 330.

In that text thread, Mr. McGraw told Mr. Ribman the

following things:

"Okay.  I have been trying to get with you so you are up

to speed.  I am filing suit against TBN at 12:01 a.m., as in

three hours from now."

"I am also filing Chapter 11 for MSM to wipe out all the

s-h-i-t Matt Crouch has burdened us with."

"It will wipe out PBR's claim against MSM, but our claim

against them will survive.  It will free us from TBN's debt

for distribution which Matt saddled us with.  Distributors are

cooperating with us.  Two biggest assets are OUR claims

against TBN and PBR.  The biggest creditor is me.  Second is

1   distributor group, then you.  (See below as to you.)"

2       As an aside, this reference in the text to the large

3   unsecured claims of the distributor group and the Ribman Trust

4   is interesting.  In Chapter 11 cases generally, it's very

5   common -- in fact, expected -- for a debtor to be aware of and

6   concerned about who the largest unsecured creditors in a case

7   are, because they often end up on the creditors' committee,

8   especially if those creditors are encouraged to do so.

9       Now back to more information from the deleted text:

10      "We are immediately relaunching in a joint venture with

11  MediaCo in the new 65,000 square foot broadcast center at 2410

12  Gateway in Irving just off Beltline.  Soundstages are under

13  construction, as are all other elements we need.  We will not

14  go off the air for even one second except where our

15  distributors take us down when they can replace us.  We are

16  working to replace them as well.  No adversarial blood there."

17      "Just want you to know we think we 'Free At Last.'  Very

18  happy.  Wish we didn't have to do it, but it is time.

19  Important to me that you know:  Your investment is one hundred

20  percent safe.  Hope you will choose to go along and move it to

21  new deal (clean balance sheet!).  However, I am happy to

22  reimburse you via wire transfer at a moment's notice, as I

23  have previously indicated.  I don't care about the agreement

24  that protects with the library or what the Court does.  Our

25  deal is between us, and I am very grateful for it.  I made a

choice and will not allow you to be in an uncomfortable

position for even a second."

"I just did NOT want you to be surprised in any fashion or

think some court was going to impact your investment.  Not

happening.  Since this goes public technically at midnight, I

just had to get to you with the scoop.  And yes, we can meet

tomorrow!  Hope this helps.  Sorry to be a nag!"

Mr. Ribman replied a few minutes later, noting that "You

couldn't nag me if you tried.  Your challenges are mine!

Couldn't be more proud of what you are building.  Let me know

when you are free tomorrow."

Stated differently, instead of questioning Mr. McGraw's

stated intent to wipe out PBR's claim in the bankruptcy or Mr.

McGraw's guaranty of payment no matter what the Court does,

Mr. Ribman immediately cheered on Mr. McGraw's plan, since Mr.

McGraw's challenges were also Mr. Ribman's challenges.

At trial, Mr. McGraw testified that Mr. Ribman voluntarily

declined his payment offer on a phone call, but I don't

believe that testimony.  *See* Transcript of Hearing Held

September 23, 2025, Docket No. 523, at Pages 91 and 92, and 95

to 96.

In a text thread between Mr. McGraw and Joel Cheatwood

also late in the evening on July 1st, Mr. Cheatwood asked who

should reach out to certain talent that night in advance of

the all-hands meeting the next day.  Mr. McGraw replied that

1   Mr. Cheatwood should call them because "I still have to write

2   our pleading!  With Chip because the lawyers just can't get it

3   right."  That's TBN Exhibit 320.  That text says "bc" but

4   clearly that is short for "because."

5        It's easy for me to connect the dots and conclude that the

6   pleading that Mr. McGraw was working on late in the evening on

7   July 1st with Chip Babcock, Mr. McGraw's and Peteski's long-

8   time litigation counsel, is the very lawsuit against TBN that

9   Mr. McGraw promised he would file within hours, and that was,

10  in fact, filed within hours, except with Sidley signature

11  blocks rather than Jackson Walker's.

12       After the bankruptcy filing, Mr. Ribman met with Mr.

13  McGraw at Envoy's facility, as the text thread suggested they

14  would.  PBR Exhibit 231.

15       For convenience, during this ruling I may refer to the

16  Ribman Trust and Mr. Ribman interchangeably because I find

17  that Mr. Ribman was a Trust representative and Agent for all

18  relevant purposes after the December 2024 loan, including

19  communications with Mr. McGraw, even if Committee counsel

20  dealt with Mrs. Ribman during the bankruptcy.

21       The Debtor filed bankruptcy on July 2nd at 12:15 a.m.,

22  followed at 1:43 a.m. with the lawsuit against TBN that Mr.

23  McGraw promised "I am also filing" shortly after midnight.

24  That's TBN Exhibit 330.

25       At the first-day hearings on July 3rd, Judge Jernigan

1    asked whether certain creditors, including the Ribman Trust,

2    were given notice of the bankruptcy.  Debtor's counsel Mr.

3    Venter noted that there were principal-level discussions with

4    the Ribman Trust and that the Ribman Trust was fully in the

5    loop on the bankruptcy.  That's Transcript of Hearing Held

6    July 3, 2025, Docket No. 47 at Pages 16 to 20.

7        Not surprisingly, just two weeks later, on July 17, after

8    those principal-level discussions and on the heels of Mr.

9    McGraw's text message where he guaranteed payment of the

10    Ribman claim and noted the large size of the Ribman unsecured

11    claim relative to other claims, the Ribman Trust was appointed

12    to the Creditors' Committee.  *See* Docket No. 95.

13        Who else appeared on the Committee?  Borden Media

14    Consulting and the Professional Bull Riders.

15        Somewhere around that time, as discussed right before

16    closing arguments, Debtor's counsel notified Mr. Bublick with

17    the United States Trustee that the Debtors were marketing

18    their litigation claims against PBR.  Transcript of Closing

19    Arguments, September 29, 2025, Docket No. 550 at Pages 8 to

20    10.

21        Not long thereafter, on August 6, PBR was removed from the

22    Committee, even though PBR told the United States Trustee it

23    would not bid on any claims against it.  Docket No. 170, and

24    Transcript of Closing Arguments, September 29, 2025, Docket

25    No. 550 at Page 172.

1        Thus, in the critical early stage of the case, the

2   creditor that knew of Mr. McGraw's project to get rid of TBN,

3   the creditor that provided the specific messaging for that

4   project and praised that project, the creditor that knew of

5   Mr. McGraw's desire to wipe out the PBR claim and cheered on

6   that plan, the creditor that knew its claim was absolutely

7   guaranteed by Mr. McGraw to get paid no matter what the Court

8   does, THAT creditor made it onto the Committee, while the to-

9   be-wiped-out creditor, PBR, was removed from the Committee.

10       Under the proposed plan that Mr. McGraw and Mr. Broadbent

11   negotiated and filed on the eve of trial, Mr. Broadbent, for

12   the estate, will settle and release claims against Mr. McGraw

13   and Peteski while a Litigation Trust, supervised by the same

14   two members on the Creditors' Committee, will control the

15   litigation against TBN and PBR.  That Plan is found at Docket

16   No. 412.  I'll refer the parties to Pages 47 to 50, Pages 9

17   and 10.  Also Plan Article IV.C, Pages 30 to 33, and Plan at

18   Article IV.A.e., at Page 28, generally permitting the

19   Creditors' Committee to select members of the Litigation

20   Advisory Committee that supervise and vote on terms of any

21   settlements.

22       I will repeat these troubling facts for emphasis:  The

23   creditor that helped Mr. McGraw with his plan to remove TBN

24   board members by providing specific messaging that gave rise

25   to a TBN fraud claim against Mr. McGraw and Peteski, the

creditor that cheered on Mr. McGraw's stated intent to wipe

out a fellow unsecured creditor's claim through the bankruptcy

because Mr. McGraw's challenges and Mr. Ribman's challenges

were the same, the creditor whose claim -- in a purposefully-

deleted text message -- was guaranteed to be paid by Mr.

McGraw no matter what the Court does, THAT creditor not only

constitutes half of the Creditors' Committee but will

supervise litigation against TBN and PBR after confirmation if

the plan is confirmed.

It may be easier to detect a conflict when a creditor on

the committee, such as PBR once was, has claims against the

debtor and the debtor has claims against that creditor.  At

least in theory, the adverse creditor will benefit and other

unsecured creditors may suffer a detriment if the debtor's

claims against it are settled cheaply.  Potentially, that

conflict can be managed with a waiver that the adverse

committee member will abstain from voting on matters

concerning litigation with that creditor.  But the U.S.

Trustee felt otherwise in this case when PBR was removed from

the Committee.  And while I may not know all the facts that

led to that decision, I do know that the Debtor nudged the

U.S. Trustee in that direction.

On the other hand, when a committee member and the debtor

are seemingly aligned against a third party -- here, both TBN

and PBR -- you could say at least in theory that there is no

1   conflict that would lead to a breach of the fiduciary duty the

2   committee member has to all unsecured creditors.  After all,

3   the bigger the recovery by the debtor against the third party,

4   the more unsecured creditors will benefit.

5       But at some point, if a creditor committee member that is

6   aligned with the debtor is too close to the debtor or is

7   involved in conduct that will be reviewed by the committee, a

8   line may be crossed where the fairness of the bankruptcy

9   process is implicated.

10      Judge Felsenthal of this Court once said, "The bankruptcy

11  process must both be fair and appear fair," and he made this

12  statement in an opinion removing a committee member whose

13  conduct the committee was investigating.  That's *In re*

14  *Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D.

15  Tex. 2003).

16      *Venturelink* is somewhat distinguishable because the

17  removed committee member in that case was a former board

18  member that the debtor had sued for breach of fiduciary duty.

19  Here, the Ribmans and the Ribman Trust are not current or

20  former Merit Street board members or officers, and the

21  bankruptcy estate has not sued any Ribman party.

22      But Mr. Ribman, knowing of the project to get rid of TBN,

23  provided the persuasive messaging that Trinity in this very

24  trial has alleged is the kick-start of the Debtor's bad-faith

25  conduct that continues to this day.

1          Did Mrs. Ribman and Mr. Borden, the two Committee member

2    representatives, ever discuss Mr. Ribman's persuasive

3    messaging during Committee meetings before the Committee

4    joined with the Debtor and Peteski to argue that this case was

5    filed in good faith?

6          Did Mrs. Ribman watch the trial video where the words

7    originally penned by her husband regarding the stock swap

8    values were perceived by Mr. Crouch to be the word of the Lord

9    coming from Mr. McGraw's mouth?  If so, did that make her the

10   least bit uncomfortable, knowing that Trinity now alleges that

11   the statement was fraudulent?

12         Did Mrs. Ribman and Mr. Borden ever discuss during a

13   Committee meeting whether Mr. McGraw's secret guaranty of the

14   Ribman claim was evidence of bad faith?  Did Mrs. Ribman

15   recuse herself from any of these discussions, leaving Mr.

16   Borden to chat with himself?

17       I'm asking these questions not because I want somebody to

18   reveal confidential Committee deliberations, but because I'm

19   highlighting a fairness issue.

20         And would Mr. Borden feel free to discuss these issues

21   openly with Mrs. Ribman, knowing that Mr. McGraw flies on a

22   Hawker airplane with Mr. Ribman, specially favors the Ribman

23   Trust claim, and attempts to have secret communications with

24   the Ribmans?

25         In other contexts, courts have removed committee members

1  based on a concern that the committee member will share

2  confidential committee deliberations with somebody close to

3  the debtor.  *See, for example*, *In re Swolsky*, 55 B.R. 144, 146

4  (Bankr. N.D. Ohio 1985); *In re Daig Corporation*, 17 B.R. 41,

5  42 (Bankr. D. Minn. 1981).

6      Although *Swolsky* and *Daig* involved family connections

7  between the debtor and the committee, the same principle

8  arguably applies here, given the very close relationship

9  between Mr. McGraw and the Ribmans and given the unusual facts

10  present here.

11      What's more, Mr. Ribman's persuasive messaging is now also

12  at the core of a fraud claim by TBN against Mr. McGraw and

13  Peteski, and it also appears to be implicated in TBN's answer

14  to the Debtor's claims in the pending adversary proceeding.

15      I am not commenting on the merits of the pending fraud

16  claim and answer, but the fact is the Ribman Trust will now

17  have a role in supervising this litigation under the proposed

18  plan.  Will Mrs. Ribman and Mr. Borden have those same awkward

19  discussions when the litigation trust is pursuing or settling

20  TBN-related litigation?

21      Is this bankruptcy process fair or does it appear to be

22  fair to TBN and PBR, when Mr. McGraw has vowed to get rid of

23  and wipe out their claims, all while Mr. Ribman cheers him on

24  and the Ribman Trust sits on the Committee?

25      This line-crossing into unfairness territory is even more

significant when other facts and circumstances in the case

suggest that Mr. McGraw's influence and control extend not

only to the Committee but to other parties as well.  And I'll

cover those facts and circumstances soon.

I didn't lay out all these facts and concerns on the day

of closing arguments when I asked Ms. Young of the U.S.

Trustee Office her thoughts on the Committee composition.  Ms.

Young was pinch-hitting for Mr. Bublick, and at that time she

relayed the U.S. Trustee position that the Committee

adequately represents the interests of unsecured creditors,

even with the Ribman Trust on the Committee.

With this additional information I've provided for the

first time, I hope the U.S. Trustee understands why I've had

so much heartburn over this issue, why I believe the Ribman

Trust should not be on the Committee, and why, if the plan

were confirmed, it would be equally or even more inappropriate

for the Ribmans to sit in judgment of the estate's litigation

with PBR, and especially TBN, against whom the Ribmans are

adverse and conflicted and by whom they may even be called as

witnesses.

I'll conclude my discussion of the Ribmans by cautioning

that I am not relying on the Committee composition as cause to

either convert the case to Chapter 7 or appoint a Chapter 11

trustee.  But I will consider the role of the Ribmans on the

Committee and under the proposed plan when I weigh many

factors in deciding what to do after finding cause.

D.   I'm now going to talk about the bankruptcy filing and DIP

financing and discovery issues.

After the Debtor filed for Chapter 11 relief on July 2nd,

it let go most of its employees immediately.  There were some,

albeit minimal, operations ongoing, and only a handful of

employees left.  The budget presented at the first-day hearing

reflected that zero revenues were expected during the case.

The Debtor quickly filed its first-day motions, including

a DIP financing motion.  Although such a motion is, of course,

routine in many Chapter 11 cases, there was at least one

unorthodox part of the DIP financing motion:  The DIP Lender,

Peteski, indicated that it would not fund a second draw under

the DIP loan unless and until it received a favorable ruling

on the Debtor's preference claim against TCT, an affiliate of

TBN, contained in a six-count postpetition adversary

proceeding that was filed against TBN and TCT even before any

substantive motions were filed in the main bankruptcy case.

*See* Adversary Proceeding No. 25-8006.  This is the lawsuit

that Mr. McGraw, late on July 1st, worked on with Mr. Babcock

and promised that he would file shortly after midnight.  He

delivered on his promise.

The Court, Judge Jernigan presiding, granted interim DIP

financing relief, and based on Peteski's uncustomary condition

for the next DIP financing draw, the Court scheduled the next

1    DIP financing hearing and a summary judgment hearing on the

2    preference claim less than a month later, on July 29th.  The

3    Court has no qualms with Judge Jernigan's scheduling of those

4    combined matters on that time frame, given the landscape and

5    record at the time, including Peteski's unorthodox DIP

6    financing condition.

7         As often happens in bankruptcy, however, facts and

8    circumstances change, and Peteski's uncustomary DIP financing

9    condition soon tripped up the Debtor.  Trinity filed a motion

10   requesting dismissal of the case, conversion of the case to

11   Chapter 7, or appointment of a Chapter 11 trustee.  That's at

12   Docket 100.  That motion alleged several causes for relief,

13   including that the bankruptcy was filed in bad faith, that the

14   estate needed a non-conflicted, independent fiduciary, and

15   that the case was filed without proper corporate authority.

16        PBR partially joined in Trinity's motion, preferring

17   conversion over dismissal, and also listing several causes for

18   relief, including the need for an independent and

19   disinterested trustee, and continuing loss to or diminution of

20   the estate and the absence of a reasonable likelihood of

21   rehabilitation.  That's at Docket No. 151.

22        The Court has since reminded the parties more than once of

23   the urgency of determining the authority-to-file issue, given

24   Fifth Circuit precedent holding that a bankruptcy case must be

25   dismissed if it was filed without proper corporate authority.

1   *See Franchise Services of North America*, 891 F.3d 198, 206-07

2   (5th Cir. 2018).

3       Trinity then requested a continuance of the July 29th

4   preference hearing and DIP financing hearing, arguing that it

5   needed discovery for its motion to dismiss, convert, or

6   appoint a trustee.

7       At a July 22nd continuance hearing, when Peteski's

8   unorthodox DIP financing condition was still in place, all

9   parties agreed that it made sense to try the motion to dismiss

10  and preference count at the same time.  *See* Transcript of

11  Hearing Held July 22, 2025, Docket No. 144 at Pages 27 and 28.

12  After all, if there's no bankruptcy case, there's no

13  preference.

14      After a back-and-forth discussion where the Court probed

15  the positions of the parties, including Trinity's and PBR's

16  persuasive arguments that they needed more time to obtain

17  discovery, the Court selected the already-scheduled Merit

18  Street omnibus hearing date of August 19th.  It should have

19  been clear to the Debtor and Peteski, based on the Court's

20  ruling and based on the tight schedule, that Trinity and PBR

21  were entitled to timely production of discovery, not only for

22  the DIP financing motion but also for the competing motions of

23  Trinity and PBR.

24      Unfortunately, Trinity and PBR had trouble getting the

25  discovery they requested, with PBR first filing a motion to

compel and a motion to expedite.  Docket Nos. 173 and 174.

Trinity later filed a joinder to PBR's motion to compel at

Docket No. 206.

At an August 8th status conference on those matters, I

became concerned that at least one attorney for Peteski was

purposefully not cooperating in the production of discovery

for the conversion, trustee, and dismissal motions, but I

asked the parties to continue conferring before having to set

the motion to compel.  *See* Transcript of Hearing Held August

8, 2025, Docket No. 223, at Pages 42 and 43.

The conferral process stalled, so at an August 14th

hearing on Trinity's and PBR's respective motions to compel,

the Court overruled the remaining unresolved objections of the

Debtor and Peteski to the discovery requests and ordered

production by August 22nd.  Transcript of Hearing Held August

14, 2025, Docket No. 231, at Pages 14, 19, 25, and 31.  *See*

Docket No. 536.

In the Court's view, very few, if any, of the discovery

rulings were particularly close calls.  And notably, not until

August 11th at 11:05 p.m., in Footnote 8 of one of the

Debtor's discovery-related responses, did the Debtor notify

the Court that Peteski was no longer sticking to its

unorthodox DIP financing condition.  That's at Docket 192.

With the August 19th hearing looming, and with much of the

ordered discovery still outstanding, Trinity and PBR filed an

1  emergency continuance motion that I granted from the bench on

2  August 15, thus pushing the trial to September 2nd.   I

3  memorialized my ruling in a written order found at Docket No.

4  248.

5      The discovery battles continued.  Peteski filed a motion

6  to compel against PBR, which I partially granted at an August

7  25th hearing.  *See* Transcript of Hearing Held August 25, 2025,

8  Docket No. 333 at Page 22.

9      Then things took a darker turn when Trinity filed on

10  August 26th an emergency motion for contempt and sanctions,

11  alleging, among other things, that not all of Mr. McGraw's

12  text messages and emails had been produced, even though the

13  time for production had passed and Mr. McGraw's deposition was

14  scheduled just two days later, on August 28th.  *See* Docket No.

15  303.

16      On August 27th, Peteski filed a response to the sanctions

17  motion, alleging, in bold and italicized letters, "As of this

18  filing, Peteski's production is complete."  That's Docket No.

19  310, Paragraph 1.

20      But at the August 28th hearing, I found out that the

21  production was not exactly complete.  Mr. Moore, counsel for

22  Trinity, showed the Court three documents that were produced

23  by Peteski's counsel for the first time on August 26th.

24  Transcript of Hearing Held August 28, 2025, Docket No. 373 at

25  Page 18.

1   One was by far the most troubling.  It was a text thread

2   between Mr. McGraw and Phil McIntyre, Mr. McGraw's longtime

3   business consultant and advisor, spanning July 1st and 2nd,

4   2025.  That's at TBN Exhibit 330.

5   In that text thread, Mr. McGraw said, "What I sent to

6   Jamie:" and he cut-and-pasted the McGraw-Ribman text thread

7   from July 1st that I described earlier, the one where Mr.

8   McGraw promised to wipe out the PBR claim and guaranteed the

9   Ribman claim.

10  The problem is that neither Peteski nor the Debtor ever

11  produced the original unflattering text message from Mr.

12  McGraw to Mr. Ribman.  The only reason I know about it is

13  because it was cut-and-pasted into the McGraw-to-McIntyre

14  text, which was produced.  Later, I learned that a lengthy

15  text thread between Mr. McGraw and Mr. Ribman from July 1st

16  was produced, but curiously absent from that thread was the

17  unflattering message I've talked about at length.  PBR Exhibit

18  231.

19  In other words, you can tell from the chronological order

20  of the July 1st text thread between Mr. McGraw and Mr. Ribman

21  that was produced that the unflattering message Mr. McGraw

22  sent is missing.  It appears that the unflattering portion of

23  the text had been deleted from Mr. McGraw's phone before the

24  rest of the text thread was produced.

25  Neither Peteski nor the Debtor nor anybody else ever

1  provided a satisfactory explanation of the missing text, and

2  Mr. McGraw's testimony at trial professing not to know what

3  happened to the missing text was not credible.

4      I find, based on all the evidence, that Mr. McGraw deleted

5  the unflattering text message after the bankruptcy petition

6  date because he didn't want me to see it.

7      I've spent a significant amount of time reviewing the

8  deleted July 1st text message and all the related evidence to

9  determine in what capacity Mr. McGraw was acting when he

10  deleted it.  He does not appear to have been acting in his

11  capacity of Peteski, the DIP Lender, or even Peteski, the

12  shareholder.  Instead, Mr. McGraw appears to have been acting

13  in significant part in his capacity as a member of the board

14  of Merit Street, or a *de facto* officer or agent of Merit

15  Street, describing his control over the Debtor and his plan to

16  file bankruptcy to wipe out the PBR claim and sue TBN.

17      He also noted that "our" claim against PBR will survive,

18  that the bankruptcy filing will free "us" from TBN debt, and

19  that the two biggest assets are "OUR claims" against TBN and

20  PBR.  These are all references to the Debtor.

21      Mr. McGraw then described the largest claims in the case,

22  including the Ribman claim, previewing the Ribmans' appearance

23  on the Committee.

24      Mr. McGraw, as a board member or *de facto* officer or agent

25  exercising control over the Debtor and strategizing with a

creditor about the bankruptcy filing had a duty to turn over

that text message pursuant to my order compelling production,

which memorialized my August 14th bench ruling.  *See* Docket

No. 536.

My order compelling production is directed to both Peteski

and the Debtor, so it should have been produced no matter in

what capacity he created and maintained the text message.  But

again, at least part of the duty of production was his duty as

a board member or *de facto* officer or agent of the Debtor.

Finally, there is ample evidence that Mr. McGraw used cell

phone text messages to conduct business for Merit Street.

There are too many in evidence to count.  Those text messages

contain in part the Debtor's business records.  One of those

business-related text messages was the one he purposefully

deleted.

Mr. McGraw also had a duty, separate and apart from any

specific order compelling production or general discovery

rules, not to destroy property of the estate.  The text

message itself, a communication with a creditor describing the

Debtor's litigation and bankruptcy strategy, is property of

the estate, no matter who owned the physical phone or who paid

for the phone data service.  *See Torch Liquidating Trust v.*

*Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009), which

interprets the phrase "all legal or equitable interests" in

Bankruptcy Code Section 541 broadly.

1    *See also In re Correra*, 589 B.R. 76, 124 (Bankr. N.D. Tex.

2    2018), where the Chapter 7 debtor and his former personal

3    assistant spoliated evidence in violation of discovery rules

4    by not preserving computer and computer records.  The court

5    noted that "This is not a mere discovery dispute at this

6    point; rather, this dispute involves an act of intentional

7    destruction of property of the estate and an overt effort to

8    make records of the debtor inaccessible."

9        *See also In re CTLI, LLC*, 528 B.R. 359, 368 (Bankr. S.D.

10   Tex. 2015), concluding that a debtor firearms company and not

11   the former majority owner owned a firearms Facebook page when,

12   among other things, many but not all of the former owner's

13   posts were business-related and he spoke for the store with

14   phrases like, "On behalf of myself and the Tactical Firearms

15   family."

16       Finally, *see also In re Advanced Modular Power Systems*,

17   413 B.R. 643, 667 (Bankr. S.D. Tex. 2009), holding that

18   property of the estate includes assets such as goodwill, phone

19   numbers, and other similar intangible property.

20       When I consider the entirety of the evidence in this case,

21   some of which I have yet to describe, I find that Mr. McGraw

22   has exercised influence and control over the Debtor since the

23   bankruptcy filing in his capacity as a board member or *de*

24   *facto* officer or agent, notwithstanding the appointment of Mr.

25   Broadbent as CRO and Independent Director.

1        Finally, counsel for Peteski noted at trial that the text

2   message at issue was produced, because it was cut-and-pasted

3   into a different text thread between Mr. McGraw and Mr.

4   McIntyre that was produced.

5        I have two responses to that.  First, kudos to Peteski's

6   counsel for producing the unfavorable cut-and-pasted copy.  My

7   comments related to the deleted text are not directed to

8   Peteski's counsel.

9        Second, that Mr. McGraw apparently forgot to delete the

10  cut-and-pasted version from the McGraw-McIntyre text thread

11  does not excuse Mr. McGraw's destruction of the original

12  version in the McGraw-Ribman text thread, which I have found

13  he did on purpose so that I wouldn't see it.

14  E.  Now let me rewind a little bit and talk about the abrupt

15  attempt to dismiss the case in mid-August.

16       On August 14th, I ruled from the bench that Peteski had

17  until August 22nd to produce text messages and emails and

18  other responsive documents.  On August 18th, the Debtor

19  abruptly filed a request to consent to dismissal and Sidley

20  filed a motion to withdraw as counsel, and they set both

21  requests for emergency hearing on August 19th, just three days

22  before my August 22nd deadline to produce documents, including

23  Mr. McGraw's texts and emails.

24       Keep in mind that at this time on August 19th I was not

25  yet aware of the purposefully-deleted text message, which was

first produced on August 26th and which Mr. Moore first

brought to my attention on August 28th.

At the August 19th hearing, I first heard the emergency

request by the Debtor to consent to dismissal.  In a nutshell,

the Debtor's counsel argued that I should dismiss the case

immediately because of continuing unpaid professional fees,

and that dismissal was preferable to conversion because it

would allow the Debtor to allegedly maintain a going concern

business with management and employees who could shepherd the

process on an out-of-court basis.

That explanation struck me as odd at the time since there

wasn't a going concern business.  The Debtor fired nearly all

its employees on the first day of the case.  I was concerned

that the Debtor simply wanted to file bankruptcy somewhere

else to try to get different rulings.

During closing arguments at trial, Mr. Strubeck for the

Committee expressed surprise that the Committee supported

dismissal over conversion at the August 19th hearing.  I was

equally surprised when it happened, and some of the reasons

the Committee provided at the hearing to support dismissal

over conversion gave me pause.

Mr. Wilkes said that dismissal would give creditors

optionality.  One option he mentioned was for creditors to

file, after dismissal, an involuntary petition against the

Debtor.  I found that suggested option very concerning,

1  because it would have allowed creditors friendly to Mr. McGraw

2  to file the petition in another jurisdiction, potentially

3  freeing the Debtor and Peteski of my orders compelling them to

4  produce emails and text messages, many of which I now believe

5  Mr. McGraw didn't want me to see.

6      Indeed, as I'll discuss later, Mr. Broadbent admitted when

7  I questioned him at trial that a dismissal in mid-August would

8  have freed him to decide whether to give me or another judge

9  another bite at the apple, which was a diplomatic way of

10  saying he wanted to file bankruptcy somewhere else because he

11  didn't like my DIP loan and discovery rulings. *See* Transcript

12  of Hearing Held September 17, 2025, Docket No. 469 at Page

13  219.

14      Dismissal on August 19, followed by an involuntary

15  elsewhere, also could have truncated inquiry into whether the

16  case was filed in good faith or whether it was being

17  prosecuted in good faith and for the benefit of all creditors

18  with either Mr. McGraw or Mr. Broadbent or both at the helm.

19      It was also unexpected for the Committee to suggest, after

20  all the time we spent trying to get to a hearing on

21  conversion, dismissal, or appointment of a trustee, despite

22  Peteski's discovery failures, that the parties should now

23  start that process all over again in a new case. Although Mr.

24  Wilkes suggested that the issue of corporate authority to file

25  the bankruptcy could have been obviated in an involuntary

1   case, that issue, although significant, was but one of many

2   issues that were well on their way to resolution when the

3   Debtor abruptly sought dismissal.

4        According to Mr. Wilkes, dismissal of the case would also

5   give creditors the second option, to simply negotiate

6   settlement and payment of their claims outside of bankruptcy.

7   With 20/20 hindsight, that suggestion seems especially

8   curious.

9        I want to say I have no reason to believe that Mr. Wilkes

10  or the other Committee counsel knew about the deleted text at

11  that point on August 19th, because Mr. Moore first raised it

12  at an August 28th hearing, but the Ribmans and Mr. McGraw

13  certainly were aware of the text that vowed to wipe out the

14  PBR claim and to pay the Ribman claim no matter what the Court

15  does, and there's no question that both the Debtor and Peteski

16  were in the process of reviewing responsive texts and emails,

17  given my August 22nd production deadline.

18       Dismissal on August 19th would have been a free pass to

19  Mr. McGraw to pay his favored creditors like the Ribmans and

20  not pay his disfavored creditors like PBR, and it would have,

21  just in the nick of time, excused the obligation to turn over

22  the text message thread with Mr. Ribman that Mr. McGraw tried

23  to deep-six.

24       Finally, in support of dismissal, Mr. Wilkes also said he

25  believed there likely would be no recovery for unsecured

creditors in a Chapter 7 after considering administrative

expenses.  It's difficult to see how the Committee could have

been confident in that position at that stage of the case,

even with mounting administrative expenses.

But in any event, I thought it was strange for the

Committee to take this position on immediate dismissal when I

hadn't heard a shred of evidence yet on a significant

unsecured creditor's motion to convert, which had been pending

for nearly three weeks.

After carefully considering the arguments of all parties,

I denied the emergency request, in part because there was

still an open issue on corporate authority that needed to be

resolved, because there were still documents that hadn't been

produced, and because dismissal would deprive PBR of the

opportunity to present its request to convert the case, which

had been on file since August 1st.

I then heard Sidley's emergency motion to withdraw as

counsel, which alleged that Sidley couldn't continue to

represent the Debtor without incurring unreasonable financial

burden and risk.  I denied that request as well, in part

because Sidley attorneys were at least partly responsible for

depositions that had to be retaken and documents that at least

initially were not produced, and because Sidley could not

explain how replacement counsel, who was never identified,

could possibly handle all the discovery obligations that would

1  be dropped in their lap and still be prepared for the

2  scheduled trial on September 2nd.

3      I concluded the hearing thinking to myself that the

4  proffered explanations for why the Debtor suddenly sought

5  dismissal and why Sidley suddenly sought to withdraw didn't

6  quite make sense.

7  F.   Now I'm going to talk about Debtor employees working for

8  Mr. McGraw and Envoy after the bankruptcy filing.

9      This is not the first bankruptcy case I've seen, either on

10  the bench or in private practice, where an insider proposes to

11  purchase a debtor's assets out of a bankruptcy.  But in the

12  other cases I've been involved with, scrupulous attention was

13  paid to avoiding any appearance that the process was being run

14  by or for the benefit of the insider.

15      But it goes beyond just appearances.  The process should

16  not, in fact, be run by or for the benefit of the insider, who

17  is clearly self-interested.

18      And in all my years of private practice and my three and a

19  half years on the bench, I have never seen a case where a

20  debtor's officers and employees were, in fact, working for the

21  insider's newly-created company that plans to acquire what's

22  left of the debtor's assets in the bankruptcy.  I've never

23  seen it until this case, that is.

24      Take, for example, TBN Exhibit 416, which is a draft Envoy

25  press release dated July 14, 2025, the title for which is "Mr.

McGraw Launches Envoy Media Company, A New Interactive News

and Entertainment Multimedia Platform."

Jerry Sharell, a public relations agent, the same one Mr.

McGraw tasked a year earlier with drafting a press release of

his anticipated self-professed gangster move against TBN,

circulated the draft on July 13th to Mr. McGraw and Mr.

McGraw's core team:  Ken Solomon, the Debtor's Chief Executive

Officer; Joel Cheatwood, the Debtor's Chief Operating Officer;

Phil McIntyre, Mr. McGraw's close personal advisor and

business consultant; and Mr. Broadbent.

Mr. McGraw did a "reply all" the same day, quarterbacking

the proposed launch date and commenting on a national

distribution from launch.  Interestingly, Mr. McGraw added,

"Gary, of course, will sign off on everything or make edits."

Mr. McGraw thus seems to have been under the impression that

part of Mr. Broadbent's job as CRO of Merit Street was to

simply sign off on Envoy press releases or edit them.

An appropriate response from the Debtor's CRO would have

been to ask to be taken off the email chain, as the Debtor's

CRO had no business signing off on Envoy press releases or

acting as Envoy's editor.  Instead, Mr. Broadbent replied all

with, "Press release looks great!"  That's TBN Exhibit 416.

At trial, Mr. Broadbent attempted to justify his response

by saying that he knew the transaction was going to be

scrutinized so it was better to have Merit Street informed of

1   what was going on at Envoy rather than be taken by surprise.

2   That's Transcript of Hearing Held September 17, 2025, Docket

3   No. 469 at Page 118.

4        That explanation was not credible.  Unfortunately, I find

5   that Mr. Broadbent was simply doing Mr. McGraw's bidding for

6   Envoy, when he should have pushed back instead and kept his

7   distance.  Mr. Solomon and Mr. Cheatwood likewise should have

8   bowed out of that email discussion, since at the time they

9   were solely employees of Merit Street.

10       There are other examples, such as Mr. Cheatwood creating

11  staffing plans for Envoy while an officer of Merit Street,

12  negotiating salaries for Envoy employees, setting up Envoy

13  bank accounts, setting up Envoy domain names, negotiating a

14  MediaCo lease, and addressing MediaCo facility matters.  *See*

15  Transcript of Hearing Held September 22, 2025, Docket No. 516

16  at Pages 66, 67, 70 and 71, 77, and 88.

17       Mr. Cheatwood's general testimony, including his proffered

18  explanations, including that Merit Street wasn't harmed, was

19  not entirely credible, as I lost count how many times he was

20  impeached with his prior deposition testimony.

21       Finally, near the end of July, somebody must have told Mr.

22  Cheatwood to back off, at least publicly, the work for Envoy,

23  as he noted in a July 28th text message, "My dilemma is this.

24  As a remaining officer of MSM, I've been advised not to do

25  anything public to indicate an attachment to Envoy.  That's

1    about to change, but as yet hasn't."  That's TBN Exhibit 498.

2         The thing that evidently was about to change was that Mr.

3    Cheatwood and Mr. Solomon finally signed consulting agreements

4    with Envoy on August 2nd, making their allegiance to Envoy

5    public and official rather than secretive.  *See* Transcript of

6    Hearing Held September 17, 2025, Docket No. 469 at Page 204.

7         To put it charitably, it wasn't the greatest business

8    judgment for Merit Street officers Broadbent, Cheatwood, and

9    Solomon to work for Envoy while simultaneously contesting

10   allegations from TBN and PBR that the Debtor's CRO and other

11   officers are conflicted and attached at the hip to Mr. McGraw.

12        Could I do a quick sound check?  I'll take anybody.  Mr.

13   Moore?  Mr. Bankler?

14            MR. BANKLER:  We can hear you.

15            MR. RUDD:  Yes, we can hear you, Your Honor.

16            THE COURT:  All right.  Thank you.

17        Unfortunately, Mr. Broadbent's credibility and his

18   professed independence from Mr. McGraw and Peteski took an

19   even more serious and abrupt hit when I asked Mr. Broadbent

20   some simple and direct questions near the end of his testimony

21   at trial on September 17th.

22        After noting the benefits of a Chapter 7 bankruptcy,

23   including an automatic stay, centralized litigation, and 363

24   sales, over the free-for-all of dismissal, I asked Mr.

25   Broadbent why he thought dismissal was preferable to

1   conversion to Chapter 7, as he previously testified.  Mr.

2   Broadbent admitted that a dismissal would free him to give

3   another judge another bite at the apple, which was another way

4   of saying he wanted to file bankruptcy elsewhere to get a

5   judge who might give him different rulings on the DIP loan and

6   discovery matters.  Transcript of Hearing Held September 17,

7   2025, Docket No. 469 at Page 219.

8       That answer heightened my concern that Mr. Broadbent might

9   be yielding to a demand from Mr. McGraw to dismiss the case to

10  protect Mr. McGraw's personal interests, rather than put the

11  bankruptcy estate in the hands of a neutral trustee.

12      I then asked him some questions about the abrupt attempt

13  to dismiss the case in mid-August and whether he communicated

14  with Mr. McGraw about whether to dismiss or convert the case

15  at that time.  As I was asking Mr. Broadbent these questions,

16  I was laser-focused on his demeanor.  He became increasingly

17  uncomfortable answering the questions, and there were pregnant

18  pauses during his answers.  One of those pauses is even noted

19  in the transcript.  I could tell that he did not want to

20  answer the questions.  I'm going to quote the exchange now:

21      "Q   I know they're -- I understand, but you rank

22      dismissal above conversion to Chapter 7?

23      "A   Yeah, I would.

24      "Q   Okay.  And so earlier in the case, there was a

25      request to consent to the dismissal.  Do you remember

1    that?

2    "A   Yeah.

3    "Q   And that's kind of where I'm headed with this.   I

4    was a little perplexed why the Debtor was consenting to

5    a dismissal at that point as opposed to converting to

6    Chapter 7.   Did Mr. McGraw consult with you or did you

7    talk with him about that consent to dismissal?

8    "A   I don't think so.   I'd have to look at the board

9    meetings, but I know I talked a lot with our

10   restructuring advisors on that.   I --

11   "Q   Was there communication between Mr. McGraw on his

12   side and you on the other side regarding dismissal

13   versus conversion?"

14   (Pause).   And the transcript reflects the word "pause."

15   "THE WITNESS: I don't remember one.   I remember talking

16   to our restructuring advisors, but I don't remember

17   them channeling any message from Mr. McGraw."

18   "BY THE COURT:

19   "Q   Are you aware of any communications between Mr.

20   McGraw, Peteski on the one hand, and either you or your

21   professionals about whether it would be better to

22   consent to a dismissal versus convert to a 7?

23   "A   I think the advice that we -- that I received from

24   our advisors --

25   "Q   So I don't want -- I'm not trying to get into

1      privileged communication, so I don't want to know what

2      your lawyers --

3      "A    Sure.

4      "Q    I'm asking, do you know if there were

5      communications between you and your counsel on the one

6      hand and Mr. McGraw and his counsel or other

7      restructuring advisors on whether it was better to

8      dismiss the case or convert it to a 7?

9      "A    I don't know.  I don't know if they -- I'm sure

10      they talked about it, but I don't know the content of

11      those conversations.

12      "Q    You are sure that they talked?

13      "A    I guess I should be more careful with my words.  I

14      presume that they talked, but I don't know what was

15      said between them."

16      That's Transcript of Hearing Held September 17, 2025,

17      Docket No. 469, Page 220, Line 19, through Page 222, Line 8.

18      Mr. Moore for TBN then jumped out of his chair at

19      lightning speed and proceeded to impeach Mr. Broadbent, whose

20      demeanor changed instantly and suggested he knew he had just

21      been busted.  Mr. Moore first started with these questions:

22      "BY MR. MOORE:

23      "Q    All right, Mr. Broadbent.  Did the Debtor's Board

24      of Directors have a meeting on August 17, 2025, where

25      voluntary dismissal was discussed?

1    "A    We may have. I'm not sure. I can't remember.

2    "Q    Okay.    And    was    Mr.    McGraw    present    for    that

3    meeting?

4    "A    I'm not sure.

5    "Q    Was Jackson Walker present for that meeting?

6    "A    I don't know."

7    Transcript of Hearing Held September 17, 2025, Docket No.

8    469 at Page 223.

9    Mr. Broadbent's answers were abrupt and defensive, and his

10   sudden memory lapses that started with some of my questions

11   and continued with Mr. Moore's questions were completely at

12   odds with his earlier trial testimony, where Mr. Broadbent

13   exhibited a vast and impressive knowledge and memory of

14   detailed events, both prior to and during the bankruptcy.

15   Mr. Moore then showed Mr. Broadbent TBN Exhibit 532, which

16   are minutes of a meeting of the Board of Directors of Merit

17   Street dated August 17, 2025, just one month before Mr.

18   Broadbent's trial testimony.  The minutes reflect that it was

19   a large and robust meeting.  The board members present were

20   Mr. Broadbent and Mr. McGraw.  The minutes reflect many others

21   participating as well:  four attorneys from Sidley attended;

22   four attorneys from Jackson Walker attended; four

23   representatives of Portage, the Debtor's financial advisor,

24   attended, including Coley Brown, who testified at trial about

25   the Debtor's liquidation analysis; and Ken Solomon, the

1   Debtor's CEO, and Joel Cheatwood, COO, also attended.

2        According to the minutes, the video-teleconference meeting

3   started at 3:00 o'clock p.m. and lasted a full hour.  I'm

4   going to quote the minutes at length:

5        "Upon the presence of a quorum of the Board, Mr. Venter

6   began by providing an overview of certain materials attached

7   hereto as Exhibit A (the "Discussion Materials").  Mr. Venter

8   recounted the rulings of the bankruptcy court since the last

9   board meeting and described their potential impact on the

10  Company's pursuit of a value-maximizing Chapter 11 process.

11  Questions were asked and answered, and a discussion ensued.

12  The Board concluded that a path forward under Chapter 11 had

13  become increasingly infeasible in light of recent court

14  rulings.

15       "Mr. Venter then provided an overview of the mechanics and

16  merits of a hypothetical (i) dismissal of the Company's

17  Chapter 11 case, and (ii) conversion of the Company's Chapter

18  11 case to a case under Chapter 7.  Questions were asked and

19  answered, and a discussion ensued regarding the relative

20  merits of each option, with the Board weighing the (i) the

21  flexibility each option afforded the Company to react to

22  unforeseen developments, and (ii) the estimated return to

23  creditors under each option.  The Board expressed support for

24  dismissal of the case.

25       "II.  Adjournment.  There being no further business to

come before the Board, the meeting was adjourned at 4:00

o'clock p.m. Eastern Time."

One of the slides attached to the Discussion Materials

that were attached to the minutes is called "Voluntary

Dismissal," which is followed by redactions for a claim of

privilege.  Although Mr. Broadbent testified that he didn't

think they went through the Discussion Materials attached to

the minutes with Mr. McGraw in the room and that they went

through those Discussion Materials only in a Special Committee

meeting after the full board meeting, his testimony was not

credible and is contradicted by the board minutes themselves.

Mr. Ducayet tried to salvage the situation by asking Mr.

Broadbent whether, having now read the minutes, he remembered

Mr. McGraw or Jackson Walker making any sort of direction to

him about whether to seek dismissal or seek conversion.  Mr.

Broadbent, who just minutes before when I questioned him

denied having any discussion with Mr. McGraw and his

professionals about conversion or dismissal, and then

alternatively not remembering one, suddenly answered with a

definite and firm conviction:

"A    Absolutely not, no.

"Q    Who made that decision?

"A    I did."

*See* Transcript of Hearing Held September 17, 2025, Docket

No. 469 at Page 228.

1      Mr. Ducayet then went on to show Mr. Broadbent Debtor's

2  Exhibit 80, which are the minutes of the meeting of the

3  Special Committee of the Merit Board, which met immediately

4  after the full board meeting.  The minutes reflect that Mr.

5  McGraw and the Jackson Walker attorneys were not in that

6  meeting, but the minutes also explicitly state that Mr.

7  Broadbent considered the input of the full board -- that is,

8  Mr. McGraw.

9      Now, with Mr. Ducayet's prompting, Mr. Broadbent recalled

10  very specifically and without hesitation that, after the

11  discussion at that Special Committee meeting, he wanted to

12  seek dismissal because of the lack of funding to pay

13  increasing administrative expenses.

14      The whole episode was very disappointing to me, and I'll

15  repeat what I said at closing arguments:  I lost sleep over

16  Mr. Broadbent's testimony, and I've lost sleep writing this

17  part of my ruling, which I didn't enjoy or appreciate having

18  to write.

19      The full board meeting on August 17th, exactly one month

20  before Mr. Broadbent's September 17th trial testimony, would

21  have been one of the most memorable events of the case, if not

22  the most memorable.  It was a stressful time not only for me,

23  but for the parties and the attorneys as well, as both the

24  Sidley law firm and the Jackson Walker law firm made it clear

25  they were exasperated that I would only consider further

interim DIP financing to pay necessary operating expenses and

not to prefund attorney fee accounts before we reached

resolution on the motions to dismiss, convert, or appoint a

trustee.

The August 17th board meeting was such a drastic event

that it prompted not only an emergency request to dismiss the

case, but also an emergency backup request by Sidley to

withdraw as counsel, both of which were heard on August 19th.

In short, the dramatic August 17th board meeting, the very

purpose of which was to discuss dismissal versus conversion,

was an event that an intelligent, experienced, and competent

CRO would not forget in one month, or a year, or even ten

years.  Yet on September 17th, when I asked Mr. Broadbent

directly whether he ever had such a communication, he first

denied it and then said he couldn't remember.

I've always considered myself a straight shooter.  I don't

always ask questions on the bench, but when I do, I don't

think it's expecting too much to expect straight answers, and

I didn't get them from Mr. Broadbent.

When I consider Mr. Broadbent's demeanor while testifying,

the subject of his testimony, and the memorable events leading

up to his testimony, I find that Mr. Broadbent's testimony did

not satisfy the duty of candor that he has to the Court.  For

some reason, when put under the spotlight, Mr. Broadbent

thought it was more important to shield from the Court his

communications with Mr. McGraw regarding the emergency request
to dismiss the case.

Further, his testimony regarding the full board meeting
and the Special Committee meeting throws a shadow of doubt
over all his trial testimony, including that involving his
independence from Mr. McGraw and his apparent work for Envoy
after the bankruptcy filing.

Before I turn to my legal conclusions, I'll finish this
background discussion by noting that, even after retaining Mr.
Broadbent as CRO, Mr. McGraw continued to make Alexander Haig-
like statements, asserting control over the bankruptcy and the
litigation against TBN.  At trial, Mr. McGraw testified, "My
attitude is you don't — you don't hire a brain surgeon and
then hold a mirror to see if you can coach him through doing
it."  Transcript of Hearing Held September 25, 2025, at Page
44, Docket No. 524.

That testimony was not credible.  There are numerous
examples after Mr. Broadbent was retained as CRO of Mr. McGraw
purporting to call the shots rather than the other way around.
Here are a few:

Mr. Cheatwood stated that "Dr. Phil led the [June 24th or
25th] discussion [about whether to file bankruptcy], along
with the attorneys from Jackson Walker."  Transcript of
Hearing Held September 22, 2025, Docket No. 516 at Page 17.

When asked if Mr. Cheatwood's testimony about the June

1  24th or 25th discussion was accurate, Mr. McGraw said, "You

2  can take it as gospel."  Transcript of Hearing Held, September

3  25, 2025 [Court correction], Docket No. 523 at Page 154.

4      When Mr. Cheatwood asked Mr. McGraw if he still wanted to

5  "talk to the talent tonight in advance of tomorrow's all

6  hands," -- the meeting where Merit Street fired almost all of

7  the remaining Merit Street employees -- Mr. McGraw said, "I

8  still have to write our pleading.  You talk to the talent,

9  please."  TBN Exhibit 320.

10      "I am filing suit against TBN at 12:01 a.m., as in three

11  hours from now."  TBN Exhibit 330.

12      "I am also filing Chapter 11," which will "wipe out PBR's

13  claim against MSM, but our claim against them will survive."

14  TBN Exhibit 330.

15      Mr. McGraw told Judge Aquilina on July 4th that "I filed

16  suit," "I also then filed Chapter 11," and more.  TBN Exhibit

17  373.

18      Mr. McGraw made those same statements to Former NYPD Chief

19  John Chell on July 4th, and that's found at PBR Exhibit 282.

20      During his direct examination by Mr. Secco, Mr. McGraw

21  attempted to explain away his usage of the pronoun "I" in the

22  context of filing suit against TBN and filing bankruptcy on

23  behalf of the Debtor.  Mr. McGraw stated, "When I'm writing to

24  my friends like this, who are not sophisticated in these

25  matters or interested in a lot of the legalese, they're just

1    interested in my experience in this, I'm explaining to them

2    where I am and how I feel about this.  I was speaking about

3    this from a personal experience rather than breaking it down

4    into this entity to that entity to this entity."  Transcript

5    of Hearing held September 25, 2025, Docket No. 530 at Page 26

6    and 27.

7         But one of these friends Mr. McGraw was communicating with

8    was a sitting judge who would certainly understand the

9    legalese.

10        Mr. McGraw's explanation for his usage of the pronoun "I"

11   in the context of these statements is not credible, especially

12   when I consider the rest of the evidence from trial.  Mr.

13   McGraw believed he was calling the shots.

14                             ANALYSIS

15        All right.  Now to the analysis part of my ruling.  Before

16   I turn to my ruling, let me first address a timing issue.

17   Bankruptcy Code Section 1112(b)(3) requires that I decide the

18   motion to convert or dismiss not later than 15 days after the

19   commencement of the hearing unless the movants expressly

20   consent to a continuance for a specific period of time or

21   compelling circumstances prevent the Court from meeting the

22   time limits established in Section 1112(b)(3).

23        Compelling circumstances prevented me from meeting this

24   time limit.  Those compelling circumstances include the length

25   and complexity of the multiday trial itself, an unusually busy

court schedule in my other cases recently, and an out-of-town

family medical emergency that put me behind several days.

Some of the matters I prepared for, or ruled on, or both,

while I was either preparing for the Merit Street trial,

conducting the Merit Street trial, or working on a ruling on

the Merit Street trial, include the following:

I gave a 29-page, 157-paragraph oral ruling in mid-

September on Phase I of the Hooters confirmation hearing,

dealing with a complicated royalty dispute with a significant

creditor.

I conducted an eight-day confirmation trial in the Stoli

Vodka/Kentucky Owl cases, including a 12-page, 69-paragraph

oral ruling from the bench on October 3.

I prepared for and took under advisement two significant

and complicated Rule 12(b)(6) hearings in the McClain cattle

case.

I issued rulings in two unrelated but tricky Chapter 13

under-advisements earlier in October.

Finally, I handled my every-day, every-week hearings and

orders in countless cases in my increasingly-busy docket.

Now I'll turn to the ruling.  Under Section 1112(b)(1) of

the Bankruptcy Code, upon request of a party in interest, a

bankruptcy court "shall" convert a case to Chapter 7 or

dismiss the case, whichever is in the best interests of

creditors and the estate, for cause, unless the court

1    determines that appointment of a Chapter 11 trustee or

2    examiner is in the best interests of creditors and the estate,

3    or unless the exception in Section 1112(b)(2) applies.

4        I'll first address cause before discussing any exceptions

5    to conversion or dismissal, and among the alleged causes, I'll

6    start with the alleged lack of corporate authority to file the

7    bankruptcy.

8        Again, the Court has reminded the parties more than once

9    of the urgency of determining the authority-to-file issue,

10   given Fifth Circuit precedent holding that a bankruptcy case

11   must be dismissed if it was filed without proper corporate

12   authority.  *See Franchise Services* case, 891 F.3d 198, 206-07

13   (5th Cir. 2018).

14       My ruling on this issue is extremely narrow.  I have

15   serious concerns about whether the August 8, 2024 Stock

16   Confirmation resulted in a change of control within the

17   meaning of Section 5 of the Voting Agreement, and whether the

18   Stock Confirmation was a standalone agreement as opposed to

19   the first step in a multistep process involving a change in

20   control of Merit Street.

21       I don't need to decide those issues today because I find

22   that Trinity ratified Mr. McGraw as sole board member while

23   the parties sorted out their disagreements on ownership and

24   control of Merit Street.

25       In other words, for the limited purpose of this ruling, I

1    find that Trinity did not consent to a stock swap with its

2    ratification; it simply ratified Mr. McGraw's role as sole

3    board member for the limited purpose of exercising

4    questionable-but-consented-to authority to put in place the

5    steps for Merit Street to file the bankruptcy.  The parties'

6    rights and defenses concerning the stock swap generally are

7    fully preserved and will be decided another day.

8        Now I'll move on to the nonjurisdictional causes for

9    conversion or dismissal.  I find at least four causes to

10    convert or dismiss the case, each of which independently is

11    sufficient cause to warrant relief.

12        The first cause for conversion or dismissal:  There is

13    substantial or continuing loss to or diminution of the estate

14    and the absence of a reasonable likelihood of rehabilitation,

15    as alleged in PBR's joinder filed on August 1st.  That's

16    Docket 151.  Things have only gotten worse since then.

17        The Debtor's latest 20-week cash budget for the period

18    from the bankruptcy petition date through mid-November was

19    filed at Docket No. 392-1.  The budget reflects cumulative

20    gross collections of just $1.949 million, negative operating

21    cash flows of almost $1 million, and total restructuring costs

22    of over $20 million.  The operating revenues are swamped by

23    administrative claims, primarily either unpaid professional

24    fees or outstanding loans to pay professional fees.  This

25    negative cash flow situation alone is sufficient to establish

1   continuing loss to or diminution of the estate.  *See Loop*

2   *Corp. v. United States Trustee*, 379 F.3d 511 at Pages 515 to

3   516 (8th Cir. 2004).  *See also In re TMT Procurement Corp.*,

4   534 B.R. 912, 920-21 (Bankr. S.D. Tex. 2015).

5       Mr. McGraw and Peteski have been willing to fund the case

6   so far, and have indicated that they may release or waive

7   certain claims, in the hopes that Mr. Broadbent will be the

8   one they negotiate with for a release and in the hopes that

9   the Ribmans will be there to supervise the litigation with TBN

10  and PBR.

11      But Mr. Broadbent and the Ribmans will soon be excused

12  from any supervision in this case, likely drying up the

13  bankruptcy funding.

14      There is clear, substantial, and continuing loss to or

15  diminution of the estate.  The case has basically been an

16  expensive exercise in trying to keep control over who

17  negotiates releases for Mr. McGraw and Peteski and who

18  controls and supervises the litigation against TBN and PBR.

19      In addition, there is no hope of rehabilitation.

20  Persuasive authority demonstrates that "rehabilitation" under

21  this Code section does not mean a liquidating Chapter 11.

22  Courts have consistently understood "rehabilitation" to refer

23  to a debtor's ability to restore the viability of its

24  business.  *See Loop Corp.*, 379 F.3d at 515-516.

25      As noted by *Collier's* and the cases it cites:

1   "Significantly, the second part of the test under Section

2   1112(b)(4)(A) requires a reasonable likelihood of

3   'rehabilitation,' not 'reorganization.'  Thus, the standard

4   under Section 1112(b)(4)(A) is not the technical one of

5   whether the debtor can confirm a plan, but, rather, whether

6   the debtor's business prospects justify continuance of the

7   reorganization effort.  'Rehabilitation' is not another word

8   for 'reorganization.'  Rehabilitation means to reestablish a

9   business.  Whereas confirmation of a plan could include a

10   liquidation plan, rehabilitation does not include

11   liquidation."  That's 7 *Collier on Bankruptcy*, Paragraph

12   1112.04.

13   The second cause for conversion or dismissal:  The CRO is

14   not a neutral fiduciary but instead is conflicted in favor of

15   Mr. McGraw, as alleged in PBR's joinder filed on August 1st.

16   The evidence in support of that conflict includes Mr.

17   Broadbent's work for Envoy after the petition date, his

18   blessing of the other Merit Street officers' work for Envoy

19   after the petition date, and his disastrous attempt to shield

20   from the Court his communications with Mr. McGraw regarding

21   dismissal or conversion of this case.

22   In making this finding, I have carefully weighed the

23   evidence supporting Mr. Broadbent's independence against the

24   evidence tilting the other way.  I have also carefully

25   considered and weighed the testimony of Mr. Cheatwood, Mr.

1  McGraw, and other witnesses.

2      The third cause for conversion or dismissal:  The CRO

3  failed in his duty of candor to the Court.  This happened in

4  real-time during the trial, and it happened while I was

5  exploring a critical issue in this case -- that is, whether

6  Mr. Broadbent tried to get the case dismissed abruptly in mid-

7  August because he was either looking out for Mr. McGraw's

8  personal interests or taking direction from Mr. McGraw.

9      Pursuant to Section 105(a) of the Bankruptcy Code, the

10  Court may act *sua sponte* in dismissing or converting a case

11  under Section 1112(b).  *See In re Starmark Clinics, L.P.*, 388

12  B.R. 729 (Bankr. S.D. Tex. 2008) and *In re Munteanu*, 2007 U.S.

13  Dist. LEXIS 48233 (E.D.N.Y. Jun. 28, 2007).  *See also* 7

14  *Collier on Bankruptcy*, Paragraph 1112.04.  *Finally, see* 11

15  U.S.C. Section 105(a), which reads in part, "No provision of

16  this title providing for the raising of an issue by any party

17  in interest shall be construed to preclude the court from, *sua*

18  *sponte*, taking any action or making any determination

19  necessary or appropriate to enforce or implement court orders

20  or rules, or to prevent an abuse of process."

21      I specifically asked the parties at closing arguments to

22  address whether Mr. Broadbent's trial testimony, either

23  considered on its own or in connection with other evidence,

24  was cause to either convert the case or appoint a Chapter 11

25  trustee.  The Debtor's counsel addressed the issue in closing

arguments and did not ask for more time to consider or address the issue.  I consider the issue fully joined after sufficient due process.

Candor to the Court is critical, even at this later stage of the case.  I reviewed the proposed plan as soon as it was filed on the eve of trial, and I quickly determined that a core aspect of the plan was Mr. Broadbent's release for the estate of claims, if any, against Mr. McGraw and Peteski. Although, of course, Mr. Broadbent has qualified professionals to assist him, the buck stops with him, and it's his judgment, at least initially, whether to pursue claims or negotiate a settlement and release of claims.  Somebody else is going to have to come to court to persuade me of any settlement of estate causes of action against not only Mr. McGraw and Peteski, but other parties as well.

The fourth cause for conversion or dismissal:  Mr. McGraw's destruction of relevant evidence in his capacity as either board member of Merit Street or *de facto* officer or agent of Merit Street.  Mr. McGraw's actions violated not only a discovery order aimed at Peteski and the Debtor, but also a broader principle, that the Debtor's board members or *de facto* officers or agents should not destroy property of the estate to help them in pending litigation.

The deleted text message was not expressly raised in Trinity's and PBR's initial moving papers because it did not

1   come to light until August 26th to 28.  Even before then,

2   however, Trinity and PBR moved to compel the production of

3   emails and text messages from both the Debtor and Peteski, and

4   the issue is now one of the subjects of a pending request for

5   sanctions.

6       In addition, the deleted text was raised prominently in

7   the reply briefs of both Trinity and PBR on the issue of

8   conversion, dismissal, or appointment of a Chapter 11 trustee.

9   *See, for example*, Docket No. 413, Paragraph 51, and Docket No.

10  401, Paragraph 68.

11      All parties have been fully heard on whether Mr. McGraw

12  intentionally deleted the text message.

13      Given all the due process on the issue of whether Mr.

14  McGraw deleted the text, and given that even a cursory review

15  of the text shows Mr. McGraw acting in significant part as

16  someone calling the shots for the Debtor, I have no problem

17  adding the deleted text to the list of causes to either

18  convert or dismiss the case.

19      Now that I've determined there is cause to convert or

20  dismiss the case, I'll next determine which of those two

21  options is in the best interests of creditors and the estate.

22  The winner there by a large margin is conversion.  A Chapter 7

23  trustee can sell the media library and any remaining assets

24  under Section 363 of the Bankruptcy Code, while enjoying the

25  benefits and protections of the automatic stay.  The Chapter 7

1    trustee can then do his or her own independent investigation

2    into estate causes of action, and the trustee can also review

3    filed proofs of claim to determine which ones to object to.

4    Creditors can have faith that the process will play out fairly

5    and neutrally.

6        Dismissal, on the other hand, would allow Mr. McGraw to

7    pay his favored creditors and not pay his unfavored creditors,

8    as his own deleted text makes clear he wants to do.  Dismissal

9    would also allow the Debtor or friendly creditors to file

10   another bankruptcy case in a different jurisdiction to try to

11   get different rulings that favor Mr. McGraw and his interests,

12   including on the pending sanctions motion that I've yet to

13   rule on.

14       Next, I'll address whether conversion to Chapter 7, or

15   instead appointment of a Chapter 11 trustee or an examiner, is

16   in the best interests of creditors and the estate.  This one

17   is a closer call, but the nod goes to Chapter 7 for a few

18   reasons.

19       First, what's left in this case is the sale of a media

20   library, and litigation, and not much else.  A Chapter 7

21   trustee can handle those matters more efficiently and at lower

22   cost compared to a continued Chapter 11 with the attendant

23   expenses of estate professionals for both a debtor and a

24   committee.

25       In making this determination, I have carefully weighed the

1    potential benefits and detriments of having new counsel with

2    limited knowledge of the case, yet with fresh eyes, come in

3    for the Chapter 7 trustee.  Overall, I think fresh eyes are

4    needed.

5         I have also carefully considered that there is normally a

6    dramatic difference between appointment of a Chapter 11

7    trustee and conversion to Chapter 7 when the debtor is an

8    operating company with a viable business and employees' jobs

9    are on the line.  There simply is not that type of dramatic

10   difference here, where the Debtor's business was as dead as a

11   doornail when they filed bankruptcy and nearly all the

12   Debtor's employees were fired on day one.  There's a media

13   library to sell, and litigation, and like I said, not much

14   else.  We're now talking about a Chapter 11 liquidator versus

15   a Chapter 7 liquidator.

16        Second, I've talked until I'm blue in the face about the

17   Ribmans, why they shouldn't be on the Committee and why they

18   shouldn't supervise litigation against PBR and especially TBN

19   going forward under the proposed plan, even if a Chapter 11

20   trustee were to adopt that plan.  I do not intend to reopen

21   the discussion in a continued Chapter 11 where I would then

22   face more contested issues and the estate would thus incur

23   even more administrative expenses when I consider *sua sponte*

24   removal of the Ribman Trust from the Committee under

25   Bankruptcy Code Sections 1102(a)(4) and 105(a) and when I

decline the Ribmans a role in the Litigation Advisory

Committee contemplated under the plan.  I've completely run

this issue to ground, and conversion to Chapter 7 has the

added benefit of not reviving it.

Third, although the Committee supports a Chapter 11

trustee over a Chapter 7 trustee, I give at least as much

weight on this issue to the voice of PBR, which has a

significant asserted unsecured claim.  In weighing these

competing voices, I have specifically considered the fact that

PBR is in litigation with the estate.  All the evidence to

date leads me to believe that PBR is still considering the

best interests of unsecured creditors in this trial, even

though it also has its own litigation interests to consider.

Finally, appointment of an examiner would not be helpful

at this point.  We've had a full trial on the relevant issues.

There is nothing left to examine that a Chapter 7 trustee

can't do.  Also, appointment of an examiner would not address

the corporate governance issues I'm concerned about.

Next, I'll address whether the exception in Bankruptcy

Code Section 1112(b)(2) applies and thus prevents conversion

to Chapter 7.  Under this subsection, the court may not

dismiss or convert the case to Chapter 7 if it specifically

finds that unusual circumstances establish that dismissal or

conversion is not in the best interests of creditors and the

estate and an objecting party establishes that (1) there is a

reasonable likelihood that a plan will be confirmed within a

reasonable time; (2) the cause for dismissal or conversion is

other than continuing loss to or diminution of the estate

without reasonable likelihood of rehabilitation; and (3) there

is a reasonable justification for the act or omission of the

debtor constituting cause, and the act or omission will be

cured within a reasonable time.

The first condition that must be satisfied to stop

mandatory conversion is that I must specifically find unusual

circumstances establishing that conversion is not in the best

interests of creditors and the estate.  Although there are

unusual circumstances in the case, they favor conversion and

not the current Chapter 11.

At this point, and notwithstanding able counsel for the

parties, the Chapter 11 case is a broken three-legged stool.

The first leg is Mr. McGraw, who deletes unfavorable text

messages he doesn't want me to see, who vows to pay favored

creditors no matter what the Court does, and who vows to wipe

out unfavored creditors.

The second leg is Mr. Broadbent, who worked for Mr.

McGraw's newly-created company after the petition date without

pushing back and who didn't give me honest and direct answers

to direct, simple questions.

And the third leg is a Creditors' Committee, half-composed

of the Ribmans, who enjoy a favorable payment guaranty from

1   either Mr. McGraw or the Debtor no matter what the Court does,

2   and who enjoy the right under the proposed plan to supervise

3   litigation Mr. Ribman allegedly helped instigate and is now

4   deeply enmeshed in.

5       These parties presumably want me to find the required

6   unusual circumstances based on the Chapter 11 plan that was

7   filed on the eve of trial, including the liquidation analysis

8   that purports to show that Chapter 11 is a better result than

9   Chapter 7.

10      While I very appreciate Committee counsel's role in

11  negotiating this plan, Mr. Strubeck himself acknowledged in

12  closing arguments that the liquidation analysis relies in

13  significant part on the testimony of Mr. Broadbent.  *See*

14  Transcript of Closing Arguments, September 29, 2025, Docket

15  No. 550 at Page 158.

16      For the reasons I've already discussed, I don't have

17  confidence that Mr. Broadbent has done a neutral, detached,

18  comprehensive investigation into the estate's claims against

19  Mr. McGraw and Peteski, or even against Trinity and PBR.  I

20  therefore give little weight to his valuation of the claims

21  and the proposed consideration to be received to settle those

22  claims.

23      I simply cannot find on this record that creditors would

24  fare better under the plan than under Chapter 7.  There are no

25  unusual circumstances to prevent mandatory conversion.

1        Even if the required unusual circumstances existed,

2   conversion would still be mandatory because the objecting

3   parties cannot possibly satisfy the second condition of

4   Section 1112(b)(2) to stop mandatory conversion.  They must

5   also establish that (1) there is a reasonable likelihood that

6   a plan will be confirmed within a reasonable time; (2) the

7   cause for dismissal or conversion is other than continuing

8   loss to or diminution of the estate without reasonable

9   likelihood of rehabilitation; and (3) there is a reasonable

10  justification for the act or omission of the debtor

11  constituting cause, and the act or omission will be cured

12  within a reasonable time.

13     One cause I have found is continuing loss to or diminution

14  of the estate without reasonable likelihood of rehabilitation.

15  That ends the inquiry.

16     What's more, two causes I have found involve purposeful

17  destruction of estate property, in violation of a discovery

18  order, and less-than-truthful testimony by Debtor

19  representatives.  There is no possible reasonable

20  justification for those acts or omissions.  That ends the

21  inquiry yet again.

22     To summarize, cause exists to convert this case to Chapter

23  7.  That alternative is better than dismissal, appointment of

24  a Chapter 11 trustee, or appointment of an examiner.  And the

25  two required conditions in Section 1112(b)(2) to stop the

1 | mandatory conversion do not exist.

2 |                         CONCLUSION

3 |     I'll wrap up this ruling with a few comments.  Mr. Ducayet

4 | suggested at closing arguments that to find cause for

5 | conversion, I would necessarily have to find a conspiracy that

6 | includes not only the respective clients but also the

7 | professionals as well as the U.S. Trustee.  I have too much

8 | respect for the professionals and the U.S. Trustee to agree

9 | with that hyperbole.  If there were a conspiracy that included

10 | all the professionals, Peteski's counsel wouldn't have done

11 | the right thing and produced the unfavorable and unflattering

12 | text message that Mr. McGraw tried to keep hidden.

13 |     If there were a conspiracy that included all the

14 | professionals, I wouldn't have received an honest and direct

15 | answer from Ms. Miller when I asked if anybody talked to the

16 | U.S. Trustee about PBR's role on the Committee.  I am familiar

17 | with the jockeying that goes on in Chapter 11s concerning

18 | Committee composition, and Ms. Miller's response didn't

19 | surprise me.  Ms. Miller did nothing wrong, and I appreciate

20 | her candor.  I'm much more bothered by the Ribmans' inclusion

21 | than PBR's exclusion.

22 |     If there were a conspiracy that included all the

23 | professionals, Mr. Ducayet wouldn't have acknowledged in

24 | response to my question before closing arguments that the

25 | claim Mr. McGraw guaranteed to pay in the deleted text message

was, in fact, the Ribman Trust claim.  I specifically recalled

and appreciated that acknowledgment as I was writing my ruling

and reviewing the transcripts, and that's one reason I asked

the attorneys to work with the court reporter to fix the

transcript that didn't correctly record that exchange.

If there were a conspiracy that included the U.S. Trustee,

Ms. Young would not have parachuted into the closing arguments

on relatively short notice to address questions I had for Mr.

Bublick, who has been the main U.S. Trustee attorney at this

trial.  Ms. Young relayed the U.S. Trustee position regarding

the Committee composition with the information available to

her at the time.

As I said earlier, my ruling is the first time I have laid

out in detail all the reasons I think it's inappropriate for

the Ribmans to sit on the Committee and to supervise post-

confirmation litigation against Trinity and PBR.  I will never

find out if the U.S. Trustee would have been persuaded by my

reasoning because the Committee will cease to exist upon

conversion.  I think I might have persuaded them, but even if

they disagreed with my analysis, I have no doubt that the U.S.

Trustee Office would act with impeccable integrity and hard

work, which is par for the course for them.

I could name other examples, but I've given enough to

demonstrate that my ruling absolutely is not a finding of a

conspiracy.  In short, there can be cause for conversion

1  without a conspiracy.  That's the case here.

2      I will end where I began.  This case is an anomaly.  And

3  for the unique reasons I've discussed at length, this case

4  will be converted to Chapter 7.  That concludes the Court's

5  ruling.  The Court will prepare its own order.

6          MR. DUCAYET:  Your Honor?

7          THE COURT:  I'm sorry?

8          MR. DUCAYET:  Your Honor, it's Jim Ducayet from

9  Sidley on behalf of the Debtors.  May I be heard briefly?

10         THE COURT:  Sure.

11         MR. DUCAYET:  Your Honor, in light of the Court's

12  ruling, we would respectfully request that you stay

13  enforcement of your pending order to permit us to take an

14  appeal.

15         THE COURT:  This is a request for a stay pending

16  appeal?

17         MR. DUCAYET:  Yes, it is.

18         THE COURT:  So, first, --

19         MR. DUCAYET:  Pursuant to Rule 8007(a).

20         THE COURT:  So, first, I'll ask -- I'm going to take

21  a short break in a minute because my throat is really killing

22  me.  But before I do, --

23         MR. DUCAYET:  Of course, Your Honor.

24         THE COURT:  -- let me hear from other counsel on that

25  request, on whether I should entertain that request now.

1              MR. BABCOCK:  Your Honor, this is Charles Babcock for

2      Peteski.  And I'm not sure whether we would appeal or not.  I

3      suspect we would.  But we certainly would want to have an

4      opportunity to talk to our client in order to make that

5      decision expeditiously.  So we would join Mr. Ducayet's

6      request for a stay for some short period of time.

7              MS. MOSCARINO:  Your Honor, this is Alyssa Moscarino

8      for PBR.  May I be heard?

9              THE COURT:  Sure.

10             MS. MOSCARINO:  Thank you.  We would request an

11     opportunity to be heard on this issue, and also to brief the

12     issue, but we will note our objection for the record to the

13     requested stay.

14             THE COURT:  All right.

15             MR. MOORE:  Your Honor, Mark Moore on behalf of

16     Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc.

17         We agree with PBR's counsel that we'd like to be heard on

18     this.  I believe that the rule referenced requires notice and

19     a hearing.  Under the Federal Rules of Bankruptcy Procedure,

20     the parties get 14 days to file their notice of appeal.  It's

21     extremely unlikely, especially given the Government shutdown,

22     that a 7 trustee would even be in place, much less would take

23     any kind of precipitous action before that 14-date period

24     runs.

25         We believe this issue needs to be fully briefed in light

1    of the Court's ruling.  We need a copy of the Court's ruling

2    to be able to determine what the position would be.  But at

3    that outset, obviously, we would oppose any stay being entered

4    today and ask to be heard on regular notice.

5              MR. WILKES:  Your Honor, this is Greg Wilkes.  We're

6    in the same boat as Jackson Walker is, in the need to be able

7    to speak with our client.

8              MR. DUCAYET:  Your Honor, if I could just briefly

9    make a comment.

10        We're happy to brief this.  I simply wanted to put

11   something on the record in view of the potential timing here.

12   You know, provided that we all have an opportunity to brief

13   this before a trustee is appointed, I think that's perfectly

14   fine.  It'll give all of us an opportunity to speak with our

15   respective clients and brief this issue fully so that Your

16   Honor can consider it.  And we're willing to do that quickly,

17   Your Honor.

18             THE COURT:  All right.  Do we have --

19             MR. BUBLICK:  Your Honor?

20             THE COURT:  Yes, there's Mr. Bublick.  I was going to

21   ask if Mr. Bublick was on.

22             MR. BUBLICK:  The U.S. Trustee stands ready to

23   appoint a Chapter 7 trustee, should the Court enter that order

24   directing the U.S. Trustee to appoint a Chapter 7 trustee,

25   Your Honor.

1              THE COURT:  All right.

2              MR. BUBLICK:  Without delay.

3              THE COURT:  All right.  Thank you, Mr. Bublick.

4         Anybody else want to weigh in?  I am going to take a short

5     break because I need -- well, I have a big bottle of water,

6     but I need to get something for my throat.  So why don't we

7     take a five-minute recess.

8         Mr. Ducayet, could you tell me, are you planning to file a

9     motion?

10             MR. DUCAYET:  Your Honor, --

11             THE COURT:  You're not suggesting that you argue that

12    now?

13             MR. DUCAYET:  No, Your Honor.  We're fine filing a

14    motion.  I simply wanted to put it on the record so that there

15    wasn't any issue with respect to the immediate appointment of

16    a trustee.  We're -- we have a motion ready to go.  We can get

17    that on file very promptly.  And as I said, we're happy to

18    brief that.

19             THE COURT:  All right.  Let me take a short recess,

20    and I'll come back out.

21             MR. DUCAYET:  Thank you, Your Honor.

22             THE CLERK:  All rise.

23        (A recess ensued from 4:26 p.m. until 4:40 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  Thank you.  Please be seated.

1      All right.  Thank you for that break.  I had a chance to

2   get a lozenge for my throat.

3      Mr. Ducayet, can you tell me timing-wise when you expect

4   to be able to file your motion?

5           MR. DUCAYET:  Your Honor, I think we could file it

6   first thing tomorrow morning.

7           THE COURT:  Say it again?

8           MR. DUCAYET:  I'm sorry, Your Honor.  We could file

9   it first thing in the morning, first thing tomorrow.

10          THE COURT:  All right.  And then, Responding Parties,

11  how much time do you think you would need to respond?

12          MR. MOORE:  Your Honor, Mark Moore on behalf of TBN

13  and TCT Ministries.

14     So, there's a couple of issues.  First, I think we need

15  the Court to enter its order.  We also need to get a firm

16  grasp of what the Court's findings and conclusions were

17  through either your written transcript or the official

18  transcript of the hearing.  That seems to be a gating issue to

19  staying your ruling if we don't have a copy of what your

20  ruling is, but I understand that the Debtor wants to move

21  quickly.

22     But then, third, the Court has now found, at least we can

23  all understand, cause for conversion of the case to Chapter 7.

24  The United States Trustee's Office has indicated that it is

25  ready, willing, and able to appoint a Chapter 7 trustee upon

1   entry of your order converting the case.

2       In the absence of a stay, that order will not be stayed,

3   so we'd like the United States Trustee to move forward with

4   that, understanding that there's very little risk, or

5   believing that there's very little risk, if any, that any

6   precipitous action is going to be taken before the Court --

7   or, before the Court could hear, potentially grant or

8   potentially overrule the motion for stay pending appeal.

9       As far as if a motion is filed tomorrow, our staff at

10  Foley obviously will work as quickly so we can with our

11  clients to get a response on file.  I suspect, without having

12  spoken to the client, we could probably do that by Monday.

13  But, again, we don't actually know yet what the basis for that

14  motion for stay pending appeal is going to be because we don't

15  even have your order.

16      So those are some of the concerns that we have, both with

17  the process that is underlied by a motion, or what seems to be

18  an oral motion, but then also the circumstances of the case,

19  where you've now ordered that conversion is appropriate, the

20  United States Trustee says that they can appoint a 7 trustee.

21          THE COURT:  So help me with that.  If I were to enter

22  the order immediately and the U.S. Trustee appoints a Chapter

23  7 trustee, and then we have a hearing on a motion for stay

24  pending appeal, going down the decision tree, if I deny it,

25  then the Chapter 7 trustee stays there.  If I grant it, then

1    what?  Who's in control of the Debtor at that point?

2            MR. MOORE:  Your Honor, I believe that the procedural

3    impact would be that you stay your own order, which means

4    that, functionally, the Debtor-in-Possession remains in

5    possession, assuming that you order a stay, and the 7 trustee

6    is not in place and is not in authority.

7        But your order is your order until it is stayed or

8    overturned on appeal.  So it's kind of taking chicken or egg,

9    whether you should -- I think what the Debtor is asking you to

10   do is to not enter your order, or to enter your order but then

11   kind of order the United States Trustee not to act on it.  And

12   that doesn't seem procedurally proper, either.

13           THE COURT:  So, Mr. Bublick, can you tell me, just

14   logistically, if I were to enter the order today and have the

15   normal language about the U.S. Trustee is ordered to appoint a

16   Chapter 7 trustee, how long does that process take?  I know it

17   doesn't take long, but can you help me understand maybe a

18   little more granular-like how long that takes?

19           MR. BUBLICK:  Your Honor, if I could just have a

20   moment with my client?

21           THE COURT:  Sure.

22       (Pause.)

23           MR. BUBLICK:  Your Honor, it does depend on the

24   Clerk's staff as well, given that they are understaffed at the

25   moment as well.  So we believe it probably would be tomorrow

1    morning, at the earliest.

2              THE COURT:  So if I enter the order today, then at

3    some point tomorrow morning you would select a trustee and

4    then -- I just don't know, I should know this because I did a

5    smaller amount of Chapter 7 trustee work, but how long does it

6    take to select someone, notify them?  And then obviously

7    they're going to have to start doing stuff if I don't stay the

8    order.

9        So I guess I'm struggling a little bit with how that would

10   play out logistically.  If I enter the order and the U.S.

11   Trustee does their thing and appoints a Chapter 7 trustee, and

12   then I stay the order, again, this goes back to Mr. Moore,

13   then what happens?  Does the Chapter 7 trustee not do

14   anything?  Because then there's an order in place, and then

15   the Chapter 7 trustee will have duties.  Do I then say, But

16   don't do anything, just let the current management stay there?

17             MR. MOORE:  I think that's a question for the Court,

18   frankly, about what you would want your stay order to look

19   like.

20       If there are let's call them ministerial actions that a

21   Chapter 7 trustee could take pending a denial, hypothetical

22   denial of the motion to stay, such as get their hands wrapped

23   around what the assets of the estate are, or to understand who

24   the parties are, things of that nature, then those actions

25   seem like they're still appropriate to be taken.

1      But what you're faced with now is you have found cause.

2  The Debtor wants you to do basically a *de facto* stay of your

3  finding of cause so that they could file a motion they've not

4  yet filed and then have it ruled on expeditiously, which I

5  understand at one point, but then also puts us in a box of

6  having to respond expeditiously.

7      And it seems like this could be dual-tracked, where you

8  get a Chapter 7 trustee.  Assuming the Chapter 7 trustee

9  doesn't sell anything, settle anything, or give anything away,

10  it doesn't seem like it would be prejudicial to anyone for

11  that person to be there.  And then the Court can ultimately

12  rule on whether you want to stay your own order that appointed

13  that person in the first place.

14      THE COURT:  Let me ask Mr. Bublick to weigh in on

15  that.  Because once they appoint a Trustee, I know they have

16  duties, they have to start doing stuff, protecting the estate.

17  Mr. Bublick, how would that play out?  I guess I can craft a

18  bespoke order, but I'm trying to figure out how that would

19  work.  If I enter an order requiring you to appoint a trustee,

20  you then appoint a Chapter 7 trustee, can the order then say,

21  But don't do anything?  I think that seems potentially

22  problematic.

23      MR. BANKLER:  Your Honor, may I make an offer?  I'm

24  not trying to interrupt Mr. Bublick, but I think I can propose

25  a solution to the question that you're asking, if you'll allow

1   me.  Or I'll wait if Your Honor would prefer for me to wait.

2            THE COURT:  No, go ahead.

3            MR. BANKLER:  I think one of two solutions might be

4   in order, Your Honor, neither of which would impact the bigger

5   issues that Mr. Moore is talking about, which is getting the

6   order entered and having time to properly brief and understand

7   a full stay pending appeal.  That's a bigger issue.  As Mr.

8   Moore said, it probably needs to be briefed and heard on an

9   expeditious but slower timeline than figuring out here this

10  afternoon.

11      So what I would propose, Your Honor, would be one of two

12  things.  One, your order becomes effective on a date later

13  than today; or two, you enter a temporary administrative stay

14  of your order.  Not a stay pending appeal, a temporary

15  administrative stay, so that a Chapter 7 trustee is not

16  appointed, for example, tomorrow morning and then we end up in

17  the weird scenario that Your Honor seems to be struggling

18  with.  Or we would all be struggling with.  I'm not trying to

19  point out Your Honor.

20      But, that way, we don't have a Chapter 7 trustee then

21  appointed with duties but we all know that we're trying to

22  brief and have Your Honor hear a motion for stay pending

23  appeal.

24      So if Your Honor were to just enter a temporary

25  administrative stay of your own order, that seems to be a

1    solution that could buy us the time to properly brief and hear

2    the issues before Your Honor.

3            THE COURT:  What would the administrative stay --

4            MR. MOORE:  Your Honor, if I may briefly respond?

5            THE COURT:  Yes.  What would the administrative stay

6    of my order, what would that say?

7            MR. BANKLER:  It would just say that your order is

8    not effective until the motion for stay pending appeal can be

9    properly briefed and heard before the Court.  Something along

10   those lines, Your Honor.

11           THE COURT:  All right.

12           MR. MOORE:  Your Honor, I think --

13           THE COURT:  Well, first, --

14           MR. MOORE:  I apologize, Your Honor.

15           THE COURT:  No, that's okay.  Let me hear from --

16   well, go ahead, Mr. Moore, and then I'll go to Mr. Bublick.

17           MR. MOORE:  Again, Your Honor, this seems like it's a

18   very chicken-and-egg sort of situation.  What MSM and Peteski,

19   and I understand they're not necessarily aligned right now

20   because this just came up, but what they're effectively saying

21   is you found cause, you are going to enter an order, but that

22   order shouldn't have meaning until something else happens.

23       This issue has been fully briefed about whether to

24   convert, dismiss, appoint a Chapter 11 trustee.  You have

25   heard all of the evidence related to that issue.  What they're

1  trying to do is short-circuit that order by basically jumping

2  an appeal to the front of the line and assuming the validity

3  of that appeal.

4      Your order is your order until it is disturbed on appeal

5  or stayed by you or someone else.  So your order needs to be

6  entered.  Your order needs to be effective.  And the United

7  States Trustee's Office should be acting upon that order, just

8  like it would any other conversion order, until you decide

9  otherwise at a future time.

10     And I hear the Court's concern, and I understand it,

11 because we share the concern of, if you don't act on the

12 order, then you effectively have a debtor that's in purgatory,

13 with management that the Court has now repeatedly questioned

14 their candor and the reasons why they're taking certain

15 actions.

16     So we are very concerned that if the Court has found this

17 cause and the Court has determined that it's necessary to take

18 this step, which you have, that there be any delay in that

19 step, unless you subsequently find cause or a reason to stay

20 your own ruling that you just read to the court over the last

21 two hours and forty-five minutes.

22          THE COURT:  All right.  Mr. Bublick, what are your

23 thoughts?

24          MR. BUBLICK:  Your Honor, as to your earlier

25 question, the U.S. Trustee would, if she were directed to

1 appoint a trustee, would choose a trustee off the next

2 rotation, and we would immediately be in contact with that

3 person so they can move forward expeditiously.  And,

4 obviously, that once they were -- once they did receive that

5 appointment, they would immediately have -- they would take

6 over the bank accounts, change the locks, and proceed with all

7 those duties and powers.

8        THE COURT:  And so that's what I'm struggling with a

9 little bit.  An administrative stay.

10       MR. DUCAYET:  If I could, Your Honor, I think what

11 Mr. Bankler suggests makes eminent sense, which is you issue

12 your order, you issue an administrative stay to permit the

13 parties to brief the motion for a stay, and then decide that

14 motion.  I think that protects everybody.

15     The concern, obviously, that we have is, like you said,

16 we're in purgatory.  But, frankly, a concern that we're going

17 to lose standing and thereby sort of lose the ability to

18 appeal this order at all.

19     And so that's why we made this request.  We want to make

20 sure that we have the ability to preserve our appeal, should

21 we -- should we present it to the District Court.  This allows

22 you to effectuate your order.  It allows for the parties to

23 brief the motion to stay in a little bit, you know, a better

24 time.  And then Your Honor can decide one way or the other one

25 whether you're going to grant the stay or not.

1      But all of this I think can be done without the need for a

2  trustee to step in and take over the bank accounts and change

3  the locks on the doors and the like.  Your Honor will still

4  have the order out there.  It will just be temporarily stayed

5  while the parties brief this issue.

6          THE COURT:  And I'm struggling --

7          MR. MOORE:  Your Honor, the threat of locking the

8  doors or keeping people out of a certain place would be

9  highlighted in a normal Chapter 11 case where you had an

10  operating debtor.  The only operational location of the Debtor

11  that I'm aware of is TBN's PLEX studio that has not been

12  occupied by the Debtor for almost four months.  The Court has

13  made multiple findings about how there is not an operational

14  debtor in this situation.  The Debtor entered bankruptcy on a

15  liquidation posture with no legitimate prospect of

16  reorganization.

17      So the fear that you might ordinarily have as a debtor of

18  losing the value of an ongoing operation is not present in

19  this case.  Full stop.  In fact, if you stop their operations,

20  the testimony at trial was they would actually not lose money.

21  They would not gain money, but they would lose less, I guess

22  is the better way to put it.

23      And while I understand the concern that the Debtor has,

24  once again, the order is the order.  The Court has issued its

25  ruling.  The order needs to be entered and followed upon,

1   unless the Court orders otherwise subsequently.

2        And this idea of an administrative or prudential stay, I

3   don't know the justification for that under the circumstances

4   or under the Bankruptcy Code.

5            MR. WILKES:  Well, Judge, may I be heard on this?

6            THE COURT:  Sure.

7            MR. WILKES:  This is Greg Wilkes.  I think Your Honor

8   has the ability under 9014(c)(1) to extend the 14-day

9   automatic stay under 7062 that normally applies in adversary

10  proceedings.  Your Honor has the discretion to be able to

11  extend that to contested matters, including this one.  And

12  perhaps that's the simplest way, and that may be sort of, in a

13  roundabout way, the way that Mr. Bankler was trying to get to

14  this in terms of the administrative stay.

15       But I think in terms of a procedural way, the way that you

16  would do it, Judge, is to look at 9014(c)(1), which allows

17  Your Honor to extend the other rules to the extent that Your

18  Honor determines in a contested matter.  That would include

19  7062.

20           MR. MOORE:  So, as we stand here today, we're not in

21  an adversary proceeding or a contested matter where that rule

22  applies.

23           MR. WILKES:  That's not --

24           MR. MOORE:  If they were trying to change the rules

25  of the game  --

1          MR. WILKES:  That's not --

2          MR. MOORE:  -- after the game has been played, we

3  don't believe that's appropriate.

4          MR. WILKES:  Sorry, Judge.  That's not how the rule

5  works.  9014 applies to contested matters, which we clearly

6  are in.

7          MR. MOORE:  And -- and --

8          MR. WILKES:  And Your Honor has the discretion in the

9  context of a contested matter to extend the rules that

10  otherwise apply in other proceedings.

11          MR. MOORE:  Your Honor, we're extremely uncomfortable

12  with the idea that we would get through this entire process,

13  the Court would issue its ruling and make its determination,

14  the Debtor would decide that it's going to stay or attempt to

15  stay the proceeding, and then get relief in advance of that

16  stay, which is effectively to tell the United States Trustee,

17  notwithstanding that I am ordering you to appoint a Chapter 7

18  trustee, don't do it.

19          MR. DUCAYET:  And Your Honor, the point I think we're

20  simply trying to make is we could lose our right to appeal

21  entirely unless the motion is stayed, unless the order is

22  stayed.  That's the point.

23          MR. WILKES:  That's the concern.  The other concern,

24  Judge, is that the Committee, for example, might not have the

25  ability to continue any efforts that it determines it wants to

1  take in response to the order if a trustee is appointed,

2  because obviously that has dramatic ramifications for the

3  Committee.

4          THE COURT:  All right.  I think what I'm going to do

5  is sleep on it.  I'm going to sleep on it.  I will give you

6  some comfort that I'm not going to sign any order today.  I

7  have another TRO I have to address after I get off the bench.

8  I'm going to go address that TRO, get an order out on that

9  TRO, and then give it a little bit more thought on whether the

10 administrative stay or some other remedy would be appropriate

11 or not.  I understand the positions of the parties, but --

12         MR. BUBLICK:  Your Honor?

13         THE COURT:  Yes?

14         MR. BUBLICK:  I understand you will be delaying your

15 ruling.  Will you be preparing that order, or will you be

16 assigning a party to prepare that order?

17         THE COURT:  The order converting the case?

18         MR. BUBLICK:  Yes, Your Honor.

19         THE COURT:  No, we will prepare that.  We will

20 prepare that.  I'm not going to sign it today.  We already

21 have an order.  I'm not going to sign it.  It's not going to

22 be entered today.  I'm going to turn to my other TRO.  I'm

23 going to think about it overnight.

24     And then let me look at the calendar.  (Pause.)  I don't

25 know that I'm going to need to reconvene this hearing, but if

1    I do, I have some time tomorrow afternoon.  Again, I'm not

2    telling you I'm going to set something, but if I were to set a

3    status conference or something, if I have additional

4    questions, what are y'all's schedules tomorrow afternoon?

5          MR. DUCAYET:  Your Honor, from the Debtors, we can

6    have someone available at any time.

7          MS. MOSCARINO:  PBR will --

8          MR. BANKLER:  We'll be available from Peteski.

9          MS. MOSCARINO:  Sorry, Chris.  PBR will make it work.

10          A VOICE:  (overspoken), Your Honor.

11          A VOICE:  (overspoken) is available, Your Honor.

12          MR. BANKLER:  I apologize.  We're --

13          THE COURT:  No, that's all right.  I invited this.

14   So let me go to Mr. Wilkes.  I'm just going to go on the

15   *Hollywood Squares* here.  Well, to Mr. Bankler.  Mr. Bankler,

16   tomorrow afternoon?

17          MR. BANKLER:  Either myself or someone from our team

18   will make it work for sure, Your Honor.

19          THE COURT:  Okay.  Mr. Moore?

20          MR. MOORE:  Your Honor, I have a conflict with a case

21   on the West Coast beginning at 3:30 p.m. Central.  But before

22   that, completely available through the morning.

23          THE COURT:  Well, my morning doesn't look great.

24   What about 2:00 o'clock?

25          MR. MOORE:  Perfectly available, Your Honor.

1          THE COURT:  So that depends on whether my 1:30 lift

2    stay docket cooperates.

3       Mr. Cavenaugh, Mr. Babcock?

4          MR. CAVENAUGH:  Someone from Jackson Walker will be

5    available, Your Honor.

6          THE COURT:  All right.

7          MR. BABCOCK:  And Your Honor, we'll get it covered

8    one way or the other, Your Honor.

9          THE COURT:  All right.

10       (WebEx interruption.)

11          THE COURT:  Mr. Ducayet?

12          MR. DUCAYET:  Yes, Your Honor.  Someone from Sidley

13   will be there.  I can make it work.

14          THE COURT:  Okay.  Who have I missed?  Mr. Bublick?

15          MR. BUBLICK:  Your Honor, the U.S. Trustee will --

16   there will always be someone available from the U.S. Trustee's

17   Office.

18          THE COURT:  All right.  Have I missed anybody?

19          MR. WILKES:  Judge, I think you missed me, but that's

20   okay, we'll make somebody available as well.

21          THE COURT:  All right.  Thank you, Mr. Wilkes.

22       So, just keep it open.  I don't know if we're going to

23   need it or not.  I'm going to turn to my other emergency

24   matter, and then I'll give it some thought tonight.  In the

25   meantime, --

95

1            MR. DUCAYET:  Thank you, Your Honor.

2            THE COURT:  In the meantime, between now and

3    tomorrow, is there -- well, forget that.  All right.  I'm

4    going to give it some thought, and then we will notify the

5    parties if I decide we need to reconvene tomorrow afternoon.

6            MR. DUCAYET:  Thank you, Your Honor.

7            MR. BANKLER:  Thank you, Your Honor.

8            THE COURT:  All right.  Anything else for this

9    afternoon?

10            MR. DUCAYET:  No, sir.

11            THE COURT:  All right.  Thank you all.  The Court

12    will be in recess.

13            THE CLERK:  All rise.

14            MR. RUDD:  Thank you, Your Honor.

15        (Conclusion of proceedings at 5:02 p.m.)

16                              --oOo--

17

18

19

20                          CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22    above-entitled matter.

23     **/s/ Kathy Rehling**                        **10/30/2025**

24    _____        _____

     Kathy Rehling, CETD-444                        Date
25    Certified Electronic Court Transcriber

96

# INDEX

PROCEEDINGS                                                          3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                             3

     Emergency Motion for an Order: (I) Dismissing the
     Debtor's Chapter 11 Case, (II) Converting the Case to
     Chapter 7, or (III) Appointing a Chapter 11 Trustee
     filed by TCT Ministries, Inc., Trinity Broadcasting
     of Texas dba Trinity Broadcasting Network (100)

     Partial Joinder of Emergency Motion for an Order (I)
     Dismissing Debtor's Chapter 11 Case, (II) Converting
     the Case to Chapter 7, or (III) Appointing a Chapter
     11 Trustee filed by Creditor Professional Bull Riders,
     LLC (151)

END OF PROCEEDINGS                                                  95

INDEX                                                               96

# EXHIBIT C



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 18, 2025**

**United States Bankruptcy Judge**

_____

## United States Bankruptcy Court
### Northern District of Texas
### Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | **Case No. 25-80156-swe-11** |
| | § | |
| Debtor. | § | |

---

*Memorandum Decision Regarding (i) Request to Alter or Amend Judgment; (ii) Motions for Stay Pending Appeal; and (iii) Conversion of Case to Chapter 7*

---

## I.  Background

On July 18, 2025, creditors Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. filed an *Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* (the **"Trinity Motion"**) [Docket No. 100]. On August 1, 2025, creditor Professional Bull Riders, LLC filed a *Partial Joinder* in Trinity's Motion (the "**Joinder**") [Docket No. 151]. The Court conducted a multi-day trial on those requests and read its ruling into the record on October 28, 2025. Under the Court's ruling that is now transcribed at Docket No. 582 (the "**Ruling**"), the Court stated

1

its intent to convert this case to Chapter 7 pursuant to a separate order. This Memorandum Decision is not the conversion order.

At the end of the Court's ruling, the Debtor announced its intent to file a motion for stay pending appeal and requested an opportunity to brief the issue before a Chapter 7 trustee is appointed. The Court entered its *Order Preserving Status Quo* [Docket No. 579] on October 29, 2025 (the "**Status-Quo Order**"), indicating that the Court would delay entering the conversion order until the Court hears the motion for stay pending appeal, and ordering that the Debtor should not transfer estate property to any party absent further Court order.

Both the Debtor and Peteski Productions, Inc. have since filed motions for stay pending appeal [Docket Nos. 585, 589] (the "**Stay Motions**") and related briefs [Docket Nos. 586, 590] (the "**Stay Briefs**"). Trinity and PBR have filed reply briefs. [Docket Nos. 608, 609].

In its Stay Brief, Peteski argued or suggested the Court did not satisfy due process when it found as cause for conversion or dismissal (a) Mr. Broadbent's failure in his duty of candor to the Court; (b) Mr. McGraw's destruction of relevant evidence and property of the estate in his capacity as either board member of Merit Street or de facto officer or agent of Merit Street; and (c) Mr. Broadbent's not being a neutral fiduciary but instead being conflicted in favor of Mr. McGraw.

To address any concerns about *alleged* failures in due process for issues (a) and (b),[1] the Court held a precautionary due-process hearing on those issues on November 13, 2025 (the "**Precautionary Due-Process Hearing**"). Peteski and Mr. McGraw filed a brief in response [Docket No. 610] (the "**Peteski Due-Process Brief**"), as did the Debtor [Docket No. 617] (the "**Debtor Due-Process Brief**").

In addition, after the Ruling, the Darcy Lynn Ribman 1997 Trust (the "**Ribman Trust**") filed its *Emergency Motion for Entry of an Order (I) Altering or Amending Judgment, and (II) Granting Related Relief*

---

[1] The Court called it a "precautionary" due-process hearing because the Court firmly believed—and still does—that due process had, in fact, been provided. Out of an abundance of caution, the Court set the hearing to address *alleged* failures in due process.

[Docket No. 597] (the "**Ribman-Trust Motion**") on November 7, 2025, which the Court also heard on November 13, 2025.

The Court is now prepared to rule on these matters. The Court's findings and conclusions in this Memorandum Decision address the Ribman-Trust Motion and the Stay Motions. These same findings and conclusions also supplement and amend the Ruling, which is completely interlocutory and which the Court may freely amend or supplement until entry of the conversion order. Although the Debtor and Peteski have both filed notices of appeal [Docket Nos. 598, 607], those are not yet effective because the Court has not yet entered the conversion order, which will be entered only after the Court fully supplements and amends its Ruling through this Memorandum. Fed. R. Bankr. P. 8002(a)(2).

## II. Ribman-Trust Motion

The Ribman Trust requests that the Court remove from its Ruling the Court's finding that Mr. Ribman was a Ribman Trust representative and agent. According to the Ribman Trust, the Court's agency finding violates the party-presentment principle because "no party alleged, briefed, argued, or attempted to prove that Mr. Ribman acted as an 'agent' of the Trust. The issue was not raised in the Motion to Convert, any response, objection, or in the multi-day evidentiary hearing." Ribman-Trust Motion ¶ 16, at 5. The Ribman Trust also argues that the multi-day evidentiary hearing generated "no facts from which an agency relationship could be inferred." *Id.* ¶ 19, at 6. The record contradicts both arguments. The evidence at trial shows that Darcy knowingly permitted Jamie to hold himself out as having apparent authority to act for the Ribman Trust, or lacked ordinary care so as to clothe Jamie with an indicia of authority that would lead a reasonably prudent person to believe Jamie had apparent authority to act for the Ribman Trust. *Patel v. Mustang Rental Servs. of Tex., Ltd.* 719 S.W.3d 691, 699 (Tex. App.— Houston [14th Dist.] 2025) (citing *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)).

The controversy surrounding Jamie Ribman and the Ribman Trust grew exponentially when Trinity first brought to the Court's attention the deleted McGraw-to-Ribman text on August 28. At that hearing, Mr. McGraw's text containing the I-don't-care-what-the-Court-does guaranty of the Ribman Trust claim was front and center. Transcript of Hearing Held August 28, 2025, Docket No. 373 at 18, 23-27, 47-48, 61-

66, 70-71, and 79. Counsel for the Ribman Trust acknowledged that she observed that hearing, after first being retained on July 24, 2025, filing a *Notice of Appearance and Request for All Documents* on July 28, 2025 [Docket No. 140], and thereafter receiving via ECF all briefs and other filings in the bankruptcy case. At the August 28 hearing, everybody in the room, including the presiding judge, was seeing evidence that Jamie Ribman was the point man for the Trust's communications with the Debtor and Mr. McGraw. That hearing would have been a good time for the Ribman Trust's counsel to speak up and set the record straight if she thought only Darcy Ribman was authorized to speak for the Trust.[2] What's more, it was clear to everybody at that hearing that Jamie Ribman's role for the Ribman Trust was going to be a significant part of the then upcoming trial.

Since August 28, the relationship between Mr. McGraw, the Ribmans, and the Ribman Trust was addressed numerous times both in pretrial briefing, in discovery hearings and conferences, and at trial.

To start, here are just a few instances in pretrial briefing (again, which the Ribman Trust was monitoring) where Trinity and PBR alleged that Jamie Ribman was acting for the Ribman Trust or that Mr. McGraw believed Jamie Ribman was acting for the Ribman Trust and was the correct person to communicate with regarding the Ribman Trust claim. All of these examples were cited as evidence in support of cause for conversion or appointment of a Chapter 11 trustee, *none of which* the Ribman Trust disputed or raised in any sort of responsive briefing or even a comment in the courtroom.

---

[2] It is not uncommon in Chapter 11 cases for parties to appear and be heard in contested matters if their rights may be affected. The Court sees these type of "pop-ins" with some frequency. *See, e.g.,* 11 U.S.C. § 1109(b) (noting that a party-in-interest, including a creditor, may appear and be heard on any issue in a Chapter 11 case); *Truck Ins. Exch. v. Kaiser Gypsum Co.,* 602 U.S. 268, 269 (2024) (unanimously interpreting "party in interest" broadly to give standing to an insurance company, and noting that by using the words "party" and "interest," the statute was intended to cover entities that are "potentially concerned with, or affected by, a proceeding.").

- "Indeed, the Committee has walked lock step with the Debtor and Peteski during the entire pendency of this case. That is not surprising because neither Ribman nor Borden has any interest in discharging their fiduciary duties to general unsecured creditors. Around the time the Debtor filed this Chapter 11 Case, Dr. Phil guaranteed his good friends, the Ribmans, a 100% recovery on their claim against the Debtor out of his own pocket. He also invited the Ribmans to invest in Envoy." PBR Reply, Docket No. 413 ¶ 12, at 7.

    o PBR here is alleging that Mr. McGraw guaranteed the claim of his good friends Jamie Ribman and Darcy Ribman ("their claim").

- "Among the potential investors Dr. Phil approached were Darcy and Jamie Ribman, his close friends with whom he had previously shared his desire to rid the Debtor of TBN in June 2024. In December 2024, through a family trust, the Ribmans invested $5 million in the Debtor via a convertible note." PBR Reply, Docket No. 413 ¶ 22, at 11.

    o Again, PBR is alleging that both Jamie and Darcy Ribman acted for the Ribman Trust.

- "At the same time, Dr. Phil and his team were still seeking outside investors for the Debtor. On May 18, McIntyre shared with Jay that the 'collective opinion' was to close an 'investment round with Jamie [Ribman] and co asap inside Merit' while they simultaneously 'start the first phase with Soo [Kim] to move to his studio.'" PBR Reply, Docket No. 413 ¶ 28, at 13.

    o PBR here alleges that it is Mr. Ribman who was the point of contact for potential investment in Envoy in May 2025.

- "The Ribmans were not the only unsecured creditors who received a guarantee from Dr. Phil that he would personally pay their debts outside of this Court's supervision." PBR Reply, Docket No. 413 ¶ 62, at 27.

    o PBR again refers to the Ribmans together as the beneficiary of Mr. McGraw's guaranty.

- "As discussed above, Dr. Phil fully and personally guaranteed the $5 million investment of the Ribmans, whom he has described numerous times as his close personal friends. Dr. Phil also invited the Ribmans to invest in Envoy. Indeed, on the same day that Dr. Phil put the Debtor into bankruptcy, Dr. Phil (along with Broadbent) gave Mr. Ribman a preview of that potential investment vis-à-vis an exclusive VIP tour of Envoy's new facilities at MediaCo." PBR Reply, Docket No. 413 ¶ 66, at 28.

  o More PBR allegations about both Jamie and Darcy Ribman's involvement with the Ribman Trust.

- "This scheme would allow Peteski to extract the Debtor's assets and leave behind the Debtor's liabilities (other than from preferred creditors that Peteski or Envoy chose to assume or backstop, such as Committee Chair Darcy Ribman's claim for $5 million). Ironically, despite this guarantee, the Committee tries to portray itself as an impartial and independent party in this case by claiming that it 'lacks TBN's and PBR's complicated history and business relationships with the Debtor and Peteski'. Committee Reservation of Rights, ¶ 1. The Court should reject the Committee's false characterization of its member's history and business relationships with the Debtor and Peteski." PBR Reply, Docket No. 413 ¶ 91 & n. 208, at 36.

  o Yet more PBR allegations about Mr. McGraw's guaranty of the Ribman Trust claim through the deleted-text guaranty.

- "Discovery in this matter revealed that Jamie Ribman, husband to Darcy Ribman, was involved in the inception of what would become the Alleged Transfer. On June 29, 2024, McGraw texted Ribman about his 'project of getting rid of TBN!,' Ex. 1, at PETESKI0007916, following which Ribman texted back about 'Matt [Crouch] also thinking about how to extricate himself from this relationship.' Ex. 2, at PETESKI0007918. Ribman then texted talking points to McGraw prior to the meeting on July 28, 2024, between McGraw and Matt Crouch discussed below. Ribman is one of the very few creditors that received an explicit guaranty of payment from McGraw in connection with the bankruptcy proceeding *and* an offer to invest in Envoy. Ex. 3, at PETESKI0005841. Ribman was reportedly present at Envoy's

new facility on the Petition Date when MSM's Chief Restructuring Officer, Gary Broadbent, visited the facility. Simply put, the idea that a Committee containing Ribman and/or an entity closely related to him represents a completely independent, unemotional voice in the room, lacks credibility." Trinity Reply, Docket No. 401 n. 7, at 5.

> ○ Here Trinity explicitly refers to Jamie Ribman as the lucky recipient of Mr. McGraw's I-don't-care-what-the-Court-does guaranty. Based on that guaranty of the Ribman-Trust Claim, Trinity alleges that the Committee is not neutral.

- "In sum, the Committee appears to be arguing that prior, obvious bad faith at the inception of the case and/or the lack of corporate authority to even file the case, should be overlooked in light of what it characterizes as a 'remarkable about face.' In other words, pay no attention to how we got here or why. [fn. 24:] Considering he appears to be a key player in both the 'how' and 'why,' it makes sense Ribman (through the Committee) would take this position." Trinity Reply, Docket No. 401 ¶ 15 & n. 24, at 9.

> ○ Here Trinity is referring to Jamie Ribman and how Jamie Ribman, through the Committee, was taking certain positions in this case.

- After Trinity describes Mr. Broadbent as working for Mr. McGraw and Envoy, Trinity alleges this: "Furthermore, for similar reasons, the appointment and formation of the Committee does not fix this conflict-of-interest problem. The Committee is comprised of two members. The evidence is clear that at least one of those members (if not both) is a trusted confidant of McGraw and part of his 'inner' circle. It is also clear that this Committee member has some sort of investment or sweetheart deal either in MSM or Envoy that McGraw has promised will remain. As such, there is ample cause to appoint a Chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code." Trinity Reply, Docket No. 401 ¶¶ 163-64, at 74.

> ○ Here Trinity expressly alleges that Mr. McGraw's I-don't-care-what-the-Court-does guaranty—made to Jamie

7

Ribman in the deleted text—resulted in a sweatheart deal for the Committee member, the Ribman Trust, that supports cause to appoint a Chapter 11 trustee.

At trial, Mr. McGraw testified that Jamie Ribman, *speaking for the family-and-friends group*, indicated they would feel much more comfortable investing in Merit Street if TBN were not in control. Transcript of Hearing Held Sept 23, 2025, Docket No. 523 at 22. As detailed in the Ruling, Jamie Ribman then provided very specific, persuasive messaging to help with Mr. McGraw's project to get rid of TBN, thereby satisfying the family-and-friends group's desire to see Mr. McGraw in control. Then, after Mr. McGraw and Peteski gained control of Merit Street, the family-and-friends group Ribman Trust made its loan to Merit Street.

In addition, at trial, Mr. McGraw testified extensively about his text to Jamie Ribman, about his promise to pay the Ribman Trust Claim (which he described as "your investment"), and about how Jamie Ribman purportedly declined payment on behalf of the Ribman Trust. Transcript of Hearing Held Sept 23, 2025, Docket No. 523 at 91.

And right before closing arguments, when I asked counsel in attendance if the guaranteed claim referred to in the deleted text was, in fact, the Ribman Trust claim, Mr. Ducayet responded that it was. Transcript of Hearing Held Sept 29, 2025, Docket No. 550 at 11.

Finally, rewinding a bit to the first-day hearings on July 3, 2025, Mr. Venter for the Debtor represented that there were principal-level discussions taking place with the Ribman Trust and that the Ribman Trust was fully in the loop on the bankruptcy. Transcript of Hearing Held July 3, 2025, Docket No. 47 at 16. Of course, just two days before that, on July 1, in the purposefully deleted text message, Mr. McGraw was discussing Merit Street's bankruptcy strategy with Jamie Ribman and educating Mr. Ribman on the large size of the Ribman Trust claim relative to the size of the other claims in the case, an issue *critical* to appointment on a creditors' committee. *Lo and behold*, not long after those discussions, the Ribman Trust appeared on the Committee.

Is there enough evidence to show that Darcy knowingly permitted Jamie to hold himself out as having apparent authority to act for the Ribman Trust, or lacked ordinary care so as to clothe Jamie with an indicia of

authority that would lead a reasonably prudent person to believe Jamie had apparent authority to act for the Ribman Trust? Absolutely.

Moreover, by actively monitoring the briefing and observing the August 28 hearing—all of which extensively dealt with Jamie Ribman's Trust involvement—and never speaking up to set the record straight, *especially when it was obvious Trinity and PBR were teeing up the factual issue for the Court to decide*, the Ribman Trust itself recognized Jamie Ribman's authority, or at least impliedly consented to the Court's determination of the issue for purposes of the requests to convert the case or appoint a Chapter 11 trustee.

The Ribman Trust alternatively requests a new hearing on agency, alleging that this "completely new issue" was raised sua sponte by the Court in the Ruling, that no party briefed this issue, and that the Ribman Trust was deprived of notice and an opportunity to be heard on this issue. The Court's points above adequately dispel this argument. In a nutshell, the Court rejects the suggestion that the Ribman Trust is shocked—shocked—that the Court would make a finding that Jamie Ribman was the Trust's point person for communications with Mr. McGraw and the Debtor.

Even if somehow there were insufficient evidence of an agency relationship between Jamie Ribman and the Ribman Trust, the Court would still conclude—as further explained in the Ruling and as supplemented below in the Stay-Motions section—that conversion to Chapter 7 rather than appointment of a Chapter 11 trustee is in the best interests of the estate and creditors, for reasons both unrelated to fairness and directly related to fairness. Each of those reasons favors a Chapter 7. On the fairness issue, I'll echo the words of Judge Felsenthal that I noted in my Ruling: The bankruptcy process must both be fair and appear fair. Jamie Ribman was actively involved in the conduct that is being litigated and determined not only in this very ruling, but also in the related litigation with Trinity and PBR in Adversary Proceeding No. 25-8006. Absent sua sponte Court intervention and thus more time and expenses incurred in the process, Jamie Ribman's wife Darcy would continue to sit on the Committee and supervise post-bankruptcy litigation against Trinity and PBR. Conversion to Chapter 7 avoids that unseemly and unfair arrangement.

### III. Separately Identified Supplemental and Amended Findings and Conclusions

In the Ruling, the Court identified four causes for conversion or dismissal. For three of the four causes (lack of a neutral fiduciary, failure in the duty of candor to the Court, and destruction of a text), the Court intended to state that each such cause was also cause to appoint a Chapter 11 trustee. The Court states so now for the first two causes, and for bad-faith conduct—the amended fourth cause—as described in this memorandum. Lack of candor to the Court is dishonesty, an enumerated cause. Bad-faith conduct is either unenumerated cause or enumerated cause of gross mismanagement or dishonesty. *See* 11 U.S.C. § 1104(a)(1).

In addition, even if lack of a neutral fiduciary, lack of candor, and bad-faith conduct were somehow not cause to convert to Chapter 7 but were instead only cause to appoint a Chapter 11 trustee, and if no other Chapter 7 conversion cause existed, the Court alternatively would appoint a Chapter 11 trustee rather than dismiss the case or continue with current management in control. A Chapter 11 trustee would at the very least cure the lack of a neutral fiduciary and would avoid the free-for-all of a dismissal. The Court would simply have to address the Ribman Trust issue in the continued Chapter 11.

In the further alternative, absent cause under section 1112(b) or section 1104(a), the Court would find the appointment of a Chapter 11 trustee in the best interest of creditors, equity security holders, and other interests of the estate, given the skyrocketing level of distrust and vitriol among the parties. *In re Taub*, 472 B.R. 208, 227 (Bankr. E.D.N.Y. 2010); *In re Marvel Entertainment Group, Inc.*, 140 F. 3d 463, 472-73 (3d Cir. 1998).

Finally, in reviewing the Stay Motions (discussed below), which prompted the Court to (again) review the evidence and arguments of all parties, the Court came to an inescapable conclusion. There is a more comprehensive fourth cause for conversion, dismissal, or appointment of a Chapter 11 Trustee from the Ruling: Bad-faith conduct in the prosecution of this bankruptcy case by Mr. McGraw, acting for the Debtor.

Although Trinity and PBR initially alleged bad faith in the *filing* of the bankruptcy case, the focus in this case shifted dramatically on August 28, when the deleted text was revealed to the Court. Since then, an

incredible amount of time and expense was spent addressing bad-faith conduct in the *prosecution* of this case. For example, in its PowerPoint presentation for opening arguments, Trinity highlighted the requirement that there be good faith not only in the filing of a bankruptcy, but in the prosecution and confirmation of bankruptcy proceedings. Docket No. 443 at 37/94. That same PowerPoint noted the deleted text on a timeline of critical events, and the content of the deleted text itself was highlighted on its own slide. *Id.* at 68/94, 71/94.

In its pretrial briefing, PBR alleged that the Committee was not neutral due to Mr. McGraw's guaranty of the Ribman Trust claim, which PBR alleged was part of an overall scheme by Mr. McGraw to steer the case for his benefit. *See, e.g.,* PBR Reply, Docket No. 413 ¶ 12, at 7. PBR further alleged that Mr. McGraw's text guaranteeing the Ribman Trust claim appeared to have been deleted. *Id.* ¶ 51 & n.134, at 23.

Trinity noticed the motion for discovery sanctions for the days of trial [Docket No. 362], and the Debtor put the sanctions motion on the agenda for the first day of trial. Docket No. 403. At the beginning of trial, both parties gave their position on whether there was compliance with the prior order compelling production, and Trinity's counsel noted that they had tried—but failed—to get any explanation for the deleted text. Docket No. 490, at 8-11. Trinity's counsel was not interested in even more delays before starting the trial. Further, PBR's counsel noted that the missing text was "quite germane and relevant" to the issues to be tried, that Mr. McGraw was unable at a deposition to provide any sort of explanation for the deleted text, and that PBR had repeatedly asked Peteski's counsel for a forensic image of his phone or an update on their investigation on why the text was deleted, all to no avail. *Id.* at 11-12. PBR's counsel likewise stated they were not interested in further delaying the trial, noting that there was a shadow looming about the missing text. *Id.*

After Peteski's counsel said their investigation was still ongoing, the Court noted: "With this much fanfare being made about that text message it seems like today would have been a good day to have an update. I mean, there's no answer other than, we're still looking into it?" Counsel's reply: "I understand, your Honor. And that is correct." *Id.* at 15.

It smacks of gamesmanship for the Debtor and Peteski to suggest that the deleted text was relevant *only* to discovery matters when Mr.

McGraw's conduct and the deleted text was alleged to be integral to a scheme that involved—in part—hiding from the Court secret communications with Mr. Ribman that described Mr. McGraw's stated intent to wipe out the PBR and Trinity claims and give preferential treatment to the Ribman Trust claim. It seems the goal was to run out the clock on the discovery matter while the conversion trial started, profess never to have finally determined what happened to the deleted text,[3] and then feign surprise when Mr. McGraw was examined about the deleted text at trial. The deletion of the text was squarely within the bad-faith issues raised prior to trial and litigated during trial. The evidence at trial demonstrates that Mr. McGraw deleted the text because it contained highly relevant and unfavorable evidence about Mr. McGraw's inappropriate goals in this case. That's bad-faith conduct in the prosecution of this bankruptcy case.

Unfortunately, the Court confused matters by concluding in the Ruling that the intentional deletion of the text was a separate cause for conversion. It wasn't a separate cause. The issue had already been raised by PBR and Trinity prior to trial and litigated at trial, as was the issue of Mr. McGraw's control over the Debtor and this case. The Fourth cause is simply Mr. McGraw's bad-faith conduct in the prosecution of this case, which is cause to convert the case, dismiss the case, or appoint a Chapter 11 trustee.

Finally, there was abundant evidence at trial that Mr. McGraw conducted Merit Street business by text and email.[4] While writing this

---

[3] The sanctions motion was carried each day of trial and was noted on the docket for each day of trial. Docket Nos. 484, 509, 516, 517, 518, and 519. The Court never received an update. To this day, the Court has received no further update on what happened to the deleted text. Although that could have been forced by somebody setting the sanctions motion for hearing yet again, PBR and Trinity were absolutely within their rights to prove bad-faith conduct at the conversion trial by asking about the deleted text. The Court did not need to make any finding of a violation of a discovery order, and since the sanction motion was pending against only Peteski at the time, the Court amends its Ruling to eliminate that finding as unnecessary.

[4] *See, e.g.*, TBN Ex. 554 pp. 4594—4597 (Mr. McGraw texting Frank Amedia about the terms of a contract between TBN and MSM and the need for MSM to secure a bridge loan.); TBN Ex. 143 (Mr. McGraw texting Frank Amedia about "3 MAJOR issues to resolve [with] MSM: Lease, Shared Services, Distribution and just comp with Peteski."); Peteski Ex. 86 (Mr. McGraw texting Matt Crouch "as partners/shareholders

Memorandum and further considering the issue, it became clear to the
Court that there is no need (as suggested by Peteski) to halt this pro-
ceeding and hear a new adversary proceeding to determine whether the
deleted text—which on its face reflects Mr. McGraw conducting and dis-
cussing Merit Street business—is a company record and thus neces-
sarily property of the estate, or whether Mr. McGraw acted in his per-
sonal capacity when deleting it. *See, e.g.*, 11 U.S.C. § 102(1) (recognizing
that notice and a hearing means such notice as is appropriate in the
particular circumstances, and such opportunity for a hearing as is ap-
propriate in the particular circumstances).

After hearing Peteski's position at the Precautionary Due-Process Hear-
ing, the Court determines anew—without any burden of proof or persua-
sion on Peteski—that the text Mr. McGraw deleted was a Merit Street
record and thus necessarily property of the estate, and that he did it
wearing his Merit Street hat.[5]

## IV.  Stay Motions

In determining whether to grant a stay pending appeal, the Court con-
siders (1) whether the movant has made a strong showing of likelihood
of success on the merits; (2) whether the movant has made a showing of
irreparable injury if the stay is not granted; (3) whether granting the
stay would substantially harm other parties; and (4) whether granting

---

in MSM" about needing a cash injection so MSM does not lose its must carry distribu-
tion.); TBN Ex. 200 (Mr. McGraw texting Ken Solomon about how MSM can best pur-
sue litigation against TBN.); TBN Ex. 345 (Mr. McGraw texting Ken Solomon and Joel
Cheatwood an outline of the points to be told to Merit employees at a mass layoff the
day after bankruptcy was filed.). *See also* TBN Ex. 45 (Mr. McGraw emailing Frank
Amedia about deal points of a swap of MSM stock between Peteski and TBN.); TBN
Ex. 86 (Mr. McGraw emailing MSM officers and managers around two weeks after
purporting taking majority control in MSM that the MSM employees are not on the
same team as TBN and that "if you really need something done come to ME FIRST
and I will decide how to get it."); TBN Ex. 558 (Mr. McGraw emailing Brian Lidji and
MSM officers about the need to be "sure that no one at TBN is spending MSM money…
[because] [t]hey are apt to go in there first thing in the morning and write a $3+
million check to PBR.").

[5] Even without a determination on property of the estate, the Court's ruling on the
bad-faith conduct remains the same. Mr. McGraw deleted the text because he didn't
want the Court to see it and his stated intent to wipe out the claims of unfavored cred-
itors and guaranty the claims of a favored creditor.

13

the stay would serve the public interest. *In re First South Savings Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987).

None of the four factors favors a stay pending appeal.

## A. The movants have not made a strong showing of likelihood of success on the merits

The Court's findings of cause to convert to Chapter 7 are all fact-based, and three of the four (lack of candor, lack of a neutral fiduciary, and bad-faith conduct in the prosecution of this case) heavily depend on the Court's boots-on-the-ground credibility determinations.[6] *See, e.g., First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 814 (5th Cir. 1992) ("The bankruptcy judge had occasion to observe Martin and to listen to his testimony, which necessarily includes the opportunity to study any changes in both his demeanor and tone of voice. This opportunity places the bankruptcy judge in a far superior position to gauge Martin's credibility than this Court is in by merely reading the transcripts. If the bankruptcy judge finds one version of events more credible than other versions, this Court is in no position to dispute the finding. Consequently, we hold that the bankruptcy court's findings of fact are not clearly erroneous.").

The Court will respond point-by-point to the arguments in the Peteski Stay Brief and the Debtor Stay Brief regarding likelihood of success on the merits.

- **Trinity and PBR failed to establish either bad faith or the lack of a valid purpose in the filing of the Chapter 11 case.**

Although PBR and Trinity alleged a bad-faith filing, the Court's Ruling and this Memorandum do not rely on any party establishing a bad-faith

---

[6] The Court realizes that the Debtor and Peteski didn't have an opportunity to address in their Stay Motions this description of, and finding of, the amended Fourth Cause, but the Debtor and Peteski will have a full opportunity to address it on appeal and any stay request addressed to the District Court. Because there are multiple independent causes for conversion and given the administrative losses that this estate is incurring each day (causing harm to other parties, as explained below), the Court will not order another round of briefing on the Stay Motions.

or valid purpose in the *filing* of the Chapter 11 case, so this point is moot.[7]

PBR and Trinity raised and litigated the issue of whether there was bad-faith conduct in the *prosecution* of the Chapter 11 case, which the Court addresses elsewhere.

- **Destruction of information, neutrality assessments, and candor assessments are *legally* invalid grounds for cause because they don't fall within the "paradigm" of protection of the estate for the benefit of creditors, such as continuing loss to the estate and gross mismanagement. And the Court didn't even cite § 1112(b)(4) in its analysis.**

This argument is a head-scratcher. The determination of cause is inherently a factual determination, depending of course on the unique facts of each case, which is why section 1112(b)(4) is a nonexhaustive, nonexclusive list of *examples* of cause. For instance, in the Chapter 11 case of a fully operating and viable business with dozens, hundreds, or thousands of employees, it very likely would be a clearly erroneous *factual* determination that a dishonest CRO would be cause to convert to Chapter 7, resulting in the liquidation of the business and loss of jobs. It would be much more appropriate in that case to appoint a Chapter 11 trustee under the "dishonesty" cause listed in the nonexclusive, nonexhaustive list of examples of cause in section 1104(a)(1) for appointment of a Chapter 11 trustee. That way, the business wouldn't have to liquidate, and employees would keep their jobs.

But in this case, Merit Street is already a zombie of a company with virtually no employees, virtually no operations, and virtually nothing left to do other than sell a media library under section 363 and pursue litigation. Under the unique facts of this case, dishonesty is cause to remove the CRO, and Chapter 7 fits the bill much better than a continuing Chapter 11 liquidation for the factual reasons the Court has detailed at length in the Ruling and in this Memorandum.

---

[7] The Court's not so sure it would be smooth sailing for the Debtor if the Court were to undertake this analysis, as Peteski seems to suggest in its Brief. But because it's a more complicated analysis and unnecessary given the other cause findings, the Court won't do it.

For the same reasons, destruction of information and neutrality assessments might more appropriately lead to appointment of a Chapter 11 trustee rather than a Chapter 7 conversion, depending on the facts. After carefully weighing all the evidence and facts in this case, I find that conversion to Chapter 7 is more appropriate.

Finally, it is simply odd to suggest an iron-clad legal rule that "gross mismanagement of the estate" is some type of paradigm example of cause that suitably results only in Chapter 7 conversion. After all, "gross mismanagement" is also listed as an *example* of cause for appointment of a Chapter 11 trustee under section 1104(a)(1). And Peteski trivializes the need for neutral estate fiduciaries—which are critical for the integrity of the bankruptcy process—by suggesting it's merely "trial-management concerns." Peteski Stay Brief ¶ 48, at 20.

In a nutshell, facts matter. And the Court has carefully considered them before determining the appropriate remedy.

- **The Court raised ground 2, a conflicted fiduciary, sua sponte, raising due-process concerns**

This argument is just flat wrong. Trinity, in its Motion and *while Mr. Broadbent was CRO*, alleged that the estate needed an independent fiduciary, a Chapter 7 trustee. Trinity Motion ¶ 67. Likewise, PBR, *while Mr. Broadbent was CRO*, alleged in its Joinder that the estate needed an independent and disinterested Chapter 7 trustee without conflicts. PBR Joinder ¶ 26. The issue of a conflicted fiduciary and the need for an independent trustee was raised numerous other times before trial. Here are just a few samples: *See* Trinity Motion ¶ 69 ("Creditors would be best served by an independent trustee—not one that is currently under the control of McGraw/Peteski. An independent trustee (whether it be one appointed in a Chapter 11 or Chapter 7 case) will best serve the interests of all creditors and stakeholders."); Trinity Motion ¶ 72 ("[I]t is McGraw vis-à-vis Peteski that is running this Chapter 11 Case—not the Debtor."); Trinity Motion ¶ 80 ("But overall, and perhaps the most important justification here, is that the appointment [of a] Chapter 11 trustee cleanses the Debtor of all material conflicts of interest—i.e., removes McGraw/Peteski from control."); Trinity Reply [Docket No. 401] ¶ 140 (alleging as bad-faith conduct: "Worst of all, Broadbent—the Debtor's

CRO and 'Independent' Director[8]—was aware of their employment and activities for Envoy and did nothing to stop them."); Trinity Reply [Docket No. 401] ¶ 143 (alleging that bad-faith conduct—which would include the prior description of Mr. Broadbent's approval of Merit officer work for Envoy—was cause to either convert or dismiss); PBR Reply Brief [Docket No. 413] ¶ 78 (alleging as cause to convert the case Peteski's and McGraw's control over Mr. Broadbent, whose technical appointment was done merely to "cloak transactions between the Debtor and Peteski with a façade of being arm's length negotiations.").

The Court finds that the Debtor and Peteski had due-process notice that the Court might either convert the case, dismiss the case, or appoint a Chapter 11 trustee based on the issue of Mr. Broadbent's independence or neutrality, which Trinity and PBR raised before trial and numerous times since.

- **The Court raised ground 3, lack of candor, sua sponte, raising procedural due-process concerns**

The Court observed Mr. Broadbent's lack of candor in real time, during trial, when the Court was exploring whether he was conflicted. His lack of candor is now part-and-parcel of the Court's conflicted-fiduciary determination. The Court didn't need to raise whether his lack of candor was an independent cause for conversion or dismissal, and the fact that the Court did so has no effect whatsoever on the conflicted-fiduciary—ground 2—determination of cause.

But did the Court somehow violate the Debtor's (or Peteski's) due-process rights by raising whether potential dishonesty was an independent cause? The Debtor hasn't made that argument, although it's possible it may on appeal. Peteski is claiming procedural due-process concerns. Although the Court is sensitive to allegations of due-process violations, the Court finds—after carefully considering the issue—no such violations here.

This is what the Court said at closing arguments, *after* the close of evidence:

---

[8] Notice the air quotes.

THE COURT: Something I will ask you to address and I'm going to have all the parties address it. So you did, in the alternative, request appointment of a trustee. And you have alleged — you cite the statute and what potential causes could be. And you mentioned conflict of interest. You also cite trustworthiness is a factor. Something I'm going to ask all the parties to address, and I will tell you I lost sleep after Mr. Broadbent's testimony. That's generally not a good thing when the Judge loses sleep. So I have some concern that Mr. Broadbent's testimony in response to my questions may not have satisfied the duty of candor that he had to the Court.

So I'm going to ask all parties to address whether *if, and it's an if at this point, if* I find that there is not a neutral fiduciary who is willing to honor an obligation of candor to the Court, is that solely cause for appointment of a [Chapter 11] trustee or is it either an independent or an overlapping cause for appointment of a Chapter 7 trustee?

Transcript of Closing Arguments Sept 29, 2025, Docket No. 55 at 42 (emphasis added by the Court in this quote because that language was emphasized on the record).

A court asking what the appropriate remedy might be *if* the court makes a certain finding of dishonesty is hardly a due-process violation, and the Court knows of no other way to raise sua sponte a potential Chapter 7 conversion, Chapter 11 trustee appointment, or dismissal for cause, which the Court is entitled to do under sections 105(a), 1104(a), and 1112(b) of the Bankruptcy Code. *In re Lynch*, 795 Fed. App'x. 57, 59 (2d Cir. 2020) (holding a bankruptcy court may sua sponte convert a Chapter 11 proceeding to one under Chapter 7 for cause); *In re A-1 Specialty Gasolines*, 238 B.R. 876, 878-79 (holding the 1986 amendment to the Bankruptcy Code that changed the language in 11 U.S.C. § 105(a) permitted sua sponte conversion of a Chapter 11 case to one under Chapter 7).

At closing arguments, the Debtor's counsel didn't ask for more time to consider the question. Nor did Peteski's counsel. If they wanted more notice and a separate hearing, they could have asked for it. Peteski finally did, in its Stay Brief, allege that "[r]ecasting a credibility critique

as "cause" deprived Peteski of a fair chance to contest *whether the testimony amounted to 'cause'* under § 1112(b)." Peteski Stay Brief, Docket No. 586 ¶ 50, at 21 (emphasis added). In response to that allegation, the Court set the Precautionary Due-Process Hearing and gave Peteski *exactly* what it asked for: a fair chance (to the extent it didn't already get it) to contest *whether the testimony amounted to cause* under § 1112(b). At the very beginning of the Precautionary Due-Process Hearing, in response to apparent confusion about the scope of the hearing, the Court made crystal clear that it was *not* reopening the determination of whether Mr. Broadbent's testimony lacked candor;[9] instead, it was inviting the Debtor and Peteski to address any *other* arguments or evidence of *whether the testimony amounted to cause. See* Fed. R. Bankr. P. 9023 (generally making Federal Civil Rule 59 applicable in a bankruptcy case); Fed. R. Civ. P. 59 (allowing retrial "on all or some of the issues"). In other words, the Court effectively gave the Debtor and Peteski more time to answer the question from closing arguments.

To the extent Peteski is suggesting that the Court—prior to the Precautionary Due-Process hearing—needed to vacate its determination that Mr. Broadbent's credibility was cause for conversion, the Court doesn't believe that's required. The Court is serious about allegations of due-

---

[9] No party offered, and the Court did not consider, any evidence on this issue at the Precautionary Due-Process Hearing, notwithstanding a new Broadbent declaration attached to the Debtor's Due-Process Brief. Had it been offered, the Court would not have considered it because—as the Court made clear at the beginning of the hearing—the Court was not reopening that issue. In its Due-Process Brief, the Debtor says the new Broadbent declaration is also submitted for the Stay Motions. Although Bankruptcy Rule 8007(b)(3)(B) permits the filing of declarations "supporting facts subject to dispute," those facts should relate to the stay request (such as irreparable harm, an issue relevant to the stay pending appeal). Mr. Broadbent's new declaration inappropriately attempts to get into the record additional testimony that was never offered at trial on the merits. That's not the purpose of a Rule 8007(b)(3)(B) declaration. Likelihood of success on the merits should be determined on the facts presented at trial. Movants should not be permitted to buttress trial evidence—to support likelihood of success on appeal—with evidence submitted to the trial court or an appellate court for the first time in a motion for stay pending appeal. A motion for stay pending appeal is not a motion to reopen the evidence or for a new trial. The Debtor is inappropriately attempting to expand the record on appeal, which (with rare exceptions not applicable here) largely consists of evidence presented at trial or in pretrial matters. *Cf.* Fed. R. App. P. 10(a); *Craig v. Bisignano*, __ F. 4th __, 2025 WL 3077897 at *1-*2 (5th Cir. 2025) ("Consistent with Rule 10(a), we have excluded filings attached to briefs that were not available to the district court and offered by a party for the first time on appeal."). *See also* Fed. R. Bankr. P. 8009.

process violations. It was fully the Court's intent, in setting the Precau-
tionary Due-Process Hearing, to put Peteski in the same position it was
in at closing arguments, except giving it more time to consider the issue.
The Court was not expecting—and does not expect—Peteski to rebut or
disprove the Court's determination, which the Court is considering *anew*
after considering the positions set forth by Peteski at the Precautionary
Due-Process Hearing and in its Due-Process Brief. The Court is giving
Peteski a new slate.[10] After considering Peteski's position, the Court de-
termines that Mr. Broadbent's testimony was independent cause for
conversion to Chapter 7. The integrity of the bankruptcy process de-
pends in turn on having estate fiduciaries that will fulfill the duty of
candor to the Court. While lack of candor might more appropriately lead
to appointment of a Chapter 11 trustee under certain facts, here Chap-
ter 7 with a Chapter 7 trustee is the best path forward.

Nor did the Court need to vacate its Ruling in its entirety, as Peteski
also argues in its Due-Process Brief. Did the Court already make up its
mind on conversion, as Peteski suggests? Yes. But there were multiple
independent grounds to find cause to convert the case to Chapter 7, and
depending on how the Court rules on the credibility-as-cause-to-convert
issue, Peteski might have had one less ground to argue on appeal.

- **There is no evidence that Mr. McGraw intentionally de-
  leted any text; he actually produced it. And what's the
  harm anyway?**

As the Court explained in detail in the Ruling, Mr. McGraw deleted the
unflattering text in the lengthy McGraw-to-Ribman text thread, and he
apparently forgot to delete the copy in the McGraw-to-McIntyre thread.
Mr. McGraw's "I didn't do it" protestations in the courtroom (which the
Court observed, paying particular attention to his demeanor) were not
credible.

And to say there was no harm because the McGraw-to-McIntyre shadow
copy was produced is to whistle past the graveyard. Mr. McGraw *tried*

---

[10] Because the Court's Ruling was completely interlocutory, and there is not yet a con-
version order, the Court is free to change its findings and conclusions for any reason.
There's no need to vacate anything. The Court's consideration of the issue anew—with-
out any burden of persuasion or proof placed on Peteski or the Debtor—provides
Peteski the clean slate it requested.

*but failed* to hide his true intent to wipe out the PBR and Trinity claims and favor the Ribman Trust claim. That is bad-faith conduct in the prosecution of this case.

- **The conversion to Chapter 7 is a sanction against Peteski**

It is not. As already noted, the Court did not need to make any finding of a violation of a discovery order, and since the sanction motion was pending against only Peteski at the time, the Court amends its Ruling to eliminate that finding as unnecessary. The Court is not making any discovery-based negative inferences. The Court is not ruling on any discovery ground whatsoever. The Court is not relying on a nebulous inherent power to sanction. The Court is not relying on a violation of any order. The bad-faith conduct was—together with other independent grounds—cause for conversion under section 1112(b).

- **"Only the Court asked Dr. McGraw about the allegedly deleted text message," so the Court must have acted sua sponte.**

Mr. Slovak, Trinity's counsel, did first, followed soon after by Mr. Secco, PBR's counsel. Transcript of Hearing Held September 23, 2025, Docket No. 523 at 48, 88.

- **The substantial-or-continuing-loss-to-the-estate ground is clearly erroneous and legally unsupportable.**

The Court is very comfortable with this factual determination. The Court found that the Debtor had negative monthly cash flows (expenses exceeded its revenue) of approximately $1 million—not that the Debtor had monthly operating expenses of $1 million as suggested by the movants. There is substantial and continuing loss and diminution even before considering administrative expenses.

As for the planned payment for those administrative expenses, Peteski cites hoped-for recoveries from claims against Trinity and PBR under the proposed plan. But for the many reasons outlined elsewhere in the Memorandum, it would be nearly impossible for the Court to make the required finding for confirmation that the plan was proposed in good faith. 11 U.S.C. § 1129(a)(3). The Court rejects Peteski's hyperbole that—under the Court's analysis—*every* Chapter 11 liquidating plan will result in Chapter 7 conversion. Again, facts matter.

Even if there is a split in the case law on whether "rehabilitation" includes liquidating Chapter 11s, it doesn't change the result here. That is, even if a liquidating Chapter 11 plan could be "rehabilitation" under section 1112(b)(4)(A), those Chapter 11 cases could be saved from Chapter 7 conversion only if the debtor shows (a) the unusual circumstances required under section 1112(b)(2); and (b) a reasonable likelihood the plan will be confirmed within a reasonable time as required by section 1112(b)(2)(A). The Debtor and Peteski have not established either of these conditions given everything described in the Ruling and this Memorandum about the Plan, the Debtor, and this whole Chapter 11 case.

- **The "unusual circumstances" exception to Chapter 7 conversion applies because the undisputed evidence in Mr. Brown's liquidation analysis shows creditors will be better off under the proposed plan than they would under a Chapter 7 liquidation.**

As the Court found in the Ruling and as supplemented in this Memorandum, the Court gives little or no weight to Mr. Brown's liquidation analysis that purports to show creditors would do better in this Chapter 11 under the proposed plan than they would in a Chapter 7. Mr. Brown, the financial advisor, can't possibly know the value of the estate's claims against Peteski and Mr. McGraw, or against Trinity and PBR, which are critical to the liquidation analysis. In other words, Mr. Brown's analysis *assumes* in part that the value given by Peteski and Mr. McGraw for releases exceed the value a truly neutral, detached trustee could recover through litigation and settlement. Mr. Brown's analysis necessarily relies on Mr. Broadbent's determination of the value of those claims and the reasonableness of the plan settlement. Although Mr. Broadbent has attorneys to help him with that analysis, at the end of the day, the attorneys take direction from the client. It's *Mr. Broadbent* who again will have to look the Court in the eyes and testify that he's made a neutral, detached investigation and that he thinks the value the estate is getting for the releases is reasonable. The Court would have no confidence in that determination.

- **The Court clearly erred in its findings regarding Mr. Broadbent's lack of candor.**

Some of the more important arguments on this issue are addressed below.

- **The Court gave too much weight to the pauses in Mr. Broadbent's testimony.**

  - The Court sees and hears pauses in testimony nearly every week in all manner of cases, including when the Court asks questions. That is just one factor the Court considered, as explained in the Ruling.

- **Mr. Broadbent needed to see the Board Minutes to refresh his recollection of what happened on August 17.**

  - The Court explained in detail in its Ruling why this suggestion is not credible for a seasoned chief restructuring officer. But it may be difficult for somebody who is not a restructuring professional to appreciate how dramatic, unusual, and stressful the August 17 board meeting would have been in this Chapter 11 case—again, just *one month* prior to Mr. Broadbent's trial testimony. So the Court will attempt to put it in terms that a reviewing court might appreciate. Would a district court need to review its proceedings minutes to remember whether it was reversed by the Fifth Circuit in the last month? Would a district court need to review its proceedings minutes to remember whether it imposed the death penalty in the last month?

- **The Debtor had the Board of Director minutes and Special Committee minutes marked as exhibits at trial, so Mr. Broadbent could not possibly have intended to hide that there were meetings where conversion or dismissal was discussed.**

  - The Court has no idea which of the hundreds of trial documents Mr. Broadbent knew were marked as exhibits. Nor does the Court know whether Mr. Broadbent realized— even though the attorneys for PBR and Trinity had wrapped up their examination of him—the Court would ask all attorneys if they had any follow-up questions for Mr. Broadbent based on my questions (which is the Court's practice after examining a witness).

  - After considering Mr. Broadbent's testimony as a whole— including his demeanor, his pauses, the subject of his

testimony, and the memorable events leading up to his testimony—the Court reluctantly stands by its findings.

- **The Court clearly erred in finding that Mr. Broadbent was conflicted and is not a neutral fiduciary.**

First, the Court has already covered Mr. Broadbent's dashed credibility and the Court's finding that he did not want me to know about his August 17 board meeting with Mr. McGraw. The meeting was unusual, and the requests that flowed from it (immediate dismissal of the case shortly before texts were due to be turned over, and withdrawal of counsel) were highly unusual. Mr. Broadbent's reluctance to tell the truth about this meeting with Mr. McGraw when put under the spotlight puts a severe dent in his professed neutrality.

Second, Peteski misconstrues the Court's finding when the Court said, "To put it charitably, it wasn't the greatest business judgment for Merit Street officers Broadbent, Cheatwood, and Solomon to work for Envoy while simultaneously contesting allegations from TBN and PBR that the Debtor's CRO and other officers are conflicted and attached at the hip to Mr. McGraw." Transcript of Ruling, Docket 582 at 48. The Court amends its findings to state it more bluntly: It was inappropriate for them to do so as the Court's overall findings suggested and as Mr. Cheatwood tacitly recognized when he said he was told to stop revealing any public attachment to Envoy. TBN Ex. 498. Mr. Broadbent knew of and approved paying a liquidating debtor's employees to do work not only for Merit Street, but also—free of charge—for the company that is planning to buy the Merit Street media library and that is owned and controlled by Mr. McGraw. *See, e.g.,* TBN Ex. 403 (Envoy Media Staffing Plan that noted Mr. Cheatwood (Merit COO), Mr. Solomon (Merit CEO), Jeff Miller (Merit HR), Natalia Gomez (Merit finance), and Marc Rothman (Merit programming/scheduling/traffic) were consultants who were "[e]mployed by MSM and contracted to Envoy at no additional costs."); Transcript of Hearing Held Sept. 22, 2025, Docket No. 516 at 80-81 (Mr. Cheatwood acknowledging Merit employees were performing "voluntary" services for Envoy).

That was all highly unusual and not in the ordinary course of business under any reasonable construction of that term.[11] Mr. Broadbent and the Debtor should have disclosed this to the Court and other creditors and asked for Court permission. *See* 11 U.S.C. § 363(b) (requiring court permission to use, sell, or lease property of the estate outside the ordinary course of business); 11 U.S.C. § 363(c) (allowing trustee/debtor to enter into transactions without court approval only if done in the ordinary course of business). *See also In re ASARCO LLC*, 441 B.R. 813, 829 (Bankr. S.D. Tex. 2010) (citing *In re Bethlehem Steel Corp.*, No. 02 Civ. 2854(MBM), 2003 WL 21738964 at *10 (Bankr. S.D.N.Y. 2003) ("[U]nder § 363(b), if the debtor in possession wants to use funds from the estate for a transaction outside the ordinary course of business, the debtor must obtain advance approval from the bankruptcy court.")). Instead, as Mr. Cheatwood recognized, they were trying to work for Envoy in secrecy.

It simply doesn't help Peteski's or the Debtor's case to say that Mr. Broadbent and his top lieutenants—or the rank-and-file employees—weren't actually getting paid by Envoy initially, and that the whole process didn't harm Merit Street. They were being paid by Merit Street yet working for Envoy for free behind the scenes and helping Mr. McGraw launch the business. This all should have been disclosed to the Court and other creditors as one or more transactions outside the ordinary course of business.[12] Then the Court could have determined whether Mr. Broadbent's now after-the-fact business-judgment justification was sound. Instead, he chose to keep his and the Debtor's nonordinary-course dealings with Envoy and Mr. McGraw secret, which has become a theme during this case. For just *one* example of the type of problems this causes, see the discussion below on harm to other parties and what happened at a recent administrative-claim hearing that involved Merit Street employees who worked for both the Debtor and Envoy, unbeknownst to the Court.

---

[11] As mentioned in the Ruling, the Court has never seen anything like this in a long private-practice career or in three and a half years on the bench.

[12] Indeed, Mr. Broadbent admitted at trial that "Merit is not going to operate as it once did. I think it's very clear that the most likely scenario is a wind down of Merit as it once was." Docket No. 469 at 183.

Finally, in a last-ditch effort to satisfy the likelihood-of-success factor, the Debtor and Peteski argue that they need not show a 'probability' of success on the merits but need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay. *See Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981) (per curiam).

After carefully considering the parties' positions, the Court concludes that there are no serious legal questions involved. And as noted elsewhere, the balance of the equities does *not* weigh heavily in favor of a stay; the balance favors immediate conversion instead.

## B. Most of the alleged harms would not result in irreparable injury if the stay is not granted, and any reputational harm is outweighed by other factors, including serious countervailing harms

Mr. McGraw was already moving the business to Envoy before this case was filed. The Debtor fired nearly all its employees on the petition date. As mentioned in the Ruling, Merit Street was dead as a doornail when it arrived in bankruptcy (or perhaps more accurately, it was on life support, and Mr. McGraw and Peteski were harvesting the organs for Envoy). All the Debtor had left to do—all that it planned to do—was sell the Debtor's media library and handle claims by and against the estate. What will happen if the Court does not order a stay? A neutral fiduciary will sell the media library and handle claims by and against the estate. That's not irreparable injury. That's satisfaction of the Debtor's goal, except a conflicted fiduciary won't be in charge.

Moreover, all parties, including the Debtor and Peteski, will enjoy a double layer of protection when a Chapter 7 trustee proposes to sell the media library or pursue or settle claims. The first layer of protection is the Chapter 7 trustee—selected from a panel of qualified trustees by the United States Trustee—who must exercise sound business judgment and obtain fair and reasonable results when selling assets or handling claims. The second layer of protection is this Court, which won't approve any asset sales or any proposed settlement of litigation unless all appropriate standards are met. Rather than irreparable injury, that's indubitable protection.

The Debtor and Peteski cite several cases involving irreparable injury when the Chapter 11 case of a fully operational business is converted to

Chapter 7, or when the Chapter 13 case of an individual debtor is converted to Chapter 7. Debtor Brief at 6, Peteski Brief at 21-23. In such cases, courts have found that the Chapter 11 debtors may suffer irreparable injury because fully operational businesses in Chapter 11 would be shut down and liquidated in a Chapter 7 (with the attendant loss of employee jobs), and the Chapter 13 individual debtors would suffer irreparable injury because they would lose their possessions that they're entitled to keep in a Chapter 13 (such as certain nonexempt property) but not in a Chapter 7. In such cases, it's not surprising when courts find threat of irreparable injury because—as quoted in the Debtor's Brief at 6—"[U]nder Chapter 7, once the debtor's assets have been liquidated, it is virtually impossible to reassemble them." *In re Young*, 237 F.3d 1168, 1173 (10th Cir. 2001) (threat of irreparable injury in conversion from Chapter 13 to 7).

This case is nothing like those cases. Merit Street is on life support. The Debtor fired nearly all its employees on the first day of the case, and the Court learned for the first time at a November 13 hearing on an emergency application to pay administrative expenses that two more officers (Mr. Cheatwood and Mr. Solomon) recently left the company and that the Debtor is perilously low on cash. The Debtor's plan all along was to liquidate what's left of the company. That's exactly what's going to happen in Chapter 7, fully protected by a neutral estate fiduciary and under Court supervision. Even the Debtor and Peteski have no desire to "reassemble" the company or its assets. Indeed, Mr. McGraw (through either Peteski or its designee Envoy) has been chomping at the bit to bid for the media library. Nothing will stop that now.

Next, the Debtor argues that it might lose standing to appeal if a stay is not granted. But the Debtor cites cases it says supports the standing of Debtor's management to appeal even if the case is converted. Debtor Brief at 8. The Court does not opine on that issue, which is exclusively within the province of the courts on appeal. The mere possibility of irreparable harm is not enough, however. *In re Taub*, 470 B.R. 273, 278 (E.D.N.Y. 2012) (quoting *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007)). That is especially true here under these unique facts when the Debtor's stated goal to liquidate under a neutral fiduciary will be fully accomplished absent a stay. And as noted below, there are serious countervailing harms to consider if a stay is granted.

Next, the Debtor and Peteski argue that creditors will be irreparably harmed if a stay is not granted because they'll lose out on the creditor recoveries guaranteed to them under the plan negotiated by Mr. McGraw and Mr. Broadbent. Even if the Debtor and Peteski had standing to raise this argument for other parties, there is nearly zero chance the Court would confirm the plan and make the finding required for confirmation that the plan was proposed in good faith by the Debtor, given the Court's findings related to two of the principals behind the negotiated settlement (Mr. McGraw and Mr. Broadbent), and given the Ribman Trust's role on the Committee and in supervising postpetition litigation against PBR and Trinity. *See* 11 U.S.C. § 1129(a)(3).

Just as important, as the Court found in the Ruling and as supplemented in this Memorandum, the Court gives little or no weight to Mr. Brown's liquidation analysis that purports to show creditors would do better in this Chapter 11 than they would in a Chapter 7, as already explained above.

Moreover, there is no reason Peteski and Mr. McGraw couldn't reach a functionally equivalent settlement with a Chapter 7 trustee if the trustee believes the benefits under the plan settlement are worth giving a release to Mr. McGraw and Peteski.

Finally, Peteski—not the Debtor—argues that Peteski and Mr. McGraw, as well as the Debtor and Mr. Broadbent, will suffer irreparable reputational harm if a stay is not granted, relying on cases involving damages to a brand from shutting down the business or movants being removed from their professional industry. Peteski Brief ¶ 53, at 22. There is zero chance of damages to the Merit Street brand, as the company is being liquidated no matter the chapter of this case.

The Court recognizes the seriousness of the Court's findings about Mr. McGraw's and Mr. Broadbent's conduct, so much so that (as already noted), the Court lost sleep over the Ruling. But as noted in the following section, actual and threatened harm to creditors and administrative claimants outweighs any harm to the movants.

To summarize, most of the alleged harms would not result in irreparable injury if the stay is not granted, and any reputational harm is outweighed by other factors, including serious countervailing harms to other parties-in-interest.

## C.     Granting the stay would substantially harm other parties

Peteski argues in its Stay Brief that "Trinity will not be injured by a stay. When balancing the hardships, the harms to Peteski and others in the absence of a stay significantly outweigh any potential harm that Trinity or PBR might try to claim." Peteski Brief ¶ 57, at 24. Similarly, the Debtor argues that "any potential harm to other parties caused by a stay pending appeal would be minimal, if it exists at all. . . . The Court can avoid potential harm to other parties by ordering a similar mainte-nance of the status quo pending appeal." Debtor Brief at 9. Both Stay Briefs neglect to fully address the potential harm that would occur should the Court stay its order converting the case.

A very recent event in this case highlights the type of harm that may continue if the Court stays conversion of this case. On November 6, 2025, the Debtor filed an emergency motion to pay certain administrative claims [Docket No. 592], which the Debtor could not do absent further Court order under the terms of the Status-Quo Order. Those unpaid ad-ministrative claimants included the four remaining rank-and-file Merit Street employees who were owed postpetition wages and benefits of roughly $179,000, as well as a group of content distributors who were unpaid to the tune of $265,964 for providing postpetition services to the Debtor. Transcript of Hearing Held Nov. 13, 2025, Docket No. 628 at 86, 92.

But the problem is that Peteski decided to stop funding this case on Oc-tober 19 even before the Court issued its Ruling on October 28. *See* With-drawal, Docket 558. And at the November 13 emergency hearing, Coley Brown, the Debtor's financial advisor, testified that the Debtor currently has only roughly $200,000, not nearly enough to pay both groups of ad-ministrative claimants. Mr. Brown further testified that there are con-tinuing operating losses and that the estate continues to diminish. *See* Transcript of Hearing Held Nov. 13, 2025, Docket No. 628 at 115.

Trinity and PBR objected to the request, partly because those employees had done work for Envoy during the bankruptcy at no cost, *id.* at 89-90, and partly because the funds on hand would have (and according to Trin-ity and PBR, should have) gone to the Chapter 7 estate had the Debtor and Peteski not asked for a stay pending appeal.

Peteski's counsel, who also represents Mr. McGraw and Envoy, was at the hearing. The Court never heard any offer by Envoy to pay its share of those employees' unpaid wages or unpaid benefits.[13] Yes, this is the same Envoy that Mr. McGraw set up to buy the Debtor's business and acquire its assets and many of its employees. The same Envoy described as the new venture in the infamous deleted text. TBN Ex. 330. The same Envoy that Mr. Broadbent and his core team of officers were working for free of charge—after the bankruptcy filing—to help get the Envoy business kickstarted, with press releases and all. No help from this same Envoy.

The Debtor's counsel pleaded for the Court to avoid the precedent of failing to pay rank-and-file employees who needed money to get by during the holidays. *Id.* at 132. Counsel for an ad hoc group of distributors, on the other hand, demanded that the Court pay all administrative claimants ratably, even if that meant the rank-and-file employees would lose out. *Id.* at 137.

With not enough cash on hand to go around, the Court was faced with a Hobson's choice of sorts. Should the Court deny payment to all the Chapter 11 administrative claimants and let the funds go to the Chapter 7 trustee so that the Chapter 7 estate doesn't become administratively insolvent? Should the Court require ratable payment of administrative claimants, which would likewise leave rank-and-file employees at least partially unpaid during the holidays? Or should the Court favor certain administrative claimants (the rank and file) over others (the distributors)?

The Court exercised its discretion and allowed certain payroll to be paid and denied without prejudice payment of the balance of the administrative claims.

---

[13] During the conversion trial, after the fact, since Court approval was never requested, Mr. Broadbent attempted to justify a potential financial benefit of Merit employees working for Envoy: "There could be [a financial benefit] if the vacation PTO, the other administrative liabilities of the company were absorbed by Envoy or absorbed by a new employer so that we no longer have that burden on us." Transcript of Hearing Held Sept. 17, 2025, Docket No. 469 at 184. Not all employees were absorbed by Envoy, nor apparently was their share of administrative liabilities, including the unpaid benefits of $149,000 that were part of the emergency motion to pay administrative claims. Certainly, Envoy didn't offer to absorb them during the November 13 hearing.

This harm to administrative claimants will only be exacerbated should the order converting the case be stayed given the Debtor's continuing losses and the lack of a DIP loan. The same risk of substantial harm to administrative claimants extends to general creditors in the case as well. An overarching goal of bankruptcy is an equitable, fair distribution of assets to a debtor's creditors. That distribution has already been delayed for months, and it will continue to be delayed even further if the order converting the case is stayed.

The Court finds granting a stay of its conversion order would result in substantial harm to other parties.

## D.     Granting the stay would not serve the public interest

It would serve the public interest to have a neutral, nonconflicted Chapter 7 trustee in place immediately who can begin an orderly administration of estate assets. Peteski itself states that "public interest in bankruptcy proceedings is to have an orderly administration of the debtor's assets via their bankruptcy estate." Peteski Brief ¶ 58, at 24 (internal quotations omitted). Delaying the conversion order would only stall the orderly administration, which would not serve the public interest.

Staying the conversion order would also create confusion among creditors of the estate. This case would enter an uncertain state of limbo. The case would enter Chapter 7, but depending on when the stay took effect, there would be either no Chapter 7 trustee, or a Chapter 7 trustee who is stayed from doing anything. General creditors and administrative claimants need certainty on who has authority to exercise control over and take actions on behalf of the estate. Staying the conversion order would muddy the waters and amplify uncertainty.

The Bankruptcy Code provides "[p]romptly after the order for relief under this chapter, the United States trustee shall appoint" a Chapter 7 trustee. 11 U.S.C. § 701. Staying the conversion order frustrates the prompt appointment of a Chapter 7 trustee, and were the Court to stay its conversion order, the resulting delay in promptly appointing a Chapter 7 trustee would harm and parties-in-interest and would not serve the public interest.

## V. Conclusion

The Court will enter separate orders (a) denying the Ribman-Trust Motion; (b) denying the Stay Motions; and (c) converting this case to Chapter 7 immediately and without further delay or stays, administrative or otherwise.

### End of Memorandum ###

# EXHIBIT D



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 7, 2025**

_____
United States Bankruptcy Judge

_____

United States Bankruptcy Court
Northern District of Texas
Dallas Division

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | **Case No. 25-80156-swe-11** |
| | § | |
| **Debtor.** | § | |

### _Order Setting Precautionary Due-Process Hearing_

On July 18, 2025, creditors Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. filed an _Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee_ [the **"Motion"**] [Docket No. 100]. On August 1, 2025, creditor Professional Bull Riders, LLC filed a _Partial Joinder_ in Trinity's Motion [the "**Joinder**"] [Docket No. 151]. The Court conducted a multi-day trial on those requests and read its ruling into the record on October 28, 2025, starting at 2:00 p.m. Under the Court's ruling, the Court intends to convert this case to Chapter 7 pursuant to a separate order. This order is not the conversion order.

At the end of the Court's ruling, the Debtor announced its intent to file a motion for stay pending appeal and requested an opportunity to brief the issue before a Chapter 7 trustee is appointed. The Court entered its

1

*Order Preserving Status Quo* [Docket No. 579] on October 29, 2025, indicating the Court would delay entering the conversion order until the Court hears the motion for stay pending appeal.

Both the Debtor and Peteski Productions, Inc. have since filed motions for stay pending appeal [Docket Nos. 585, 589] and related briefs [Docket Nos. 586, 590]. In its brief, Peteski argues or suggests the Court did not satisfy due process when it found as cause for conversion or dismissal (a) Mr. Broadbent's failure in his duty of candor to the Court; (b) Mr. McGraw's destruction of relevant evidence in his capacity as either board member of Merit Street or de facto officer or agent of Merit Street; and (c) Mr. Broadbent's not being a neutral fiduciary but instead being conflicted in favor of Mr. McGraw.[1]

To address any concerns about alleged failures in due process for issues (a) and (b), the Court **ORDERS** as follows pursuant to 11 U.S.C. §§ 105(a), 1104(a), and 1112(b), Federal Rules of Civil Procedure 52 and 59, and Federal Rules of Bankruptcy Procedure 7052 and 9023:

---

[1] Trinity, in its Motion and while Mr. Broadbent was CRO, alleged that the estate needed an independent fiduciary, a Chapter 7 trustee. Motion ¶ 67. Likewise, PBR, while Mr. Broadbent was CRO, alleged in its Joinder that the estate needed an independent and disinterested Chapter 7 trustee without conflicts. Joinder ¶ 26. *See also* Motion ¶ 69 ("Creditors would be best served by an independent trustee—not one that is currently under the control of McGraw/Peteski. An independent trustee (whether it be one appointed in a Chapter 11 or Chapter 7 case) will best serve the interests of all creditors and stakeholders."); Motion ¶ 72 ("[I]t is McGraw vis-à-vis Peteski that is running this Chapter 11 Case—not the Debtor."); Motion ¶ 80 ("But overall, and perhaps the most important justification here, is that the appointment [of a] Chapter 11 trustee cleanses the Debtor of all material conflicts of interest—i.e., removes McGraw/Peteski from control."); Trinity Reply [Docket No. 401] ¶ 140 (alleging as bad-faith conduct: "Worst of all, Broadbent—the Debtor's CRO and 'Independent' Director—was aware of their employment and activities for Envoy and did nothing to stop them."); Trinity Reply [Docket No. 401] ¶ 143 (alleging that bad-faith conduct—which would include Mr. Broadbent's approval of Merit officer work for Envoy—was cause to either convert or dismiss); PBR Reply Brief [Docket No. 413] ¶ 78 (alleging as cause to convert the case Peteski's and McGraw's control over Mr. Broadbent, whose technical appointment was done merely to "cloak transactions between the Debtor and Peteski with a façade of being arm's length negotiations."). The Court finds that the Debtor and Peteski had due-process notice that the Court might either convert the case, dismiss the case, or appoint a Chapter 11 trustee based on the issue of Mr. Broadbent's independence or neutrality.

1. The Court will hold a hearing on November 13, 2025, at 9:30 a.m. to address any additional evidence and arguments related solely to the following:

   a. Whether Mr. Broadbent's testimony that the Court addressed in its ruling is cause to either dismiss the case, appoint a Chapter 11 trustee, or convert the case to Chapter 7.

      i. The potential cause may be unenumerated cause under 11 U.S.C. §§ 1104(a)(1) and 1112(b)(4), and enumerated cause under § 1104(a)(1) (dishonesty).

   b. Whether Mr. McGraw's purposeful deletion of his text message to Mr. Ribman is cause to either dismiss the case, appoint a Chapter 11 trustee, or convert the case to Chapter 7.[2]

      i. The potential cause may be unenumerated cause under 11 U.S.C. §§ 1104(a)(1) and 1112(b)(4), enumerated cause under § 1104(a)(1) (fraud, dishonesty, gross mismanagement of the affairs of the debtor by current management), and enumerated cause under § 1112(b)(4) (gross mismanagement of the estate and failure to comply with an order of the Court, including the order at Docket No. 536).

2. The precautionary due-process hearing shall be set as a hybrid hearing, with parties being permitted to appear both in person or by Webex. The address where the hearing shall be held is:

---

[2] Peteski misconstrues the Court's October 28 ruling, so the Court now makes it clear that the Court's ruling is not, and was not intended to be, a discovery sanction or inherent-power sanction against Peteski. The Court's ruling regarding the text message, and its precautionary due-process hearing on that subject, is limited to whether the conduct is enumerated or unenumerated cause under §§ 1104(a) and 1112(b). Although that issue concerns, at least in part, whether the Debtor violated an order (a discovery order) for purposes of § 1112(b)(4)(E), the issue is whether there is cause under §§ 1104(a) and 1112(b) to dismiss, convert, or appoint a trustee because of that conduct.

United States Bankruptcy Court
1100 Commerce Street
14th Floor, Courtroom 3
Dallas, Texas 75242

3. The Webex link is: https://us-courts.webex.com/meet/everett.
   The Webex instructions are attached to this order.

4. The parties shall confer on whether to suspend their agreed
   briefing schedule for the motions for stay pending appeal pend-
   ing the outcome of the precautionary due-process hearing. After
   the precautionary due-process hearing, the Court will determine
   whether to set a further hearing on the motions for stay pending
   appeal, or whether the Court will rule on the papers.

### End of Order ###

# WebEx Hearing Instructions
## Judge Scott W. Everett

Pursuant to General Order 2023-05 issued by the Court on September 19, 2023, hearings before Judge Scott W. Everett will be conducted pursuant to the guidelines set forth in the General Order unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:    https://us-courts.webex.com/meet/everett

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In:   1-650-479-3207;   Access code:   2304 017 9738

**Participation/Attendance Requirements**:

- Counsel and other parties-in-interest who plan to actively participate in the hearing are encouraged to attend the hearing in the WebEx video mode using the WebEx video link above. Counsel and other parties-in-interest who will <u>not</u> be seeking to introduce any evidence at the hearing and who wish to attend the hearing in a telephonic-only mode may attend the hearing in the WebEx telephonic-only mode using the WebEx dial-in and access code above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time.  Please be advised that a hearing may already be in progress. <u>During hearings participants are required to keep their lines on mute when they are not addressing the Court or otherwise actively participating in the hearing.</u> **The Court reserves the right to disconnect or place on permanent mute any attendee that causes any disruption to the proceedings.**  For general information and tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode, and live testimony will only be accepted from witnesses who have the WebEx video function activated**. Telephonic testimony without accompanying video will <u>not</u> be accepted by the Court.  The Court may consider special requests for other appearance options on a case-by-case basis.

- All WebEx hearing attendees are required to comply with Judge Everett's Telephonic and Videoconference Hearing Policy (included within Judge Everett's Judge-Specific Guidelines): https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-everetts-hearing-dates .

**Exhibit Requirements**:

- Any party intending to introduce documentary evidence at the hearing <u>must</u> file an exhibit list in the case with a true and correct copy of each designated exhibit filed as a <u>separate, individual</u> <u>attachment thereto</u> so that the Court and all participants have ready access to all designated exhibits.

- In addition, for evidentiary hearings, when more than ten exhibits have been filed in ECF or when the total page count of all exhibits exceeds 500 pages, Judge Everett requests a thumb/USB drive be delivered to him prior to the hearing at: U.S. Bankruptcy Court, Attn: Stephen Manz, 1100 Commerce Street, Room 1254, Dallas, TX 75242.

- Paper copies of exhibits are not encouraged; however, paper copies may be provided <u>to the witness(s)</u> at an in-person hearing if preferred.

**Notice of Hearing Content and Filing Requirements:**

<u>IMPORTANT: For all hearings that will be conducted by WebEx only</u>:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing Instructions or provide notice that they may be obtained from Judge Everett's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-everetts-hearing-dates .

- When electronically filing the Notice of Hearing via CM/ECF <u>select "at https://us-courts.webex.com/meet/everett" as the location of the hearing</u> (note: this option appears immediately after the first set of Wichita Falls locations).  Do <u>not</u> select Judge Everett's Dallas courtroom as the location for the hearing.

## <u>CONNECTION INSTRUCTIONS FOR PARTICIPATING IN A WEBEX VIRTUAL HEARING</u>

The Court will allow participation in a virtual hearing using either of the following two methods. Please connect at least 10 minutes prior to the hearing time. It is recommended that attorneys discuss the logistics of the WebEx appearance with their clients/witnesses at least 48 hours before the hearing.

### <u>Option 1</u>: Using the WebEx app on your smartphone, tablet, laptop, or desktop.

Please connect using only one device. Using two or more devices may cause audio feedback issues.

If using a phone or tablet for video, it should be set in a stationary position. Holding a phone or tablet in your hand while speaking does not yield a good video for the court.

**NOTE: If you are experiencing audio issues when using the WebEx application,** you may use the "Call Me At" selection under "Audio Connection" to move just the audio portion of the WebEx conference to your telephone.

### <u>Option 2</u>: Call in via phone (audio only).

Webex dial-in number: 1-650-479-3207 (access code: 2304 017 9738).

## <u>HELPFUL HINTS AND ETIQUETTE</u>

- Please use the mute function when you are not speaking. Please be aware that sometimes the court mutes everyone when there is background noise.  When you want to speak, make sure you are not on mute.  Call-in users should <u>dial *6 to unmute your line</u>.

- Remember to state your name for the record each time before speaking and speak slowly and clearly so the Court can get a good record.

- Use headphones whenever possible, especially if using a desktop PC with external speakers. We have found that newer iPhones provide the best visual and audio feed – better than most desktop computers. <u>If you are on a personal computer, headphones or earbuds are required for those who need to speak during the hearing.</u>

- During examination, attorneys and witnesses should use a separate camera and microphone  when possible. To avoid feedback, parties using separate devices must not be in the same room. The Court may consider special requests on a case-by-case basis.

- WebEx participants may use the "share" button to easily share their screen or document with the Court or other WebEx participants.  Press "stop sharing" to remove the presentation from the meeting.

- When making an appearance from a vehicle, please park in a safe location with windows rolled up (to minimize background distraction and noise) and use a headset that is ear-to-phone (not the vehicle's hands-free speaker-phone option).

- Suggestions for participating in a WebEx hearing from home: If you are having connectivity problems, turn off devices that may be using bandwidth on your home network. Devices or applications such as Facetime, Roku, streaming media players, video games, or large downloads can negatively impact the audio and video quality of the WebEx meeting.

- Participants are reminded that they should wear attire suitable for court.

- Participants who wish to test their WebEx connection or the share screen functionality in advance of the hearing may arrange a "practice run" by contacting the courtroom deputy.

Exhibits should be filed ahead of time by the date that they would normally be exchanged pursuant to our local rules using the "list (witness/exhibit/generic)" OR "notice (generic)" OR "Support/Supplemental document" event in ECF.

Demonstrative aids and Power Points should also be filed prior to the hearing, if possible. If not, WebEx has the ability to allow you to share your screen, or a particular document, with everyone in the hearing. If these documents are admitted as exhibits, they would then have to be filed after the hearing.

- During the hearing, lawyers can refer to (and offer) their exhibits by referencing the exhibit's docket number for the court and all to access. After the hearing, the court will create a Minute Entry reflecting which exhibits were admitted. You should consider emailing exhibits to witnesses ahead of time since they may not have access to PACER.

- In addition for evidentiary hearings, when more than ten exhibits have been filed in ECF or when the total page count of all exhibits exceeds 500 pages, Judge Everett requests a thumb/USB drive be delivered to him prior to the hearing at: U.S. Bankruptcy Court, Attn: Stephen Manz, 1100 Commerce Street, Room 1254, Dallas, TX 75242.

- Paper copies of exhibits are not encouraged; however, paper copies may be provided to the witness(s) at an in-person hearing if preferred.

# EXHIBIT E



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 29, 2025**

United States Bankruptcy Judge

---

### United States Bankruptcy Court
### Northern District of Texas
### Dallas Division

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | **Case No. 25-80156-swe-11** |
| | § | |
| **Debtor.** | § | |

---

### *Order Preserving Status Quo*

On July 18, 2025, creditors Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. filed an *Emergency Motion for an Order: (I) Dismissing Debtor's Chapter 11 Case, (II) Converting the Case to Chapter 7, or (III) Appointing a Chapter 11 Trustee* [the **"Motion"**] [Docket No. 100]. On August 1, 2025, creditor Professional Bull Riders, LLC filed a *Partial Joinder* in Trinity's Motion [the **"Joinder"**] [Docket No. 151]. The Court conducted a multi-day trial on those requests and read its ruling into the record on October 28, 2025, starting at 2:00 p.m. Under the Court's ruling, the Court intends to convert this case to Chapter 7 pursuant to a separate order. This order is not the conversion order.

At the end of the Court's ruling, the Debtor announced its intent to file a motion for stay pending appeal and requested an opportunity to brief the issue before a Chapter 7 trustee is appointed. The Court has not yet entered its order converting the case to Chapter 7. The Court is willing

1

to preserve the status quo, but the status quo must apply to all parties. Therefore, pursuant to 11 U.S.C. § 105(a) and—to the extent it applies prior to entry of a conversion order—Bankruptcy Rule 8007(e), the Court will delay entering the conversion order until the Court hears the motion for stay pending appeal.

In addition, pending further Court order, it is **ORDERED** that—notwithstanding any prior orders entered in this case—the Debtor shall not transfer any estate property to any person for any reason pending further Court order, and any transfers made after 2:00 p.m. on October 28, 2025, shall be returned to the Debtor immediately.

It is further **ORDERED** that the parties shall confer on the logistics of the hearing date and briefing deadlines.

### End of Order ###

# EXHIBIT F



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 18, 2025**

_____

**United States Bankruptcy Judge**

_____

### United States Bankruptcy Court
### Northern District of Texas
### Dallas Division

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | **Case No. 25-80156-swe-7** |
| | § | |
| **Debtor.** | § | |

---

### *Order Denying Motions for Stay Pending Appeal*

On November 3, 2025, Peteski Productions, Inc. filed a *Motion for Stay Pending Appeal* [Docket No. 585]. The Debtor filed its own *Motion for Stay Pending Appeal* on November 3, 2025 [Docket No. 589] (together, the **"Stay Motions"**). For the reasons stated in the Court's Memorandum Decision entered on this date, the Stay Motions are **DENIED**.

### ### End of Order ###

# EXHIBIT G



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 18, 2025**

_____
**United States Bankruptcy Judge**

_____

## United States Bankruptcy Court
### Northern District of Texas
### Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Merit Street Media, Inc.,** | § | Case No. 25-80156-swe-11 |
| | § | |
| Debtor. | § | |

_____

*Order Denying Darcy Lynn Ribman 1997 Trust's
Emergency Motion for Entry of an Order (I)
Altering or Amending Judgement, and (II)
Granting Related Relief*
_____

On November 7, 2025, the Darcy Lynn Ribman 1997 Trust filed an *Emergency Motion for Entry of an Order (I) Altering or Amending Judgement, and (II) Granting Related Relief* [the **"Motion"**] [Docket No. 597]. For the reasons stated in the Memorandum Decision entered on this date, the Motion is **DENIED.**

### ### End of Order ###